# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# DURHAM DIVISION

| | |
|---|---|
| DAVID HARRIS; CHRISTINE BOWSER; and SAMUEL LOVE,<br><br>    Plaintiffs,<br><br>v.<br><br>PATRICK MCCRORY, in his capacity as Governor of North Carolina; NORTH CAROLINA STATE BOARD OF ELECTIONS; and JOSHUA HOWARD, in his capacity as Chairman of the North Carolina State Board of Elections,<br><br>    Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**Three-Judge Court Requested** |

## INTRODUCTION

1. Plaintiffs bring this action to challenge the constitutionality of North Carolina's Congressional Districts 1 and 12 as racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment.

2. Until recently, 40 of North Carolina's 100 counties were deemed covered jurisdictions under the Voting Rights Act of 1965 ("VRA"). Accordingly, North Carolina's congressional map was subject to preclearance by the federal government.

3. In the name of avoiding retrogression, North Carolina has used Section 5 as a justification to racially gerrymander congressional districts, specifically by packing African-American voters into Congressional Districts 1 and 12 and thereby diminishing their influence in surrounding districts.

4. On June 25, 2013, in *Shelby County v. Holder*, 570 U.S. ____, 133 S. Ct. 2612 (2013), the United States Supreme Court held that the coverage formula provided in Section 4(b) of the VRA is unconstitutional. As a result, none of North Carolina's counties are covered jurisdictions for purposes of Section 5.

5. North Carolina can no longer use Section 5 as an excuse to racially gerrymander Congressional Districts 1 and 12. Drawn with race as their predominant purpose, neither district can pass constitutional muster.

6. Plaintiffs seek a declaration that North Carolina's Congressional Districts 1 and 12 are invalid and an injunction prohibiting the Defendants from calling, holding, supervising, or taking any action with respect to Congressional elections based on Congressional Districts 1 and 12 as they currently stand.

## **PARTIES**

7. Plaintiff David L. Harris is a United States citizen and registered voter in the State of North Carolina. He currently resides in Durham County, in Congressional District 1.

8. Plaintiff Christine R. Bowser is a United States citizen and registered voter in the State of North Carolina. She currently resides in Congressional District 12.

9. Plaintiff Samuel L. Love is a United States citizen and registered voter in the State of North Carolina. He currently resides in Congressional District 12.

10. Defendant Patrick L. McCrory is sued in his official capacity as Governor of North Carolina.

11. Defendant North Carolina State Board of Elections is the agency of the State of North Carolina that is responsible for administering North Carolina election laws, and is tasked with "general supervision over the primaries and elections in the State," N.C. Gen. Stat. § 163-22(a), including elections for the United States House of Representatives.

12. Defendant Joshua B. Howard is sued in his official capacity as Chairman of the North Carolina State Board of Elections.

## JURISDICTION AND VENUE

13. This Court has jurisdiction to hear Plaintiffs' claim pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3), and 1357. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14. A three-judge district court is requested pursuant to 28 U.S.C. § 2284(a), as Plaintiffs' action "challeng[es] the constitutionality of the apportionment of congressional districts" in North Carolina.

15. Venue is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### History of Congressional District 1

16. Since after the 1992 general election, Congressional District 1 has been served by Representatives Eva Clayton, Frank Ballance, and G.K. Butterfield. All are African American and have been the candidates of choice for African-American voters.

17. The First Congressional District was first drawn in an iteration of its present form in 1992 in response to demands made by the U.S. Department of Justice during the preclearance process after the 1990 Census.

18. In 1997, after various litigation earlier in the 1990s, the General Assembly redrew the boundaries of Congressional District 1. Between 1997 and 2001, the Black Voting Age Population ("BVAP") of Congressional District 1 was 46.54%. Thus, in 1997, the North Carolina General Assembly determined that the VRA did not require that Congressional District 1 be drawn as a majority African-American district. The 1997 congressional plan was precleared by the Department of Justice. No lawsuit challenging the 1997 version of Congressional District 1 under Section 2 of the VRA was filed.

19. In 1998 and 2000, Representative Clayton prevailed, winning 62% and 66% of the vote, respectively. Thus, although Congressional District 1 was not a "majority-minority" district for purposes of the 1998 and 2000 elections, the White majority did not vote as a bloc to defeat the candidates favored by African-American voters in these elections.

