# EXHIBIT Q – Part 1

Complete Deposition of Dr. Thomas Hofeller

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
Civil Action No. 1:13-CV-00949

DAVID HARRIS; CHRISTINE      )      D E P O S I T I O N
BOWSER; and SAMUEL LOVE,     )
                             )              O F
             Plaintiffs;)
                             )   THOMAS B. HOFELLER, PH.D.
     -v-                     )
PATRICK MCCRORY, in his capacity)
as Governor of North Carolina;  )
NORTH CAROLINA STATE BOARD OF   )
ELECTIONS; and JOSHUA HOWARD, in)
his capacity as Chairman of the )
North Carolina State Board of   )
Elections,                      )
             Defendants.)
--------------------------------)

APPEARANCES:

For the Plaintiffs:  Poyner Spruill
                     Attorneys at Law
                     P.O. Box 1801
                     Raleigh, North Carolina 27602
                     John W. O'Hale, Esquire, appearing
                     Caroline P. Mackie, Esquire, appearing
                     Edwin M. Speas, Jr., Esquire, appearing.

For the Defendants:  Ogletree, Deakins, Nash
                     Attorneys at Law
                     4208 Six Forks Road, Suite 1100

                     Raleigh, North Carolina 27609

                     Thomas A. Farr, Esquire, appearing.


                     N.C. Department of Justice

                     P.O. Box 629

                     Raleigh, North Carolina 27602

                     Alexander McC. Peters, appearing.

In Attendance:       Dalton Oldham

At Raleigh, North Carolina.

Tuesday, May 6, 2014.

8     Hofeller Expert Report                    6

9     Ansolabehere Expert Report                14

10  Ansolabehere Report in Answer               17

    Hofeller Report

11  Statement by Rucho and Lewis re             31

    the Proposed 2011 Congressional Plan

12  Joint Statement of Rucho and Lewis          42

    re release of Rucho-Lewis Congress 2

13  N.C. Congressional Districts                59

14  Rubio-Lewis District 12 Maps (4)            60

15  Report of Voting Age Population             63

    by Race and Ethnicity (2 pages)

16  NCGA Congress Zero Deviation                67

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 3 of 82

The following deposition of THOMAS B. HOFELLER,
PH.D., called as a witness by the Plaintiffs, was taken
before Glenda F. Hightower, Certified Verbatim Reporter and
Notary Public, at the law offices of Ogletree, Deakins,
Nash, Smoak and Stewart, 4208 Six Forks Road, Suite 1100,
Raleigh, North Carolina on Tuesday, May 6, 2014 beginning
at 9:06 a.m.

S T I P U L A T I O N S

Prior to the taking of the testimony, counsel for the
respective parties stipulate and agree as follows:

1.  That the deposition shall be taken and used as
permitted by the applicable Federal Rules of Civil
Procedure.

2.  That any objections of any party hereto as to the
notice of the taking of the deposition or as to time or
place thereof, or as to the competency of the person before
whom the same shall be taken, are deemed to have been met.

3.  Objections to questions and motions to strike
answers need not be made during the taking of this
deposition, but may be made for the first time during the
progress of the trial of this case, or at any pretrial
hearing held before any judge of competent jurisdiction for
the purpose of ruling thereon, or at any other hearing of
said case at which said deposition might be used, except
that an objection as to the form of a question must be made

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 4 of 82

at the time such question is asked, or objection is waived

as to the form of the question.

    4.  That the witness reserves the right to read and

sign the deposition prior to filing.

    5.  That the original transcript of this deposition

shall be mailed Priority Mail Postage to the party taking

the deposition for preservation and delivery to the Court.

1   Whereupon,

2         THOMAS B. HOFELLER, PH.D.,

3   Having been first duly sworn, was examined and

4   testified as follows:

5   Direct Examination by Mr. Speas:

6   Q.    Would you state your name for the record?

7   A.    Thomas Brooks Hofeller.

8   Q.    Okay.  We've met before, I believe, Dr.

9   Hofeller, at various times.

10  A.    Several times.

11  Q.    Yes, we have, and thank you for coming

12  today.  I want to talk with you a little bit

13  this morning about your expert report filed in

14  this matter.

15        MR. SPEAS:  And if we could, let's

16  go ahead and mark it as Exhibit 1.  I guess

17  this the first exhibit in this case.

18        MR. FARR:  I'm not sure.  Michael

19  had the exhibits and --

20        MR. O'HALE:  I think it might be up

21  to eight by now.

22        MR. SPEAS:  Oh, okay.  So, let's --

23        MR. FARR:  Can we go off the record

24  for a second?

25              (DISCUSSION OFF RECORD.)

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 6 of 82

1   (Plaintiffs' Exhibit 8, Marked for

2   Identification.)

3   **Q.**   (Mr. Speas)  Dr. Hofeller, Exhibit 8 has

4   been placed in front of you.  And I would ask

5   you whether or not you can identify Exhibit 8

6   as the expert report that you have filed in

7   this case, Harris -v- McCrory?

8   **A.**    I can.

9   **Q.**    And is that your report?

10   **A.**    It is.

11   **Q.**    Okay.  I want to ask you a few questions

12   about your circumstances that brought you here.

13   You have been retained in this case by whom?

14   **A.**    I've been retained by the law firm.

15   **Q.**    Of Ogletree Deakins?

16   **A.**    Yes.

17   **Q.**    Okay.  And when were you retained?

18   **A.**    I can't remember the last date, but I --

19   I really can't remember when I was retained.

20   **Q.**    Okay.

21   **A.**    It's been -- I've been with this case

22   through -- this line of cases through the whole

23   redistricting cycle.

24   **Q.**    You were retained by the Ogletree firm

25   in the State Court redistricting litigation,

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 7 of 82

1  correct?

2  A.    Yes.

3  Q.    And this, of course, is a separate

4  federal lawsuit.  Were you separately retained

5  in this suit, or is your work here simply a

6  continuation of your State Court work?

7  A.    No, I -- as far as I understand, at this

8  point I'm through with the State case, and this

9  is a new case.

10  Q.    And your expert report is dated January

11  17, 2014, is that correct?

12  A.    Yes.

13  Q.    So, you were retained some time prior to

14  January 17th?

15  A.    Yes.

16  Q.    Can you estimate how long before January

17  17?

18  A.    I imagine it would have been in November

19  or December.

20  Q.    Okay.  And for what purpose were you

21  retained?

22  A.    I was retained to give expert testimony;

23  and, of course, I expected to give some factual

24  testimony too.

25  Q.    Okay.  And your retainer is for $295 an

1   hour?

2   A.     That is my fee, yes.

3   Q.     Okay.  And --

4   A.     Plus expenses.

5   Q.     Right.  And how much have you been paid

6   so far?

7   A.     I'm not exactly sure, but I think it's

8   been somewhere in the neighborhood of about 16K

9   -- 12 to $16,000.

10  Q.     Okay.  And have you been paid for all

11  the services you have provided to this point?

12  A.     Except for this deposition, yes.

13  Q.     Okay.  Now, in preparing Exhibit 8,

14  other than the attorneys at Ogletree, with whom

15  did you confer; or from whom did you receive

16  assistance?

17  A.     I wrote this, myself; and made the

18  inquiries, and examinations and analyses,

19  myself.

20  Q.     Okay.  So, you did not confer with

21  anyone other than the attorneys in preparing

22  this report?

23  A.     Not to my recollection, no.

24  Q.     All right.  And no other person assisted

25  you in preparing this report?

1    **A.**    No.

2    **Q.**    Okay.  A little bit of background:  I

3    know a lot about your background, but you have

4    a Ph.D. from Claremont Graduate University,

5    correct?

6    **A.**    I do.

7    **Q.**    And I believe you received that in 1970

8    or thereabouts?

9    **A.**    No, that's not correct.

10   **Q.**    Oh, okay.  When did you receive that?

11   **A.**    1980.

12   **Q.**    Okay.  And what was your dissertation

13   topic?

14   **A.**    Mississippi redistricting.

15   **Q.**    Okay.  Now, since receiving your Ph.D.,

16   have you ever been employed at the University

17   as a faculty member?

18   **A.**    No.

19   **Q.**    Okay.  Since receiving your Ph.D., have

20   you been the sole author of any article in any

21   academic journal?

22   **A.**    No.

23   **Q.**    Is it correct that you have been a

24   consultant for the RNC or other Republican

25   organizations continuously since the 1900s --

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 10 of 82

1  1990s?

2           MR. FARR:  The 1900s might be right.

3           MR. SPEAS:  That may be correct.

4           MR. FARR:  I'll let Tom answer that.

5  A.    No.

6  Q.    (Mr. Speas)  Would you describe for me

7  the periods during which you have been a

8  consultant for the Republican National

9  Committee?

10 A.    You said during the '90s?

11 Q.    Yes.

12 A.    I'd have to -- I'd have to go back and

13 look at my resume because I'm not sure.  I left

14 the employment of the National Republican

15 Congressional Committee after the '90

16 redistricting.  And then I was not employed by

17 any committee, and then in 1999, I believe I

18 was employed by the Republican National

19 Committee through 2003.

20           And then I was employed in the Federal

21 Government from 2003 through the beginning of

22 2009; and then, I believe, in May of 2009, I

23 was retained by the Republican National

24 Committee as a consultant.

25 Q.    Would it be accurate, Dr. Hofeller, that

1   you have been a consultant with the Republican

2   National Committee for the 1990 redistricting

3   cycle, the 2000 redistricting cycle and the

4   2010 redistricting cycle?

5   A.    No.

6   Q.    Okay.

7   A.    I was -- I was retained for the -- the

8   1990 redistricting cycle by the National

9   Republican Congressional Committee.  It's a

10  separate entity.

11  Q.    Okay.

12  A.    And then -- well, I'll finish your

13  question -- then the RNC for the subsequent two.

14  Q.    Okay.  Thank you for that clarification.

15  Describe for me the fields in which you believe

16  you are an expert.

