# EXHIBIT S – Part 1

## Complete Deposition of Dr. Stephen Ansolabehere

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
Civil Action No. 1:13-CV-00949

DAVID HARRIS; CHRISTINE          )     D E P O S I T I O N
BOWSER; and SAMUEL LOVE,         )
                                 )            O F
                Plaintiffs;)
        -v-                      )     STEPHEN ANSOLABEHERE, PH.D.
PATRICK MCCRORY, in his capacity)
as Governor of North Carolina;  )
NORTH CAROLINA STATE BOARD OF   )
ELECTIONS; and JOSHUA HOWARD, in)
his capacity as Chairman of the )
North Carolina State Board of   )
Elections,                      )
                Defendants.)
--------------------------------)

APPEARANCES:
For the Plaintiffs:  Poyner Spruill
                     Attorneys at Law
                     P.O. Box 1801
                     Raleigh, North Carolina 27602
                     John W. O'Hale, Esquire, appearing
                     Caroline P. Mackie, Esquire, appearing
                     Edwin M. Speas, Jr., Esquire, appearing.
For the Defendants:  Ogletree, Deakins, Nash
                     Attorneys at Law
                     4208 Six Forks Road, Suite 1100

                     Raleigh, North Carolina 27609

                     Thomas A. Farr, Esquire, appearing.


                     N.C. Department of Justice

                     P.O. Box 629

                     Raleigh, North Carolina 27602

                     Alexander McC. Peters, appearing.

In Attendance:       Dalton Oldham and Thomas Hofeller

At Raleigh, North Carolina.

Tuesday, May 6, 2014.

T A B L E   O F   C O N T E N T S

E X A M I N A T I O N

| Witness | By Whom | Page No. |
|---|---|---|
| Stephen Ansolabehere | Mr. Farr | 5 |

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 3 of 63

        The following deposition of STEPHEN ANSOLABEHERE,

PH.D., called as a witness by the Defendants, was taken

before Glenda F. Hightower, Certified Verbatim Reporter and

Notary Public, at the law offices of Ogletree, Deakins,

Nash, Smoak and Stewart, 4208 Six Forks Road, Suite 1100,

Raleigh, North Carolina on Tuesday, May 6, 2014 beginning

at 12:25 p.m.

              S T I P U L A T I O N S

        Prior to the taking of the testimony, counsel for the

respective parties stipulate and agree as follows:

        1.  That the deposition shall be taken and used as

permitted by the applicable Federal Rules of Civil

Procedure.

        2.  That any objections of any party hereto as to the

notice of the taking of the deposition or as to time or

place thereof, or as to the competency of the person before

whom the same shall be taken, are deemed to have been met.

        3.  Objections to questions and motions to strike

answers need not be made during the taking of this

deposition, but may be made for the first time during the

progress of the trial of this case, or at any pretrial

hearing held before any judge of competent jurisdiction for

the purpose of ruling thereon, or at any other hearing of

said case at which said deposition might be used, except

that an objection as to the form of a question must be made

at the time such question is asked, or objection is waived

as to the form of the question.

    4.  That the witness reserves the right to read and

sign the deposition prior to filing.

    5.  That the original transcript of this deposition

shall be mailed Priority Mail Postage to the party taking

the deposition for preservation and delivery to the Court.

1  Whereupon,

2        STEPHEN ANSOLABEHERE,

3  Having been first duly sworn, was examined and

4  testified as follows:

5  Direct Examination by Mr. Farr:

6  Q.    Henry Higgins, I presume?

7  A.    (Laughs.)

8  Q.    Could you please state your name for the

9  record?

10 A.    Stephen Daniel Ansolabehere.

11 Q.    And during the course of this deposition,

12 would you object if I called you Professor or

13 Steve?

14 A.    Not at all.

15 Q.    Okay.  Thanks a lot.  Professor, I don't

16 -- I've got a copy of your report which has

17 been marked as Exhibit 9, and I apologize; but

18 the copy that I have does not have a copy of

19 your vitae attached to it.

20 A.    Oh.

21 Q.    So, I'm just going to ask you a few

22 questions about your background.

23 A.    Okay.

24 Q.    So, could you tell me how -- when you

25 received your education, and the type of

1   degrees you received and when you received your

2   degrees?

3   A.    In 1984, I received a Bachelor of Arts

4   and a Bachelor of Science from the University

5   of Minnesota.  In 1989, I received by Ph.D. in

6   Government from Harvard University.

7   Q.    And is that --

8   A.    Those are my degrees.

9   Q.    Do you have a master's degree?

10  A.    Well, I get a master's in passing in the

11  Ph.D.  program, so --

12  Q.    Okay.  So, let me --

13  A.    -- as you qualify, you get a master's.

14  Q.    Okay.  Have you had your deposition

15  taken before?

16  A.    I have.

17  Q.    Okay.  Just a few ground rules,

18  Professor:  because of the court reporter,

19  would you let me finish my question before you

20  answer?  A lot of times, people who are in this

21  situation start having a conversation, and you

22  know what I'm going to say, and I think I know

23  what you're going to say; but to benefit the

24  court reporter, try to let me finish my

25  question.  And I will try very hard not to

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 7 of 63

1    interrupt your answer.  Is that okay?

2    **A.**    I will try my best.

3    **Q.**    Okay.  I'm looking at your -- your first

4    -- you've done two expert reports in this case,

5    is that right?

6    **A.**    Correct.

7    **Q.**    Okay.  I'm looking at the first one,

8    which I think has been marked as Exhibit 9,

9    which you have in front of you.  I want to ask

10   you about some of the experiences that you've

11   listed in the first few pages of this exhibit.

12       So, could you tell me -- in the first

13   paragraph, you say you directed the Caltech/MIT

14   voting technology project from 2000 to 2004.

15   Could you give me an explanation of what that

16   was?

17   **A.**    Following the 2000 election controversy,

18   the President of Caltech and the President of

19   MIT initiated a project to study voting

20   technology to try to help find technical

21   solutions to various problems that were

22   discovered during the elections.

23       And I organized a team of engineers,

24   computer scientists and social scientists to

25   try to develop new voting technologies, new

1   registration procedures and so forth, and to

2   help advise different organizations,

3   governmental and non-governmental.

4        And as Director, I was responsible for

5   raising the funds for that, organizing the

6   activities, helping prepare reports and

7   coordinating any kind of consulting with

8   government.

9   Q.   Okay.  Was that your first job after you

10  got your Ph.D.?

11  A.   My first job after my Ph.D. was I taught

12  at UCLA, and I was a Professor of Political

13  Science.  Then, they didn't have a statistics

14  department; they had a social statistics

15  program.  So, that eventually became the

16  statistics department.

17       And then I moved to MIT in 1995, and I

18  taught at MIT.  I was appointed in '94, but I

19  moved there in '95.  I taught at MIT until

20  2007/2008, and then I moved to Harvard.

21  Q.   Okay.  What were your positions at MIT?

22  A.   I was -- I started as an Assistant

23  Professor and was immediately promoted to

24  Tenured Associate Professor.  I was then

25  promoted to a full Professor, and then given an

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 9 of 63

1  endowed Chair.  I served as the associate head

2  of the department, largely in charge of

3  personnel matters.

4       At MIT, I did various activities,

5  including running a seminar for senior

6  congressional staff on technology politics, and

7  running the Caltech/MIT voting technology

8  project and other programs and projects.

9  Q.    Okay.  Did you -- at UCLA or MIT, did

10  you teach any classes?

