# EXHIBIT S – Part 2

Complete Deposition of Dr. Stephen Ansolabehere

1    A.    I didn't know that.

2    Q.    I think he would stipulate to that.  Do

3    you know that there was another group of

4    Plaintiffs where the lead Plaintiff was the

5    North Carolina NAACP?

6    A.    I don't know specifics on the case, no.

7    Q.    Okay.  Did you look at any of the

8    testimony from that case?

9    A.    No.

10   Q.    Let me get a little more specific.  Did

11   you look at any of the trial testimony from

12   that case?

13   A.    No.

14   Q.    Did you look at any of the deposition

15   testimony from that case?

16   A.    Did I look at any deposition testimony?

17   I don't recall.

18   Q.    Okay.  Do you know an expert witness and

19   professor named Ted Arrington?

20   A.    I know the name, but I've never met him.

21   Q.    Okay.  And do you know whether he gave a

22   deposition in the Dixon case or not?

23   A.    I don't know for sure.

24   Q.    Okay.  Do you know an expert witness

25   named David Peterson?

1    A.     I know the name because people have

2    mentioned him -- Mr. Speas has mentioned him in

3    relationship to this case, and I've seen his

4    name from prior cases in North Carolina.

5    Q.     Did you read any of the testimony that

6    he gave in the Dixon case?

7    A.     No.

8    Q.     All right.  Did you read any of the

9    testimony that was given by the legislative

10   leaders in the Dixon case?

11   A.     No.

12   Q.     Did you read any of the affidavit

13   testimony or deposition testimony given by any

14   of the legislative staff in the Dixon case?

15   A.     No.

16   Q.     Did you read the opinion -- there's been

17   an opinion by a three-judge state court in that

18   case.  Have you read that opinion?

19   A.     I believe I did read that.

20   Q.     Okay.

21   A.     This is one of these points where I

22   think, did I read that?  I taught four courses

23   this semester, so I'm little --

24   Q.     That's all right.  I forget who I had

25   lunch with last week, so you just do the best

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 3 of 65

1    you can.

2         Do you recall anything about that opinion?

3    A.   Not in particular.

4    Q.   Do you recall any findings or rulings by

5    the court in that case about whether race was

6    the predominant motive in the construction of

7    the 2011 Twelfth Congressional District?

8    A.   I think I was told by -- no, I don't

9    remember reading it.  I think I was told in a

10   conversation by my friend Nate Pursely who is

11   an election lawyer about that case, but I don't

12   remember reading it.

13   Q.   Did you know that was a decision by a

14   three-judge trial court?

15   A.   I didn't know the composition of the

16   court.

17   Q.   Unh-hunh (yes).  Did you know that they

18   made findings of fact after there was a trial

19   in the case?

20   A.   After -- as part of the decision?

21   Q.   Unh-hunh (yes).

22   A.   Just from what was mentioned to me, yeah.

23   Q.   Okay.  But you don't recall reviewing

24   that?

25   A.   I don't recall reviewing it.

Case 1:13-cv-00949-WO-JEP  Document 68-5  Filed 06/02/14  Page 4 of 65

1    Q.    Okay.  Did you look at -- you're aware,

2    I'm sure, Professor, that there's been a long

3    history of litigation associated with the First

4    and the Twelfth Congressional Districts in

5    North Carolina?

6    A.    I'm aware of that.

7    Q.    As a Professor of Government, you're, I'm

8    sure, aware of that?

9    A.    Yes.

10    Q.    Have you studied any -- for purposes of

11    this case, have you studied any of the prior

12    versions of the First or the Twelfth

13    Congressional Districts?

14    A.    Not -- not before the 2001 and 2011

15    districts.  I am familiar with cases such as

16    Shaw v. Reno and Thornburg versus Gingles.

17    Q.    I understand.

18    A.    Yeah, they are very important cases.

19    Q.    But for purposes of this case, did you

20    go back and look at any of the prior versions

21    of the First or the Twelfth District starting

22    in 1991 up to 2001?

23    A.    You know, I might have re-read Shaw v.

24    Reno.  I was teaching a course on election law

25    this semester, and we taught Shaw v. Reno and

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 5 of 65

1   Thornburg versus Gingles in the context of

2   that.  So, I've -- I've read them, but it was

3   not expressly for this purpose.

4   Q.    Okay.  Did you go back -- did you do a

5   VTD analysis on any of the prior plans?

6   A.    No.

7   Q.    Okay.  I should have asked that earlier.

8   I'm sorry.

9   A.    Okay.

10  Q.    All right.  Now, I want to go to page 4

11  of your report, and I want to get you to --

12  first of all, I think I want to talk with you

13  about compactness since that's the first thing

14  in your report.

15  A.    Unh-hunh (yes).

16  Q.    How do you define compactness?

17  A.    Compactness is a description of how

18  spread out a district is relative to an ideal

19  district.  And an ideal district is defined in

20  different ways, depending on geography, but the

21  most -- the way it's often defined is take the

22  most compact shape, which is a circle; and

23  consider the area or perimeter of this district

24  relative to area or perimeter of the most

25  compact shape.  That would be one way to think

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 6 of 65

1    about it.

2         The Reock score is take the area of the

3    -- the smallest circle in which the district is

4    inscribed and put the district in, and measure

5    the area of the district itself and the area of

6    that smallest circle.  So, that's one specific

7    definition of a measure of the compactness.

8    Q.    Was that -- so, did you just describe one

9    definition of compactness or two?

10   A.    One definition and one definition of a

11   measure.

12   Q.    Okay.

13   A.    I didn't know what you -- if you wanted

14   the concept or the measure.

15   Q.    The Reock test is based upon the concept

16   you described?

17   A.    Yes.

18   Q.    Okay.  Got that.  Is there any sort of

19   legal definition for compactness that's been

20   adopted by a court?

21   A.    The courts -- my understanding -- I'm

22   not a lawyer.  My understanding of what the

23   courts have used was a bit of we know it when

24   we see it as a standard, and there's not a --

25   there's not a specific bright-line threshold

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 7 of 65

1  like, you know, maybe with majority/minority

2  districting, 50 percent is the number.  I just

3  know specific bright-line for compactness.

4  Q.    Okay.  So, if I say to you there's no

5  judicially manageable standard for determining

6  when a district is legally compact, would you

7  agree with that?

8  A.    That's a legal opinion.

9  Q.    Okay.

10  A.    I don't know if -- I don't know if the

11  standards that have evolved in existing cases

12  are -- I mean, it's up to the judges to decide

13  if it's manageable.

14  Q.    Well, you've read the cases -- you're

15  read a lot of cases that --

16  A.    Yeah.  I mean, I think -- my reading of

17  Shaw, it was my understanding that they had a

18  sense that, you know, when it's -- you know,

19  that they would develop it or come up with it.

20      For me, compactness is not so much -- and

21  other geographic features of districts are not

22  so much a kind of bright-line test of this is

23  acceptable or this is not acceptable.  It's

24  more of a red flag, and just says, okay,

25  something is going on here.  This district is

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 8 of 65

1  really narrow, or this district swings around

2  back on top of itself.

3      And the compactness score gives you a

4  quantitative measure of how much this district

5  does it compared to other districts in, say, a

6  state or in the whole nation; how much it did

7  it compared to previous versions of the

8  district.  It's just more of a red flag; and,

9  you know, we need to look now more closely at

10  this.

11  Q.    Okay.  And, again, I'll -- I'll get off

12  of this after I ask this question.  Are you

13  aware of any legal standards that can define

14  when a district is legally compact versus not

15  legally compact?

16  A.    Not that I know of beyond the most

17  subjective assessment.

18  Q.    Okay.

19          MR. FARR:  Does anyone want to take

20  a break?  Let's take a short break.

21          (SHORT BREAK 1:40 - 1:50 P. M.)

22  Q.    (Mr. Farr)  Professor, I'm going to ask

23  you some questions about your compactness

24  conclusions and -- and -- and so, you might

25  want to get your finger on page 4 and wherever

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 9 of 65

1    Table 1 is.

2    **A.**    (Peruses document.)   Okay.

