**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**NO. 1:13-CV-00949**

DAVID HARRIS and CHRISTINE
BOWSER,

              Plaintiffs,

      v.

PATRICK MCCRORY, in his capacity as
Governor of North Carolina; NORTH
CAROLINA STATE BOARD OF
ELECTIONS; and JOSHUA HOWARD, in
his capacity as the Chairmand of the North
Carolina State Board of Elections,

           Defendants,

## PLAINTIFFS' TRIAL BRIEF

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................... 1

II.  EXPECTED EVIDENCE AT TRIAL ........................................................... 3

    A.   Background ............................................................................................ 3

        1.   Former CD 1 and CD 12 ............................................................ 3

        2.   The 2011 Redistricting Process ................................................ 6

    B.   The Record is Replete with Direct and Circumstantial Evidence That Race Was the Predominant Consideration in the Drawing of the Challenged Districts .................................................................................... 7

        1.   The Direct Evidence of Racial Predominance is Overwhelming ................ 7

            a.   Statements by the Legislators Demonstrate That Race Played a Predominant Role in the Design of the Challenged Districts ...................................................... 7

            b.   In Its Section 5 Preclearance Submission, the State Emphasized That It Drew CD 1 and CD 12 to Increase African-American Population ...................................... 10

        2.   The Circumstantial Evidence of Race-Based Redistricting is Equally Strong ................................................................... 11

            a.   Reconfigured CD 1 ....................................................... 12

            b.   Reconfigured CD 12 ..................................................... 13

III. STATE-COURT PROCEEDINGS ............................................................... 14

V.   ARGUMENT ............................................................................................... 16

    A.   Racial Gerrymandering is Indisputably Unconstitutional .................... 16

    B.   Race Was the Predominant Factor in Drawing CD 1 .......................... 18

        1.   Direct Evidence Demonstrates That Race Predominated in CD 1 ............. 18

        2.   Circumstantial Evidence Confirms That Race Predominated in CD 1 ....... 20

    C.   Race Was Also the Predominant Factor in Drawing CD 12 ................. 22

        1.   Race Explains CD 12 ................................................................ 22

            a.   Direct Evidence Demonstrates That Race Predominated ............ 22

            b.   Circumstantial Evidence Confirms that Race Predominanted in CD 12 ........................................... 24

2.      Traditional Redistricting Principles Were Subordinated to Race .............. 26

3.      Political Considerations Were Subordinated to Race ................................ 27

D.      CD 1 and CD 12 Cannot Survive Strict Scrutiny ................................................. 32

1.      The State Can Assert No Compelling Interest in Section 5 of the VRA ......................................................................................................... 32

2.      The State Can Assert No Compelling Interest in Section 2 of the VRA ......................................................................................................... 33

E.      CD 1 and CD 12 Are Not Narrowly Tailored .................................................... 37

F.      This Court Should Impose an Immediate and Effective Remedy ....................... 40

G.      Plaintiffs Are Entitled to Reasonable Attorneys' Fees and Costs ...................... 41

VI.     CONCLUSION ............................................................................................................ 41

Case 1:13-cv-00949-WO-JEP   Document 109   Filed 09/21/15   Page 3 of 49

## TABLE OF AUTHORITIES

Page

**CASES**

*Alabama. Dickson v. Rucho (Dickson III)*,
    135 S. Ct. 1843 (2015)............................................................................14

*Alabama Legislative Black Caucus v. Alabama*,
    135 S. Ct. 1257 (2015)....................................................................... passim

*Beer v. United States*,
    425 U.S. 130 (1976)..........................................................................30

*Bush v. Vera*,
    517 U.S. 952 (1996)...........................................................16, 20, 31, 32

*Clark v. Putnam Cnty.*,
    293 F.3d 1261 (11th Cir. 2002) ..........................................................20

*Cromartie v. Hunt*,
    133 F. Supp. 2d 407, 413 (E.D.N.C. 2000)................................................3

*Dickson v. Rucho (Dickson II)*,
    766 S.E.2d 238 (2014) .......................................................................14

*Dickson v. Rucho*,
    Nos. 11 CVS 16896 & 11 CVS 16940, 2013 WL 3376658 (July 8, 2013)...............13, 14

*Easley v. Cromartie*,
    532 U.S. 234 (2001)........................................................................28, 29

*Gause v. Brunswick Cnty.*,
    92 F.3d 1178 (4th Cir. 1996) ...............................................................32

*Growe v. Emison*,
    507 U.S. 25 (1993)............................................................................31

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)...........................................................................38

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006)...........................................................................37

- iii -

# TABLE OF AUTHORITIES
## (continued)

Page

*Lewis v. Alamance Cnty.*,
N.C., 99 F.3d 600 (4th Cir. 1996) ...........................................................................31

*McDaniels v. Mehfoud*,
702 F. Supp. 588 (E.D. Va. 1988) ...........................................................................37

*Miller v. Johnson*,
515 U.S. 900 (1995) .......................................................................................... passim

*Moon v. Meadows*,
952 F. Supp. 1141 (E.D. Va. 1997) .........................................................................34

*Page v. Va. State Bd. of Elections*,
No. 3:13cv678, 2015 WL 3604029 (E.D. Va. June 5, 2015).................................24, 25, 31, 36

*Rodriguez v. Pataki*,
308 F. Supp. 2d 346 (S.D.N.Y. 2004), *aff'd*, 543 U.S. 997 (2004) .........................33

*Scott v. Germano*,
381 U.S. 407 (1965) ................................................................................................37

*Shaw v. Hunt*,
517 U.S. 899 (1996) ................................................................................................32

*Shaw v. Hunt*,
861 F. Supp. 408 (E.D.N.C. 1994) ..........................................................................11

*Shaw v. Reno*,
509 U.S. 630 (1993) ................................................................................................15

*Shelby Cnty., Ala. v. Holder*,
133 S. Ct. 2612 (2013) ..............................................................................................4

*Smith v. Beasley*,
946 F. Supp. 1174 (D.S.C. 1996) ............................................................................36

*Strickland v. Bartlett*,
129 U.S. 1231 (2009) .........................................................................................7, 36

*Thornburg v. Gingles*,
478 U.S. 30 (1986) .............................................................................................31, 36

*Wise v. Lipscomb*,
   437 U.S. 535 (1978) ................................................................................................37

**STATUTES**

42 U.S.C. § 1973l(e) ........................................................................................................38

42 U.S.C. § 1983 ..............................................................................................................38

52 U.S.C. § 10301 ..............................................................................................................4

52 U.S.C. § 10302 ..............................................................................................................4

52 U.S.C. § 10304 ..............................................................................................................4

Session Law 2011-403 (July 28, 2011) (amended by curative legislation, Session
   Law 2011-414 (Nov. 7, 2011)) ..................................................................................6

Voting Rights Act ....................................................................................................... passim

Voting Rights Act
   Section 2 ................................................................................................................ passim

Voting Rights Act
   Section 4 ..............................................................................................................................4

Voting Rights Act
   Section 5 ............................................................................................................... passim

**OTHER AUTHORITIES**

United States Constitution ......................................................................................1, 15

Case 1:13-cv-00949-WO-JEP   Document 109   Filed 09/21/15   Page 6 of 49

# I.    INTRODUCTION

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids race-based redistricting absent a compelling state interest.  Even where such an interest exists, use of race must be carefully circumscribed and narrowly tailored to meet that interest.  The map adopted by the North Carolina General Assembly in 2011 stands in flagrant violation of these well-established principles:  race was the predominant consideration, and the General Assembly did not narrowly tailor the districts to serve a compelling interest.

In its 2011 Congressional redistricting plan, the North Carolina General Assembly mechanically sorted voters by race into Congressional District 1 ("CD 1") and Congressional District 12 ("CD 12").  This practice exceeds even the race-based redistricting in *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015), where the Court found "strong, perhaps overwhelming" that race predominated because the mapdrawers determined to maintain existing percentages of African-American voters in a district without analyzing whether such a "mechanical" approach was warranted.

With respect to CD 1, the General Assembly expressly *increased* the number of African-Americans in the district so that such voters would constitute 50% or greater of the voting-age population, apparently on the theory that doing so would shield the state from liability under the Voting Rights Act ("VRA").  Indeed, the General Assembly expressly and repeatedly characterized CD 1 as a "VRA" district—a district purposefully drawn to have a majority black voting age population ("BVAP").  With respect to CD 12,

- 1 -

the General Assembly drew the district to include all of the heavily African-American population of Guilford County, believing this race-based redistricting was required by Section 5 of the VRA. Legislators similarly admitted that they meant to transform a district into one with a majority African-American population (although for allegedly political reasons).

