IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
Civil Action No. 1:13-CV-00949

| | | |
|---|---|---|
| DAVID HARRIS and CHRISTINE BOWSER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PATRICK MCCRORY, in his capacity as Governor of North Carolina; NORTH CAROLINA STATE BOARD OF ELECTIONS; and JOSHUA HOWARD, in his capacity as Chairman of the North Carolina State Board of Elections, | ) ) ) ) ) ) ) | **DEFENDANTS' TRIAL BRIEF** |
| Defendants. | ) ) | |

## INTRODUCTION

Plaintiffs are members of organizations which have already challenged the constitutionality of Congressional District 1 ("CD 1") and Congressional District 12 ("CD 12"), and lost. Plaintiffs are bound by that judgment in which both CD 1 and CD 12 were held constitutional under the Fourteenth Amendment to the United States Constitution. Regardless, the undisputed evidence in this case, as it did in the prior case, will demonstrate that race was not the predominant motive for either district, and that, in any event, the North Carolina legislature had more than a strong basis in evidence to enact CD 1 to protect the State from liability under § 2 and § 5 of the Voting Rights Act ("VRA").

# I.    FACTUAL BACKGROUND

## A.    The 2011 Redistricting Proceedings in State Court.

The history of the 2011 redistricting which produced the enacted CD 1 and CD 12, as well as the lengthy and thorough state court proceedings finding those districts constitutional, is recounted in a detailed Judgment and Memorandum Opinion issued by a three-judge panel of the North Carolina Superior Court appointed by the Chief Justice of North Carolina.  *See* Judgment and Memorandum Opinion, *Dickson v. Rucho*, Nos. 11 CVS 16896 and 11 CVS 16940 (consolidated) (July 8, 2013) ("*Dickson*")[1] (filed with the court in this case as part of the *Dickson* record at D.E. 100-4, p. 39 through 100-5, p. 144).  Pages 5 – 7 of the Opinion accurately recite this history and defendants incorporate it herein by reference.  (D.E. 100-4, pp. 43 - 45)

As it relates to the instant litigation, the *Dickson* plaintiffs challenged CD 1 and CD 12 on all of the grounds asserted by the *Harris* plaintiffs in this case.  After a two-day trial, the *Dickson* trial court issued its Opinion.  Regarding CD 1, the state court made specific findings of fact and found as a matter of law that the General Assembly had a strong basis in evidence to conclude that the district was reasonably necessary to protect the State from liability under the VRA and that the district was narrowly tailored. (*Dickson*, pp. 9-23, 28-30, 44, Appendix A pp. 77-95, F.F. Nos. 1-36; 155-57, F.F. Nos. 165-71) (D.E. 100-4, pp. 47-61, 66-67; D.E. 100-5, pp. 1, 15, 48-66, 126-28)

---

[1] The Judgment and Memorandum Opinion without appendix is available on Westlaw at 2013 WL 3376658.  Because the electronic version does not contain the appendix, for consistency citations in this memorandum will correspond to the page numbers as they appear in the record with the two appendices and not the online version.

Regarding CD 12, the state court made detailed findings of fact that the General Assembly's predominant motive for the location of that district's lines was to re-create the 2011 CD 12 as a strong Democratic-performing district, not race. (*Dickson*, pp. 46-49, Appendix A, pp. 157-59, Appendix B. pp. 161-63) (D.E. 100-5, pp. 17-20, 216-28, 132-34)

On July 22, 2013, the *Dickson* plaintiffs filed their notice of appeal from the three-judge panel's Judgment. The *Harris* plaintiffs filed their complaint on October 24, 2013. On December 19, 2014, the North Carolina Supreme Court affirmed the judgment of the three-judge panel in *Dickson v. Rucho*, 367 N.C. 542, 761 S.E.2d 228 (2014). On January 16, 2015, the *Dickson* plaintiffs petitioned the United States Supreme Court for a writ of *certiorari* and on April 20, 2015, the Court granted plaintiffs' petition for a writ of *certiorari*, vacated the decision by the North Carolina Supreme Court, and remanded the case to the North Carolina Supreme Court "for further consideration in light of *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. ___ (2015)." The United States Supreme Court expressed no opinion on the merits of the ruling by the North Carolina Supreme Court upholding CD 1 and CD 12. Oral argument on the remand was held by the North Carolina Supreme Court on August 31, 2014 and no ruling has yet been issued. [2]

---

[2] In similar cases, lower courts have reaffirmed their prior position following a remand from the United States Supreme Court and the Supreme Court has declined to further review the case. *See, e.g., Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F. 3d 289 (6th Cir. 1997), *cert. denied*, 525 U.S. 943 (1998).

**B.** **Majority-minority, minority coalition, crossover, and influence districts under § 2 and § 5 of the VRA.**

Over the years, courts have defined four different types of districts that have been described as "voting rights districts" or "VRA districts":

- "Majority-minority districts" are districts in which a specific minority constitutes an actual majority of the voting age population. *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009).

- Minority "coalition" districts are districts in which two minority groups constitute a majority and form a coalition to elect the coalition's candidate of choice. *Id.*

- Majority-white "crossover" districts are districts in which minority voters make up less than a majority but are potentially large enough to elect their candidate of choice with the help of some white "crossover" voters. *Id.*

- "Influence" districts are districts in which the minority group can influence the outcome of an election even if its preferred candidate of choice cannot be elected. *Id.*

In 1995 and 1996, the Supreme Court assumed, without expressly holding, that a State may enact VRA districts when it has a reasonable fear of potential liability under § 5 or § 2. *Miller v. Johnson*, 515 U.S. 900, 920, 923 (1995); *Shaw v. Hunt*, 517 U.S. 988, 909-13 (1996); *Bush v. Vera*, 517 U.S. 952, 997 (1996).

**C.** **Racial gerrymandering litigation involving CD 1 and CD 12.**

In 1991, the State of North Carolina adopted a congressional plan in which CD 1 was the only majority-black district. CD 1 was located in the northeastern region of the State and extended into Durham County. *Shaw v. Hunt*, 861 F. Supp. 408, 460-61

4

(E.D.N.C. 1984), *rev'd*, 517 U.S. 899, 902 (1996) ("*Shaw II*").[3] The State submitted the plan for preclearance under § 5 of the VRA. The United States Attorney General ("USAG") did not object to the proposed CD 1, but registered an objection to the State's failure to create a majority-minority coalition district that would combine African Americans with Native Americans living in Mecklenburg County and the southcentral and southeastern parts of the State. *Id.*

The General Assembly responded by enacting a new version of CD 1 and a second majority-black district, CD 12. This district started in Gaston County, continued through Mecklenburg County, and then used interstate highways to connect dispersed pockets of African American population in Forsyth, Guilford, and Durham Counties. 861 F. Supp. at 465-67; 517 U.S. at 902; 1991 N.C. Extra Sess. Laws Chapter 7.[4] The General Assembly declined to enact the district suggested by the USAG because of the negative political impact such a district would have on three incumbent Democratic Congressmen. 861 F. Supp. at 465-67.

Under the 1990 Census, the 1992 version of CD 1 was created with a total Black Population ("BPOP") of 57.26% and a Black Voting Age Population ("BVAP") of 53.40%. CD 12's BPOP was 56.63% and BVAP was 53.43%. (*See* Fourth Frey Aff. Ex. 1, pp. 2, 3) (D.E. 31-1, pp. 8-9)

---

[3] The 1991 CD 1 was drawn into Durham County and is similar in appearance to the 2011 CD 1. (*Dickson,* Third Affidavit of Dan Frey ("Third Frey Aff."), ¶ 22, Ex. 84) (D.E. 30-5, pp. 7, 17) In *Shaw II*, the Supreme Court expressed its approval of the 1991 version of CD 1. *Shaw II*, 517 U.S. at 912.

[4] *See* Fourth Affidavit of Dan Frey ("Fourth Frey Aff.") (Listing of North Carolina Congressional Districts, Maps, and Statistics, Ex. 1 [1992 Congressional Base Plan # 10]) (D.E. 31-1, pp. 8-9)

In *Shaw v. Reno*, 509 U.S. 630 (1993) ("*Shaw I*"), the Supreme Court held that plaintiffs stated a claim that CD 1 and CD 12 constituted racial gerrymanders. The Court held that statutes that are "unexplainable on grounds other than race" must be narrowly tailored to further a compelling government interest. *Shaw I*, 509 U.S. at 643 (citing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986) and *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). The case was then remanded for trial. *Shaw I*, 509 U.S. at 658.

Following remand, the trial court ruled in favor of the defendants and dismissed plaintiffs' claims. *Shaw II*, 861 F. Supp. at 408. The court held that the two districts advanced compelling interests because they were reasonably necessary to avoid liability under § 5 and § 2 of the VRA. The trial court also held that the districts were narrowly tailored. *Shaw II*, 861 F. Supp. at 473-74.

But on appeal, the United States Supreme Court found that the *Shaw* plaintiffs had demonstrated that race "was the predominant factor" behind the legislature's decision to place a significant number of voters within CD 12. *Shaw II*, 517 U.S. at 905. The Court rejected the district court's decision that CD 12 was narrowly tailored to protect the State from liability under § 5 or § 2. *Id.* at 911. Because of its location, CD 12 could not substantially remedy any vote dilution claim that might be alleged by African American and Native Americans living in Mecklenburg County or in south central and southeastern North Carolina. *Id.* at 917-18. [5]

_____

[5] This was the minority population identified by the USAG as the compact minority population capable of alleging a § 2 claim. *Id.*

6

Following *Shaw II*, in 1997, the State once again changed CD 1 and CD 12. *Cromartie I*, 526 U.S. at 542; 1997 N.C. Sess. Laws Ch. 11; (Fourth Frey Aff. Ex. 2 [1997 House/Senate Plan A]) (D.E. 31-1, pp. 11-13)  Under the 1997 CD 12 plan, BPOP was approximately 47% and BVAP was 43%.  *Cromartie I*, 526 U.S. at 544.  In CD 1, BPOP was 50.27% and BVAP was 46.53%.  *Cromartie II*, 133 F. Supp. 2d at 415 n.6.