20. After the 2000 Census, the General Assembly again redrew the boundaries of Congressional District 1. The BVAP of the new Congressional District 1 was 47.76%. Thus, in 2001, the North Carolina General Assembly determined that the VRA did not require that Congressional District 1 be drawn as a majority African-American district. The 2001 congressional plan was precleared by the Department of Justice. No

4

Case 1:13-cv-00949-WO-JEP   Document 1   Filed 10/24/13   Page 4 of 20

lawsuit challenging the 2001 version of Congressional District 1 under Section 2 of the VRA was filed.

21. Although Congressional District 1 was not "majority-minority" during the 2000s, the White majority did not vote as a bloc to defeat candidates favored by African-American voters during that decade.

22. In each of the five general elections held under the 2000 Congressional map, an African-American candidate, who was also the candidate of choice among African-American voters, prevailed, either running unopposed or prevailing by a large margin. In 2002, the African-American candidate, Frank Ballance, received 63.73% of the vote. In 2004, the African-American candidate, Representative Butterfield, received 63.97% of the vote. Representative Butterfield ran unopposed in 2006. In 2008 and 2010, Representative Butterfield defeated a White candidate, receiving 70.28% and 59.31% of the vote, respectively.

23. During the period between 1992-2011, the parts of counties that constituted Congressional District 1 shared common interests in rural and agriculture issues.

**History of Congressional District 12**

24. Congressional District 12 has existed in roughly its current form since 1992, when it was drawn as a majority African-American district in response to the U.S. Department of Justice's then-existent "maximization policy," which has since been repudiated by the United States Supreme Court. *See, e.g., Miller v. Johnson*, 515 U.S. 900, 921 (1995).

5

25. Since the 1992 general election, Congressional District 12 has been served by Representative Mel Watt. Representative Watt is African American and has been the candidate of choice among African-American voters in Congressional District 12.

26. After various litigation earlier in the 1990s, the General Assembly redrew the boundaries of Congressional District 12 in 1997. For purposes of the 1998 and 2000 elections, the BVAP of Congressional District 12 was 32.56% and 43.36%, respectively. As described by the District Court in *Cromartie v. Hunt*, under the 1997 plan "District 12 is not a majority-minority district." 133 F. Supp. 2d 407, 413 (E.D.N.C. 2000). Thus, in 1997, the North Carolina General Assembly determined that the VRA did not require that Congressional District 12 be drawn as a majority African-American district. The 1997 congressional plan was precleared by the Department of Justice. No lawsuit challenging the 1997 version of Congressional District 12 under Section 2 of the VRA was filed.

27. In 1998 and 2000, Representative Watt prevailed, winning 56% and 65% of the vote, respectively. Thus, although Congressional District 12 was not a "majority-minority" district for purposes of the 1998 and 2000 election, the White majority did not vote as a bloc to defeat candidates favored by African-American voters in these elections.

28. After the 2000 Census, Congressional District 12 was redrawn. The BVAP of the new Congressional District 12 was 42.31%. Although Congressional District 12 was, again, not a "majority-minority" district during the 2000s, the White majority did not vote as a bloc to defeat candidates favored by African-American voters during that decade.

29. In the five general elections held under the 2000 Congressional Map, Representative Watt received 65.34%, 66.82%, 67.60%, 71.55%, and 63.88% of the vote, respectively.

**2011 Redistricting**

30. On July 28, 2011, the North Carolina General Assembly established North Carolina's thirteen Congressional districts, set forth at Session Law 2011-403 [hereinafter "2011 Congressional Plan"].

31. On January 27, 2011, Senator Robert Rucho was appointed Chair of the Senate Redistricting Committee. On February 15, 2011, Representative David Lewis was appointed Chair of the House Redistricting Committee. Senator Rucho and Representative Lewis were jointly responsible for developing a Congressional map.

32. Senator Rucho and Representative Lewis engaged Thomas Brooks Hofeller to design and draw the Congressional map (as well as the House and Senate maps). Mr. Hofeller was the Republican National Committee's ("RNC") Redistricting Coordinator for the 1990, 2000, and 2010 redistricting cycles.