17  A.    I believe I'm an expert in the field of

18  -- well, all fields really pertaining

19  redistricting, to demographics, to political

20  data analysis, to redistricting; statistical

21  analysis.  I don't think there are any others

22  that are really relevant to that.

23  Q.    Okay.  You're presently employed at an

24  organization called Geographic Strategies,

25  correct?

1    A.    I'm a partner.

2    Q.    Okay.  And Mr. Dale Oldham is your

3    partner in that enterprise?

4    A.    He is.

5    Q.    Okay.  And when was Geographic Strategies

6    formed?

7    A.    My recollection is it was in May of 2011.

8    Again, I'd have to look at my resume though.

9    Q.    Okay.  And are there other partners at

10   Geographic Strategies other than you and Mr.

11   Oldham?

12   A.    No.

13   Q.    And Mr. Oldham is here today?

14   A.    He is.

15   Q.    Did you confer with Mr. Oldham in

16   advance about your expert report in this case?

17   A.    In his capacity as my attorney, we

18   discuss a whole range of redistricting issues

19   almost constantly.

20   Q.    Is Mr. Oldham your attorney in this

21   matter along with Mr. Farr?

22   A.    I'm retained by Mr. Farr.  Dale is my

23   attorney.

24   Q.    All right.  Dr. Hofeller, in paragraph 17

25   of Exhibit 8, you say you have been asked to

1   evaluate the "Export" --   I think that must be

2   a typo -- Expert Report submitted by Dr.

3   Stephen Ansolabehere on behalf of the

4   Plaintiffs.

5   **A.**     I'm sorry.  Could you give me the page

6   number again?

7             MR. FARR:  Page 5.

8   **Q.**   (Mr. Speas)  It's paragraph 17, page 5.

9   **A.**     Okay.

10            MR. FARR:  And thank you, Eddie, for

11  pronouncing that name.  I'm sure I'm not going

12  to be able to do that.

13            MR. SPEAS:  And I have tried, and I

14  think I've got it down, but there's some

15  question about that.

16  **A.**     The "e" is silent.

17  **Q.**   (Mr. Speas)  Okay.  You were asked to

18  evaluate this expert report, correct?

19  **A.**     I was.

20  **Q.**     Okay.  And which fields of your expertise

21  did you use in evaluating this report, Exhibit

22  8?

23  **A.**     Demographics, redistricting, political

24  analysis; statistical analysis.

25  **Q.**     Okay.  Have you been asked to conduct

1    any other analyses for this case?

2    A.    Not at this time, no.

3    Q.    Okay.  Do you expect to be asked to

4    conduct other analyses for this case?

5    A.    Possibly.

6    Q.    Okay.  All right.

7              MR. SPEAS:  Now, let me ask the court

8    reporter to mark this as Exhibit 9.

9    (Plaintiffs' Exhibit 9 Marked for

10   Identification.)

11   Q.    (Mr. Speas)  What the court reporter has

12   placed in front of you is Exhibit 9, the Expert

13   Report of Stephen Ansolabehere.  Do you

14   recognize that report -- that exhibit?

15   A.    I do.

16   Q.    Okay.  And that is the report that you

17   analyzed for Mr. Farr?

18   A.    I did.

19   Q.    Okay.  Now, let me ask you this:  this

20   report, Exhibit 9, includes Tables 1 through

21   11, correct?

22   A.    (Witness peruses document.)  Yes.

23   Q.    Okay.  Is there anything -- is any of

24   the data in Tables 1 through 11 inaccurate in

25   your judgement?

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 15 of 82

1  **A.**    (Witness peruses document.)  Not that I

2  recall, no.

3  **Q.**    Okay.  And Exhibit 9 also includes Maps

4  1 through 8.  Have you examined those maps?

5  **A.**    (Witness peruses document.)  Yes, I did

6  look at them.

7  **Q.**    Okay.

8  **A.**    They're not very clear on this document.

9  **Q.**    Okay.  But are those -- do those maps

10  accurately depict what they purport to depict?

11  **A.**    Yes.

12  **Q.**    Okay.  Now, in examining Exhibit 9, did

13  you reach any conclusion with respect to the

14  appropriateness of the methodologies that Dr.

15  Ansolabehere used in preparing his report?

16  **A.**    Could you re-word that again?  I'm sorry.

17  **Q.**    Okay.  Do you disagree with the

18  methodologies that Dr. Ansolabehere used in

19  preparing his report, Exhibit 9?

20  **A.**    I don't disagree with the method he used.

21  I do disagree with their -- their efficacy in

22  terms of his conclusions.

23  **Q.**    Okay.  You do not believe that the

24  methodologies he used were not appropriate, do

25  you?

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 16 of 82

1    **A.**    I think my answer is as I stated before.

2    I think he used -- he used the methodol- -- the

3    methods, actually, correctly for what they are.

4    **Q.**    Your disagreement is with Dr.

5    Ansolabehere's conclusion, correct?

6    **A.**    It is.

7    **Q.**    Okay.  All right.  Not with his data?

8    **A.**    No.

9    **Q.**    And --

10    **A.**    Well, yes, in the way -- yes.  This one

11    -- there's one thing that I would disagree with

12    and --

13    **Q.**    All right.

14    **A.**    -- that's his dependence upon

15    registration data rather than election results,

16    but as he used the -- the registration data, he

17    came out with the number he should come out

18    with using that method.

19    **Q.**    Okay.  And the registration data he used

20    was accurate data?

21    **A.**    I -- I will take him at face value on his

22    data.

23    **Q.**    All right.  Okay.  Now, Dr. Ansolabehere

24    prepared a report in response to your report,

25    is that correct?

1    A.    Yes, he did.

2              MR. SPEAS:  And I'll ask the court

3    reporter to mark this as Exhibit 10.

4    (Plaintiffs' Exhibit 10 Marked for

5    Identification.)

6    Q.    (Mr. Speas)  Is Exhibit 10 Dr.

7    Ansolabehere's response to your report?

8    A.    (Witness peruses document.)  Yes.

9    Q.    And have you reviewed that report?

10   A.    I have.

11   Q.    Okay.  And when did you review the

12   report?

13   A.    I reviewed it when I received it from the

14   attorneys, and I reviewed it before this

15   deposition.

16   Q.    Okay.  And have you prepared any

17   documents in response to Exhibit 10?

18   A.    I have not.

19   Q.    Okay.  Did you conduct any analysis of

20   any data as a consequence of reviewing Exhibit

21   10?

22   A.    Any analysis of my own, are you asking?

23   Q.    Yes.

24   A.    No.

25   Q.    Okay.  And let me ask you if you contend

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 18 of 82

1  that any of the data used in Exhibit 10 is not

2  accurate?

3  **A.**    I accept the data that he has in his

4  report.

5  **Q.**    And do you believe that any of the

6  methods Dr. Ansolabehere used in preparing

7  Exhibit 10 are not appropriate for the purpose

8  he used them?

9  **A.**    Again, I would not agree that they are

10  appropriate for the purposes of his

11  conclusions.  He -- he preformed the analyses.

12  He performed the analyses correctly.  I, once

13  again, agree with his conclusions; and I also

14  state that I'm still not agreeing with the fact

15  that he relied heavily on registration figures

16  and not on actual results; although he did use

17  some election results this time.

18  **Q.**    Okay.  All right.  Are you considering

19  conducting any additional analysis in response

20  to Exhibit 10?

21  **A.**    Not unless asked.

22  **Q.**    All right.  Have you been asked?

23  **A.**    No.

24  **Q.**    Okay.  Have you recommended to your

25  counsel that any additional analysis be

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 19 of 82

Thomas B. Hofeller, Ph.D.  5-6-14

1   conducted of Exhibit 10?

2   **A.**    No.

3   **Q.**    Now, Dr. Hofeller, let's talk a little

4   bit about North Carolina and your work in North

5   Carolina in 2011.  In paragraph 29 of Exhibit 8

6   on page 9, you state that you were, quote,

7   "intensely involved," close quotes, in the

8   redistricting process in North Carolina.

9          Is that correct?

10  **A.**    I'm sorry?  What paragraph, please?

11  **Q.**    Paragraph 29, page 9.

12  **A.**    (Witness peruses page.)

13  **Q.**    And in the last sentence, you say you

14  were "intensely involved in the entire process."

15  **A.**    I'm sorry?  The paragraph number again?

16          MR. FARR:  29.

17  **Q.**    (Mr. Speas)  29.

18          MR. FARR:  It's the last sentence in

19  29, I think.

20  **A.**    Oh, yes.  I'm sorry.  Yes.

21  **Q.**    (Mr. Speas)  Okay.  And is that an

22  accurate description of your role in the

23  redistricting process?

24  **A.**    Yes.

25  **Q.**    Okay.  Now, I want to talk to you a

1   little bit about the kinds of involvement you

2   had.  Did you draw the Congressional plans?

3   **A.**   I was the person who drew most of the

4   plans, and finalized the plans and kept track

5   of the plans.  It was the same role that I

6   explained to you in the last case we were in.

7   My primary thing was to advise, to keep track

8   of the plans, to draft plans; to be the

9   gatekeeper to make sure everything got done.

10   **Q.**   And in the prior case, you described

11   yourself as the principal architect of the

12   Legislative plans.  Would you describe yourself

13   as the principal architect of the Congressional

14   plan as well?

15          MR. FARR:  Objection.

16   **A.**   I would.  I'm sorry.

17          MR. FARR:  That's fine.

18   **Q.**   (Mr. Speas)  Okay.  Now --

19   **A.**   I would amplify that by saying, of

20   course, as was the case in the Legislative map,

21   the decision -- principal decision-makers in

22   the Congressional map as well as the

23   Legislative map were the chairmen of the two

24   committees.

25   **Q.**   Senator Rucho and Representative Lewis?