11  A.    Yes.  I teach everything from Intro to

12  American Government to Social Science

13  Statistics to advanced graduate classes largely

14  in elections and voting behavior; some in

15  Congress and representation.

16  Q.    And tell me what you mean by voting

17  behavior.

18  A.    Voting behavior covers a range of -- of

19  research activities from public opinion

20  research to study of elections and election

21  outcomes, both in the U.S. and other countries,

22  to various questions -- even engaged in things

23  like election law, problems of representation,

24  redistricting and so forth.

25       So, it really runs the gamut from the

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 10 of 63

1   very micro to the aggregate macro.

2   Q.     Have you ever taught a class, or have

3   you ever been engaged to predict election

4   results?

5   A.     I work for CBS News on election night.

6   So, the job there is to actually call the

7   elections on election night as we're getting

8   real-time data.  So, it's processing the

9   election returns as they come in, trying to

10  resolve discrepancies; trying to make a

11  forecast so we're reasonably sure when an

12  election is going one way or the other.

13         So, that's actually real-time forecasting;

14  you know, what will happen when the election

15  count is over and how sure are we that this is

16  a finished, you know, election.  Before that,

17  though, we do a lot of forecasting for about a

18  year and a half to try to get a sense of which

19  elections are likely to come out which way and

20  why.  And that helps us manage election night

21  and which races are we going to have to pay a

22  lot of attention to and which ones should we

23  not worry so much about.

24  Q.     Okay.  What sort of -- and how often

25  have you done this for CBS News?

1   **A.**     I started at CBS in 2006.  Well, I

2   started in 2005, but the 2006 election.

3   **Q.**     And have you been employed by CBS since

4   then?

5   **A.**     Yeah.

6   **Q.**     Okay.  So, every general election since

7   2006?

8   **A.**     And primaries, yeah.

9   **Q.**     And primaries, okay.  What sort of data

10  have you looked at for -- you said you do

11  election day predictions and then forecasting

12  before the election.  What sort of data did you

13  look at to forecast el- - or do you look at to

14  forecast elections before election night?

15  **A.**     Okay.  We use surveys; surveys of

16  different forms.  Some are horse-race surveys,

17  who is ahead in the race.  Others are surveys

18  having to do with, like, basic demographics or

19  political orientations of the public: how many

20  Democrats and Republicans are they, how they

21  are trending; economic surveys.

22       Consumer confidence is a very good

23  predictor of how the aggregate will come out at

24  the end of the year.  Then we also look at

25  registration data at the precinct level and

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 12 of 63

past vote returns at the precinct level.  And
from that, we build a model to predict which
precincts are likely to go toward which party
given our model of how the electorate is
trending that year.

Q.    When you say you look at past vote
returns at the precinct level, could you
amplify on that a little bit?  What do you mean
by that?

A.    So, we take precinct level election
returns from prior elections.  Like, for 2014,
we'll look at the 2012 presidential, governor,
senate elections and so forth in any state as
reported by the secretary of state or whatever
the election office is in that state.  Usually
it's the secretary of state, but some states
have a board of elections like North Carolina.

        And we'll take those data mapped into the
precincts.  Most of the states now work with
the census voter tabulation district system, so
that makes it easy to merge that into census
data such as racial demographics, income
statistics and so forth.

        And then we'll use all that information
merged in at the precinct level to do some

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 13 of 63

1   statistical modeling to form forecasts.

2   Q.    Okay.  And you've said that you use

3   presidential, governor and senate to --

4   A.    Yeah, we use a lot of elections:

5   lieutenant governor, attorney general;

6   secretary of state.

7   Q.    So, are those elections typically

8   statewide elections that you use?

9   A.    Yeah.  Our team -- I work with a team of

10  -- of researchers that come from different

11  domains.  There's a Democratic consultant on

12  the team, a Republican consultant on the team,

13  another academic and then two in-house people.

14       And we have a discussion about each

15  state, thinking about which -- given the

16  context in which the election is happening,

17  which election is likely to be a very good

18  predictor of what will happen in this given

19  context.

20       So, it depends on who the candidates are

21  running; what the economic context is.  If it's

22  a bad economy, we might think about when was

23  the last time that, say, a Republican president

24  -- when a Republican was president and it was a

25  bad economy, we'd go back and look at those and

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 14 of 63

1   how do the precincts shape up.

2        So, it's very context dependent in terms

3   of which elections we will use as a -- kind of

4   a bellwether election.  We also take all those

5   elections and average them so that we come up

6   with, like, a party support score.  So, the

7   average of those will help us protect against

8   there being an odd election that you can make a

9   wrong inference based on.

10   Q.    Okay.  I guess my question was, are --

11   are statewide elections more useful than, like,

12   district elections in predicting election

13   outcomes?

14   A.    Well, a lot of what the CBS folks design

15   -- because that's the national nightly news --

16   are the national elections.  So, they really

17   care about the federal races.  So, we -- and

18   since most of those elections are really

19   senate, some governor and then president,

20   that's what we tend to use for those races.

21        For the U.S. House races, we don't --

22   we'll do an ongoing tabulation and count --

23   have a model that's using a lot of different

24   elections to come up with a forecast.  So, the

25   average vote is used -- is what we'll use more

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 15 of 63

1  often in making our forecasts for the House

2  districts.

3  Q.    Do you use the statewide elections to

4  evaluate the congressional elections?

5  A.    Yeah.

6  Q.    What sort of --

7  A.    Well, there are some statewide elections

8  we wouldn't use where it's just an

9  idiosyncratic election.  We would look at it

10  and say, this is not correlated at all with the

11  ten other elections that happened in this state.

12  Q.    Unh-hunh (yes).

13  A.    An example would be the Blackwell's -- the

14  secretary of state election in Ohio was really

15  uncorrelated with -- really had a low

16  correlation with everything else.  We didn't

17  use that one.

18  Q.    What do you mean by low correlation?

19  A.    Well, in that case, it was about .6.

20  These elections at the precinct level -- the

21  precinct election returns tend to be very

22  highly correlated with each other, .9, .8 or

23  somewhere in there.

24  Q.    Okay.  So, I guess one question I have

25  is if you have a statewide election where the

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 16 of 63

1   candidate wins by a very large margin, however

2   you would define that, is that as useful as a

3   statewide election where there's a closer

4   margin of victory?

5   **A.**    It depends on the state and what you're

6   trying to do.  I know that in -- it's called

7   swing vote analysis or party bias analyses that

8   all -- that researchers will tend to use a lot

9   of different elections and try to predict out.

10  But the ones that are closest to 50/50 in the

11  outcome are the most useful for that kind of

12  analysis.

13      So, which races you're using depends a

14  little on what kind of analysis you're doing.

15  For forecasting purposes, every state has its

16  own average of -- like, Massachusetts is pretty

17  Democratic; Wyoming and Utah are pretty

18  Republican.  We want to find which ones are

19  going -- you know, which races are going to be

20  close to the average vote.

21      For forecasting the key -- North Carolina

22  is a pretty evenly divided state.  So, the

23  50/50 races are pretty good indicators, you

24  might guess.

25      But for forecasting purposes, at the

1  precinct level, what we really care about is

2  getting a good prediction of the order of the

3  precincts.  And what we look for is, is there

4  -- is there a precinct or a county that has an

5  early return that's kind of a bellwether

6  county, and it's going the wrong way or it's

7  going towards one candidate or another.