3    **Q.**    On page 4, you say that the Rucho-Lewis

4    reduced substantially the compactness of

5    Congressional Districts 1 and 12.

6         What I wanted to know is what -- how do

7    you define -- or what do you mean by "reduced

8    substantially"?

9    **A.**    So, there's a -- a numerical reduction

10   in the Reock measure and the area to perimeter

11   measure.   The area to perimeter measure is you

12   calculate the area of the -- of the district

13   and then calculate the perimeter of the total

14   miles around.

15        And then take the ratio of those two.

16   They're different scores.   They measure

17   slightly different aspects of compactness of

18   the districts.

19        And what I mean is that there was a

20   substantial, noticeable, meaningful reduction

21   in compactness according to either one of those

22   measures.

23   **Q.**    Okay.  So, I -- I want to try to put

24   that in context.   I'm looking at your Table 1.

25   **A.**    Unh-hunh (yes).

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 10 of 65

1  Q.   And you stated that the Reock score

2  under the 2001 plan for District 1 was .390?

3  A.   Correct.

4  Q.   And the Reock score under the 2011 plan

5  was .294?

6  A.   Correct.

7  Q.   So, if you subtract that, what's the

8  difference?

9  A.   Point one, roughly.  I mean, there's --

10  .096.

11  Q.   It would be -- right, 096.  And that's,

12  like -- what -- so, what would be an

13  insubstantial difference?

14  A.   So, one way to think about Reock is it's

15  a ratio -- the ratio of -- if you had a

16  perfectly compacted district, and it was a

17  circle, it would be one.

18  Q.   Unh-hunh (yes).

19  A.   And so, if you had a square -- because

20  you can't fit circles all over the State, but

21  you might be able to fit squares -- it would be

22  about .65, roughly.

23  Q.   Unh-hunh (yes).

24  A.   And so, that might be a good starting

25  point to take.  It's like, okay, that's, like

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 11 of 65

1    -- as compacted of districts as we see are

2    typically around .65 around maps in the United

3    States.

4         So, if you take .65 as the base line,

5    just sort of hypothetically, how much -- what

6    percentage reduction is that?  That's a pretty

7    substantial reduction.

8         It's about a 12 percent reduction from

9    that right at .096 over .65 -- somewhere around

10   12 percent.

11   Q.    Okay.  What -- like, it is was a -- if

12   it was a .01 reduction, would that be

13   substantial?

14   A.    Point 01?

15   Q.    Unh-hunh (yes), .01.

16   A.    I -- I don't -- I don't think so.  But

17   it depends on what the base line is.  As you

18   get down to the --

19   Q.    What do you mean by base line?

20   A.    What the -- when you get very -- when

21   you -- when you get down to highly non-compact

22   districts, beca- -- well, I should say the

23   limit.

24        As you -- as you get down to -- a

25   district that is a -- got a Reock score of .02,

1   a reduction to .01 would be a fif- -- 50

2   percent reduction in the compactness.

3        If you think about geometrically what must

4   happen to that district to go from .02, which

5   is already, like, extremely non-compact, to

6   .01, it's got to get stretched out a whole lot

7   more and bent around and contorted.

8        So, it depends a little bit on -- on the

9   ex- -- extreme values.  At the extreme values,

10  it becomes harder and harder to -- now, the re-

11  -- the reductions -- percentage reductions are

12  -- are, kind of, more substantial.

13  Q.   Like, what if you had a district that

14  had a .32 Reock score, and the new district was

15  .29.  That would give you a difference of .03.

16       Would that be substantial?

17  A.   Probably not.

18  Q.   Okay.  And then have you referred to any

19  scholarly literature on -- on compactness?  Or

20  articles?

21  A.   Not in this report, I didn't refer to

22  any of it.  But there is scholarly literature

23  on it.

24  Q.   Have you ever re- -- referred to scholarly

25  literature on compactness in your studies?

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 13 of 65

1    **A.**     Yes.

2    **Q.**     Do you remember any of the literature

3    that you referred to?

4    **A.**     I really like Micah Altman's Ph.D.

5    dissertation and the articles that came out of

6    that.

7    **Q.**     Are you familiar with an article by Niemi

8    and Plides?

9    **A.**     Niemi and Plides, I've -- Reock's

10   original article is a -- that -- that original

11   article is one of the standard articles on how

12   do you do compactness, and how he derived that

13   specific measure.

14        Gudgeon and Taylor's book on political

15   geography -- there's a big literature -- I've

16   read a lot of -- is there something in

17   particular you're thinking of?

18   **Q.**     No, I'm just trying to see which ones

19   you rely upon.

20   **A.**     Oh, okay.

21   **Q.**     And so, is Niemi and Plides -- is that

22   -- how would you rate that?  Is that

23   authoritative on compactness or --?

24   **A.**     It's -- it's quite good.  I -- you know,

25   Reock's article is taken as one of the

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 14 of 65

1    authoritative pieces on compactness.

2    **Q.**    Whose article?

3    **A.**    Reock, the person who generated this

4    report, yeah.

5    **Q.**    Okay.  Okay.  And -- but Niemi and

6    Plides, how would you rate that?

7    **A.**    I think it's a good, you know, further

8    application and -- and examination of the

9    concept and its application in this domain.

10   **Q.**    Okay.  Did you know Dr. Hofeller, who's

11   our expert, was one of the authors of that

12   report?

13   **A.**    I did know that.

14   **Q.**    Okay.  Okay.  Now, your second

15   compactness test, which is ratio, area to

16   perimeter of district?

17   **A.**    Unh-hunh (yes).

18   **Q.**    Is that a -- a test that's referred to

19   in the literature?  Or is that -- is that

20   something that you've come up with?

21   **A.**    This is actually standard.  It's in the

22   literature.  Maptitude produces it as part of

23   its other -- other -- ArcGIS produces this.

24   **Q.**    Okay.  Does it have a name?

25   **A.**    I'm not sure.  I've -- I've seen it in

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 15 of 65

1   different reports and different studies with

2   different names.  So, I don't know if there's a

3   standard name that's commonly used.  And also

4   different literatures -- and so, we're dealing

5   literature on geography, literature on

6   political science.

7        And they use different names for the

8   different scores.

9   Q.    Okay.  And so, turning -- looking at the

10  Table 2, based upon your calculations --

11  A.    Table -- Table 2?

12  Q.    Excuse me, Table 1, my apologies.  Is it

13  correct that the Rucho-Lewis 3 First District

14  has a more compact Reock score than the Twelfth

15  District under the 2001 Congressional Plan?

16  A.    The Rucho-Lewis -- which one?  The --

17  Rucho-Lewis --?

18  Q.    Rucho-Lewis 1 has a -- has a -- has a

19  more compact Reock score than the Twelfth

20  District under the 2001 plan?

21  A.    Correct.

22  Q.    And the Rucho-Lewis District 1 has a more

23  compact score than District 13 under the 2001

24  plan?

25  A.    Correct.

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 16 of 65

1   Q.    And -- and that's also true for

2   Rucho-Lewis District 3 as compared to the 2001

3   Twelfth and Thirteenth Districts under your --

4   A.    So --

5   Q.    -- ratio of area to perimeter of district

6   test, right?

7   A.    Oh, so, are we looking at ratio/perimeter

8   or Reock?

9   Q.    Yes.

10  A.    And it's 3 versus --?

11  Q.    I'm comparing -- I'm comparing

12  Congressional District 1 under Rucho-Lewis --

13  A.    Unh-hunh (yes).

14  Q.    -- under the ratio of area to perimeter.

15  I'm comparing it first to District 12.  And

16  would you -- District 12 under the 2001 plan.

17  Would you agree that the -- the 2011 version of

18  the First District is -- is more compact under

19  the ratio of area to perimeter test as compared

20  to the 2001 version of District 12?