Even in the absence of the General Assembly's admissions about its race-based approach to redrawing CD 1 and 12, the bizarre shape of these districts and disregard for traditional redistricting principles give away the game: race was plainly the predominant factor in creating them.

Defendants, moreover, cannot show that this racial packing was narrowly tailored to serve a compelling state interest. In neither district did legislators conduct an individualized analysis of racially-polarized voting to determine whether this mechanical 50% threshold was warranted. Indeed, the state does not even attempt to argue that CD 12 is narrowly tailored, and for good reason: there is no even remotely plausible basis for doing so. As to CD 1, as the Supreme Court recently held, if legislatures wish to assert a compelling state interest in complying with the VRA, they cannot rely "heavily upon a mechanically numerical view" regarding how to avoid liability. *Alabama*, 135 S. Ct. at 1273. But here, the General Assembly did precisely that.

Plaintiffs respectfully request that this Court invalidate CD 1 and 12 and implement immediate, effective relief well in advance of the 2016 general election.

## II. EXPECTED EVIDENCE AT TRIAL

### A. Background

For decades, African-Americans enjoyed tremendous success in electing their preferred candidates in former versions of CD 1 and CD 12 regardless of whether those districts contained a majority of Black Voting Age Population ("BVAP") citizens. The evidence will show that, in 2011, the State responded by purposefully packing *even more* African-Americans into those districts.

#### 1. Former CD 1 and CD 12

The North Carolina General Assembly first drew CD 1 in an iteration of its present form in 1992. Pl. Ex. 64.[1] Between 1997 and 2011, the BVAP fell below 50%. The BVAP stood at 46.54%, for example, for the plan in place from 1997 to 2001. Pl. Ex. 110. After the 2000 Census, the General Assembly redrew CD 1, modestly increasing the BVAP to 47.76%. Pl. Ex. 111.

The BVAP of former CD 12 mirrored that of former CD 1. Initially in 1991, to comply with the Department of Justice's ("DOJ's") then-existing "maximization" policy—requiring majority-minority districts wherever possible—CD 12 was drawn with a BVAP greater than 50%. Pl. Ex. 72. After years of litigation and the U.S. Supreme Court's repudiation of the "maximization" policy, *see Miller v. Johnson*, 515 U.S. 900, 921–924 (1995), the General Assembly redrew the district in 1997 with a BVAP of 32.56%. Pl. Ex. 110. The General Assembly thus determined that the VRA did not

---

[1] Attached as an Appendix to this Trial Brief are selected excerpts from Plaintiffs' proposed trial exhibits (*see* Dkt. No. 102). Plaintiffs' counsel anticipates that all of these exhibits will be admitted into evidence by way of a stipulation, although that stipulation has not yet been finalized.

require drawing CD 12 as a majority African-American district. *See Cromartie v. Hunt*, 133 F. Supp. 2d 407, 413 (E.D.N.C. 2000) ("District 12 [was] not a majority-minority district"). The 2001 version of CD 12 reflected a BVAP of 42.31%. Pl. Ex. 111.

Despite the fact that African-Americans did not make up a majority of the voting-age population in these versions of CD 1 or CD 12, African-American preferred candidates easily and repeatedly won reelection under those plans. Representative Eva Clayton prevailed in CD 1 in 1998 and 2000, for instance, winning 62% and 66% of the vote, respectively. Pl. Ex. 112. Indeed, African-American preferred candidates prevailed with remarkable consistency, winning at least 59% of the vote under *each* of the five general elections under the version of CD 1 created in 2001. *Id.* Representative G.K. Butterfield has represented that district since 2004. *Id.* In CD 12, Representative Mel Watt won every general election in CD 12 between 1992 and 2012. *Id.* He never received less than 56% of the vote, gathering at least 64% in each election under the version of CD 12 in effect during the 2000s. *See id.*

Neither district has been challenged under the VRA. Both districts have been consistently precleared pursuant to Section 5 of the Act, which requires that certain "covered" jurisdictions obtain preclearance from the DOJ or the District Court for the District of Columbia before enacting plans that may lead to the retrogression of minority voters' influence. *See* 52 U.S.C. § 10304. There are more than 40 counties in North

Carolina that were subject to Section 5.[2]  Neither district at issue in this litigation has been the subject of a challenge arising under Section 2 of the VRA.[3]

Because African-Americans successfully and easily elected their candidate of choice in CD 1 and CD 12 in every election—without exception—in an unbroken line from 1992 onward, the VRA most assuredly did *not* require the General Assembly to manipulate these districts to achieve a BVAP greater than 50%.  The DOJ, moreover, precleared the previous plans.  Nor did the Attorney General or any other person bring a lawsuit under Section 2 to challenge the plans.  In fact, no statewide redistricting Section 2 suit has been filed in North Carolina in over three decades.  Not one.

The composition and election results in CD 1 and CD 12 vividly demonstrate that, though not majority-BVAP districts, the white majority does not vote as a bloc to defeat African Americans' candidate of choice.  In fact, precisely the opposite occurs in these two districts:  significant crossover voting by white voters *supported* the African-American candidate.  This was the background and context confronting the North Carolina General Assembly when it took up the task of redistricting in 2011.

---

[2] Of course, the U.S. Supreme Court held the Section 5 coverage formula unconstitutional in *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013) (rejecting Section 4 of the VRA as unconstitutionally outdated), relieving jurisdictions of the preclearance requirement.  To date, Congress has not adopted a refashioned coverage formula and Section 5 thus no longer applies to any of the previously-covered North Carolina jurisdictions.

[3] Section 2 of the VRA allows the U.S. Attorney General or any "aggrieved person" to sue to enjoin the enforcement of voting practices that lessen minority voter's ability to elect representatives of their choice.  52 U.S.C. §§ 10301, 10302.  Nothing in *Shelby County* affects the continued validity or applicability of Section 2 to North Carolina.

- 5 -

## 2. The 2011 Redistricting Process

All of these data regarding the composition and election results in former CD 1 and former CD 12 were in front of the General Assembly when it began the redistricting process in 2011. Yet rather than applaud the race-neutral political results achieved with remarkable consistency nearly three decades, the General Assembly instead set out to reconfigure each district as majority-BVAP districts using race as the predominate factor shaping the district.

The Congressional redistricting coincided with the state legislative redistricting. Sen. Robert Rucho was appointed Chair of the Senate Redistricting Committee; Rep. David Lewis chaired the House Redistricting Committee; and together they managed the drawing of the Congressional map. Pl. Ex. 74 at 5-6. Sen. Rucho and Rep. Lewis engaged Dr. Thomas Hofeller to be the "chief architect" of the state and federal maps. Pl. Ex. 121 (Rucho Dep. 31:14-16); Pl. Ex. 127 (Hofeller Dep. 30:19-25). Dr. Hofeller received instructions from no legislator other than Sen. Rucho and Rep. Louis. *Id*. (Hofeller Dep. 56:15-57:4). These directions were given orally, so there is no written communication between the legislators and Dr. Hofeller discussing the redistricting criteria he used to draw the congressional map. *Id*.

One feature of the redistricting criteria that *is* clear, however, was the mechanical creation of districts with a BVAP of 50% or greater. Sen. Rucho and Rep. Lewis specifically labeled CD 1 a "VRA district," instructing Dr. Hofeller to draw a majority-BVAP district purportedly to shield the State from supposed legal liability under the VRA. *See* Pl. Ex. 67 at 3-4. Regarding CD 12, Sen. Rucho and Rep. Lewis maintained

that district was not a "VRA district," but noted that because of the presence of Guilford County (a covered jurisdiction under Section 5), they draw the "proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District" to "ensure preclearance of the plan." *Id.* at 5. Notwithstanding the purposeful creation of CD 1 as a "VRA district" and the purposeful creation of CD 12 with a BVAP exceeding the BVAP of the benchmark district, the State did not conduct an assessment of racially-polarized voting in these districts suggesting that it needed to create districts with a BVAP of 50% or greater.

Dr. Hofeller nevertheless drew, and the General Assembly passed, a plan ("2011 Congressional Plan") that transformed CD 1 and CD 12 into majority-BVAP districts. *See* Session Law 2011-403 (July 28, 2011) (amended by curative legislation, Session Law 2011-414 (Nov. 7, 2011)). The BVAP in CD 1 surged from 47.76% to 52.65%, and in CD 12 the BVAP swelled from 43.77% to 50.66%. Pl. Ex. 106-107. The result: bizarrely-shaped districts that packed African-Americans and flouted traditional redistricting principles.