In *Cromartie I*, the district court granted plaintiffs' motion for summary judgment, holding that race was the predominant motive for the 1997 CD 12 and that the district therefore constituted a racial gerrymander.  The Supreme Court then reversed the district court and remanded the case for trial.  526 U.S. at 553-54.  The Supreme Court held that, at the summary judgment stage, the district court was required to accept as true the State's evidence that CD 12 was politically motivated and summary judgment was therefore inappropriate.  *Id.* at 551.  The Supreme Court stated that evidence that African Americans constitute even a *super*majority in a challenged district does not "suffice" to prove that "a jurisdiction was motivated by race in drawing its district lines when the evidence shows a high correlation between race and party preference."  *Id.*  The Supreme Court also noted that "just as summary judgment is rarely granted in plaintiff's favor in cases where the issue is defendant's racial motivation, such as disparate treatment suits under Title VII . . . the same holds true for racial gerrymandering claims."  *Id.* at 553 n. 9.[6]

---

[6] In a concurring opinion, Justices Stevens, Souter, Ginsberg, and Breyer noted that "the most remarkable feature of the District Court's erroneous decision was that it relied entirely on data concerning the location of registered Democrats and ignored the more probative evidence of how people who live near the borders of District 12 actually voted

In *Cromartie II*, following a trial on the merits, the district court found that CD 1 was based upon the compelling interest of avoiding liability under the VRA, that the district was narrowly tailored, and that it was therefore constitutional. 133 F. Supp. at 421-23. The factual basis to support this finding included a stipulation, approved by the district court, that "the white majority votes sufficiently as a bloc to often enable it to defeat the minority's preferred candidate." *Id.* at 422. In contrast, the district court ruled that CD 12 was an illegal racial gerrymander. *Id.* at 418-21. The Court once again relied on testimony by plaintiffs' expert that race, and not *party registration*, better explained the district lines. *Id.* at 419.

Plaintiffs did not appeal the district court's ruling in *Cromartie II* regarding CD 1. However, the State appealed the district court's holding that CD 12 was unconstitutional. In *Cromartie II*, in an opinion written by Justice Souter, the Supreme Court once again reversed the decision by the district court. The Supreme Court outlined the following criteria to be applied in cases involving claims of alleged racial gerrymanders:

> 1. Plaintiffs' burden of proof is a "demanding one." *Cromartie II*, 532 U.S. at 241.
>
> 2. Plaintiffs must show at a minimum that the "legislature subordinated traditional race-neutral criteria . . . to racial considerations." *Id.*

---

in recent elections." *Id.* at 557. The concurring Justices also noted that the evidence showed that the members responsible for drawing District 12 had relied upon "election results, not voter registration," and that "all of the majority-Democrat precincts that the State legislature excluded from District 12 in favor of precincts with higher black populations produced significantly less dependable Democratic results and actually voted for one or more Republicans in recent elections." *Id.*

3.     Race must not simply have been a factor, but must be the *predominant* factor motivating the legislature's districting decision. *Id.* (citing *Cromartie I*, 526 U.S. at 547).

4.     Plaintiffs must show that the district lines are "unexplainable on grounds other than race." *Id.* at 242.

5.     Districting decisions ordinarily fall within a legislature's sphere of competence. *Id.* (citing *Miller*, 515 U.S. at 915).    A legislature must have discretion to exercise the political judgment necessary to balance competing interests and a court must exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race. *Id.* (citing *Miller*, 515 U.S. at 916). Caution is especially appropriate when the State has articulated a legitimate political explanation for its districting decision and the voting population is one in which race and political affiliation are highly correlated. *Id.* (citing *Cromartie I*, 526 U.S. at 551-52).

6.     Finally, in cases where majority-minority districts (or the approximate equivalent) are at issue and where racial identification correlates highly with "political affiliation" plaintiffs "must show" that: (a) the legislature could have achieved its political objectives in alternative ways that are "comparably consistent with traditional districting principles;" and (b) that districting alternatives proposed by plaintiffs would "have brought about significantly greater racial balance." *Id.* at 258.

Applying these standards, the Court found that the district court's findings were clearly erroneous. *Id.* at 242. The Court found that the district court had again erroneously relied upon *party registration* statistics as opposed to actual voting patterns. *Id.* at 245. This included evidence that white registered Democrats vote for Republican candidates at a far higher percentage than do African Americans. *Id.* The Court observed that:

A legislature trying to secure a safe Democratic seat is interested in Democratic voting behavior. Hence a legislature may, by placing reliable Democratic precincts within a district without regard to race, end up with a district containing heavily African American precincts, but the reasons would be political rather than racial.

9

*Id.*

**D.** **The 2001 Congressional Plans established CD 1 and CD 12 as majority-minority coalition districts and strong Democratic districts in which African Americans constituted a majority of the registered Democrats.**

Following the decision in *Cromartie II*, in 2001, the North Carolina General Assembly enacted a Congressional Plan called "Congress Zero Deviation." (Fourth Frey Aff. Ex. 4) (D.E. 31-1, pp. 19-23) The 2001 version of CD 12 is almost identical to the 1997 version. (*Id.*) Thus, it was again established by the General Assembly as a safe district for a Democratic candidate. Under the 2000 Census, CD 12 was created with a BPOP of 45.02% and a BVAP of 42.31%. The undisputed evidence in this case will show that, under the 2000 Census, the non-Hispanic white VAP for the 2001 CD 12 was 48.07%. Therefore, under the 2000 Census, the 2001 version of CD 12 was not majority-white in total population. Moreover, non-Hispanic whites were not a majority of VAP. Thus, even though the State did not defend CD 12 as a VRA district, like the 2001 CD 1, under the 2000 Census, the 2001 CD 12 was a minority coalition district.

The 2001 CD 1 was based upon the 1997 version and therefore designed to protect the State from § 2 liability.[7] Under the 2000 census, it was established with a BPOP of 50.71% and a "white" total population of 45.44%. (D.E. 31-1, p. 20)[8] "Other" racial groups constituted 3.85% of the total population. (*Id.*) Under the 2000 Census, African

---

[7] In its 2001 preclearance submission, North Carolina argued that the 2001 CD 1 should be precleared because it was based upon the 1997 version of CD 1 and that the 1997 version had been found to be reasonably necessary to protect the State from § 2 liability in *Cromartie II*. (*See* 12/17/01 Section 5 Submission C-27N)

[8] The category of "white" is calculated without regard to ethnicity and therefore includes Hispanics. (*See Dickson*, Second Affidavit of Dan Frey ("Second Frey Aff.") p. 26, Exs. 60-64, notes); (Fourth Frey Aff. ¶ 3) (D.E. 30-4, pp. 8, 11-15; D.E. 31-1, p. 3)

Americans constituted 47.76% of the voting age population, "whites" constituted 48.80% of the voting age population, and Hispanics constituted 2.77% of the VAP. (D.E. 31-1, pp. 22, 23)[9]

The 2001 CD 1 was a majority-black district based upon total population. The undisputed evidence in this case will show that, under the 2000 Census, CD 1 was not a majority non-Hispanic white district, whether the census category consists of total population or voting age population. The 2001 CD 1 was a majority-minority coalition district based upon VAP.

The decision by the 2001 General Assembly to create the 2001 CD 1 as a VRA district with a majority-minority coalition, instead of a majority African American district, reflected a political strategy later described and supported by the decision of the Supreme Court in *Georgia v. Ashcroft*, 539 U.S. 461 (2003). That case involved the preclearance of Georgia's legislative plans under § 5 of the Voting Rights Act. The Court articulated two strategies available to states to obtain preclearance. Under one option, states could create "a certain number of 'safe districts' in which it is highly likely that minority voters will be able to elect their candidates of choice." *Id.* at 480. The Court also endorsed an alternative strategy under which states could make a political decision to enact a combination of districts, including coalition and influence districts, in place of safe majority-minority districts. *Id.* at 480-83. While North Carolina had originally created the 1991 and the 1992 versions of CD 1 as true majority-black districts,

---

[9] Under the 2000 Census, both the BPOP and the BVAP for the 2001 CD 1 was slightly higher than the comparable percentages for the 1997 version of that district under the 1990 Census.

in 1997 and in 2001, the General Assembly opted for the "political" strategy of creating the 2001 CD 1 as a minority coalition district in which non-Hispanic whites constituted a minority of the VAP.

The legal landscape established by *Ashcroft* was short-lived. In *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*"), the Supreme Court rejected the argument that § 2 requires influence districts because "the opportunity 'to elect representatives of their choice' . . . requires more than the ability to influence the outcome between some candidates, none of whom is [the minority group's] candidate of choice." 548 U.S. at 445-46; *see also Strickland*, 556 U.S. at 13.

Another significant legal development occurred when Congress reauthorized § 5. *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, P.L. 109-246, 120 Stat. 577 (2006). Section 5 was amended to prohibit "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the *purpose* of or will have the *effect* of diminishing the ability of any citizens of the United States on account of race or color . . . *to elect their preferred candidates of choice*." *Id.* (emphasis added). One of the purposes of these amendments was to reverse any portion of *Ashcroft* which gave states the option of selecting coalition or influence districts over districts that allow the minority group to elect their preferred candidates of choice. *See* S. REP. NO. 109-295, at 18-21 (2006) ("Preferred Candidate of Choice"); H.R. REP. NO. 109-478, at 65-72 (2006).

The final significant legal change occurred in *Strickland*. Under a 2003 redistricting plan for the North Carolina House, North Carolina divided Pender County into different districts to create a majority-white crossover district (House District 18). The plaintiffs contended that dividing Pender County into different districts violated state law restrictions on dividing counties into different legislative districts. North Carolina defended the division of Pender County on the ground that majority-white crossover districts served as a defense to vote dilution claims under § 2. *Pender Cnty. v. Bartlett*, 361 N.C. 491, 493-98, 649 S.E.2d 364, 366-68 (2007) ("*Pender County*"). The North Carolina Supreme Court held that § 2 did not authorize the creation of coalition districts, crossover districts, or influence districts, and that any district enacted to protect the State from § 2 liability would need to be established with a true majority-minority population. *Id.* at 503-07, 649 S.E.2d at 372-74.

On appeal, the United States Supreme Court affirmed that crossover districts could not be required under § 2 because districts designed to protect a state from § 2 liability must be numerically majority-minority. *Strickland*, 556 U.S. at 12-20. While the Court did not squarely address whether coalition districts could be required by § 2, it stated that such districts had never been ordered as a remedy for a § 2 violation by any of the circuit courts. *Id.* at 13, 19.

E.    **2010 Census Statistics for the 2001 Versions of CD 1 and 12.**

The 2011 General Assembly published statistics on the racial composition of the 2001 CD 1 and CD 12 under the 2010 Census. For the first time, the General Assembly released three new standard reports that are relevant to this litigation. First, statistics for

13

each district included a column for persons who reported themselves to the Census Bureau as being single-race black (or "Black" under the General Assembly's reports) plus individuals who reported themselves "any part black" (or "Total Black" under the General Assembly's reports) (Fourth Frey Aff. ¶ 7) (D.E. 31-1, pp. 3-4)[10]  Second, the 2011 reports also included a column for "non-Hispanic white" in the categories of total population and VAP.   Finally, the 2011 reports included registration by party and race. (*See id.* at Ex. 5; Second Frey Aff. ¶ 26, Exs. 60, 64) (D.E. 31-1, pp. 25-34; D.E. 30-4, pp. 8, 11, 15)

Under the 2010 Census, the 2001 CD 1 was under-populated by 97,563 persons as compared to the 2010 ideal population for a congressional district (733,499).   (Fourth Frey Aff. Ex. 5, p. 1) (D.E. 31-1, p. 26)  CD 1 was the most under-populated of North Carolina's thirteen congressional districts.   (*Id.*).   Under the 2010 Census, CD 1's total population was 49.65% single-race black, 44.19% white, including Hispanics, 50.65% "any part" black or "Total Black Population" ("TBPOP"), and 42.56% non-Hispanic white.[11]   Voting age population in the 2001 district was 48.07% single race black, 46.92% white including Hispanics, 48.63% any part black or "Total Black Voting Age

---

[10] The category any part black or "Total Black" is the census category preferred by the United States Department of Justice and the United States Supreme Court. *Ashcroft*, 539 U.S. at 473 n.1.