33. Mr. Hofeller commenced work on North Carolina redistricting in December 2010. Mr. Hofeller did not attend any public hearings on redistricting in North Carolina or review transcripts of those hearings.

34. Mr. Hofeller was assisted in his role as architect of the Congressional map by Dale Oldham, John Morgan, and Joel Raupe. Mr. Oldham was the RNC's Redistricting Counsel for purposes of the 2000 and 2010 redistricting cycles.

Mr. Morgan is a Republican demographer who resides in Virginia. Mr. Raupe performed paralegal-like services to support Mr. Hofeller.

35. Senator Rucho and Representative Lewis were the only people to give instructions to Mr. Hofeller regarding the creation of the Congressional map. Senator Rucho and Representative Lewis gave Mr. Hofeller these instructions verbally.

36. On July 1, 2011, Senator Rucho and Representative Lewis issued a joint public statement to accompany the release of their Congressional plan. This statement shows that Congressional District 1 was drawn with the express intent of making it a "majority-minority" district:

> The State's First Congressional District was originally drawn in 1992 as a majority black district. It was established by the State to comply with Section 2 of the Voting Rights Act. Under the decision by the United States Supreme Court in *Strickland v. Bartlett*, 129 U.S. 1231 (2009), the State is now obligated to draw majority black districts with true majority black voting age population. Under the 2010 Census, the current version of the First District does not contain a majority black voting age population.
>
> [. . .]
>
> Because African-Americans represent a high percentage of the population added to the First District … , we have also been able to re-establish Congressman Butterfield's district as a true majority black district under the Strickland case.

37. Senator Rucho and Representative Lewis indicated they subordinated other redistricting principles to make Congressional District 1 a majority-minority district. For example, they stated that while they generally attempted to avoid dividing existing

8

precincts, "[m]ost of our precinct divisions were prompted by the creation of Congressman Butterfield's majority black First Congressional District."

38. Senator Rucho and Representative Lewis also indicated that race was the predominant motivating factor behind the redrawing of Congressional District 12. In their July 1, 2011, statement, Senator Rucho and Representative Lewis expressly said that they drew "our proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District" because of their belief that this would "ensure preclearance of the plan" under Section 5 of the VRA. Congressional District 12 contains Guilford County, which was—at the time—a covered jurisdiction under Section 5 of the VRA.

39. On July 19, 2011, Senator Rucho and Representative Lewis issued a joint public statement to accompany the release of a revised Congressional plan. In this statement, Senator Rucho and Representative Lewis expressly stated that Congressional District 1 was drawn to include a majority BVAP:

> [W]e cannot keep the 2001 version of the First District because of two flaws. First, the current First District is under-populated by over 97,000 people. Second, the current First District . . . does not include a majority black voting age population ("BVAP"), as required by Section 2 of the Voting Rights Act. *See Strickland v. Bartlett*, 129 U.S. 1231 (2009). Thus, any revision of the First District requires the addition of over 97,000 people. In addition, added population must include a sufficient number of African-Americans so that the First District can re-establish as a majority black district.

40. Senator Rucho and Representative Lewis also stated that their revised Congressional District 1 "re-establishes it as a majority black district."

9

41. In this public statement, Senator Rucho and Representative Lewis further stated expressly that they had Mr. Hofeller redraw Congressional District 1 because of an alleged need to comply with Section 5 of the VRA:

> While our initial version of the First District was fully compliant with Section 2 and Section 5 of the Voting Rights Act, our second version includes population from all of the Section 5 counties found in the 2001 version of the First District. Moreover, the total BVAP located in Section 5 counties in Rucho-Lewis 2 exceeds the total BVAP currently found in the 2001 version.

42. The end result of the redistricting process was the 2011 Congressional Plan, which includes Congressional District 1 and 12.

**Preclearance of the 2011 Congressional Plan**

43. As of the date of the enactment of the 2011 Congressional Plan, 40 of North Carolina's 100 counties were considered covered jurisdictions under Section 5 of the VRA, 42 U.S.C. § 1973c. Accordingly, the 2011 Congressional Plan was subject to preclearance by either the United States Department of Justice or the United States District Court for the District of Columbia before it could take effect.