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 21 of 82

1  A.    That's correct.

2  Q.    And you answered to Senator Rucho and

3  Representative Lewis in drawing the

4  Congressional plan, correct?

5  A.    I did.

6  Q.    Okay.  And did you make recommendations

7  to them with regard to the goals that should be

8  achieved by the plan?

9  A.    Actually, they pretty clearly stated to

10 me the goals that they wished to achieve by the

11 plan.

12 Q.    Okay.  And did they state those goals to

13 you in writing?

14 A.    Not directly, no.

15 Q.    Okay.  Did they state those goals to you

16 in an email?

17 A.    No.

18 Q.    Okay.  Did they state those goals to you

19 by conversation?

20 A.    Yes.

21 Q.    And was Mr. Oldham present at those

22 conversations?

23 A.    Not at all times, no.

24 Q.    Okay.  Was Mr. Farr present at those

25 conversations?

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 22 of 82

1   A.    Not at all times, no.

2   Q.    Okay.  Did you make any recommendation

3   to Senator Rucho and Representative Lewis with

4   regard the requirements of the Voting Rights

5   Act in drawing the Congressional plan?

6   A.    Representative Lewis and Senator Rucho

7   stated to me that the maps should be drawn in

8   such a way as to pass muster under both Section

9   2 and Section 5, and they knew what that

10  entailed.

11  Q.    Okay.  And what did that entail?  What

12  did you understand that entailed?

13  A.    With regard to the Congressional plan, it

14  -- that -- that District 1 was a Voting Rights

15  district, and that District 12 was not a Voting

16  Rights district.  It was a political district.

17  Q.    Okay.  And with regard to District 1,

18  did you recommend to them, Senator Rucho and

19  Representative Lewis, that that district had to

20  be drawn with more than a 50 percent BVAP?

21  A.    I was instructed by them that the

22  district should be drawn with a

23  African-American percentage in excess of 50

24  percent total VAP.

25  Q.    Okay.  Did you receive a similar

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 23 of 82

1   instruction from them with regard to District

2   12?

3   A.    No.

4   Q.    Did you receive any instructions from

5   Senator Rucho and Representative Lewis with

6   regard to the partisan advantage that should be

7   provided the Republicans in drawing the

8   districts?

9   A.    Yes.

10   Q.    And what were those instructions?

11   A.    My instructions were to draw the plan to

12   make it -- have an increased number of

13   competitive districts for GOP candidates.

14   Q.    And did you make any evaluation of the

15   likely results -- partisan results of the plan

16   enacted by the General Assembly?

17   A.    Yes.

18   Q.    And what was that estimate?

19   A.    That -- that three of the districts were

20   most certainly going to be strong Democratic

21   districts, and that the remaining districts

22   would be more competitive or remain competitive

23   for Republican candidates.

24   Q.    And those three strong Democratic

25   districts were?

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 24 of 82

1   A.    One, 4 and 12.

2   Q.    Okay.  And what was the result of the

3   2012 election with regard to partisan advantage?

4   A.    Four Democrats won election to the House

5   of Representatives -- U.S. House of

6   Representatives, and the remainder were

7   Republicans.

8   Q.    Now, when you -- as you were drawing the

9   plans, did Senator Rucho and Representative

10  Lewis give you any instructions as to whether

11  partisan advantage or competitiveness was to

12  take precedence over compliance with the Voting

13  Rights Act as you drew the districts?

14  A.    No.

15  Q.    Okay.  As you were drawing the districts,

16  did you weigh partisan advantage more heavily

17  than compliance with the Voting Rights Act?

18  A.    For the plan as a whole?

19  Q.    Yes.

20  A.    For the plan as a whole, I would have to

21  say, yes; but the plan was compliant with the

22  Voting Rights Act.  There were many, many -- 12

23  of the 13 districts were drawn as political

24  districts.

25  Q.    As you were drawing Congressional

1  District 1, did you give precedence to

2  compliance with the Voting Rights Act over

3  partisan advantage in constructing that district?

4  **A.**    I would not say so, no.

5  **Q.**    Okay.

6  **A.**    It was a factor certainly, but it was

7  not the predominant factor.

8  **Q.**    Okay.  What was the predominant factor?

9  **A.**    Well, as you -- as probably you don't

10  know, when -- when you're drawing a plan, of

11  course, the plan is a whole plan -- a whole map

12  of the State.  And so, every district plays

13  into every other district, and the map which

14  the Republicans inherit -- inherited had

15  districts which were not equal in population.

16       The entire reason you redistrict to begin

17  with is to equalize the population.  So,

18  certainly equality of population was a

19  preeminent factor.

20  **Q.**    Okay.

21  **A.**    Another factor was to rema- -- to retain

22  the cores of many of the districts.  In fact, I

23  think most of them retained their cores; and

24  also to, again, shift the populations.

25       With regard to District 1, one -- one of

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 26 of 82

1   the problems with District 1 was that it was

2   underpopulated by, I believe, 97,600 people or

3   something like that; and population would have

4   to be added to the district.  The new district

5   would have to have 97,000 more people in it.

6        One of the other factors that concerned

7   the -- the Chairmen was that District 1 was the

8   most underpopulated district in the previous

9   plan, and we were trying to ameliorate that

10  situation in the drafting of the new district

11  so that the difference in population between

12  the -- all the districts in the plan would --

13  would stay smaller as the decade progressed.

14  Q.   Okay.

15  A.   The other thing was that the population

16  needs of the surrounding districts had to be

17  taken care of too.  Once again, District 1 was

18  not drawn in a vacuum.  So, the populations had

19  to be adjusted.

20  Q.   Okay.

21  A.   And, of course, the political goals of

22  the General Assembly in the plan had to be

23  taken into account too.

24  Q.   Okay.  Let me talk about District 12 for

25  just a minute.  When you were drawing District

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 27 of 82

1   12, did partisan advantage take precedence over

2   compliance with the Voting Rights Act?

3   **A.**   Yes.

4   **Q.**   Now, let me ask you this:  when you

5   began drawing the Congressional districts, did

6   you start with the existing plan and modify it;

7   or did you start from scratch?

8   **A.**   In drawing almost any redistricting plan,

9   particularly in a state for Congressional

10  districts where the number of districts has not

11  changed because of reapportionment, the -- the

12  normal starting point is always from the

13  existing districts.

14       But once again, it's the whole map, and

15  the needs of the whole map.  So, we had areas

16  where there was more population than needed,

17  and we had areas where there was less

18  population needed.  So, all that had to be

19  adjusted.

20       And, of course, so all the plans -- all

21  the maps, districts had to be shifted around in

22  order to accommodate the goals of the whole

23  plan.

24  **Q.**   Okay.  But you began with the existing

25  plan?

1    A.    Yes.

2    Q.    Okay.  Now, did you draw the districts

3    in any particular sequence; that is, did you

4    focus first on District 1?

5    A.    It was my instruction and it would have

6    been the normal practice in any state I drew

7    where we had Section 2 or Section 5 issues to

8    pay particular attention from the beginning of

9    the plan to a district that was covered.

10        Aside from that, an analysis, of course,

11   had to be made about how the districts had to

12   be shifted from one spot to another.  And as is

13   in the case of any plan drafting, you go

14   through many iterations of the map before it

15   even is made public.

16   Q.    Unh-hunh (yes).  Okay.  So, it would be

17   accurate that the first district you focused on

18   was Congressional District 1?

19             MR. FARR:  Objection to the form.

20   A.    I really don't agree with your premise or

21   your question there.

22   Q.    (Mr. Speas)  Okay.

23   A.    It was always in my mind.  I was

24   focusing first on the -- the nature of the

25   whole plan -- the holistic view of the plan,

1  and where the shifts needed to be and what had

2  to be done in the whole plan.

3      And when you're doing that, you work your

4  way back and forth across the map many times,

5  tugging and pulling at districts, and looking

6  at them, and other people are looking at them.

7  And so, I would say your premise in that

8  question is -- is not -- doesn't work for me.

9  **Q.**   What does work for you is that District 1

10  was always in your mind?

11  **A.**   It was in my mind when I was drawing it

12  and the results of what would be there, but so

13  were the other districts.

14  **Q.**   Okay.  But it was in the front of your

15  mind, correct?

16          MR. FARR:  Objection to the form.

17  **A.**   It was always important to circle back if

18  necessary, depending on where I was drawing,

19  and see how all the pieces of all the districts

20  pieced together.  But once again, my

21  instruction from the Chairmen was to draw a

22  legal map that would qualify in a one person

23  one vote, and that would qualify under the

24  Voting Rights Act.

25          And then the political goals were going

1    to be taken into account; and, of course, there

2    are always the needs and desires of incumbents,

3    some of which are good ideas and some of which

4    maybe aren't good ideas.

5    **Q.**    (Mr. Speas)  And when you circled back to

6    Congressional District 1 as you were working on

7    the rest of the map, did you circle back to

8    make sure that it remained above 50 percent

9    total black voting age population?

10   **A.**    Again, my understanding and instructions

11   were because of Strickland, if the district

12   were to be drawn as a Voting Rights Act

13   district, it had to be in excess of 50 percent,

14   I would say, TVAP.

15   **Q.**    Okay.  I understand.  Now, was -- where

16   was Congressional District 12 in your mind as

17   you were drawing the whole plan?  Was it just

18   after Congressional District 1 or was it

19   someplace else?

20            MR. FARR:  Objection to the form.

21   **A.**    Again, I -- if you've ever drawn a plan,

22   you would know that I was focusing from

23   district to district to district and back and

24   forth and forth and back.  So, it wasn't a

25   situation where I was saying, "Well, what does

1   this do to 12, or what does this do to 1?"

2       Because, you may be working in an entirely

3   different area of the State.  The -- the

4   mission here was to create a legal plan first

5   off, and to make sure that it would pass muster

6   under the Voting Rights Act, both Section 5 and

7   Section 2.

8   Q.   (Mr. Speas)  Okay.

9   A.   So, if you've ever drawn a map, you

10  would know that you're just -- you're thinking

11  of the task at hand, which is the district that

12  you're drawing on.