8  Q.    Unh-hunh (yes).

9  A.    An example would be Ohio.  This last

10  election in 2012, we saw that Ohi- -- Hamilton

11  County in Ohio which is in the Cincinnati area

12  --

13  Q.    I'm from Cincinnati.

14  A.    Okay.  It's a really closely divided

15  county, but it tends to be -- it tips toward

16  Republican.

17  Q.    In the good, old days.

18  A.    Yeah.  So, if the Republicans aren't

19  winning that county early in the night, it's --

20  it's kind of bad news for Republicans as a

21  predictor.

22  Q.    Okay.  I've got you.

23  A.    So, what we're looking for is the rank

24  ordering of the counties in the prediction, and

25  if we see something early in the night that's

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 18 of 63

1  trending in the wrong direction for one of the

2  parties, that helps us to make a judgement

3  about how all the other -- all the other races

4  are going to go -- all the other counties, all

5  the other precincts are going to go.

6      And the reason is that because the

7  precincts are so highly correlated, election

8  returns from one -- elections are highly

9  correlated as long as you don't have an

10  idiosyncratic election in that mix.

11  Q.   Unh-hunh (yes).

12  A.   Then you -- you can sort of rank order

13  things and see where -- where you are relative

14  to expectations.  And Hamilton would be an

15  example of a county where we'd just say, "Oh,

16  that's our 50/50 bellwether county.  Let's

17  watch that one tonight and see where it goes."

18  Q.   Okay.  Now, just -- has it been your

19  experience that in states that are controlled

20  by a particular party, that the legislative

21  districts are often drawn to favor the party

22  that drew the districts?

23  A.   Yeah, that tends to be the case.

24  Q.   Okay.  And --

25  A.   Not entirely, but tends to be.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 19 of 63

1  **Q.**    Okay.  And does that raise any issues

2  about using legislative races to predict either

3  legis- -- state legislative or congressional

4  races -- are there any issues that are raised

5  by that in terms of trying to predict elections?

6  **A.**    The usual problem with using legislative

7  races to predict congressional races or a state

8  legislative race to predict a congressional

9  election is that you have different candidates

10  running in different legislative races, and you

11  have to somehow figure out how the candidate

12  effect -- well, you might have an incumbent in

13  one race -- so the other congressional district

14  that has, say, three legislative districts in

15  it, you might have a cong- -- an incumbent in

16  one legislative district and he's doing better

17  than the party average -- right?

18  **Q.**    Unh-hunh (yes).

19  **A.**    So, what we're doing for forecasting is

20  thinking about how well a typical Democrat or

21  Republican will do in this specific area.  So,

22  if we -- if we used the state legislative

23  races, we'd have to think a little bit about

24  what's the incumbency effect and how do we

25  subtract that out or account for it.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 20 of 63

1    So, using statewide offices tends to be a

2  little bit easier because you've got the same

3  two candidates everywhere.  So, it makes it a

4  little easier to do the forecasting.

5  **Q.**    And is it not true that the -- aren't

6  there a lot of legislative or congressional

7  races where the incumbent often runs unopposed?

8  **A.**    Yes.  And some states like Florida don't

9  report any election returns for unopposed or

10  traditionally didn't.  So, we don't even have,

11  like, a total number of people who voted in

12  that race.

13    So, for unopposed, that creates an issue.

14  **Q.**    That would not -- the sort of race like

15  that would not be a good one to use to predict

16  election results?

17  **A.**    Well, you just wouldn't use the year in

18  which the data was an unopposed because there's

19  no information.  So, it's called missing data,

20  and you would use other elections for that seat

21  or elections in other offices in that year to

22  construct an average.

23  **Q.**    Unh-hunh (yes).

24  **A.**    And that's one reason why you might

25  construct an average party score because it

1    just omits those cases where you don't have an

2    observation.

3    **Q.**    How many -- what about the funding of

4    respective candidates?  Can that make a

5    difference in terms of whether, you know, a

6    very well-funded candidate defeats an

7    under-funded candidate?  Does that have any

8    impact on the utility of that race for

9    predicting election results?

10   **A.**    It can.  It's interesting that the

11   academic literature on the effect of money on

12   elections is -- is all over the place.  We

13   don't have a good sense of, like, what the

14   effect of money is; and when you do a

15   correlation between your vote and how much is

16   spent, it turns out the correlation between how

17   much is spent and your vote is negative if

18   you're an incumbent.

19        That's an indication that vulnerable

20   incumbents are the ones who have to spend the

21   most amount of money.  And that's been a very

22   difficult -- very difficult to figure out how

23   much money actually matters for the final

24   outcome and what the net effect is.

25        So, the money -- money is a very

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 22 of 63

1    complicated thing, and we don't -- at CBS, we

2    don't do anything to correct for that.  In

3    other academic work, I've researched that --

4    that question; but, typically, in swing-vote

5    analyses and so forth, people do not correct

6    for money.

7    Q.    Unh-hunh (yes).  Have you ever done any

8    research as to whether or not candidates who

9    are substantially better funded than their

10   opponent have any sort of edge in --

11   A.    Yeah.

12   Q.    -- a legislative or a congressional race?

13   A.    Yeah.

14   Q.    And what is your conclusion from that?

15   A.    My conclusion is that it -- the -- that

16   research has -- well, my colleague, Jim Synder,

17   and I estimated that the elasticity; in other

18   words, the percent changing your vote for a

19   percent changing your money is about four or

20   five percent.

21         So, if I have a hundred percent increase

22   in how much money I spent; or if I spent a

23   hundred percent more than the other guy, I get

24   about a four percent advantage.  But that's --

25   that's a contested conclusion.  Other academics

1    have written other things, so --.

2    Q.   Other academics think it's a bigger

3    advantage to have more money?

4    A.   Some people think it's bigger.  Some

5    people think it's smaller.  Some people think

6    it only matters for challengers and not for

7    incumbents.  Some people think it matters only

8    for incumbents and not for challengers.  So,

9    the literature is a mess.

10   Q.   So, the effect of money on campaigns is

11   contested?

12   A.   Yes.

13   Q.   Okay.  Got you.  All right.  Looking --

14   I think you've explained to me what you do as a

15   consultant for CBS News.  I now wanted to ask

16   you about your role as consultant to the

17   Brennan Center in the case of McConnell v. FEC.

18   A.   Unh-hunh (yes).

19   Q.   Could you tell me what the Brennan Center

20   is?

21   A.   The Brennan Center is a nonprofit

22   organization in New York City.  It has an

23   affiliation with NYU.  It was created, I think,

24   in memory of Justice Brennan, and it works on

25   voting rights issues -- a variety of them and

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 24 of 63

1    other issues as well.

2    Q.    Okay.  Is the Brennan Center involved in

3    redistricting cases?

4    A.    Probably.  I -- I don't have any

5    personal knowledge of it.

6    Q.    Okay.  And when you say you were a

7    consultant in McConnell versus FEC, could you

8    elaborate on that a little bit?

9    A.    So, they approached me -- Brennan Center

10   approached me about being the testifying expert

11   in that case, and I passed because I was

12   involved with other research, and I wanted to

13   devote myself to that.

14        But they had asked me if I would consult

15   with them, helping them think through things,

16   show me data analyses; study, you know, kind of

17   the merits of their own research that they were

18   putting forth for the case.

19   Q.    And could you describe the issues that

20   were involved in that case?