21  A.    Correct.

22  Q.    And it's also more compact than the

23  District 13 under the 2001 Congressional Plan?

24  A.    Correct.

25  Q.    Okay.  Do -- do you know -- now on Table

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 17 of 65

1    1 -- we've talked about the fact that the First

2    District under the 2001 plan has got this Reock

3    score .390 versus .294 under the Rucho-Lewis 3

4    plan.

5         Do you -- can you explain why that

6    difference arose?

7    A.    The -- the district boundaries were

8    shifted; and shifted in such a way that the --

9    I think what happened -- if I'm recalling the

10   maps specifically, I think what happened is the

11   district extended westward.

12   Q.    Unh-hunh (yes).

13   A.    I -- I think that extension creates some

14   of the -- but I'd have to go back and look at

15   the exact map and overlay it with the circle to

16   see exactly where the inscribed circle is

17   pushed out.

18   Q.    Okay.  Are you aware of the fact that

19   the First District under the 2001 plan under

20   the 2010 census was underpopulated by 97,000

21   people?

22   A.    That's correct.

23   Q.    Okay.  Could that explain why the

24   boundaries needed to change?

25   A.    Yes, the boundaries would have to change

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 18 of 65

1  to capture another 97,000 people.

2  Q.    Okay.  Have you prepared a map showing

3  how they could have changed the boundaries for

4  the First District and achieved a Reock score

5  that was closer to the 2001 First District?

6  A.    No, I have not.

7  Q.    Have you prepared a map to show how the

8  First District -- the 2011 First District would

9  have been drawn to achieve a more compact Reock

10  score while also achieving the political goals

11  of the General Assembly when they enacted the

12  2011 Congressional Plan?

13  A.    No, I have not.

14  Q.    Okay.  And let's go to District 12 for a

15  second.  So, I -- I can see that the 2001 plan

16  has a Reock score that is higher on the

17  compactness scale than the 2011 version.

18        Do you know why that happened?

19  A.    Do you mean District 12?

20  Q.    Yes, sir.  Do you --

21  A.    Do you mean lower on --

22  Q.    Yes, sir, I meant lower.

23  A.    Okay.

24  Q.    The -- the new district is lower on the

25  Reock score.  Do you know why that happened?

1   A.    It looks like the district extended -- if

2   I recall the boundaries specifically, I think

3   the district extend--- extended northward

4   somewhat.

5        So, it's elong- -- elongating --

6   Q.    Right.

7   A.    -- further, so it's losing its -- it's

8   losing its area --

9   Q.    Unh-hunh (yes).

10  A.    -- as it stretches north.  So, it's

11  losing its area.  That's my recollection of the

12  geometry of the district.

13  Q.    Exactly right.  So, the longer the

14  district is, the lower the Reock score is going

15  to be?

16  A.    Unh-hunh (yes).

17  Q.    Is that -- you need to say yes or no.

18  A.    Yes, that's right.

19  Q.    Okay.  Did you look at any of the

20  legislative testimony or evidence presented at

21  trial regarding why District 12 was elongated?

22  A.    No, I did not.

23  Q.    Okay.  Have you prepared any maps

24  showing how the legislature could accomplish

25  its political goals for District 12 and the

1  2011 Congressional Plan by drawing a different

2  version of District 12 with a more -- with a

3  higher Reock score?

4  **A.**    No, I have not.

5  **Q.**    Okay.  And, you know, the answers you

6  just gave about the Reock score as far as, you

7  know, under the area to perimeter test, have

8  you prepared any maps showing how the 2011

9  First District could have scored better under

10 the area to perimeter test while also achieving

11 the political goals of the General Assembly?

12 **A.**    No, I have not.

13 **Q.**    And have you drawn any maps showing how

14 District 12 could have been drawn in 2011 with

15 a -- a better score under the area to perimeter

16 test while also achieving the legitimate

17 political goals of the General Assembly?

18 **A.**    No, I have not.

19 **Q.**    Okay.  Thanks.  I'm going to skip your

20 testimony about the split counties, since that

21 -- I think that speaks for itself.

22        So, I just want to ask you a few more

23 questions about compactness, I guess.  When you

24 say Congressional District 12 is highly

25 non-compact, what does that mean?

1   A.    I'm sorry, what -- which paragraph are

2   we on?

3   Q.    I'm sorry, yes, sir, I'm on paragraph 15.

4   A.    (Reads paragraph 15)  Which line -- so,

5   "CD 12 is highly non-compact"?

6   Q.    It says -- yes, I just want to know what

7   you meant by that.

8   A.    That -- that is based on my judgement

9   having looked at a lot of maps and looked at

10  various compactness scores across maps.

11        And also, there is a rule of thumb with

12  Reock scores that's emerged that Reock below .2

13  is viewed -- viewed as, sort of, having, kind

14  of, a fairly low compactness.

15  Q.    And a- -- and above .2 is not -- is not

16  viewed as having low compactness?

17  A.    Yes, not -- people don't, like, "Oh,

18  that's a really low -- that -- what's going on

19  there?"  They don't think above .2 is -- that's

20  just a rule of thumb.

21  Q.    Okay.

22  A.    There's no -- as far as I know, there's

23  no statistical property associated with Reock

24  scores, yet, though, I think, some geographers

25  are trying to work on that issue using

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 22 of 65

1    simulations.

2    **Q.**    Unh-hunh (yes).

3    **A.**    Because you don't know what the sam- --

4    what the sample of possible districts would be.

5    And I know that John Rhoden and Joey Chan at

6    Stanford and Michigan have been working on a

7    simulation based method of trying to understand

8    compactness, but --.

9    **Q.**    Okay.  All right.  Have you -- in your

10   studies and your work you've done, have you

11   seen any districts that have got lower, or

12   comparable Reock scores as the 2011 version of

13   the North Carolina Twelfth Congressional

14   District?

15   **A.**    I -- CD 5 in Florida had -- is about the

16   same.

17   **Q.**    Is that a majority black district that's

18   --

19   **A.**    That's one of the disputed questions,

20   whether it is majority black.

21   **Q.**    What's -- do you know what the racial

22   composition is of that district?

23   **A.**    It is not majority -- well, the prior --

24   the -- the version -- I think it was called --

25   numbered CD 3 was not majority black.

1      And they altered the district to make it

2  majority black VAP, but it's not majority black

3  citizen VAP.

4  Q.   Okay.  Good -- well, that's -- that's

5  okay.  Was that the district adopted by the

6  State of Florida for -- for Section 2 reasons

7  or Voting Rights Act reasons?  Do you know?

8  A.   That was -- I don't know what their

9  motivation was.  It was adopted under this new

10  constitutional provision where they'd have to

11  get pre-clearance from the State Supreme Court

12  and so forth.

13      So, I -- that -- my --.

14  Q.   Okay.  You just don't know what their

15  motivation was?

16  A.   To get it past the various screens that

17  they would have to pass at the state level and

18  possibly the federal level.

19  Q.   Okay.  All right.  Okay, but it -- it's

20  a --

21  A.   It's not a Section 5 covered county.  It

22  doesn't -- I don't -- yeah, I don't think it

23  intersected with any of the Section 5 covered

24  districts -- counties in the state.

25      So, it was not a Section 5 question.  It

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 24 of 65

1   was a -- it might have been a Section 2

2   question.

3   Q.   Okay.

4   A.   But then there's a Section 2 question,

5   which is whether or not -- if the district is

6   not majority black VAP, you have to create a

7   majority black VAP.

8        So, that's, I think, what the -- part of

9   the question is that they're grappling with

10  right now in the courts.

11  Q.   Okay.

12  A.   And the Florida Constitution has explicit

13  compactness criteria that they're trying to

14  figure out what the standard is, so --.

15  Q.   Do you know the -- do you know anything

16  about the history of that district in Florida?

17  A.   A little bit of it.

18  Q.   Has it -- has it -- has it, kind of, had

19  the same configuration for more than one cycle?

20  A.   It's -- it -- it moved.  I'm trying to

21  remember where it moved, what -- what --

22  exactly what decade it moved in.