**B. The Record is Replete with Direct and Circumstantial Evidence That Race Was the Predominant Consideration in the Drawing of the Challenged Districts**

**1. The Direct Evidence of Racial Predominance is Overwhelming**

**a. Statements by the Legislators Demonstrate That Race Played a Predominant Role in the Design of the Challenged Districts**

The words of the plan's authors provide perhaps the most compelling evidence of their racial purpose—the misguided attempt to "comply" with the VRA. On July 1,

- 7 -

2011, Sen. Rucho and Rep. Lewis issued a joint public statement accompanying the release of the 2011 Congressional Plan. Interpreting *Strickland v. Bartlett*, a U.S. Supreme Court case construing Section 2 of the VRA, the statement read:

> The State's First Congressional District was originally drawn in 1992 as a majority black district. It was established by the State to comply with Section 2 of the Voting Rights Act. Under the decision by the United States Supreme Court in *Strickland v. Bartlett*, 129 U.S. 1231 (2009), the State is now obligated to draw majority black districts with true majority black voting age population. Under the 2010 Census, the current version of the First District does not contain a majority black voting age population.
>
> [. . .]
>
> Because African-Americans represent a high percentage of the population added to the First District . . . we have . . . been able to re-establish Congressman Butterfield's district as a true majority black district under the *Strickland* case.

Pl. Ex. 67 at 3-4. Putting aside for the moment the statement's misreading of *Strickland*, the declaration can be read as nothing less than an open, frank, and express acknowledgment that CD 1 was created to be a *majority-BVAP district*. Sen. Rucho and Rep. Lewis similarly admitted that the map's "precinct divisions were prompted by the creation of Congressman Butterfield's majority black [CD 1]." *Id.* at 7.

Sen. Rucho and Rep. Lewis made similar admissions in a July 19, 2011 joint public statement that accompanied a revised version of the Congressional plan. They stated that CD 1 was redrawn to include a majority BVAP "as required by Section 2 of the Voting Rights Act" and that they added to CD 1 "a sufficient number of African-

- 8 -

Americans so that the [CD 1] can re-establish as a majority black district." Pl. Ex. 68 at

3. The statement emphasized the importance of BVAP in creating the district:

> While our initial version of [CD 1] was fully compliant with
> Section 2 and Section 5 of the [VRA], our second version
> includes population from all of the Section 5 counties found
> in the 2001 version of [CD 1]. Moreover, the total BVAP
> located in Section 5 counties in Rucho-Lewis 2 exceeds the
> total BVAP currently found in the 2001 version.

*Id.* at 4.

During the debate surrounding passage of the 2011 Congressional Plan,

Sen. Rucho and Rep. Lewis reiterated that they had redrawn CD 1 to be majority-BVAP.

Sen. Rucho stated that CD 1 was "required by Section 2" of the VRA to contain a

majority BVAP, and that CD 1 "must include a sufficient number of African-Americans

so that [CD 1] can re-establish as a majority black district." Pl. Ex. 139 (July 25, 2011

Senate Testimony (Sen. Rucho), 8:19-9:6); *see also id.* (17:23-25) (CD 1 "has Section 2

requirements, and we fulfill those requirements"); *see also* Pl. Ex. 140 (July 27, 2011

House Testimony (Rep. Lewis), 30:2-4) (CD 1 "was drawn with race as a consideration,

as is required by the [VRA]").

Race similarly predominated with respect to CD 12. Although their plan recreated

CD 12 as a majority-BVAP district, Sen. Rucho and Rep. Lewis maintained that CD 12

was *not* a "VRA" district. Instead, they claimed that CD 12 was drawn to pack

Democratic voters into the district. *See, e.g.*, Pl. Ex. 121(Rucho Dep. 182:5-184:9). But

the contemporaneous public statements from Sen. Rucho and Rep. Lewis, and other

Republican legislators, tell a different story.

- 9 -

Sen. Rucho and Rep. Lewis emphasized that race was the driving factor in creating the specific boundaries of CD 12. In a section of their public statement captioned "Compliance with the Voting Rights Act," they stated that they drew the "proposed [CD 12] at a black voting age level that is above the percentage of black voting age population found in the current [CD 12]" to "ensure preclearance" under Section 5 of the VRA. Pl. Ex. 68 at 2-5. CD 12 contains Guilford County which was—at the time—a covered jurisdiction under Section 5 of the VRA. *Id.* at 5.

Likewise, when asked whether CD 12 was a "voting rights district," Sen. Andrew Brock, Vice Chair of the Redistricting Committee, replied "I think you do have voting rights in District 12, through Guilford County," and Sen. Rucho reiterated that "[t]here is a significant Section 5 population in Guilford County." Pl. Ex. 137 (July 22, 2011 Senate Testimony (Sen. Brock), 26:5-6); *see also* Pl. Ex. 136 (July 21, 2011 Joint Redistricting Committee Testimony (Rep. Lewis), 12:19-13:8) (describing, in addition to CD 12, how "[m]inority population was also considered in other districts as well").

### b. In Its Section 5 Preclearance Submission, the State Emphasized That It Drew CD 1 and CD 12 to Increase African-American Population

Further evidence of the predominant racial purpose behind CD 1 and CD 12 comes from the State's preclearance submission to DOJ. In that document, the State acknowledged that under the Congressional plans in effect between 1992 and 2010, "African-American candidates and incumbents have been elected in [CD 1 and 12]." *See* Pl. Ex. 74 at 10-11. The State nevertheless trumpeted the fact that it had added more African-Americans to create majority BVAP districts:

- 10 -

> [T]he 2011 Congressional Plan recreates District 1 at a
> majority African-American level and continues District 12 as
> an African-American and very strong Democratic district that
> has continually elected a Democratic African American since
> 1992 . . . . Minority voters have clearly retained their ability
> to elect two preferred candidates of choice in the 2011
> versions of District 1 and 12.

*See id.* at 15. According to the state, CD 1 had a "structural problem" after the 2010 Census that required re-drawing CD 1 to add a large number of African-Americans. Specifically, the State decided that because the post-Census CD 1 had a "BVAP of only 48.63%," it had to be "re-create[d] . . . at a majority African-American level." *Id.* at 12; *see also id.* at 13 (discussing how the "majority African-American status of the District is corrected by drawing the District into Durham County.").

Attempting to justify its dramatic increase in the BVAP of CD 12, the State cited purported "concerns" that 20 years earlier the DOJ had objected to the 1991 Congressional Plan because it only included one majority-minority district. *Id.* at 14. The state therefore added tens of thousands of African-Americans, though it "was only slightly over-populated by 2,847." *Id.* Its new version of the district was "similar to the 2001 version," but it increased the district's BVAP from 43.77% to 50.66%. *Id.* at 15.

The direct evidence is powerful, compelling, and undisputed. Race predominated in the construction of both districts.

## 2. The Circumstantial Evidence of Race-Based Redistricting is Equally Strong

The circumstantial evidence vividly confirms the predominance of race in drawing CD 1 and CD 12 that the direct evidence so plainly shows. Plaintiffs will present

- 11 -

testimony from Dr. Stephen Ansolabehere, who is a professor of Government at Harvard University and previously was a professor of Political Science at the Massachusetts Institute of Technology.  Dr. Ansolabehere will testify that voters were sorted by race to concentrate African-Americans into CD 1 and CD 12, resulting in bizarrely-shaped, noncompact, serpentine districts splitting large numbers of political subdivisions. Dr. Ansolabehere will testify that race, not politics, is by far the most powerful explanatory factor for the construction of CD 1 and 12.  This conclusion will not surprise anyone who views a map of the reconfigured, bizarre districts.

### a.    Reconfigured CD 1

Transforming CD 1 into a majority BVAP district required creating a behemoth sprawling from the rural Coastal Plain to the City of Durham, extending tendrils to sweep in pockets African-American voters:



- 12 -

*See* Pl. Ex. 50. What used to be a "distinctively rural" district, *Shaw v. Hunt*, 861 F.

Supp. 408, 469 (E.D.N.C. 1994), now includes a significant urban population. Durham

now constitutes 20% of CD 1's population. *See* Pl. Ex. 113. But the state only included

the "right" Durhamites in CD 1—the district now includes more than **77%** of the black

voting age population in Durham County, compared to less than **44%** of the white voting

age population. *See* Pl. Ex. 18, ¶ 48.