[11] Under the 2010 Census, statewide, single-race blacks constitute 21.48% of the total population.   Any part black or TBPOP constitutes 22.56% of the state wide population. (*See* Fourth Frey Aff. Ex. 5, p. 2) (D.E. 31-1, p. 27)

Population" ("TBVAP"), and 45.59% non-Hispanic white.[12]   Blacks also represented a majority of the registered voters (50.66%).  (Second Frey Aff. Ex. 64) (D.E. 30-4, p. 15)  Democrats constituted 67.78% of the registered Democrats in CD 1.  Blacks constituted 66.55% of the registered Democrats. (Second Frey Aff. ¶ 27, Ex. 60, 64) (attached as Ex. C); (Fourth Frey Aff. Ex. 5, pp. 2-4) (D.E. 30-4, pp. 9, 11, 15; D.E. 31-1, pp. 27-29)[13]

Under the 2010 Census, the 2001 CD 12 was over-populated by 2,847 persons or 0.39%.  (Fourth Frey Aff. at Ex. 5, p. 1) (D.E. 31-1, p. 26)  Single race blacks comprised 43.90% of the total population, whites including Hispanics made up 42.24% of the total population, and TBPOP was 45.39%.   Hispanics constituted 12.38% of the total population while non-Hispanic whites made up only 38.58% of the population.  Single-race black VAP was 42.87%, white VAP, including Hispanics, was 45.63%, any part black or TBVAP was 43.77%, and non-Hispanic white was 42.40%.  Blacks represented 48% of all registered voters while whites (including Hispanics) represented 45.26% of registered voters.   Democrats represented 58.42% of the registered voters and blacks comprised 71.44% of registered Democrats.  (*Id.* at Ex. 5, pp. 2-4) (*Dickson,* Second Frey Aff. ¶¶ 26, 27, Exs. 60, 64) (D.E. 31-1, pp. 27-29; D.E. 30-4, pp. 8, 9, 11, 15)

The 2011 reports released by the General Assembly show that both districts had been created in 2001 with super-majorities of Democrats and that African Americans

---

[12] Under the 2010 Census, single-race blacks constitute 20.64% of the state wide voting age population.  Any part black or TBVAP constitutes 21.18% of the state wide voting age population. (*See* Fourth Frey Aff. Ex. 5, p. 3) (D.E. 31-1, p. 28)
[13] Under the 2010 Census, statewide Democrats constitute 44.65% of all registered voters.  Blacks constitute 41.38% of all registered Democrats.  (*See* Fourth Frey Aff. Ex. 5, p. 4) (D.E. 31-1, p. 29)

represented super-majorities of the registered Democrats in each district. CD 1 was constructed as a VRA district in a manner consistent with the concurring opinion of Justices Souter and Ginsberg in *LULAC*, who stated that VRA districts could be less than majority-minority if the minority group constituted a majority of the political party that normally wins elections in the district. *LULAC*, 548 U.S. at 485-86. This view was rejected in *Strickland*.

### F. 2011 Legislative Proceedings

Early in the 2011 redistricting process, the co-chairs of the Joint Senate and House Redistricting Committee (Senator Bob Rucho and Representative David Lewis) released a Legislator's Guide to Redistricting (Doc. Ex. 1720-22, accessible at http://www.ncleg.net/GIS/Download/Maps_Reports/2011RedistrictingGuide.pdf) ("Legislator's Guide").[14] The Legislator's Guide explained numerous cases that would govern redistricting in 2011, including, for example, *Stephenson v. Bartlett*, 355 N.C. 354, 371, 562 S.E.2d 372, 390 (2002) ("*Stephenson I*"); *Thornburg v. Gingles*, 478 U.S. 30 (1986); *Pender County*; *Strickland; Shaw I*; *Shaw II*; *Cromartie I*; *Cromartie II*, and other cases. The Guide also reported the decision by Congress to revise § 5 because of the decision in *Ashcroft*.

On March 24, 2011, the co-chairs advised legislators that the General Assembly was obligated to comply with *Strickland* in forming VRA districts, that "political

[14] The Legislator's Guide is included in the record filed with the North Carolina Supreme Court in *Dickson v. Rucho* but has not yet been filed with the Court in the instant case. Accordingly, there is no direct docket entry citation for the Legislator's Guide. All other citations in Defendants' Trial Brief which do not have corresponding docket entry citations are included with the record filed with the North Carolina Supreme Court and will become part of the record of this case, but have not yet been filed with this Court.

considerations" would play a role in redistricting, that the General Assembly would "consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions," "that race cannot be the predominant factor in redistricting so that traditional redistricting principles are subordinated to race," and that any new plans could not be "retrogressive." (Rucho Aff. Ex. 3) (D.E. 31-3, pp. 28-29)

On March 31, 2011, the co-chairs mailed a letter to the General Assembly's "minority contact" list which included the NC NAACP and its counsel. In their letter, the co-chairs solicited input on whether the State was still experiencing racially polarized voting in statewide, legislative, congressional or other elections particularly in counties covered by § 5 and areas that had been or may be subject to claims under § 2. The letter also sought input on the meaning of *Strickland*, the continuing presence of the *Gingles* factors, and any matters related to VRA compliance. All members of the legislative Black Caucus were copied on this letter. (Rucho Aff. Exs. 4, 5) (D.E. 31-3, pp. 31-32, 34-35)

During the 2011 legislative proceedings leading to the enactment of redistricting plans in July, the General Assembly conducted an unprecedented number of public hearings. (Rucho Aff. ¶ 6, Exs. 1, 2) (D.E. 31-3, pp. 3-4, 14-19, 21-26) During a public hearing on May 9, 2011, representatives of a coalition called "Alliance for Fair Redistricting and Minority Voting Rights" ("AFRAM"), presented a proposed Congressional plan. The NC NAACP was a member of AFRAM and AFRAM was represented by attorneys from the Southern Coalition for Social Justice ("SCSJ"). Thus, the plan was designated by General Assembly Staff as "Southern Coalition for Social

17

Justice – Congress." (Fourth Frey Aff. Ex. 6) (Rucho Aff. Ex. 6, pp. 8-11) (D.E. 31-1, pp. 26-45; D.E. 31-3, pp. 40-43)

During the public hearing, counsel for the NC NAACP, Anita Earls, stated that AFRAM was responding to the letter from the co-chairs dated March 31, 2011. Ms. Earls offered a congressional map designated as the SCSJ Congressional Plan. Ms. Earls argued that both CD 1 and CD 12 were covered by the nonretrogression principle of § 5. Prior to the public hearing, the NC NAACP had recognized that drawing CD 1 into the Research Triangle Park ("RTP") area might be required to ensure that the new version of the district complied with one person, one vote. (Response to First Set of Production by NC NAACP Plaintiffs, Ex. H to Appendix) (D.E. 32-2) Nevertheless, the SCSJ version of CD 1 was not drawn into RTP. Like the 2001 version of CD 1, the SCSJ proposed that the 2011 version be created as a minority coalition district with a TBVAP of 47.44% and a non-Hispanic white VAP of 46.47%. Blacks constituted 49.2% of all registered voters while whites (including Hispanics) constituted 47.40% of registered voters. Democrats constituted 66.89% of all registered voters with blacks constituting 65.73% of all registered Democrats. Thus, the 2011 version of CD 1 proposed by the SCSJ was based upon a formula followed by the 2001 General Assembly, endorsed by Justices Souter and Ginsburg in *LULAC*, but rejected by the Supreme Court in *Strickland*.

The version of CD 12 proposed by SCSJ was also similar to the version enacted by the 2001 General Assembly. The SCSJ CD 12 had a TBVAP of 43.89%, a Hispanic VAP of 10%, and a non-Hispanic white VAP of 42.38%. Blacks constituted 48.7% of all registered voters while whites (including Hispanics) constituted 45.17% of registered

voters. Democrats represented 58.51% of all registered voters with blacks constituting 71.53% of all registered Democrats. (Second Frey Aff. Exs. 63 and 66) (D.E. 30-4, pp. 14, 17)

Under the 2010 Census, the TBVAP of North Carolina was 21.18% with blacks representing 21.63% of all registered voters. Neither the NAACP nor the SCSJ, nor their counsel, proposed that either CD 1 or 12 be reduced in TBVAP or in the percentage of registered black voters to levels even remotely approaching the statewide percentages for blacks. This is because the SCSJ and the NC NAACP represented to the legislative committee on May 9, 2011, that North Carolina continued to "have very high levels of racially polarized voting in the state." (Rucho Aff. Exs. 6, 12-13) (D.E. 31-3, pp. 44-45) In support of this opinion, counsel for the NAACP offered an expert report by Dr. Ray Block. (*Id.* at pp. 52-62) Dr. Block examined black-white election results for 54 elections in 2006, 2008, and 2010, many of them in counties encompassed by all versions of CD 1, including the 2011 enacted version. Dr. Block stated that this report was "evidence that non-blacks consistently vote against African American candidates and that blacks demonstrate high rates of racial bloc voting in favor of co-ethnic candidates." (*Id.* at p. 52) Dr. Block stated that racially polarized voting was present, as that term was defined by Justice Brennan in *Gingles*, because there was a "consistent relationship between the race of a voter and the way in which s/he votes." (*Id.* at p. 54) Block stated that "in all elections examined here, such a consistent pattern emerges" and that "the

evidence . . . suggests that majority-minority districts facilitate the election of African American candidates." (*Id.*)[15]

In a letter provided to the Committee, Ms. Earls stated that Dr. Block had analyzed "54 elections and finds significant levels of racially polarized voting." (Rucho Aff. Ex. 7, p. 2) (D.E. 31-3, p. 49) Ms. Earls also stated that Block's report found that "the number of elections won by Black candidates in majority-minority districts is much higher than in other districts" and that "this data demonstrates the continued need for majority-minority districts." (*Id.*) Ms. Earls also stated that there was a continuing "need to have majority-minority districts" to protect the State from vote dilution claims under § 2 (*Id.* at p. 42), and that the "totality of the circumstances" factor, relevant to claims under § 2, were still present in North Carolina as demonstrated by a law review article authored by Ms. Earls. (*Id.* at pp. 13-14, 64-79; D.E. 31-4, pp. 2-32)[16]