44. On September 2, 2011, the General Assembly submitted its submission under Section 5 to the Department of Justice. On September 2, 2011, the North Carolina Attorney General also filed a complaint in the United States Court for the District of Columbia (*North Carolina v. Holder*, No. 1:11-CV-01592 (D.D.C.)) seeking preclearance.

45. In its Complaint, North Carolina averred that "[t]he 2011 Congressional Plan, when compared to its 'benchmark' 2001 Congressional Plan, does not lead to retrogression in the position of racial minorities in North Carolina's forty counties covered under § 5 or diminish their ability to elect their preferred candidates of choice, and does not otherwise have the effect of denying or abridging the right to vote on account of race or color."

46. North Carolina attached, as Exhibit 3 to its Complaint, a "comparison of relevant districts: Congressional." Exhibit 3 identifies as "relevant" both Congressional District 1 and 12, which both contain Section 5 counties. Exhibit 3 reflects that the 2011 Congressional Plan recast both districts as majority African American, when neither had been a majority African-American district under the 2001 plan.

47. On November 1, 2011, the Department of Justice precleared the 2011 Congressional Plan.

48. On June 25, 2013, the United States Supreme Court issued its opinion in *Shelby County v. Holder*, 570 U.S. ____, 133 S. Ct. 2612 (2013), holding that the coverage formula provided in Section 4(b) of the VRA is unconstitutional. As a result, no North Carolina counties are covered jurisdictions and the State's congressional redistricting plan is not required to meet preclearance requirements under Section 5.

### Congressional District 1 under the 2011 Congressional Plan

49. Under the prior congressional plan, Congressional District 1 had a BVAP of 47.76%. In the 2011 Congressional Plan, the BVAP of Congressional District 1 was increased to 52.65%.

50. Congressional District 1 disregards political subdivisions and geographical boundaries and subordinates other traditional districting principles for the purpose of packing African-American citizens into the district.

51. The shape of Congressional District 1 is bizarre, with an appearance akin to a Rorschach inkblot. It weaves through 24 counties, and contains only five whole counties:



12

52.     As both a qualitative and quantitative matter, Congressional District 1 is not compact.  The length of the perimeter of District 1 is 1319.43 miles.  This is almost precisely the distance from Chapel Hill to Austin, Texas.  In creating the current version of Congressional District 1, the General Assembly ignored the common rural and agricultural interests of the citizens of the existing Congressional District 1 residing in the Coastal Plain.  By way of example, the 2011 version of Congressional District 1 extends for the first time into the City of Durham.  Indeed, Durham now constitutes one-quarter of Congressional District 1's population, destroying what the federal courts had previously recognized as the "distinctly rural" character of Congressional District 1.  *See Shaw v. Hunt,* 861 F. Supp. 408, 470 (E.D.N.C. 1994).

53.     Upon information and belief, and as reflected by the public statements of Senator Rucho and Representative Lewis, Section 5 preclearance requirements were used as a justification to pack African-American voters into the bizarrely-shaped Congressional District 1.

54.     Race was the predominant consideration in the creation of Congressional District 1.  No other factor explains the tortured shape of this district, its failure to comply with traditional districting principles, or the high concentration of African-American voters in the district.  Indeed, Senator Rucho and Representative Lewis have admitted that Congressional District 1 was created as a "VRA District" drawn so that the district's BVAP would exceed 50%.

13

55. The North Carolina state courts have also expressly held that current Congressional District 1 was drawn with race as the predominant consideration. The 2011 Congressional Plan was challenged in state court. *See Dickson v. Rucho et al.*, Civil Action No. 11 CVS 16896 (Wake County Superior Court). Among other things, the plaintiffs in the state court lawsuit challenged Congressional District 1 as an unlawful racial gerrymander pursuant to state law. The three-judge panel appointed to hear the case held that race was the predominant consideration in the creation of Congressional District 1.

56. The predominant consideration of race with respect to Congressional District 1 is not justified by a compelling state interest.

57. In particular, in the wake of *Shelby County*, Section 5 cannot justify the use of race as a predominant factor in drawing congressional district lines.

58. Section 2 of the VRA cannot justify the use of race as a predominant factor in drawing congressional district lines. African-American voters in the prior version of Congressional District 1 were able to elect candidates of their choice without constituting a majority of the District's voting age population. The General Assembly had no strong basis in evidence to conclude that drawing Congressional District 1 as a majority BVAP district was reasonably necessary to avoid liability under Section 2. To the contrary, in creating the current version of Congressional District 1, the General Assembly ignored the results of seven election cycles in which African-Americans had elected their candidate of choice in a district that was not majority African-American.