13  Q.   Okay.

14          MR. SPEAS:  I'm going to ask the

15  court reporter to mark this document as Exhibit

16  11.

17  (Plaintiffs' Exhibit 11 Marked for

18  Identification.)

19  Q.   (Mr. Speas)  Dr. Hofeller, I would ask

20  you to review Exhibit 11, and then ask you

21  whether or not it is the public statement

22  issued by Senator Rucho and Representative

23  Lewis on July 1, 2011 regarding the 2011

24  Congressional Plan?

25  A.   It's a true copy.  It certainly is.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 32 of 82

1    Q.    Okay.  Did you assist in preparing that

2    document?

3    A.    I did not.

4    Q.    Okay.  Did you review the document

5    before it was released?

6    A.    I don't recollect whether I saw it before

7    or after it was released.

8    Q.    Did -- to your memory, did Senator Rucho

9    or Representative Lewis seek your advice in

10   preparing this document?

11   A.    They did not.

12   Q.    Have you reviewed this document before?

13   A.    Yes.

14   Q.    Okay.

15   A.    Before this --

16   Q.    Before this deposition.

17   A.    -- deposition, yes.

18   Q.    You have?

19   A.    Yes.

20   Q.    Okay.  And does Exhibit 11 reflect the

21   directions you received from Representative

22   Lewis and Senator Rucho in drawing the

23   Congressional plan.

24         MR. FARR:  I think you should make

25   sure you read the whole thing.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 33 of 82

1    A.    Yes, I would -- I would actually have to

2    sit down and read it in really great detail to

3    see if it correlates exactly.  In general it

4    does, yes.

5    Q.    (Mr. Speas)  All right.  Well, let me

6    call your attention to some specific parts of

7    Exhibit 11.  If you would look on page 2 at

8    paragraph 1, was one of the instructions you

9    received to use the current Congressional plan

10   as a frame of reference?

11   A.    I think by the time that this statement

12   was written, it was clear that that had already

13   been done.

14   Q.    Okay.  So, the plan you drew met this

15   instruction; or, rather, let me put it this

16   way:  in drawing the plan, you used the current

17   plan as the frame of reference?

18           MR. FARR:  Objection to the form.

19   A.    I don't understand what you mean by

20   "frame of reference."

21   Q.    (Mr. Speas)  I'm using the term that

22   Senator Rucho and Representative Lewis used.

23           MR. FARR:  I think it says, "a

24   frame of reference."

25   Q.    (Mr. Speas)  Did you understand what --

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 34 of 82

1  do you understand what they meant when they

2  said, "Use of current congressional plan as a

3  frame of reference"?

4  A.    I would understand that it's the way we

5  would start any plan.  So, yes, it's -- it's a

6  frame of reference.

7  Q.    Okay.

8  A.    It's always a frame of reference in the

9  districting.

10  Q.    All right.  And in drawing the plan, you

11  used the 2001 plan as a frame of reference in

12  accordance with --

13  A.    Yes, as a frame.

14  Q.    Okay.

15  A.    Okay.

16  Q.    Now, would you turn with me to page 3?

17  And there is a sentence -- paragraph midway

18  that begins, "The State's First Congressional

19  District was originally drawn in 1992 as a

20  majority black district.  It was established by

21  the State to comply with Section 2 of the

22  Voting Rights Act.  Under the decision by the

23  United States Supreme Court in Strickland v.

24  Bartlett, the State is now obligated to draw

25  majority black districts with true majority

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 35 of 82

1   black voting age population."

2        Was that an instruction you received from

3   Representative Lewis and Senator Rucho, that

4   the State is obligated to draw majority black

5   districts with true majority black voting age

6   population?

7   A.    Did you say districts?

8   Q.    That's -- I'm reading --

9   A.    Could you just restate your question,

10  please?

11  Q.    Okay.

12  A.    Thank you.

13  Q.    In Exhibit 11, Senator Rucho and

14  Representative Lewis state, quote, "The State

15  is now obligated to draw majority black

16  districts with true majority black voting age

17  population."

18        Did you receive an instruction from

19  Senator Rucho and Representative Lewis to draw

20  majority black districts with a true majority

21  black voting age population?

22              MR. FARR:  Object to the form

23  because you're quoting half the sentence.

24  Q.    (Mr. Speas)  Can you answer the question?

25  A.    It was my understanding -- and, again,

1    this has been three years.  So, it was my

2    understanding that if you were going to draw a

3    Section 2 or Section 5 district, that because

4    of Strickland, you had to draw it over 50

5    percent.

6    Q.    Okay.

7    A.    I understood that, yes.

8    Q.    Okay.  And that was an instruction you

9    received from Rucho and Lewis?

10   A.    Yes.

11   Q.    Okay.  Let's turn to page 5 of Exhibit

12   11 where the first of the page talks about the

13   Twelfth District.

14   A.    Yes.

15   Q.    And I would call your attention,

16   specifically, to the paragraph midway of that

17   page which says, quote, "Because of the

18   presence of Guilford County in the Twelfth

19   District, we have drawn our proposed Twelfth

20   District at a black voting age level that is

21   above the percentage of black voting age

22   population found in the current Twelfth

23   District.  We believe that this measure will

24   ensure pre-clearance of the plan."

25        Did I read that accurately?

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 37 of 82

1   A.     You did.

2   Q.     Okay.  Did you receive an instruction from

3   Representative Lewis and Senator Rucho to draw

4   the Twelfth District at a black voting age

5   level that is above the level -- black voting

6   age level in the current Twelfth District?

7   A.     Actually, my understanding of the issue

8   was because Guilford was a Section 5 county and

9   because there was a substantial

10  African-American population in Guilford County,

11  that if the portion of the African-American

12  community was in the former District 13 -- was

13  a strong -- which was a strong Democratic

14  district was not attached to another strong

15  Democratic district, that it could endanger the

16  plan and make a challenge to the plan.

17        And that's where that concern generated

18  from.

19  Q.     Okay.  And did that concern come from

20  Senator Rucho and Representative Lewis or

21  elsewhere?

22  A.     It came from them.

23  Q.     Okay.  Now, let me call your attention

24  now, Dr. Hofeller, to page 7 and in particular,

25  paragraph 7 on page 7.  Did you -- in that

1  paragraph, Senator Rucho and Representative

2  Lewis state, quote, "We have attempted to

3  respect county lines and whole precincts when

4  it was logical to do so and consistent with

5  other relevant factors."

6      Did you receive an instruction from

7  Representative Lewis and Senator Rucho to

8  respect county lines when logical to do so?

9  A.    Yes, and consistent with other relevant

10  factors.

11  Q.    Okay.  And what were those other

12  relevant factors as you understood them?

13  A.    Well, my relative factors were to, again,

14  draw a plan that was legal which fulfilled the

15  Federal criteria of one person one vote, and

16  which would pass muster under Section 2 and

17  Section 5 of the Voting Rights Act;

18  particularly, to get pre-cleared.

19  Q.    Okay.  So, if the Voting -- compliance

20  with the Voting Rights Act required the

21  division of a county, you divided a county,

22  correct?

23          MR. FARR:  Objection to the form.

24  A.    Once again, I have to state that the --

25  the one Section 2 county -- Section 2 district,

1  District 1, was not drawn in a vacuum.  And so,

2  in order to accomplish all of the goals in the

3  drawing of Section (sic) 1 and all of the

4  surrounding districts and the whole plan, it

5  became necessary to split some precincts, and

6  they were split.

7  Q.    I'm not talking about split precincts

8  right now.  I'm talking about county splits.

9  A.    Well, and counties also.

10  Q.    Okay.

11  A.    Yes.

12  Q.    So, when was it logical to split a

13  county as you were -- when did you conclude it

14  was logical to split a county when you were

15  drawing the plan?

16  A.    Well, certainly, if you could not make a

17  -- a legal district out of whole counties, you

18  would have to split counties.

19  Q.    Okay.  And a legal district would be one

20  that was required by Section 2?

21  A.    Yes.

22  Q.    And the Voting Rights Act?

23  A.    I believe that's part of --

24  Q.    Well, I guess it may be about all of it

25  now.

1   A.      No, I don't think so, but I won't get

2   into a legal discussion with you.

3   Q.      Okay, okay.

4   A.      I'll leave that to your fellow attorneys.

5   Q.      Okay.  When else was it logical to split

6   a county?

7   A.      Well, again, you might split a county --

8   you have to, certainly, split counties in order

9   to meet one person one vote.  You might have to

10  split counties to transition.

11  Q.      Transition?

12  A.      The plan.

13  Q.      Transition --

14  A.      From one place to another.

15  Q.      Okay.

16  A.      You might have to split precincts because

17  of incumbencies.

18  Q.      What about partisan advantage?

19  A.      There might be a case of that, yes.

20  Q.      Okay.  Now, I'm focused on whole

21  counties.  Let me now talk about split

22  precincts just a moment.  You were instructed

23  to attempt to respect precinct lines as you

24  were drawing this plan?

25  A.      Yes.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 41 of 82

1    Q.    Okay.  And there are occasions when you

2    did split precincts, correct?

3    A.    That's correct.

4    Q.    And when was it logical in your estimate

5    to split a precinct?

6    A.    Well, again, it might be the same person

7    -- the same purpose for which we would split a

8    county.  It could be a transit.  It could be

9    an incumbency.  It could be to equalize the

10   populations.  It could be in the case of the

11   First to, again, comply with the Voting Rights

12   Act and to comply with some of the input that

13   we had from the public and from members on the

14   plan.

15   Q.    Okay.  And, in fact, in Exhibit 11 on

16   page 7 in paragraph 7, Senator Rucho and

17   Representative Lewis state; and I quote, "Most

18   of our precinct divisions were prompted by the

19   creation of Congressman Butterfield's majority

20   black First Congressional District or when

21   precincts needed to be divided for compliance

22   with the one person one vote," correct?