21   A.    The Brennan Center -- I think one of the

22   things that was a main focus of their work was

23   the Brennan Center prepared a series of reports

24   on issue ads and what kind of words are used in

25   issue ads, and how often -- how much money is

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 25 of 63

1   spent on those issue ads and so forth.

2        And most of my time I spent analyzing the

3   data that they had collected, and I actually

4   had them bring in an outside consultant, Anna

5   Greenberg, to do an independent evaluation of

6   that study where they just did a complete

7   replication of the -- of the results.

8        So, we, like, really were getting into

9   the nuts and bolts of how did they do their

10  research and what are the problems with it and

11  what are the strengths of it.  Issue ads were

12  -- I think they were the centerpiece for what

13  the Brennan Center was focused on because that

14  was the issue that they had sort of been

15  pushing the most.

16  Q.   Did that case McConnell v. FEC involve

17  any matters related to redistricting?

18  A.   No.

19  Q.   Okay.  All right.  Then you say you

20  testified before the Senate -- various Senate

21  committees and a House committee, and the

22  Congressional Black Caucus and you say on

23  election administration in the United States.

24       Could you give me an idea of what that

25  testimony has entailed before all those

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 26 of 63

1   committees?

2   A.    Most of it involved testimonies related

3   to the Caltech/MIT Voting Technology Project,

4   what we knew about performance of voting

5   machines and -- and we issued several reports;

6   one important report called Voting, what is;

7   what could be.

8       And various committees in Congress were

9   very interested in that because they were

10  considering legislation at the time.  So, I and

11  others in my team were pretty active responding

12  to requests from Congress to hear what we had

13  to say.

14      Later -- that -- a lot of that was in

15  2001, 2002, 2003.  Later in 2009, I testified

16  on registration.  Senator Schumer and Senator

17  Bennett were having -- holding hearings on a

18  potential voter registration bill that would

19  have been some sort of comprehensive voter

20  registration system for the United States.

21      I'd done a lot of survey work on who has

22  trouble voting in the United States, and one of

23  the things that popped out in that survey, just

24  unbeknownst to me, was that the people who had

25  the most problem voting -- when you get to the

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 27 of 63

1    point of requesting of a ballot -- say, an

2    absentee ballot, or going to the polls or

3    something like that or some problem with your

4    registration -- were the U.S. Military

5    personnel.

6         So, that's what I was testifying about.

7    And that helped the Senators move forward to

8    embrace the MOVE Act in 2009.  So, that's where

9    we ended up moving.  And then --

10   **Q.**    What was the MOVE Act?

11   **A.**    I don't remember what the acronym stands

12   for, but it was basically an act to improve the

13   ability of overseas military personnel to cast

14   ballots.

15   **Q.**    Okay.  That's a worthy project.  Thank

16   you.

17   **A.**    You're welcome.

18   **Q.**    Can you think of any other testimony

19   before the committees that you mentioned here

20   on -- in paragraph 2?

21   **A.**    Those committees, no, but since I filed

22   this report, I've been helping the Presidential

23   Commission on Election Administration that just

24   finished its work.  It was headed by Bob Bower

25   and Ben Ginsberg, and I testified for them on a

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 28 of 63

1   few things.

2       But, mainly, I was serving a purpose of

3   trying to facilitate a lot of academic

4   researchers to come together and help them

5   answer specific research questions that that

6   commission had.  That's the most recent public

7   testimony.

8   **Q.**   And if this is going to take an hour, I

9   don't want you to do it, but --

10  **A.**   No.

11  **Q.**   -- can you tell me what -- what the

12  commission is looking at, what the issues that

13  they are examining that you facilitated

14  testimony on?

15  **A.**   Okay.  The commission was looking at what

16  are the things that the United States,

17  especially states and counties, can do without

18  the passage of new legislation to improve the

19  technical administration of elections in the

20  United States.

21      And that included things like how do you

22  reduce lines and so forth.  So, one of things

23  that I -- I built for them was a web page that

24  just has different tools that county

25  administrators can use to manage their lines.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 29 of 63

1       You type in a few -- you type in some

2   parameters, and then it tells you how many

3   voting machines and how many voter registration

4   places you should have in a given precinct

5   given its turnout and so forth.

6   **Q.**    Well, explain to me how do you manage

7   lines?

8   **A.**    So, it turns out it's an operations

9   research problem.  Like Disneyland has lines

10  and how do they manage their lines.  So, we --

11  I worked with my colleague Steven Grades who

12  I've known since the beginning of the Voting

13  Technology Project, and he's an operations

14  research person; and he developed a simple tool

15  for -- for line management.

16      And it's basically an optimization

17  problem, given the flow over the course of the

18  day and the number of people who come to the

19  polling place, and the backlog that happens

20  from a bottleneck at any moment from the --

21  from not having enough poll workers to check

22  people in or not having enough machines to vote

23  on.  How many poll workers and machines should

24  you have in order to minimize lines?

25      And it's a little complicated problem

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 30 of 63

Stephen Ansolabehere, Ph.D.  5-6-14

1  because once a line starts, it creates

2  feedback, and the line lengthens, so it will

3  take some time to clear it out.  So, we're

4  developing some operations research tools to

5  help people manage.

6       And the idea was, "Let's just put these

7  tools out there for free so that anybody can

8  look at them, criticize them, but also any

9  county administrator can use 'em."

10      Most of the counties in the United States

11  that administer elections are rural, poor,

12  don't have resources; and that's a big part of

13  the problem.  So, they can't hire a consultant

14  to come in and do this.  This needs to be free

15  for those people.

16      The other aspect of this is that Darren

17  Shaw, who is my -- who is my colleague in

18  Texas, and he -- he and I were helping to

19  organize the research team for this commission,

20  ran a survey of election administrators in the

21  United States just to hear from them what they

22  think is problem -- what the problems are, and

23  what they think we can do better, and to get

24  that information into the commission's hands.

25  Q.   Okay.  Does that cover your testimony --

1    A.    Yeah, that's the --

2    Q.    -- with the committees and working with

3    the committees?

4    A.    Yes.

5    Q.    Okay.  And then you say that you filed a

6    brief with a couple of professors in the case

7    of Northwest Austin Municipal Utility District

8    v. Holder.

9    A.    Yeah.

10   Q.    Could you tell me about that?

11   A.    That brief had to do with the question

12   of racially polarized voting in the different

13   states and questions of coverage under Section

14   5, which was the issue at stake in that case.

15   Q.    Okay.  Did you testify in that case?

16   A.    I did not.  That brief was an Amicus

17   brief for neither party.  It was accepted by

18   both parties.

19   Q.    Okay.  Then you were a consultant for

20   the Rodriguez plaintiffs in Perez v. Perry?

21   A.    Correct.

22   Q.    Which is in the District Court in the

23   Western District of Texas?

24   A.    Correct.

25   Q.    Could you tell what you did in that case?

1   A.   I'm the expert witness in that case, and

2   I've been --

3   Q.   For which side?

4   A.   For the Rodriguez plaintiffs; not the

5   State of Texas, which would be Perry.

6   Q.   Have you given any testimony in this case?

7   A.   I have.

8   Q.   Could you tell me what your tes- --

9   again, I don't want to keep you here to examine

10   you on your testimony in that case.

11   A.   No, no.

12   Q.   I just kind of want to know what you

13   testified about.