23  Q.   And are you a witness in that case?

24  A.   I am.

25  Q.   Are you familiar with the parties in that

Case 1:13-cv-00949-WO-JEP  Document 68-5  Filed 06/02/14  Page 25 of 65

1   case?

2   **A.**    A bit.

3   **Q.**    Is the NAACP a party in that case?

4   **A.**    They are.  There's a set of Plaintiffs

5   called the Coalition Plaintiffs.  And I think

6   the NAACP is part of the Coalition Plaintiffs.

7   **Q.**    Do you know who their counsel are in

8   that case?

9   **A.**    I don't remember the names.  I think

10  they've been mentioned to me on the phone, but

11  I don't --.

12  **Q.**    Does the Southern Coalition for Social

13  Justice ring a bell?

14  **A.**    I've heard the name.  I don't know if

15  they're involved in that.

16  **Q.**    Okay.  Are those Plaintiffs defending that

17  district?

18  **A.**    I am not sure.  I'm just -- deal with my

19  counsel and the questions that they raise with

20  me.  I'm not --.

21  **Q.**    Okay.  You can't answer if you don't

22  know.

23  **A.**    Yes.

24  **Q.**    Okay.  Now, let's turn to the racial

25  compositions of districts, which starts on page

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 26 of 65

1   8, paragraph 18.   Okay.

2         When you say there were no majority black

3   districts under the 2001-2011 Map, you're

4   referring to what I call the 2001 Congressional

5   plan?  Is that the same thing?

6   A.     I believe that is.

7   Q.     Okay.  And what did you mean by no

8   majority black districts?

9   A.     No majority black VAP districts.   That

10  is, none of the districts had -- were districts

11  in which a majority of the voting age

12  population were black, according to census.

13  Q.     Okay.  But then you also say that the

14  First District was majority black as to

15  registered voters?

16  A.     Correct.

17  Q.     Okay.  And did you look to see if the --

18  if either the First or the Twelfth District

19  were majority non-hispanic white districts?

20  A.     Majority non-hispanic white districts?

21  I'm trying to remember if I did a -- I don't

22  remember looking at the -- but -- whether

23  either of them was a coalitional district.

24  Q.     Okay.  If they were -- if the -- if the

25  -- under the 2010 census, if the First -- if

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 27 of 65

1    the 2001 First and Twelfth Congressional

2    Districts were non-majority or non-hispanic

3    white minority districts --

4    A.     Unh-hunh (yes).

5    Q.     -- would that then potentially make them

6    into a coalition district similar to what you

7    talked about in Texas?

8    A.     Potentially.  There'd have to be a

9    separate analysis of the voting behavior of the

10   hispanics and the blacks in the area; whether

11   they vote together in the general elections

12   with sufficient cohesion, and the whites in

13   those areas vote together with sufficient

14   cohesion in opposition; and whether or not the

15   voting is -- behavior is sufficient that they

16   can elect their -- their candidates.

17   Q.     Okay.  Now, you then say there's two

18   majority black congressional districts in the

19   Rucho-Lewis 3 Congressional Map in paragraph 19.

20   A.     Unh-hunh (yes).

21   Q.     All right.  And let's look at your table

22   2.  Now, I want to -- when you say majority

23   black congressional districts, you're just

24   using that to describe the percentage of the

25   total black voting age population in the

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 28 of 65

1  district?

2  **A.**     Correct.

3  **Q.**     Okay.  All right.  Turning to your

4  section about race is a factor in the

5  composition of the districts, one of the tests

6  you -- you performed is -- is based upon what

7  you described as the envelope of the district?

8  **A.**     Envelope of counties, yes.

9  **Q.**     Okay.  The envelope of the counties that

10  have a part of the district in -- in them?

11  **A.**     Correct.

12  **Q.**     Okay.  Where did you get that concept?

13  **A.**     That concept I've encountered from map

14  drawing in other contexts.  The idea is -- and

15  -- and also through a traditional districting

16  principle of trying to respect county

17  boundaries.

18        So, if you imagine there being a set of

19  counties where there is a set of people with

20  particular characteristics, and you think that

21  that district ought to go in that county, then

22  the only question is, "Okay, how exactly

23  configured is the district within that envelope

24  defined by the county?"

25        So, if I'm not going to cross additional

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 29 of 65

1    county boundaries and so forth -- so the basic

2    principle of respect for county boundaries,

3    which is a fairly common redistricting

4    principle that goes back to the beginning of

5    districting in the United States, is one, sort

6    of, starting concept.

7         And one way of approaching a map is to

8    take all the counties and start to draw maps

9    with counties.  This county plus this county

10   plus this county; keeping them -- them whole to

11   the extent possible, and then starting to split

12   them if you're overpopulated or grabbing parts

13   of counties if they're underpopulated.

14        So, it's just a -- a -- an approach to

15   districting that's following a traditional

16   Democratic -- a districting principle.

17   Q.   But you've never actually drawn a

18   Congressional plan for a state government or a

19   party that submitted it to the legislature?

20   A.   No.

21   Q.   Okay.  And this -- this envelope theory

22   that you are using, has it been recognized by

23   any courts in a case similar to this one?

24   A.   Well, certainly, in respect for county

25   boundaries is -- is something that courts do

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 30 of 65

1  look at in thinking about districting;

2  certainly, your Florida example, it's a state

3  court but not federal court in that case.

4  **Q.**    Right.  I got that, but what -- what --

5  **A.**    Keeping counties whole, and then

6  imagining where the districts are situated

7  within that.  As soon as you think about

8  keeping counties whole, then you're talking

9  about the counties themselves being the

10  envelope and restrict- -- and restricting the

11  districting within that.

12       So, it is a principle that comes out of a

13  lineage.  In terms of the specific approach to

14  how you define the sub-population that you'd

15  study in terms of assessing a particular

16  district, there are some analyses that look at

17  specific subsets of states where the counties

18  in that subset of states -- or -- or some parts

19  of the states are what are -- are used, such as

20  -- all of the -- you know, Harris County is --

21  is used, and then how are the districts

22  configured within that, or the area -- the

23  metropolitan area and how the districts are

24  configured within that.

25       In terms of assessing the likelihood that

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 31 of 65

1  a black voter ends up in a district, or a

2  Democratic voter ends up in a district, or a

3  Republican voter ends up in a district, and

4  looking at the envelope as the baseline, I have

5  not encountered that particular analysis.

6  **Q.**    Okay.  That was my question.

7  **A.**    Okay.  I didn't know which part of it

8  you meant, like --

9  **Q.**    No, that was good.

10  **A.**    -- state as the envelope or the --

11  **Q.**    You're just -- you answered -- you

12  answered the question I wanted to ask.

13       So, using the envelope to predict or

14  assess the number of Republicans or blacks that

15  end up in or out of a district is not something

16  you encountered before this case?

17  **A.**    Not -- yeah, not explicitly that, yeah.

18  **Q.**    That's not something that a court has

19  recognized as a way to assess the evidence in a

20  racial gerrymandering case?

21  **A.**    Not that I know of.

22  **Q.**    All right.  Now, do you have a opinion

23  on actual voting behavior by blacks in North

24  Carolina versus whites in North Carolina?

25  **A.**    I have written on that question in a

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 32 of 65

1  pair of articles in the Harvard Law Review.

2  Q.   Oh, good.

3  A.   It's not specifically North Carolina, but

4  it is -- it's a -- every state in the United

5  States.  And there's an assessment of voting

6  patterns at a statewide level.

7       It doesn't break it out into specific

8  sub-regions within the states, and sometimes

9  there are variations of it in sub-regions.

10  Q.   Okay.

11  A.   But the articles -- if you look at my CV

12  -- if you -- if you don't have a copy of my

13  CV, please email me, and I will send it through

14  --

15  Q.   I'll ask Mr. Speas to send it to me.

16  That would be fine.

17  A.   But the articles are Voting Rights in

18  the Eye of the Beholder -- is that right -- no,

19  no, I have three articles in the Review.  So,

20  there's one that's an analysis of the 2008

21  election, and another is an analysis of 2012.