The new CD 1 is substantially less compact than its predecessor. A common

method for measuring a district's compactness is to calculate its Reock score, which is

the ratio of the area of the district compared to the area of the smallest circle that could

inscribe it. *See* Pl. Ex. 17, ¶ 9. The Reock score for the reconfigured district declined

significantly from the score for the old district—from 0.390 to 0.294. *See id.*, Table 1.

Other measures of compactness show the same result. For instance, the ratio of CD 1's

area to its perimeter dropped from 11,098 to 6,896. *See id.*

The reconfigured CD 1 also disregards geographic and political boundaries to a

greater extent than its predecessor. Whereas the old version of CD 1 split only 10

counties, the reconfigured CD 1 houses only five whole counties, with the other 19 split

between CD 1 and one or more other districts. *See* Dkt. #33-2 (Hoffeller Report), at ¶ 45.

CD 1 now splits 21 cities or towns, as opposed to 16 in the previous district. *See id.* ¶ 47.

### b. Reconfigured CD 12

CD 12 is similarly contorted as a result of the Legislature's singular focus on

racial sorting. New CD 12 is a 120-mile-long snake that stretches a mere 20 miles across

at its widest part. *See* Pl. Ex. 51. It includes fragments of Charlotte, Winston-Salem, and

- 13 -

Greensboro connected by a thin strip of precincts. *See id.* The reason CD 12 connects these three far-flung cities is, of course, because they have substantial African-American populations. *See* Pl. Ex. 72.



After the Rucho-Lewis redistricting, CD 12's Reock score fell from 0.116 to 0.071, which puts CD 12 in a rogue's gallery comprised of the most non-compact districts in the country. *See* Pl. Ex. 17, at ¶ 15; *see also* Pl. Ex. 70. The ratio of CD 12's area to perimeter fell from 2,404 to 1,839. Pl. Ex. 17, Table 1. No Congressional District in North Carolina is less compact. *See id.* New CD 12 also disregards geographic and political boundaries, splitting the boundaries of 13 different cities and towns. *See id.* ¶ 17. In short, CD 12 would be a compelling candidate to serve as the illustration in the encyclopedia entry for "racial gerrymander."

### III.    STATE-COURT PROCEEDINGS

In 2011, two sets of plaintiffs filed suit in state court to challenge the state legislative plans (and portions of the 2011 Congressional Plan) as illegal racial

gerrymanders under state and federal law. *See Dickson v. Rucho*, Nos. 11 CVS 16896 & 11 CVS 16940, 2013 WL 3376658 (July 8, 2013). The court consolidated the cases in front of a three-judge panel and, after a bench trial, entered judgment in the defendants' favor. *Id.*

Regarding CD 1, the court found it "undisputed that the General Assembly intended to create [CD 1] to be [a] 'Voting Rights Act district[]'" and that "it set to draw . . . VRA districts so as to include at least 50% Total Black Voting Age Population." *Dickson v. Rucho ("Dickson I")*, Nos. 11 CVS 16896 & 11 CVS 16940, 2013 WL 3376658, at*6 (July 8, 2013). Assuming the application of strict scrutiny, the court concluded that the state had a compelling interest in avoiding Section 2 and Section 5 liability and that the state's VRA districts were narrowly tailored to those ends. *See id.* at *8. But this analysis was not specific to CD 1. Instead, the court addressed *all* of the covered districts—including those under the state legislative plans—generally. Regarding CD 12 and "non-VRA" districts, the court found that politics—not race— drove their creation. *See id.* at *31. The state court's analysis was chiefly *general* rather than district-*specific*.

On appeal, the North Carolina Supreme Court affirmed. *Dickson v. Rucho (Dickson II)*, 766 S.E.2d 238 (2014). Essentially adopting the reasoning of the trial court, the North Carolina Supreme Court differed in one key respect, finding that the trial court "erred" by assuming that strict scrutiny applied in CD 1. *Id.* at 247. Because the Supreme Court went on to conclude that CD 1 would nevertheless pass strict scrutiny, it affirmed. *Id.* at 554.

The U.S. Supreme Court vacated the decision and remanded the case to the North Carolina Supreme Court for further consideration in light of *Alabama*. *Dickson v. Rucho (Dickson III)*, 135 S. Ct. 1843 (2015). After post-remand briefing, the North Carolina Supreme Court entertained oral argument on the matter on August 31, 2015, and has yet to issue a decision. Thus, none of the state court's findings are final, much less binding,[4] and, as explained below, there should be no question that they are flawed after *Alabama* and a review of the expert testimony in this case.

## IV. ARGUMENT

### A. Racial Gerrymandering is Indisputably Unconstitutional

"[A] State may not, absent extraordinary justification, . . . separate its citizens into different voting districts on the basis of race." *Miller*, 515 U.S. at 911-12 (internal quotations and citations omitted). A voting district is an unconstitutional racial gerrymander when a redistricting plan "cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw v. Reno*, 509 U.S. 630, 643, 649 (1993) ("*Shaw I*").

In a racial gerrymander case, the "plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a

---

[4] Even if there were a final state-court decision, of course, the state court findings would not be admissible because no party here was a party to the state-court litigation and those findings are certainly not entitled to deference in this federal constitutional proceeding. Detailed arguments on this score are included in Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, Dkt. No. 78, and incorporated herein.

- 16 -

particular district." *Miller*, 515 U.S. at 916. "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, such as compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id*. Public statements, submissions, and sworn testimony by the individuals involved in the redistricting process are not only relevant but often highly probative. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 960-61 (1996) (examining the state's preclearance submission to the DOJ and the testimony of state officials).

Once plaintiffs establish race as the predominant factor, the Court applies strict scrutiny, and "the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920. Four key principles highlighted in *Alabama* guide the analysis here. First, a "racial gerrymandering claim . . . does not apply to a State considered as an undifferentiated 'whole,'" 135 S. Ct. at 1265, and thus evidence of statewide racially-polarized voting is irrelevant when determining whether race-based redistricting is justified in a particular district. Second, the "predominance" question is not about showing that *every* single decision to move an African-American into a district was motivated predominately by race; it "is about . . . show[ing] that race was the predominant factor motivating the legislature's decision to place *a significant number of voters* within or without a particular district." 135 S. Ct. at 1270 (internal quotation marks and citation omitted) (emphasis added). Third, when legislators establish a goal to achieve a certain BVAP percentage in a district, such a goal constitutes "strong, perhaps overwhelming evidence that race predominated as a factor."

- 17 -

*Id*. at 1271.  Fourth, the legislature cannot claim the VRA as a justification by "mechanically rely[ing] upon numerical percentages" without analyzing the circumstances to determine whether relying on such percentages would be required by the VRA.  *Id*. at 1273.  These principles, applied here, easily control the decision.

**B.     Race Was the Predominant Factor in Drawing CD 1**

Here, the evidence will show that race was the predominant factor driving the creation of CD 1.  The State has all but stipulated as much.

**1.     Direct Evidence Demonstrates That Race Predominated in CD 1**

The direct evidence in this case is clear, undisputed, and overwhelming.  It vividly demonstrates the General Assembly's singular focus on race.  Plaintiffs will present evidence even beyond the amount and type described in *Alabama* as "strong, perhaps overwhelming" evidence of a mechanical threshold showing that race predominated.  135 S. Ct. at 1271.  The legislators in *Alabama* "believed, and told their technical adviser, that a primary redistricting goal was to maintain existing racial percentages in each majority-minority district."  *Id*.  And there was "considerable evidence that the goal had a direct and significant impact on the drawing of at least some of [the district's] boundaries."  *Id*.

By contrast, the evidence in this case is even stronger and more overwhelming than that in *Alabama*:  the goal was not to simply *maintain* existing racial percentages, but to *increase* them.  And this goal was not relayed to a mere "technical adviser," but Dr. Hofeller, who was described by both himself and Sen. Rucho as the "chief architect" of the plan.  Pl. Ex. 121 (Rucho Dep. 31:14-16); Pl. Ex. 127 (Hofeller Dep. 30:19-25).

- 18 -

Indeed, Sen. Rucho and Rep. Lewis specifically dubbed CD 1 a "Voting Rights Act district." In a public statement, they expressly stated that CD 1 was redrawn to include a majority-BVAP "as [they thought was] required by Section 2 of the Voting Rights Act" and that they added "a sufficient number of African-Americans so that [CD 1] can re-establish as a majority black district." Pl. Ex. 68 at 3. They also explicitly sacrificed traditional redistricting principles to allow CD 1 to be recast with a majority-BVAP population—which is clear from even a cursory glance at the district. *See, e.g.*, Pl. Ex. 67 at 7 ("[M]ost of our precinct divisions were prompted by the creation of . . . majority black [CD 1]"); *see also* Pl. Ex. 129 (Hofeller Dep. 38:19-39:11) (to draw CD 1 as majority-BVAP, "it became necessary to split some precincts [and counties], and they were split"); *id*. (Hofeller Dep. 41:15-42:12) (agreeing that most precinct splits were the result of creating CD 1 as majority-BVAP).