---

[15] Dr. Block's report was limited to the extent that he only examined black versus white legislative or congressional races. Because of these limitations, the General Assembly engaged Dr. Thomas Brunell to analyze racially polarized voting in 40 North Carolina counties that were covered by § 5 and eleven other counties. Brunell found statistically significant racially polarized voting in all of these counties except for Camden (because of small sample size). During the redistricting process, not one witness or legislator disputed these findings. (Rucho Aff. Ex. 10; Three Judge Court Findings of Fact Nos. 14-21) (D.E. 31-4, pp. 34-70; D.E. 100-5, pp. 54-56)

[16] The law review article submitted by Ms. Earls also provided evidence of racially polarized voting as alleged or established in voting rights lawsuits filed in many of the counties in which 2011 VRA districts were enacted. (Rucho Aff Ex. 9, App. B) (D.E. 31-4, pp. 2-32) These cases included: *Ellis v. Vance County, Fayetteville; Cumberland County Black Democratic Caucus v. Cumberland County; Fussell v. Town of Mt. Olive* (Wayne), *Hall v. Kennedy* (Clinton City Council and City Board of Education) (Sampson); *Harry v. Bladen County, Holmes v. Lenoir County; Johnson v. Halifax County; Lewis v. Wayne County; McClure v. Granville County; Montgomery County Branch of the NAACP v. Montgomery County Board of Election; Moore v. Beaufort County; NAACP v. Duplin County; NAACP v. Elizabeth City* (Pasquatank); *NAACP v.*

During the public hearing process, many witnesses besides Ms. Earls testified about the continuing presence of racially polarized voting, the continuing need for majority-minority districts, and the continuing existence of the *Gingles* factors used to judge "the totality of the circumstances." Not a single witness testified that North Carolina's long and established history of racial polarization had vanished either statewide or in areas in which the General Assembly had enacted past VRA districts or 2011 VRA districts. *See Gingles*, 478 U.S. at 52, 56 (court noted, without objection, that district court had relied on lay-witness testimony in addition to statistical evidence presented by experts); *McDaniels v. Mehfoud*, 702 F. Supp. 588, 593 (E.D. Va. 1988) (racially polarized voting can be established through both expert analysis and anecdotal evidence); *Sanchez v. Bond*, 875 F.2d 1488 (10th Cir. 1989) (finding "nothing in *Gingles* to suggest that a trial court is prohibited from considering lay testimony in deciding whether" racially polarized voting exists); *See also Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1558 (11th Cir. 1987) (plaintiffs established existence of racially polarized voting through regression analysis *and* the testimony of lay witnesses) (emphasis added).

On April 13, 2011, Lois Watkins, a member of the Rocky Mount City Council, asked the legislature to draw majority-minority districts and stated that there was a desire in the City of Rocky Mount to elect and keep representatives of choice. (NC 11-S-28F-

---

*Forsyth County; NAACP v. Richmond County; NAACP v. Roanoke Rapids* (Halifax County); *Pitt County Concerned Citizens for Justice v. Pitt County; Rowson v. Tyrell County; Speller v. Laurinburg* (Scotland County); *United States v. Lenoir County; Webster v. Person County; White v. Franklin County;* and *Wilkers v. Washington County.* (Rucho Aff. Ex. 9, App. B, pp. 4-27) (D.E. 31-4, pp. 5-29)

3(a), pp. 13-15) (D.E. 68-12, pp. 2-4)[17]    Another member of the Rocky Mount City Council, Reuben Blackwell, testified that there was inequality in housing, elections, transportation, and economic development. (NC 11-S-28F-3(a), pp. 20-23) (D.E. 68-12, pp. 5-8) AFRAM representative Jessica Holmes testified that many historical factors, including racial appeals in campaigns, had conspired to exclude African American voters from the political process.  (NC11-S-28F-3(a), pp. 24-27)  Ms. Holmes further stated that social science would confirm that racially polarized voting continues to occur in many areas of North Carolina and that any redistricting plan should not have the purpose or effect of making African American voters worse off.  (NC11-S-28F-3(a), p. 26) (D.E. 68-12, p. 9)  Andre Knight, another member of the Rocky Mount City Council and President of the local branch of the NAACP, testified about the historical exclusion of African Americans from the electoral process in Rocky Mount, that race and economic class continued to be divisive issues in regard to school systems, and that racially polarized voting still exists and is demonstrated by the negative attitude toward the African American majority on the Rocky Mount City Council.  (NC11-S-28F-3(a), pp. 28-30) (D.E. 68-12, pp. 10-13)

On 20 April 2011, Bob Hall, Executive Director of plaintiff Democracy NC testified that race must be taken into consideration in the redistricting process, that discrimination still exists in North Carolina, and that racially polarized voting continues

---

[17] Citations beginning "NC11-S-28F" refer to a portion of the preclearance submission to USDOJ of the enacted Senate Plan dealing with public input. Pages cited herein were attached to Defendants' Response to "Plaintiffs' Undisputed Material Facts" as "Attachment B" in the *Dickson* case.

in some parts of the State. (NC11-S-28F-3(b), pp. 29-31) (D.E. 68-12, pp. 13-16) Toye Shelton, an AFRAM representative, testified that African Americans and other protected groups must be afforded an equal opportunity to participate in the political process. (NC11-S-28F-3(b), pp. 33-37) (D.E. 68-12, pp. 16-20) Terry Garrison, a Vance County Commissioner, urged the legislature to be cognizant of race as they drew districts. (NC 11-S-28F-3(b), pp. 41-44) (D.E. 68-12, pp. 21-24) Lavonia Allison, Chair of the Durham Committee on the Affairs of Black People, testified that racial minorities have faced discrimination in voting, that race must be taken into account when drawing redistricting plans to serve the goal of political participation, and that the VRA requires the General Assembly to draw districts in which minorities are afforded the opportunity to elect a candidate of choice. (NC 11-S-28F-3(b), pp. 71-74) (D.E. 68-12, pp. 25-28) Ms. Allison also drew attention to the fact that African Americans represent 22% of the total population of North Carolina and that fair representation would reflect that with proportional numbers of representatives in the General Assembly. *Id.*

On 28 April 2011, Bill Davis, Chair of the Guilford County Democratic Party, testified that redistricting plans should not undermine minority voting strength. (NC11-S-28F-3(d), pp. 17-20) (D.E. 68-12, pp. 29-32) James Burroughs, Executive Director of Democracy at Home, advised that the legislature was "obligated by law" to create districts that provide an opportunity for minorities to elect candidates of choice. He asked that current minority districts be maintained and that other districts be created to fairly reflect minority voting strength. (NC11-S-28F-3(d), pp. 26-28) (D.E. 68-12, pp. 33-35)

On 30 April 2011, June Kimmel, a member of the League of Women Voters, told the committee that race should be considered when drawing districts and that the legislature must not "weaken" the minority vote to avoid a court challenge. (NC11-S-28F-3(f), pp. 9-12) (D.E. 68-12, pp. 36-39) Mary Degree, the District 2 Director of the NAACP, stated that the legislature was legally obligated to consider race, asked that current majority-minority districts be preserved, and asked that new majority-minority districts be added based upon new census data. (NC11-S-28F-3(f), pp. 17-19) (D.E. 68-12, pp. 44-46) Maxine Eaves, a member of the League of Women Voters, urged that any new plan fairly reflect minority voting strength. (NC 11-S -28F-3(f), pp. 28-31) (D.E. 68-12, pp. 50-53)

On 7 May 2011, Mary Perkins-Williams, a resident of Pitt County, testified that the VRA was in place to give minorities a chance to participate in the political process. She stated that Pitt County African Americans had faced disenfranchisement and that it remained hard for African Americans to be elected in her county. (NC11-S-28F-3(j), pp. 23-26)( D.E. 68-12, pp. 54-57) Taro Knight, a member of the Tarboro Town Council, expressed his opinion that wards for the Town Council drawn with 55% to 65% African American population properly strengthened the ability of minorities to be elected. (NC 11-S-28F-3(j), pp. 40-42) (D.E. 68-12, pp. 58-60)

On 7 May 2011, Keith Rivers, President of the Pasquotank County NAACP, stated that race must be considered, that current majority-minority districts should be preserved, and that additional majority-minority districts should be drawn where possible. (NC11-S-28F-3(k), pp. 9-11) (D.E. 68-12, pp. 61-63) Kathy Whitaker

Knight, a resident of Halifax County, stated that race must be considered to enfranchise all voters. (NC11-S-28F-3(k), pp. 35-37) (D.E. 68-12, pp. 64-66) Nehemiah Smith, editor of the *Weekly Defender,* a publication in Rocky Mount, North Carolina, testified that minorities have faced many obstacles to being involved in the electoral process throughout history. (NC 11-S-28F-3(k), pp. 39-41) (D.E. 68-12, pp. 67-69) David Harvey, President of the Halifax County NAACP, stated that communities in eastern North Carolina are linked by high poverty rates, disparities in employment, education, housing, health care, recreation and youth development, and that these communities have benefitted from majority-minority districts. (NC11-S-28F-3(k), pp. 47-48) (D.E. 68-12, pp. 70-71) On 23 June 2011, Florence Bell, a resident of Halifax County, testified that northeastern North Carolina continued to lag behind in the *"Gingles* factors" including "high poverty rates, health disparities, high unemployment, community exclusion, lack of recreational and youth development and that these are contributing factors to juvenile delinquency, issues of racial injustice, inequality of education and economic development." (NC 11-S-28F-3(m), pp. 97-100) (D.E. 68-12, pp. 72-75)

On May 17, 2011, the co-chairs once again sought input from the Legislative Black Caucus and other interested parties and experts. (*See* 5/17/11 letter from co-chairs to the Honorable Floyd B. McKissick and others) One response was a letter from Professors Michael Crowell and Bob Joyce of the UNC School of Government. In relevant part, Professors Crowell and Joyce advised that North Carolina remained bound by the judgment in *Gingles* and that majority-minority districts should still be established

25

in the counties at issue in *Gingles* including those encompassed by prior versions of CD 1:

**1.     What counties were the subject of a finding of liability under Section 2 of the Voting Rights Act in the case of *Thornburg v. Gingles*, 478 U.S. 30 (1986) ("*Gingles*")?**

In *Gingles* the United States Supreme Court upheld the finding of Section 2 violations in North Carolina's 1982 legislative redistricting plans. The areas where violations were found included: . . . (4) a six-member House district comprising Wake County; and (5) a four-member House district consisting of *Edgecombe, Nash and Wilson* counties. In addition, a Section 2 violation was found in eastern North Carolina in the area where a single-member Senate district had been created consisting of all of *Bertie, Chowan, Gates, Hertford and Northampton counties and parts of Edgecombe, Halifax, Martin and Washington counties* . . . .