59. Even if there were a compelling state interest for the race-based redistricting of Congressional District 1, Congressional District 1 is not narrowly tailored to achieve that interest. There are other viable and constitutionally permissible alternatives to Congressional District 1.

**Congressional District 12 under the 2011 Congressional Plan**

60. Under the prior congressional plan, Congressional District 12 had a BVAP of 42.31%. In the 2011 Congressional Plan, the BVAP of Congressional District 12 was increased to 50.66%.

61. As both a qualitative and quantitative matter, Congressional District 12 is not compact. Indeed, under some measures, Congressional District 12 is among the least compact districts in the entire country. No Congressional District in North Carolina is less compact. The district is 120 miles long but only 20 miles wide at its widest part. It includes chunks of Charlotte and Greensboro connected by a thin strip—averaging only a few miles wide—that traces Interstate 85. A person traveling on Interstate 85 between the two cities would exit the district multiple times, as the district's boundaries zig and zag to encircle African-American communities:



62. Upon information and belief, and as reflected by the public statements of Senator Rucho and Representative Lewis, Section 5 preclearance requirements were used as a justification to pack African-American voters into the bizarrely-shaped Congressional District 12.

16

63. Race was the predominant consideration in the creation of Congressional District 12. No other factor explains the tortured shape of this district, its failure to comply with traditional districting principles, or the high concentration of African-American voters in the district. Federal courts have in the past described Congressional District 12 as a "racial archipelago," *Cromartie v. Hunt*, 133 F. Supp. 2d 407, 515 (2000). Analysis of the boundaries of Congressional District 12 demonstrates that racial—not political—considerations best explain the shape of the district.

64. The predominant consideration of race with respect to Congressional District 12 is not justified by a compelling state interest.

65. In particular, in the wake of *Shelby County*, Section 5 cannot justify the use of race as a predominant factor in drawing congressional district lines.

66. Section 2 of the VRA cannot justify the use of race as a predominant factor in drawing congressional district lines. African-American voters in the prior version of Congressional District 12 were able to elect candidates of their choice without constituting a majority of the District's voting age population. The General Assembly had no strong basis in evidence to conclude that drawing Congressional District 1 as a majority BVAP district was reasonably necessary to avoid liability under Section 2.

67. Even if there were a compelling state interest for the race-based redistricting of Congressional District 12, Congressional District 12 is not narrowly tailored to achieve that interest. There are other viable and constitutionally permissible alternatives to Congressional District 12.

## CAUSE OF ACTION
**(Violation of the Equal Protection Clause of the United States Constitution)**

68. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-68 above.

69. The Fourteenth Amendment of Section 1 of the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

70. Race was the predominant factor in the creation of Congressional Districts 1 and 12.

71. The use of race as the predominant factor with respect to Congressional Districts 1 and 12 is not narrowly tailored to serve a compelling state interest.

72. Accordingly, Congressional Districts 1 and 12 each violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

73. Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin the conduct of elections based on Congressional Districts 1 and 12 will irreparably harm Plaintiffs by violating their constitutional rights.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1. Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

2. Declare that Congressional Districts 1 and 12 under the 2011 Congressional Plan each constitute racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment;

3. Issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the boundaries of Congressional Districts 1 and 12 as drawn in the 2011 Congressional Plan, including an injunction barring Defendants from conducting any elections for the United States House of Representatives based on Congressional Districts 1 and 12;

4. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new congressional districts in the State of North Carolina; and

5. Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Respectfully submitted, this the 24th day of October, 2013.

**PERKINS COIE LLP**

/s/ Marc E. Elias
Marc E. Elias
D.C. Bar No. 442007
MElias@perkinscoie.com
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

*Attorneys for Plaintiffs*

**POYNER SPRUILL LLP**

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
John W. O'Hale
N.C. State Bar No. 35895
johale@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynerspruill.com
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
Telephone: (919) 783-6400
Facsimile: (919) 783-1075

*Local Rule 83.1*
*Attorneys for Plaintiffs*