23   A.    On what page?

24   Q.    Page 7, paragraph 7.

25   A.    Oh, okay.  I'm sorry.

1   Q.    I was --

2   A.    Page 7, 7?

3   Q.    Yes, 7, 7, the last sentence.

4   A.    That's true.

5   Q.    Okay.  And is that an accurate statement,

6   that the -- most of the precincts that were

7   divided in the Congressional plan were divided

8   in the creation of Congressman Butterfield's

9   Congressional District 1 or one --

10  A.    Yes.

11  Q.    -- person one vote?

12  A.    Yes, yes.

13  Q.    Okay.

14  A.    Well, and once again, several other

15  reasons.

16  Q.    Okay.

17          MR. SPEAS:  Now, let me ask the court

18  reporter to mark Exhibit 12.

19  (Plaintiffs' Exhibit 12 Marked for

20  Identification.)

21  Q.    (Mr. Speas)  Dr. Hofeller, I have placed

22  in front of you a document bearing the

23  letterhead of the North Carolina General

24  Assembly and the title "Joint Statement of

25  Senator Bob Rucho and Representative David

1  Lewis regarding the release of Rucho-Lewis

2  Congress 2."

3       I would ask you if you have ever seen

4  Exhibit 12 before?

5  **A.**    I have.

6  **Q.**    Okay.  And did you assist Senator Rucho

7  and Representative Lewis in preparing this

8  document?

9  **A.**    I did not.

10  **Q.**    Did you review this document before it was

11  released?

12  **A.**    I did not.

13  **Q.**    Did you have discussions -- have you

14  reviewed Exhibit 12 since it was published?

15  **A.**    I have.

16  **Q.**    Okay.  And it does not bear a date, but

17  let me just say for the record that the

18  Legislative website reports that this document

19  was published on July 19, 2011.

20       Let me ask you, Dr. Hofeller, to turn to

21  page 4 of Exhibit 12.  And I would call your

22  attention specifically to the last paragraph,

23  and I would -- that paragraph says, "In

24  adopting the Twelfth District, we intended to

25  accommodate the wishes expressed to us by

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 44 of 82

1   Congressman Watt, as we understood them, to

2   continue to include populations located in

3   Mecklenburg, Guilford and Forsyth Counties.

4       "Our revised version of this district

5   makes it more compact and continues the

6   district as a very strong Democratic district.

7   Our version of the Twelfth District is based

8   upon whole precincts that voted heavily for

9   President Obama in the 2008 General Election."

10      Did I read that correctly?

11  **A.**    You did.

12  **Q.**    Okay.  Let me first ask you about their

13  statement that District 12 in the enacted plan

14  is more compact than District 12 in the former

15  plan?

16  **A.**    I haven't reviewed that.

17  **Q.**    You have not?

18  **A.**    I can't answer that.

19  **Q.**    Okay.  What instructions did you receive

20  from Senator Rucho and Representative Lewis

21  about compactness in the Congressional plan --

22  in drawing the Congressional plan?

23  **A.**    I was -- I don't remember actually

24  receiving any specific instructions, except the

25  generalized fact to make plans as compact as

1   possible with the goals and policies of the

2   entire plan.

3   Q.    Okay.  And as you were drawing the

4   plans, did you occasionally apply the

5   mathematical measures of compactness to see how

6   the districts were holding up?

7   A.    No.

8   Q.    Okay.  And at the end of the process,

9   did Senator Rucho and Representative Lewis ask

10  you if the districts were compact in your

11  judgement?

12  A.    Not that I recall.

13  Q.    Okay.  And at the end of the process,

14  did you on your own form any opinion as to

15  whether the districts were compact?

16  A.    Some were; some weren't.

17  Q.    Did you form an opinion as to whether

18  District 12 was compact?

19  A.    My opinion on District 12 was that

20  District 12's compactness was in line with

21  former versions of District 12 and in line with

22  compactness as one would understand it in the

23  context of North Carolina redistricting; and,

24  indeed, in the context of redistricting across

25  the country.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 46 of 82

1    Q.    And on one occasion, you described a

2    former version of Congressional District 12 as

3    the least compact district you'd ever seen,

4    didn't you?

5               MR. FARR:   Objection to the form.

6    A.    I -- if I made that statement, you have

7    some -- I might have said it.  It depends on

8    when I made that statement.  There's been a lot

9    of districts, maybe, after that happened --

10   there's been a lot of 'em this round that have

11   been pretty extreme.

12   Q.    (Mr. Speas)  Do you recall making that

13   statement with regard to the 1991 version of

14   Congressional 12?

15   A.    I don't recall making it, but I would

16   not be at all surprised if I had made it.  It's

17   been a feature of PowerPoints by many, many,

18   many different people.

19   Q.    Okay.  Now, as you completed the plan,

20   did you form an opinion as to whether or not

21   Congressional District 1 was compact?

22   A.    Within the context, again, of North

23   Carolina plans, I did not believe that the --

24   that the new District 12 (sic) had a

25   compactness issue.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 47 of 82

1  Q.    Okay.  Now, let me call your attention --

2            MR. FARR:  Were you asking about 12

3  or 1?

4            MR. SPEAS:  About 1.

5            MR. FARR:  Well, he --

6  A.    I'm sorry.  I gave you a 12 answer,

7  didn't I?

8  Q.    (Mr. Speas)  I'm sorry.  You did.

9            MR. SPEAS:  Thank you, Tom.

10  Q.    (Mr. Speas)  I was asking about District

11  1.

12  A.    Again, within the context of the history

13  of Congressional District 1, I certainly did

14  not believe that there was an issue with the

15  compactness of that district, again, in the

16  North Carolina compactness.

17  Q.    Did you form an opinion as to whether

18  the 2011 version of Congressional 1 was more

19  compact than earlier versions of Congressional

20  1?

21  A.    I'm not really sure that that's a relevant

22  comparison.  I mean, the former plans were all

23  drawn in a different context.  In many cases,

24  there were different numbers of districts, the

25  distribution of the demographics, both

1    demographics racially and ethnically; and

2    population levels were different in all the

3    plans.

4         So, it's -- it's very hard to compare one

5    year to another because all the other factors

6    weigh very heavily on how those districts are

7    formed.

8    Q.    So, would it be accurate then that you

9    made no judgement with respect to whether the

10   2011 version of Congressional 1 was more

11   compact than the 2001 version of Congressional

12   1?

13   A.    Again, please restate that.

14   Q.    You made no judgement at the end of the

15   2011 process regarding whether Congressional 1

16   in 2011 was more or less compact than the 2001

17   version of Congressional 1?

18   A.    Again, I don't understand what you mean

19   by "the end."

20   Q.    Okay.  I'm not sure how I can clear up

21   my unclear question.

22   A.    I mean, it's still going on, is it not?

23   Q.    What's still going on?

24   A.    The process.  We're in court.

25   Q.    Oh, we're in court?

Page 49

1  A.    Okay.

2  Q.    Did you make a decision in 2011 when

3  Congressional District 1 was enacted as to

4  whether it was more compact than the 2001

5  Congressional 1?

6  A.    Again, as I stated previously, I didn't

7  think that it was a relevant thing to do.

8  Q.    Okay.  All right, thank you.

9  A.    Okay.

10 Q.    Now, let me ask you about the next

11 sentence on page 4 of Exhibit 12, which is, and

12 I quote, "Our revision of the Twelfth District

13 is based upon whole precincts that voted

14 heavily for President Obama in the 2008 General

15 Election."

16       Did I read that correctly?

17 A.    Again, I'm trying to find it.

18 Q.    It's at the bo- -- fourth line up from

19 the bottom of page 4.  "Our revision of the

20 Twelfth District is based upon whole precincts

21 that voted heavily for President Obama in the

22 2008 General Election."

23       Did I read it correctly?

24 A.    You did.

25 Q.    Okay.  Did you receive an instruction

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 50 of 82

1  from Senator Rucho and Representative Lewis to

2  draw District 12 based on the 2008 Obama vote?

3  **A.**     I think that was my decision.

4  **Q.**     Okay.  And did you --

5  **A.**     And --

6  **Q.**     Go ahead.

7  **A.**     And there were many, many factors that

8  played into the creation of District 12, and

9  all of them were political.  So, once again, I

10 have to state that District 12 was not drawn in

11 a vacuum.  It was drawn in the context of the

12 districts that immediately surrounded it and in

13 the context of the whole State.  So --

14 **Q.**     Did --

15 **A.**     But --

16 **Q.**     Go ahead.

17 **A.**     No, that's all right.

18 **Q.**     Did you look at the Obama 2008 vote in

19 deciding which districts -- I'm sorry -- which

20 VTDs or census blocks to include in

21 Congressional 12 or not include in

22 Congressional 12?

23 **A.**     You really asked -- there are two parts

24 to that question.

25 **Q.**     Okay.  Can you answer them?

1  **A.**    Okay.  First of all, you don't have

2  Obama vote by block.

3  **Q.**    Okay.

4  **A.**    So, it couldn't have been a factor in

5  where the blocks were -- where there were

6  splits.

7  **Q.**    Okay.

8  **A.**    Secondly, it was certainly an important

9  factor in the placement of the boundaries of

10  the Twelfth District, but there were other

11  political and demographic factors; and by that,

12  I mean population factors that played into

13  which precincts were put in the district as I

14  have explained in previous reports.

15  **Q.**    Okay.  Did you use the Obama 2008 vote

16  in deciding whether to put a VTD in District 12

17  or to put it outside District 12?

18  **A.**    In many cases, yes.

19  **Q.**    Okay.

20  **A.**    Not exclusively.

21  **Q.**    We'll get to that.  And when you were

22  deciding whether to put a district -- a VTD in

23  District 12 or not, did you look at the level

24  of the Obama vote?

25  **A.**    The percentage, yes.

1  **Q.**   Okay.  And if the percentage were less

2  than 50 percent for Obama, did you have a rule

3  as to what you would do with the district --

4  the VTD?  I'm sorry.