14   A.   That was in 20- -- that started in 2011,

15   so it's becoming --

16   Q.   What the subject of your testimony?

17   A.   The subject was racially polarized voting

18   in the State of Texas in specific congressional

19   districts, the likely electoral performance of

20   those districts, the demographic characteristics

21   of those districts, the quality of the American

22   Community Survey; questions about projections

23   of citizen voting age population in states and

24   localities.

25   Q.   Okay.

1  A.    There's details, but --

2  Q.    That's good enough.  Okay.  And then the

3  next case you have listed is the Department of

4  Justice in State of Texas v. Holder?

5  A.    Right.

6  Q.    And that case is in the District Court of

7  the District of Columbia?

8  A.    There are two cases.  I'm not sure which

9  one you're referring to.  There are two cases

10  that --

11  Q.    I'm just -- I want you to follow along

12  in your expert report.

13  A.    Okay.  One is a Section 5 case in Texas

14  on redistricting.

15  Q.    Right.  Is the Section 5 case in the

16  District of Columbia court?

17  A.    Yes, it is.  There were two Section 5

18  cases.  One is -- right, so there's -- working

19  on behalf of the Gonzales intervenors in the

20  State of Texas versus the United States.

21  Q.    Unh-hunh (yes).

22  A.    That's the Section 5 redistricting case,

23  and that concerned whether there had been

24  retrogression or reduction in the number of

25  black and hispanic districts in the State of

1    Texas.

2         And the kind of analyses done, again,

3    were racially polarized voting analyses,

4    demographic analyses and assessment of the

5    likely performance of those districts.

6    Q.    Yeah, I want to ask you a question about

7    that.  You say the reduction in the number of

8    black and hispanic districts.  What's -- in the

9    context of that case, what was a black district?

10   A.    There are several categories.  One is

11   whether it's a majority CVAP district; that is,

12   whether the demographics of the district are

13   such that a majority of the citizen voting age

14   population, CVAP, was above 50 percent hispanic

15   or 50 percent black.

16   Q.    Unh-hunh (yes).

17   A.    And then there are a set of districts

18   that might be considered coalitional districts

19   where it's black plus hispanic.

20   Q.    Do the black and hispanics equal the

21   amount that's over 50 percent of those

22   districts?

23   A.    Correct.  But it's citizen voting age

24   population.  And then there is a further

25   question -- it's an open question about whether

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 35 of 63

1   or not cross-over districts and districts where

2   the black or hispanic preferred candidate can

3   win but not with the vote -- but they're not a

4   majority; and the whites are voting against

5   them, but there are enough whites who cross

6   over and vote with the minorities so it's an

7   effective minority district.

8       And that's the -- that's actually a live

9   -- a very live question in the courts right

10  now, and it's a highly disputed question, I

11  think.

12  Q.    Is that a live question under Section 5?

13  A.    It was a Section 5 question.  Should the

14  Department of Justice count that -- that

15  district in making its retrogression analysis.

16  Q.    Yeah.

17  A.    And then under Section 2, it becomes a

18  question as well, which what's the legal status

19  of such a district if it exists.  And then

20  that's -- that's -- those are, I think, the

21  central issues.

22  Q.    Okay.  And you have testified in that

23  case?

24  A.    Yes.

25  Q.    Okay.  And then you said there was

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 36 of 63

1  another Texas case that's pending actually in

2  Texas?

3  **A.**    Well, that case is coming back currently.

4  I've not yet testified in that, and that is

5  Perez v. Perry again, and that will be mid-July

6  in the District Court, I think, in Corpus

7  Christi.

8  **Q.**    Have you made any reports in that case?

9  **A.**    I just did the reports in that case.

10  **Q.**    Well, just give me the --

11  **A.**    The --

12  **Q.**    -- highlights --

13  **A.**    Yeah.

14  **Q.**    -- of your report.

15  **A.**    Yeah, the reports in that case were "See

16  all my earlier reports" because it's all the

17  same old issues.  And then there were a few

18  specific questions about Congressional District

19  23 and Congressional District 25, and about the

20  American Community Survey and the calculation

21  of citizen voting age population.

22  **Q.**    Okay.  All right.  And then I think the

23  next one that's on your list is Guy v. Miller.

24  **A.**    There's a second State of Texas v.

25  Holder case.

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 37 of 63

1    Q.    Okay.

2    A.    That's the Texas voter I.D. case.

3    Q.    Okay.

4    A.    And that was a Section 5 case.

5    Q.    What's the status of that case since

6    Section 5 has gone away?  Do you know?

7    A.    The Department of Justice is suing Texas

8    under Section 2.

9    Q.    Okay.

10   A.    And I've been retained as their expert

11   in that, but no reports have been filed.

12   Q.    Okay.  What about -- am I right that the

13   next case is Guy v. Miller?

14   A.    Unh-hunh (yes).

15   Q.    What's that case all about?

16   A.    That was redistricting in the State of

17   Nevada.  The State Legislature passed a plan,

18   the governor didn't sign it.  Nevada had

19   received an additional congressional district,

20   and they didn't have the process for creating

21   it.

22        So, the judge in the state court created

23   a panel to consider the voting rights

24   questions, draw a new plan; and the different

25   parties in the case had to weigh in on what

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 38 of 63

1   were the voting rights issues in the state and

2   what the likely consequences of alternative

3   plans that had been proposed.

4   Q.    Are you a witness in that case?

5   A.    I was a witness in that case.

6   Q.    And for which side?

7   A.    I'm trying to -- the Guy plaintiffs, yeah.

8   Q.    What's that?

9   A.    The Guy plaintiffs.

10  Q.    Okay.  Were the Guy plaintiffs minority

11  plaintiffs or -- can you describe the

12  demographic status or --

13  A.    I think they were Democratic plaintiffs.

14  Q.    Okay.

15  A.    Democratic Party plaintiffs.  It was a

16  very confusing case because, like, there wasn't

17  a plan and all sorts of maneuvers were going on

18  that were -- one of the motions was that they

19  just adopt a plan and ignore the veto of the

20  governor, and was that constitutional in the

21  state.  Yeah, it was a very confusing case.

22  Q.    In these other cases that we've

23  mentioned, have you testified for other

24  Democratic plaintiffs?

25  A.    The plaintiffs in Perez v. Perry are

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 39 of 63

1  Democrats, I believe.

2  **Q.**   In any of these cases that are on

3  Exhibit 9, did you ever testify for Republican

4  plaintiffs?

5  **A.**   No.  I've never been asked.

6  **Q.**   Okay, Tom, don't feel so bad.

7  (Addressing Mr. Hofeller)   Just kidding.

8      What about Florida Democratic Party in re

9  Senate resolution of legislative appointment?

10  Were you a witness in that case?

11  **A.**   I filed a report.  I did not testify.

12  That is ongoing.  The continuation of that is

13  Romo v. Detzner.  In re Senate joint resolution

14  is a, kind of, preliminary process that was set

15  up by the State of Florida in its new

16  constitutional amendment that created a

17  procedure for evaluating the state plans.

18  **Q.**   Unh-hunh (yes).

19  **A.**   So, they had -- the State Supreme Court,

20  essentially, had a pre-clearance process where

21  they did a preliminary evaluation of all plans

22  to see whether a trial should be held, or

23  whether the plans passed by the Florida State

24  Legislature were acceptable as is.

25      And the Florida State House plan was

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 40 of 63

1   acceptable in their judgement, and the State

2   Senate and congressional plans were deemed as

3   not passing a prima facia review or facia

4   review, and then it went on -- now, it's at

5   trial; and that's waiting.