22  So, the 2012 analysis was in 2013.

23       So, if you get on the Harvard Law Review

24  website, you'll -- and I think it's April, 2013

25  -- you'll -- or May issue, it'll be an article

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 33 of 65

1   by me, me, Nate Pursely and Charles Stewart.

2       And then the other article is from 2010.

3   And I think it's the April issue.

4   Q.   Okay.  Well, here's what I was going to

5   ask you.  There's been some other expert --

6   there was some expert testimony in the -- in

7   the Dixon case that as much as 95 percent or

8   higher of -- of black voters who vote tend to

9   vote for the Democratic candidate?

10       Is -- would you agree with that or

11  disagree with that?

12  A.   I -- I'd have to go back and look at the

13  numbers, but that could be.

14  Q.   Did you study that in -- in terms of

15  whether that was true or not in North Carolina

16  when you prepared your report?

17  A.   Not in terms of preparing this report.

18  I didn't do a racial polarization or cohesion

19  analysis for this report.

20  Q.   Well, I -- I wasn't -- I'm not sure --

21  okay.  You didn't do a racial polarization

22  analysis.  I was asking more of a political

23  question.

24       Regardless of the race of the candidate,

25  there has been testimony that blacks, whether

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 34 of 65

1  they're Democrats, unaffiliated or Republicans,

2  are likely to vote for the Democratic candidate.

3       And the percentage is in excess of 90

4  percent.  Have you ever evaluated or studied

5  that?

6  A.    I have evaluated and studied it in an

7  academic context.  I haven't done it in the

8  context of this case.  So, I haven't focused on

9  it for that.

10      And the estimates that we derived are in

11 those articles for North Carolina.

12 Q.    Okay.

13 A.    For the elections we looked at, and they

14 were explicitly about the Obama elections.

15 Q.    Right.  Did you -- did you ever -- do

16 you have an opinion on whether there is a

17 strong correlation between race and the -- in

18 fact, the race of black people and how many

19 black people vote for Democratic candidates in

20 North Carolina?

21 A.    My expectation -- and you know, based

22 loosely on my memory of that article and on

23 North Carolina voting statistics from CBS,

24 which I've gotten North Carolina as a race to

25 call, is that it's fairly high.

Case 1:13-cv-00949-WO-JEP  Document 68-5  Filed 06/02/14  Page 35 of 65

1     I wouldn't be surprised if it was

somewhere 90 percent plus.  That tends to be

the average nationwide for blacks.

They tend to vote for Democratic

presidential and statewide candidates at very

high rates.

Q.    And that would include registered black

Democrats, registered black unaffiliated and

registered black Republicans, would it not?

A.    I don't know about the sub-groups of

registration.

Q.    Okay.

A.    We usually just look at blacks as a

category and the correlation of black VAP.

Q.    Okay.  And white voters are -- are much

more split in their political affiliations when

they vote as compared to black voters, is that

correct?

A.    That tends to be the case, though,

there's -- are you referring to North Carolina?

Q.    Yes.

A.    Yeah, my recollection is they tend to be

more split.

Q.    Okay.  Are -- and that would in- -- and

that would include white Democrats are more

Case 1:13-cv-00949-WO-JEP  Document 68-5  Filed 06/02/14  Page 36 of 65

1    likely to vote for a Republican candidate than

2    a black Democrat?  Would you agree with that?

3    A.    That, I don't know offhand.  So, you're

4    -- you're -- my guess is that would be likely

5    the case.  But it's -- like, I haven't focused

6    on that analysis.

7    Q.    You haven't worked with that?

8    A.    Right.  The ideal data to look at for

9    that would be to take, maybe, the National Exit

10   Poll for North Carolina, because they have a

11   pretty good sample of people as they're leaving

12   the exit polls.

13   Q.    Okay.  And would you agree the

14   unaffiliated white voters are far more likely

15   to vote for Republican candidates than

16   unaffiliated black voters in North Carolina?

17   A.    That would be my -- my guess.  But it's

18   not -- I don't -- I didn't study that

19   explicitly.  I don't have any estimates offhand

20   to draw on.

21   Q.    Okay.  So, given that testimony, I want

22   you to explain to me your last sentence in

23   paragraph 20, where you say "If the lines were

24   drawn without regard to race, one would expect

25   that the white and black registered voters

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 37 of 65

1   would have approximately the same likelihood of

2   inclusion in a given Congressional District."

3   A.    Unh-hunh (yes).

4   Q.    And explain that to me.  I don't

5   understand that at all.

6   A.    Oh, so, if you -- if you -- as a -- as an

7   expectation, if you drew the lines without

8   regard to race -- just arbitrarily, perhaps --

9   so, if you were doing this exercise that my

10  colleagues John Rhoden and Joey do, where they

11  randomly construct a district in some part of

12  the State, what would be the resulting

13  correlation between the probability that a

14  white ends up in a district and the probability

15  a white -- a black ends up in a district, you

16  know, it would probably be uncorrelated.

17       That's what the expectation is.

18  Q.    Okay.  What if the -- what if the

19  individuals drawing the district were trying to

20  draw District 12 as an extremely strong

21  Democratic district, and the adjoining

22  districts as strong Republican districts, would

23  you still say that one would expect that white

24  and black voters should be included in District

25  12 at the same percentages?

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 38 of 65

1   A.    So, if you gave me that as the

2   conjecture, then I would have to, sort of,

3   somehow condition on party.  Let's say, given

4   the party, what's the probability.

5        So, it's, like, a second analysis is

6   introduced into the report.

7   Q.    So, you --

8   A.    And that -- if it's race versus party --

9   Q.    Unh-hunh (yes).

10  A.    -- or if party is somehow a factor, then

11  you need to do an additional analysis.  That's

12  why I did the additional analysis.

13       But if it was just a question of race or

14  not race, without any -- without anything else

15  under consideration, then that's what that

16  sentence refers to.

17  Q.    All right.  But does party necessarily

18  indicate the percentage of white Democrats who

19  vote for a  Republican candidate?

20  A.    My experience looking at exit polls and

21  working for CBS is that white democrats tend to

22  vote about 80 percent with their party; maybe a

23  little higher -- 85 percent.

24  Q.    In what states?

25  A.    It's a general pattern around the United

1   States.

2   Q.    Have you studied that for North Carolina?

3   A.    Not explicitly.  But when -- I'm trying

4   to remember what -- I -- I had the North

5   Carolina -- I had the North Carolina Senate

6   race the last time around.

7         I'm trying to remember what the numbers

8   were.  They gave us a briefing book.  I don't

9   remember what the exact numbers, but you know,

10  the white Democrats will vote overwhelmingly

11  Democratic.

12  Q.    But they're -- they're voting at a

13  percentage that's lower than what the -- the

14  black Democrats are voting for the Democratic

15  candidate?

16  A.    Correct.  And white Republicans vote for

17  Republicans at a lower rate than black

18  Democrats vote for Democrats.

19        So, in terms of the swapping, it's -- my

20  -- my guess, based on this, is white

21  Republicans look like the opposite of white

22  Democrats in terms of their percentage, voting

23  for their -- for their party's preferred

24  candidates.

25  Q.    And are un- -- unaffiliated white voters

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 40 of 65

1   likely to vote for a Republican candidate at a

2   higher rate than registered black Democrats?

3   A.    Yeah, that -- that'd be my estimate, yeah.

4   Unaffiliated generally tend to split their

5   votes pretty evenly, so that -- that would be

6   -- that would necessarily follow.

7   Q.    Right.  Well, what about un- -- would

8   unaffiliated white voters tend to vote for

9   Republicans at a higher rate than unaffiliated

10  black voters?

11  A.    I don't know that one offhand, so --.

12  Q.    You haven't looked at that?

13  A.    I don't remember looking at that one in

14  particular, but --.

15  Q.    And you've not looked at that for North

16  Carolina?

17  A.    Right.  That's a -- that particular

18  group is sufficiently small.  It usually

19  doesn't show up in the exit polls.