Dr. Hofeller's testimony will confirm these public statements. He will testify that Sen. Rucho and Rep. Lewis instructed him that CD 1 "should be drawn with a African-American percentage in excess of 50 percent total VAP." *Id*. (Hofeller Dep. 22:2-24, 35:13-36:10). He drew CD 1 to be majority-BVAP because it is "a 'VRA Section 2 Minority District.'" Dkt. 33-2 (Hofeller Report), ¶ 19 (emphasis added). Not only did Dr. Hofeller draw CD 1 to be majority-BVAP, he drew it to include specific African-Americans. He asserts that he complied with a request by a "minority Congressman" that CD 1 be drawn to "have the same number of adult African-Americans drawn from counties covered by Section 5 of the VRA, as were contained in the Old District." Hofeller Report ¶ 50. This is nothing less than clear racial sorting, forbidden by the

Equal Protection Clause of the Fourteenth Amendment unless narrowly tailored to a compelling government interest.

### 2. Circumstantial Evidence Confirms that Race Predominated in CD 1

The direct evidence in this case standing alone is, in the words of the U.S. Supreme Court, "strong, perhaps overwhelming" and more than sufficient to carry plaintiffs' burden. The available circumstantial evidence dramatically confirms what the direct evidence so clearly shows: race predominated over traditional redistricting criterial.

For starters, the district is bizarre on its face. It tramples over political subdivisions. It connects profoundly disparate parts of the State, including the small, rural communities of the Coastal Plain and the City of Durham. And African-Americans in the counties from which CD 1 was created were packed into the district, just as the drawers intended.

Moreover, Dr. Ansolabehere will testify that the data show that the legislature set a goal to create a majority-BVAP district. The district includes more than 78% of all African-American registered voters in Durham County, compared to only 39% of white voters. (*See* Pl. Ex. 18, ¶ 49.) The fact that a Durham County voter was twice as likely to be pulled into CD 1 if he is African-American than if he is white is explainable only by race. The State's preclearance submission, indeed, expressly said so. *Compare* Dkt. #18¬2, Ex. 7, at 13 (the State extended CD 1 into Durham County to ensure the "majority African-American status of [CD 1]"), *with Miller*, 515 U.S. at 916 (plaintiffs' burden is to

show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district").

Defendants barely even try to defend the plan on the grounds of other possible redistricting principles and none of their efforts find support in the law. *See* Defs.' Memo. of Law in Opp. to Pls.' Mot. for Sum. J. (July 3, 2014), Dkt. No. 76, at 20-24. For example, the State has suggested that CD 1's configuration was necessary to add voters to the district to equalize population. *Alabama* squarely forecloses this argument as a matter of law, holding that "an equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.'" 135 S. Ct. at 1270. "Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to how equal population objectives will be met." *Id*. Defendants' argument here is thus squarely foreclosed by *Alabama*.

The State also has suggested that it configured CD 1 to be a strong Democratic district, but there is little actual *evidence* to support such a contention and in any event it stands in rather stark contrast to the overwhelming evidence of racial predominance noted above. It cannot seriously be disputed that the predominant focus of virtually every statement made in connection with the redistricting effort was on complying with the VRA (in public statements, in legislative debate, in DOJ submissions). Even if politics were a consideration (and there is scant evidence to support that proposition), that hardly defeats a finding that race *predominated*. *See Alabama*, 135 S. Ct. at 1271 (remanding to trial court to determine whether race predominated even though "preserving the core of

the existing district, following county lines, and following highway lines played an important boundary-drawing role") (internal alterations, quotation marks, and citations omitted); *Bush*, 517 U.S. at 962 (finding predominant racial purpose where state neglected traditional districting criteria such as compactness, committed itself to creating majority-minority districts, and manipulated district lines based on racial data); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002) (the "fact that other considerations may have played a role in . . . redistricting does not mean that race did not predominate").

Defendants will simply not be able to supply any plausible explanation for CD 1 other than race. The evidence is overwhelming that race was the predominant purpose.

## C. Race Was Also the Predominant Factor in Drawing CD 12

The evidence is equally compelling with respect to CD 12. Although legislators did not expressly label CD 12 a "VRA district," they repeatedly admitted their use of a mechanical threshold to achieve at least 50% BVAP in drawing the district. That direct evidence is compelling standing on its own and is only bolstered by the circumstantial evidence. CD 12 is highly noncompact, bizarre on its face, splits jurisdictions and tramples traditional redistricting criteria—the only plausible inference is that race predominated. The BVAP surge of nearly 7 percentage points was hardly an accidental byproduct.

### 1. Race Explains CD 12

#### a. Direct Evidence Demonstrates That Race Predominated

For starters, the Congressional plan's architects' own words prove that it purposely created a majority-BVAP district in CD 12. In their first public statement

regarding the plan, Sen. Rucho and Rep. Lewis noted that "[b]ecause of the presence of Guilford County [a Section 5 jurisdiction under the VRA] in the Twelfth District, we have drawn our proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District."  Pl. Ex. 67 at 5.  Doing so, Sen. Rucho and Rep. Lewis continued, "will ensure preclearance of the plan."  *Id*.  The deliberate movement of African-Americans from Guilford County into CD 12 demonstrates that the legislature "place[d] a significant number of voters within . . . [CD 12]" because of their race.  135 S. Ct. at 1265 (internal quotation marks and citation omitted) (emphasis added).

    Other sources will confirm these admissions.  In its Section 5 preclearance submission, for example, the State called the new CD 12 "an African-American" district and explained that the new CD 12 "maintains, and in fact increases, the African-American community's ability to elect their candidate of choice."  Pl. Ex. 74 at 15. Moreover, Dr. Hofeller will testify that Sen. Rucho and Rep. Lewis instructed him to move African-Americans residing in Guilford County into CD 12 because failure to do so "could endanger the plan and make a challenge to the plan" under Section 5.  Pl. Ex. 129 (Hofeller Dep. 37:2-22, 71:2-21, 74:9-75:16).  Also, according to Dr. Hofeller, "in order to be cautious and draw a plan that would pass muster under the VRA, it was decided to reunite the black community in Guilford into the Twelfth."  *Id*. (Hofeller Dep. 75:1-16). Dr. Hofeller's statements show that the State moved a significant number of African-Americans from Guilford County into CD 12 to achieve a mechanical threshold of 50% BVAP.

Doing so achieves exactly what the framers of the district intended. The BVAP of CD 12 skyrocketed, from 43.8% to 50.7%. Pl. Ex. 17, ¶¶ 18-19. Roughly *75,000* more African-Americans of voting age population reside in the new CD 12 as compared to its prior version. Pl. Ex. 129 (Hofeller Dep. 69:23-70:8). This increase exceeds even that in the new CD 1, where the BVAP increased approximately 5%. Nothing more is required to show that race predominated in the drawing of CD 12.

### b. Circumstantial Evidence Confirms that Race Predominanted in CD 12

Circumstantial evidence amply confirms that race predominated in the construction of CD 12. Dr. Asolabehere's testimony, for example, analyzing the demographics of CD 12 relative to the demographics of the counties that are partly or wholly within it (CD 12's "envelope"), will put the role of race into greater focus. His envelope analysis considers the area from which the General Assembly could draw to fill CD 12 without crossing additional county boundaries or dramatically reconfiguring CD 12. Pl. Ex. 17, ¶ 20. Notably, Dr. Hofeller does not disagree with any of the facts or data presented through Dr. Ansolabehere's analysis below. Pl. Ex. 129 (Hofeller Dep. 15:12-18:17).

The population of CD 12 comprises 30.3% of the population of the envelope. Pl. Ex. 17, ¶ 34. Compare the likelihood that a person of a given race, who lives within the envelope, was included within CD 12:

| Likelihood that a Person of a Given Race was Put in CD 12 | | |
|---|---|---|
| Population Group | Population in Envelope | Population in CD 12 |

| White | 993,642 | **67.4%** | 158,959 | 16.0% |
| Black | 396,078 | **26.9%** | 254,119 | **64.2%** |

*Id.* ¶¶ 34-36.  Under the new district lines, an African-American who lives in the envelope is *more than four times as likely* than a white person to reside in the new CD 12. Like the increase in African-Americans in the voting age population, this ratio exceeds the one present in CD 1—which State officials acknowledge was drawn based on race— where a person was approximately twice as likely to be included within CD 1 if that person is African-American than if he is white.  *Id.* ¶ 22.