Thus the Supreme Court found the three *Gingles* elements - a cohesive minority group, lack of minority success because of racially polarized voting, and the ability to create a reasonably compact minority district - to exist in . . . *in the combined area of Edgecombe, Nash and Wilson counties; and in an area of eastern North Carolina that included Bertie, Chowan, Edgecombe, Gates, Halifax, Hertford, Martin, Northampton and Washington counties.* . . .

**2.     Following *Gingles*, and in all subsequent legislative redistricting plans, has the General Assembly created legislative districts in those counties with a total black population of at least 40 percent or higher?**

We believe the answer is yes but do not have ready access to the documents necessary to confirm our response. The legislative staff can provide a definite answer.

**3.     Has there ever been a judicial ruling modifying, overturning, or vacating the judgment entered in *Gingles*?**

Although there have been numerous court decisions in the quarter century since *Gingles* that elaborate upon its meaning, *Gingles* has not been overturned and remains the principal case defining the elements of a Section 2 violation . . . .

26

The April 1984 trial court order in *Gingles* approved the General Assembly's March 1984 redistricting plan as a remedy for the Section 2 violation but did not specify how long the remedy should remain in effect nor address future redistricting. *Nevertheless it appears to be commonly accepted that the legislature remains obligated to maintain districts with effective African American voting majorities in the same areas as decided in Gingles, if possible.* (emphasis added)

On June 22, 2011, the co-chairs released a joint statement to respond to criticism by Democratic elected officials to a proposed legislative plan released by the chairs on June 21, 2011, which contained only proposed legislative VRA districts. In relevant part, the co-chairs stated that creating majority-black districts would make adjoining districts more competitive for Republican candidates. The co-chairs also noted that the 2001 CD 1 had been found to be "based upon a reasonably compact black population" by a federal court.

On June 23, 2011, Ms. Earls and AFRAM provided an additional submission to the Joint Redistricting Committee. (Rucho Aff. Ex. 12) (D.E. 31-4, pp. 80-84) This submission included a written statement by Ms. Earls and proposed North Carolina Senate and North Carolina House maps. *(Id.;* Map Notebook, SCSJ Senate Plan and SCSJ House Plan) In her statement, Ms. Earls stated that the two SCSJ legislative plans should be considered because they "compl[ied] with the Voting Rights Act." (Rucho Aff. Ex. 12, p. 1) (D.E. 31-4, p. 81) More specifically, Ms. Earls stated that the SCSJ Senate and House Plans complied "with the non-retrogression criteria for districts in counties covered by Section 5 of the Voting Rights Act" and "Section 2 of the Voting Rights Act in Mecklenburg, Forsyth, and Wake Counties." *Id.* The SCSJ Senate map proposed three majority-black or majority-minority coalition districts in counties eventually included in

27

the enacted 2011 CD 1.  The SCSJ House Plan proposed nine majority-black or majority-minority coalition districts in areas eventually included in the enacted 2011 CD 1.

On 18 July 2011, Professor Irving Joyner, representing the NC NAACP, affirmed that racially polarized voting continues to exist in North Carolina. (NC 11-S-28F-3(o), pp. 68-76)) (D.E. 68-12, pp. 76-84)

Other evidence available to the General Assembly suggested the opinions offered by Dr. Block, Dr. Brunell, Ms. Earls, and public hearing witnesses that statistically significant racially polarized voting remained present in these areas of the State where voting rights districts had been enacted, including CD 1.

In 2010, eighteen African American candidates were elected to the State House and seven African American candidates were elected to the State Senate.  (First Frey Aff. Exs. 10, 11; Churchill Aff. Exs. 6, 7) (D.E. 68-10, pp. 14-19)  Two African American candidates were elected to Congress in 2010.  (Churchill Dep. Ex. 81; Churchill Aff. Ex. 1; Second Frey Aff. Ex. 62) (D.E. 76-2; D.E. 68-10, p. 6; D.E. 30-4, p. 13)  All African American incumbents elected to the General Assembly in 2010 or the Congress in 2010 were elected in districts that were either majority-African American or majority-minority coalition districts.  Many of these districts are located in counties that are encompassed by the 2011 CD 1.  (Second Frey Aff. Exs. 34, 39, 60) (D.E. 30-4, p. 11 (Ex. 60))[18]

---

[18] The census categories of "white," "black," "Hispanic," "total black," and "non-Hispanic white" are included for each district with the "stat packs" attached to all of the various plans in the Map Notebook.  The "white" category is without regarding to ethnicity and includes people who are Hispanic or Latino.  The category "Non-Hispanic white" excludes that portion of the population.  (Second Frey Aff. Ex. 34, Notes)

No African American legislative or congressional candidate elected in 2010 was elected from a majority-white crossover district. (Churchill Dep. Exs. 81, 82, 83 [2010 election]; Churchill Aff. Exs. 1-3, 6, 7; Map Notebook Stat Pack 2003 Senate Plan, 2009 House Plan, 2001 Congressional Plan) (D.E. 76-2 (Exh. 81); D.E. 68-10, pp. 6-10, 14-19 (Exs. 1-3, 6, 7)  In fact, two African American incumbent senators were defeated in the 2010 General Election, running in majority-white districts. One of these districts (2003 Senate District 5) was located in counties encompassed by the 2001 and 2011 CD 1. (Churchill Dep. Ex. 82 [2010 Election for SD 5, 2010 Election in Districts with less than 30% Minority Population, SD 24]; Churchill Aff. Ex. 7; Map Notebook, 2003 Senate Plan, Districts 5 and 24 statistics) (D.E. 68-10, pp. 18-19)    From 2006 through 2010, no African American candidate was elected to more than two consecutive terms to the legislature in a majority-white district. (Churchill Dep. Ex. 81 [Congressional Races with Minority Candidates, 1992-2010]; Ex. 82 [Senate Races with Minority Candidates 2006-2010]; Ex. 83 [House Legislative Races with Minority Candidates 2006-2010]; Churchill Aff. Exs. 6, 7) (D.E. 76-2; D.E. 68-10, pp. 14-19). From 1992 through 2010, no black candidate for Congress was elected in a majority-white district. (Churchill Dep. Ex. 81) (D.E.76-2)

From 2004 through 2010, no African American candidate was elected to state office in North Carolina in a statewide partisan election. In 2000, an African American candidate, Ralph Campbell, was elected State Auditor in a partisan election. In 2004, Campbell was defeated by a white Republican, Les Merritt, in a partisan election for state auditor. (Churchill Dep. Ex. 94, 2004 Partisan Elections; *see also Gingles*, 590 F. Supp.

29

at 364-65 (lack of success by black candidates in statewide elections is relevant evidence of legally significant racially polarized voting))[19]

On July 1, 2011, the legislative leadership released its first proposed Congressional Map, known as Rucho-Lewis Congress 1 ("Rucho-Lewis Congress 1") (Fourth Frey Aff. Ex. 7) (D.E. 31-2, pp. 3-12); (Churchill Dep. Ex. 55 [Joint Statement by Senator Bob Rucho and David Lewis ("legislative leaders" or "leaders") Regarding the Proposed Congressional Plan (July 1, 2011) ("1 July 2011 Joint Statement")]) (D.E. 32-1, pp. 26-33)

As evidenced by their joint statement, the legislative leadership considered the following in drawing a 2011 version of CD 1. First, the version of CD 1 in Rucho-Lewis Congress 1 was based on the 2001 version of CD 1. Second, the legislature intended that new Congressional districts should comply with the federal one person, one vote requirement as stated in *Wesberry v. Sanders*, 376 U.S. 1 (1964) and *Karchner v. Daggett*, 466 U.S. 910 (1984). In addition, the new plan must comply with the VRA. To that end, the leaders noted that under *Strickland*, the Supreme Court had recently held that majority-minority districts enacted to protect the State from § 2 liability must be drawn with a majority-black voting age population.

The leaders also explained that the 2001 version of CD 1 was under-populated because of the rapid growth of urban areas and the slower growth of rural areas. Thus,

---

[19] At trial, defendants will offer an expert report submitted by an expert for the NC NAACP in *NC NAACP v. McCrory*, 1:13-cv-658 (Middle District of North Carolina), confirming what everyone accepted during the 2011 legislative process: that racially polarized voting remains very high throughout the State, including the counties encompassed by the 2011 CD 1.

drawing CD 1 into the RTP area would make it less likely that the district would again become substantially under-populated during the 2010-2020 decade and more likely that the configuration would be retained after the 2020 Census. This was also consistent with the strategy of the co-chairs to create multiple congressional districts within North Carolina's urban counties, based upon their opinion that urban counties are best represented by multiple members of congress.

The legislative leaders also explained their intention of continuing the 2011 version of CD 12 as a very strong Democratic district. They explained that one of them (Senator Rucho) had met with Congressman Watt and had agreed to accommodate Congressman Watt's request that the 2011 version of CD 12 be modeled after the 2001 version (as opposed to moving the district from Mecklenburg County to the east as suggested by the USAG in 1991 prior to the *Shaw* cases). Because one of the counties in the District was covered by § 5 (Guilford), the leaders noted their belief that their proposed version of CD 12 would be precleared because the black voting age population was higher than the 2001 version.

After the legislative leaders released Rucho-Lewis Congress 1, Congressman Butterfield and Congressman Watt published their opposition to the plan. (D.E. 32-3; D.E. 32-4) Congressman Butterfield's main complaint was that the Rucho-Lewis Congress 1 version of CD 1 had reduced the number of voters in his district who resided in counties covered by § 5.

On July 7, 2011, a public hearing was held on Rucho-Lewis Congress 1. During this hearing, a witness named Steven Gerontakis objected to the impact of Rucho-Lewis

Congress 1 on population in § 5 counties. He proposed an alternative majority-black district that would be drawn into Durham County rather than Wake County. Under Mr. Gerontakis' proposal, a larger number of persons from § 5 counties would reside in his proposed CD 1 as compared to the version in Rucho-Lewis Congress 1. (D.E. 32-5, pp. 3-8)

On July 19, 2011, the legislative leaders released a new Congressional plan called Rucho-Lewis Congress 2 ("Rucho-Lewis Congress 2"). (Fourth Frey Aff. Ex. 8) (D.E. 31-2, pp. 14-23); (Churchill Dep. Ex. 55 [Joint Statement of Senator Bob Rucho and Representative David Lewis (7-19-11)] p. 1 ("19 July Joint Statement")) (D.E. 32-1, pp. 40-44) Rucho-Lewis Congress 2 addressed Congressman Butterfield's objection by adopting Mr. Gerontakis' suggestion that CD 1 be drawn into Durham County instead of Wake County. This configuration of CD 1 is very similar to the original version of CD 1 enacted in 1991 and approved by the Supreme Court in *Shaw II*. In their 19 July Joint Statement, the leaders explained that their new version of CD 1 was drawn to address criticisms made by Congressman Butterfield and others. By using Durham County instead of Wake County, the Rucho-Lewis Congress 2 version of CD 1 could be drawn to include more population from all of the § 5 counties found in the 2001 version. Moreover, the TBVAP located in § 5 counties in the Rucho-Lewis Congress 2 version of CD 1 exceeded the TBVAP found in the 2001 version.