5  **A.**   I'm sorry.  I'm trying to follow your

6  question, but --

7  **Q.**   Okay.  As you were looking at the Obama

8  vote, did you look at the percentage of the

9  vote for Obama in deciding whether to put the

10  VTD in District 12 or not?

11  **A.**   In many cases, yes.

12  **Q.**   Okay.  And if the percentage vote for

13  Obama were higher, more than 50 percent, was

14  that a factor that led you to put the VTD in

15  Congressional 12?

16  **A.**   In some cases; in other cases, it was --

17  there were other factors at play.

18  **Q.**   Okay.  In Exhibit 12, Senator Rucho and

19  Representative Lewis state that the revision of

20  the Twelfth District is based upon whole

21  precincts that voted heavily for President

22  Obama in the 2008 General Election.

23      Do you know -- do you have some

24  understanding of what they meant when they

25  said, "voted heavily for President Obama"?

1   A.    I think you'd really have to ask them

2   what they thought they meant by it.

3   Q.    Okay.  Did you place districts in 12 or

4   out of 12 based the heaviness of the Obama vote?

5   A.    In many cases, yes.

6   Q.    Okay.  The higher the Obama vote, the

7   more likely you would put the VTD in 12,

8   correct?

9   A.    Again, in most cases, yes.

10  Q.    The lower the Obama vote, the more

11  likely you would place the VTD outside District

12  12, correct?

13  A.    I don't think that that's a fair

14  conclusion to make.  I mean, there are many

15  factors, again, playing into the actual

16  construction of District 12.  It's a very

17  complex district.  And some of the precinct

18  placements obviously were -- actually, VTDs, I

19  might use them interchangeably -- were more

20  mandated by holding the district together.

21  Q.    Okay.  It had to be contiguous?

22  A.    That's now a requirement.  It wasn't a

23  requirement in past Congressional plans in the

24  State.

25  Q.    Okay.  Now, did you inform Senator Rucho

1   and Representative Lewis that you were drawing

2   12 -- the Twelfth District based on the whole

3   precincts that voted heavily for President

4   Obama?

5   A.    My instructions were I was to create a

6   heavily Democratic district.

7   Q.    Okay.

8   A.    And by creating a heavily Democratic

9   district, Democratic voting strength would be

10  withdrawn from the surrounding districts which

11  would make the surrounding districts more

12  competitive for Republicans.

13  Q.    Okay.

14  A.    Some of those districts had requirements

15  that were different from other districts.  So,

16  it was a balancing act of the Twelfth in

17  relationship to all the other surrounding

18  districts, which would be my understanding of

19  how it was drawn previously, too.

20  Q.    And Senator Rucho and Representative

21  Lewis did not disagree with the decision you

22  made?

23          MR. FARR:  Objection to the form.

24  Q.   (Mr. Speas)  They did not inform you

25  that they disagreed with your decision?

1    **A.**     I think if you know Senator Rucho, you'd

2    know that if he disagreed with something I did,

3    I would know it.

4    **Q.**    Okay.  All right.  Now, you -- one of

5    your areas of expertise is voting behavior,

6    correct?

7    **A.**     Yes.

8    **Q.**    Okay.  And you used your expertise in

9    voting behavior in constructing the 2011 plan?

10   **A.**     To some extent.  Most of my voting

11   behavior experience was -- is with election

12   targeting and such; but, again, the -- there

13   were certain partisan policy goals which the

14   General Assembly wanted to fulfill in the

15   construction of this map.  And, certainly, my

16   knowledge of political data and how it plays

17   into the winning of elections is just

18   internalized in my mind.

19   **Q.**    Okay.  Based on your past experience and

20   your knowledge, did you count a vote for Obama

21   as a vote for a black or a Democrat?

22   **A.**     A Democrat.

23   **Q.**    Okay.  Did you use any other election

24   results in putting VTDs in or outside of

25   Congressional 12?

1    **A.**    I'm sorry?  Did you say political --

2    **Q.**    Did you use any elections other than the

3    2008 Obama election in putting districts in or

4    outside --

5    **A.**    I did not.

6    **Q.**    Okay.  You've draw a lot of plans.

7    **A.**    Many, many plans.

8    **Q.**    Many, many, many plans -- hundreds

9    probably, correct?

10   **A.**    I don't know if it's hundreds, but a lot.

11   **Q.**    In drawing other plans, have you ever

12   placed a VTD in or outside a district based on

13   the results of a single election?

14   **A.**    Yes.

15   **Q.**    And can you -- have you ever done that

16   -- did you do that with any other North

17   Carolina district, Congressional or --

18   **A.**    I may have.  You know, it's been a long

19   time since this last process.

20   **Q.**    Okay.

21   **A.**    I think most people over-complicate these

22   things.

23   **Q.**    Okay.  Do you recall any State

24   legislative district you drew in 2011 that you

25   used only the results of a single election in

1  putting VTDs in or outside the district?

2  A.    In -- in many cases as part of my

3  general work, I would evaluate states and how

4  they could be redistricted; and in many of

5  those cases, I would use the presidential vote

6  because the presidential vote is the most

7  recent and in many states it might be the only

8  50/50 or near 50/50 contested election with

9  full turnout and with the kinds of knowledge

10  and communications in them.

11       And I think it's a -- a very good thing

12  to look at.  Also, when you're comparing old

13  districts to new districts, in some of those

14  cases, I would use one election; and in other

15  cases, I might use two or three elections.

16  Q.    But to answer my question, do you recall

17  any district you drew in either the State House

18  or State Senate in 2011 in which you used the

19  results of a single election in assigning a VTD

20  to a district?

21  A.    I'd have to think about that.

22  Q.    Well, let me be more specific.  Do you

23  recall any other Congressional district other

24  than 12 in which you used the results of the

25  2008 Obama election to assign a VTD to the

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 58 of 82

1    district or not?

2    A.    Other than --

3    Q.    Other than CD 12.

4    A.    Yes, of course.

5    Q.    Okay.  Which ones?

6    A.    I'm sorry.  I -- I was using the

7    McCain/Obama vote across the State.

8    Q.    Okay.  In forming --

9    A.    That's the way I understood your question.

10   Q.    In forming Congressional 12 -- I mean, the

11   Congressional plan?

12   A.    Yes.

13   Q.    Okay.  All right.  Thank you.

14   A.    I'm sorry.  I thought I -- you thought I

15   --

16   Q.    I misunderstood.

17   A.    Could I get a break here?

18   Q.    Yes, absolutely.

19              (SHORT BREAK 10:20 - 10:25 A. M.)

20   Q.    (Mr. Speas)  Let me give my last set of

21   questions one more try.  Here's my question:

22   when you were drawing the Congressional plan,

23   did you use any election results other than the

24   Obama 2000 (sic) election results in assigning

25   VTDs to one district or another?

1    **A.**    Not that I can recall.

2    **Q.**    Okay.  In drawing the Legislative plans,

3    the State House and the State Senate, do you --

4    did you use election results other than the

5    Obama 2008 election results in assigning VTDs

6    to districts?

7    **A.**    I don't really recall.  I had a lot of

8    advice from many, many people on that, and as

9    you recall, the Legislative map draws itself to

10   a very great extent.

11             MR. SPEAS:  And let's mark as

12   Exhibit 13 this next document.

13   (Plaintiffs' Exhibit 13 Marked for

14   Identification.)

15   **Q.**    (Mr. Speas)  Dr. Hofeller, Exhibit 13, I

16   would represent to you, was printed off of the

17   Legislature's redistricting website; and I

18   would ask you if you have seen that document

19   before?

20   **A.**    To be truthful, I don't recall that I

21   have seen that document before.  I certainly

22   computed the same data.  It would be probably

23   one of the very first steps that you would look

24   at.  Even before you start drawing, people in

25   states and in Washington, D.C. are looking at

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 60 of 82

1  the pluses and the minuses of all the districts.

2  Q.    Okay.  And this document simply reports

3  the amount by which any district was --

4  existing district -- the 2001 district was over

5  or under the ideal population for 2011

6  purposes, correct?

7  A.    Yes.

8  Q.    And this document reports that District

9  12 was overpopulated by 2,847 people?

10  A.    Yes.

11  Q.    And that District 1 was underpopulated by

12  97,563 people?

13  A.    Yes.

14  Q.    Okay.  And the same numbers -- the same

15  result is reported for other districts?

16  A.    True.

17  Q.    Okay.  Now, I want to show you Exhibit

18  14.

19  (Plaintiffs' Exhibit 14 Marked for

20  Identification.)

21  Q.    (Mr. Speas)  Dr. Hofeller, I would

22  report to you that Exhibit 14 is a collection

23  of maps of District 12 as it appeared in

24  Rucho-Lewis Congress 1, Rucho-Lewis Congress 2,

25  Rucho-Lewis Congress 2A, and Rucho-Lewis

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 61 of 82

1    Congress 3.

2          Does this document appear to contain those

3    districts -- those versions of Congressional 12?

4    A.    You know, I can't verify --

5    Q.    Okay.

6    A.    -- with any high degree of certainty.

7    It looks right to me.

8    Q.    Okay.  My question is this:  looking at

9    Exhibit 13 (sic), and based on your memory, is

10   it correct --

11              MR. FARR:  It's 14.

12              MR. SPEAS:  Fourteen.  I'm sorry.

13   Q.    (Mr. Speas)  Is it correct that

14   Congressional District 12 did not change much,

15   if at all, through the various iterations

16   presented to the General Assembly; Rucho-Lewis

17   Congress 1, 2, 2A and 3?

18   A.    (Witness peruses Exhibit.)  Okay.  Now,

19   that I've looked at all four maps, I need you

20   to repeat your question.

21              MR. FARR:  Well, I may want you to

22   look at these first.  (Indicating other

23   documents.)