6   Q.     Okay.

7   A.     And that's Romo v. Detzner.

8   Q.     Okay.  So, that's kind of related to the

9   other case?

10  A.     Yeah.

11  Q.     And are your clients in those cases

12  Democratic clients?

13  A.     It's my understanding that they're

14  Democratic clients.

15  Q.     Okay.  And then the last case that you

16  listed, League of United Latin American

17  Citizens v. Edwards Aquifer Authority, --

18  A.     Unh-hunh (yes).

19  Q.     -- could you tell me about that case?

20  A.     That's a one person one vote case.  It's

21  a water district that manages use of water in

22  the area to protect endangered species, prevent

23  pollution, prevent overuse of water; and I've

24  been retained or hired by the City of San

25  Antonio and the San Antonio water district.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 41 of 63

1    Q.    Okay.  All right.  Now, in this case,

2    who has retained you?

3    A.    I am retained by the -- the -- I was

4    approached by the -- by John Devaney to see if

5    I was interested in working on this case.  So,

6    I'm retained by the -- I'm sorry -- an early

7    senior moment.

8              MR. SPEAS:  Harris Plaintiffs.

9    A.    Harris Plaintiffs.  Sorry.

10   Q.    (Mr. Farr)  Okay.  Are the Harris --

11   there's two Harris Plaintiffs in the case now

12   is my understanding.  Is that your

13   understanding?

14   A.    I didn't know that.

15   Q.    Oh, you didn't know how many there were?

16   A.    I didn't know how many Harris Plaintiffs

17   there were.

18   Q.    Okay.  All right.  And have you ever

19   talked to any of the Harris Plaintiffs?

20   A.    I've not.

21   Q.    Are they paying your fee, the Harris

22   Plaintiffs?

23   A.    That's my understanding, yes.

24   Q.    Okay.  Do you have a fee agreement with

25   the Harris Plaintiffs?

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 42 of 63

1   **A.**     I have a fee agreement through John

2   Devaney at Perkins Coie.

3   **Q.**     Have you submitted bills in this case?

4   **A.**     I have.

5   **Q.**     And who have you submitted the bills to?

6   The Harris Plaintiffs or to John?

7   **A.**     John Devaney in regard to the Harris --

8   **Q.**     Have you received checks form --

9   **A.**     I have.

10  **Q.**     And are the checks signed by the Harris

11  Plaintiffs or are they signed by someone else?

12  **A.**     I've not looked at who the -- the checks

13  come from -- directly from Perkins Coie, and I

14  have not looked at the signatories.

15  **Q.**     Have you worked with Perkins Coie in

16  other cases?

17  **A.**     Yes, I -- the Romo case in Florida is

18  Perkins, and the -- and Perkins is involved in

19  the Texas Section 2 and Section 5 redistricting

20  cases.   And Perkins was involved in the Guy v.

21  Miller case.

22       They approached me in July of 2011 about

23  working with them on the Texas redistricting

24  case, and they liked my work, so they hired me

25  again for other cases.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 43 of 63

1    Q.    Okay.  All right.  In paragraph three,

2    you say you're an "author of numerous scholarly

3    works on voting behavior and elections, the

4    application of statistical methods in social

5    sciences, legislative politics and

6    representation and distributive politics."

7         Could you describe all those topics for

8    me, please?

9    A.    So, voting behavior and elections, I've

10   worked pretty extensively on questions such as

11   election forecasting, incumbency effects;

12   campaign finance.  I do a fair amount of work

13   on voting behavior at the individual level;

14   largely survey research in trying to understand

15   what factors predict why people choose to vote

16   for one candidate or another or one party or

17   another, and also why people choose to vote or

18   not vote but be registered to vote or not vote

19   and what the implications of those are -- those

20   factors are for understanding election outcomes

21   in the United States.

22        Application of statistical methods in the

23   social sciences, my research has -- one of the

24   things I focus on is aggregational issues,

25   like, how -- how do individual level data get

1   aggregated; some work on experimental methods.

2   That's older work.  That's from the '90s.

3        Legislative politics and --

4   Q.   Could you stop for a second?

5   A.   Okay.

6   Q.   I'm -- I know enough about this to be

7   dangerous, but I don't know as much as you do.

8   A.   Okay.

9   Q.   When you say aggregation of --

10  A.   So, if I have data that consists of a

11  lot of individuals and I want to understand the

12  relationship between two factors at the

13  individual level, but I have data at an

14  aggregate level, what assumptions do I need to

15  make in order to infer from the aggregate level

16  correlations between those two factors --

17  something about individual level behavior.

18  Q.   Can you give me an example?

19  A.   The classic example is by someone named

20  W.S.  Robinson where they were looking at the

21  correlation between literacy and income, and

22  found a weak correlation.  And then they --

23  Robinson discovered that there was an omitted

24  variable, which was foreign-born population.

25  As soon as you control for foreign born, that

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 45 of 63

1   relationship changes.

2   Q.    The connection between literacy and

3   income --

4   A.    Yes.

5   Q.    -- was that when you take the foreigners

6   out, is that right, or it the other --

7   A.    Yes.

8   Q.    -- way around?

9   A.    That would be correct.

10  Q.    Okay.

11  A.    And this was an important finding in the

12  1950s.

13  Q.    All right.  So, what about legislative

14  politics and representation?

15  A.    So, legislative politics and

16  representation, I work on coalitional politics

17  in Europe.  How do governments get formed,

18  coalition partners, how stable are they, what

19  -- what are the politics behind the formation

20  of coalitions.

21        In the United States, I work on

22  representation, especially, roll-call voting

23  behavior in Congress; and what explains why

24  members of Congress and state legislatures vote

25  certain ways on -- on legislation.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 46 of 63

1    A very live question for political

2  scientists is whether or not members of

3  Congress are following what their districts

4  want, what their parties want or what they

5  personally would like to do or don't -- their

6  own personal ideologies in those cases.

7  Q.    Okay.  And I think the final subject is

8  distributive politics.  What does that mean?

9  A.    Distributive politics is how money is

10  distributed in a federalized system such as the

11  United States.  So, the state government has a

12  pool of money, and it gets distributed through

13  the counties; which counties are winning or

14  losing in the distribution of money or which --

15  what are the factors that predict where the

16  money is going in the political system.

17  Q.    Okay.  Now, Professor, I just wanted to

18  clarify one thing.  The cases that you've

19  testified in -- actually testified in, has

20  Perkins Coie been involved in all those cases?

21  A.    No.

22  Q.    Is there any one where they've not been

23  involved where you've testified?

24  A.    The Department of Justice, I -- they

25  might have been involved in some other -- for

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 47 of 63

1    some other party, but I was working for the

2    Department of Justice in the State of Texas v.

3    Holder.

4    **Q.**    Unh-hunh (yes).

5    **A.**    And the Edwards Aquifer Authority is the

6    San Antonio Water District, and I was retained

7    by an attorney for the State of Texas named

8    Renee Hicks.

9    **Q.**    Okay.  Now, have you any experience in

10   drawing redistricting plans?

11   **A.**    A little.  I've -- there's casual

12   experience teaching students how to draw plans,

13   and in my course on elections, we use map

14   making software such as Maptitude and other

15   free ware.

16        And then in the context of some of these

17   redistricting cases, people have asked me

18   about, like, how a plan ought to be shifted.

19   And so, I'll sort of mock out a plan; and if

20   you drew the boundary here, what would it mean

21   and so forth.  That's just a query that's made

22   of me.