20  Q.    Do you know what the percentage of

21  unaffiliated voters is in North Carolina?

22  A.    I don't remember offhand.

23  Q.    Do you know what percentage of registered

24  black voters are registered as Democrats?

25  A.    I recall it was very high, like, 85

1    percent of so.  I don't remember the exact

2    number, but I remember it being very high.

3    Q.    In North Carolina?

4    A.    In North Carolina.

5    Q.    Do you recall what -- what percentage

6    black voters make up of registered Democrats in

7    North Carolina?

8    A.    So, what percentage of all Democrats are

9    black voters?  I don't remember that number

10   offhand.

11   Q.    Okay.  Let me ask you, so, if -- if the

12   -- if the lines of the district were drawn to

13   try to increase Democratic performance in one

14   -- in District 12 --

15   A.    Unh-hunh (yes).

16   Q.    -- and increase Republican performance in

17   the adjoining districts, would you expect that

18   the percentage of whites and blacks moved in

19   and out of the Twelfth District would be the

20   same?

21         Or would -- would the percentage of

22   blacks moved in be higher?

23   A.    It depends on what the adjoining

24   populations are and what the populations in the

25   district are.  Because if you remove

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 42 of 65

1  population, you could affect it as well as

2  adding to it, so --

3  Q.    Well, let's --

4  A.    -- it just depends on what the

5  population is.

6  Q.    Let's talk about North Carolina, okay,

7  and District 12.

8  A.    Right.

9  Q.    You've got three major population centers

10  for District 12, right?

11  A.    Unh-hunh (yes).

12  Q.    And then you've got this connecting area?

13  A.    Correct.

14  Q.    Okay.  The -- the -- the -- in

15  Mecklenburg County and Guilford County and

16  Forsyth County, is it fair to say that a high

17  percentage of the registered Democrats in those

18  counties are African-American?

19  A.    That's -- that's fair to say.  I don't

20  know what percentage it is, but it's -- I

21  remember it being high.

22  Q.    Okay.  And if you were going to increase

23  the Democratic performance of that district in

24  those counties, would it be likely that you

25  would be adding African-American voters to

Case 1:13-cv-00949-WO-JEP  Document 68-5  Filed 06/02/14  Page 43 of 65

1   those districts if you were going to increase

2   the percen- -- or the performance of the

3   Democratic candidate in those districts?

4   **A.**    Well, that would be one strategy.  You

5   could add white Democrats, and it would

6   increase it, because white Democrats are voting

7   for Democrats at higher than 50 percent.  You

8   could --.

9   **Q.**    Yes, but they vote -- they vote for --

10  the white Democrats and -- and the unaffiliated

11  whites for the Democratic candidate at a lower

12  percentage than the black Democrats?

13  **A.**    That would be conjectured and then --

14  you know, my guess -- I don't know -- I don't

15  know if it's -- how much lower it is.

16       And if you're -- if you're taking, say,

17  white Republicans out of the district and

18  putting white Democrats in, that's a net swing,

19  say, of -- from 20 percent Democratic to 80

20  percent Democratic of those voters.

21       That's a pretty big net swing if you take

22  a white Republican out and put a white Democrat

23  in.  I guess, the marginal improvement would be

24  another -- under this hypothetical, another 15

25  points if you put a black Democrat in.

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 44 of 65

1   **Q.**    Okay.  What is the -- do you know what

2   the Supreme Court of The United States says

3   about whether election results or registration

4   statistics are a better predictor of actual

5   voting conduct?

6   **A.**    My recollection from -- this is what come

7   up in Cromartie --

8   **Q.**    Unh-hunh (yes).

9   **A.**    -- is that they said that election in

10  Briar's opinion -- is that right -- was a --

11  I'm trying to remember.  I'm not sure I've got

12  the right opinion in mind, but that election

13  results are better predictors or preferred

14  predictors.

15      My experience analyzing data is that the

16  two are highly correlated.

17  **Q.**    So, you disagree with the United States

18  Supreme Court?

19          MR. SPEAS:  Objection to form.

20  **A.**    I'm not disagreeing with them.  I'm not

21  disagreeing with them.  I'm just saying that

22  the two are highly correlated.  So, it could be

23  that -- my practical experience predicting

24  elections is that registration statistics are

25  very useful in predicting elections.

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 45 of 65

1        Party -- party registration is a very good

2    predictor of party vote.

3    Q.    (Mr. Farr)  But your experience in doing

4    that has been in working for CBS?

5    A.    And -- and also doing academic research.

6    Q.    Okay.  But you didn't -- you've never

7    been asked to -- to draw a redistricting map

8    for a jurisdiction, so that the party that

9    hired you would end up with a more favorable

10   redistricting plan than the one that was in

11   place in the previous decade?

12   A.    No.

13   Q.    Okay.  If the -- if the -- the drawers

14   of the -- of the First District or the Twelfth

15   District were focused on election results and

16   trying to draw a stronger Twelfth District,

17   with your knowledge of where the Twelfth

18   District is located, in your opinion, would

19   that result in the Twelfth District having a

20   higher black percentage in the 2011 than what

21   it had under the 2001 plan?

22   A.    It -- it might; it might not.  It

23   depends on how much population needed to be

24   shifted.  My recollection of the statistics was

25   that District 12 was overpopulated by 2400

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 46 of 65

1  people.

2      So, to make that a legal map, if you

3  started with that district as your first

4  district to draw, to make that legal -- if you

5  were doing the least thing possible, you'd

6  remove 2400 people.

7      And that would have been the extent of

8  the change.  So, they -- just conceptually,

9  just looking at the map, from what -- based on

10  what I -- I know, that's one thing I -- you

11  know, that could have been done.

12      However, the map drawer shifted in -- I

13  don't remember the exact numbers, but it was

14  somewhere around 75,000 people -- shifted out

15  another big chunk of people -- 70 -- 77,000.

16  So, there -- there were a lot of population

17  shifts that happened between the two.

18      If you started with, kind of, the

19  minimalist approach of just make this an equal

20  population district, and they could zero it out

21  to comply with Baker v. Kerr or with some later

22  cases, like, stop there, or at least that would

23  be my experience.

24  Q.    Okay.  Is the -- in your opinion, is the

25  2011 Twelfth District a stronger performing

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 47 of 65

1    Democratic district than the 2001 version?

2    A.    I think under either map, the Democrat is

3    almost surely going to win those districts.

4    Q.    Is it -- which one is he going to win by

5    a higher percentage?

6    A.    My guess is there's a small -- there

7    would be a percentage gain.  In terms of data

8    analysis at CBS, when we forecast the House,

9    we're not going to worry about either one of

10   those districts.

11       Those are safe, safe Democratic districts.

12   Q.    Right.  But -- but -- but is the -- is

13   the 2011 version of the Twelfth likely to get a

14   higher Democratic vote total for President and

15   Congress and other Democratic races than its

16   2001 district?

17   A.    It -- it's likely.

18   Q.    Okay.  What about the surrounding

19   districts?  Have you studied those to see if

20   those districts are better performing districts

21   for Republicans as a result of the way the --

22   the Twelfth District was constructed?

23   A.    I have not studied the party performance

24   of those districts.

25   Q.    Have you studied the party performance of

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 48 of 65

1  any of the other districts in the 2001

2  Congressional Plan other than the First and the

3  Twelfth?

4  A.     Just the First and the Twelfth.  I mean,

5  I have -- I have to start studying them for CBS

6  now.  So -- summer is upon me, and the election

7  is coming, so --.

8  Q.     Turn to paragraph 38 of your report.

9  And you say that "The VTDs moved into

10  Congressional District 12 are 44.0 percent

11  black registration."  I'm going to start over

12  again with 38.

13        I'll just read the whole paragraph.

14  A.     Okay.

15  Q.     "The VTDs kept in Congressional District

16  12 (the Core) --" and that raises an issue to

17  me, because I -- I want you to define to me

18  that that means, the Core.