The same results hold at an even more granular level of analysis.  Compare the racial composition of the Voting Tabulation Districts (VTDs, places where voters cast ballots) between those in the prior CD 12 and those in the current map:

| Racial Composition of VTDs in former vs. new CD 12 (Registered Voters) | | |
|---|---|---|
|  | Black | White |
| Remained in CD 12 | **54.0%** | 31.9% |
| Moved into CD 12 | **44.0%** | 37.1% |
| Moved out of CD 12 | 23.2% | **64.0%** |

*Id.*, ¶ 38.  The VTDs the State chose to keep in or add to CD 12 reflect higher black populations; those removed from CD 12 have dramatically higher white populations. And the net difference in percent black registration between VTDs moved into CD 12 and VTDs removed from CD 12 is 20.9%.  The same pattern holds if the metric is population generally or voting age population, rather than registered voters.  The analysis vividly confirms that voters were sorted by race in drawing CD 12; race predominated.

- 25 -

## 2. Traditional Redistricting Principles Were Subordinated to Race

Race predominates as a matter of law where, as here, a state subordinates traditional redistricting principles to race. For example, the Court held in *Miller*, that racial predominance is proven if racial considerations overtook "traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." 515 U.S. at 916. Indeed, the "Supreme Court has cited several specific factors as evidence of racial line drawing." *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 WL 3604029, at *7 (E.D. Va. June 5, 2015). Those factors include the "creation of non-compact and oddly shaped districts beyond what is strictly necessary to avoid [liability under the VRA]," *id*. (citing *Shaw I*, 509 U.S. at 646-48), and "creation of districts that exhibit disregard for city limits, local election precincts, and voting tabulation districts ("VTDs"), *id*. (citing *Bush*, 517 U.S. at 974).

That is precisely what happened here. CD 12 is bizarrely shaped, consisting of meandering tentacles that extend in erratic directions, slicing through county lines and encircling areas otherwise carved out from the district. Pl. Ex. 51. CD 12's shape is arguably the more bizarre (and least defensible) of the two, as it lacks any central nucleus. The district is 120 miles long but only 20 miles wide at its widest point. *See id*. Part of the district traces I-85 and includes parts of two cities that are over 90 miles apart—Charlotte and Greensboro—in addition to Winston-Salem. *See id*. There are only two things that unite those three far-flung cities—(1) they have significant African-American populations and (2) they are in CD 12.

- 26 -

CD 12 utterly ignores the traditional districting principle of compactness. Dr. Ansolabehere will testify that, before the 2010 Census, CD 12 had a Reock score of 0.116. Pl. Ex. 17. The 2011 Congressional Plan reduced CD 12's score even further—to an abysmal 0.071, a fraction of the median score for the state, 0.377. *See id.* The ratio of CD 12's area to its perimeter also declined substantially, from 2,404 to 1,839. The new CD 12 has been cited as the least compact district in the country. Pl. Ex. 70 at 4. Unsurprisingly, Dr. Hofeller—the plan's "chief architect"—did not even consider mathematical measures of compactness in drawing CD 12. Pl. Ex. 129 (Hofeller Dep. 44:19-45:12).

Nor can CD 12 be explained as an effort to protect political subdivisions. It weaves through six counties and does not contain a single county in its entirety, splitting 13 cities or towns, with several of those cities and towns split among three or even four different congressional districts. Pl. Ex. 17, ¶ 17. CD 12 utterly disregards traditional redistricting principles.

### 3. Political Considerations Were Subordinated to Race

The State will argue, and Dr. Hofeller will testify, that the "race-neutral" explanation for CD 12 was politics, not race. Dr. Hofeller will testify that he used data pertaining to a single election—of the Nation's first African-American President, with unusually high African-American voter turnout—to pack Democrats into CD 12 and bolster Republican performance in surrounding districts. Pl. Ex. 129 (Hofeller Dep. 56:2-5). The evidence will belie these claims.

First, though Dr. Hofeller claims that his use of the President Obama vote to draw CD 12 somehow shows that politics predominated, the use of that vote actually shows that *race* predominated.  As Dr. Ansolabehere will testify, the President Obama vote is highly correlated with the BVAP and, indeed, even more strongly correlated with BVAP than party registration.  Pl. Ex. 18 (Dr. Ansolabehere's Reply Report), ¶¶ 20, 33.  Using such an obviously correlated election to draw district lines is no different (and results in no difference) than using race directly.

Moreover, the data will show that race—not politics—better explains the redrawn CD 12.  If political considerations were the predominant factor, one would expect that the percentage of African-American and white voters included within CD 12 would be equal (or nearly so) for any given party registration.  But that's not the case here.  The percentage of African-American and white voters included within CD 12 is vastly different *even holding party affiliation constant*.

Dr. Ansolabehere will testify concerning his "envelope analysis" discussed above, adding party registration as a control variable:

| Likelihood that a Person of a Given Race and Party was put in CD 12 | | | | |
|---|---|---|---|---|
| Party of Registration | Population Group | Population In Envelope | Population in CD 12 | Percent of Group in CD 12 |
| Democrat | White | 280,915 | 51,367 | **18.3%** |
| | Black | 334,427 | 217,266 | **65.0%** |
| Republican | White | 448,914 | 61,740 | **13.8%** |
| | Black | 10,341 | 6,199 | **59.9%** |
| Undeclared | White | 262,024 | 45,496 | **17.4%** |
| | Black | 51,061 | 30,505 | **59.7%** |

Case 1:13-cv-00949-WO-JEP   Document 109   Filed 09/21/15   Page 34 of 49

Pl. Ex. 17, ¶ 44. If an individual within the envelope is African-American, the odds that she was included within CD 12 were still approximately four times higher than if she were white—*irrespective of party*.

These disparities are significantly greater under new CD 12 than they were under the prior map. For instance, under the old map, 40.4% of white Democrats were included within CD 12. *Id.* ¶ 45. If the State drew CD 12 as a political gerrymander, not a racial gerrymander, there is no reason why that number should have been cut by more than half, down to just 18.3% (as it was in the reconfigured district).

Now consider again the VTD analysis with party registration added:

| Racial Composition of VTDs in former vs. new CD 12, Controlling for Party Registration (Registered Voters) | | | | | | |
|---|---|---|---|---|---|---|
| | Among Democrats | | Among Republicans | | Among Undeclared | |
| | Black | White | Black | White | Black | White |
| Remained in CD 12 | 79.5% | 15.3% | 9.6% | 85.7% | 37.0% | 49.3% |
| Moved into CD 12 | 68.1% | 24.8% | 6.7% | 87.0% | 29.8% | 55.2% |
| Moved out of CD 12 | 45.8% | 48.8% | 1.7% | 95.6% | 13.0% | 78.4% |

*Id.*, Table 10. Within all three categories of party registration, the VTDs kept in CD 12 or moved into CD 12 had much higher proportions of African-American voters than the VTDs that were moved out.

Reorganizing the data to sort first by race then by party registration further undermines the State's purported explanation:

| Racial Composition of VTDs in former vs. new CD 12, Controlling for Party Registration (Registered Voters) | | | | | | |
|---|---|---|---|---|---|---|
| | Among Whites | | | Among Blacks | | |
| | Dem. | Rep. | Unreg. | Dem. | Rep. | Unreg. |
| Remained in CD 12 | 31.1% | 40.4% | 28.4% | 85.7% | 2.4% | 11.3% |
| Moved into CD 12 | 34.3% | 36.2% | 29.2% | 87.0% | 2.5% | 14.0% |
| Moved out of CD 12 | 29.3% | 45.1% | 24.5% | 95.6% | 2.5% | 12.9% |

*Id.*, Table 11. The differences in party registration between the VTDs kept or moved within CD 12 compared to those moved out are trivially small. For instance, among white voters, the VTDs kept within CD 12 had only a slightly higher percentage of Democrats than those moved out (31.1% vs. 29.3%). Remarkably, among African-American voters, the VTDs moved into CD 12 had a *lower* percentage of Democrats than the VTDs moved out (87.0% vs. 95.6%). The quantitative evidence all point in the same direction: Race, not traditional districting principles or even political affiliation, was the dominant factor in drawing CD 12. *Id.* ¶ 53.