In their July 19, 2011 Joint Statement, the leaders stated that CD 12 in Rucho-Lewis Congress 2 was based upon the 1997 and 2001 versions and that the 2011 version was again drawn by the legislative leaders as a "very strong Democratic district . . . based

32

upon whole precincts that voted heavily for President Obama in the 2008 General Election." The co-chairs stated that by making CD 12 a very strong Democratic district, adjoining districts would be more competitive for Republicans.

The General Assembly convened in legislative session on Monday, July 25, 2011, for purposes of enacting redistricting plans.[20] On that same date, Democratic leaders released a proposed congressional plan: Congressional Fair and Legal ("Fair & Legal") (*Dickson*, Appendix A, p. 91, F.F. No. 34) (D.E. 100-5, p. 62) Despite prior requests dating back to March 2011, the Fair and Legal Plan was the first congressional plan published by the Democratic members of the General Assembly. The Fair & Legal Plan did not draw CD 1 into RTP or create the district with a majority TBVAP. (Fourth Frey Aff. Ex. 10) (D.E. 31-2, pp. 36-45) Under the 2010 Census, the Fair and Legal Plan was drawn with a TBVAP of 47.82%, and a non-Hispanic white VAP of 46.46%. Democrats represented 66.74% of registered voters with blacks representing 65.66% of all registered Democrats. (Second Frey Aff. Exs. 63 and 67) (D.E. 30-4, pp. 14-18) The Fair and Legal version of CD 12 had a TBVAP of 41.99% with a non-Hispanic white VAP of 41.84%. Hispanics constituted 12.39% of the VAP. Blacks represented 46.54% of all registered voters with whites (including Hispanics) equaling 46.09% of registered voters.

On July 27, 2011, the General Assembly enacted Rucho-Lewis Congress 3 ("Rucho-Lewis Congress 3") as the 2011 Congressional Plan for the State of North

---

[20] On the same date, the Democratic leadership and the Legislative Black Caucus also published proposed legislative plans. Like the SCSJ plans, these plans proposed nine majority-black or coalition house districts in counties included in the 2011 First Congressional District and three majority-black or coalition senate districts in counties encompassed by the 2011 CD 1.

33

Carolina. (*Dickson*, Appendix A, p. 91) (D.E. 100-5, p. 62) Rucho-Lewis Congress 3 was nearly identical to Rucho-Lewis Congress 2 and a variation called Rucho-Lewis 2A, both of which drew CD 1 into Durham County. (Fourth Frey Aff. Exs. 8, 9, 11) (D.E. 31-2, pp. 14-23, 25-34, 47-56)[21]

The voting age population for the 2011 CD 1 was 51.97% "black" and 41.51% white. The TBVAP was 52.15%. Non-Hispanic whites made up 38.52% of the VAP. The TBVAP in the 2011 CD 1 was higher than the TBVAP in the 2001 version by only 3.98%. Registered Democrats constituted 69.79% of the registered voters and blacks constituted 69.29% of the registered Democrats. (Fourth Frey Aff. Ex. 11, pp. 2-4) (D.E. 31-2, pp. 49-51); (Second Frey Aff. ¶¶ 26, 27, Exs. 61, 65) (D.E. 30-4, pp. 8-9, 12, 16)

For the 2011 CD 12 the black voting age population was 49.59%. The TBVAP for this district was 50.66%. Hispanics were 12.08% of the VAP and non-Hispanic whites were 32.92%. Democrats represent 63.93% of all registered voters. African Americans represent 76.26% of all registered Democrats. (Fourth Frey Aff. Ex. 11, pp. 2-4) (D.E. 31-2, pp. 49-51); (Second Frey Aff. Exs. 61, 65) (D.E. 30-4, pp. 12, 16)

## II.     ARGUMENT

### A.     Race was not the predominant motive for either CD 1 or CD 12.

The state court three-judge panel conducted a trial on whether race was the predominant motive for CD 12. The state three-judge court also conducted a trial on whether CD 1 furthered a compelling government interest and was narrowly tailored. It

---

[21] During the legislative debates, Representative Lewis explained the very minor differences between Rucho-Lewis Congress 2 and 2A and Rucho-Lewis Congress 3. (*See* Transcript of Proceedings on July 27, 2011) (D.E. 32-6, pp. 5-6)

entered extensive findings of fact related to these two districts and found that plaintiffs had failed to prove that race was the predominant motive for CD 12. The state court incorrectly assumed, without conducting a trial on the issue, that race was the predominant motive for CD 1, but made findings of fact affirming that the district advanced a compelling interest and was narrowly tailored. (D.E. 74; D.E. 81) Defendants believe that those findings are binding on the plaintiffs. (D.E. 106, pp. 11-12); *See SSIH Equip. S.A. v. ITC*, 718 F.2d 365, 370 (Fed Cir. 1983) ("the law is well settled that the pendency of an appeal has no effect on the finality or binding effect of a trial court's holding"); *See also Ashton v. City of Concord*, 337 F. Supp. 2d 735, 741 (M.D.N.C. 2004) ("Under North Carolina law, a previous judgment will preclude a subsequent action if the first decision was a final judgment on the merits, involving the same parties *or* parties in privity with them, and the same cause of action") (emphasis added). In any case, plaintiffs' claims that race was the predominant motive for either CD 12 or CD 1 are baseless.

The Supreme Court has reiterated that plaintiffs bear the burden of proving that race was the predominant motive for the shape and location of the challenged district and that race is not the predominant motive for a specific district simply because the challenged district was drawn with a "consciousness" of race or has a majority TBVAP. *Vera*, 517 U.S. at 958. Race is the predominant motive *only* when a plaintiff proves that the challenged district "is unexplainable on grounds other than race." *Cromartie II*, 532 U.S. at 242 (quoting *Shaw I,* 509 U.S. at 644).

Assuming plaintiffs prove that race was the predominant motive, "in . . . a reverse-discrimination case, as in any other Equal Protection case, the ultimate burden remains with the plaintiff to demonstrate [the] unconstitutionality of [the] affirmative-action program." *Shaw II*, 861 F. Supp. at 436; 517 U.S. at 910 (quoting *Wygant*, 476 U.S. at 277). This only gives rise to a presumption that the district is unconstitutional. The presumption "shifts" to the State a burden of "'demonstrating' that its use of race was justified by a compelling governmental interest." *Id.* (quoting *Wygant*, 476 U.S. at 293). The State's burden is one of production, not persuasion. *Id.*; *see also Johnson v. Miller*, 864 F. Supp. 1354, 1378-79 (S.D. Ga. 1994), *aff'd*, *Miller v. Johnson*, 515 U.S. 900 (1995). Defendants can meet this burden of production by showing that when the General Assembly enacted a challenged district, it had "a strong basis in evidence" to conclude that the district was reasonably necessary to protect the State from liability under the VRA. *Shaw II*, 517 U.S. at 910; *Vera*, 517 U.S. at 979.[22] Once defendants have shown a strong basis in the legislative record that reasonably supports the creation of a challenged VRA district, they have satisfied their burden of production, and it

---

[22] The strong basis in evidence test resembles the "substantial evidence" standard used by the North Carolina Supreme Court and federal courts to review agency decisions. *See, e.g., N.C. Dep't of Env't and Natural Res. v. Carroll*, 358 N.C. 649, 660, 599 S.E.2d 888, 895 (2004) (applying whole record test and stating that "[s]ubstantial evidence is relevant evidence a reasonable mind might accept as adequate to support a conclusion.") (citations and quotation marks omitted). The term "substantial evidence" means "such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (emphasis added). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. FMC*, 383 U.S. 607, 620 (1966) (internal citations omitted).

36

remains plaintiffs' burden to prove that the challenged district is nevertheless unconstitutional. *Shaw II*, 517 U.S. at 910 (quoting *Wygant*, 476 U.S. at 277).[23]

**1.** **The Supreme Court's decision in *Alabama* supports North Carolina's position on the racial predominance issue.**

In *Alabama*, the Court, relying upon *Shaw I*, and its progeny, including *Miller*, *Shaw II*, *Vera*, and *Cromartie II*, reversed and remanded a decision by the trial court affirming certain majority black districts enacted by the State of Alabama in 2012. The Court held that claims of racial gerrymandering require an evaluation of whether "race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Alabama*, 135 S. Ct. at 1265. The fact that "Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets (mandating all 2012 legislative districts at the same black voting age population or higher than the 2002 districts) above all other districting criteria (save one person, one vote) provides evidence that race motivated the drawing of particular lines in multiple districts . . . ." *Id.* at 1267.[24] But evidence of a legislative statewide goal for VRA districts does not "transform a racial gerrymandering claim about a set of individual districts into a separate, general claim that the legislature racially gerrymandered the State as an undifferentiated 'whole.'" *Id.*

---

[23] The model for analyzing evidence in a racial gerrymander case (if plaintiffs prove that race was the predominant motive) is similar to the formula used by the United States Supreme Court to analyze evidence in employment cases. To meet their burden of production in employment cases, defendants are only required to state a legitimate, non-discriminatory reason for their decision. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 250 (1981).

[24] The "mechanical racial target" was Alabama's legislative decision to keep all majority-black districts at the same or higher super-majority levels of BVAP based upon Alabama's incorrect interpretation of § 5.

The Court also reaffirmed that plaintiffs must prove that race was the "predominant factor motivating the legislature's decision to place a significant number of voters within or without a district." *Id.* at 1270 (citing *Miller*, 515 U.S. at 916). To do so, the "plaintiff must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Id.* Traditional race-neutral districting principles include "compactness, contiguity, *respect for political subdivisions* or communities defined by actual shared interests, . . . *incumbency protection and political affiliation.*" *Id.* (citing *Vera*, 517 U.S. at 914) (emphasis added).[25] The Court then found that the district court's sole reliance on Alabama's equal population criteria as evidence that race did not predominate in the creation of other district was in error.

The United States Supreme Court observed that Alabama's Senate District 26 (BVAP of 72.7%) was "the one district that the parties . . . discussed . . . in depth." *Id.* at 1271. The Court concluded that other than the legislature's rule on equal population, the record contained no evidence that any other neutral redistricting criteria played any role in the construction of this district. While the legislative leaders had adopted criteria stating that districts should follow county lines and be based upon whole precincts, neither criterion was followed in the construction of Senate District 26. *Id.* at 1271-72.