24   Q.    (Mr. Speas)  Well, let me just put my

25   question on the table so you can think about it

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 62 of 82

1    when you're looking at whatever Tom wants you

2    to look at.

3        My question is simply this:  from the

4    time it was first introduced as Rucho-Lewis

5    Congress 1 until the time it was enacted as

6    Rucho-Lewis Congress 3, there was no

7    significant change in the shape or location of

8    the district?  It was enacted essentially as it

9    was first introduced?  That's the question.

10   **A.**    Did you want me to look at something?

11   (Addressing Mr. Farr)

12          MR. FARR:  You might want to look

13   at these color versions just because -- well,

14   go ahead and answer the question.

15   **A.**    Okay.  I'm going to answer your question.

16   **Q.**    (Mr. Speas)  Okay.

17   **A.**    Again, it depends on what you judge as

18   significant.  You know, in a redistricting

19   plan, a movement of one VTD could be extremely

20   significant, particularly, to an incumbent.

21   So, in order to answer that question with a

22   high degree of precision, I'd have to do a

23   comparison on the system between the plans to

24   see what happened.

25          So, I think substantially the same would

1  be a better definition.

2  Q.    Okay.  And do you recall making any

3  changes in Congressional 12 from the time it

4  was introduced as Rucho-Lewis Congress 1 until

5  it was enacted?

6  A.    Yes, I did.

7  Q.    Okay.  And do you recall what those

8  changes were?

9  A.    Not specifically, no.  I'd have to go

10  back and review, again.

11  Q.    Okay.  Do you recall any of those

12  changes as being significant as you would use

13  the term significant?

14  A.    I don't use -- I'm not using the term

15  significant; you are.

16  Q.    Okay.

17  A.    I would --

18  Q.    Were they significant to you?

19  A.    Well, if they weren't -- if they weren't

20  important to be made, I wouldn't have made them.

21  Q.    Okay.

22          MR. SPEAS:  Let me ask the court

23  reporter to mark the next document as Exhibit

24  15.

25  (Plaintiffs' Exhibit 15 Marked for

1    Identification.)

2    **Q.**    (Mr. Speas)  Dr. Hofeller, you have in

3    front of you Exhibit 15, which I will report to

4    you is the "Stat. Pack Report of Voting Age

5    Population by Race Ethnicity, Rucho-Lewis

6    Congress 3 as printed off of the General

7    Assembly's website.

8        Do you recognize that document?

9    **A.**    No, I'm having trouble seeing the

10    document; let alone recognize it.

11        MR. OLDHAM:  That was what I was

12    going to ask you, is --

13    **A.**    And the pages are stapled together

14    incorrectly.

15        MR. SPEAS:  I'm sorry?

16        MR. OLDHAM:  I said as soon as I

17    saw this, I knew he was going to have trouble

18    reading this.

19    **A.**    Can I take it apart?

20    **Q.**    (Mr. Speas)  Yes, you can take it apart.

21    **A.**    I don't know if it -- does anyone have a

22    magnifying glass?

23        MR. FARR:  I do.

24            (DISCUSSION OFF RECORD.)

25    **Q.**    (Mr. Speas)  Do you recognize this as a

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 65 of 82

1  report generated from the General Assembly's

2  website reporting the voting age population by

3  race for Rucho-Lewis Congress 3, the first

4  page, and Rucho-Lewis Congress 1, the second

5  page?

6  **A.**     Yes.

7  **Q.**     And looking at Congressional 12 as

8  enacted in Rucho-Lewis Congress 3, is it

9  correct that that district contains 269,987

10  black votes?

11  **A.**     I'm sorry?  What type of African-American?

12  **Q.**     Blacks.

13  **A.**     What -- there are several different --

14  **Q.**     Does this report -- the black voting age

15  population for --

16  **A.**     Okay.

17  **Q.**     -- District 12 in Rucho-Lewis Congress 3

18  has 269,987?

19               MR. FARR:  Which one are you on,

20  Eddie?

21               MR. SPEAS:  The first page, the

22  Rucho-Lewis 3.

23               MR. FARR:  269,987?

24               MR. SPEAS:  Yes.

25               MR. FARR:  Yeah.  We'll stipulate

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 66 of 82

1   that's what it says.

2   A.   I can't find it.

3          MR. FARR:  That's all right.  It's

4   there.

5   A.   269 -- oh, that's total population; not

6   VAP.

7   Q.   (Mr. Speas)  No, it's voting age

8   population.

9          MR. FARR:  It's voting age

10  population.  It's not total black voting age

11  population.

12  A.   I've got it.  Yeah, I agree.

13  Q.   And that the total black population is

14  275,812.

15  A.   Say again now.  I'm trying to look.

16  Q.   275,812 total black population District

17  12 in Rucho Congress 3.

18  A.   Yes.

19  Q.   Okay.  Looking at the second page, was

20  the black population -- voting age population

21  in Rucho-Lewis Congress 1 268,871?

22  A.   Yes.

23  Q.   And was the total black population in

24  Rucho-Lewis Congress 1 for Congressional 12

25  274,671?

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 67 of 82

1   A.    Yes.

2   Q.    Okay.

3         MR. SPEAS:  Now, let me ask the court

4   reporter to mark this as Exhibit 16.

5   (Plaintiffs' Exhibit 16 Marked for

6   Identification.)

7   Q.   (Mr. Speas)  Dr. Hofeller, would you

8   look at Exhibit 16, and tell me whether or not

9   this document contains information about

10  Congress Zero Deviation which was the 2001

11  enacted Congressional plan?

12  A.    Appears to to me.

13  Q.    Okay.  And would you look at the third

14  page of that Exhibit 16 and tell me whether

15  that page lists the voting age population by

16  race by district for the 2001 plan?

17        MR. FARR:  Was this by the 2000

18  census or the 2010 census?

19        MR. SPEAS:  2000 census.

20  A.    (Witness peruses document.)  It doesn't

21  say that on there, but --.

22  Q.   (Mr. Speas)  Okay.

23  A.    Because you ask for it in different ways.

24  Q.    You can, and I asked for it in 2000.

25  A.    Okay.

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 68 of 82

1  Q.    Let me ask you this -- and pull out your

2  magnifying glass.

3  A.    I can read this.

4  Q.    Oh, okay, good.  In District 12 in 2001

5  by voting age population, were there 194,901

6  African-Americans in District 12?

7  A.    The report so states, yes.

8  Q.    Okay.  Now, in 2011, District 12

9  contained 269,987 blacks, voting age

10 population.  That's the number Tom agreed to.

11         MR. FARR:  Which -- Eddie, I'm lost.

12 Where are --

13 A.    That's off the previous report.

14 Q.    (Mr. Speas)  Exhibit 15.

15         MR. FARR:  The enacted plan

16 contained -- the 2011 enacted plan --

17         MR. SPEAS:  Contained 269,987 black

18 voting age population persons.

19 Q.    (Mr. Speas)  Is that correct?

20 A.    May I ask my attorney a question off the

21 record?

22 Q.    You sure may.

23             (DISCUSSION OFF RECORD.)

24 Q.    (Mr. Speas)  Comparing Exhibit 15 and

25 Exhibit 16, Dr. Hofeller, is it correct that --

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 69 of 82

1          MR. FARR:  Eddie?

2          MR. SPEAS:  Yes.

3          MR. FARR:  Just to clarify, on

4   Exhibit 15, we're looking at voting age

5   population; not total population?

6          MR. SPEAS:  Yes.

7          MR. FARR:  Okay.  I just think

8   there was some confusion in your question.

9          MR. SPEAS:  Okay.  All -- all these

10  numbers are voting age population.

11         MR. FARR:  Right, right, just to

12  clarify for the record.

13         MR. OLDHAM:  If you asked him what

14  the total population was --

15         MR. SPEAS:  I did not mean to ask

16  about total population.  I did -- there is the

17  category "Total Black" population.

18         MR. OLDHAM:  But that is not total

19  population.

20         MR. SPEAS:  That is not total

21  population.  I understand that.

22         MR. OLDHAM:  Okay.

23  Q.   (Mr. Speas)  Dr. Hofeller, my question is

24  this: based on Exhibit 15 and 16, is it correct

25  that District 12 as drawn in 2011 contains

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 70 of 82

1   approximately 75,000 more blacks than the

2   district contained in 2001?

3          MR. FARR:  Under the 2- -- the 2001

4   district -- you're comparing the 2000 census to

5   the 2010 census?

6          MR. SPEAS:  Yes, yes.

7   A.    Yes.  I don't know why that's relevant

8   though.

9   Q.    (Mr. Speas)  Okay.  My -- my question to

10  you is this:  how did you find these

11  approximately 75,000 black citizens in drawing

12  District 12?

13  A.    Well, the -- the correct comparison are

14  the 2010 census figures of the old district to

15  the new district.  Of course it would be

16  different.  The populations were smaller then.

17  Q.    But there are 75,000 more black citizens

18  in District 12 in 2011 than 2001, correct?

19  A.    Again, I don't agree with the premise of

20  your question.  The benchmark, if you have a

21  benchmark, which is really a Section 5 term,

22  would not be the district as it was in 2001.

23  It would be the district as it is at the end of

24  the decade with the new census.

25         So, the census found most of them.

1   That's where they came from.

2   Q.   How did you go about fulfilling the

3   direction you received from Senator Rucho and

4   Representative Lewis to increase the black

5   voting age population in District 12?

6   A.   I believe I've already mentioned that,

7   that -- that the issue there was really

8   Guilford County and the fact that the black

9   community was fractured by the Democrats in

10   2001 for the political purpose of making

11   District 13 more partisan in their favor.

12        And as that wasn't the objective of our

13   plan, there were new -- going to be a new bunch

14   of districts surrounding District 12 that we

15   were worried that there would be a challenge

16   because the black community would have been

17   fractured if the district were left in the same

18   place.