23        I've never drawn an entire state

24   districting plan for a state legislature.

25   **Q.**    That was going to be my next question.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 48 of 63

1    Have you been hired by a state legislature to

2    draw any sort of redistricting plan?

3    A.    No.

4    Q.    Have you ever been hired by a political

5    party to draw a proposed redistricting plan to

6    be presented during the legislative process?

7    A.    No.

8    Q.    Have you been hired by anybody to draw a

9    redistricting plan?

10    A.    No, except in the context of some of

11    these cases, I'm asked, "What if we drew the

12    district that way?"  And I will get on the

13    software and look at the district.  So, I'll do

14    it in that context, but it's always in the

15    context of a case rather than in the context of

16    passage of a plan.

17    Q.    So, you -- you would examine theories on

18    redistricting software after the case had been

19    filed?  Is that a fair way to say it?

20    A.    Yes, that's right.

21    Q.    And you say -- what sort of software --

22    redistricting software are you familiar with?

23    A.    I am familiar with Maptitude.  I'm

24    familiar with a free -- an interesting free

25    ware platform called Dave's Redistricting App

1   developed by someone named Dave Bradley.

2   Q.   We all know that one.

3   A.   Okay.  I love that one.  I actually had

4   Dave come to Harvard to give a big presentation

5   to the Institute for Quantitative Social

6   Sciences.  It was way interesting.

7        And then --

8   Q.   He was quite popular in North Carolina

9   around February of 2011.  (Laughter)

10  A.   And then the software developed by Mike

11  Altman for the -- I forget what the name of it

12  -- My District Building, I think is what it's

13  called.

14  Q.   Okay.  Tell me all the times you've used

15  Maptitude.

16  A.   I've used Maptitude through -- we had a

17  private license that I used Maptitude to just

18  draw various districts.  We did a redistricting

19  exercise to draw districts for the entire State

20  Legislature in Massachusetts.

21  Q.   Unh-hunh (yes).

22  A.   I trained to do Maptitude in the State

23  Legislature in Massachusetts because they had

24  stated -- sent out a request for proposals, and

25  my colleague Jim Griner and I put in a proposal

1    to help them with the State Legislative

2    districts, but they chose another group to do

3    that.

4          I used Maptitude in looking at Florida

5    districts in the Romo case, and then just

6    casually for other, like, educational purposes,

7    like, for teaching purposes in making maps.

8    That's not redistricting.

9    Q.    Have you had any training on Maptitude?

10   A.    Yes, at Maptitude headquarters in

11   Massachusetts which is the next town over from

12   me.

13   Q.    And how long was that training?

14   A.    That was -- it was a -- it was a three

15   or four-day training.  I also have training in

16   ArcGIS which is the platform on which Maptitude

17   is built.

18   Q.    Just for the court reporter, tell her

19   what GIS stands for?

20   A.    Geographic Information Systems.

21   Q.    And what is that?

22   A.    That is a -- a software architecture for

23   drawing maps.

24   Q.    Okay.  When you drew the Massachusetts

25   plan that you submitted for a proposal, who did

1   you submit the proposal to?

2   A.    We didn't actually submit the plan for the

3   proposal.  We just were training on it and --

4   and the proposal was for consulting services to

5   the Massachusetts State Legislature, and it was

6   directly to Representative Moran, M-o-r-a-n,

7   and Representative -- I think it's Rosenfield

8   or Rosen- --.

9   Q.    Do you remember what --

10  A.    Senator Rosenfield.  They had a joint

11  house/senate committee to draw districting.

12  Q.    We had the same thing.  What political

13  party were those two gentlemen from?

14  A.    They're both Democrats.

15  Q.    Do you remember anything about the draft

16  Massachusetts plan that you drew?

17  A.    Well, I drew many draft -- I drew many

18  different versions of it.

19  Q.    Okay.  Do you remember what criteria you

20  used?

21  A.    We were looking for various things, but

22  one of the things -- one of the criteria we

23  were using is could we make a map that was

24  unbiased for the parties; can we make a fair

25  map using standards of unbiasedness that

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 52 of 63

1    academics had developed -- statistical

2    standards.

3    Q.    Is that why you weren't hired?  Sorry.

4    I couldn't resist that.

5    A.    Actually, I think that -- my own

6    assessment of the Massachusetts plan, after the

7    fact developed by somebody completely

8    different, was that they actually drew a really

9    fair map; and they got rid of an old partisan

10   gerrymander that was discriminatory against the

11   Republicans in the state.

12   Q.    Okay.

13   A.    They really made things a lot better.

14   It was a good thing.

15   Q.    What kind of screens did you look at --

16   computer screens on Maptitude?  What sort of

17   information was on the screens?

18   A.    We loaded a lot of demographic data, the

19   census date, population count -- voting age

20   population count by racial groups.  We loaded

21   in different voting data that we -- we

22   provided.  One of the projects I ran at Harvard

23   is called the Harvard Election Data Archive.

24   Q.    Unh-hunh (yes).

25   A.    And the project there was to try to

1   collect as much precinct level election data as

2   possible and merge it in with census data.

3   This is one of the reasons I trained in ArcGIS,

4   to really get how to do those merges and

5   linkages.

6        So, beyond -- beyond drawing maps, it's

7   very useful for trying to deal with these

8   aggregation issues which are statistical

9   problems.  You know, precincts are different

10  from census areas.  So, how do you link these

11  two levels of reporting of data.

12       So, that -- and a lot of the motivation

13  for that development was just to -- we've got

14  this new technology for putting information out

15  there, and that would improve the study of

16  elections generally in the United States so

17  people could understand better the relationship

18  between the sociological structure of the

19  United States and the electoral structure of

20  the United States.

21  Q.    Okay.  With Maptitude could you pull up

22  on the screen the tabulation districts?

23  A.    Yeah.

24  Q.    Okay.  Could the person manipulating the

25  computer decide the type of information that he

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 54 of 63

1    wanted to look at in relationship to vote

2    tabulation districts?

3    **A.**    Yes.

4    **Q.**    Okay.  So, was it possible, for example,

5    to pull up the vote tabulation districts and

6    only look at election results?

7    **A.**    Yes, you can select what is pulled in the

8    -- there are different -- different versions of

9    Maptitude; and depending on which version is

10   used, different options and functionality are

11   available.

12        For example, one version of Maptitude

13   that they allowed us access to was the previous

14   version which allowed you to randomly simulate

15   districts, which I thought was kind of cool.

16   But apparently nobody wanted to buy it, so they

17   didn't distribute it in the new version of

18   Maptitude.

19        But there are different versions of

20   Maptitude that do different things.  It depends

21   a little bit on the version, but, yeah, you can

22   -- and we -- you could also pull in your own

23   data into Maptitude so you can bring your own;

24   not just what they provide.  You can bring your

25   own data and upload it which is what we were

Case 1:13-cv-00949-WO-JEP  Document 68-4  Filed 06/02/14  Page 55 of 63

1    doing in the Massachusetts project.

2    Q.    But would you agree that with the

3    Maptitude, you can pull up information on a VTD

4    level based upon election results?

5    A.    Yes.

6    Q.    And you can limit it to election

7    results, can you not?

8    A.    Yes.

9    Q.    And you can limit it to a particular

10   election result, can you not?

11   A.    Yes.

12   Q.    Okay.  All right.  Now, I want to move

13   to paragraph four.  And what did you do to get

14   ready for this deposition today, Professor?