19        "The VTDs kept in Congressional District

20  12 are 54.0 percent black registration and 31.9

21  percent white registration.  The VTDs moved out

22  of Congressional District 12 are 23.2 percent

23  black registration and 66.0 percent white

24  registration.

25        "The VTDs moved into Congressional

1  District 12 are 44.0 percent black registration

2  and 37.1 white registration."  Okay.  Are you

3  with me?

4  A.    Unh-hunh (yes).

5  Q.    Then you say -- what -- what conclusion

6  do you reach from that?  Is that -- what is

7  that -- what's the significance of that?

8  A.    So, the net effect is moving VTDs --

9  keeping a district -- keeping -- the part of

10  the district that was kept in the district

11  without being moved in or out, that -- that --

12  that's the Core -- is 54 percent black

13  registration.

14        So, it's majority black registration.

15  That's the part that was left.

16  Q.    Unh-hunh (yes).

17  A.    And then the net change was to move out

18  VTDs that were 64 percent white registration

19  and 23 percent black registration total; and

20  then to move in VTDs that are 44 percent black

21  registration and 37 percent white registration.

22        So, the net swing is to move -- you're

23  moving out VTDs that are disproportionately

24  white; you're moving in VTDs that are somewhat

25  more black.

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 50 of 65

1      So, the net swing in black registration is

2   23.2 versus 44.0.

3   Q.   Okay.  And I -- and I don't know if

4   you've got this in the back or not.  But do --

5   do you actually have totals of population that

6   was moved out and in in one of your tables?

7      Or did you just do percentages?

8   A.   That's a good question whether I put the

9   -- I did calculate that at one point.  And I

10   was trying to keep the -- I think (peruses

11   document).  I mean, I don't -- I don't see

12   population.

13   Q.   Okay.  Do -- do you know where the --

14   the -- the moved VTDs are located in the

15   district, the ones who were moved out and moved

16   in?

17      Did you make a study of that?

18   A.   I studied it in the map.  So, I -- I

19   looked at the boundaries of the map to see

20   which areas were being moved, which -- whether

21   there were any county splits that were

22   introduced, whether there were municipal splits

23   and things like that.

24   Q.   Okay.  And you're familiar with District

25   12.  And you've got these urban centers in

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 51 of 65

1    Mecklenburg and Guilford County, and then

2    you've got the corridors that connect them?

3    A.    Right.

4    Q.    Do you consider the part of the corridor

5    that was re- -- retained a part of the core of

6    the district?  Is that how you defined Core?

7    A.    Core is the part that's left in, kept in.

8    Q.    Okay.

9    A.    That's literally what the Core is.

10   Q.    Okay.

11   A.    It's not a -- it's not a, kind of,

12   judgmental term.

13   Q.    Okay.  Now, looking at paragraph 38,

14   "The VTDs that moved out were 23 percent black

15   registration and 64 percent white registration.

16        "The ones that were moved in were 44

17   percent black registration and 37.1 white

18   registration."  Did you do any political

19   analysis of the election results in the VTDs

20   that were moved out versus the ones that were

21   moved in?

22   A.    No, I didn't, just -- I -- I studied the

23   registration.  I think I looked at the -- we

24   had -- the report I had had election results,

25   but I didn't -- of the VTDs, but I didn't know,

1    like, which voters vote for -- I just knew vote

2    share for, say, Obama.

3         But I didn't know if it was the black

4    vote, the -- you know, what percentage of that

5    was the blacks voting which way, or the

6    Democrats.

7         So, I stuck with the individual level

8    analysis to avoid, kind of, the inferential

9    problem of predicting, you know, what

10   percentage of the vote for those was coming

11   from blacks and whites.

12   Q.   Okay.  So -- well, do you -- well, do

13   you have an opinion on -- if we just looked at

14   the VTDs that were moved out of Congressional

15   District 12 versus the ones that were moved in,

16   would you -- would you have an opinion on

17   whether the ones that mo- -- were moved out had

18   a higher percentage of vote for McCain than the

19   districts that were moved in to District 12?

20   A.   No, not -- not offhand, no.

21   Q.   You didn't look at that?

22   A.   I think I did look at it, but it's not

23   in the reports.

24   Q.   Okay.

25   A.   It's not something I would -- I would

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 53 of 65

1    testify on.

2    Q.    Well, looking at the -- at the

3    registration figures where the -- the districts

4    moved out were 23.2 percent black and 64.0

5    percent white, and then you compare that to the

6    44 percent black that were moved in and -- with

7    37.1 percent white, based upon your knowledge

8    of voting patterns by blacks versus whites,

9    wouldn't it be reasonable to assume that McCain

10   performed better in the districts that were

11   moved out than he did in the ones that were

12   moved in?

13   A.    That would be my prediction.

14   Q.    Okay.  And wouldn't it be reasonable to

15   assume that other Republican candidates

16   performed better in the districts that were

17   moved out than the ones that were moved in?

18   A.    That would be my prediction, too.

19   Q.    Okay.  And that same answer would apply

20   if we looked at this from a voting age

21   population perspective?

22   A.    Yes.  It gets a little complicated,

23   because one of the other groups is not

24   mentioned in here.  Hispanics, we don't know

25   what the registration rate of those is and so

1  forth, but --.

2  Q.    Okay.

3  A.    And again, you have to make some

4  projections.  And there are some classic

5  problems with making projections where in some

6  counties the whites who are closest to the

7  blacks are the -- you know, voting --

8  residentially are the ones who are voting the

9  most strongly opposite to the blacks.

10       But then the whites that are farther away

11  are not.  That's a classic article from Jerry

12  Wright in the 1970s.  So, it depends on -- I

13  guess it depends on which whites.

14  Q.    Okay.  Oh, I'll add something I forgot

15  to ask you.  Do you know what is meant by point

16  contiguity?

17  A.    Yes.

18  Q.    What does that mean?

19  A.    So, if you have a -- if you have a VTD

20  here and a VTD here, and they just touch at one

21  point, you've got point contiguity.

22  Q.    Okay.  Do you know what's meant by the

23  term -- it's been called various things down

24  here, but one of the terms it's been called is

25  double point contiguity.

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 55 of 65

1      Have you ever heard of that before?

2  **A.**    I haven't heard of double point

3  contiguity.

4  **Q.**    Okay.  Or criss-cross contiguity?  Have

5  you ever heard of that?

6  **A.**    I -- I've heard of criss-cross

7  contiguity, but -- like, I don't --

8  **Q.**    What -- what is that?

9  **A.**    -- fully -- I don't fully understand that.

10  **Q.**    What's criss-cross contiguity as far as

11  you know?

12  **A.**    So, I've -- the one reference I saw that

13  comes to mind was where you've got two -- two

14  -- two -- let me get an example.

15      So -- so, the point would be just like

16  any -- any -- any corner touching at least two

17  VTDs.  The criss-cross would be a -- my

18  understanding, it was a form of point

19  contiguity.

20      But it's, like -- it has to do with the

21  -- the shape of the boundary that's connecting.

22  **Q.**    If a -- if a jurisdiction used point

23  contiguity, could that affect the compactness

24  scores on a Reock test?

25  **A.**    It depends -- depends on the shape.  So,

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 56 of 65

1   if the district actually bent around -- back

2   around itself --

3   Q.    Unh-hunh (yes).

4   A.    -- then the inscribed circle -- the

5   inscribed circle wouldn't capture the bending

6   back.  So, that wouldn't necessarily affect it.

7       The area to perimeter ratio would reflect

8   that.

9   Q.    Okay.

10  A.    That's one -- one of the examples of why

11  you'd want to look at both as, kind of,

12  indicators of what's going on with the district

13  shapes.

14  Q.    Okay.  But it's pos- -- is it possible

15  that the use of point contiguity could have an

16  impact on a Reock test?

17  A.    It's possible if I took a district here,

18  and I stuck another district on top with just a

19  point connecting them, then by virtue of

20  elongating the district and reducing the total

21  area covered, that -- that would be an example

22  where it could, but --.