Dr. David Peterson will also testify, focusing on a "boundary segment analysis" of CD 12, and will bolster Dr. Ansolabehere's conclusion. Dr. Peterson first conducted a boundary segment evaluation of CD 12 in 1996, regarding that year's version of the district, as an expert witness *for the State*. *See Easley v. Cromartie*, 532 U.S. 234 (2001). To conduct this analysis, Peterson divided the boundary of CD 12 into segments of corresponding precincts immediately within and immediately outside the district lines. He then compared the racial and partisan political characteristics of the residents assigned

- 30 -

to precincts just inside the boundary of CD 12, versus the racial and partisan political characteristics of the citizens assigned to precincts just outside the border, to determine whether the placement of the line was better explained by race or partisan politics. As explained by the Supreme Court in *Cromartie*, "[t]he principle underlying Dr. Peterson's analysis is that if the district were drawn with race predominantly in mind, one would expect the boundaries of the district to correlate with race more than with politics." 532 U.S. at 251. Dr. Peterson's analysis of the 1996 version of CD 12 established that partisan politics explained the boundary that the General Assembly chose for CD 12 in 1996 better than race did. The Supreme Court blessed this conclusion by holding that the trial court clearly erred when it found that race, not partisan politics, best explained the boundary of the 1996 version of CD 12. *Id.* at 251-53.

Circumstances have changed. Dr. Peterson repeated this *same* analysis for CD 12 as enacted by Defendants in 2011, reaching the *opposite* conclusion: race, not partisan considerations, best explained the way the State chose to draw the lines of CD 12 in 2011. *See* Pl. Ex. 15, ¶¶ 3, 18.[5]

In short, the overwhelming direct evidence is confirmed and buttressed by equally compelling circumstantial evidence, all confirming what the plan's "chief architect" has admitted: Race predominated in the construction of North Carolina's CD 1 and CD 12. Plaintiffs' burden is easily established here.

---

[5] Dr. Peterson performed a similar segment analysis of the 2011 iteration of CD 1 and reached the same conclusion. Pl. Ex. 16, ¶¶ 3, 17.

**D.      CD 1 and CD 12 Cannot Survive Strict Scrutiny**

Because race predominated in the creation of CD 1 and CD 12, strict scrutiny applies.  Accordingly, "the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920.  This analysis for CD 12 is easy:  the state has never argued that there was a compelling reason for drawing CD 12 predominately by race, so if this Court finds that race was the predominant purpose, CD 12 necessarily fails strict scrutiny.  There is no further analysis necessary or appropriate.  On this record, the district necessarily fails.

With respect to CD 1, the State will argue that there was a strong basis in evidence for concluding that it needed to draw a majority-BVAP district to avoid VRA liability, and that it was drawn narrowly tailored to achieve that interest.  The evidence will compel precisely the opposite conclusion.

**1.      The State Can Assert No Compelling Interest in Section 5 of the VRA**

First, the State can no longer rely on Section 5 as a compelling state interest after *Shelby County* invalidated the coverage formula and rendered Section 5 inapplicable to North Carolina and its political subdivisions.  But even if Defendants *could* continue to rely on Section 5, they would find precious little shelter there for racially drawn redistricting plans:  A state must have a "strong basis in evidence in support of the (race-based) choice that it has made." *Alabama*, 135 S. Ct. at 1274 (internal quotation marks and citation omitted).  Section 5 merely prevents a state from creating districts that "retrogress" and weaken a minority group's ability to elect their candidates of choice. *See Beer v. United States*, 425 U.S. 130, 141 (1976).  North Carolina hardly needed a

surge of African-American citizens in CD 12 to prevent retrogression.  The district was an extraordinarily safe district for African-American preferred candidates and had been for decades upon end.  The suggestion that maintaining a similar district might expose the state to Section 5 liability for "retrogression" is simply absurd.

The evidence vividly and indisputably shows that African-Americans were consistently able to elect candidates of their choice in CDs 1 and 12 under the previous two redistricting maps, notwithstanding that neither district had a majority-BVAP. Section 5 cannot be used to "justify not maintenance, but substantial augmentation, of the African-American population percentage" in the challenged district.  *Bush*, 517 U.S. at 983; *see also Page*, 2015 WL 3604029, at *17 (Defendants could "show no basis for concluding that an augmentation of the [challenged district's] BVAP to 56.3% was narrowly tailored when the district had been a safe majority-minority district for two decades").  Section 5 can hardly constitute a compelling state interest for the State's predominant use of race.  The argument simply cannot be maintained with a straight face.

### 2. The State Can Assert No Compelling Interest in Section 2 of the VRA

Nor can Defendants justify race-based redistricting by arguing that avoidance of potential Section 2 liability was a "compelling state interest."  These districts have never been challenged under Section 2 and for good reason:  there is no basis for such a challenge as they have consistently performed for African-American preferred candidates for decades.

Section 2 requires legislatures to create majority-minority districts only where three preconditions are met: (1) the minority group is "sufficiently large and

- 33 -

geographically compact to constitute a majority" in a single-member district; (2) the minority group is "politically cohesive"; and (3) a white majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). *See also Growe v. Emison*, 507 U.S. 25, 40 (1993). If these preconditions are met, the court must then apply a totality of circumstances analysis to determine whether there has been a violation of Section 2. *Lewis v. Alamance Cnty.*, 99 F.3d 600, 604 (4th Cir. 1996). "[G]eneralized assumptions about the prevalence of racial bloc voting" do not qualify as a "strong basis in evidence." *Bush*, 517 U.S. at 994 (O'Connor, J., concurring). The district must "substantially address[]" the potential Section 2 liability without "subordinat[ing] traditional districting principles to race substantially more than is 'reasonably necessary' to avoid" that liability." *Id*. at 977, 979.

None of these preconditions were even arguably met and there is no evidence that the General Assembly even remotely considered these issues. As to the first precondition, the State will not be able to prove a geographically compact minority community in CD 1 (or CD 12), *Bush*, 517 U.S. at 979 ("If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district."); *Gause v. Brunswick Cnty.*, 92 F.3d 1178 (4th Cir. 1996) (rejecting a Section 2 claim where the plaintiff failed to establish this precondition).

To the contrary, as is dramatically evidenced by the tortured district lines that snake in all directions to capture disparate pockets of African-American voters, the

minority population in the northeastern part of the state is rather obviously *not* geographically compact enough to comprise a majority in a single-member district. At the risk of stating the obvious, a State cannot use Section 2 to justify its race-based redistricting where it draws a district that "reaches out to grab small and apparently isolated minority communities which, based on the evidence presented, could not possibly form part of a compact majority-minority district." *Bush*, 517 U.S. at 979; *see also Shaw v. Hunt*, 517 U.S. 899, 916 (1996).

Nor can the State establish the second and third preconditions—racially-polarized voting significant enough that the white majority routinely votes as a bloc to defeat the minority candidate of choice. Strikingly, there is utterly *no* evidence that the State conducted or considered any sort of a particularized polarized voting analysis during the 2011 redistricting process for CD 1 or 12.

Indeed, the plain and unadorned historical record standing alone is devastating to Defendants' argument. Under the prior two Congressional plans, CD 1 and CD 12 were not majority-BVAP, and no lawsuits were filed under Section 2. Indeed, no statewide Section 2 redistricting challenge of *any kind* had been filed in North Carolina in the prior three decades. And for good reason: Minority-preferred candidates have consistently won in the prior iteration of CD 1 (and CD 12), without majority-minority districts. The historical record thus vividly demonstrates the absence of racial bloc voting: in over 30 years, a white majority has never voted as a bloc to defeat the candidates favored by African-American voters. Not once. As Dr. Hofeller concedes, the "best predictor of the

- 35 -

results of elections in Congressional Districts 1 and 12 would have been the past election results in those districts." Pl. Ex. 129 (Hofeller Dep. 77:13-78:8). Indeed.[6]

Defendants have elsewhere pointed to generic evidence that there is some degree of racially-polarized voting in North Carolina, considered as a whole. And there may well be. But such evidence, if it exists, is irrelevant as a matter of law to the case at hand. In *Alabama*, the Court reversed the judgment of the trial court in part because it considered whether race predominated in "a State considered as an undifferentiated whole" even though a "racial gerrymandering claim . . . applies district-by-district." *Id*. at 1265. The Court further emphasized that a "showing that race-based criteria did not significantly affect the drawing of some Alabama districts . . . would have done little to defeat a claim that race-based criteria predominately affected the drawing of other Alabama districts. *Id*. at 1266 (emphasis added). Because a gerrymandering claim is only concerned with voting patterns in a particular district, whether racial bloc voting occurs in other cities, or other counties, or other portions of the state is decidedly irrelevant to the question at hand—whether racially polarized voting exists *in the district in question* such that the minority in question usually cannot elect its chosen candidate. *See Moon v. Meadows*, 952 F. Supp. 1141, 1149-50 (E.D. Va. 1997) (state could not justify redistricting plan under Section 2 where "white bloc voting does not prevent

---

[6] *See, e.g., Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 438-39 (S.D.N.Y. 2004) (rejecting an "analysis [that] examines racially polarized voting without addressing the specifics of the third *Gingles* factor, which requires white majority bloc voting that usually defeats the [minority]-preferred candidate" and noting that "[e]ven if there were racially polarized voting, the report does not speak—one way or the other—to the effects of the polarized voting"), *aff'd*, 543 U.S. 997 (2004).

blacks from election their candidates of choice" as "black candidates . . . were elected despite the absence of a black majority district.").  The State admitted in previous briefing that "African American voters have been able to elect their candidates of choice in the First District since the district was established in 1992."  Defs.' Memo. of Law in Opp. to Pls.' Mot. for Sum. J. (July 3, 2014), Dkt. No. 76, at 2, 8.