### 2. Plaintiffs cannot show that race was the predominant motive for CD 12.

The 2011 CD 12, just like the 1997 and 2001 versions, was created as a very strong Democratic district. In 2000, the United States Supreme Court ruled that the 1997

---

[25] Traditional or race-neutral redistricting criteria are not constitutionally required. *Shaw I*, 509 U.S. at 647. Instead, neutral redistricting criteria "are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." *Id.*

version of CD 12 was not a racial gerrymander because the 1997 General Assembly had created this district to be a strong Democratic district. Politics and not race was the predominant factor. *Cromartie II*, *supra*. The 1997 and 2001 versions of CD 12 were drawn by a Democratic-controlled General Assembly while the 2011 version was drawn by a Republican-controlled General Assembly. The 2011 version is based upon populations in the same counties used to construct both the 1997 and 2001 versions of CD 12. Over 67% of the population in the 2011 CD 12 had previously been assigned to the 2001 version. (Second Frey Aff. Ex. 31) (D.E. 30-4, p. 10) The 2011 General Assembly accomplished its political goals by moving voters who supported Republican presidential candidate, John McCain, in 2008 out of the district and replacing them with voters in other 2001 congressional districts who supported President Obama. The State used this criteria because the 2011 General Assembly intended to create districts that adjoined the 2011 CD 12 that were better for Republicans than the adjoining versions enacted by Democratic-controlled General Assembly in 1997 and 2001. While the 1997 and the 2001 General Assemblies intended to make CD 12 a strong Democratic district, they also intended to make the districts adjoining CD 12 more favorable for Democrats. Politics was the prime motivation for this district in 1997, 2001, and 2011, but the political interests of the 1997 and 2001 Democratic General Assemblies were different than the Republican General Assembly in 2011.

Other than the fact that there is a high correlation between blacks and those who vote for Democratic candidates, plaintiffs can offer no evidence that race was a factor motivating the legislature's decision on which voters should be included in the 2011 CD

39

12. *Cromartie II*, 532 U.S. at 242. The 2011 CD 12 is therefore not unexplainable on grounds other than race. *Id.* But even assuming plaintiffs could prove that race was the predominant motive, they have failed to offer alternative plans that achieve the political goals of the 2011 Republican-controlled General Assembly. *Id.* Plaintiffs' claims regarding CD 12 are thus completely unfounded.

### 3. Plaintiffs cannot show that race was the predominant factor for CD 1.

Plaintiffs' argument that race was the predominant factor for the district lines of CD 1 is based upon comments by legislative leaders that they intended to create VRA districts with TBVAP in excess of 50% to protect the state from liability under § 2. The Court in *Alabama* clarified that general legislative goals for VRA districts do not prove that race was the predominant motive for a specific district. *Alabama*, 135 S. Ct. at 1270-71. This is because predominant motive cannot be established because a legislature enacted a district with a "consciousness of race" or created a majority-black district to comply with federal law. *Vera, supra.* Moreover, unlike the 70% plus black VAP district at issue in *Alabama*, the North Carolina General Assembly used other criteria besides equal population and race to construct the 2011 CD 1. CD 1 is based upon several legitimate districting principles which were not subordinated to race and the district is not unexplainable but for race.

First, the 2011 version of CD 1 is based upon the core population from the 2001 version. (Second Frey Aff. ¶ 9, Ex. 3) (76% of the population in the 2001 CD 1 is included in the 2011 CD 1) (D.E. 30-4, pp. 5, 10) These persons were not assigned to the district solely because of their race. The 2011 General Assembly used the core of the

"old" district to form the "new" district. Basing a new district on an old district is a traditional and legitimate districting principle. *Karcher,* 462 U.S. at 740.

Second, an exact replica of the 2001 version of CD 1 could not be adopted in 2011 because the 2001 version was under-populated by over 97,000 people. To remedy this deficiency, even the NC NAACP recognized that drawing the district into RTP was a legitimate criteria. The past and future population growth in North Carolina has been and will be more rapid in urban as compared to rural areas. Thus, the legislative leaders decided to draw CD 1 into the RTP area to address the massive under-population of the district not only under the 2010 Census but in the future. Following public hearings, the legislative leaders decided to move the district from Wake County to Durham County to address objections made by an incumbent Congressman and speakers at a public hearing. Accommodating a request from an incumbent regarding the location of his district's lines is another neutral and legitimate redistricting criterion that has nothing to do with race. *Alabama*, 135 S. Ct. at 1263, 1270; *Shaw I,* 509 U.S. at 646-47; *Stephenson I*, 355 N.C. at 371, 562 S.E. 2d at 390 (citing *Gaffney v. Cummings*, 412 U.S. 735, 93 S. Ct. 2321 (1973)).

The legislative leaders also intended to make this district a safer district for the incumbent and any other Democratic candidate. (Churchill Dep. Ex. 55 [1 July 2011 Joint Statement and 19 July 2011 Joint Statement]) (D.E. 32-1, pp. 11-44) Incumbent protection is a legitimate districting principle. *Alabama*, 135 S. Ct. at 1263, 1270; *Vera*, 517 U.S. at 964-65; *Stephenson I*, 355 N.C. at 371(citing *Gaffney*, 412 U.S. at 735). The legislative leaders also understood and intended that districts adjoining majority black

districts would become more competitive for Republicans. (Churchill Dep. Ex. 55, 22 June 2011 Joint Statement, p. 4) Partisan advantage is also a legitimate redistricting principle. *Alabama*, 135 S. Ct. at 1263, 1270; *Vera*, 517 U.S. at 964-65, 968. This evidence demonstrates that several legitimate redistricting criteria reasons other than race were used to assign voters to this district. Defendants are entitled to judgment in their favor without regard to whether this district furthers a compelling interest.

### B.     The evidence shows that the 2011 CD 1 serves a compelling governmental interest and is narrowly tailored.

### 1.     Districts based upon race survive strict scrutiny when a state has "good reasons" to believe that such districts protect the state from liability under the VRA.

Even assuming plaintiffs could prove that race was the predominant factor for CD 1, defendants are still entitled to a judgment affirming this district. In *Alabama*, the Supreme Court clearly held that a state has a compelling reason for using race to create districts that are reasonably necessary to protect the state from liability under the VRA. *Alabama*, 135 S. Ct. at 1272-73.[26] However, the Court ruled that the district court had erred in approving the only district evaluated by the Supreme Court (Alabama's Senate District 26) under § 5 because Alabama did not provide a strong basis in evidence to support the creation of a super-majority black district with black VAP in excess of 70%. Section 5 does not mandate super-majority districts but instead only requires that states adopt racial percentages for each VRA district needed to "maintain a minority's ability to

---

[26] The *Alabama* Court only considered the test for evaluating race-based districts under § 5. It did not modify any of its prior decisions regarding how a compelling interest may be established under § 2 and it expressly did not overrule either *Vera* or *Strickland*.

elect a *preferred candidate of choice*." *Id.* (emphasis added). The Alabama legislature's policy of maintaining super-majority black districts had no support in applicable case law and represented an improper "mechanically numerical view as to what constitutes forbidden retrogression." *Id.* at 1272. Alabama cited no evidence in the legislative record to support the need for super-majority districts. Therefore, the Court found it unlikely that the ability of African-American voters to elect their preferred candidate of choice could have been diminished in this district if the percentage of BVAP had been reduced from a super-majority of over 70% to a lower super-majority of 65%. *Id.*at 1272-74.[27]

The Court qualified its ruling by stating that it was not "insist[ing] that a legislature guess precisely what percentage reduction a court or the Justice Department might eventually find to be retrogressive." *Id.* at 1273 This is because "[t]he law cannot insist that a state legislature, when redistricting, *determine precisely what percent minority population § 5 demands*." *Id.* (emphasis added). Federal law cannot "lay a trap for an unwary legislature, condemning its redistricting plan as either (1) unconstitutional racial gerrymandering should the legislature place a few too many minority voters in a districts or (2) retrogressive under § 5 should the legislature place a few too few." *Id.* at 1274 (citing *Vera*, 517 U.S. at 977).

Based upon these concerns, the Court held that majority-black districts would survive strict scrutiny, including any narrow tailoring analysis, when a legislature has "a

---

[27] Neither the *Alabama* plaintiffs nor the Court criticized VRA districts that were majority-minority with BVAP percentages in the low 50% range.

strong basis in evidence in support of the race-based choice it has made." *Id.* at 1274 (citations omitted). This standard of review "does not demand that a State's action actually is necessary to achieve a compelling state interest in order to be constitutionally valid." *Id.* Instead, a legislature "may have a strong basis in evidence to use racial classifications in order to comply with a statute when they have *good reasons* to believe such a use is required, even if a court does not find that the actions were necessary for statutory compliance." *Id.* (emphasis in original). Nothing in the legislative record explained why Senate District 26 needed to be maintained with a BVAP in excess of 70% as opposed to a lower super-majority-minority percentage. Therefore the Court could not accept the district court's conclusion that District 26 served a compelling governmental interest or was narrowly tailored. *Id.* at 1273-74.[28]

---

[28] Unlike North Carolina, Alabama did not argue that politics played any role in the districts challenged in that case. Thus, nothing in *Alabama* changes the test for districts that are defended based upon partisan considerations. Nor did any of the plaintiffs in *Alabama* argue that § 5 required states to create districts that allowed the minority group to elect their candidate of choice with a non-majority BVAP percentage. Nor did Alabama defend its majority-black districts from claims of racial gerrymandering on the ground that the challenged districts were reasonably necessary to protect the State from liability under § 2. In constructing its districts, Alabama did not rely upon testimony by experts and many lay witnesses on racially polarized voting or prior court decisions requiring or affirming § 2 districts. Finally, the *Alabama* decision did not reverse the Court's prior holdings that racial gerrymandering is not established merely because "redistricting is performed with consciousness of race." *Vera*, 517 U.S. at 958; *Shaw I*, 509 U.S. at 646. Thus, plaintiffs still cannot prove a racial gerrymander merely by showing that race was "a motivation for drawing the majority-minority district," but instead must continue to prove that race was "the predominant factor" and that the district "is unexplainable on grounds other than race." *Cromartie II*, 532 U.S. at 241-42 (citations omitted).

### 2. The legislative record contained a strong basis in evidence that racially polarized voting continues to exist in the areas encompassed by CD 1.

In *Dickson*, the state court made extensive findings that the legislative record provided a strong basis for the General Assembly to conclude that racially polarized voting continues to exist in the area of the State encompassed by the 2011 CD 1. (*Dickson*, App. A., pp. 77-91, F.F. No. 1-35); (*Dickson*, App. A., pp. 92-95, F.F. No. 36a-h, pp. 155-57, F.F. Nos. 165-71). Defendants have cited much of the evidence relied upon by the state court to affirm the 2011 CD 1. *See supra at* pp. 14-34.