19        So, my instruction was not to increase the

20   population.  My instruction was to try and take

21   care of that problem, Guilford, but the primary

22   instructions and overriding instruction in

23   District 12 was to accomplish the political

24   goal of making the district strongly Democratic

25   and pulling strongly Democratic voting areas

1   out of the surrounding districts to make them

2   more competitive or keep them competitive for

3   the Republicans.

4        That's what I believe I said last time

5   you asked me that.

6   Q.   Is it an accident that the black voting

7   age population increased by several percent

8   from 2001 to 2011 in District 12?

9   A.   An accident?

10  Q.   Yes.

11  A.   What do you mean by an accident?

12  Q.   That was an inadvertent result?  Was

13  that an intended result, or unintended result?

14  A.   It was not an intended result.  The

15  intended result was to increase the Democratic

16  voting strength in the Twelfth.  It was that

17  when -- it was constructed after the Cromartie

18  case, and it was that -- it's been that ever

19  since.  It's a political district; not a racial

20  district.

21       And the goal was to accomplish political

22  ends.  The problem is that the Republicans'

23  political ends and objectives for that whole

24  area were entirely different than the

25  Republicans' objectives this time around.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 73 of 82

1      And -- and it was influenced by that, and

2   it was influenced by population shifts.  So, I

3   can't --

4           MR. FARR:  Excuse me, Dr. Hofeller.

5   Did you mean the Democrats' interests were

6   different from the Republicans' interests?  You

7   said Republicans twice.

8   **A.**    I'm sorry.  The primary difference

9   between the 2001 redistricting cycle and the

10  2011 redistricting cycle was that in the recent

11  cycle, the one we're still dealing with, the

12  Republicans were in control.  In the last

13  cycle, the Democrats were in control, and they

14  had entirely different political objectives

15  that they wanted to accomplish in the creation

16  of this map as a whole.

17  **Q.**    (Mr. Speas)  So, your testimony is that

18  the increase in black total population in

19  District 12 from 2001 to 2011 is an inadvertent?

20  **A.**    No, that's not my testimony.

21  **Q.**    Is it your testimony that it is a

22  consequence of your use of the 2008 Obama

23  election results to assign VTDs to the district?

24  **A.**    Partially.

25  **Q.**    And what else?

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 74 of 82

1   A.    The shape of the district, again, was

2   influenced by the goals of the Republican

3   redistricting group -- the General Assembly

4   majority in constructing the entire plan, and

5   the goal was to make the Twelfth District

6   stronger in terms of Democratic vote.

7        And when that was done, these were the

8   consequences.

9   Q.    In their July 1, 2011 report to the

10  people of North Carolina, Senator Rucho and

11  Representative Lewis said, "Because of the

12  presence of Guilford County in the Twelfth

13  District, we have drawn our proposed Twelfth

14  District as a black voting age -- at a black

15  voting age level that is above the percentage

16  of black voting age population found in the

17  current Twelfth District."

18        Did you receive an instruction from

19  Senator Rucho and Representative Lewis to draw

20  the Twelfth District at a level above the

21  percentage of black voting age population in

22  the 2001 version?

23  A.    No.  As I said before in my previous

24  answer -- do you want me to repeat it?

25  Q.    Yes, please.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 75 of 82

1  **A.**     Okay.  The problem in Guilford County was

2  that Guilford County was a Section 5 county.

3  When the Democrats redistricted the county in

4  the previous map, they fractured the

5  African-American community for political

6  purposes.

7      And that political purpose was to

8  strengthen the Thirteenth District.  When the

9  district in the northern end of Guilford County

10  was being drawn in the Republican map in 2011,

11  it was clear that that district was not going

12  to be a Democratic district.

13      So, in order to be cautious and draw a

14  plan that would pass muster under the Voting

15  Rights Act, it was decided to reunite the black

16  community in Guilford County into the Twelfth.

17  **Q.**    Okay.  Dr. Hofeller, would you put your

18  Exhibit 8 back in front of you, which is your

19  report?

20           (DISCUSSION OFF RECORD.)

21  **A.**     Okay.

22  **Q.**    (Mr. Speas)  Dr. Hofeller, turn with me

23  to page 23 of your report, which is the last

24  page of your report.  And my questions will be

25  about paragraphs 68, 69, 70 and 71, if you want

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 76 of 82

1   to take a minute to review that.

2   A.    (Witness peruses document.)

3   Q.    Have you had a chance to look at it?

4   A.    I have.

5   Q.    Dr. Hofeller, my question is this:  with

6   respect to Congressional District 1, was

7   compliance with the Voting Rights Act or the

8   creation of safe and competitive districts more

9   important?

10  A.    The primary factor governing the creation

11  of the entire plan, including the First

12  District, was to accomplish the political

13  policy goals of the General Assembly to

14  equalize the populations, to stabilize the

15  populations by going into the urban area, to

16  account for the population shifts within the

17  State and to ensure that Section 2 -- District

18  1 is a Section 2 district -- pardon me -- would

19  pass muster as a Section 2 district under the

20  Voting Rights Act and under Strickland.

21  Q.    And in drawing Congressional 1, did the

22  law as set forth in the Voting Rights Act, as

23  you and Senator Rucho and Representative Lewis

24  predominate over your political goals?

25              MR. FARR:  Objection to the form.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 77 of 82

1  **A.**   Well, I don't agree with the premise of

2  your question, but the -- the -- again, the

3  placement of where the First District was

4  located and accomplishing the political goals

5  were not necessarily in opposition to one

6  another, as were any of the other goals.

7       So, it was one factor out of many.

8  **Q.**   (Mr. Speas)  Okay.

9         MR. SPEAS:   Can I take a few

10  minutes to look over my stuff?

11         MR. FARR:  Sure.

12         (SHORT BREAK 10:55 - 11:04 A. M.)

13  **Q.**   (Mr. Speas)  I have one more set of

14  questions.  Dr. Hofeller, would you put Exhibit

15  8 back in front of you, which is your report.

16  And I want to talk to you about paragraph 33 of

17  your report on page 10.

18       And I am particularly interested in the

19  sentence in paragraph 33 that says, quote, "My

20  experience in drafting and evaluating plans has

21  continued to enforce my expert opinion that the

22  best predictor of future election success is

23  past voting behavior, not registration."

24       Did I read that correctly?

25  **A.**   Yes.

Case 1:13-cv-00949-WO-JEP   Document 68-1   Filed 06/02/14   Page 78 of 82

1  **Q.**    And that is your opinion?

2  **A.**    Yes.

3  **Q.**    All right.  And would it be accurate

4  then, Dr. Hofeller, that the best predictor of

5  the results of elections in Congressional

6  Districts 1 and 12 would have been the past

7  election results in those districts?

8  **A.**    I'd say I'd have to agree with that, yes.

9  **Q.**    Okay.

10          MR. SPEAS:  Thank you very much.

11  **A.**    Am I done?

12          MR. SPEAS:  You're done.  I'm sorry.

13          MR. FARR:  I just have a couple of

14  questions -- very few; actually, maybe just one.

15  Cross-Examination by Mr. Farr:

16  **Q.**    Dr. Hofeller, would you pull out Exhibit

17  10, which is the second report of the Professor.

18          MR. SPEAS:  The second report?

19          MR. FARR:  Yeah, of the Plaintiffs'

20  expert witness.

21  **A.**    Okay.

22  **Q.**    (Mr. Farr)  Do you remember testifying

23  that you thought that in this second report,

24  the Plaintiffs' expert had relied to some

25  extent on election results?  Do you remember

1  saying that today?

2  A.    I did.

3  Q.    Would you go through this and tell me if

4  you can point out where the expert relied on

5  election results?

6  A.    I'd really have to -- it would be better

7  if I could be read back the context of what I

8  said.

9  Q.    Well, I think you made a comment that

10  you thought in the second report that he had

11  relied upon election results to some extent.  I

12  wanted to clarify what you meant by that.  I

13  wanted you to -- well, let me be more specific.

14  A.    Okay.

15  Q.    In this second report, does Plaintiffs'

16  expert actually look at any actual election

17  results in an election?

18  A.    I believe in Table 1 on page 18.

19  Q.    Yeah.

20  A.    He did the correlation between Obama's

21  share of the two-party vote and the racial

22  composition of VAP and registered voters in

23  VTDs.  That classifies in my term election

24  results.

25  Q.    Can you explain that a little more?

1   What is your understanding of what he did?

2   **A.**    Well, he computed the black and white

3   voting age population for each VTD, or he took

4   out of the data -- one or the other, and he

5   took out the black and white voter

6   registration.  Of course, it doesn't speak at

7   all about the independent, which is a great

8   deal of the vote.

9        And then ran a correlation of that, and

10  the racial composition of the -- of the VAP and

11  the two-party vote.  So, he added the Obama

12  vote and the McCain vote, and found a total of

13  that and created percentages for the two-party

14  Obama vote and the two-party McCain vote.

15       And he ran the correlation analyses.

16  **Q.**    Okay.  Did you -- when you were drawing

17  these districts, did you rely on information

18  that would be similar to what is in Exhibit 10,

19  the Plaintiffs' expert's second report?

20  **A.**    All of it?

21  **Q.**    No, no, just what we just talked about.

22  **A.**    Oh.

23  **Q.**    The election results.

24  **A.**    I'm sorry.  Table 1?  Of course not.

25  There are a lot of things that you would look

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 81 of 82

1    at about a district after it's drawn, but the

2    redistricting system doesn't calculate on the

3    fly.

4         There's just -- you can't -- after you

5    move each little unit in the district, you

6    can't go through a full analysis of it.  We'd

7    still be doing the plan today.  So, the answer

8    is no.

9              MR. FARR:  All right.  That's all I

10   have.

11             MR. SPEAS:  Thank you.

12   **A.**    You're welcome.  Nice seeing you again.

13             (WITNESS EXCUSED.)

14   (FURTHER DEPONENT SAITH NOT AT 11:10 A. M.)

Case 1:13-cv-00949-WO-JEP  Document 68-1  Filed 06/02/14  Page 82 of 82