15   A.    I read through all my reports, and

16   yesterday I met with Eddie Speas, and we

17   discussed my report.

18   Q.    Okay.  I'm not going to ask you anything

19   about that.

20   A.    Okay.

21   Q.    Now, you say here that you have been

22   asked to assess whether race is a predominant

23   factor in the configuration of Congressional

24   District 1 and 12.

25   A.    Unh-hunh (yes).

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 56 of 63

1  Q.    Okay.  What do you mean by "a

2  predominant factor"?

3  A.    Is it a factor that strongly predicts a

4  configuration of the district in a statistical

5  sense.  I'm looking at effects rather than, you

6  know, what individuals were doing when they

7  drew the maps.  So, I'm taking a look at which

8  demographic categories were put into which

9  groups, or which partisan categories were put

10  into which groups of districts -- groups of

11  VTDs that comprise districts.

12      And there might be multiple factors in

13  constructing a district, and the question was

14  how important?  Is it the most important

15  predictor?  Is it an important predictor of

16  race.

17  Q.    Okay.  Where did you get the term "a

18  predominant factor"?  Who gave you that term?

19  A.    I -- that was one of the questions that

20  was put to me, was is -- is it a predominant

21  factor in the configuration of these districts.

22  Q.    So, could there be more than one

23  predominant factor under your analysis?

24  A.    It's possible.  It's possible there are,

25  say, two equally important factors.  Those

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 57 of 63

1    would be two predominant factors, and

2    everything else is less important.  It's

3    possible if there's one fact that strongly

4    predicts --

5    Q.    All right.  And in your report -- I'm

6    sure we'll get a chance to go over this, but is

7    it your conclusion that race was a predominant

8    factor amongst other potential factors or was

9    it the predominant factor?

10   A.    It -- it -- my conclusion is the

11   predominant factor in the analysis of -- in

12   comparing party versus race.  When I looked

13   within party groups, I see a very strong racial

14   difference, but when I looked with racial

15   groups, I only see a small party difference.

16   And that's what I mean by holding race and

17   party constants.

18         The idea is to try to -- try to predict

19   which of these is a stronger factor.  It need

20   not have come out that way, but --

21   Q.    So, you were comparing race against

22   party.  And does that mean --

23   A.    Right.

24   Q.    -- how people are registered to vote?

25   A.    In this case, I was looking at how

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 58 of 63

1    people are registered to vote, and that's

2    because North Carolina is a state in which

3    party and race are on the voter files.  So,

4    it's uniquely good data.  It avoids the

5    aggregation issues that we discussed earlier

6    because it's individual level data.

7         If I didn't have that individual level

8    data on how individuals are registered as -- of

9    a certain racial group and of a certain party

10   group, I would have to make an imputation based

11   on aggregate level correlations.  So, this is

12   from a statistical perspective superior to the

13   aggregate analysis one might do.

14        Others have done aggregate analyses in

15   other contexts and --

16   Q.    Okay.  And I've read your report.  So,

17   you were looking at registration stats; not VTD?

18   A.    Yes.

19   Q.    Is that pretty much the heart of your

20   report?

21   A.    Yes.

22   Q.    Okay.  Did you ever look at actual

23   election results by VTD?

24   A.    Well, the actual election results do not

25   have race.  I don't know how the race of a

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 59 of 63

1   given voter -- nor do I know how all black

2   voters voted.  I'd have to make an imputation

3   or prediction based on some aggregate level

4   correlation.

5   Q.    So, if you looked at election results by

6   VTD, you're saying that from that data, you

7   couldn't determine the race of the voters?

8   A.    Correct, with certainty.  We do have to

9   make additional assumptions.  So, without

10  having to make those assumptions, you can state

11  with the registered voters, there are this many

12  black Democrats or this many black Republicans,

13  and this many black undeclared and so forth.

14  Q.    Okay.  Now, did you -- tell me what --

15  if you can remember, to the best of your

16  ability, what -- what did you review in

17  preparing this report?

18  A.    I reviewed the reports that are available

19  on the North Carolina Redistricting web page.

20  Q.    What reports?  There's a lot of reports.

21  A.    Yeah, yeah.  The reports -- there's a

22  page for the Rucho-Lewis 3 map, and there are

23  reports on demographics of the diff- -- VTDs in

24  the different districts.  So, I downloaded and

25  reviewed all of those spreadsheets and reports

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 60 of 63

1  that were there.

2       And I think that there were some -- I'm

3  trying to remember if I reviewed -- I think I

4  downloaded another report from the website on

5  just the redistricting process.

6  Q.   Okay.  Is it fair to say the only

7  redistricting plan you looked at was the

8  Rucho-Lewis 3 Congressional plan?

9  A.   Yes.  I didn't look at any of the prior

10 plans from throughout the process, and I also

11 looked at the existing -- the plan that applied

12 to the prior decades' districts.

13 Q.   Okay.  That was a bad question I asked

14 you, and I'm sorry.  I know you got a stats

15 report from the prior plan.

16 A.   Okay.

17 Q.   That's not what I'm really asking you.

18 Did you -- you did a VTD analysis of the

19 Rucho-Lewis 3 Congressional plan, right?

20 A.   Correct.

21 Q.   And did you do a VTD analysis of the

22 prior 2001 Congressional plan?

23 A.   Yes.

24 Q.   Okay.  And for the analysis for both of

25 those plans, you looked at registration

1    statistics for the VTDs?

2    **A.**    Correct.  And we also looked at census

3    demographic statistics.

4    **Q.**    Okay.  But, again, you didn't look at

5    the election results for those VTDs?

6    **A.**    I don't remember doing an election --

7    **Q.**    Okay.  Did you review any Supreme Court

8    decisions in preparing this report?

9    **A.**    Not this one specifically.  I had a few

10   cases going on at the same time, and so --

11   **Q.**    I understand.

12   **A.**    -- there were Supreme Court cases in

13   those others.

14   **Q.**    Right.  Are you familiar with a couple

15   of Supreme Court decisions, which I have

16   mispronounced for years almost as badly as I've

17   mispronounced your name; but which I've now

18   been corrected to refer to as Cromartie -- the

19   U.S. Supreme Court decisions in Cromartie, have

20   you ever looked at those cases?

21   **A.**    I've read those cases in other contexts,

22   yes.

23   **Q.**    Okay.  Did you refer to those cases in

24   preparing this report?

25   **A.**    No, I did not.

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 62 of 63

1   Q.    Do you recall anything about those cases?

2   A.    Not off -- not offhand, except that Dr.

3   Hofeller has noted that in Cromartie, the Court

4   said -- states reservations about using

5   registration as an indicator.

6   Q.    Okay.

7   A.    The question is an indicator of what, and

8   I think that's probably a question that will be

9   discussed in trial.

10  Q.    Okay.  Do you recall anything else about

11  those cases?

12  A.    Not -- not too many in particular, but

13  --.

14  Q.    Okay.  Did you read any Supreme Court

15  cases about what is meant by the term

16  predominant factor in preparing this report?

17  A.    Not in preparing this report, but I've

18  read the term many times.

19  Q.    Okay.  Did you look at any of the --

20  you're aware of the fact that there was a state

21  court redistricting case?

22  A.    Yes.

23  Q.    Okay.  And Mr. Speas represented a group

24  of the Plaintiffs in that case.  Are you aware

25  of that?

Case 1:13-cv-00949-WO-JEP   Document 68-4   Filed 06/02/14   Page 63 of 63