23  Q.    Okay.  All right.  I've skipped a

24  paragraph I want to ask you about, paragraph

25  29.  This -- this -- we're talking about the

Case 1:13-cv-00949-WO-JEP  Document 68-5  Filed 06/02/14  Page 57 of 65

1    same question I just asked you about

2    Congressional 12.

3         I want to ask you about Congressional

4    District 1.  You can see in your -- in

5    paragraph 29 you say that "The VTDS moved out

6    of Congressional District 1 are 27.4 percent

7    black registration and 66.7 percent white

8    registration."  Do you see that?

9    A.    Correct.

10   Q.    "The VTDs moved into Congressional

11   District 1 are 48.1 percent black registration

12   and 37.7 percent white registration"?

13   A.    Correct.

14   Q.    Okay.  Would it be fair to assume that

15   the VTDs moved out of Congressional District 1

16   when the 2011 version was created performed

17   better for McCain than the VTDs that were moved

18   into the district?

19   A.    That -- that would be my guess just

20   blindly on the basis of these statistics and

21   the correlation between race and -- and party.

22        But again, it depends on which whites, so

23   --.

24   Q.    Okay.  Would -- would -- would it be

25   fair to assume that other Republican candidates

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 58 of 65

1   performed better in the VTDs that were moved

2   out of Congressional District 1 as compared to

3   the VTDs that were moved into Congressional

4   District 1?

5   A.    That -- again, that would be my

6   prediction.  But again, it depends on which

7   whites and hispanics and other -- others.

8   Q.    Okay.  Would you be able to determine

9   that by looking at election results?

10  A.    Election results, registration -- those

11  are the data that would be helpful.

12  Q.    But you agree election results would be

13  helpful?

14  A.    Yes.

15        MR. FARR:  Can I take a short break?

16        (SHORT BREAK 2:50 - 2:59 P. M.)

17  Q.    (Mr. Farr)  Okay.  Professor, I wanted

18  to ask you about your second report.  And --

19  A.    Before I move on to my second report,

20  can I make one change in my --

21  Q.    Sure, you're always able to do that.

22  A.    So, Dr. Hofeller pointed out something to

23  correct -- there is an error I made in

24  tabulation on paragraph 18.  It should be 19

25  counties; not 18.

Case 1:13-cv-00949-WO-JEP  Document 68-5  Filed 06/02/14  Page 59 of 65

1      And it should be "splits nine of the ten

2   counties." I just miscounted.  I was counting

3   by hand from the Excel spreadsheet.  And I just

4   --.

5   Q.    We'll give you that one.

6   A.    Okay.

7   Q.    No problem.

8   A.    Time for new reading glasses, I guess.

9   Q.    I just want to ask you -- I hope I can

10  get -- I'm not going to go all through your

11  second report.  It's -- it speaks for itself.

12      But I -- you made some effort in this --

13  in the second report to try to --

14              MR. SPEAS:  This is Exhibit 10?

15              MR. FARR:  I'm sorry, yes, Eddie,

16  thank you, Exhibit 10.

17  Q.    (Mr. Farr)  Did -- you made an effort to

18  try to predict election results in your -- in

19  Exhibit 10, is that right?

20  A.    Well, there's a correlation between the

21  election data, the voting -- at the voting

22  tabulation district and the registration data.

23  Q.    Explain that to me.

24  A.    It's not an attempt to actually predict

25  the election results.  The question is whether

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 60 of 65

1   or not registration and -- and voting are

2   highly related to each other; and therefore,

3   whether registration is a good indicator of

4   likely performance of the -- of the district,

5   or whether or not -- you know, if you analyzed

6   registration, you'd get essentially the same

7   conclusions or close to the same conclusions as

8   analyzing elections.

9   Q.    Did that assessment that you did include

10  an assessment of accounting for unaffiliated

11  voters?

12  A.    Unaffiliated voters are included in that

13  measure of registration.

14  Q.    Okay.  Again, how did you predict how the

15  unaffiliated voters were going to vote?

16  A.    It's not a prediction about how the

17  unaffiliated voters are going to vote.  It's

18  just a correlation between the percent vote --

19  of the two-party vote and the correlation and

20  -- and the percent of the registration that's

21  Democrat or Republican or unaffiliated.

22        So, the higher the Democratic percent,

23  the -- in registration, the higher the

24  Democratic percent in vote.  And that degree of

25  correlation is quite high -- around .8 or

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 61 of 65

1    higher was my recollection of the numbers.

2    **Q.**   Could you point that part of your report

3    out to me?  Because this -- this is something

4    that I really didn't understand, which is why

5    I'm asking you questions about it.

6    **A.**   Okay.

7    **Q.**   Where is this in your report?

8    **A.**   Table -- page 5.

9    **Q.**   Okay.

10   **A.**   Paragraph 16, 17, 19.

11   **Q.**   Okay.  So, I'm looking at 17.  And you

12   said --

13   **A.**   I --

14   **Q.**   I'm sorry?

15   **A.**   Sorry, go ahead.

16   **Q.**   Anything else?

17   **A.**   No, no.

18   **Q.**   I didn't mean to interrupt you.  It's --

19   so, and you said Table 5?

20   **A.**   I didn't say a table, but yeah, I think

21   that's the right one -- Table 2?  No, Table 1.

22   **Q.**   Okay.  So, you -- you correlated

23   Democratic registration -- black Democratic

24   registration and VAP against the Obama vote?

25   Is that what you did?

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 62 of 65

1    A.    Right.   When I said .8, I was

2    remembering the black and white registration;

3    not the -- so, I correlated black registration

4    versus the Obama vote and white registration

5    other than party registration.

6          So, I just forgot which number I was

7    looking at.

8    Q.    Okay.  And then did you do the same

9    thing for black VAP and white VAP in the Obama

10   vote?

11   A.    Yes.

12   Q.    Okay.  Did you look at any other races

13   besides the Obama race?

14   A.    In this -- in this report, I only looked

15   at the Obama 2008 vote.

16   Q.    Okay.  Is there a correlation between

17   black registration and voting for Democratic

18   candidates, do you think?

19   A.    Yes.

20   Q.    Do you think it would be in the same

21   range as -- as the Obama correlation?

22   A.    Yes.

23   Q.    And what about -- is there a correlation

24   between black VAP and votes for other Democrats?

25   A.    Yes, my guess is it's quite high.

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 63 of 65

1   Q.    And would it be in the same -- close to

2   the same number as -- as for the Obama

3   correlation?

4   A.    Correct.

5   Q.    Okay.  So, your -- your study shows that

6   when you take all three of those things into

7   consideration, that blacks are very likely to

8   vote for the Democratic candidate?

9   A.    Correct, and -- and particularly for

10  Obama.  I was looking at the Obama '08 vote.

11  Q.    Right.  And that includes registered black

12  Democrats and unaffiliated blacks, right?

13  A.    Correct.

14  Q.    And with the VAP would also include some

15  degree -- to some degree, Republican blacks?

16  A.    Correct.

17  Q.    Okay.  And then I wanted to ask you,

18  have you -- I know you've looked at Dr.

19  Hofeller's report?

20  A.    Yes.

21  Q.    Is there anything that he added

22  incorrectly or any data that -- that he didn't

23  quote accurately?  I'm not asking you to agree

24  with his conclusions, but did you find any

25  errors?  Mathematical errors or things he

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 64 of 65

1   reported that were not correct?

2   **A.**    I found no mathematical errors or in- --

3   incorrect reports.

4   **Q.**    Okay.  Let me look real quickly here.

5              MR. FARR:  I think I'm done.  Thank

6   you, sir.

7   **A.**    Thank you.

8              MR. SPEAS:  Can we have just a

9   minute?

10             MR. FARR:  Sure.

11             (SHORT BREAK 2:50 - 3:01 P. M.)

12             MR. SPEAS:  We have no questions.

13             (WITNESS EXCUSED.)

14   (FURTHER DEPONENT SAITH NOT AT 3:01 P. M.)

Case 1:13-cv-00949-WO-JEP   Document 68-5   Filed 06/02/14   Page 65 of 65