That admission ends the inquiry.

**E.     CD 1 and CD 12 Are Not Narrowly Tailored**

Even if Defendants could show that they had a strong basis in evidence for complying with the VRA (which they cannot), they will not, in any event, be able to show that making a majority-BVAP districts was necessary to achieve that purpose.

*Alabama* again settles the issue.  There, the Alabama legislature set out to redraw its House districts in compliance with the VRA.  At the outset, the legislature determined that "it was required to maintain roughly the same black population percentage in existing majority-minority districts" in order to avoid retrogression.  *Alabama*, 135 S. Ct. at 1263.  But there was no analysis to determine whether maintaining those levels was necessary to preserve minorities' ability to elect their candidates of choice.  Instead, like the General Assembly in this case, the Alabama legislature simply "relied heavily upon a mechanically numerical view as to what counts as forbidden retrogression" without any evidence to support that view.  *Id*. at 1273.

The Supreme Court held that Alabama's "numerical" approach was not narrowly tailored.  The legislators had no basis in evidence—let alone a strong basis—to believe

Case 1:13-cv-00949-WO-JEP   Document 109   Filed 09/21/15   Page 43 of 49

that an inflexible racial floor was necessary. Nor was that surprising because, as the

Supreme Court put it, Alabama's legislators asked the "wrong question":

> They asked: "How can we maintain present minority percentages in
> majority-minority districts?" But given § 5's language, its purpose, the
> Justice Department Guidelines, and the relevant precedent, they should
> have asked: "To what extent must we preserve existing minority
> percentages in order to maintain the minority's present ability to elect the
> candidate of its choice?" Asking the wrong question may well have led to
> the wrong answer.

*Id.* at 1274. Here, too, the General Assembly asked the wrong question. It should have

asked: "'To what extent must we preserve existing minority percentages . . . in order to

maintain the minority's present ability to elect the candidate of its choice?'" *Id.* Instead,

it asked how to create a majority-BVAP district; there was no analysis as to *why* it should

create such a district.

At the risk of belaboring the point, *Alabama* has been applied in circumstances

similar to here. In *Page v. Virginia State Board of Elections*, the legislators adopted a

floor of a 55% BVAP for a Virginia Congressional district it thought was necessary to

comply with the VRA. 2015 WL 3604029, at *18. The court invalidated the district

because its use of a mechanical BVAP target, "as opposed to a more sophisticated

analysis of racial voting patterns, suggests that voting patterns in the [challenged district]

were not considered individually." *Id.*; *see also Smith v. Beasley*, 946 F. Supp. 1174,

1210 (D.S.C. 1996) (noting that "a plan seeking to ameliorate past discrimination does

not require super-safe majority-minority districts of at least 55% BVAP to accomplish

this purpose").

- 38 -

Defendants lean heavily on *Strickland* for the proposition that the VRA required the creation of majority-BVAP districts. This is a decidedly revisionist (and implausible) reading of *Strickland*. In fact, *Strickland* did not touch upon the pertinent question here. A plurality in *Strickland* held that Section 2 did not require states to draw election-district lines to allow a racial minority that would make up less than 50 percent of the VAP in the new district to join with crossover voters to elect the minority's candidate of choice. 129 S. Ct. at 1249 (plurality). That is, Section 2 does not compel the creation of crossover districts wherever possible. This is a far cry from saying that states *must create* majority-BVAP districts wherever possible—in fact, the case stands for the opposite proposition, emphasizing that "[i]n areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition—bloc voting by majority voters." *Id*. at 1248 (plurality).

That is exactly the situation here. The suggestion that the VRA would somehow *require* racial balkanization where, as here, citizens have *not* voted as racial blocs, where cross over voting *has* naturally occurred, and where creating a majority-minority district requires serpentine districts in blatant disregard for fundamental redistricting principles is frankly absurd and stands the Voting Rights Act on its head. Such a reading of the statute would defeat its very purpose.

The evidence that will be placed before this Court at trial will demonstrate that race was the General Assembly's predominant purpose, and the General Assembly's race-based redistricting was anything but narrowly tailored. CD 1 and CD 12 are unconstitutional and should be rejected by this Court.

**F.     This Court Should Impose an Immediate and Effective Remedy**

Plaintiffs respectfully submit that this Court should, following trial, promptly enter an immediate and effective remedy.  Courts regularly exercise the "power . . . [either] to require valid reapportionment or to formulate a valid redistricting plan."  *Scott v. Germano*, 381 U.S. 407, 409 (1965).  If time allows, a court should give the General Assembly an opportunity to enact a new plan that avoids the constitutional infirmities in the invalidated plan.  *See McDaniels v. Mehfoud*, 702 F. Supp. 588, 596 (E.D. Va. 1988); Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1133 (2005).  Under North Carolina law, courts must give legislatures at least two weeks to remedy defects identified in a redistricting plan.  *See* N.C. Gen. Stat. § 120-2.4.

As the Supreme Court has explained, however, "[a]lthough the legislative branch plays the primary role in . . . redistricting, our precedents recognize an important role for the courts when a districting plan violates the Constitution."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415 (2006).  In particular, where it is clear that the appropriate legislative body will not or cannot enact a valid plan in time, as when the "imminence of . . . [an] election makes [referral to the legislative branch] impractical," then "it becomes the 'unwelcome obligation' of the federal court to devise and impose a reapportionment plan pending later legislative action."  *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (principal opinion) (internal citation omitted).

- 40 -

**G.      Plaintiffs Are Entitled to Reasonable Attorneys' Fees and Costs**

Plaintiffs brought this lawsuit under 42 U.S.C. § 1983, and prevailing parties in § 1983 actions "should ordinarily recover an attorney's fee." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and citation omitted). Prevailing parties are also entitled to recover their expert fees. *See* 42 U.S.C. § 1973l(e). Plaintiffs request the opportunity—should they prevail—to demonstrate their attorneys' fees, expert fees, and costs by post-trial motion.

## V.      CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court invalidate North Carolina Congressional Districts 1 and 12 and ensure that constitutional districts are adopted for the 2016 general election and any future election.

Respectfully submitted, this the 21st day of September, 2015.

**PERKINS COIE LLP**

/s/ Kevin J. Hamilton
Kevin J. Hamilton
Washington Bar No. 15648
Khamilton@perkinscoie.com
William B. Stafford
Washington Bar No. 39849
Wstafford@perkinscoie.com
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  (206) 359-8741
Facsimile:  (206) 359-9741

John M. Devaney
D.C. Bar No. 375465
JDevaney@perkinscoie.com
Marc E. Elias
D.C. Bar No. 442007
MElias@perkinscoie.com
Bruce V. Spiva
D.C. Bar No. 443754
BSpiva@perkinscoie.com
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone:  (202) 654-6200
Facsimile:  (202) 654-6211

*Attorneys for Plaintiffs*

**POYNER SPRUILL LLP**

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
John W. O'Hale
N.C. State Bar No. 35895
johale@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynerspruill.com
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
Telephone: (919) 783-6400
Facsimile:  (919) 783-1075

*Local Rule 83.1*
*Attorneys for Plaintiffs*

Case 1:13-cv-00949-WO-JEP   Document 109   Filed 09/21/15   Page 48 of 49

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I served a copy of the foregoing **PLAINTIFFS' TRIAL BRIEF** to be made by electronic filing with the Clerk of the Court using the CM/ECF System, which will send a Notice of Electronic Filing to all parties with an e-mail address of record, who have appeared and consent to electronic service in this action.

This the 21st day of September, 2015.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.