In prior briefs filed in this case, plaintiffs argued that the state violated strict scrutiny by raising the TBVAP of the 2011 CD 1 to a majority level (and just a few percentage points higher than the 2001 CD 1). Plaintiffs contended that racially polarized voting could not be present in the 2001 CD 1 because it was "majority-white." While this is not an accurate description of the 2001 CD 1, racially polarized voting can still exist in a majority-white district. *Cromartie II*, 133 F. Supp. at 423. For example, almost all of the multi-member districts in *Gingles* were majority-white. Several were found illegal even though a few black candidates in those districts had experienced some electoral success. *Gingles, supra* (reversing only the district court's finding regarding House District 23 in Durham County).

In any case, no prior version of CD 1 was a "majority-white" district. All prior versions were majority-black in total population and majority-minority coalition districts in VAP. By the time of the 2010 Census, African Americans were a majority of all registered voters in the 2001 CD 1. Non-Hispanic whites have never been in the majority in past versions and none of the past versions were majority-white crossover districts.

45

Thus, contrary to plaintiffs' argument, whites have never been able to vote as a bloc to defeat the African-American candidate of choice because non-Hispanic whites have never enjoyed majority status in CD 1.

Nor does the fact that black incumbents have won in the district since 1992 prove the absence of racially polarized voting. Collectively, the two experts who submitted reports to the General Assembly found the existence of racially polarized voting in all of the counties encompassed by the 2011 CD 1. (*Dickson,* App. A., pp. 81-85, 92-95, F.F. No. 10-21, 36 f and g) (D.E. 100-5, pp. 52-56, 63-66)[29] Their findings were consistent with the twenty-year history of CD 1 being established as a § 2 VRA district. Further, it is undisputed that the incumbent for CD 1 has won elections by margins that were less than the amount by which CD 1 was underpopulated in 2010. The Court's decision in *Strickland* allows North Carolina to use a benchmark of over 50% black voting age population to account for the impact of incumbency and issues like under-population. The Court in *Strickland* recognized that states should not be required to determine the "right type" of white voters that needed to be included in a district so that minority voters can still "control" the election with some unspecified percentage of the voting age population (presumably determined by expert witnesses) under 50%. The decision in *Alabama* re-affirmed that North Carolina is not required to establish the 2011 CD 1 with the exact right percentage of black VAP.

---

[29] Counsel for the NC NAACP stated that Dr. Block's report demonstrated "significant levels" of racially polarized voting.

Nor did North Carolina adopt a "mechanical" legislative rule to determine the percentage of black VAP to include in CD 1. Instead, North Carolina followed a benchmark for § 2 districts set by the United States Supreme Court. In *Strickland*, the Supreme Court held that establishing a bright line majority benchmark for a § 2 district provides a judicially manageable standard for courts and legislatures alike. It also relieves the State from hiring an expert to provide opinions on the minimum black voting age population needed to create a district that could be controlled by black voters. *Strickland*, 556 U.S. at 17. Any such expert would have to predict the type of white voters that would need to be added to or subtracted from a district (to comply with one person, one vote) who would support the minority group's candidate of choice, the impact of incumbency, whether white voters retained in the district would continue to support the minority group's candidate of choice after new voters were added, and other "speculative" factors. *Id.* The holding in *Strickland* is consistent with the holding in *Alabama* that legislatures are not obligated to create majority black districts with the exactly correct percentage of black voting age population. *Alabama*, 135 S. Ct. at 1272-74. The State court in *Dickson* made specific factual findings regarding CD 1 related to all of these points. (*Dickson*, App. A, F.F. Nos. 6, 7, 165, 166-67, 169, 170) (D.E. 100-5, pp. 50-51, 126-28) Based upon the foregoing, plaintiffs cannot show that the General Assembly lacked a strong basis in evidence or good reasons to conclude that a VRA district should be re-enacted in 2011 because racially polarized voting remained present in the areas encompassed by the 2011 CD 1.

### 3. The legislative record contains a strong basis for concluding that CD 1 is based upon a reasonably compact African American population.

Plaintiffs cannot cite a case that provides a definition of compactness nor can they give the court a judicially manageable standard for finding CD 1 to be non-compact. For example, plaintiffs contend that the 2011 CD 1 is less compact than the 2001 version because of a test that measures "dispersion compactness," known as the Reock test. Plaintiff's Expert Report of Stephen Ansolabehere ("Pl. Exp. Rep.", Table 1) (D.E. 18-1a, p. 5). "Dispersion compactness" measures the geographic dispersion of a district. *Id.*; *Cromartie II*, 133 F. Supp. at 415 n. 4.

In *Cromartie II*, the district court found that the 1997 version of CD 1 satisfied the "compactness" element of *Gingles* with a dispersion or Reock score of 0.317. Plaintiffs' expert reports a Reock score of .390 for the 2001 version of CD 1 and a score of .294 for the 2011 version. Plaintiffs do not explain, nor do they cite a case that explains, why a score of .390 is compact while a score of .294 is not. Nor do they explain how the 1997 version could be legally compact with a score of .317 while the score of .294 is not legally compact (only .023 lower than the "compact" 1997 version).

This dilemma demonstrates why a court should hesitate before finding a VRA district to be "uncompact" because of a mathematical compactness test. *Karcher*, 462 U.S. at 756 (compactness requirements are of little use because of vague definitions and imprecise application). Defendants are aware of no cases, federal or state, that define the term "compact" or establish a judicially manageable standard by which a legislative or a court could use to measure legally acceptable compactness. In *Dickson*, plaintiffs'

expert, Dr. Ted Arrington, explained the problems with mathematical compactness tests as follows:

> Courts and reformers often cite compactness as a valuable technical criterion in redistricting, but scholars do not think it should be a priority. One problem is that there are many different and partially conflicting ways to measure the compactness of a district or a district plan. And there can be no mathematical standard of compactness that can be applied across varying geography in a way that equal populations can have a mathematical standard. The most one can say is that with the use of a particular statistic, one redistricting plan for a particular jurisdiction has more or less compact districts than another plan for the same jurisdiction. But there is no standard that can tell us whether the districts in a plan are compact enough.

(Arrington Dep. p. 142-43) (D.E. 104-9, pp. 9-10)

Dr. Ted Arrington is an expert on redistricting and the legal requirements for districts. He is often hired by the United States Department of Justice to draw proposed districts that comply with the VRA and any restrictions imposed by *Shaw I* and *Shaw II*. Instead of a mathematical compactness test, Arrington relies upon an "interocular test" to determine whether a district is too irregular. Under Dr. Arrington's "interocular test," there is no meaningful difference between the shapes of the 2011 CD 1, the 1997 and 2001 versions, or all of the 2011 alternatives. (*See* Fourth Frey Aff. Exs. 2, 5, 6, 10, 11) (D.E. 31-1, pp. 11-13, 25-34, 36-45; D.E. 31-2, pp. 34-45, 47-56) In any case, plaintiffs' own evidence shows that the Reock score for the 2011 CD 1 is not dramatically different from the 1997 or the 2001 versions.

49

**4. The amended version of § 5 provided North Carolina with good reasons to draw CD 1 as a majority black district.**

Plaintiffs' arguments that the 2011 CD 1 is not narrowly tailored ignore the 2006 amendments to § 5. North Carolina had "good reasons" under § 5 to create CD 1 (which includes 21 § 5 counties) with a TBVAP in excess of 50%, even though this resulted in a slight increase of the TBVAP as compared to the 2001 version. Plaintiffs' expert in *Dickson*, Dr. Arrington, conceded that he has been instructed by USDOJ to draw exemplar districts in § 5 proceedings with a TBVAP in excess of 50% to avoid any dispute on whether § 5 should be construed as requiring majority-black districts because of the definition given to "candidate of choice" by the Court in *Strickland*. (Arrington Dep. pp. 108-14, 191, 216-17) (D.E. 104-9, pp. 4-6, 14, 20-21)[30] Good reasons for creating CD 1 as a majority black district surely exist under § 5, where even the Justice Department draws districts covered by § 5 with a majority black VAP.[31]

### III. CONCLUSION

For all of the reasons stated above, plaintiffs' claims should be dismissed.

---

[30] All of the districts challenged in *Alabama* were already majority-black districts under the 2001 Plan. None of the *Alabama* plaintiffs argued that these districts should have been established in 2012 as coalition districts.

[31] It is a standard principle of statutory construction for terms within the same statute to be given the same meaning. *Sorenson v. Sec'y of the Treasury,* 475 U.S. 851, 860 (1986) ("identical words used in different parts of the same act are intended to have the same meaning"). In *Strickland,* the United States Supreme Court held that, under § 2, districts drawn to give a minority group an equal opportunity to elect "their candidate of choice," must be created with a majority of the minority groups' voting age population. Under the standard rule of statutory construction, it is irrational to give the words "candidate of choice" under § 5 a different interpretation than "candidate of choice" under § 2.

Case 1:13-cv-00949-WO-JEP   Document 110   Filed 09/21/15   Page 50 of 52

Respectfully submitted this 21st day of September, 2015.

NORTH CAROLINA DEPARTMENT OF JUSTICE

By: /s/ Alexander McC. Peters
Alexander McC. Peters
Senior Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
*Counsel for Defendants*


OGLETREE, DEAKINS, NASH SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr
N.C. State Bar No. 10871
Phillip J. Strach
N.C. State Bar No. 29456
Michael D. McKnight
N.C. State Bar No. 36932
thomas.farr@ogletreedeakins.com
phil.stach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Co-counsel for Defendants*

51

<u>**CERTIFICATE OF SERVICE**</u>

I, Thomas A. Farr, hereby certify that I have this day electronically filed the foregoing **DEFENDANTS' TRIAL BRIEF** with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

PERKINS COIE LLP

Kevin J. Hamilton
Khamilton@perkinscoie.com
William B. Stafford
Wstafford@perkinscoie.com
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099

John M. Devaney
JDevaney@perkinscoie.com
Marc E. Elias
MElias@perkinscoie.com
Bruce V. Spiva
BSpiva@perkinscoie.com
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
MElias@perkinscoie.com

*Attorneys for Plaintiff*

POYNER SPRUILL LLP
Edwin M. Speas, Jr.
espeas@poynerspruill.com
John W. O'Hale
johale@poynerspruill.com
Carolina P. Mackie
cmackie@poynerspruill.com
301 Fayetteville St., Suite 1900
Raleigh, NC 27601

*Local Rule 83.1*
*Attorneys for Plaintiffs*

This the 21st day of September, 2015.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr (N.C. Bar No. 10871)
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: 919.783.9412
thomas.farr@odnss.com

*Counsel for Defendants*

22446204.1