```
 1                IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF NORTH CAROLINA
 2
   DAVID HARRIS, CHRISTINE       )
 3 BOWSER, and SAMUEL LOVE,      ) Greensboro, North Carolina
                                 ) October 13, 2015
 4      Plaintiff,               ) 9:01 a.m.
                                 )
 5      vs.                      )
                                 )
 6 PATRICK MCCRORY, in his       )
   capacity as Governor of North ) Case No. 1:13CV949
 7 Carolina, NORTH CAROLINA STATE)
   BOARD OF ELECTIONS, and JOSHUA)
 8 HOWARD, in his capacity as    )
   Chairman of the North Carolina)
 9 State Board of Elections,     )
                                 )
10      Defendants.              )
   _____)
11
12       TRANSCRIPT OF BENCH TRIAL VOLUME I OF III HELD BEFORE
     THE HON. WILLIAM L. OSTEEN, JR., UNITED STATES DISTRICT JUDGE
13      THE HON. MAX O. COGBURN, JR., UNITED STATES DISTRICT JUDGE
         THE HON. ROGER L. GREGORY, UNITED STATES DISTRICT JUDGE
14
15 APPEARANCES:
16 For the Plaintiff:   KEVIN J. HAMILTON
                        Perkins Coie, LLP
17                      1201 Third Ave., Ste. 4900
                        Seattle, WA 98101-9741
18
                        EDWIN M. SPEAS , JR.
19                      JOHN WARD O'HALE
                        Poyner Spruill, LLP
20                      POB 1801
                        Raleigh, NC 27602-1801
21
   For the Defendant:   THOMAS A. FARR
22                      PHILLIP JOHN STRACH
                        Ogletree Deakins Nash Smoak & Stewart
23                      POB 31608
                        Raleigh, NC 27622
24
25
```

1  APPEARANCES, CONTINUED:

2  For the Defendant:    **ALEXANDER MCCLURE PETERS**
                         N.C. Department of Justice
3                        POB 629
                         Raleigh, NC 27602-0629

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22 Court Reporter:       Joseph B. Armstrong, RMR, FCRR
                         324 W. Market, Room 101
23                       Greensboro, NC  27401

24            Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.

25

```
 1                    I N D E X

 2                                              PAGE

 3    Opening statement by Mr. Hamilton           6

 4    Opening statement by Mr. Farr              19

 5
      WITNESSES FOR THE PLAINTIFF:
 6
      DANIEL BLUE
 7        Direct Examination By Mr. Speas         40
          Cross-Examination By Mr. Strach         64
 8
      MELVIN WATT
 9        Direct Examination By Mr. Speas        100
          Cross-Examination By Mr. Farr          114
10        Redirect Examination By Mr. Speas      153

11    G.K. BUTTERFIELD
          Direct Examination By Mr. Speas        156
12        Cross-Examination By Mr. Peters        175
          Redirect Examination By Mr. Speas      204
13        Recross-Examination By Mr. Peters      206

14    DAVID PETERSON
          Direct Examination By Mr. Speas        208
15        Cross-Examination By Mr. Strach        233
          Redirect Examination By Mr. Speas      252
16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>P R O C E E D I N G S</u> |
| 2 | (At 9:01 a.m., proceedings commenced.) |
| 3 | JUDGE OSTEEN:  All right.  Good morning, everyone. |
| 4 | All the lawyers know who everyone is, but just so that |
| 5 | everybody understands, Judge Gregory, being the gentleman that |
| 6 | he is, is seated to my right.  It will be the only time that |
| 7 | I'm seated in the middle of a panel with Judge Gregory seated |
| 8 | to my right, and Judge Cogburn is to my left. |
| 9 | So we'll go -- we'll calling for trial |
| 10 | Case No. 13CV949, Harris, et al., versus McCrory, et al.  So |
| 11 | I'll start with the plaintiffs.  If you will, just state for |
| 12 | the record who is seated at counsel table at this point. |
| 13 | MR. HAMILTON:  Good morning, Your Honor.  Kevin |
| 14 | Hamilton for the plaintiffs.  With me today is he Eddy Speas to |
| 15 | my immediate right, and to his right John O'Hale representing |
| 16 | the plaintiffs. |
| 17 | JUDGE OSTEEN:  All right.  And the plaintiffs are |
| 18 | ready to proceed? |
| 19 | MR. HAMILTON:  We are, Your Honor. |
| 20 | JUDGE OSTEEN:  All right.  Mr. Farr? |
| 21 | MR. FARR:  Thank you very much, Your Honor.  We |
| 22 | appreciate you being here today.  My name is Tom Farr.  I'm |
| 23 | from the Raleigh office of Ogletree Deakins.  With me is Alex |
| 24 | Peters.  He's from the North Carolina Attorney General's |
| 25 | Office.  Next to Mr. Peters is Phil Strach, who is my law |

partner at Ogletree Deakins, and at the far end of the table is our ace, super duper paralegal Philen Alexander who we've stolen from the Charlotte office and made him be here today even though he has more interesting things and more pleasurable things to do in Charlotte.

JUDGE OSTEEN: All right. Well, welcome everyone. And defendants are ready to proceed, Mr. Farr?

MR. FARR: Yes, we are, Your Honor.

JUDGE OSTEEN: All right. Well, we will proceed ahead with this hearing. Yesterday, the parties filed a stipulation. I think all of us have seen that and reviewed that. As I indicated at this point in time, we are denying the motion to stay without prejudice.

We have two motions in limine that are pending. We will address those briefly further once we get to that expert testimony, and at this point I anticipate that we will be -- whether you want to call it denying the motion in limine without prejudice or reserving judgment on it, we will probably go ahead and hear the testimony in its entirety subject to whatever objections remain. We'll discuss that further when the experts are called.

Will either one of those experts be called today, do you think, Mr. Hamilton?

MR. HAMILTON: It's possible that Dr. Ansolabehere might be called by the end of the day. It's possible.

1          JUDGE OSTEEN:  Okay.  Well, we'll see how we get

2     along.  Once you get ready to call one of those experts, we'll

3     talk about procedures related to that at that particular time.

4          All right.  The parties may proceed with their

5     opening statements.  The plaintiff is recognized.

6     Mr. Hamilton?

7          MR. HAMILTON:  Thank you, Your Honors.  And for the

8     record, it's Kevin Hamilton again.  I appear on behalf of the

9     plaintiffs in this litigation, David Harris and Christine

10    Bowser.

11         The Equal Protection Clause of the Fourteenth

12    Amendment forbids race-based redistricting absent a compelling

13    state interest, and even then only when narrowly tailored to

14    meet that state interest.  The evidence will show that in 2011

15    the North Carolina General Assembly used race as the

16    predominant factor in drawing North Carolina's 1st and

17    12th Congressional District, had no compelling state interest

18    for doing so, and in all events failed to narrowly tailor those

19    districts to that state interest.

20         The evidence will show that the General Assembly

21    manipulated these districts by moving voters in and out of the

22    districts based on the color of their skin.  With respect to

23    CD 1, the 1st Congressional District, racial predominance is

24    really not in serious dispute.  The General Assembly increased

25    the number of African-Americans in the district with the

express goal of creating a majority-black district, what they
called a Voting Rights Act District, all on the theory that
doing so is somehow required by the Voting Rights Act.  There's
no dispute what was going on here.  The defendants baldly admit
their purpose was to increase the black voting-age population
to 50 percent plus one or higher.

          With respect to the 12th Congressional District, the
General Assembly drew the district to include the heavily
African-American population of Guilford County on the theory
that doing so was required by Section 5 to prevent
retrogression.  Again, this was hardly a secret.  The
legislators explained that they drew the proposed 12th
Congressional District, and I quote, At a black voting-age
level that is above the percentage of black voting-age
population found in the current district to ensure
preclearance, closed quote, under Section 5 of the Voting
Rights Act.  That's Plaintiff's Exhibit 68.

          The evidence plaintiffs will put before the Court
come from the mouths of the defendants themselves, their
emails, their statements on the floor of the General Assembly,
their documents.

          In addition, plaintiffs will call several witnesses.
First this morning, Senator Dan Blue, a member of the General
Assembly, who observed firsthand the enactment of this flawed
plan, will testify.  The current incumbents in both of these

1    two districts, Representative Watt and Representative

2    Butterfield, will testify.  Both of them opposed the plan as

3    did the entire Black Caucus in the General Assembly, and both

4    of them informed the defendants that the plan was legally

5    flawed and unnecessary as a practical matter.

6              And we will present two expert witnesses.  The first

7    is Dr. David Peterson, and the second is Dr. Steven

8    Ansolabehere.  Dr. Peterson analyzed precincts on the borders

9    of these districts in the *Cromartie* litigation in 2000 here in

10   North Carolina, and the Supreme Court specifically discussed

11   and relied on his analysis in its decision in that case in

12   finding that race did not predominate in the construction of

13   the districts at that time.  Dr. Peterson will repeat his

14   analysis here but reaches the opposite conclusion using the

15   same methodology, but different data.  And then finally,

16   Dr. Ansolabehere will testify using several different analyses

17   that race predominated in the drawing of these districts.

18             Together, the evidence will show that race, not

19   politics, was the predominant purpose of this redistricting

20   plan from start to finish and that neither district was

21   narrowly tailored to achieve a compelling state interest, and,

22   as a result, the plans necessarily fail constitutional muster

23   and must be invalidated.

24             Now, I know the Court has already had the benefit of

25   the parties' briefing in the trial brief before the proceeding

got started, so rather than repeat or do a dramatic recitation
of the trial brief that you've already read, I thought I would
just emphasize a couple of -- a handful of key facts that we
believe will be clear from the record and will be established
during the course of the trial.

First, the evidence will show that the incumbent
representatives in the 1st and 12th Congressional Districts
were safe in winning re-election by large margins of victory.
In the jury box, we've blown up the table showing the election
results and the black voting-age population.  We'll also be
showing that on the screen during the course of the trial
showing the black voting-age population and then the election
results, the winning margin.

Congressional District 1 was first drawn in its
present configuration in 1992.  Between 1997 and 2001, the
black voting-age population fell below 50 percent.  It has
remained below 50 percent since that time until -- all the way
up until this redistricting exercise.  CD 12 is similar.  From
1997 to 2011 it had a black voting-age population well below
50 percent.

Yet, despite the fact that neither district was a
majority African-American district, African-American candidates
of choice easily and consistently won re-election in an
unbroken string of clear and overwhelming electoral victories.
How did that happen?  It happened because white voters crossed

over to vote with African-American voters to elect those

candidates.  It's simple now.  That's what happened.  And

that's a terrific result, and that's one we should all be proud

of and applaud.

        But rather than applaud this post racial success in

these two districts where white and black voters united to

elect candidates of choice, the North Carolina General Assembly

chose instead to dismantle both districts and to sort voters by

the color of their skin packing black voters into CD 1 and

CD 12 and astonishingly now stand before this Court and assert

that the Voting Rights Act, of all things, somehow required

dismantling these two districts sorting voters by race and

creating black and white electoral districts.  To put it

delicately, that's a decidedly odd reading of the Voting Rights

Act of 1965.

        Second, the record will demonstrate that neither

district has been challenged under the Voting Rights Act at any

point in the last 20 years, not once.  Both districts have been

consistently precleared pursuant to Section 5 of the Voting

Rights Act, and neither has been the subject of a lawsuit under

Section 2.  In fact, the evidence will show there's been no

state-wide redistricting Section 2 lawsuit filed in over three

decades in this state, and for good reason.  As the historical

record vividly demonstrates, white and blacks in these

districts have voted for the same candidate in numbers

1    sufficient to elect the African-American candidate of choice.

2            In other words, in the words of *Gingles*, the white

3    majority did not, quote, vote as a bloc to the African-American

4    candidates of choice, closed quote.  Precisely the opposite

5    happened.  Significant crossover voting supporting

6    African-American preferred candidates occurred.  On such a

7    record, there's really no credible argument that baldly

8    increasing the black voting-age population levels of these

9    districts is somehow required to avoid liability.

10           Third, the evidence will show that the General

11   Assembly used a mechanical 50 percent black voting-age

12   population floor in drawing these two districts.  The evidence

13   is clear, direct, and undisputed.

14           With respect to CD 1, defendants baldly admit their

15   goal of achieving a racial threshold of 50 percent black

16   voting-age population.  Senator Rucho and Representative Lewis

17   labeled CD 1 a "VRA district" and explicitly instructed

18   Dr. Hofeller to draw the district to increase the black

19   voting-age population to more than 50 percent.  The point's

20   critical, and the point is entirely undisputed.  Dr. Hofeller

21   will admit it from the stand.

22           With respect to CD 12, Senator Rucho and Lewis

23   conceded that it was not what they called a "VRA district," but

24   they pointed to Guilford County, which is a covered

25   jurisdiction under Section 5, or was a covered jurisdiction

1  under Section 5 of the Voting Rights Act, as a reason to ensure

2  that the existing black voting-age populations in the district

3  be maintained or increased.  This is plain constitutional

4  error.  That score is now settled beyond dispute by the Supreme

5  Court's recent decision last year in the *Alabama* case which

6  flatly condemned the use of such mechanical racial targets and

7  by the recent decision in the United States District Court for

8  the Eastern District of Virginia decided just last year in *Page*

9  *versus Virginia State Board of Elections* which similarly struck

10 down the use of a 55 percent black voting-age population

11 threshold for Virginia's Third Congressional District.

12       But even if the direct evidence were not so clear and

13 undisputed, the circumstantial evidence makes clear what's

14 going on.  Both districts -- and I've blown up easels.  Here is

15 CD 1, and there is CD 12 -- make a mockery of traditional

16 redistricting principles.  Whether measured by split counties

17 or split VTDs or highly irregular shapes, you can take a look

18 what's called the "interocular test" and see that these are

19 unusually shaped districts.

20       Fourth, although Senator Rucho and Representative

21 Lewis pointed to the Supreme Court's decision in *Strickland*

22 *versus Bartlett* as requiring at least 50 percent BVAP, that's

23 the explanation, to be clear, that the defendants will offer

24 that *Strickland* somehow required this.  The case doesn't say

25 anything of the sort.  *Strickland* was a badly splintered

1  Supreme Court decision.  The plurality opinion only had three

2  justices sign on to it, and those three justices explicitly

3  recognized that where, as here, there's substantial crossover

4  voting, it is, by definition, impossible to establish liability

5  under Section 2 because of the absence of racially polarized

6  voting sufficient to defeat the African-American candidate of

7  choice from being elected.  How do we know that's not existing

8  here?  Those tables are a vivid testament to that, 20 years of

9  African-Americans every year being elected year after year.

10         The Court went out of its way in *Strickland* to point

11  out the irony if the Voting Rights Act interpreted to entrench

12  racial differences.  Here's what they said, quote:  Crossover

13  districts are by definition the result of white voters joining

14  forces with minority voters to elect their preferred candidate.

15  The Voting Rights Act was passed to foster this cooperation,

16  closed quote.  The statute most assuredly does not require

17  balkanization of voters on the basis of race, particularly

18  where, as here, there is no evidence of racial bloc voting that

19  would deny minority voters the opportunity to elect the

20  candidate of their choice.

21         Fifth, the evidence will show that 50 percent black

22  voting-age rule predominated over all other criteria, save one

23  man, one vote, one person, one-vote.  Defendants apparently

24  intend to present evidence that they considered political

25  factors in drawing these maps, and they may well have done so,

but only after satisfying the nonnegotiable goal of creating

majority minority districts.  It was hardly an accident that

both of these districts ended up above 50 percent black

voting-age population.  That was the whole point of the

exercise.

        Dr. Hofeller will testify that he considered black

voting-age population levels when drawing CD 1, but he will

also testify that as to CD 12 he only used the 2008

presidential election results to draw CD 12, and he used those

results in order to favor Republicans and disfavor Democrats.

But using a racially charged election involving the first

African-American major party candidate for the United States

presidency in US history, if you use that as the measuring

stick, that hardly shelters what's going on here.  The 2008

presidential election results in CD 12 were much more closely

coordinated with race than party affiliation as

Dr. Ansolabehere will testify.

        Sixth, the evidence will show that the defendants

cannot identify a compelling state interest to justify the use

of race in drawing these districts.  Defendants contend that

the General Assembly's alleged goal of complying with Section 2

and Section 5 of the Voting Rights Act justified its use of

race in drawing these districts, but the only way to survive

strict scrutiny since the Supreme Court's decision in *Miller*

*versus Johnson* is to ensure that the plans were actually -- is

1    to prove that the plans were actually required by Section 5.

2           But there's no plausible argument here that either

3    Section 2 or Section 5, properly interpreted, required a

4    50 percent black voting-age population.  There's no safe

5    harbor, as the defendants like to say.  Both of these districts

6    were already performing for minority preferred candidates with

7    large winning majorities.  There was no need to increase those

8    to levels that would be embarrassing to even Eastern European

9    dictators.

10           The question under Section 5 is whether there's been

11   retrogression, that is, whether the proposed plan would reduce

12   minority voters' effective ability to elect candidates of their

13   choice.  It most assuredly does not command a state to match,

14   much less significantly increase, the preexisting level of

15   minority population without regard to the minority communities'

16   actual ability to elect.  If that's what the General Assembly

17   thought or was advised, it was just wrong.

18           If the Supreme Court's decision last year in *Alabama*

19   means anything, it means that this is a district-specific

20   analysis and mechanical, numerical thresholds are forbidden.

21   The burden is on the state to establish that it had a strong

22   basis in evidence -- that's the quote -- strong basis in

23   evidence for believing that Section 5 required it to draw these

24   districts with this level of black voting-age population; and

25   in the absence of such a showing, the plan necessarily fails

 1    the strict scrutiny analysis.  Here, the defendants will fail

 2    in that showing.

 3         Defendants claim that racially polarized voting

 4    exists generally in North Carolina, but that certainly doesn't

 5    establish racially polarized voting in these two specific

 6    districts; and, as *Alabama* teaches, this is an analysis that is

 7    district-specific, not state-wide.  That's the whole reason for

 8    the reversal in *Alabama*.  The analysis there was done on a

 9    state-wide level, and the Court reversed and said you can't do

10    it that way.  It's done state-wide, done with a flat black

11    voting-age population threshold.

12         In the absence of such a district-specific analysis,

13    it's simply impossible to have a strong basis in evidence for

14    believing that either Section 2 or Section 5 required

15    increasing the number minority voters to achieve the 50 percent

16    BVAP in these districts, and the evidence will show that the

17    authors of the enacted plan simply declined to conduct such an

18    analysis and chose instead to guess -- set a rule of 50 percent

19    and pack black voters into these districts.

20         That approach, no matter how well-intentioned -- and

21    this is not an intent case.  We don't have the burden and don't

22    intend to try and show that anyone was motivated by ill-intent

23    here.  No matter how well-intentioned, using this approach to

24    draw these districts cannot be considered a strong basis in

25    evidence for believing that Section 5 required them.  Simply

 1   invoking the name of the Voting Rights Act without actually

 2   conducting an analysis, as required by the statute, cannot

 3   inoculate race-based redistricting from constitutional

 4   scrutiny.

 5            Seventh, even if the defendants could identify

 6   compelling state interest, they can't meet their burden of

 7   proving that these districts were narrowly tailored to meet

 8   that interest.  The Supreme Court long ago declared the

 9   reapportionment plan, quote, would not be narrowly tailored to

10   the goal of avoiding retrogression if the state went beyond

11   what was reasonably necessary to avoid retrogression.  That's

12   the *Shaw* case from this very state.

13            But that's exactly the evidence that will be placed

14   before you in this case.  Both districts consistently

15   cleared -- consistently elected African-American candidates of

16   choice by wide margins.  No straight-faced argument can be

17   advanced that either needed to have their black voting-age

18   population increased in order to prevent retrogression.  As the

19   Court declared in *Shaw*, covered jurisdictions do not have carte

20   blanche to engage in racial gerrymandering in the name of

21   retrogression.  That's exactly what happened here.

22            Now, before I sit down, let me just mention.  There

23   is a parallel state court litigation challenging these

24   districts.  It is pending before the North Carolina Supreme

25   Court.  The state trial court in that case issued a decision

1  before the US Supreme Court issued the decision in *Alabama*,

2  and, as a result, the Court failed to review these two

3  districts on a district-specific basis and didn't have the

4  teaching of *Alabama* to assist it in resolving the cases, but

5  that's the status of the stated Court litigation.

6         The Supreme Court emphasized in its *Miller* decision

7  that, quote, the essence of the Equal Protection claim

8  recognized in *Shaw* is that the state used race as a basis for

9  separating voters into districts without any compelling state

10  interest necessitating such race-based redistricting.

11         The *Strickland* plurality decision as well condemned

12  racial balkanization where minority communities had

13  successfully joined forces with white voters to achieve

14  electoral success, and *Strickland* noted the irony if the

15  shining star of the Civil Rights Act -- shining star of the

16  Civil Rights movement were interpreted to actually require

17  separation of voters into districts according to the color of

18  their skin.

19         The *Shaw* court condemned the redistricting plan there

20  because they, quote, threatened to carry us further from the

21  goal of a political system in which race no longer matters, a

22  goal that the Fourteenth and Fifteenth Amendment embody and to

23  which the nation continues to aspire, closed quote.

24         So, too, will the evidence condemn the plans before

25  this Court.  The evidence will show that the General Assembly

used race, not politics, as a predominant factor in drawing
these districts and that this constitutionally suspect use of
race was neither required by a compelling state interest nor
narrowly tailored to further any such interest.

         At the conclusion of the trial, the plaintiffs will
ask this Court to invalidate these two districts and to
implement appropriate, immediate, and effective remedies.
Thank you, Your Honors.

         JUDGE OSTEEN:  All right.  Give me just a moment.
All right.  Mr. Farr, or whoever is ready to proceed for the
defense.

         MR. FARR:  I am, Your Honor.  Suffice it to say, Your
Honor, that we have strong disagreements with the plaintiffs in
the way they've outlined the facts and the applicable law in
the case.

         What this case is really about, Your Honors, is it's
a political case.  The legal fees in this case are being paid
by something called the National Democratic Voting Rights Trust
Fund who are bringing cases like this all across the United
States.  The reason why this case was brought is because a
Democratic General Assembly enacted the 2001 Congressional Plan
in a way that favored the Democratic Delegation, and the 2011
General Assembly enacted a plan that favored the Republican
Delegation.  The only way that the plaintiffs, who we contend
are bound by the prior decision in the *Dickson* case, and their

 1   counsel in the National Democratic Voting Rights Trust Fund can
 2   try to get these plans thrown out is through the legal theories
 3   they're alleging in this case which were also litigated in the
 4   *Dickson* case.

 5          So we disagree with plaintiffs' counsel.  We do not
 6   think the evidence will show that race was the predominant
 7   motive for either one of these districts.  District 12 was
 8   drawn based upon political characteristics as it had been done
 9   in 1997 and in 2001.  The difference between District 12 is
10   that in '97 and 2001, it was drawn by a Democratic legislature
11   to be a strong Democratic district, but enough Democratic votes
12   were shaved out of the district to create strong adjoining
13   Democratic districts such as the former Senate -- or
14   Congressional District 13.  You'll see a picture of that.  It
15   is at least as bizarre looking as any of the other
16   congressional districts that have been drawn in North Carolina.
17   It stretched from Raleigh to Guilford County.  It was drawn by
18   the Chairman of the Senate Redistricting Committee, Brad
19   Miller, who then ran that district and was elected to Congress
20   in that district.

21          In the Mecklenburg area, Mecklenburg County was added
22   to the 8th Congressional District in the 2001 plan in order to
23   create a stronger Democratic 8th District which ultimately
24   resulted in the defeat of the Republican incumbent in that
25   district, Robin Hayes, by Congressman Kissell.  So this case is

about politics.

If the Court finds that the 1st District -- if you find that the race was the predominant motive in the 1st District, then we believe the evidence will show that there was a compelling governmental interest, that there's a substantial basis in the evidence to support that.  I'll go over some of that as I walk through a history of the Congressional Plan, but I'm not really sure how plaintiffs can say that the district -- that either the legislature or the Court in *Dickson* did not do a district-by-district analysis.

The legislature had two polarization experts that studied racially polarized voting in all of the counties in which the 1st Congressional District is located, and this now brings me, Your Honors, to a couple map notebooks that are going to be helpful to the Court.  I'm not going to hand this one up right now, but Exhibit 22 is the map notebook that the parties provided the three-judge court in the *Dickson* case; and what this notebook has in it, it has all of the so-called benchmark plans, the benchmark plans being the plans that were in place during the 2010 general election.  So in the case of the congressional district, it's the 2001 Congressional Plan which is also known as the zero deviation plan.  It has the 2003 Senate plan, and it has the 2009 House plan.

The House plan was amended in 2009 because of the case which we've cited to the Court called *Strickland v.*

1    *Bartlett*, and we do think that a case says that if you're going
2    to draw a VRA district, a Section 2 district, the black
3    voting-age population needs to be above 50 percent.  That is
4    how the state interpreted that case, and I know that one of the
5    dissenting judges in *Strickland* interpreted that case as
6    stating that the legislature should create VRA districts that
7    are above 50 percent.

8            So what else is in this notebook, Your Honors, are
9    all of the alternative proposed maps for the Congress, for the
10   House, for the Senate, and included in this notebook is what we
11   call the "stat pack" which has got all of the census categories
12   in it.  It has election results for all the districts.  This
13   will make more sense to you when you actually see the notebook.

14           But a point that's very important, Your Honor, is
15   that this notebook is based upon the 2010 Census; and, during
16   the course of this case, you'll discover that there's two
17   different categories to measure black population.  There's a
18   category called "single-race black population," and there's a
19   category that the Census Bureau calls "any part black
20   population."  "Any part black population" is where the person
21   reports themselves as being black and some other race in
22   addition to being black.

23           So those are two different categories.  That's
24   important to understand because when we go to the charts that
25   the plaintiffs have over here, and we'll point this out when we

get a chance, they talk about the black population in these

districts, the black voting-age population.  I've looked at

these charts just before we started today, and the black

voting-age population they list for the 2011 1st and

12th Districts is from the 2010 Census, and it's the any part

black voting-age population.  That term "any part black

voting-age population" is defined in this notebook with the

phrase "total black population."  So it's called "total black

voting-age population" in this notebook.  The Census calls it

"any part black population."

         So for the black voting-age population, they've

listed in their charts for the 2010 1st and 12th Districts --

they've used the 2010 Census "any part black."  For the

population that they've listed for the 2001 Congressional

Districts, they've used "single-race black," and they've used

the 2000 Census.  So they're comparing apples to oranges in two

different ways.  Just as a minor fact, Your Honor, if we're

going to look at single-race black population, the

12th District was not drawn over 50 percent.  It's slightly

below 50 percent.

         So that's the importance of this notebook.  Now,

there's another notebook I would like to hand up to the Court

if I might.

         JUDGE OSTEEN:  Now?

         MR. FARR:  Yes, because it's part of my opening

1    statement.

2              JUDGE OSTEEN:  Okay.

3              MR. FARR:  And I think it will help the Court.  This

4    is Exhibit 126, Your Honor, and this is important to review

5    this with the Court now to give the Court the historical

6    perspective, and I've got extras if the law clerks would like

7    one.

8              JUDGE OSTEEN:  All right.  Keep it to an overview,

9    Mr. Farr.

10             MR. FARR:  What's that?

11             JUDGE OSTEEN:  Keep it to an overview if you can.

12             MR. FARR:  I will, Your Honor.

13             I just want to flip through the tabs in this quickly,

14   Your Honor.  Tab 1 is the original version of the 1st District

15   that was enacted in 1991.  It was precleared by the Justice

16   Department, and the Justice Department objected to the failure

17   of the state to create a second majority-black -- or majority

18   minority district running from Charlotte to basically

19   Wilmington.

20             And it's important, Your Honor, that you understand

21   some terms for voting rights districts.  A majority-black

22   district is where the black population is in the majority.  A

23   coalition district is where whites are in the minority, there

24   is no majority white population, and blacks and, say, Hispanics

25   create the majority.  Then there's something called a crossover

1   district.  That's where whites are actually in the majority.

2          Counsel for the plaintiff referred to the 1st

3   District as a crossover district in his opening argument.

4   That's not correct.  In none of these plans from '91 through

5   the present, the 1st District has never been a white crossover

6   district.  Whites have never been in the majority in that

7   district.  It originally started off as a majority-black

8   district in population and voting-age, and then I believe by

9   the time of the '97 Plan, the 1st District was a majority-black

10  in population and a plurality voting age.  So make sure you

11  understand those terms.  There's never been a majority-white

12  population in the 1st District that could vote as a black to

13  defeat the candidate of choice of the African-American

14  population.

15         So going through this notebook quickly, Your Honor,

16  under Tab 2 is the '92 Congressional Plan.  This was the plan

17  that was the subject of the litigation in the *Shaw* case.  The

18  12th District -- it's hard to read on this, but basically it

19  stretched from Gastonia to Durham along the interstate

20  highways.  The 1st District was in Eastern North Carolina.

21  There was never a ruling in *Shaw* on the 1st District.  There

22  was no plaintiff withstanding to challenge the 1st District, so

23  the Court in *Shaw* never ruled on the 1st District, but they did

24  declare the 12th District unconstitutional as illegal racial

25  gerrymandering.

1    So then if you turn to the next tab, Tab 3, Your

2  Honors, this was the plan that the state enacted after *Shaw* in

3  1997; and as you're looking at these plans, I want you to note

4  we heard from counsel about how horrible this district looked.

5  This district looks no different than any other versions of the

6  1st District that have ever been enacted.  There was historical

7  precedence for this district, and having beautiful appearance

8  was never a criteria that any of the General Assemblies

9  followed.  I mean, I really would like to have counsel get up

10  here and explain to me how any of these versions of the 1st

11  District passed the interocular test in a way that's better

12  than the 2011 1st District.

13    Now, the point on the '97 plan, Your Honor, is the

14  court -- the district court originally granted summary judgment

15  for the plaintiffs, and in that case the plaintiffs were

16  relying on registration statistics to prove that race was the

17  prominent motive.  In the first *Cromartie* case, the Supreme

18  Court reversed and sent it back to trial, and they very

19  strongly indicated that voting patterns were more probative of

20  whether race was a predominant motive in registration

21  statistics, and that's because we have a large number of

22  unaffiliated voters, and also because everyone in this

23  courtroom knows that there's a lot of white Democrats that vote

24  Republican.  So registration does not correlate with how people

25  vote.  How people vote correlates with how people vote.

 1          So when this was sent back down for trial, the 1st
 2   District -- which I defy anyone to tell me how this is prettier
 3   than the 2011 1st District -- this was found to be
 4   constitutional and survived the *Shaw* compelling governmental
 5   interest test.  The Court found that it was compact.  The Court
 6   found there was racially polarized voting even though it was a
 7   majority -- a minority-black voting-age population district.  I
 8   think there was only 46 percent single-race black voting-age
 9   population in the 1st District under this plan.
10          The district court found the 12th District to be
11   illegal, again, based upon expert testimony involving
12   registration statistics.  So it went up to the Supreme Court
13   again, and the Supreme Court found that registration statistics
14   do not correlate with the way people vote and that you can't
15   use registration statistics to prove a racial gerrymander.  And
16   amazingly, that's exactly what Dr. Ansolabehere -- and I
17   apologize if I have not pronounced his name correctly.  The
18   main point of his testimony is to use registration statistics
19   to prove that Congressional District 12 is an illegal racial
20   gerrymander after we've had two Supreme Court decisions saying
21   that's not a proper way to prove that case.
22          Your Honor, Tab 8 -- or excuse me -- Tab 4 was a plan
23   the General Assembly enacted after they lost in the district
24   court in the first *Cromartie* case.  This plan was only used in
25   the 1998 election.  It had a much lower black voting-age

1  population, but I think it was still well above 30 percent.  If

2  we look at the evidence, we'll see that Congressman Watt, I

3  believe, had his closest election in '98 of all the elections

4  he's had when he was representing this district.  When the

5  state won the *Cromartie* case, they reverted back to the '97

6  plan for Congressional District 12.

7        The next tab, five, is the Congressional Zero

8  Deviation Plan.  This is the 2001 plan.  Again, Your Honor, you

9  look at the 1st District.  I would like to have someone tell me

10  how that passes the interocular test but the 2011 District

11  doesn't.  And what's important to note, Your Honor, is that

12  nobody has ever argued until this case that racially polarized

13  voting does not exist where the First Congressional District

14  has been drawn.

15        In 2001, the state in its preclearance submission

16  admitted that they were drawing the 1st District as a Section 2

17  district as they had done from the beginning of this district.

18  There had never been a black congressional representative in

19  North Carolina until the 1st District and 12th District were

20  enacted.

21        Also, Your Honor, what this case is really about is

22  the *Strickland* case as far as it relates to Congressional

23  District 1.  They -- on their charts here, Your Honor, they

24  haven't reported the actual black voting-age population for

25  CD 1 under the 2010 Census.  If you look at the any party black

voting-age population for CD 1 under the 2010 Census, if you look at the 2001 version, it's about 48.65 percent.

So the General Assembly was looking at the *Strickland* case. There's no -- there is no dispute in the legislative record that significant -- legally significant racially polarized voting exists in this part of North Carolina. One thing these map notebooks will show you, Your Honor, is that all of the proposed legislative maps produced majority-black or coalition districts in the very area where Congressional District 1 was drawn. That was before the General Assembly.

They had two racial polarization experts who studied racial polarization in these counties. A three-judge court in *Dickson* looked at each one of these districts on an individual basis to make it's findings, and so the whole issue is did the General Assembly violate the law because they drew a district slightly above 50 percent instead of the 48.65 percent district that existed under the 2010 Census?

Now, counsel for the plaintiffs refers to the *Alabama* case, and I want to say something about that briefly. The *Alabama* case was a Section 5 case. *Alabama* drew their districts that there was a legislative Section 5 case. The district that was scrutinized by the Supreme Court had been drawn to be over 70 percent black, and the state justified that by saying, well, we decided that we had to keep districts at this level because that's what they were previously.

1        Now, there's no Supreme Court case that says that,

2   and the 70 percent district, Your Honor, I would say is quite a

3   bit different than the 52 or 53 percent district which we're

4   talking about here in Congressional District 1, and the state

5   didn't adopt a mechanical rule that they came up with.  *Alabama*

6   came up with a mechanical rule that they made up with no

7   Supreme Court basis.

8        North Carolina followed a rule that had been adopted

9   not only by the United States Supreme Court but also by the

10  North Carolina Supreme Court that if you're going to draw a VRA

11  district, it had to be over 50 percent because one of the

12  *Gingles* elements is there's no racially polarized voting unless

13  the blacks need a majority to defeat the white minority voters

14  who are voting in a bloc.

15       And so what's interesting is plaintiffs get up here

16  and say there's no racially polarized voting because whites are

17  crossing over in a crossover district, which it wasn't, to vote

18  for the black candidate.  Well, if that's true, Your Honor,

19  then why did the plans proposed by the Legislative Black Caucus

20  and the NAACP and the Democratic leadership -- they all

21  produced plans that were 47 to 48 percent black voting-age

22  population.  If there's no racially polarized voting anymore,

23  then we don't need this district at all.  It can go away.  We

24  can draw the district that -- 10 percent black population if

25  there's no racially polarized voting.

1        That's not what the plaintiffs wanted.  They want the

2   Court to think that *Strickland* didn't happen, and they want to

3   shave the black population out of these majority-black

4   districts to create a better plan for Democrats because black

5   voters are highly correlated with voting for Democratic

6   candidates.

7        I also want to point out, Your Honor, that Tab 5 is

8   the Congressional Zero Deviation Plan with the 2000 Census.  If

9   you flip through there, you'll see that the reports from the

10  General Assembly did not report the any part black voting-age

11  population.  That would be on about page 3.  It was the

12  single-race black population that was reported.

13       And if you go to Tab 6, Your Honor, that's the 2001

14  Congressional Plan with the 2010 Census.  And if you look at

15  all the cases and the guidance from the Justice Department,

16  what the General Assembly was obligated to do was to compare

17  the benchmark plan using the 2010 Census, not the 2000 Census.

18       Oh, by the way, I do want to point out that we've

19  heard about the percentage of the vote that Congressman

20  Butterfield received, but what the plaintiffs don't want to

21  talk about is what's the actual margin of victory?  So this

22  district was underpopulated by 97,500 people.  Congressman

23  Butterfield had several elections where he won by less than

24  that amount.  And so the question is what type of white voters

25  do you have to put back into the district to keep it at

1  98 percent?  And that's exactly what the Supreme Court said the

2  states were not obligated to do under *Strickland*, that

3  legislatures and courts needed a judicially manageable

4  standard.

5          So, again, North Carolina didn't make up a mechanical

6  rule like *Alabama* did.  They followed the US Supreme Court; and

7  while not binding on you, Your Honors, it is binding on the

8  General Assembly.  The North Carolina Supreme Court said the

9  same thing.

10          The rest of these maps, Your Honor, are proposed

11  maps.  There were only two proposed maps from other parties,

12  the Southern Coalition for Social Justice which represented a

13  coalition including the NAACP.  That's under Tab 7.  You can

14  see their 1st District there in yellow.  Someone tell me how

15  that passes the interocular test while the enacted plan

16  doesn't, and they drew that district, I think, with a black

17  voting-age population of 47 to 48 percent.  Again if, there's

18  no racial polarized voting, why isn't it at 25 or 28 percent?

19          They also drew that district, Your Honor, with -- so

20  that whites were in the minority.  Nobody's ever proposed a 1st

21  Congressional District with a majority-white population.  And

22  they also proposed a district with very -- nearly a majority of

23  the vote -- registered voters being black.

24          There are several versions of the *Dickson v. Rucho*

25  plan in this notebook, Your Honor.  The plan was originally --

the 1st District was originally drawn into Wake County because the cochair, Senator Rucho, and Representative Lewis may have misunderstood Congressman Butterfield. For him, I have great respect. But they thought that he had requested that the district be drawn into Wake instead of Durham acknowledging that the severe underpopulation of the 1st District could require something like that, putting it into the RTP area to make up the severe underpopulation.

The ultimate plan enacted by the General Assembly took the district into Durham instead of Wake County. There was historical precedent for that because the very first map we looked at, the '91 Plan, which was precleared by the Justice Department, had drawn the district into Durham. In fact, if you look at the *Shaw II* case, the Supreme Court kind of acknowledges that that district was a proper remedial district. So there was historical precedent for that. There was also a speaker at a public hearing who supported leaving the district into Durham.

But again, Your Honor, what these maps show is that it would be real hard to put these maps on a reality TV show and have some judges decide which one of these maps is prettier and then explain why, or why the 1st District is not pretty enough. In fact, Your Honor, the 2001 First Congressional District is more compact under -- or is only slightly less compact than the 1997 1st Congressional District which the

1  three-judge court found to be compact.  It's very, very close.

2          Just talking briefly about the 12th District, Your

3  Honor.  That district survived the *Cromartie* litigation because

4  the state had drawn that using something called a vote

5  Tabulation District.  A vote tabulation district is a piece of

6  census geography which the Census uses to do all sorts of

7  things.  In North Carolina, vote tabulation districts are

8  pretty much identical to precincts with some few exceptions,

9  and precincts, of course -- the Court is familiar with what

10 precincts are.  That's where people go to vote on election day.

11         The state in '97 and 2001 drew the 12th District to

12 be a strong Democratic district.  The software that is

13 available to do that, you can look at the election results on

14 VTD level with no racial data being present.  Dr. Ansolabehere

15 admits this in his deposition, that if you looked at election

16 results, you can't tell what the race of the voters are, and

17 that's exactly why the General Assembly in '97 to 2001 and in

18 2011 drew the 12th District based upon whole VTDs looking at

19 election results because they could not tell the race of the

20 voters.

21         The difference, Your Honor, is that the 2011 General

22 Assembly drew the 12th District to help Republicans in

23 adjoining districts.  Dr. Ansolabehere has not looked at that.

24 He admits he hasn't looked at how the adjoining districts were

25 affected by the way CD 12 was drawn.  And if you go back and

you check the *Cromartie II* case, that's fatal to his testimony

along with his somewhat inexplainable decision to rely on

registration statistics.

But even if they had proven -- if they could prove,

which they can't, that race was the predominant motive for

Congressional District 12, because -- and I'm quoting, I think,

Justice Souter if I'm right.  It might be Breyer, but whoever

wrote the majority opinion in *Cromartie* -- because there's such

a high correlation between African-Americans and voting for

Democrats that sits over 90 percent.  So if you're going to

make a more Democratic district, there has got to be more

African-Americans in it, particularly in that part of the state

where there's a high concentration of African-Americans.

And the Supreme Court in *Cromartie* said where there's

a high correlation between African-Americans and the party --

the candidate for who they vote for, even if you prove some

sort of indication that race was the predominant motive, the

plaintiffs have to offer a map showing how they could draw that

district in a way where race was not the predominant motive but

also achieving the political goals of the General Assembly.

There's a few other things that counsel said that I

disagreed with, Your Honor, but I've taken up enough time.  At

the end of the day, Your Honor, this is just a fight over a

policy decision.

In 2001, Senator Miller drafted the 13th district in

a way that's just as strange looking as the 12th District
running from Wake County to Greensboro. He actually split up
part of Congressman Watt's 12th District in doing that. They
put Mecklenburg County into the 8th District to create a
district in which a Democrat could defeat Robin Hayes, which
happened. Those are all decisions under the cases that were
within the discretion of the General Assembly; and just the
same as those decisions were not illegal under any theory, what
the General Assembly in 2011 did also is lawful and is within
the discretion of the state's elected representatives. Thank
you very much.

JUDGE OSTEEN: All right. Are the plaintiffs ready
to call their first witness?

MR. SPEAS: Yes, Your Honor. But before we call our
first witness -- Eddy Speas for the plaintiffs -- we would like
to move the introduction of our Trial Exhibits 1 through 144
previously identified in this matter. It is my understanding
that with one exception, all of these documents came from the
*Dickson* record, which is the subject of the stipulation that
the Court mentioned on Friday. With exception of one document,
I believe, there is no objection to the admissibility of the
documents. So we would at this point move the introduction of
Plaintiff's Exhibits 1 through 144.

Your Honors, I regret to tell you they're over there
in boxes. It's a pile. To make this case manageable for all

1 of us, as we call witnesses, we will give them a witness

2 notebook and share it with you and the clerks that will focus

3 on the particular exhibits that are important for those

4 witnesses.  But the immediate matter on the table is we move to

5 introduce Exhibits 1 through 144.

6          JUDGE OSTEEN:  And all those documents, except one,

7 were taken care of in that stipulation filed -- like Document

8 69 or something like that?

9          MR. SPEAS:  Document 70, and we would withdraw that

10 one.

11          JUDGE OSTEEN:  Okay, and use this one?

12          MR. SPEAS:  Yes.

13          MR. FARR:  I'm just questioning Mr. Speas.  I think

14 Document 70 is the attorney-client privilege --

15          MR. SPEAS:  Thirteen is the document that's got your

16 name on it.

17          MR. FARR:  Okay.  We have an attorney-client

18 privilege objection to Exhibit 13 then, Your Honor.

19          JUDGE OSTEEN:  So plaintiff -- so no objection to 1

20 through 12 and 14 through 144?

21          MR. FARR:  If -- and Mr. Speas, I'm sure, has given

22 me the right number.  If it's Exhibit -- what did you say, 13?

23          MR. SPEAS:  To clarify, we will withdraw our

24 Exhibit 70 which was not in the record in *Rucho*.  The only

25 exhibit to which there is an objection is Exhibit 13, which is

1   an email in which Mr. Farr is copied.  To the extent there was

2   a privilege, we think it's been waived, so we would -- and it

3   is a part of the *Dickson* record.

4           JUDGE OSTEEN:  All right.  So to clarify then,

5   Mr. Farr, no objection to 1 through 12, 14 through 69, and 71

6   through 144?

7           MR. FARR:  Your Honor, there's one other -- there's

8   like an expert report from a group that we objected to on the

9   grounds of hearsay -- oh, okay.  Yes.  So the only objection we

10  have is to Exhibit 13.  And, Your Honor, when you look at it, I

11  wasn't just copied, I was giving legal advice to people who

12  were working for the legislature.

13          JUDGE OSTEEN:  All right.  Seventy is withdrawn.  So

14  I'm going to -- 1 through -- now, I've got my numbers mixed up.

15  So 1 through 12, 14 through 69, 71 through 144 are admitted

16  without objection.  There is a pending objection as to

17  Plaintiff's Exhibit 13.  Unless there's a better procedure, to

18  keep us moving this morning, at present I'm going to admit it

19  subject to the objection, and we'll rule on the objection when

20  we have a few minutes.

21          MR. FARR:  I was going to suggest something like

22  that, Your Honor.  I was thinking if the Court would look at

23  that at some point in time and just tell us what you think,

24  that would be fine.  You don't need to do it right at this

25  moment.

1          JUDGE OSTEEN:  All right.  Let me get my numbers

2     right for my notes.  1 through 12 -- Plaintiff's Exhibits 1

3     through 12 are admitted.  14 through 69 are admitted.

4     Plaintiff's Exhibits 71 through 144 are admitted.  Plaintiff's

5     Exhibit 13 is admitted pending a final determination of the

6     attorney-client privilege objection.  Where are -- is that the

7     boxes over there?

8          MR. SPEAS:  Yes, Your Honor.  There's a box for each

9     of the judges and each of your clerks.  But as I said, as a

10    witness is called, we will hand the witnesses notebooks that

11    contain those exhibits so that it will be manageable for

12    everyone hopefully.

13         JUDGE OSTEEN:  All right.  Move forward then.

14         MR. SPEAS:  Your Honors, thank you.  We would then

15    call as our first witness Senator Dan Blue.  And as Senator

16    Blue comes around, Your Honors, if I may approach the bench?

17         JUDGE OSTEEN:  Yes.  Mr. Farr, will it be easier for

18    us to give you these back -- hold on just a second -- the

19    exhibits you've handed us now and let you hand them up again

20    when you're ready to introduce them, or just keep them up here?

21         MR. FARR:  Whatever the Court prefers.  You might

22    like to refer to them as the testimony is going forward.

23         MR. SPEAS:  I have no objection to you keeping them.

24         JUDGE OSTEEN:  Okay.  All right.

25         (Witness sworn by the clerk.)

1          MR. SPEAS:  Your Honor, if I may approach the witness

2    and hand him the exhibits.

3          THE COURT:  You may.

4          MR. SPEAS:  Your Honor, in addition to using the

5    notebook, to the extent my technological skills permit this to

6    happen, I am hoping to put up on the screens the pertinent

7    parts of their testimony so that we will all be talking about

8    the same thing.

9          THE COURT:  All right.

10                        DANIEL BLUE,

11          PLAINTIFF'S WITNESS SWORN AT 10:04 a.m.

12                    DIRECT EXAMINATION

13   BY MR. SPEAS:

14   Q    Would you stated your name for the record, please?

15   A    Yes.  Good morning, Your Honors.  My name is Daniel Blue,

16   Jr.

17   Q    And would you tell the Court a little bit about where you

18   grew up and where you went to school.

19   A    I grew up in Robeson County on a farm in Lumberton.  After

20   graduating from the public schools in Robeson County, I

21   enrolled at North Carolina Central University and got a degree

22   in mathematics and from there I went to Duke Law School and

23   graduated from Duke Law School with a JD in 1973.

24   Q    Have you been engaged in the practice of law since then?

25   A    I have, since August 1973 when I got word that I passed

1  the bar exam.

2  Q    And tell the Court just a little bit about your law

3  practice over those years.

4  A    Out of law school, I was recruited to one of the bigger

5  firms in Raleigh.  It was Sanford, Cannon, Adams and

6  McCullough, a firm founded by and headed by former Governor

7  Terry Sanford, and I practiced there for a while and then left.

8             I along with two other associates of my earlier

9  associates established a law firm in Raleigh, Thigpen, Blue &

10  Stephens, and since that time I have practiced with that firm

11  in one iteration or the other, but it's now Blue, Stephens &

12  Fellers in Raleigh, and so for the last 42 -- 42 plus years,

13  we've consecutively practiced general litigation but also

14  specializing in some subareas.

15  Q    Did your work with former Governor Sanford inspire you to

16  get involved in political life yourself?

17  A    It did.  Growing up, it's not popular now, but I was

18  nailing signs up on light posts and trees when Sanford was

19  running for governor in 1960.  I was a little boy.  I was 10

20  years old, 11, and so when we joined the firm, one of the

21  requirements that Sanford had -- who at that time had become

22  president at Duke but was still involved in the firm, is that

23  everybody had to do something politically oriented, whether it

24  was work in your precincts or run for office or do various

25  things.  Multiple people in the firm ran and served in various

1  public offices around Wake County and around the state.

2  Q    And you yourself have served in public office, I believe?

3  A    I was elected to the North Carolina House of

4  representatives in 1980, and I served continuously in that body

5  until 2001 when a slight fit of insanity hit me and I ran for

6  the United States Senate.  I stayed out of the legislature from

7  2003 and went back in 2006 back to the House and went over to

8  the Senate in 2009.

9  Q    And during your many years, I guess more than 30 years now

10  in the legislature, were you involved in various redistricting

11  decisions by the North Carolina General Assembly as a member of

12  the General Assembly?

13  A    I have been since 1980, in November when I was certified

14  as a member of the House.  I've somewhat been involved.  In the

15  1981 session of the General Assembly, I was involved both in

16  Congressional Redistricting Committees and the House

17  Redistricting Committee, and was involved in the districts that

18  led to *Gingles*.

19       I was first elected county wide in Wake County and

20  ran county wide on several occasions.  In '84 as a result of

21  *Gingles*, *Gingles* versus -- became *Gingles* versus *Thornburg*, but

22  as a result of that case, a single member district, a system of

23  single member districts were created in Wake County, and what

24  had been a six member at large district became six single

25  member districts, so I represented those.

1          In 1990, I was involved pretty intimately in the

2     redistricting process.  I was elected Speaker of the House of

3     the session that began in 1991, so not only was I involved, I

4     appointed the redistricting committees, both the House

5     Redistricting and the Congressional Redistricting Committees

6     and was involved in many of the discussions regarding the 1991

7     Congressional Redistricting effort, and so I did that.

8          And then in 2000 I was still in the House, and I was

9     involved in the redistricting discussions, both at the

10    Congressional level as well as in the House redistricting, and

11    I was not involved in the redistricting committee.  I was not

12    appointed to the Senate Redistricting Committee in 2011,

13    although I tried hard to be and had a guy who was a senator who

14    was going to resign so that I could serve there, but it was a

15    choice of the president pro tem of the Senate not to appoint me

16    to redistricting, but I was still involved in following the

17    hearings and listening to testimony and talking to people all

18    across the state regarding the redistricting effort.

19    Q    Okay.  Now, were you involved in the redrawing of

20    Congressional District 1 and Congressional District 12 in 1997

21    following the 1996 decision of the US Supreme Court in *Shaw v*

22    *Hunt*?

23    A    I was.

24    Q    Okay.  And Senator Blue, I would ask you to turn to the

25    tab behind your testimony marked 73, which is Plaintiff's

1  Exhibit 73, and if our paralegal could put that up on the

2  screen.  Is it there?  Yes.  Thank you.

3          Senator, is this the Section 5 submission made to the

4  US Department of Justice by the North Carolina General Assembly

5  in 1997 sending forth for preclearance the rewrite of those

6  Congressional 1 and Congressional 12 following the *Shaw*

7  decision?

8  A    Yes, that's what it purports to be, and that's what it is,

9  typical cover letter sent with submissions.

10 Q    And would you turn to pages 10 -- I'm sorry, nine and 10

11 of that document, and there's a section there entitled, "Effect

12 of Change on Minority Voters," is that correct?

13 A    That's correct.

14 Q    And is it fair to say -- I don't want you to get into read

15 it or anything like that.  Is it fair to say in that section,

16 the North Carolina General Assembly explained to the US

17 Department of Justice the criteria that it was following and

18 the factors that it was considering in establishing those

19 districts?

20 A    That is a correct characterization of it, and that is

21 consistent with typical explanations that had been given; but,

22 yes, it clearly says what the criteria is and what the factors

23 are that are being considered.

24 Q    And would you actually read for us the first two sentences

25 of that section?

1  A    "The General Assembly's primary goal in redrawing the plan

2  was to remedy the constitutional defects in the former plan.

3  Those defects were the predominance of race in the location and

4  shape of Districts 12, and perhaps in the location and shape of

5  District 1, and a failure of narrow tailoring."

6  Q    And would you look with me to page 10 of that document,

7  the 6th line from the top, I believe, and is it accurate that

8  the legislature applying the criteria it described there and

9  weighing the factors it described there, set the voting --

10 black voting-age population for Congressional 1 in 1997 at

11 46.54 percent?

12 A    That's -- that states it correctly, yes.

13 Q    Okay.  Now, was the '97 legislation precleared by the US

14 Department of Justice?

15 A    Yes, it was.

16 Q    Was any suit filed challenging that legislation under

17 Section 2 of the Voting Rights Act?

18 A    There was no suit under Section 2 of the Voting Rights

19 Act.  Yeah, as I recall correctly, there was not.

20 Q    And that brings us to the 2001 redistricting.  You were in

21 the legislature?

22 A    I was.

23 Q    And is it fair to say that the Congressional 1 and

24 Congressional 12 in the 2001 plan looked a fair amount like the

25 '97 versions?

1  A     They did.  They did.

2  Q     And were those versions precleared by the US Department of

3  Justice?

4  A     They were.

5  Q     And was any suit filed during that decade challenging any

6  of those districts on Section 2 grounds?

7  A     There was no suit filed against them on Section 2 basis;

8  and, in fact, Mr. Speas had the honor, I call it that, but when

9  I was Speaker, the challenges on the basis of Section 2 were --

10  basically it was the Justice Department objecting because we

11  were refusing to create a second Congressional District that

12  was race based.

13       Following the redistricting, it was pretty much

14  concluded that polarization and all of those issues existed in

15  the northeast and the east primarily, and you could draw a

16  district that was contiguous and somewhat compact, but with

17  respect to a second minority Congressional District, we made

18  the call, primarily with my urging, not to create a second

19  Congressional District and the United States Department of

20  Justice corrected us on that and made us go back and do it.

21  Q     That was in '91?

22  A     That was in '91.

23  Q     Not 2000?

24  A     Yeah, that's what I was saying all of that to say that

25  subsequent to that, I think that may have been the last

1  Section 2 challenge that was started out as Section 5.  May

2  have been the last Section 2 challenge, other than leading up

3  to the earlier -- the '97 remapping.

4  Q    I apologize for my confusing question.  My question is

5  addressed to the 2001 plan.  Was it precleared?

6  A    It was precleared, and there was no lawsuit brought in

7  connection with it.

8  Q    Now, that brings us to 2011.  You were in the legislature?

9  A    Yes, sir.

10 Q    And you were not on the Redistricting Team Committee, but

11 is it fair to say you have an avid interest in redistricting?

12 A    I do.

13 Q    Would you provide the Court with an overview of this 2011

14 redistricting process as you saw it as a member of the Senate.

15 A    As a sitting member of the Senate, again, there was -- I

16 think maybe it was in June or July sort of that there was this

17 discussion after the census data had been received where

18 Senator Rucho, who was the Senate chairman of both Senate

19 Redistricting and Congressional Redistricting, along with

20 Representative Lewis who was his counterpart in the House sort

21 of sprung them out, and said these are the things that we're

22 looking for in redistricting, and we're going to have public

23 hearings to see what the public reaction is to what they're

24 trying to do.  That's sort of the background of how we started

25 talking about redistricting.

1  Q     So it's accurate that first plans are presented by the

2  defendants here some time in mid-June and then they're enacted

3  by the end of July; is that --

4  A     Yes, that's accurate.

5  Q     And that's Congressional and State House and State Senate?

6  A     That's right.

7  Q     So it was a pretty quick process?

8  A     It was a quick process, and there was -- for all intents

9  and purposes there was no real external input other than

10 they're presenting the map, and any tweaking or changes they

11 did among themselves.  I mean, the -- there were no changes

12 that were adopted that may have come from anybody externally in

13 the sense of legislators not on the committee.

14 Q     And what role did Senator Rucho and Representative Lewis

15 play in this process?

16 A     Senator Rucho was the Senate Chair of Congressional as

17 well as Senate Redistricting.  Representative Lewis was the

18 House Chair of House Redistricting and Joint Chair of the

19 Congressional Redistricting, and for the most part, the two of

20 them drew the maps -- not necessarily drew them, but supervised

21 the drawing of the maps, which were done external of the

22 General Assembly.

23 Q     And do you know who actually drew the maps?

24 A     Mr. Tom Hofeller.

25 Q     Okay.

1  A    I've learned since then drew the maps, and that's what we

2  learned during the course of the enactment of the plans.

3  Q    Did Mr. Hofeller ever appear in the legislature and

4  explain how he drew the plans?

5  A    No, sir.

6  Q    Okay.  Now, I think the historical record establishes that

7  Senator Rucho and Representative Lewis communicated their

8  criteria for developing these plans in a series of public

9  statements, is that correct?

10 A    Yes, they on several occasions, both written and I think

11 in press conference form, indicated what they were looking for

12 and what they were looking at in trying to arrive at the

13 redistricting plans.

14 Q    And did they explain in these statements and in other

15 places their understanding of their obligations under the

16 Voting Rights Act?

17 A    Well, the thing that stood out is that they explained that

18 their obligation was to create voting rights districts, Voting

19 Rights Act districts pretty much throughout the state, both

20 legislatively and congressionally and that the criteria that

21 they had to adhere to was the 50 percent plus voting-age

22 population in each of the districts because that's what they

23 read *Strickland* to mean.

24 Q    And, Senator, if you would turn to the tab in -- after

25 your notebook that's labeled five, it's in front of -- actually

1   Defendant's Exhibit 55 is a very nice collection of all the

2   public statements.  Is the first public statement issued in

3   June, on June 17, 2001 --

4   A    It is.

5   Q    -- 2011?

6   A    It is June 17, 2011, issued from them.

7   Q    And could we put page 2 of that up on the screen?

8              THE COURT:  Let me ask a question.  So in the

9   notebook, the tab five is Plaintiff's Exhibit 5?

10             MR. SPEAS:  I'm sorry, Your Honor, it got mislabeled.

11  It's Defendant's Exhibit 55 which we listed as, you know, we --

12  in our --

13             THE COURT:  So the defendant/plaintiff labels may not

14  mean anything as we go along?

15             MR. SPEAS:  Not in this particular instance.  I'm

16  sorry for the confusion.

17             THE COURT:  So it's Defendant's Exhibit -- I have on

18  the first page a deposition Exhibit 55, and then down at the

19  bottom I have a copy of a Defendant's Exhibit something.  How

20  do these numbers --

21             MR. SPEAS:  I thought it was 55.  Maybe I'm confused.

22             MR. FARR:  Your Honor, Defendant's 55 is some

23  testimony from a person in a public hearing, and our version of

24  what Mr. Speas was referring to is I think it's Defendant's --

25             THE COURT:  So the sticker at the bottom that says

1   Defendant's Exhibit D-5.11 is the number for the record?

2             MR. FARR:  Yeah, Your Honor.  I think the defendant's

3   sticker for this case on the screen is in blue at the bottom.

4   The exhibit number at the top was the exhibit number in the

5   *Dickson* case.  I think that clears it up.

6             THE COURT:  Okay.  So make sure, as you go along, do

7   the best you can to get me the right numbers.

8             MR. SPEAS:  I apologize, Your Honor.  It's

9   Defendant's Exhibit D-5.11.

10            THE COURT:  Okay.

11  BY MR. SPEAS:

12  Q   Senator Blue, now that I've not confused it too terribly I

13  hope, would you look on the second page of this exhibit which

14  is one of the public statements and read into the record the

15  second paragraph, beginning paragraph, the first two sentences

16  beginning, "In creating."

17  A   Yes, sir.  "In creating new majority African-American

18  districts, we are obliged to follow the decisions in *Stephenson*

19  1 and 2 as well as the decision by the North Carolina Supreme

20  Court and the United States Supreme Court in *Strickland versus*

21  *Bartlett*, with a cite.  Under the *Strickland* decisions,

22  districts created to comply with Section 2 of the Voting Rights

23  Act must be created with a black voting-age population, BVAP,

24  as reported by the census at the level of at least 50 percent

25  plus one."

1  Q    Okay.  And would you look -- that was from the June 17

2  public statement?

3  A    Yes, that was from the joint statement by Senator Rucho

4  and Representative Lewis dated or released June 17, 2011.

5  Q    And I'm going to ask our paralegal to put up on the screen

6  the public statement dated July 12, particularly page 4.  Do

7  you have the July 12 statement?

8  A    Is that -- do you mean on page 4 of this document?  Yes,

9  I'm looking at page 4 of the document.

10 Q    Okay.

11       THE COURT:  While we're stopped.  We had an air

12 conditioning problem of all things this morning.  The chillers

13 went down and GSA was slow.  So to get us restarted, I

14 understand the problem has supposedly been taken care of, but

15 it's going to take a little while for the cooling to fix this

16 courtroom, and I apologize for that.

17 BY MR. SPEAS:

18 Q    Senator Blue, could you look over at the screen.  That's

19 the particular part of the July 12 statement I'm interested in.

20 Could you read that into the record, please.

21 A    Sure.  First, we have complied, as we must, with the

22 holding by the United States Supreme Court and the North

23 Carolina Supreme Court in *Strickland versus Bartlett*, with a

24 cite.  These decisions require that districts drawn to insulate

25 the state from liability under the Voting Rights Act must be

1    drawn with a black voting-age population in excess of

2    50 percent plus one.

3              THE COURT:  Let me make sure I understand where that

4    comes from.  Where is --

5              MR. SPEAS:  It comes from the July 12 public

6    statement which is a part of Defendant's Exhibit D-5.11.

7              THE COURT:  Oh, that's page 2.

8              MR. SPEAS:  I apologize for the confusion, 5.11.  I

9    apologize for the confusion.  This exhibit contains all the

10   public statements issued.

11             THE COURT:  All right.

12   BY MR. SPEAS:

13   Q    Now, were you in debates in the legislature where these

14   same statements were made by Senator Rucho?

15   A    Was I in the legislature?

16   Q    Yes.

17   A    Sure.

18   Q    And you heard these statements on the floor of the Senate?

19   A    Well, this statement was from a July statement that he

20   made, but I've heard him make, yes, the statement because this

21   wasn't the only time.  He said that multiple times.

22   Q    Okay.  Now, let me now ask you, Senator Blue, if you would

23   look at the July 1 public statement which is a part of

24   Defendant's Exhibit D-5.11 at page 3.

25   A    I have that.

1   Q    Did you -- do you have that in front of you?

2   A    I have page 3, yes.

3   Q    Okay.  And if you would look at page 3 of that statement,

4   would you -- could we put this up on the screen, please.

5   Senator Blue, if you would look at the screen.  Is that up?

6   I'm sorry, Your Honor, I'm having a hard time seeing.  Your

7   Honor, I've managed to completely confuse myself.  Let's just

8   skip by that for the moment.

9          Let's look, Senator, at exhibit -- Plaintiff's

10  Exhibit 139 which is in front of you under tab 139.

11  A    Got it.

12  Q    Is that a transcript of the July 25, 2011 session of the

13  North Carolina General Assembly?

14  A    It is.

15  Q    And would you look at pages 8 and 9, particularly at the

16  bottom of page 8, at line 19, the paragraph beginning

17  "however."

18  A    I got it.

19  Q    Okay.  Would you read that into the record, please.

20  A    It says, "However, we must alter the 2001 version of the

21  first district because of two flaws.  First, the current first

22  district is underpopulated by over 97,000 people.  Secondly, it

23  does not include a majority-black age voting - black voting-age

24  population, better known as BVAP, as required by Section 2 of

25  the Voting Rights Act, see *Strickland* and *Bartlett* -- *Bartlett*

1    excuse me.  Thus any revision of the first district requires

2    the addition of over 97,000 people.  Also, the added population

3    must include a sufficient number of African-Americans so that

4    the first district can re-establish as a majority-black

5    district.

6            Prior to our release of the Rucho/Lewis 1, we

7    discussed both of these problems with Congressman Butterfield.

8    We believe that he understood and agreed that his district

9    would be drawn in either Wake or Durham County to cure the

10   district's equal population and voting rights deficiencies.  We

11   understood that Congressman Butterfield preferred that his

12   district be drawn in Wake instead of Durham.  We also discussed

13   with Congressman Butterfield that drawing his district in Wake

14   County may result in the withdrawal from his district of one or

15   more counties covered by Section 5 of the Voting Rights Act."

16   Q    Okay.  Thank you.  And when the General Assembly enacted

17   the Congressional Plan in July, did Congressional District 1

18   contain more than 50 percent voting-age -- black voting-age

19   population?

20   A    The plan finally enacted did.

21   Q    Okay.  And let me go back just a moment to your district.

22   You were in Senate District 14, I believe?

23   A    I am in Senate District 14, yes.

24   Q    And tell the Court what Senate District 14 was like in

25   2010 in terms of shape and in terms of voting -- black

1  voting-age population.

2          MR. STRACH:  Objection, Your Honor.

3          THE COURT:  Basis?

4          MR. STRACH:  It appears that the line of questioning

5  is going into legislative districts.  This matter seems to be

6  focused on Congressional Districts, so we'd simply note

7  objection, Your Honor, to testimony from Senator Blue regarding

8  Legislative Senate District 14.

9          THE COURT:  Relevance of the statement?

10          MR. SPEAS:  It illustrates the application of the

11  50 percent plus one rule.

12          THE COURT:  Just a second.  Is it for illustrative

13  purposes only, in your opinion?

14          MR. SPEAS:  Yes.

15          THE COURT:  Yes, sir?

16          MR. STRACH:  We wouldn't have any objection to it for

17  illustrative purposes.

18          THE COURT:  No objection?

19          MR. STRACH:  For illustrative purposes.

20          THE COURT:  For illustrative -- hold on just a

21  second.

22          (Discussion among judges.)

23          THE COURT:  We'll allow it for illustrative purposes.

24          MR. SPEAS:  Thank you, Your Honors.

25  BY MR. SPEAS:

1  Q    Senator Blue, briefly, tell the Court what your district

2  was like in 2010 before it was redrawn in terms of shape and

3  population.

4  A    Yeah, my district, as the other districts that later

5  became the majority minority districts was well under

6  50 percent black, not only voting-age population but black

7  population, and the idea that Senator Rucho expressed in the

8  press release that you saw earlier as well as in his statement

9  on the floor was that any district drawn to satisfy the

10  requirements as he perceived of Section 2 of the Voting Rights

11  Act had to be more than 50 percent plus voting -- black

12  voting-age population.

13           So my district was somewhere down in the low 40s, 40,

14  41, 42 at most and had consistently been that level.  It had 70

15  or 80,000 people too many in it, and by the time we did 2010

16  census; but, anyhow, my district is illustrative of what

17  happened to the other districts that had black senators in that

18  it was taken from roughly 40, 42 percent black population,

19  black voting-age population, to in excess of 50 percent, and

20  that was the same -- same thoughts that he had expressed about

21  the Congressional Districts, that even though they were below

22  50 percent, that he was going to take them above 50 percent

23  black voting-age population.

24  Q    And at some point in the legislative process, you posed to

25  Senator Rucho the question, what is it about the Voting Rights

1  Act that requires you to increase the black voting-age

2  population in districts that are less than 50 percent that are

3  already electing African-American candidates?

4  A    He said it was his understanding and his belief that he

5  had to take them all beyond 50 percent because *Strickland*

6  informed him that that's what he's supposed to do.

7  Q    Now, let me ask you, Senator, to do this for me.  We've

8  talked about the 2001 plan that was precleared by US Justice,

9  or plans that were precleared, and we talked about the 2011

10 plan.  The 2001 plan had how many majority African-American

11 voting-age population districts, the 2001 plan?

12 A    I believe the 2001 plan had nine.

13 Q    No, I'm sorry.  Congressional Districts?

14 A    Congressional District.  The 2001 plan had two districts

15 that had black Congress people representing them.  Neither of

16 those districts was over 50 percent black voting-age

17 population.

18 Q    And the enacted plan had how many districts over

19 50 percent?

20 A    In 2001?  Oh, in 2011.

21 Q    Yes.

22 A    The 2011 plan took both districts in excess of 50 percent

23 or at least attempted to take both districts in excess of 50

24 percent black voting-age population.

25 Q    And how many districts, Senate districts, in the 2001 plan

1  had a majority-black African-American voting-age population?

2  A    Nine Senate districts.

3  Q    No in 2001?

4  A    2001?  2001 had no State Senate districts.  However, black

5  voting-age population in excess of 50 percent.  The range ran

6  from I think the high 20s, even lower than that in a district

7  that was represented by a black Senator in Alamance County, but

8  the 2001 plan, or three plan as finally enacted, had no North

9  Carolina Senate districts that had black voting-age population

10 above 50 percent.

11 Q    And the 2011 Senate plan had how many majority --

12 A    It went from zero in the 2003 final plan to nine in the

13 2011 plan.  So zero in 2003 had over 50 percent -- had

14 50 percent plus black voting-age population, nine following the

15 2011 redistricting had 50 percent black voting-age population.

16 Q    And on the House side, in 2001, do you recall

17 approximately how many House districts had majority-black

18 voting-age populations?

19 A    The House had -- it was either 10 or 11 black voting-age

20 population districts in 2001 and 2003 after the redistricting

21 effort, and the 2011 plan, the House had 23 black voting-age

22 population districts.

23 Q    That --

24 A    That were over 50 percent.

25 Q    So let me see if I've got this right and to summarize.

1  The Senate plan went from no majority-black voting-age

2  population district in 2001 to nine in 2011?

3  A    That's correct.

4  Q    The House went from 10 majority African-American

5  voting-age districts in 2001 to 23 in 2011?

6  A    That's accurate.

7  Q    And in the Congressional side, the 2001 plan had no

8  Congressional District with a majority voting-age population

9  black; the 2011 plan had two?

10 A    That's correct.

11 Q    Now, did you vote on all three of these plans?

12 A    I voted on all three of them, yes.

13 Q    And how did you --

14 A    No, no, no, I voted on two of them.  I couldn't vote for

15 the House plan.

16 Q    Okay.

17 A    I could at the end --

18 Q    How did you vote?

19 A    I could at the end, but I voted -- I voted no on all of

20 them, and every other black Senator voted no on all of them,

21 all three plans.  And the reason I made the comment earlier is

22 typically the Senate affirms what the House does its plans, and

23 the House affirms what the Senate does to its plan, and then

24 both fight about the Congressional Plan.

25              But in this case all of the African-American

1  senators, and there were nine at the time, nine who came from

2  these non-majority-black districts, all voted against the plan.

3  No, there may have been more than that at the time; but,

4  anyway, all of them voted against it, and all of the House

5  members voted against all three plans, the black House members.

6  Q    All of the African-American members of the Senate in 2011

7  voted against the plan that was finally enacted for the Senate

8  and the plan finally enacted for Congress?

9  A    Yes.

10 Q    Okay.  Would you take a minute and just tell the Court why

11 you opposed these plans that created all these new for the

12 first time majority African-American voting-age population

13 districts.

14 A    Well, there's several reasons, but the most obvious was

15 that this was seen among those who had been elected to

16 represent all of the people in their districts, not just the

17 black citizens in their districts, it was seen as a

18 balkanization of the electorate, and basically a ghettoization

19 of the black elected officials.

20         It was creating districts where they were not needed

21 and where they were not justified to create a majority-black

22 district in Wake County, and this was part of a discussion with

23 the Congressional debate as well.  A county that since the

24 passage of the Voting Rights Act shortly thereafter had

25 consistently elected minorities in county-wide positions; a

1  county which had two of the four constitutional officers, the

2  Register of Deeds and the sheriff, two of the four county

3  constitutional officers elected county wide were minority; a

4  county that had elected judges county wide and in districts

5  since following the passage of the Voting Rights Act, a county

6  that had elected African-Americans at every level of county

7  Government to the legislature, as well as other places, school

8  board, and everything else; a county that had elected three

9  African-Americans at the same time in -- from 2000 to 2010 to

10 the House of Representatives, although there was only one

11 majority minority district, and it was not over 50 percent, but

12 had elected African-Americans in districts that were under

13 20 percent African-American, a second district that was under

14 30 percent African-American, that there was no indication that

15 you needed to draw districts that were over 50 percent

16 African-Americans in order to achieve the purposes of the

17 Voting Rights Act; and, quite frankly, it was offensive to most

18 of those of us who represented the people of our districts and

19 especially those of us who were African-American.

20          It was acting as if the Voting Rights Act had

21 determined that things would go in a negative direction, that

22 you would create these districts, and they would sit there

23 forever, that they would not grow with time, that they would

24 not expand, that they would not basically do what we felt the

25 Voting Rights Act was designed to do, and that is eliminate the

1  need for race -- race use in any kind of districting or any

2  kind of plan as we basically made the promise of America apply

3  equally to everybody.

4          And this plan was seen as basically reversing all of

5  that, ignoring the last 50 years of history and acting as if

6  Wake County, which had a record that I just described to you, I

7  was elected county wide to the General Assembly, we had a

8  senator elected county wide, but that Wake County had the same

9  history or the same proclivities as some of the other counties

10 where remedial action was necessary.  That was an insult not

11 only to the black citizens of Wake County, but to everybody in

12 Wake County, including the white citizens who had been told

13 that they were racist, that they voted in a polarized fashion,

14 when the record showed they did not.  When the record showed

15 they voted in coalition forms, voted for candidates, and that

16 there was no need to have special privileges and special

17 districts set aside that became -- I called them, I think in my

18 floor debate, townships like existed in South Africa.

19          MR. SPEAS:  Thank you, Senator Blue.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Cross-examination?

22          MR. STRACH:  Yes, Your Honor, Phil Strach for

23 defendants.

24

25

                            CROSS-EXAMINATION

1

2  BY MR. STRACH:

3  Q    Good morning, Senator Blue.

4  A    Good morning, Phil.

5  Q    Good to see you again.

6  A    Same here.

7  Q    Senator Blue, you just had a discussion about Wake County.

8  If the legislature had drawn a Senate district for you that was

9  in the 10 to 15 percent black voting-age population range,

10 would you have agreed to that?

11 A    I probably would have, yes.

12 Q    Do you believe --

13 A    I got elected in a district initially that was less than

14 15 percent black voting-age population.

15 Q    Do you believe that a black candidate other than yourself

16 could be elected in that district?

17 A    Yes, I just indicated that county wide we elected a

18 sheriff when less than 15 percent of the county population,

19 black voting-age population -- when less than 15 percent of the

20 county's black voting-age population was African-American.

21        We elected county commissioners.  We elected judges

22 county wide in districts that had less than 15 percent

23 registered black vote.  The vote in Wake County now is

24 approximately 23, 24 percent African-American, reflects the

25 state population pretty much; and, again, consistently, that

1    county has elected African-Americans.

2            There is no study that I'm aware of that I have seen,

3    and I've followed this for the last 30 plus years, that shows

4    that degree of polarized voting in Wake County that would

5    justify the creation of these super majority minority

6    districts, a super saturated minority districts.

7            One of the things that, Phil, that distinguished Wake

8    County from some of the other urban counties is that most of

9    the black voting-age population and the black population did

10   not live in just one section of Raleigh, of Wake County, and so

11   part of the difficulty in drawing districts, if you determine

12   that you're going to make a certain percent black, you've got

13   to have all these strange appendages all over your maps because

14   you've got to reach into neighborhoods that are not

15   majority-black, but they've got majority-black pockets in them.

16   And so you reach all over the place getting pieces of votes

17   through neighborhoods without regard to other things that unify

18   those neighborhoods.

19           So, yeah, I would have voted for a plan that

20   naturally divided Wake County on some basis.  I think it would

21   have been tough to draw a plan that did not have at least a

22   House district or a Senate district with over 25, 30 percent

23   minority population if you kept together the natural area in

24   southeast Raleigh, but that that would have been the natural

25   thing.  You could have drawn a district 30 percent black

1  voting-age population I think that would have been acceptable

2  to most people.

3  Q    Do you -- were you aware of alternative Legislative and

4  Congressional Plans proposed by the Legislative Black Caucus.

5  A    I'm aware of two or three other groups that proposed

6  plans.

7  Q    Did you have any input on the -- the alternative maps that

8  were proposed by the Legislative Black Caucus?

9  A    The only influence I had was to convince people that it

10 made no sense to pack all African-Americans in as few of

11 districts as possible.  I didn't have any plans on the final

12 proposal that they sent forth.  In fact, I disagreed with some

13 of the districts that they proposed to create.

14 Q    Were you aware that the Legislative Black Caucus proposed

15 House districts -- or at least one House district in Wake

16 County that was majority-black?

17 A    Yeah, it was a continuation of old House District 33, I

18 believe; and, again, as I say, if you go into southeast Raleigh

19 which is a traditional African-American area of town, you can

20 come up with 40,000 African-Americans without having contorted

21 districts, without having strange appendages.  So if you just

22 take that population, you'll end up with a district that's

23 close to 50 percent African-American.

24          But what the legislature did, for the first time they

25 created two African-American House Districts in Wake County

1  that have strange looks to them; and, again, in light of the

2  fact that Wake County had elected three African-Americans in

3  districts that were far less than the 30, 40 percent

4  African-American black voting-age population.

5  Q    Now, you're talking about blacks that have been elected

6  county wide, correct?

7  A    County wide and district wide, no, no, no.  They were

8  elected in specific districts.  There was one district in the

9  Knightdale/Raleigh area that had 29 percent black population,

10 black voting-age population, that consistently elected a black

11 woman.  There was another district in northwest Raleigh that

12 elected and reelected Ty Harrell.  That district was less than

13 20 percent African-American.  All of that was done and occurred

14 between 2001 and 2010.

15 Q    Now, the candidate in the district that you just mentioned

16 that had 29, 30 percent in the Knightdale area, who -- was that

17 Linda Coleman?

18 A    Linda Coleman won reelection in that district.

19 Q    How many times?

20 A    She ran -- again, I was out of the House from 2003 to

21 2006.  Linda was there when I got back, and she ran -- she was

22 re-elected -- I think she was re-elected two times, and then

23 she chose to join the cabinet of Governor Perdue after Governor

24 Perdue was elected in 2009.

25 Q    Right.  And do you know who won that district after she

1   left that district?

2   A    Darren Jackson.  I don't think there was a black opponent.

3   If it was, it wasn't a serious one.

4   Q    But he's white, correct?

5   A    Darren is white, yes.

6   Q    Now, Senator Blue, you said that you were in the North

7   Carolina House from 1980, and I think you were there through

8   December 31 of 2002?

9   A    That's correct.

10  Q    Is that correct?  So you were consistently elected from

11  either a multimember district or your single member district

12  from 1980 to -- to through 2000, is that correct?

13  A    That's correct.

14  Q    And so you were in the State House when the 2001

15  Congressional Plan was enacted?

16  A    I was.

17  Q    And you were on the redistricting committee?

18  A    I was.  I was.

19  Q    All right.  So --

20  A    I was traveling pretty extensively as a said.  I was

21  running for the -- in the primary for the United States Senate,

22  so I have to admit that I probably didn't put as much time in

23  the legislature as I should have, but I paid attention to

24  redistricting.

25  Q    But you were on the redistricting committee, so you had a

1  direct voice in the drawing of those maps, correct?

2  A    Yep, sure, as well as other members.  It was an open

3  process.  Not only those on the redistricting committee, but

4  members of the House had pretty free rein to say what they

5  believed, and everybody reviewed their own districts.

6  Q    Do you remember how many times you ran in multimember

7  districts at the beginning?

8  A    Primary and general elections?

9  Q    Just -- yeah, primary and general.

10 A    I ran in multimember districts in three or four primaries,

11 I think, and two general elections.

12 Q    All right.  And then that's after the *Gingles* litigation

13 that then went to a single member district?

14 A    Yes, after *Gingles* and after '84 it became a single member

15 district.

16 Q    All right.

17 A    And it became a single member district not -- because the

18 proposal that had been made after *Gingles* was handed down was

19 that we create single member districts in the urban areas,

20 including those that were not necessarily affected by *Gingles*.

21 For example, in Durham County, the *Gingles* decision determined

22 that there did not have to be any majority minority district.

23 *Gingles* specifically said Durham did not have polarized voting,

24 but decision was made in the General Assembly so that these

25 districts wouldn't be isolated and stand out as different, that

1  if we were going to create single member districts in these

2  urban areas, that all of the districts in the urban areas would

3  become single member districts and we would totally dismantle

4  the multimember districts that would remain; but that, again,

5  was to make sure that these majority-black districts that were

6  deemed necessary by *Gingles* were not sort of looked at as again

7  isolated and ghettoized districts.

8  Q    So in a multimember district, Senator Blue, you said that

9  Wake County was a six member multimember district, so six

10  seats -- voters could vote for six seats at one time county

11 wide, is that correct?

12 A    That's correct.

13 Q    And so in that situation a voter -- there might be several

14 white candidates, there might be several black candidates

15 within that pool of how ever many candidates were running,

16 correct?

17 A    That's right.

18 Q    So in that situation in a multimember district, voters

19 have the option of voting both for white candidates and black

20 candidates at the same time, is that correct?

21 A    That's correct.

22 Q    All right.  And in a single member district, you have to

23 vote for one or the other?

24 A    That's correct.

25 Q    All right.

1  A    Unless both of them are the -- you know, two blacks or two

2  white candidates.

3  Q    Right.  And in a multimember district, are you familiar

4  with the concept of single shop voting?

5  A    Sure.

6  Q    What is single-shot voting?

7  A    Single-shot you can vote for one or fewer than all of the

8  available slots that you have that you could vote in.

9  Single-shot voting was a technique perfected primarily in the

10 '50's and '60's as a way to get over these districts.  I don't

11 defend multimember districts, but I'm saying over time you

12 learn how to adapt and you make whatever you have work for you.

13       So single-shotting was -- single-shooting was one of

14 the techniques that was developed to elect minorities in

15 districts where minorities hadn't been elected so that you

16 didn't have to vote, say, for all six.  You could vote for your

17 top three candidates, and the probability that one of them or

18 two of them or three of them would win was much greater if you

19 didn't spread your votes to the others.

20 Q    All right.  So that was one way in the multiple member

21 system that black voters could overcome the effects of racially

22 polarized voting, is that correct?

23 A    One way, yes.

24 Q    So -- because otherwise you might have a sizeable compact

25 population of black voters who would otherwise be submerged

 1  county wide, is that correct?

 2  A    If there's a sizeable enough bloc, and you got contiguous

 3  compact base, I think it's pretty clear that you ought to draw

 4  the district that would be natural in that population.

 5  Q    All right.  Now, and once you -- once you went over to a

 6  single member district, particularly when you were in the State

 7  House, you were running in and winning in just a small portion

 8  of Wake County itself, correct?

 9  A    Yeah, much smaller portion, part of the county rather than

10  the full county.

11  Q    Right.  And so is it fair to say that the vast majority of

12  the elections you won in in the State House were in that

13  smaller portion of Wake County?

14  A    Oh, sure.  I mean, I ran from '84 through 2000 in that

15  smaller district, mostly without primaries, but generally in

16  the general election I had very little opposition and -- in the

17  primary and, quite frankly, not a lot in the general elections.

18  Q    Right.  And do you think part of that is because after

19  you'd won several elections, you had the benefits of

20  incumbency?

21  A    Well, I'd like to think that it was because of how I

22  represented the district.  I don't think that longevity in and

23  of itself necessarily commands that you keep holding a

24  position.  I'd like to think that the citizens of the district

25  thought that I represented them adequately and well.

1  Q    Sure, but the longer you personally represent the district

2  and do a good job, the more the voters get to know you

3  personally, correct?

4  A    Yeah, but I would add that following that logic you'd

5  rarely get an incumbent defeated, and it happens more often

6  than you think; and, in fact, one of the prime examples is one

7  of these minority districts in Charlotte, where a sitting black

8  Senator -- where a black Senator-to-be defeated one of the most

9  powerful white legislators in the Senate in a district that had

10 only 28, 29 percent black population.

11      Malcolm Graham beat Fountain Odom down there, and

12 that's one of the districts, again, that had this same logic

13 applied to it, that any time you created a majority-black

14 district it had to go over 50 percent, which is the same logic

15 that was applied with respect to the Congressional

16 Redistricting.

17 Q    But, Senator Blue, you agree with me that over time the

18 name recognition that you gathered in your district certainly

19 helped you win elections?

20 A    Oh, I concede that it has value, yes.

21 Q    All right.

22 A    Before social media it had a lot more value than it does

23 now.

24 Q    And, Senator Blue, you brought up your Senate district,

25 and since you brought it up, I want to make sure I clarify a

 1  few points about it.  Before 2011, you're in Senate District

 2  14, correct?

 3  A     That's correct.

 4  Q     And it's in Wake County?

 5  A     Yes.

 6  Q     Before 2011, your Senate District 14 did, in fact, have a

 7  total minority population, black plus other minorities,

 8  exceeding 50 percent, is that correct?

 9  A     It has -- again, it started downtown, and it went out all

10  of Eastern Wake County, and in that area, there was a pretty

11  sizeable Hispanic population.  I don't know what the percentage

12  was, but I think that the black and Hispanic population, most

13  of which was not registered to vote, by the way, may have -- it

14  did not exceed 50 percent, I don't think.  I mean, I didn't

15  study close with stuff like -- but I don't think it exceeded

16  50 percent.

17  Q     But you don't think -- your district before 2011 was

18  certainly not majority white, was it?

19  A     I think it was majority white.

20  Q     Do you recall testifying in the *Dixon v. Rucho* state court

21  proceedings?

22  A     I do.

23  Q     Do you recall testifying about this point about whether

24  your district was minority 50 percent plus before 2011?

25  A     I recall -- I don't know what I said about it.  The

1   district is what it is; but, again, I don't think that it is

2   majority minority.  I know it's not majority minority black

3   voting-age population.

4   Q    If you testified then that you believe that your district

5   before 2011 had minority population exceeding 50 percent, would

6   you be willing to stand on that assuming that's what the record

7   says?

8   A    That my district had more than 50 percent black

9   population?

10  Q    Black plus Hispanic?

11  A    It may have.  I mean, again, I don't -- I don't know

12  exactly what the black plus Hispanic plus Asian population was

13  in my district.

14  Q    All right.

15  A    But, again, the important thing is I know, because I had

16  studied it, it did not have a majority-black voting-age

17  population, and I stand by my statement that the black

18  population, black voting-age population, was somewhere in the

19  low 40s, 40, 42 percent.  And, you know, forgive me, that's not

20  the most important thing to me in representing the district,

21  because I figured I represented all 190,000 people in the

22  district, not just 80, 90,000 who may have been

23  African-American.

24  Q    I understand, but you have been involved in redistricting,

25  you understand the important distinctions between crossover

1  districts, say, and coalition districts, is that right?

2  A    Yeah, I understand that.

3  Q    And so you -- would you agree that if your district was

4  over 50 percent minority of all minorities, then that was a

5  coalition district not a crossover district?  Would you agree

6  with that?

7  A    Well, it depends on whether they were coalescing.  It

8  depends on -- I mean, I think that the definition of a

9  coalition district is a district where there's evidence that

10  people are coalescing, that they're coming together for a

11  common purpose, not some predetermined description of it, at

12  least that's how I define a coalition district, and that's what

13  we tried creating in Wake County from about 1976 to 1980

14  forward.

15  Q    So you were trying to create coalition districts?

16  A    Coalitions between people of different viewpoints,

17  different races, different origins so that we were looking for

18  a common way to address the problems in the district so that

19  race played no issue in how you address the problems, but you

20  focused on dealing with the issues that you ought to as an

21  elected official.

22  Q    All right.  So what in -- what is -- in your

23  understanding, what is the difference between a crossover

24  district and a coalition district?

25  A    I don't know whether those are terms of art the way you're

1   using them, but a crossover district I look at as a district

2   that was involved in *Strickland*.  *Strickland* was a crossover

3   district because even though it was not a majority-black

4   district, historically white voters had crossed over and voted

5   for the black representative, and they had two or three in the

6   cycle from 2001 until *Strickland* was decided, two or three

7   black representatives.

8            And although it was not majority minority,

9   consistently the white vote would go for the African-American

10  candidate, whether primary or general election.  That's what I

11  considered a crossover district, and that's what I thought that

12  *Strickland* was addressing.

13  Q    All right.  Do you know if any of the single member house

14  districts you ever ran in were majority white district of the

15  total population or voting-age?

16  A    You mean other than the at large district that I ran in?

17  Q    Right.

18  A    In the '90s, because of the intervention of the Justice

19  Department in creating these districts initially, I think

20  initially pre-district, and I think it was 33 in the '90s, the

21  numbers changed in 2000.  It may have been 13 or something, it

22  may have been another district number, but when they were first

23  created, the directive was to create all of these districts

24  somewhere, and the number that the Justice Department felt

25  comfortable could elect African-Americans.

1          For example, there was a district created in

2   Northeastern North Carolina where there's a pretty rich history

3   at the time of polarized voting that the Justice Department

4   rejected because it did not have in excess of 68 percent black

5   population in it, but that number over time came down, and the

6   Justice Department started accepting smaller numbers as one

7   would hope it would if the Voting Rights Act was having the

8   effect that it was designed to have.

9          And so the same thing may be true with respect to how

10  the initial majority minority districts were created in the

11  urban areas, in 1984 as well as in 2000 -- I mean, in '91 and

12  2000 I do know that there was a big push made in '91 to create

13  20 some majority minority districts, and we resisted that and

14  refused to do it, and that's why I think ultimately you had 10

15  or 12 majority-black districts with more than 50 percent black

16  voting-age population.

17  Q    I appreciate that, Senator Blue.  My question is actually

18  much more simple than that.  It simply is do you know whether

19  you've ever run in Wake County in a House, a single member

20  House district, that was majority white?

21  A    Majority white?

22  Q    Yes.

23  A    I think I probably have.  Again, I don't know what the

24  final makeup -- how the district changed from 2000 -- from 1991

25  to 2000, but understand that Wake County -- Wake County's

1   population and the city of Raleigh's population increased

2   almost exponentially.  So a county went from three, 400,000

3   people to a million by the time we got around to 2010, so my

4   district was growing and it was a downtown district and

5   downtown was gentrifying and whites were moving in.

6           The suburbs that were developing around it had mostly

7   whites moving in, so the district could have been

8   majority-black again -- I mean, majority white.  I simply did

9   not study it.  I may have looked at it when we finally went

10  back to redistricting as to what it finally looked like; but

11  so, yeah, during that period, it probably was majority white at

12  some point.

13  Q    But you haven't looked at any data to confirm that?

14  A    Gut feeling tells me that it was majority white at

15  different junctures; but, again, when you're getting 70,

16  80 percent of the vote, you don't go down to drill down to see

17  where polarized voting is occurring, and that's the kind of

18  result that we were getting in my House district and in the

19  Senate district.  Not only me, but at districts that were less

20  than 50 percent majority-black majority.

21          The black candidate was getting in excess of

22  60 percent of the vote, and sometimes up towards 70 percent of

23  the vote and the general election; and so, again, you were not

24  so mindful as to who made up certain segments.  If you ask me

25  whether I routinely won in majority white precincts, because

1  the voting tabulation districts were the precinct levels, I

2  consistently won, and so did other black candidates, in Wake

3  County in majority white precincts.

4          MR. STRACH:  Your Honor, I have another couple lines

5  of questions.

6          THE COURT:  Is now a good time to take a mid-morning

7  recess?

8          MR. STRACH:  Yes, Your Honor.

9          THE COURT:  All right.  Let's take a 15-minute

10 recess.  Before we walk out, let me see counsel up here at the

11 bench.  We can do it with two, Farr and Hamilton will be fine.

12          (Bench conference as follows:)

13          THE COURT:  I'm speaking for myself at this point.

14 I'm going to talk to these other judges about it over the

15 recess.  During the course of the opening statements, which I

16 thought overall were very well done, there was some argument

17 back and forth, a comment about Eastern Bloc stuff and then was

18 responded to in kind, shall we say, during the -- and I'm

19 afraid that kind of set a stage for what I perceive to be --

20 these other judges may disagree with me -- questions and

21 answers that are running the gamut from factual to political

22 opinion to political argument in some respects.

23          And I'm not criticizing the witnesses.  This is a

24 very difficult case to stay out of areas of political opinions

25 and views, and I'm not suggesting at this point that it should

1   stop.  But my observation is that as we proceeded through

2   opening statements and have heard testimony from the first

3   witness, both through opening, the questions and various other

4   things, we've got, at least in my mind, we've got a mix.

5              And, again, these other judges may overrule me and

6   disagree with me on this, but we've got kind of a mix of

7   factual information, commentary on legal analysis of cases and

8   various other things, which are important part of it, but I

9   want to make sure in terms of the questioning that we stay

10  focused on, as I see it, at least the factual part of this

11  trial.

12             I don't want this thing to drag on to four days

13  because we've got a lot of commentary that may or may not be

14  helpful to get us to the final end result, and at least in my

15  mind the way to avoid it is make sure on both sides that the

16  questions are appropriate and tailored to elicit an appropriate

17  response.  The more open-ended they are, the more inviting.

18             I say the whole thing again, these judges may

19  disagree, I'll update you after the break, but I don't want to

20  let the opening statement portion having set the tone for a lot

21  of commentary to come in response to what was heard during the

22  course of the opening statements, if that makes any sense.

23             I'm not asking you to do anything at this point, just

24  think about it.  I'll talk to these other judges and see where

25  they fall on this, and then we'll go from there.

 1            MR. HAMILTON:  Thank you, Your Honor.

 2            MR. FARR:  Thank you, Your Honor.

 3            (Bench conference concluded.)

 4            THE COURT:  All right.  Let's take a 15-minute

 5   recess.

 6            (At 11:06 a.m., break taken.)

 7            (At 11:23 a.m., break concluded.)

 8            THE COURT:  All right.  Senator Blue, you may return

 9   to the witness stand.  You may continue.

10            MR. STRACH:  Thank you, Your Honor.

11   BY MR. STRACH:

12   Q    Senator Blue, I want to turn your attention for a moment

13   to the development of the 2011 enacted Congressional Plans at

14   issue in this case.

15   A    Okay.

16   Q    Did you at any point in the Legislative process in 2011

17   submit any alternative redistricting -- Congressional

18   Redistricting Plans yourself?

19   A    Not me individually, no.  We had several plans that I

20   looked at.  There was a plan submitted, I think, by the -- I

21   was not the Democratic leader at the time, but there was a plan

22   submitted by the Democratic caucus in the Senate, and as you

23   alluded to earlier, there was a plan that may have been

24   submitted by the Black Caucus and the General Assembly, but --

25   and I looked at them.  I didn't submit any individual plans

1    myself.

2    Q    Do you know when those plans were submitted by the

3    Legislative Black Caucus and others on the Democratic side in

4    the 2011 redistricting process?

5    A    I think they were some time after Senator Rucho and

6    Representative Lewis submitted their plans, I think.  I'm not

7    absolutely sure since I didn't personally deliver them.

8    Q    All right.  Isn't it true that those were submitted to the

9    legislature on the first day of the redistricting session in

10   2011?

11   A    I wouldn't disagree with that, I just don't know.

12   Q    All right.  And did you, with regard to -- well, there

13   were two different alternative plans -- there were actually

14   three.  There were the plans submitted by the Southern

15   Coalition for Social Justice which were submitted earlier in

16   the process.  Did you have any input on those plans?

17   A    No input on them.  I criticized them because I thought

18   that they unnecessarily, in some instances, were trying to

19   create majority minority districts where they weren't justified

20   and the percentages that some of them looked at.

21   Q    Okay.  So you criticized the SCSJ plan?

22   A    Sure did, sure.

23   Q    And who did you submit that criticism to?

24   A    To the ones who were basically espousing them.  I informed

25   their counsel that -- North Carolina is not Alabama or

1  Mississippi, quite frankly, and it did not have the same kind

2  of polarized voting history that those states had.  Unlike

3  those other southern states, North Carolina had only 40

4  counties covered by Section 5 of the Voting Rights Act because

5  you hadn't had the practice as prevalent in North Carolina as

6  you had in those other southern states.  And so I suggested

7  that some of the remedies were a one size fits all, that you

8  don't create these districts just because you can based on

9  race, that it goes in the opposite direction of where I think

10  our state and our country ought to be going.

11          There may have been some other plan, but I remember

12  specifically when I first heard of the plans proposed by the

13  southern coalition group.

14  Q    And when you say you criticized the plans to their

15  counsel, I think, who was that?

16  A    I'm trying to think who had it then.  I know Anita Earls

17  represents the group.  I'm not sure that it was Anita, but

18  there are various people who've been involved.  Irv Joyner and

19  some of the other people who had looked at it.

20  Q    All right.  Did you ever publicly criticize the SCSJ

21  Congressional proposal?

22  A    Did I have press conferences beating them up?  No.  There

23  was no need -- no need to publicly do it because I expressed my

24  opinions to the redistricting chairs.  I did in my debate on

25  the Senate floor.  I did in discussions.  There was some Senate

1  committee, although I wasn't a member of the redistricting

2  committee where Senator Rucho gave me an opportunity to say

3  something, and I was critical of any effort to unduly pack

4  black voters into as few a districts as possible.

5  Q    On the Senate floor in the debate on the 2011 plans, did

6  you ever criticize the SCSJ proposal?

7  A    I criticized the proposal that was before us, which was

8  Rucho 1 or -- Rucho 2, I think, was the final plan we were

9  acting on, and I openly criticized it and made probably a

10  30-minute speech.  It and any plan that unduly packed black

11  voters, whether it was a Congressional Plan or a House Plan or

12  a Senate Plan without justification for it, and I thought that

13  the simple justification were those set forth initially in the

14  *Gingles* decision, where you could show sufficient polarization,

15  and I figured you couldn't do that in the districts that were

16  created in either of those plans, or that it had not been done

17  for this election cycle.

18         It had been done 20 years ago and maybe adopted 10

19  years ago, but there was not any kind of polarization study

20  done, that I'm aware of, on the districts that were created,

21  either Congressional or Legislative in 2011.  And I can't help

22  but think that a lot of the counties had elected black

23  sheriffs.  They had elected black officeholders in many

24  positions since 1990.

25         And so my first argument, and I suggested to Senator

1  Rucho in my debate on the Senate floor was that in my mind the

2  Fourteenth Amendment required that you have a compelling state

3  interest to do it, and then if you could find that, it had --

4  that solution had to be narrowly tailored to address the issue

5  that you were trying to address, not just packing districts

6  with 50 percent plus when they had performed the way they were

7  designed to perform with less than 40 in many instances, but

8  certainly less than 50 percent majority minority population in

9  90 plus percent of the cases.

10          And so as I criticized that with Senator Rucho, I

11  hope that criticism, or at least observation, would have

12  registered with the sponsors of the other plans because they

13  backed off of their plans.

14  Q    Okay.  So when the -- when the -- well, let me ask you

15  this:  Did you ever reduce your criticisms of the SCSJ plan to

16  writing and submit that to anyone?

17  A    No.

18  Q    Other than your debates on the Senate floor, did you ever

19  reduce your criticisms of the proposed enacted plans and submit

20  that to anyone?  Did you ever reduce those to writing?

21  A    I have.  I did a lecture at the Wake Forest law school

22  making observations about all of the maps, and I've spoken to

23  law school groups at various times about the maps and what I

24  thought some of the flaws were.  I have -- not just law school

25  groups, but civic groups, classes, so I have criticized them on

1   many instances; and, again, my criticism is not at the

2   individuals specifically who did it, but I just think that

3   they're out of the spirit of the Voting Rights Act, and they

4   tend to segregate more than to lead us to an integrated

5   continuous society.

6   Q    Right.  And all I'm asking, Senator Blue, is there's

7   voluminous records in this case.  I'm not aware of a memo or

8   any writing from you to Representative Lewis or Senator Rucho

9   criticizing either the SCSJ plans or the proposed enacted

10  plans.  Am I missing something or is there no such --

11  A    No, sir.  I never directed any writings to Senator Rucho

12  or Representative Lewis.  My comments to them were in the

13  context of the Legislative setting, and I did a rather lengthy

14  floor debate on the Senate plan; and, again, as I said, I

15  commented at the committee, and I commented to the press when

16  they would ask me on various of these plans.  But, no, I never

17  did any formal submission to Senator Rucho or Representative

18  Lewis regarding them, other than the normal way we communicate

19  about Legislative issues.

20  Q    All right.  And you talked about black candidates winning

21  an election.  Is it fair to say that most, if not all, of your

22  experience with black candidates winning elections is in Wake

23  County where you've been most of your career, is that correct?

24  A    No, that's not correct.

25  Q    Do you have specific information or knowledge about

 1  similar type information regarding candidates in the northeast

 2  part of the state?

 3  A    Yeah, there are instances.  As I said, there are black

 4  sheriffs in counties up there that are not majority-black.

 5  There are commission chairs.  There are school boards.  I mean,

 6  the history in the state in the 40 covered counties, at least

 7  those that were covered initially by the '65 Voting Rights Act,

 8  was that polarized voting was commonplace, and I know that in

 9  the 1980s formulation that led to *Gingles*, there was testimony

10  that no black candidate had ever gotten more than 10 percent of

11  the white vote east of Interstate-95, you know, one county over

12  from Wake County, but in the other 60 counties, that was not

13  necessarily so.

14          And one would think over the 30-year period, as we've

15  basically had more desegregation of public schools, mind you

16  that didn't start in earnest until the 1970s, and this data was

17  predicated on stuff that happened before 1980, but over the

18  30-year period, one would certainly hope that if you did a

19  current day polarization study, you would find that there would

20  be much greater cross-racial voting in those areas.

21          And what I'm suggesting is that study was not done.

22  If that study showed that you still had polarized voting,

23  African-American still could not elect the candidates of their

24  choice, be them black or white, and that you had a geographical

25  area that was sufficiently compact enough that you would then

1  need to do something to remedy that.  But the remedy shouldn't

2  be put in place to last in perpetuity, because when you put it

3  in place to last in perpetuity, you're simply preserving the

4  status quo forever, and that's what we want to move away from

5  and that's what I think the Voting Rights Act was designed to

6  do.

7  Q    Senator Blue, were you aware of the polarization study

8  conducted by SCSJ expert Dr. Block?

9  A    No, I was not -- I didn't see that.  SCSJ?

10 Q    SCSJ.  Were you aware of the study by their expert of

11 racially polarized --

12 A    I never saw that.  It was not -- it was not part of our

13 deliberation in the Senate debate.

14 Q    All right.  If the transcripts in the record say

15 otherwise, you'd obviously be willing to rely on the written

16 record?

17 A    Oh, ab -- yeah, I don't know.  I mean, I never heard

18 anybody mention those polarized studies in our debate.  It

19 certainly was not mentioned in the Senate debate.  What was

20 mentioned was that somebody had studied polarized voting in the

21 '90s and 2000 and that same thing was still occurring, but

22 there was no current study of polarized voting on a

23 district-by-district basis as far as I know.  And it was my

24 feeling, and I think a requirement, that you look at it on a

25 district-by-district basis, especially in a state like North

1  Carolina where you had 40 counties that had a different history

2  than the other 60 counties.

3  Q    Right.  And when the state was covered under the Voting

4  Rights Act, it was counties that were covered, right, not

5  districts?  Weren't there 40 counties, not 40 districts that

6  were covered?

7  A    Forty counties, yes.

8  Q    Right.  And were you also aware of a racial polarization

9  study done by Dr. Brunell who expanded upon Dr. Block's work?

10 Were you aware of that?

11 A    In 2011?

12 Q    In 2011, yes, sir.

13 A    2011?

14 Q    2011.

15 A    No, nobody referred to that specifically.  I didn't see

16 that as part of the presentation before the committees.

17 Q    All right.  So your testimony today is based on your

18 belief that there was racially polarized voting analysis that

19 was lacking before the legislature in 2011?

20 A    My testimony today is I was not aware of any

21 district-by-district polarization study that was done based on

22 the 2010 census and the other factors that would have been used

23 for 2011 redistricting.  If it was, in fact, looked at, it was

24 not made part of the debate or the arguments in the Senate and

25 when the plan was presented to us, neither the Congressional

1  Plan nor the Senate Redistricting Plan.

2  Q    All right.  And just to be clear, though, your testimony

3  today is you are not aware of, and you never read, the reports

4  by Dr. Block or Dr. Brunell?

5  A    I know that there was a report that said that the

6  polarization studies from 20 -- from 1990 or '91 and 2001 show

7  that there was polarized voting in North Carolina and that that

8  polarized voting continued.  I never saw any data, was not

9  presented with any report or any other indication that there

10  was a polarization study done on a district by district basis

11  either in the Congressional Districts or the Legislative

12  Districts that were made majority minority black in 2011.

13  Q    All right.  Now, Senator Blue, turning -- shifting back to

14  Congressional District 1, and this is related to this

15  polarization issue we've been discussing.  Isn't it true that

16  at least as late as 1997 the conditions existed in that

17  district for what we call a VRA district or a majority-black

18  district?

19  A    In the Congressional District?

20  Q    Yes, sir.

21  A    Yeah, because there was a district that was created and

22  nobody -- nobody challenged it in a serious way.

23  Q    And in the exhibit that we looked at earlier, Exhibit 73,

24  which was the preclearance submission for the '97 plan, do you

25  recall that the state stated in that that the *Gingles* factors

1  were still in effect in CD 1 at that time?

2  A    In 1997, yes, because there had been a study done in that

3  time frame within the last three or four years, I think.

4  Q    All right.  Now, you said that in 2001 you were on the

5  redistricting committee that created the redistricting plans

6  that year, is that right?

7  A    As I recall, yes.

8  Q    All right.

9  A    And, again, understand, Mr. Strach, that in '80, '90, and

10  2000, all members got access to the redistricting process, the

11  debates in the redistricting committees, and members were

12  consulted individually about their proposed districts, be they

13  Republican or Democrat.  That was the process on those

14  districts prior to 2011.

15          So, as I said, I participated in discussions about

16  Congressional Districts as well as House districts in the 2000

17  redistricting cycle.  I was not involved in 2003 because I had

18  left the General Assembly, and ultimately the 2003

19  redistricting is what determined the districts that we all ran

20  under from 2003 to 2010.

21  Q    And isn't it true, Senator Blue, that even as late as

22  2001, when CD 1 was created, that the conditions satisfying the

23  *Gingles* factors existed then, too?

24  A    I think they probably did in the counties where the

25  studies had been done, but the difference is that there were

 1  multiple counties dragged into the Congressional District 1 in

 2  2011 that were not Section 5 counties, and specifically I

 3  mentioned Durham County again.

 4          Durham County had never been a Section 5 county.  In

 5  the *Gingles* decision the Court specifically found that there

 6  was not polarized voting in Durham County that -- or

 7  specifically held that there was not polarized voting in Durham

 8  County, that Durham County residents, African-American and

 9  others, could elect the candidates of their choice, and so

10  there was no requirement to even draw a minority district in

11  Durham, even though it was easily drawable because you had a

12  compact enough population to do it in.

13          The case law didn't require it.  The General Assembly

14  just decided to draw one so that it wouldn't be sort of

15  standing out like the others.

16  Q    Now, you agree, though, that other than Durham County,

17  there are a lot of other counties in 2011 CD 1 that are in fact

18  Section 5 counties, is that correct?

19  A    Absolutely, I agree totally with you.  And, again, most of

20  the counties in that district are east of Interstate 95.

21  Q    And Senator Blue, with regard to the finding in *Gingles*

22  that there was no polarized voting in Durham, that was in the

23  context of a multimember district, is that correct?

24  A    Um-hum.

25  Q    Okay.  Not a single member district?

1  A     But if there's no polarized voting in a multimember

2  district, there's none in a single member district.   The

3  finding is no polarized voting.

4  Q     Right.

5  A     That the whites vote for African-Americans and a

6  percentage high enough so that you can't prove that it's

7  polarized voting against African-Americans.

8  Q     Senator Blue, this relates to the point we made earlier

9  about single-shot voting, correct.   Wasn't it possible to

10 single-shot vote in Durham *in the Gingles* era?

11 A     No, because that was a state-wide phenomena.   That

12 happened in Mecklenburg.   That happened in Cumberland, which

13 was a covered county, Cumberland was.

14 Q     Right.   I understand.   The only point I'm trying to get

15 you to agree with is that district was a multimember district

16 in Durham and folks could single-shot if they wanted to?

17 A     But the point is in *Gingles* the Court said that you don't

18 have to draw a single member district in this multimember

19 setting.   Regardless of what they're doing, you cannot show

20 that there's white polarized voting against black candidates.

21 That was the specific holding in *Gingles*.

22 Q     All right.   Well, *Gingles* speaks for itself.

23 A     Yes, sir.

24 Q     We'll let the Court decide what *Gingles* means.   In

25 Congressional District 1, Senator Blue, under the 2001 plan, do

1  you recall that the black percentage of Democrats in that

2  district was a super majority?

3  A    The black percentage of blacks in the Democratic primary

4  was a majority.

5  Q    Yes.  Wasn't it a super majority, Senator Blue?

6  A    Super majority being what?

7  Q    Over 60 percent?

8  A    I don't know whether that was the fact or not; and, again,

9  what I remember looking at it is that Eva Clayton, who

10 represented the district at the time, had consistently gotten

11 higher percentages of the vote after her initial run in a

12 district that was somewhat different against now Congressman

13 Walter Jones, and her numbers kept going up.  And I think maybe

14 by the end of the decade, she was getting close to 70 percent

15 of the vote in the general election and not having any serious

16 primary opposition or any opposition that amounted to very

17 much, and may have been getting 80 plus percent when she was

18 challenged in the primary.

19          I mean, it was clearly a district that Clayton was

20 going to consistently be elected in and history showed that

21 everybody else, even though the numbers went down, were elected

22 in it.  Frank Ballance was elected in it, first term by a

23 comfortable margin.  G.K. Butterfield was -- has consistently

24 been elected in it, prior to 2010 when it had far less than

25 50 percent of black voting-age population.

1   Q    Right.  My question though is do you have any reason to

2   dispute me when I say that the black percentage in the

3   Democratic Party, in terms of controlling the Democratic Party,

4   is over 60 percent?

5   A    I just don't know.  I just don't know.  I don't know that

6   that was one of the factors that really was focused on that

7   much.  What was looked at is that there was a feeling that

8   that -- that the *Gingles* factors were still prevalent in the

9   1st Congressional District as it was comprised, and I think all

10  but one or two counties in the district, and it may be all of

11  them, were Section 5 counties.  But Durham County, the most

12  pronounced of the counties in it now, had never been a Section

13  5 county, had never violated any of the *Gingles* principles, and

14  to build a district around Durham County saying that you are

15  forced to take the percentages above 50 percent just didn't

16  quite register.  That's the only point I was trying to make.

17          MR. STRACH:  Your Honor, may I approach the witness

18  with an exhibit?

19          THE COURT:  You may.

20  BY MR. SPEAS:

21  Q    Senator Blue, what I've handed you has been marked

22  Defendant's Exhibit 2.64.

23  A    Um-hum.

24  Q    It's a chart regarding the 2001 Congressional Plan, and

25  there's some data on this chart, and I simply want to draw your

1  attention to about the middle of the chart.  You'll see the top

2  part of the chart regards District 1.  Do you see that?

3  A    Yes.

4  Q    And if you move over to the right on this chart, at the

5  top part of it, there's a column called "black portion of

6  DEMS," do you see that column?

7  A    I see that.

8  Q    And so for Congressional District 1, the black portion of

9  DEMS in that particular district under the 2001 plan was

10 66.55 percent.  Do you see that?

11 A    Yep, I see that.

12 Q    All right.  Do you have any reason to believe that that's

13 incorrect?

14 A    I have no reason to believe that that's correct for 2010.

15 It doesn't say what it is for 2008 and 2006, but, no, I don't

16 dispute that.

17 Q    And at the bottom of that column, there's a number that

18 says that state-wide, without regard to districts,

19 41.38 percent of DEM, Democrats, are black, do you see that,

20 the last number in that column below?

21 A    I see that, yes.

22 Q    So the proportion of Democrats who were black in

23 Congressional District 1 was significantly greater than their

24 state-wide proportion.  Would you agree with me on that?

25 A    I agree with you on that, and that's in 2010 before

1  redistricting.

2  Q    This was on -- this was in -- for 2000 -- right, that's

3  right, this is for the 2001 plan --

4  A    Um-hum.

5  Q    -- correct?

6  A    Um-hum.

7  Q    Now, you were involved in the creation of the 2001

8  Congressional Plan, correct?

9  A    Um-hum.

10  Q    As part of the Redistricting Committee?

11  A    Yes.

12  Q    Why would it be necessary to ensure that black voters were

13  a super majority of the Democrat Party in that district in

14  2001?

15  A    A good portion of the district consisted of whole

16  counties, and so you would tend to, I guess, dilute the

17  white -- the overall population.  I don't know what this number

18  would look like in the 2012 election, the 2011 redistricting

19  plan, but you're talking about the percentage of voters, not

20  the percent of black voting-age population of black registered

21  voter I take it.  You're talking about those who were inspired

22  enough to go vote in 2010, and so I don't know what -- I'm

23  trying to figure out what the numbers mean and how they would

24  compare with the current numbers, say, 2012, because in 2012

25  probably it was a much higher percentage of -- the black

 1  portion of the Democrats was probably much higher than the

 2  number that you see here.

 3  Q    Right.  And I'm just focused on 2001 right now, if that's

 4  okay.  Didn't you and your colleagues in 2001 ensure that

 5  blacks were a super majority of Democrats in that district to

 6  ensure that in a race between a black Democrat and a white

 7  Democrat that the black voters could control the outcome of

 8  that race?

 9  A    That was part of the -- not necessarily that the black

10  voter -- the black candidate would control it, that the black

11  citizens in that district would be able to elect the candidate

12  of their choice.  Now, what the numbers looked like in 2010,

13  Mr. Strach, would be totally different than what they looked

14  like in 2001.

15        And the reason that they would be different, you've

16  already pointed out.  That district lost more than 15 percent

17  of its population base.  It lost -- it was not -- not lost it

18  but did not increase its population base.  It was almost

19  100,000 people short at the redistricting effort, so it changed

20  from 2001 to 2010, and you're giving me numbers to comment on

21  that are based on turnout as opposed to who's registered or

22  who's black voting-age population.  I'm simply trying to

23  understand it.  I'm not trying to evade your question, but I'm

24  simply trying to understand what you want me to observe on

25  this.

1          MR. STRACH:  That's fine, Senator Blue.  I actually

2     think you've answered the question.  Your Honor, I don't have

3     any further questions.

4          THE COURT:  Redirect?

5          MR. SPEAS:  No, Your Honor, thank you.

6          Your Honor, we would call Congressman Mel Watt to the

7     stand.

8               (Witness sworn by the clerk.)

9                         MELVIN WATT,

10              PLAINTIFF'S WITNESS SWORN AT 11:52 a.m.

11                     DIRECT EXAMINATION

12    BY MR. SPEAS:

13    Q    Would you state your name for the record, please.

14    A    Melvin Watt.

15    Q    And would you tell the Court a little bit about where you

16    grew up and where you went to school?

17    A    I was born in Mecklenburg County outside of Charlotte.

18    Went to high school, segregated high schools -- schools all the

19    way -- public schools in Mecklenburg County.

20          Graduated from high school in 1963, and then went on

21    to the University of North Carolina, got a BS degree in

22    business administration from the University of North Carolina

23    at Chapel Hill in 1967, and then went to Yale Law School and

24    got an LLM, which was subsequently converted to a JD degree

25    from Yale University Law School in 1970.

1  Q    And did you practice law in North Carolina for thereafter?

2  A    I did.  I went back to North Carolina in 1971 and

3  practiced law from 1971 to 1990 -- I guess early 1993 in

4  Charlotte.

5  Q    And what firm were you with?

6  A    The firm at that time was Chambers, Stein, Ferguson &

7  Lanning.  In subsequent iterations of it, it was known as The

8  Chambers Firm.

9  Q    And was it a firm significantly involved in civil rights

10 litigation?

11 A    It was, but I went to the firm, actually, to -- because

12 there was a recognition that there was more and more an

13 economic component to civil rights.  And so, my role was really

14 to start a business practice, and I did -- that's basically

15 what I did for 20 years, small businesses, real estate, estates

16 work, and some workers' compensation.

17 Q    At some point, did you become interested in politics?

18 A    Yes.  I got a call from Harvey Gant one day after he had

19 been appointed to the Charlotte City Council to replace an

20 individual who had gone on to the State Senate.  And he had to

21 run a campaign, and he asked me to be his campaign manager.  I

22 think that was 1974.  And he was running for the Charlotte City

23 Council in 1975, I believe it was.

24 Q    Okay.  And as a result of that experience, did you

25 learn -- did you become interested in running for office

1  yourself?

2  A    No, not really.  I managed his political campaigns for

3  city council in '77 -- '75, '77, and then in 1979, he called

4  and said he was going to run for mayor of Charlotte, and I

5  managed his campaign for mayor of Charlotte.  We lost that

6  election by about 95 votes out of 100,000 votes cast in the

7  Democratic primary.  So he was out of office.

8          Then, two years later, he ran for the city council

9  again and was overwhelmingly elected, became the mayor pro tem.

10 And then two years after that, he ran for mayor again.  I

11 managed that campaign, and he was elected mayor of Charlotte in

12 that election.

13 Q    And --

14 A    And then, subsequently, he, in 19 -- let me get my years

15 right -- 1989, he called me and said he was going to run for

16 the United States Senate against Jesse Helms, and I managed his

17 first state-wide campaign in 1990.  And, of course, he lost

18 that election.  And then they created the 12th Congressional

19 District based on the 2000 Census.

20          And I called him and said I was ready to manage his

21 campaign for Congress, and he told me he was not going to run,

22 and suggested that I might consider doing it.  And I did.

23 Q    And that was in 1992 that you first ran for Congress?

24 A    1992, yes.

25 Q    And I believe you were elected for 11 terms?

1  A    I was elected for 11 straight terms, right.

2  Q    You're not currently in Congress?

3  A    That is correct.

4  Q    What are you doing at present?

5  A    I'm the Director of the Federal Housing Finance Agency as

6  an independent agency that has regulatory supervision over the

7  federal home loan banks and Fannie Mae and Freddie Mac.

8  Q    And, Congressman, over the years, were you aware of the

9  percentage of your district that was African-American?

10 A    Yes, I was.  I tracked it.  It was constantly in

11 litigation the first 10 years I was in Congress.  I think the

12 district changed at least four or five times, some of which I

13 ran in and some of which got thrown out before the subsequent

14 election.  But in the early stages, the Congressional District

15 was majority -- the voting-age population was majority

16 African-American.

17       And then the Court ruled that race was being taken

18 into account too much, and so they drew the district down.  And

19 there was district that I ran in in which the African-American

20 population was about 35 or 36 percent, and then that one got

21 changed.  And we finally settled on a district that was

22 approximately 40, 41, 42 percent African-American, and that one

23 was approved by the Supreme Court.

24 Q    Is it accurate, Congressman, that at every election since

25 1998, the African-American voting-age population in your

1  district was less than 50 percent?

2  A    That's correct.

3  Q    And at one point, it actually got down to, I think, 32 or

4  so percent?

5  A    Somewhere -- I was thinking it was a little bit higher

6  than that, but it probably was down to 32 percent.

7  Q    And like most politicians, you probably are familiar with

8  how you did in those elections?

9  A    Yes, I tracked that.  And when the district was over

10  40 percent, I generally got between 60 and 65 percent of the

11  vote.  The one occasion where the minority percentage had been

12  drawn down to 32 or whatever it was percent that we agreed on,

13  I got approximately 55 percent of the vote.  That was the

14  election in which they spent about a million dollars against me

15  telling people how terrible I was.

16  Q    Congressman Watt, you're a student of politics.  Tell the

17  Court what you think accounts for those margins of victory in a

18  district that was, since 1998, less than 50 percent

19  African-American?

20  A    Well, I would like to say good representation first.  I

21  think that is a factor in trying to serve all of the members of

22  the Congressional District without regard to race or gender or

23  ethnicity.  Over the years, and actually going all the way back

24  to when I managed campaigns for Harvey Gant in Charlotte, we

25  had developed a pretty strong process for building coalitions

1    across racial lines, across precinct lines, and racial

2    attitudes were in the process of changing, and they have

3    continued to change over time.

4    Q    Now, let's turn our attention to the 2011 redistricting.

5    You were still in Congress at that point?

6    A    That's correct.

7    Q    Okay.  Were you approached by Senator Rucho to meet with

8    him with regard to redistricting?

9    A    Yes, I was.  He asked me if I would come and meet with him

10   and give him my thoughts about congressional redistricting in

11   general and redistricting.  And I told him I'd be happy to do

12   that, and I went and met with him.

13   Q    Would you share with the Court what you shared with

14   Senator Rucho on that occasion.  That was in April, you said?

15   A    April 25th of --

16   Q    2011?

17   A    -- 2011.  I went to Raleigh with my district director and

18   met with what we were told was going to be Senator Rucho and

19   Representative Lewis, but Representative Lewis never showed up

20   for the meeting.  There was a staff person who came with

21   Senator Rucho, so it was the four of us.

22          And by that time, I had looked at the numbers.  My

23   Congressional District, the 12th Congressional District, was

24   approximately 2800 people over what the one person, one vote

25   mandate would have required.  And so I suggested to Senator

1    Rucho that we -- that because the district had gone through so

2    much litigation historically, and because the Supreme Court had

3    finally approved the district, that the wise thing to do would

4    be to do what I called a minimal change district for the 12th

5    Congressional District.

6              And I suggested to him he wait to do that by dropping

7    a couple of precincts that, for various reasons, I had felt

8    like I had not served as well as I had the rest of the

9    district, and by adding some smaller precincts to get to the

10   magic number of people in the Congressional District.

11   Q    Anything else occur at that meeting that you recall?  You

12   simply provided him your views about your district?

13   A    No.  He seemed receptive to the idea, and there were no

14   maps exchanged at that time.  I identified, I think, the

15   precincts that I suggested might be taken out.  I'm not even

16   sure I identified necessarily the precincts that would be put

17   in, the smaller precincts.  But the meeting was cordial and I

18   thought -- I thought constructive.

19   Q    Had you known Senator Rucho before?

20   A    I had.  Senator Rucho was my orthodontist before I went to

21   Congress.  I still have some of his work in my mouth.  And I

22   considered him a friend.  And so, in a sense, I mean, it was --

23   I thought he was asking me to give him advice because he was

24   telling me that he was going to be the -- or had been appointed

25   by that time as the Chair of the Redistricting Committee, and

1  was seeking my advice as a friend.

2  Q    Would those changes to those two or three precincts have

3  significantly affected the African-American population in that

4  district?

5  A    No, I don't think so.  I don't think so.  Basically, what

6  I suggested to him was my Congressional District, throughout

7  its history, had oriented generally up Interstate 85.  And

8  initially, a part of it went up Interstate 77.  And at some

9  point, if you went up Interstate 77, you'd get the towns of

10 Huntersville, Cornelius, Davidson where Davidson College is,

11 and my district actually went all the way into Iredell County,

12 one of the iterations of it, until it got shot down.

13         Well, in 2000 -- based on the 2000 Census, when the

14 districts were drawn, the folks in Davidson around Davidson

15 College wanted to stay in my Congressional District, and the

16 rest of the district was going to be oriented up Interstate 85.

17 So they kept Davidson in my Congressional District by going

18 across the Cabarrus County line to pick it up.  And it was just

19 inconvenient to get up there to serve the people in Davidson --

20 in Davidson, North Carolina, not Davidson County.

21 Q    Okay.  So when you left that meeting, you had no sense

22 that the population in -- the African-American population in

23 the district would be significantly increased?

24 A    No.  In fact, I was suggesting to him that a minimal

25 change district would comply with the law.  And I didn't see

1    any need to increase African-American percentage in my

2    Congressional District because I was getting 65 percent of the

3    vote.

4    Q    Did you subsequently learn that Senator Rucho planned, in

5    fact, to increase the African-American population in the

6    district significantly?

7    A    I learned that later.  He called me one weekend when I was

8    in Charlotte and asked me if I would meet with him again, and I

9    said, yes, but I don't want to drive all the way to Raleigh to

10   do it.  Both of us live here in Mecklenburg County; why don't

11   we do it here in Charlotte?  And he invited me to his home.

12            And I went to his home on a Monday morning, and we

13   had a meeting at his home.  It was kind of an interesting

14   meeting because when he called me on the phone, I was expecting

15   him to show me maps and tell me specifically how they planned

16   to draw the district because it was later in the process by

17   that -- by the time of that meeting.

18   Q    Was this in June?

19   A    I think it was in June.  And I got to the meeting, and it

20   really was kind of an uneventful meeting in the sense that

21   there were no maps.  And at some point, I mean, I could sense

22   that Senator Rucho was not very comfortable.  And at some

23   point, he said to me that his leadership had told him that he

24   had to ramp the minority percentage in my Congressional

25   District up to over 50 percent to comply with the Voting Rights

1   Law.  And I said -- I laughed.  And I think his discomfort was

2   because his leadership had told him that he was going to have

3   to go out and justify that to the African-American community.

4          So I chuckled and said, Bob, you won't be able to

5   justify this to the African-American community.  It is not --

6   the Voting Rights Act does not require it.  It does not mandate

7   it.  And the African-American community will laugh at you

8   because I'm getting 65 percent of the vote in a 40 percent

9   black district.  If you ramp my Congressional District

10  African-American percentage up to over 50 percent, I'll

11  probably get 80 percent of the vote, and -- and that's not what

12  the Voting Rights Act was designed to do.

13  Q    Just a matter of curiosity, what percentage vote did you

14  get in 19 -- I'm sorry, in 2012 in the newly redrawn 12th

15  District?

16  A    In the newly redrawn district, I got about 80 percent of

17  the vote, just like I had predicted to him I would.

18  Q    Did you express your concerns about this decision to the

19  North Carolina legislature?

20  A    I did.

21  Q    And did you ask Senator Graham to read a letter into the

22  record of the debates of the North Carolina General Assembly

23  about this matter?

24  A    I did.  I addressed a letter to Senator Rucho and

25  Representative Lewis as chairs of the committee, and I copied

1  that letter to a number of other people.  And Senator Graham --

2  State Senator Graham was a friend of mine, and I asked him if

3  he would read it into the record first at the hearing that they

4  were having, not on the legislative floor.  And then,

5  subsequently, I did a second letter that I asked him to read on

6  the floor of the Senate, I guess it was.

7  Q    Okay.  Congressman, would you turn to your tab in the

8  notebook in front of you.

9  A    I don't think I have a notebook in front of me.  I'm

10 sorry.

11         MR. SPEAS:  If I may approach the witness, Your

12 Honor.

13         THE COURT:  You may.

14 BY MR. SPEAS:

15 Q    Turning to Congressman Watt tab, and I'd like for you,

16 Congressman, to turn to tab 30 in that notebook.  And I would

17 ask you if that is the transcript of the proceedings of North

18 Carolina Senate on July 25, 2011, at which Senator Graham read

19 your remarks into the record?

20 A    It appears to be, yes, it does.

21 Q    And your remarks begin on page 38 of -- I'm sorry, they

22 begin on page 37 of Exhibit 30.  Do you see where your remarks

23 begin?

24 A    I do, yes.

25 Q    Okay.  And I would like for you, Congressman, if you

1  would, to turn with me over to page 38 of your remarks, and we

2  have this up on the screen.  I'd like for you to read for the

3  Court the comments in your letter beginning at line 6 on

4  page 38 and continuing to line 23.

5  A    It says, Plan 1, propose to increase the African-American

6  population in the 12th District from approximately 40 percent

7  to over 50 percent.  I have repeatedly expressed to Senator

8  Rucho my belief that increasing the African-American population

9  in the 12th District is not required, justified, or sanctioned

10 by the Voting Rights Act.

11          The Voting Rights Act, which I was instrumental as a

12 member of the House Judiciary Committee and as Chairman of the

13 Congressional Black Caucus to get Congress to reauthorize and

14 extend, was designed to counteract the ethnic and racially

15 repolarized voting and level the playing field for

16 African-American candidates and voters.  It was not, as several

17 Court decisions have indicated, designed to create racial

18 ghettos in which African-American candidates are given

19 inordinate and unreasonable election advantages.

20 Q    Do you stand by those words today?

21 A    I absolutely do.

22          MR. SPEAS:  Thank you.  No more questions.

23          THE COURT:  Cross-examination?  And just for the

24 record, I don't know, ultimately, in terms of the official

25 record whether these books will be a part of it, so I do think

1  when you have him turn to a tab, you probably ought to note the

2  actual exhibit number.  You understand what I'm --

3          MR. SPEAS:  And it's exhibit -- it's Plaintiff's

4  Exhibit 30.

5          THE COURT:  This one will be -- looks like

6  Defendant's 30.

7          MR. SPEAS:  There is a version in our record of --

8          THE COURT:  Okay.

9          MR. SPEAS:  -- Plaintiff's 30.  There is also in

10 their record at 30.

11         MR. FARR:  May I make a suggestion to my learned

12 colleague?

13         THE COURT:  Make it to me and we'll see what he

14 thinks of it.

15         MR. FARR:  All right.  Perhaps the Court might think

16 this is a good idea.  I don't know why we couldn't just put an

17 exhibit sticker on this notebook, like a class exhibit sticker.

18         THE COURT:  Whatever.  In terms of an official

19 record, I just want to make sure that ultimately at the end of

20 the day, it's not confusing.  So, for now, it's Plaintiff's 30?

21         MR. SPEAS:  Plaintiff's 30.

22         MR. FARR:  Defendant's 30?

23         THE COURT:  Defendant's 30.

24         MR. SPEAS:  Defendant's 30.

25         THE COURT:  All right.

 1            MR. SPEAS:  Thank you.

 2            THE COURT:  Defendant's 30.

 3            MR. SPEAS:  It has a plaintiff's number.  Okay.

 4    Thank you.

 5            THE COURT:  All right.  Cross-examination?

 6            MR. FARR:  Yes, Your Honor.  I have a couple things

 7    I'd like to do.  I would like to approach Congressman Watt.

 8            Congressman Watt, may I address you as Congressman

 9    Watt?

10            THE WITNESS:  I've been called worse.  Yes.

11            MR. FARR:  Thank you, sir.  I'd like to approach

12    Congressman Watt and give him a copy of exhibit -- Defendant's

13    Exhibit 126, which is the map notebook which I handed up to the

14    Court previously.

15            THE COURT:  All right.

16            MR. FARR:  And I'd also like to have an easel up

17    there so I could put some blowups of the map up so the Court

18    and Congressman Watt could see some blowups of a couple of

19    these maps, if that would be all right.

20            THE COURT:  This is Defendant's Exhibit 126?

21            MR. FARR:  Yes, sir.

22            THE COURT:  All right.  Any objection to Defendant's

23    126?

24            MR. SPEAS:  No, Your Honor.

25            THE COURT:  All right.

1              (Discussion regarding placement of exhibits.)

2              MR. SPEAS:  Your Honor, may I stand here?

3              THE COURT:  You may.

4                         CROSS-EXAMINATION

5   BY MR. FARR:

6   Q    Okay.  Congressman Watt, I want to go through the

7   historical maps of the 12th District, and that's what

8   Exhibit 126 is, so could you just turn in Exhibit 126 to Tab 1?

9   Do you see Tab 1?

10  A    Yes.

11  Q    Now, does Tab 1 include a map of the original version of

12  the 1st Congressional District as it was enacted in 1991?  You

13  can stay at the exhibit because there's a session log attached

14  at the beginning of it.

15  A    If you're asking me if I know whether this is the map, the

16  answer is no.  I mean, I take your word for it that it is, but

17  I -- I mean, it's been a lot of water under the bridge since

18  this map was drawn.  And I was -- you should also know that I

19  was not really involved in the drawing of any of these maps.  I

20  was the -- my district was the subject of some of them, and I

21  represented the district throughout, but I was not -- in the

22  state legislature, I was not actively participating in the

23  drawing of maps.

24  Q    Okay.  But the -- is my memory correct, Congressman Watt,

25  that you were the first person to run in Congressional District

1  12?

2  A    Yes.

3  Q    Okay.  And do you recall that in '91, the General Assembly

4  passed a map that only had one majority-black district, and the

5  Justice Department objected to that under Section 5?

6  A    I remember that, yes.

7  Q    Okay.  And there have been a bunch of cases about

8  Congressional District 12, and are you familiar with those

9  cases?

10  A    Generally, yes.

11  Q    Like the *Shaw* case.  You're familiar with that?

12  A    Generally, yes.

13  Q    You're familiar with *Cromartie* case?

14  A    Generally, yes.

15  Q    Okay.  Now, do you recall that when the Justice Department

16  objected to the first Congressional Plan, that they suggested

17  that the State create a majority-minority coalition district

18  running from Mecklenburg County to Wilmington?

19  A    I don't have any personal knowledge of that other than

20  what I read in the newspaper.  I mean, I was not involved in

21  that process, to be quite honest.

22  Q    Well, do you recall that that was what the objection from

23  the Justice Department said?

24  A    I recall that's what I read in the newspaper, yes.

25  Q    And did the General Assembly enact a second majority-black

1  district running from Charlotte to Wilmington?

2  A    I don't recall whether they did or not.

3  Q    Okay.  Well, let's turn to Tab 2.  And can you recognize

4  that as the 1992 Congressional Plan that first created the 12th

5  District?

6  A    This is the one that appears to run from Gastonia and

7  Charlotte on the south to Durham on the north.  Is that the one

8  you're referencing?

9  Q    Right.

10  A    Yes.

11  Q    And this was the district that was the subject of the *Shaw*

12  litigation; is it not?

13  A    I think that's correct.

14  Q    And in the *Shaw* litigation, there was no ruling on the

15  legality of the 1st Congressional District as it appears in

16  this map; is that correct?

17  A    I have no idea, to be quite honest with you.

18  Q    Okay.  And in the *Shaw* case, the second time it went to

19  the Supreme Court, the Supreme Court ruled this version of

20  District 12 to be an illegal racial gerrymander; is that

21  correct?

22  A    I think that's correct, yes.

23  Q    All right.  And then, if you turn to Tab 3, do you

24  recognize this, that this was the plan that the General

25  Assembly enacted after the *Shaw* case?

1  A    I know that this is a plan that was adopted.  I don't know

2  whether this is the plan that was adopted after the *Shaw* case.

3  I mean, my problem is I was not involved in the litigation.  I

4  mean, I was running in these districts after the cases were

5  decided, after the districts were drawn, but I was not actively

6  involved in the drawing of any of the districts.

7  Q    All right.  But do you recall running in a district that

8  looked like this in --

9  A    Yes --

10 Q    -- the 2000 general election?

11 A    Yes, I do recall that.

12 Q    Okay.  And is it fair to say that in this district,

13 you're -- the 12th District in this case does not go into Union

14 County?  Is that fair to say?

15 A    Does it go into Union County?  No, it has never gone into

16 Union County that I'm aware of.

17 Q    Okay.  And it didn't go into Cabarrus County, either; did

18 it?

19 A    No.

20 Q    And the 8th Congressional District in this plan did not go

21 into Mecklenburg County; is that correct?  This '97

22 House/Senate Plan A, the 8th District does not go into

23 Mecklenburg County?

24 A    The 8th District is the -- is what's in blue.  It appears

25 to go into Mecklenburg County, but I may be misreading.

1  Q    I think that's the 9th District.  I think the color is

2  blending.

3  A    Oh, okay.  I see what you're saying.  So what color is the

4  8th District?  I'm not sure.

5  Q    It's the light blue.

6  A    It's what?

7  Q    The light blue.  It's in Union County, in Catawba, and

8  Stanly, and Hanson, and so forth.

9  A    Okay.

10 Q    So that -- the 12th District didn't go into Cabarrus

11 County under this plan?

12 A    I'm sorry?  Would you --

13 Q    The 12th District was not pushed into Cabarrus County --

14 A    That's correct, yes, not in this plan, right.

15 Q    -- in this plan?  And the 8th District was not pushed into

16 Mecklenburg County?

17 A    Based on what you say, yes --

18 Q    Okay.

19 A    -- that appears to be correct.

20 Q    Now, turning to Tab 4, did you ever run in the 12th

21 District as a representative by this plan?

22 A    I don't know the answer to that.  I ran in a 12th District

23 that appeared similar to this, but I don't know whether it was

24 this plan or not, to be quite honest.

25 Q    All right.  Did you -- the district that you talked about

 1 where you won with 55 percent of the vote.

 2 A    Is that this district?

 3 Q    That's what I'm going to ask you.

 4 A    Okay.

 5 Q    I think it is.  I think it is.  I want to know --

 6 A    I don't know, because I can't look at a map like this and

 7 really tell what's included.  I mean, there's not enough

 8 detail.  This is just a picture.  So I'll take your word that

 9 this is the -- this is the district that drew the minority

10 percentage down to -- but, I mean, you're asking me to testify

11 about it, and I don't know the answer to that.

12 Q    Okay.  You ran one time in a district that had a minority

13 population in the 30 percent range?

14 A    That's correct.

15 Q    Was that in 1998?

16 A    That's correct.

17 Q    And then, that district went away and you never had an

18 election in that again?

19 A    That's correct.

20 Q    In 2000, is it not true that you -- your district that you

21 ran in was the one that is represented under Tab 3, the '97

22 House/Senate Plan A.

23 A    I'm not trying to avoid your question.  I just can't look

24 at these maps and tell you for certain that what you're saying

25 is correct.  I mean, I don't have any reason to dispute what

1   you're saying, but I suppose you're not testifying.  So, you're

2   trying to get me to confirm it, and I don't have the ability to

3   do that based on looking solely at these -- at the map.

4   Q    Okay.  Well, do you recall the counties that your district

5   was in?

6   A    Yes.

7   Q    And so, in the 2000 election, what counties was your

8   district in?

9   A    Part of Mecklenburg.  Is that Tab 3?

10  Q    I'm looking at the 2000 election, which we're looking at

11  Tab 3.

12  A    Okay.  According to this map, it would be Mecklenburg --

13  part of Mecklenburg, part of Iredell, part of Rowan, part of

14  Davidson, and part of Forsyth, and part of Guilford.

15  Q    Okay.  And then, if you turn to Tab 5, do you recall

16  whether or not Guilford County was in the district that you ran

17  in in '98?

18          MR. SPEAS:  Your Honor, I object to this line of

19  questioning.  Mr. Farr has lots of witnesses over there who can

20  testify from their own knowledge about what map is what.  This

21  witness simply does not have that information.

22          And I think what we've got here is Mr. Farr is

23  testifying, not the witness, so I object to this.

24          THE COURT:  I can sort through what's comments by

25  counsel and what Senator Watt is testifying to.  But in terms

1  of the substantive objection, response?  Any response?

2          MR. FARR:  Well, your Honor, he testified at length

3  about all the elections that he ran in from '92 to 2010 in this

4  district, so I think it's fair game for me to ask him about the

5  districts he ran in.

6          THE COURT:  All right.  I'm going to overrule the

7  objection and allow the question to continue.  Now, I

8  understand your issue in terms of if he doesn't identify the --

9  or doesn't know what the map is, a lot of colloquy from counsel

10 about what it is may not advance things.  But in terms of

11 asking him about the districts in which he ran, I think this is

12 fair, and I'll overrule.

13         Do you remember what the question was?

14         THE WITNESS:  No, sir.

15         THE COURT:  I didn't.

16         MR. FARR:  I don't, either, Your Honor, so I'll start

17 with another one.

18         THE COURT:  Let's start back over.  I think you were

19 moving --

20 BY MR. FARR:

21 Q   Actually, what I want to do now is I want to turn to the

22 Congressional Zero Deviation Plan which is under Tab 5, and may

23 I go to my exhibit now, Your Honor?

24         So Congressman Watt, Tab 5 is the plan that was

25 enacted in 2001 that you -- the 12th District that you ran in

1   was in the Congress Zero Deviation Plan?

2           THE COURT:  You're welcome to stand there, Mr. Farr,

3   but when you move away from the microphone, you need to raise

4   your voice.

5           MR. FARR:  Okay.

6           THE COURT:  If you could ask that question again.

7           THE WITNESS:  I have to take your word for it.  I

8   can't -- I mean, I can't look at this map and tell you that it

9   is or is not the map that was passed.  I mean, but if you say

10  it is, I don't have any reason to dispute that.

11  BY MR. FARR:

12  Q    Okay.  Do you recall what county your 2001 district was

13  located in?

14  A    Part of Mecklenburg, part of Cabarrus, part of Rowan, part

15  of Davidson, part of Forsyth, and part of Guilford.

16  Q    And looking at this map, you see the light blue that's the

17  8th District on this exhibit over here, Congressman Watt?

18  A    Yes.

19  Q    Okay.  Now, I think we looked at the map.  The map seemed

20  to indicate that the 8th District was not in Mecklenburg County

21  under the 97 Plan, and this map seems to indicate it was pushed

22  into Mecklenburg County under the 2001 Plan.  Do you know why

23  that happened?

24  A    I don't have any idea.

25  Q    Okay.  Now, in 2000, was there a Republican incumbent

1  elected from the 8th District named Robin Hayes?

2  A     I served with Robin Hayes.  I'm not sure which years he

3  served.

4  Q     And during the 2000 era, was he not defeated in District 8

5  by Congressman Kissell?

6  A     He was defeated by Congressman Kissell at some point, yes.

7  Q     Okay.  And let's look at Congressional District 13.  We

8  got a new Congressional District in 2001; is that correct?

9  A     That's correct.

10 Q     And do you recall who the Chairman of the Senate

11 Redistricting Committee was in 2001?

12 A     I understand there was Representative Brad Miller, but I

13 mean, I didn't know that at the time.

14 Q     So he was the Chairman of the Senate Redistricting

15 Committee in 2001?

16 A     That's what I understand, yes.

17 Q     And he played a role, then, in drawing District 13?

18 A     I don't know the answer to that.  I assume he did if he

19 was chair of the committee.

20 Q     Okay.  And District 13 runs from Raleigh and goes up

21 through Randall County, Pearson, Caswell, and then this arm

22 that reaches down into Alamance County; do you see that?

23 A     Yes.

24 Q     And then it goes over to Pearson, splits Pearson, and then

25 kind of squiggles down into Greensboro; do you see that?

1  A    Yes, I see it on the map.

2  Q    Okay.  Do you recall, in Greensboro, what happened to your

3  97th District, the district you ran in in 2000, how did that

4  change in Greensboro under this Congressional Zero Deviation

5  Plan?

6  A    Some of the precincts on the northern -- the most northern

7  end of the district went out of my Congressional District and

8  into the 13th District.

9  Q    Right, and those were pretty heavily Democratic precincts?

10  A    I assume they were.  Greensboro is pretty heavily

11  Democratic in most of the precincts.

12  Q    And do you know the racial composition of the precincts

13  that were taken out of your '97 version of the 12th District

14  and put in the 2001 version of District 13?

15  A    I probably did at some point, but I don't -- I don't have

16  a recollection of what they were.

17  Q    All right.  And from 2002 through 2010, who was elected to

18  District 13?

19  A    Brad Miller.

20  Q    Right, the guy who was the Chairman of the Senate

21  Redistricting Committee; is that right?

22  A    Well, he was, yeah, I guess.  Yeah.

23  Q    Before I leave, let's put up -- just to make this point.

24  So, Congressman Watt, this is a blowup of the 2011

25  Congressional Plan.  And there's a copy of it, I believe, in

1  Tab 12 of the notebook that I've given you, and I just have a

2  couple of questions about this.  Now --

3  A    Is this the one that was approved finally?

4  Q    It is.

5  A    Okay.

6  Q    You say you met with Senator Rucho twice?

7  A    Yes.

8  Q    The first time you met with him was in where?

9  A    In Raleigh at the state legislative building.

10 Q    All right.  And do you recall someone named Brent Woodcox.

11 A    I don't recall.  I know there was a staff person in the

12 meeting.  Is that who you're talking about?

13 Q    Yes.

14 A    I know -- I never got his name, I don't think.

15 Q    Yes, sir.  And during that meeting -- excuse me for that.

16 I didn't mean to hit you with the spotlight here.  During that

17 meeting, did you ask the staff person to stop taking notes of

18 the meeting?

19 A    I don't recall that I did.  I don't believe I did.

20 Q    Okay.

21 A    I don't know how I would have had any authority over

22 Senator Rucho's staff person.

23 Q    Okay.  So you don't recall telling this staff person that

24 you didn't want him to take notes in the meeting?

25 A    I don't recall it, but, you know, in context, this was a

1  meeting of friends, so I wasn't sure exactly what purpose even

2  having staff people there was.  But I don't recall giving him

3  any such instruction, no.

4  Q    All right.  Now, Congressman Watt, I think -- do you

5  recall that back in the days of *Shaw*, there had a been

6  suggestion from the Justice Department that the 2nd

7  majority-black District should start in Charlotte and run to

8  the east?  Do you remember your testimony on that?

9  A    You mean my testimony today on that?

10  Q    Yeah, we talked about that.

11  A    I don't think I've testified about that because I don't

12  have any real knowledge of that district.

13  Q    Okay.  Did you recall that the Justice Department had made

14  an objection?

15  A    Yes, I do remember they made an objection and said draw a

16  second voting rights district.

17  Q    All right.  And did you -- at the time, did you talk to

18  any of the congressmen that were in office right at that point

19  in time to discuss the political impact on the incumbent

20  Democratic congressman if districts had been drawn from

21  Charlotte all the way to Wilmington?

22  A    I don't recall having any conversations with anybody along

23  those lines.  I recall having some conversations with some

24  people that suggested that running a district from Charlotte,

25  an urban city, through -- down 74 would not create any district

1   that had any sensibilities to it.  And I thought and I've

2   expressed on a number of occasions that the urbanness of the

3   12th Congressional District was one of the -- one of the

4   defining criteria that was important.

5           That's where you had all of your historically black

6   colleges and universities.  That's where you had urban

7   residents in Charlotte, Greensboro, Winston-Salem, all the way

8   up to Durham, so -- but I don't recall having any discussion

9   with anybody about the politics of what impact it would have

10  politically.

11  Q    Okay.  In your discussions with Senator Rucho, was there

12  any discussion about -- in 2011, the possibility of drawing

13  your district from Charlotte right up to the east?  Did that

14  ever come up in your meetings with Senator Rucho?

15  A    I don't recall that it did, but if it did, I probably

16  would have suggested the same thing that I suggested a number

17  of times before, that running a district in that way would just

18  not make any sense in terms of cohesiveness of the district.

19  Q    Okay.  And do you recall having any discussion with

20  Senator Rucho about whether or not native Americans in the

21  Robeson County area would be cohesive with African-Americans in

22  Mecklenburg if a district was drawn in that direction?

23  A    I recall having a discussion with him about Representative

24  McIntyre's representation of native Americans and

25  African-Americans, and -- let me see how I can put this

1  politely.  I thought that Representative McIntyre missed a

2  number of opportunities to coalesce African-American voters and

3  native American voters into a single bloc as opposed to

4  dividing them constantly on a number of issues.

5          I don't recall any other conversation, and it

6  certainly wasn't in the context of them being in the 12th

7  Congressional District.

8  Q    Okay.  All right.  Now, I'll put this back up for a

9  second.  This is the 2001 Plan Congressional Zero Deviation?

10 A    Which tab is that?

11 Q    I can't remember.  It might be 6.  There's two tabs for

12 Congressional Zero Deviation.

13          THE COURT:  Try 5.

14          MR. FARR:  Five, I believe, is the 2000 Census --

15          THE COURT:  Five and six.

16          MR. FARR:  -- and 6 is the 2010 Census.

17          THE COURT:  All right.

18          THE WITNESS:  So I'm looking at 6, that's what this

19 is?

20          MR. FARR:  Yeah.

21          THE WITNESS:  Okay.

22 BY MR. FARR:

23 Q    So I just wanted to ask you this question.  The folks in

24 Guilford County that were in the 13th District, do you know

25 whether any of those voters had previously been in your 12th

1  District?

2  A     I'm pretty sure some of them were, yes.

3  Q     Okay.  And so, under the 2001 plan, they were in the

4  13th District.  Would you agree that was a strong Democratic

5  district for Congressman Miller?

6  A     You know, I never really looked that closely at

7  Congressman Miller's district.  I knew that it was making my

8  travel time shorter because it was making -- it was taking the

9  most northern part of my Congressional District out.  And by

10 that time, I accepted the notion that it was better to have

11 more compactness, because while I started out advocating that

12 it was fine to go all the way to Durham, I also knew that my

13 experience was that it put a lot of miles on your car and a lot

14 of miles on your body to travel that distance to represent

15 people.

16 Q     Okay.  Did you have any discussions with Senator Rucho

17 about Section 5 and how that applied to voters in Guilford

18 County?

19 A     I told him I understood that Greensboro -- that Guilford

20 County was a Section 5 district, and that I thought that to

21 retrogress might be a problem legally, but I also made it clear

22 to him that to ramp up the percentage of African-Americans was

23 not required based on my understanding of what the Voting

24 Rights Act and the case law was saying.

25 Q     Did you ever say that you thought there would be a

1  Section 5 objection if the new plan didn't take care of the

2  voters in Guilford County?

3  A    I think I said that there might be a problem if he

4  retrogressed from the percentages that existed.  But I also was

5  very clear that increasing the minority percentage in this

6  district was just bordering on insanity, because, as I told

7  him, you know, I'm getting 65 percent of the vote.  You're

8  going to give me a district in which I get 80 percent or more

9  of the vote, and that's not justified nor mandated by the

10  Voting Rights Act.

11  Q    Okay.  But isn't it true you -- you testified at trial,

12  Congressman Watt, you stated that you know a little bit about

13  Section 5; do you recall that?

14  A    Yes, I do.

15  Q    And are there ever any Section 5 objections raised when

16  the black community is fractured into different districts?

17  A    I don't know the answer to that question.  I know

18  something about Section 5, but I don't know whether -- every

19  objection that might get raised.

20  Q    Okay.  Now, looking at that Congress Zero Deviation, it

21  starts in Mecklenburg, it goes to Rowan, Davidson, Forsyth, and

22  Guilford County; correct?

23  A    Yeah.  You skipped over Cabarrus.

24  Q    I skipped Cabarrus, that's right.  So that's six counties;

25  correct?

1   A    Yes.

2   Q    And they're all divided?

3   A    Yes.

4   Q    There's not a single whole county in that district?

5   A    That's correct.  There never has been a single whole

6   county in the 12th Congressional District throughout its entire

7   history.  Well, actually, I take that back.  There was one

8   iteration where -- that I saw, I'm not sure I ever ran in that,

9   where all of Rowan County was in the 12th Congressional

10  District.

11  Q    But the ones that were enacted were based on divided

12  counties?

13  A    I can't remember whether I ran in that or whether it was

14  just a proposal that never got passed.

15  Q    All right.  Well, if it's a whole county, if there was a

16  whole county in one of these districts you ran in, it would be

17  the 98th District, and we've gone over that map, and I won't do

18  that again.

19           But what I want to do now is this is the 2011 plan.

20  And this plan is -- this is one that was enacted in 2011, and

21  it's in a portion of Mecklenburg, Cabarrus, Rowan, Davidson,

22  Forsyth, and Guilford; is that correct?

23  A    Which tab is it?

24  Q    This would be 12.

25  A    Twelve.  Yes, that's the same six counties -- parts of the

1  same six counties, but I assume a different configuration.

2  Q    Okay.  But the 2011 12th District is in portions of the

3  same six counties --

4  A    That's correct.

5  Q    -- that were included in the 97th District in which you

6  ran in the 2000 election?

7  A    That's correct.

8  Q    Now, Congressman Watt, when you met with Senator Rucho on

9  April 25th with the staff person, did he tell you he was going

10 to do what you asked him to do?

11 A    No, he didn't, but he seemed receptive to what I was

12 suggesting.

13 Q    So he was friendly?

14 A    Yes.  Well, he's always been friendly.  I mean --

15 Q    But he never said he was going to do what you requested?

16 A    That's correct.

17 Q    And did you have any discussions with him about how your

18 district related to the other districts that adjoined the 12th

19 District?

20 A    No.  I mean, obviously, if you move precincts, it's going

21 to have some impact, but my suggestion was a minimal degree of

22 change which would result in minimal impact on the surrounding

23 districts.

24 Q    So minimal change would have resulted in the 8th District

25 remaining in Mecklenburg County?

1   A    I don't know, because I was looking at it from the 12th

2   Congressional District, and what I was suggesting to him was

3   how he could minimally change the 12th Congressional District.

4   I wasn't having discussions with him about the 8th or other

5   Congressional Districts.  I mean, I knew it would have some

6   impact, but we were not at that level of detail.

7   Q    Okay.  So you had no discussions with Senator Rucho about

8   the political impact of how District 12 would be drawn in 2011

9   on other Congressional Districts?

10  A    I can't swear that I didn't have some discussion with him

11  about political impact.  I recall saying to him that my

12  impression was that members of the delegation were happy with

13  their general districts and were not lobbying to change

14  substantially.  That would be a political statement of sorts.

15  But I don't think I was in a position to really talk about much

16  other than the 12th Congressional District, which is what I

17  thought the meeting was designed to talk about.

18  Q    Okay.  I want to ask you about your meeting with Senator

19  Rucho in -- at his house.

20          THE COURT:  Let me ask you a question.  How much

21  longer do you have with this witness on cross, Mr. Farr?

22          MR. FARR:  I would say 15, 20 minutes.

23          THE COURT:  This is a good point, I think, to take a

24  lunch recess.

25          MR. SPEAS:  Your Honor, Congressman Watt has some

1  plans and obligations.  If we could finish before lunch, it

2  would be very helpful.

3          THE COURT:  All right.  We'll continue.  Let's move

4  it along.

5          MR. FARR:  All right.  Thank you, Your Honor.

6  BY MR. FARR:

7  Q    So, Congressman Watt, when you met with Senator Rucho at

8  his house, when was that again?

9  A    It was a month or two after the meeting in Raleigh.  I

10 didn't have -- I don't have a specific date for it, but I think

11 it was in June.

12 Q    Okay.  Was anyone else present for that meeting?

13 A    Senator Rucho's wife came in briefly, and Representative

14 Samuelson was there for a part of the meeting.

15 Q    Was Representative Samuelson there when you arrived?

16 A    I think she was, but I'm not positive.

17 Q    Was she there at the time you left?

18 A    I'm not positive of that, either, but I think most of the

19 conversations I had with Senator Rucho, I got the impression he

20 wasn't trying to have it in front of Representative Samuelson

21 because he was embarrassed that he was being called on to do

22 something that he didn't appear to be comfortable with.

23 Q    All right.  So what room did you meet Senator Rucho in his

24 house?

25 A    In his kitchen.

1  Q    And was --

2  A    We stood around.  I mean, he had he donuts and coffee, and

3  we stood around a little island in his kitchen.

4  Q    And did you go to any other room during the time you were

5  there?

6  A    I think he may have taken me on a tour of parts of his

7  house, but we didn't -- I don't think we met in those rooms.

8  Q    When he took you on a tour of his house, did you have any

9  discussion about redistricting, or did that occur in the

10  kitchen?

11  A    You're taxing my memory to a point that I couldn't swear

12  to it, to be quite honest.

13  Q    All right.  So was the discussion that you've testified

14  about, did that occur in the kitchen, about ramping up the

15  district?

16  A    You know, I have searched my mind because my recollection

17  is that it actually occurred as we were leaving.  And Senator

18  Rucho appeared to want to show me the way back out of his

19  community and used that as an excuse to go out front.  And my

20  recollection is that that's where the conversation -- there

21  wasn't much discussion about congressional redistricting in

22  this meeting.  I mean, I can't -- one of the things that

23  surprised me was that he would call me at home on a weekend,

24  ask me to meet with him.  I thought he was going to show me

25  maps.

1        There were no maps.  And he appeared not very

2   comfortable having much discussion in front of Representative

3   Samuelson.  I'm not even sure how she got to the meeting.  I

4   didn't know she was coming to the meeting.

5        But at some point, he told me that his leadership had

6   told him that they were going to ramp -- or he must ramp up

7   these districts to over 50 percent African-American, both the

8   1st and the 12th, and that it was going to be his job to go and

9   convince the African-American community that that made sense.

10       And I said, Bob, that's just -- you're not going to

11  be able to do that, and I'm not going to be able to support you

12  if you do that because I know that it does not make sense.  And

13  so, it is not required by the Voting Rights Act, it's not

14  mandated, it's not justified.  And for you to say that you're

15  going to go and try to convince the black community that this

16  is in their interest is just not going to fly, and I'm not

17  going to sit idly by and say that this makes sense because I

18  don't think it makes sense.

19  Q    So you said you wouldn't sit idly by?

20  A    Well, I don't know if I used those exact words, but I

21  mean, you know, the essence of what I was saying was, look, I'm

22  not going to support you if you go out and say that this is in

23  the interests of the African-American community because I don't

24  think it is.

25  Q    All right.  Now, do you know for sure where that

1   conversation took place?

2   A    I don't know for sure where that conversation took place.

3   I've already testified about that.

4   Q    And do you know for sure whether or not Representative

5   Samuelson was present when the conversation --

6   A    I don't think she was present when that conversation took

7   place, no.

8   Q    You can remember she's not present, but you can't remember

9   where the conversation took place?

10  A    Well, I can remember -- I can remember that I believed

11  that she was not present because it appeared to me that Bob was

12  going out of his way not to have her present.  It seemed to me

13  that she was -- she invited herself to that meeting, it

14  appeared to me.

15          Now, you know, that's -- I can't swear to that,

16  either, but it did not appear to me that he was interested in

17  having this conversation in front of her.

18  Q    So, Congressman Watt, you were the first person to serve

19  in the 12th District, and you've testified that you were

20  familiar with the *Shaw* litigation and the *Cromartie* case;

21  correct?

22  A    Yes, generally.

23  Q    Right.  And you're aware that in a case like this, if the

24  plaintiff proves that race is the predominant motive, that the

25  district's subject to a more heightened level of scrutiny than

1  if race is not the predominant motive?  Don't you understand

2  that?

3  A    I think that there's some case law to that effect, yes.

4  Q    Okay.  And you were against a district that would draw the

5  black population above 50 percent in your district; correct?

6  A    Wasn't so much that I was against it.  I mean, from my

7  electoral advantage, it would've been a much, much easier

8  district to run in.  But, you know, I just participated in the

9  judiciary committee, in reauthorizing the Voting Rights Act,

10 and I knew that the Voting Rights Act didn't stand for what he

11 was suggesting he was planning to do.

12 Q    Okay.  That's your understanding of the Voting Rights Act?

13 A    Beg your pardon?

14 Q    That's your understanding of the Voting Rights Act, and

15 you thought what Senator Rucho wanted to do violated your

16 understanding of the Voting Rights Act?

17 A    That's correct, yes.

18 Q    Okay.

19         MR. FARR:  Now, may I approach the witness, Your

20 Honor?

21         THE COURT:  You may.

22         MR. FARR:  I have some exhibits I'd like to hand up

23 to the Court.

24 BY MR. FARR:

25 Q    Now, Congressman Watt, I've handed you Defendant's

1   Exhibit 28.  Do you remember this exhibit?

2   A    Yes.

3   Q    Was this a statement that you prepared?

4   A    I did, yes.

5   Q    And did you send this to Senator Graham to have him read

6   this at a committee hearing?

7   A    I did, yes.

8   Q    And so, this statement was prepared after you had your

9   meeting with Senator Rucho at his house?

10  A    That's correct.

11  Q    And, by the way, when you say the 12th District is drawn

12  over 50 percent, what census category are you relying on?

13  A    I'm sorry, would you repeat that?

14  Q    Do you know the different types of census categories for

15  African-Americans?

16  A    I don't, no.

17  Q    Okay.  Now -- so this was a statement that you prepared to

18  have Senator Graham read at a committee hearing, and this was

19  prepared after you had told Senator Rucho that drawing your

20  district over 50 percent did not comply with the Voting Rights

21  Act; correct?

22  A    That's correct.

23  Q    And your understanding was that if Senator Rucho intended

24  to draw the district over 50 percent, that could be used as

25  evidence that race was the predominant motive for Congressional

1  District 12; is that correct?

2  A    I don't know that I ever thought about it in that context

3  until you suggested it, but it probably would be, but that

4  didn't have anything to do with what I was doing.

5  Q    All right.  Now, in reading Defendant's Exhibit 28, which

6  was going to be read to the General Assembly pursuant to your

7  instructions, is there anything in this statement that you

8  prepared, Congressman Watt, disclosing this conversation you

9  say you had with Senator Rucho where he told you that

10  leadership was requiring him to ramp up the district over

11  50 percent?

12  A    No.

13  Q    And don't you think that would have been important

14  information for the General Assembly to have?

15  A    Well --

16  Q    Just yes or no, and then you can explain.

17  A    It probably would be important information.  But these

18  statements, until Senator Rucho started talking about them

19  publicly, I was treating as confidential conversations between

20  me and Senator Rucho.  When he started to misrepresent what I

21  had said publicly, then that's when I started to say there's

22  some sinister motivations taking place here, so the answer to

23  your question is, no, it's not in here, but in a subsequent

24  letter, I put that in context.  The idea that it was read on

25  the floor of the legislature puts it in context.

1   Q    Okay.  We'll get to that in a second, Congressman Watt.

2   But -- so this statement was designed to refute public

3   statements by Senator Rucho that she thought he had

4   misrepresented what she had said; is that correct?

5   A    Yes.

6   Q    Did Senator Rucho ever make a public statement saying that

7   you were the person who was responsible for drawing the

8   district over 50 percent?

9   A    I think there are public statements that imply that, yes.

10  Q    Not imply it.  Did he ever say it?  Did he ever say --

11  A    I mean, I -- the last thing I'm going to do is go and look

12  at every statement that Senator Rucho has made on this subject.

13  I mean, that's just not something I --

14  Q    Have you ever seen the statement by Senator Rucho where he

15  stated that he drew the district up over 50 percent because you

16  wanted it that way?

17  A    I've seen a statement where he was very close to saying

18  that, yes.

19  Q    What do you mean by "very close"?

20  A    Well, he was making it sound like this was my idea to ramp

21  these minority percentages up, and I just knew that that was

22  not the case.

23  Q    Do you have a copy of that statement?

24  A    I'm sure -- I'm sure I would somewhere, but I don't have

25  it here on the witness stand with me.

1  Q    Okay.

2  A    I think if you read some of the exhibits where public

3  statements were being made, they were making it sound like,

4  somehow, this was my idea and Representative Butterfield's

5  idea, and I just thought that was a ludicrous thing to suggest.

6  Q    Okay.

7  A    Because I knew it wasn't my idea, and I didn't think it

8  was Representative Butterfield's idea, either.

9  Q    All right, Congressman Watt, looking, again, at

10  Defendant's Exhibit 28, you wrote this to correct the record

11  for misrepresentations that you thought Senator Rucho made; is

12  that right?

13  A    Yes.

14  Q    Okay.

15  A    That's what the first paragraph says.  I wish to submit

16  this statement for the public record to provide additional

17  context to the selective and misleading characterizations of my

18  opinions that the chairs of North Carolina's Legislative

19  Redistricting Panel have entered into the record.

20  Q    Okay.

21  A    Yes.

22  Q    And in this exhibit, you do not make -- you do not say in

23  this exhibit that Senator Rucho had publicly stated incorrectly

24  that you were the person responsible for having the district

25  drawn over 50 percent?

1  A    Well --

2  Q    Is that yes or a no, and then you can explain your answer.

3  A    No, I do not -- well, I do say that because when I say to

4  provide additional context to the selective and misleading

5  characterizations of my opinions, what I'm saying is that he

6  has misrepresented what I've said.  And to the extent that he

7  is either saying or implying that it was my idea to ramp these

8  districts up to 50 percent, he's just -- he's just out and out

9  not telling the truth.

10 Q    Okay.  But you give -- you give -- in this statement, you

11 give specific examples of statements you thought Senator Rucho

12 had misrepresented what you told him; right?  Aren't there some

13 specific examples in this statement?

14 A    The next to the last paragraph says, the chairs are

15 incorrect in implying that I, at any time, endorse their

16 configuration, which shifts large numbers of precincts in and

17 out of the 12th District in an apparent effort to increase the

18 African-American population in the district.  If Senator Rucho

19 and Representative Lewis were really interested in

20 accommodating my preference by agreeing to model the new 12th

21 District after the current 12th District, as they profess on

22 page 5 of their July 1, 2011, statement, shifting four

23 precincts rather than the substantial number of precincts the

24 2011 plan proposes to shift would have been much more

25 accommodating as well as much more consistent with the criteria

1  they outlined.

2          I don't know how I can be anymore direct in

3  counteracting what they were doing.

4  Q    But you don't say in here that Senator Rucho has

5  misrepresented that I was the one who asked for the district to

6  be drawn over 50 percent.  That's not in here; is it?

7  A    The first paragraph says that they've taken out of context

8  and selectively misused the characterizations of my -- of what

9  I told him.  I don't know what else I can tell you on that,

10 sir.

11 Q    I don't know what else you can tell me, either,

12 Congressman Watt.

13          MR. FARR:  May I approach the witness?

14          THE COURT:  You may.

15 BY MR. FARR:

16 Q    Congressman Watt, I've handed you Defense Exhibit 27.  Do

17 you have that in front of you?

18 A    Yes, sir.

19 Q    And is that a letter you prepared?

20 A    It is, yes.

21 Q    That's dated July 8?

22 A    Yes.

23 Q    And it's addressed to who?

24 A    Oh, I'm sorry, to senator Rucho and Representative Lewis,

25 and copied to a number of people in the state legislature.

1  Q    Okay.  And the people who received the copies of this

2  letter were members of the Legislative Black Caucus?

3  A    Yes.

4  Q    And I see Senator Blue got a copy of this letter?

5  A    Yes.

6  Q    And this letter was prepared after your meeting with

7  Senator Rucho and Representative Samuelson at Senator Rucho's

8  house?

9  A    Yes.

10  Q    In this letter, did you report that Senator Rucho had told

11  you that he'd been ordered by leadership to ramp up the black

12  percentage in the district to over 50 percent?

13  A    I didn't specifically mention that, no.

14  Q    Okay.  And did you state in this letter that Senator Rucho

15  had falsely or incorrectly stated publicly that it was your

16  idea to draw the district over 50 percent?

17  A    Well, the second sentence says, I'm writing to correct

18  statements that you attributed to me in Claim 2 of the

19  statement that you earlier misconstrued or misrepresented.

20  Q    And then, in the bottom part, the first page, you list

21  some of the things that you claim Senator Rucho didn't state

22  correctly; right?

23  A    Some of them, yes.

24  Q    Okay.  And in the part of this letter where you gave the

25  list of the items that Senator Rucho had inappropriately

1   attributed to you, you did not say that Senator Rucho had

2   stated publicly that you were the person who wanted the

3   district ramped up over 50 percent.

4   A    I'm sorry.  Would you repeat the question?  I'm trying to

5   read -- read what I said --

6   Q    Okay, sure.  Sure.

7   A    -- because I haven't seen it in a while.

8   Q    In that letter, you've got a list of items that you are

9   telling Senator Rucho and Representative Lewis, and two, four,

10  six, seven members of the Legislative Black Caucus, you've got

11  a list of items that you claim that Senator Rucho had

12  misrepresented as far as what you'd said to him; correct?

13  A    Yes.

14  Q    And the list of items that you have in this letter about

15  what Senator Rucho publicly misrepresented does not include a

16  statement by Senator Rucho where he had publicly said you were

17  the person responsible or in favor of drawing the district over

18  50 percent?

19  A    That's correct, but of course, this is responding to Claim

20  2 of a particular statement, which is what the letter was

21  intended to do.

22  Q    Okay.  And I'm looking at the notebook that Mr. Speas gave

23  you, this white notebook that doesn't have an exhibit sticker

24  yet.  And in that notebook, under Tab 30, there's a document

25  listed as Defendant's Exhibit 30.  Could you find that?

1  A    I have it, yes.  That's the floor statement.

2  Q    Yes, sir.

3  A    Yes.

4  Q    Tell us again what this was.

5  A    Beg your pardon?

6  Q    This was a statement that you prepared?

7  A    It was the statement that was read into the record at --

8  in the legislative session by Senator Graham, yes --

9  Q    Okay.

10  A    -- that starting at page -- I guess --

11  Q    I'm on 37 --

12  A    -- 37.

13  Q    -- is where I think it starts.

14  A    Do I have the right statement?  Maybe that's Congressman

15  Butterfield's statement.

16          MR. FARR:  May I assist the witness, Your Honor?

17          THE COURT:  You may.

18          THE WITNESS:  Yes.  Starting at page 37 is the letter

19  that I -- or statement I submitted.

20  BY MR. FARR:

21  Q    Now, this statement was read during the session where the

22  redistricting plans were actually enacted?

23  A    I don't know that I can verify that, but I understood it

24  was read on the floor during part of the debate, yes.

25  Q    Okay.  If you turn -- don't lose your place on 37, but if

1  you turn to the front of that Exhibit 30, this indicates it's a

2  transcript that was prepared on July 25, 2011 --

3  A     Yes.

4  Q     -- is that right?

5  A     Yes, I see that.

6  Q     Okay.  So you had prepared a statement that you asked

7  Senator Graham to read for you at a session of the legislature

8  on July 25, 2011; is that right?

9  A     Yes.

10  Q     Okay.  Now, at the time that you wrote this statement, had

11  you had any discussions about how the politics of the proposed

12  plan would change the Congressional Districts?  Had anyone

13  talked to you about that?

14  A     I don't remember having any specific conversations about

15  any political consequences of any of these things.

16  Q     So you never had anyone tell you that this new plan was a

17  Republican gerrymander?

18  A     I don't recall anybody telling me that.  Maybe if you told

19  me who you were talking about telling me, that might jog my

20  memory.

21  Q     Okay.  Now, when you submitted this statement, you knew

22  your district was going to be drawn over 50 percent in at least

23  one census category?

24  A     I knew that that's what they were proposing.  It had not

25  been adopted.

1  Q    Okay.

2  A    And I was trying to express my opinion that it should not

3  be adopted.

4  Q    So you were -- you would have favored not adopting the

5  plan that was ultimately adopted?

6  A    That's -- yes, I think that's correct.  I would have

7  favored not adopting it, yes.

8  Q    Okay.  And this statement that was read on July 25th

9  during the legislative session that you prepared, anywhere in

10  this statement do you report your conversation with Senator

11  Rucho where he told you that his leadership had ordered him to

12  ramp your black percentage in your district over 50 percent?

13  A    Probably not.

14  Q    And anywhere in the statement that you prepared, did

15  you -- that was read on July 25th, did you state that Senator

16  Rucho had publicly misrepresented that you were the person

17  responsible for ramping the district up over 50 percent?

18  A    Well, I've already been on record a couple of times about

19  that already.  I don't know whether there's -- I mean, without

20  going through and reading it again, I haven't looked at this in

21  quite a while, but I don't know the answer to your question

22  without going all the way through the statement and reading.

23  Q    Well, please do so, because it's only three pages.

24  A    At the bottom of page 37, I say, and I want to make it

25  clear that my statement -- any statement or implication that

1  either plan was drawn to accommodate the wishes that I

2  expressed is inaccurate and untrue.

3  Q    Okay.  Anything else?

4  A    In the middle of page 39, I say, to maintain as a joint

5  statement of Senator Rucho and Representative David --

6  Representative Lewis regarding the release of the Rucho-Lewis

7  Congress 2 does, that maintaining the 12th District as a very

8  strong Democratic district will make adjoining districts more

9  competitive for Republican candidates is seriously in error.

10          So, yeah, there were a couple of places where I took

11  issue with what he was saying.  But if you're asking did I --

12  did I try to embarrass Senator Rucho publicly, the answer is

13  no.

14  Q    Okay.  And I'm glad you pointed out that statement,

15  because I want to ask you some questions about that on page 39.

16  When you said that maintaining the 12th District as a very

17  strong Democratic district will make adjoining districts more

18  competitive for Republican candidates is seriously in error,

19  what did you mean by that?

20  A    Well, if you pack all the black people into one

21  Congressional District, you'll make my election a lot easier,

22  and you'll make adjoining Republican elections a lot easier for

23  them.  It won't make them more competitive.  It won't make my

24  district more competitive, and it won't make their district

25  more competitive.  It'll make both districts easier.

1           And for them to be representing to the public that

2  this was designed to make Congressional Districts more

3  competitive, which is what they had said in their statement,

4  was inaccurate.

5  Q    Did they say more competitive or more competitive for

6  Republicans?  You say here, more competitive for Republicans.

7  A    Well, more competitive for Republicans.  The flip side of

8  that coin is less competitive for Democrats.  And more

9  competitive for Democrats is -- the flip side of that coin is

10 less competitive for Republicans.  I don't know how you can --

11 I mean, they're opposite sides of the same coin.  I'm not sure

12 what you're driving at.

13 Q    But you agree that drawing the district the way your

14 district was drawn in 2011 benefited Republican candidates in

15 adjoining districts?

16 A    Benefited me politically by making my district less

17 competitive.  I would win at over 80 percent of the vote, which

18 I did, and it would make adjoining Republican districts less

19 competitive because they would -- they would find it easier to

20 win.

21 Q    Okay.  Well, what's -- well, I've got -- I'll finish up

22 with these questions, Congressman Watt, then I'll be done.

23          What about in 2010, Congressman Miller was a Democrat

24 and was elected in the 13th District.  Does that jar with your

25 memory?

1   A     Yeah, that's correct.

2   Q     Okay.  And in 2012, under the New Congressional Plan, was

3   Congressman Miller elected in the 13th District?

4   A     I don't think he was, no.

5   Q     And wasn't George Holding elected?

6   A     That's correct.

7   Q     And isn't he a Republican?

8   A     That's correct.

9   Q     And in the 8th District in 2010, which adjoins the

10  12th District -- in 2010, wasn't Congressman Kissell elected?

11  A     That's correct.

12  Q     And in 2012 under the 2011 Congressional Plan, Congressman

13  Kissell lost to a Republican?

14  A     That's correct.  And by taking black votes and packing

15  them into my Congressional District, he made all the districts

16  less competitive, yes.  So I don't know how that's inconsistent

17  with what I've said.

18  Q     So by drawing the district the way that they drew it, it

19  made many other districts more favorable for Republicans; is

20  that right?

21  A     It probably did; less competitive.

22            MR. FARR:  No further questions, Your Honor.

23            THE COURT:  Redirect?

24            MR. SPEAS:  Couple of very quick, clarifying

25  questions, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MR. SPEAS:

3    Q    Congressman Watt, you were asked -- handed Exhibit J,

4    Defendant's Exhibit No. 27, which is your July 8, 2011, letter.

5    Do you have that?

6    A    Yes.

7    Q    And in that, do you refer to a statement made by Senator

8    Rucho and Representative Lewis regarding June 23's public

9    hearing in the first paragraph?

10   A    Yes.

11   Q    And in the third paragraph, do you refer to Claim 2 of

12   that letter or that public statement?

13   A    That's correct.

14          MR. SPEAS:  May I approach the witness quickly, Your

15   Honor?

16   BY MR. SPEAS:

17   Q    Congressman Watt, I'm placing in front of you -- I'll try

18   to get the exhibit numbers right, Your Honor -- Defendant's

19   Exhibit D-5.1, which is the collection of public statements

20   issued by Senator Rucho and Representative Lewis.  And I am

21   turning to --

22          THE COURT:  Which tab, so we can find it?

23          MR. SPEAS:  June 22, 2011, statement is entitled,

24   Statement by Representative Bob Rucho and Representative David

25   Lewis regarding proposed VRA exhibits.

 1           Have you found that, Your Honor?

 2           THE COURT:  Just a second, let me catch up.  June 22,

 3  you said?

 4           MR. SPEAS:  It's Tab 5.  It's the June 22, 2011,

 5  statement.  It's in the upper right-hand corner.

 6           THE COURT:  Okay.  Handwritten up there --

 7           MR. SPEAS:  Handwritten.

 8           THE COURT:  -- 6-22?  Okay.

 9  BY MR. SPEAS:

10  Q    Let me show you that, Representative Watt, and ask you if

11  you know whether a Congressional Plan had even been released

12  on -- as of that date, June 22, 2011?

13  A    The question is, again, what?

14  Q    Does that statement, the June 22 statement, concern only

15  the State House and State Senate Plans and not the

16  Congressional Plan?

17           MR. SPEAS:  Your Honor, if I may approach the

18  witness.

19           THE COURT:  You may.

20  BY MR. SPEAS:

21  Q    Congressman, if you would look at the 96 document in this

22  ledger, it's the July 1 statement by Representative Lewis and

23  Senator Rucho.  And it concerns relating to the Proposed

24  Congressional Plan; is that correct?

25  A    That's what the title says, yes.

1  Q    So, from that document, it appears that the Congressional

2  Plans weren't even made public until July 2011?

3  A    I don't know the answer to that.  I mean, I wasn't

4  tracking the timing of any of this.  I'm sorry.

5            MR. SPEAS:  Thank you very much.  I don't have any

6  other questions.

7            MR. FARR:  No questions, Your Honor.

8            THE COURT:  All right.  You may step down.

9            THE WITNESS:  Do I leave these here?

10            MR. SPEAS:  Please.

11            MR. SPEAS:  Your Honors, Congressman Watt needs to

12  pursue other business.  I assume he's able to.

13            THE COURT:  Any objection to excusing Congressman

14  Watt?

15            MR. FARR:  No, we're happy to excuse him.

16            THE COURT:  All right.  You may be excused.  We'll

17  stand in luncheon recess until quarter to three.

18            (At 1:26 p.m., break taken.)

19            (At 2:47 p.m., break concluded.)

20            THE COURT:  All right.  Where are we?  Are the

21  plaintiffs ready to proceed with their next witness?

22            MR. SPEAS:  Yes, Your Honor.  The plaintiffs would

23  call Representative Butterfield to the stand.

24            (Witness sworn by the clerk.)

25

1                          G.K. BUTTERFIELD,

2              PLAINTIFF'S WITNESS SWORN AT 2:48 p.m.

3                       DIRECT EXAMINATION

4    BY MR. SPEAS:

5    Q    Would you state your name for the record, please.

6    A    GK Butterfield.  The G is for George, the K for Kenneth.

7    Q    Would you tell the Court a little bit about where you grew

8    up and where you went to school?

9    A    I'm a native of Wilson, North Carolina, born in 1947, and

10   went to the public schools there in my home community, both

11   elementary and high school.  Graduated from high school in

12   1965.

13           During those years, I was very active in what we now

14   refer to as the Civil Rights Movement, as was my father before

15   me.  After high school, I went on to North Carolina College at

16   Durham, later to become known as North Carolina Central

17   University.

18           After my third year in college, I was drafted into

19   the US Army.  I served two years in the Army, discharged from

20   the Army in 1970, and returned to Durham to complete my

21   undergraduate work, and then went on to the law school there at

22   North Carolina Central University, graduating in 1974.

23           Did not pass the bar exam in 1974.  I worked for a

24   law firm in Warren County called Clayton & Ballance.  And the

25   following year, 1975, I took the bar exam and passed it and was

 1  admitted to the practice of law.

 2  Q    Tell us a little bit about your legal career.

 3  A    Well, my legal career, in earnest, started in 1975, even

 4  though I had one year working with a law firm prior to that as

 5  a lawyer in a small town with another lawyer, lifelong friend

 6  named Milton F. Fitch, Jr. now Superior Court Judge Fitch.

 7          The two of us started -- and Quentin Sumner, who is

 8  also a Superior Court Judge, we started a law firm known as

 9  Fitch, Butterfield & Sumner.  And we continued under that

10  arrangement for several years.

11          After that, Judge Sumner withdrew from the firm and

12  started his own firm with his spouse, and Milton Fitch and I

13  continued the law practice.  And later, a man named James A.

14  Wynn, Jr. joined the law firm to be known as Fitch, Butterfield

15  & Wynn.  I continued to practice law until I was elected to the

16  bench some years later.

17  Q    Okay.  And you served on the North Carolina Superior Court

18  bench?

19  A    I did serve on the bench.  Prior to getting elected as a

20  superior -- resident Superior Court Judge, I was a typical

21  small-town lawyer.  In the early years, I handled the speeding

22  tickets and the misdemeanor district court cases and the like,

23  and then graduated and became a personal injury lawyer.  And I

24  began to do some probate work, and enjoyed that very much.

25          And then, in 1982, the US Supreme Court changed

 1  the -- what is required for a Section 2 violation from the

 2  intent standard to the results, or effects, standard.  And so I

 3  developed an interest in voting rights litigation, primarily

 4  because my father, in 1957, had become the victim of a

 5  miscarriage of justice when he served on the Board of Aldermen

 6  in my hometown.

 7          While my family was on vacation in March of 1957, the

 8  City Council abruptly changed the method of election from

 9  district elections to at-large election.  And my dad had been

10  the first African-American to serve on the board in its

11  history.  And when we returned from our vacation, we found that

12  the method of election had been changed, and he was soundly

13  defeated in 1957.  I was 10 years of age and remember it very

14  vividly.  And there was a challenge to the election system.

15          Also, there was a provision enacted that prohibited

16  single-shot voting.  So not only did it dissolve a district

17  election system, but it also created a requirement, a full

18  slate requirement which prevented single-shot voting.  And that

19  really angered the African-American community, as you can

20  imagine.

21          In 1959, another gentleman in the community ran, my

22  pastor, and he was soundly defeated in 1959.  And at that

23  point, the NAACP took the litigation.  And the case went to the

24  US Supreme Court -- well, the Supreme Court denied cert in the

25  case, but it was lost at every level.

 1          And so, as a young -- impressionable young man, I

 2   noticed all of this and didn't quite fully understand it, but

 3   that forced me to want to not only become a lawyer, but to go

 4   into the political arena.  And so, my law practice evolved into

 5   a voting rights practice because I wanted to try to remedy some

 6   of the past miscarriages of justice.  So I did voting rights

 7   litigation for some years.

 8          The legislature created, as a result of litigation

 9   under the Voting Rights Act, eight opportunity districts for

10   black lawyers to get elected to the Superior Court bench.  It

11   was settled; it was not a verdict by the Court.  It was settled

12   by the legislature, and eight seats were created -- eight

13   opportunities were created across the state.  And I ran in one

14   of those districts in 1988 and was elected and sworn into

15   office as resident Superior Court Judge January 1st of 1989,

16   and served the next 11 years as a Superior Court Judge.

17          In 2001, Governor Easley appointed me to the State

18   Supreme Court.  I. Beverly Lake, Jr., had defeated Chief

19   Justice Henry Frye in the election of 2000, thereby creating a

20   vacancy.  When Lake moved from Seat 7 to Seat 1, there was a

21   vacancy in Seat No. 7, and Governor Easley, one of his first

22   acts as governor was to appoint me to the State Supreme Court.

23          I stayed on the Court for nearly two years, and I was

24   defeated in the November 2002 election because we, as you

25   certainly recall, had partisan election judges.  And even

1  though my opponent was not known and did not do any

2  fundraising, did not do very much campaigning, he beat me by a

3  margin of 50 to 48 because of the straight ticket voting for

4  then candidate Elizabeth Dole.

5          And so, after serving nearly two years on the Supreme

6  Court, Governor Easley re-appointed me, this time as a Special

7  Superior Court Judge, and that's where I stayed until I was

8  elected to Congress.

9  Q    And you first ran for Congress in 2004?

10 A    I ran in 2004 in a Special Election.  Around March of

11 2004, my predecessor in this office announced he was not

12 running for re-election, and then two weeks later announced

13 that he was actually vacating the seat.  That created a vacancy

14 for the House.  There had to be a Special Election under the

15 law, and Governor Easley set both the regular primary and the

16 election for the remainder of the term, two elections on the

17 same ballot on the same day.  It was a little confusing.  But I

18 was elected on July 20th of 2004 and continue in that position

19 today.

20 Q    And you have been re-elected to Congress in 2006, 2008,

21 2010, 2012, and 2014?

22 A    That is correct.

23 Q    Okay.  Tell the Court a little bit about your work in

24 Congress.

25 A    Well, believe it or not, I'm now considered a senior

1  member of Congress.  There's been a tremendous turnover in the

2  last 10 years.  I went in as Member No. 435, and now I'm No.

3  140 in order of seniority in the House on the Democratic Side.

4  I am a Democrat.  On the Democratic side, I am a Chief Deputy

5  Whip of the House Democratic Caucus, and I'm also honored to be

6  the chairman -- as was Congressman Mel Watt some years ago,

7  Chairman of the Congressional Black Caucus.

8  Q    Okay.  Now --

9  A    And served on the Energy & Commerce Committee in the House

10 of Representatives.

11 Q    Now, let's turn just a few minutes to the districts from

12 which you were elected prior to the 2011 redistricting that is

13 at issue here.  Do you recall the approximate African-American

14 voting-age population in your district from 2004 through the

15 2010 election?

16 A    It was in the 47 percent range, I believe.

17 Q    Okay.

18 A    Forty-seven, yes.

19 Q    And like Representative Watt, do you remember your margins

20 of victory in those districts?

21 A    They were comfortable margins of victory, and I can refer

22 to the documentation to give you the exact margins.

23 Q    If you would, please.

24 A    Yes.  In 2004, 63.88 percent.  I was unopposed in 2006.

25 In 2008, 70.28 percent.  In 2010, 59.31 percent.  That was my

1   lowest tabulation in all of my years.  In 2012, 75, that was

2   after the new map went into effect, 75.32.  And in 2014,

3   73.38 percent.

4   Q    Okay.  Let's talk about the redrawing of Congressional 1

5   in 2011.  What were the differences in the district from 2010

6   until redrawn in terms of the percentage of African-American

7   voters?

8   A    Well, I was expecting an insignificant change.  I knew we

9   had to pick up 97,500 new citizens in the district.  I was

10  aware of that.  But I thought it could be done without much

11  disruption to the core district that I was familiar with.  And

12  that's what my expectation was.

13  Q    Okay.  And did the new district divide more counties than

14  the prior -- did the new plan divide more counties than the

15  prior plan?

16  A    Well, in the prior district -- I said this in all of my

17  speeches until I -- and I remember it so well, 23 district --

18  23 counties in the district, 13 whole counties, 10 parts of

19  counties.  That was the division between whole and parts of

20  counties.

21          And after the redrawing of the districts, I only had

22  five whole counties out of 24, 19 portions of counties.

23  Q    So the present district is composed of five whole counties

24  and 19 pieces of counties?

25  A    Five out of 24 counties are whole counties.

1  Q    Okay.  Now, at some point, were you approached by

2  representative -- excuse me, Senator Rucho --

3  A    Yes.

4  Q    -- and Representative Lewis with respect to the plan?

5  A    Yes, I had more interaction with Senator Rucho than I did

6  Representative Lewis, but I did see both of them on at least

7  one occasion.

8  Q    Okay.  And would you describe to the Court those

9  conversations.

10  A    Mr. Speas, I've been trying to recall those events with

11  accuracy so that I could be completely accurate in my

12  testimony.  I've gone back and researched my calendar from the

13  year 2011.  It appears to me, and I have a calendar entry with

14  me today in case it is in dispute, but on April 21, at

15  2:30 p.m, I met with Senator Rucho in Room 300A there in -- I

16  think that's his conference room in his office building.  Yes.

17          I was requested to come to Raleigh to meet with

18  Senator Rucho and Representative Lewis, and I did.  After

19  talking with Representative Watt, I determined that I was

20  probably the first to be called forward to have these

21  confidential meetings, and I went ahead of Mr. Watt.

22          And so I traveled to Raleigh and had a -- I met

23  Senator Rucho for the very first time.  He and I had small

24  talk.  He's a dentist.  My dad was a dentist for 50 years, and

25  so we had that conversation.  And then, it evolved into the

1   conversation that was relevant, and that was the redistricting

2   plan.

3          I might say, Mr. Speas, that my chief of staff at the

4   time was named Tonya Williams.  Tonya Williams is and was a

5   very distinguished lawyer.  For five years, she worked for the

6   Senate President Pro Tem, Mark Basnight.  She was his legal

7   counsel, and as such, she was his legal counsel during the

8   prior round of redistricting.

9          And as I was preparing to go to Raleigh to meet Rucho

10  and Lewis, I was admonished dozens of times -- not just a

11  couple of times, but dozens of times -- by my chief of staff to

12  be extremely circumspect and careful in how I had the

13  conversations with these two men, these two chairmen in the

14  legislature, because she explained to me, you know, her

15  experience when she served as legal counsel, and that any

16  little thing that you say could be taken out of context and

17  could be exploited if there was a motive to do that.  And so

18  she admonished me so much, that I was tired of hearing her say

19  it, but she admonished me severely to do very little talking

20  and to allow these gentlemen to do most of the talking.

21  Q    Did you take her advice?

22  A    Absolutely, I did.  That's why I believe my testimony

23  today may be a little less valuable than the other two

24  witnesses, yes.

25  Q    At some point, did you see the proposed new version of

1   Congressional District 1?

2   A    Mr. Speas, prior to going to Raleigh -- of course, all of

3   us have friends in the legislature, and I informally talked

4   with many of the colleagues of these two gentlemen.  And I was

5   told that there was a serious conversation afoot about adding

6   Guilford County to the 1st Congressional District.  And I

7   thought the source of that was mistaken.

8           And after hearing it four or five times, I then gave

9   credibility to the assertion that Guilford County was being

10  considered as an addition to the 1st Congressional District.

11  And I just absolutely could not imagine how Guilford County,

12  where we sit today, could be a part of the 1st District, which

13  extends all the way to Elizabeth City, North Carolina.  And I

14  was told that it was probably because Guilford County is a

15  Section 5 county, and there was a wish on the part of the map

16  drawers, the committee chairs, to include Section 5 counties

17  within the new 1st District.

18          And so when I got to Raleigh and met with Senator

19  Rucho and Representative Lewis, my recollection is that

20  Representative Lewis did not stay in the meeting very long, but

21  he did extend a hand of friendship to me, and we chatted for a

22  few minutes.  But at the end of the day, it was Senator Roucho

23  and myself in this meeting.

24          Senator Rucho had a map available for me, and it was

25  a very large map.  And I'd seen redistricting maps many times

1  before.  I was, as I said, a voting rights attorney, and so

2  I've seen those.  I was the spokesman for the class.  You may

3  may not know this, Mr. Speas, but I was the spokesman for the

4  class in the *Gingles* case.  I was not an attorney of record,

5  but I was the spokesman for the class.  I'm the one that

6  presented the single-member district redistricting map to the

7  North Carolina legislature and was laughed at because it

8  eliminated multi-member districts, but now it's the law of

9  North Carolina.

10        But I looked at this very large map on the table, and

11 I found it -- and Senator Rucho told me that because of the

12 population deficit, that they had to find roughly 100,000 new

13 citizens to come into the district, and I acknowledged that I

14 understood that.  He said that it would probably be difficult

15 to get a mass of people in my traditional district and to meet

16 the one person, one vote goals, and that it needed to be a zero

17 deviation district, which I never understood, still don't

18 understand to this day because I think there can be -- I think

19 there is some tolerance in deviation.  But the legislature has

20 adopted this zero tolerance formula.

21        But I told him that I really wanted my traditional

22 district, and if we could sort of enlarge it around the edges

23 and find 97,000 people, it would be great.  But he mentioned to

24 me that we needed an urban community in order to make the

25 numbers work.  And I didn't dispute that, even though I --

 1   because I didn't have the resources to draw the map on my own.

 2              And so I began to probe and ask him, well, what does

 3   that mean?  And he said, well, Raleigh's a possibility,

 4   Durham's a possibility.  And I said, well, I've heard about

 5   Greensboro, you know, is Greensboro on the table?  And he

 6   acknowledged that there had been a conversation, but it

 7   probably it would not be -- would not make the final map.

 8              And so, I did not want to get into a situation

 9   whereby it would be reported in the media that I was choosing

10   one urban area over another.  I have hundreds of friends in

11   both communities and would do -- politically, I would do very

12   well in either community.  And so I did not -- I went to

13   college in Durham and know a lot of people there.  But Raleigh,

14   I'm right at home in Raleigh as well.  And so, I was very

15   careful, extremely careful not to intimate in any way that I

16   preferred one community over another.

17              I basically said to Senator Rucho, you have the

18   computers, you have the experts.  What I'm hoping for and

19   expecting is a lawful map that protects minority voting

20   strength in the district.

21              And then, as we perused the map, I honed in on Wake

22   County because that would be a new area in the district.  And

23   in order to get my bearings, I asked where was Shaw University.

24   And Senator Rucho did not know where Shaw University was.

25   Didn't expect him to know; he's from Charlotte.

1    And so, he got on the phone and he summoned one of

2  his staff members to the room, or he may have already been in

3  the room, I'm not sure about that.  But the staff member and I

4  leaned over the table to try to identify the campus of Shaw

5  University, because if I were to get Wake County, certainly, I

6  wanted the HPCUs.  There are two in Raleigh.  St. Augustine's

7  College is the other.  I wanted those two campuses to be in the

8  Congressional District.

9    And so, as we got our bearings and I figured out what

10 I was looking at, I said, okay, this is Shaw, this is the state

11 capitol, this is St. Augustine's College, this is South

12 Raleigh.  I have my bearings now, and I see what you're talking

13 about -- what you're talking about.  And Senator Rucho said,

14 well, do you like it?  And I said, I'm not giving you an

15 opinion, you know.  I see what you're proposing.  I don't have

16 an opinion one way or another about whether I want it or

17 whether I don't want it.  I didn't tell him that Tanya told me

18 to be quiet, but I was certainly following her advice to the

19 tee.  And I was very proactive not to, even in my body

20 language, to try to suggest that I preferred one map over the

21 other.  So the meeting came to a cordial end, we shook hands,

22 and we departed.

23    I returned to Washington and told my staff and all of

24 my confidants about it.  And I was mentally preparing to pick

25 up Wake County because I thought that's the way it was going to

1    be.  I began politically accumulating mailing lists and all of

2    the other things that politicians do in Wake County, and

3    Senator Rucho and I had exchanged cell phone numbers.

4              One day, I received -- and it wasn't but a few days,

5    I received a telephone call from Senator Rucho indicating that

6    everything that we had talked about in his conference room was

7    off the table.  Just wipe the slate clean, forget the

8    conversation ever happened, it's going to start over.  And he

9    continued to indicate to me that the majority minority

10   districts, under the law, under *Strickland*, had to exceed

11   50 percent.  And while I had been out of voting rights

12   litigation for many years, because as a judge, you don't get

13   involved in voting rights litigation, at least at the state

14   level.  These gentleman certainly do.  But I lost track of

15   jurisprudence of voting rights for the 15 years that I was on

16   the bench.

17             And so, he told me that their lawyers were telling

18   him that minority districts had to exceed 50 percent.  And I

19   said, wow, I did not know that, you know.  I don't know

20   anything about *Strickland*.  I remember *Gingles*, but I don't

21   know very much about *Strickland*.

22             And so I just said, you know, that's what the law

23   requires, then that's what it has to be.  But I didn't believe

24   it then, and I don't believe it now.

25             And so, after the telephone call, then I'm anxiously

1 awaiting what the new map will look like, and that's when I saw

2 Senator Floyd McKissick, Jr., one day. And Floyd said, you

3 know, how would you feel if Durham were added to your district?

4 And I said, I don't know. I was very coy with Floyd as well.

5 And he says, well, that's the conversation now. And I said,

6 well, I look forward to the final maps.

7 And sure enough, the final maps were being readied

8 for public display. And my records show that on June 21, 2011,

9 at 2:00 in the afternoon in Room 328 of the legislative office

10 building, I again met with someone, and I think the someone was

11 Senator Rucho. My notes say that it was. I don't believe

12 Representative Lewis came to that meeting, but I may be in

13 error on that.

14 But that's when I was told that Durham would be in

15 the district. But that was -- that the law mandated that

16 50 percent of the district must be greater than 50 percent in

17 African-American voter age population, that it had to be a zero

18 tolerance in the deviation, and there needed to be communities

19 of interest and compactness, to the degree that it could be

20 compact, and that this was the best map they could come up

21 with. And I didn't say very much, and I left the meeting.

22 And a few days later, my chief of staff stormed into

23 my room and wanted to know why I would agree to the

24 inclusion -- that I would say that I would prefer one county

25 over another. And I assured Tonya that that absolutely did not

1  happen.  And she said, well, Senator Rucho has put it in his

2  report, that you made these statements to him, and that your

3  statements were a motivating reason why the district was drawn

4  the way it was.  And I was very upset about that then and

5  continue to be today.

6  Q    At some point, did you come to write a letter to Senator

7  Rucho with regard to your concerns?

8  A    I certainly did.  And I --

9  Q    And if you would, Representative Butterfield, turn to the

10 Butterfield tag in the notebook in front of you, and then turn

11 to the single exhibit which is there, which is labeled

12 Defendant's Exhibit D19.  And I would ask you if that is a

13 letter you wrote on July 22, 2011, to Senator Rucho and

14 Representative Lewis?

15 A    I authored the letter dated July 22, 2011, which is

16 Exhibit No. D19.

17 Q    And was this letter read on the floor of Senate by Senator

18 Ed Jones?

19 A    I am informed that the letter was, indeed, read by the

20 late Senator Ed Jones at my direction.

21 Q    And was Senator Jones an African-American member of the

22 North Carolina Senate?

23 A    He was, and a constituent.

24 Q    And a constituent.  And would you read for the Court your

25 final paragraph in that letter.

1  A    The final paragraph reads as follows.

2          Quote:  "Using the Voting Rights Act as justification

3  to advance partisan goals in the rest of the state is

4  unconscionable and mocks the very spirit and purpose of the

5  law.  The voters in District 1 and the citizens of our great

6  state deserve better.  I urge the committee and the members of

7  the North Carolina General Assembly to heed the concerns

8  expressed by the public and honor legal protections designed

9  and enforced to protect minority voters."  End of quote.

10  Q    All right.  You've spent a lifetime in Eastern North

11  Carolina.

12  A    I have.

13  Q    And over those years, in lots of capacities, have you

14  developed an understanding of the voting patterns in that area

15  of the state?

16  A    I don't think there's anyone in Eastern North Carolina

17  more uniquely equipped to evaluate the voting patterns in

18  Eastern North Carolina.  I don't do it scientifically, but I

19  have experienced it in one way or the other since 1968.

20  Probably since 1957, when my dad was defeated.  But I was a

21  child then, so I will pick it up in 1968.  I've been involved

22  in every election in Eastern North Carolina beginning in 1968.

23  Q    And the present African-American voting-age population in

24  your district is in excess of 52 percent; is that correct?

25  A    Currently, my records suggest that the black VAP is

1  52.65 percent.

2  Q    Okay.  And based on your years in electoral politics in

3  Eastern North Carolina, is that number necessary to allow

4  African-American citizens to elect their candidate of choice --

5  A    No, it's not necessary.  It's excessive.  It's

6  unnecessary.  When the black voting-age population was

7  47 percent, I did quite well.  And with 52 percent, you can see

8  a marked increase in my electoral success.  And I can tell you

9  that 52 percent is not necessary in order for not just me, but

10  any African-American candidate or any candidate who is the

11  choice of the African-American community to win, 47 percent is

12  sufficient.

13  Q    And I believe you testified a few moments ago that after

14  the redistricting, you won in 2012 by 75 percent?

15  A    Yes, sir.  It went from 59 percent in 2010 to 75 percent

16  in 2012.

17  Q    And this past time, it was 73 or so percent?

18  A    73.38 percent.

19  Q    Okay.  Based on your many years in politics and public

20  life, tell the Court what you -- your view of the level of the

21  extent to which white citizens in Eastern North Carolina will

22  vote for black citizens.

23  A    Mr. Speas, there has been racially polarized voting all

24  across North Carolina since the beginning of our democracy.

25  That is not in dispute.  What may be somewhat in dispute is the

1    severity of the polarization.

2             And what needs to also be a part of this conversation

3    is what region of the state are you addressing the polarization

4    question, because no one size fits all.

5    Q    Is Charlotte different than Wilson?

6    A    I was listening to Senator Blue's testimony today, and

7    there's no resemblance between voting behavior among white

8    citizens east of Interstate 95 as opposed to the urban areas of

9    Wake and Mecklenburg County.  It's regrettable, but that is a

10   fact.

11   Q    In Eastern North Carolina, what is your judgment as to the

12   level of white voting?

13   A    My judgment is not scientific, Mr. Speas.

14   Q    I understand.

15   A    But it is based on 40-plus years of direct voter

16   participation.  I round it off just for discussion purposes.  I

17   would say that most African-American candidates -- and there

18   are exceptions.  Most African-American candidates and most

19   candidates who are the choice of the African-American community

20   generally can never depend on two out of three white voters.

21   In other words, 66 percent of white voters, in my opinion, will

22   never vote for an African-American candidate for most

23   positions.

24           And as I said, there have been exceptions, and I

25   acknowledge that.  But the converse of that is also true.

1  About 33 to 35 percent of white voters will vote for a

2  qualified candidate who is African-American or the choice of

3  the African-American community if they prove their metal.

4          MR. SPEAS:  Okay.  Thank you very much, Congressman

5  Butterfield.  I have no more questions at this point.

6          THE COURT:  Cross-examination?

7          MR. PETERS:  Thank you, Your Honor.

8          Good afternoon, Congressman Butterfield.  My name's

9  Alec Peters.  I'm with the North Carolina Attorney General's

10 Office.  And I do have a few questions for you.

11                       CROSS-EXAMINATION

12 BY MR. PETERS:

13 Q    First, I noted that you took some notes up with you to the

14 stand.  And may I ask you what it was you took up with you?

15 A    You can.  It's a table that I had personally typed in my

16 office just for reference purposes, and you're certainly

17 welcome to view it.

18         I have my black voter age population figures both

19 before and after 2011.  I have the dates on which I met with

20 Senator Rucho, and I have some what we call in Washington

21 talking points, one size fits all.  Minority percentages don't

22 make sense.  The other is polarized voting is severe in Eastern

23 North Carolina.

24         The other talking point, and maybe that's not a good

25 way to describe it.  The other point is two out of three white

1  voters will not vote for the choice of the African-American

2  community.

3           The next point is only one of three white voters will

4  consider voting for an African-American candidate.

5           And the other is basically a restatement of the law,

6  which says when race is a predominant factor, then the remedy

7  must be narrowly tailored.

8           And then I have 13 whole counties and five whole

9  counties.  And then I have the names of three judges so I would

10 not get in trouble with the Court.

11          MR. SPEAS:  Thank you, Congressman.  I'll ask

12 plaintiff's counsel if we can have a copy of that provided to

13 us, please?

14          THE WITNESS:  Certainly, you can.

15          THE COURT:  I'm sorry.

16          MR. SPEAS:  May I approach the witness?  Would you

17 like to view it now?

18          MR. PETERS:  Sure.  Let me look at it now.

19          THE WITNESS:  And Mr. Peters, I have your name up

20 here as well.

21          MR. SPEAS:  May I approach?

22          THE COURT:   You may.

23 BY MR. PETERS:

24 Q   Congressman Butterfield, I want to thank you for letting

25 me look at that because there were a couple of times my hand

1  was not keeping up with me as I tried to take notes, and you've

2  helped me out.

3          You testified, I believe, earlier about the margins

4  of victory in your various races.  And I believe I wrote down

5  that in 2004, it was around -- I'm going to round here --

6  63 percent?

7  A    Yes.

8  Q    And in 2006, you were unopposed?

9  A    Yes.

10 Q    All right.  In 2008, it was over 70 percent; is that

11 correct?

12 A    Yes.

13 Q    And then in 2010, it was 59?

14 A    Yes.

15 Q    Then in 2012, over 75 percent?

16 A    Yes.

17 Q    In 2014, it was just over 73 percent?

18 A    Correct, right.

19 Q    So of the five elections in which you had an opponent,

20 three of them had a margin of over 70 percent; is that correct?

21 A    Three of the five had margins greater than -- yes, greater

22 than 70 percent.

23 Q    All right.  And one of those was under the 2001 Plan,

24 wasn't it, not under the 2011 Plan?

25 A    That is correct -- no, that is not correct.  Ask the

1  question again.

2  Q    One of those margins of victory that was over 70 percent,

3  the one in 2008, would have been under the 2001 Congressional

4  District --

5  A    That's correct.

6  Q    -- Congressional Plan; correct?

7  A    Yes.

8  Q    Okay.  Thank you.  One other thing I wanted to pick up on,

9  you mentioned -- and you may have answered this, but I want to

10 make sure it's clear.

11      You said you had heard that there might be some

12 discussion about drawing the 1st District into Guilford County?

13 A    Yes.

14 Q    Do you remember who you heard that from?

15 A    I don't.  It was a member of the legislature, I would

16 guess a member of the State Senate.  So it would have either

17 been Senator Ed Jones or Senator McKissick, probably one of

18 those two, yes.

19 Q    And I believe you said you did discuss that with Senator

20 Rucho --

21 A    Yes.

22 Q    -- when you met?  And his -- excuse me.  Go ahead.

23 A    He dismissed it when I brought it up, yes.

24 Q    All right.  When you say he dismissed it --

25 A    He acknowledged -- he acknowledged that it had been a

1  conversation, but I got the impression that it was not likely

2  to happen.

3  Q    Thank you.

4  A    Yes.

5  Q    Now, you commented that you were careful, based on

6  Ms. Williams' advice, not to state a preference for Wake or

7  Durham County when you were meeting with Senator Rucho and

8  Representative Lewis; did I get that right?

9  A    That is correct.

10 Q    And why was it you didn't want to state a preference?

11 A    Two reasons.  One was political.  I did not want the

12 voters of the county that I did not choose to feel that they

13 would be unwanted, you know, in a district that I would

14 represent.

15        Secondly, because I know how litigation works.  I

16 spent 30 years in a courtroom, and I know how it works.  And I

17 know the less you say, the better you are.

18 Q    Would I be correct in saying you didn't want to say

19 something you would be unhappy to hear repeated back, say, in

20 court today?

21 A    Yes.

22 Q    All right.  Let me ask you to look at the white notebook

23 that Mr. Speas had you looking at.  Behind the tab with your

24 name on it, there's a tab that says 19?

25 A    Yes.

1   Q    Do you see that?

2   A    I do.

3   Q    And that's the letter that you wrote to Senator Rucho and

4   Representative Lewis; correct?

5   A    It is.

6   Q    And it's marked down at the bottom left-hand corner

7   Defendant's Exhibit 19?

8   A    Yes.

9   Q    All right.  Let me ask you a few questions about that.

10  Let me ask you to look at the second paragraph, which -- let me

11  just ask you to read the first sentence of the second

12  paragraph.

13  A    Yes, and this is refreshing my memory.  I'm glad you

14  directed my attention to this.

15          Quote:  "It is regrettable that you would use the

16  Voting Rights Act and my objection to the removal of Gates,

17  Washington, Beaufort, Craven, Jones, and Wayne Counties to

18  justify wholesale changes to the proposed congressional map."

19          Should I continue?

20  Q    That's fine.  Thank you.

21  A    Yes.

22  Q    Why were you objecting to the removal of Gates,

23  Washington, Beaufort, Craven, Jones, and Wayne Counties?

24  A    I felt it was unnecessary.  It was too much of a radical

25  change to the core district that I knew so well.

1          Secondly, these were Section 5 counties that I

2  believe needed the protection of and the ability to elect a

3  member of Congress of their choosing.  And I just thought that

4  it was absolutely unnecessary to take these counties out of the

5  mix when there were many other ways that a legal district could

6  have been configured.

7  Q    Why did the fact that they were Section 5 counties make

8  you think they should be kept part of District 1?

9  A    Because Section 5 counties, by definition, are counties

10 that have histories of voter discrimination and

11 disenfranchisement.  And we have been trying to remedy past

12 discrimination in Section 5 counties -- all counties, but

13 particularly all the Section 5 counties for generations.  And

14 to see those counties just absolutely removed from a majority

15 minority district and submerged into the adjoining district, I

16 felt, was unneeded, unnecessary, and unfair to the citizens of

17 those counties.

18 Q    All right.  Were any of those counties or portions of any

19 of those counties put back in District 1 by the time the

20 district was actually enacted?

21 A    Yes, all except Jones County.

22 Q    All except Jones?

23 A    Yes.

24 Q    So Gates -- at least a portion of Gates, Washington,

25 Beaufort, Craven, and Wayne were put back in your district?

1  A    Well, we call the Gates County area the Albemarle region.

2  The counties in the Albemarle region are Gates, Chowan,

3  Perquimans, and Pasquotank.  And, traditionally, I have always

4  represented those four counties.  My two predecessors have

5  likewise represented those four.

6         And so, even though these four were in the final map,

7  only the black communities of these four counties were in the

8  final map.  The white communities were -- and the more

9  Republican-leaning communities were excluded from the final

10 map.  And that was very confusing to me why the map drawers

11 would actually go into the Albemarle region and just cherrypick

12 African-American communities and leave those in my district,

13 and to allow the remaining communities to go into the 3rd

14 Congressional District.  It was very hard to comprehend.

15        In fact, I even drew a map of it just for my own

16 edification over the weekend.  And as I look at it today, it

17 just makes no sense to me at all.  I look at Beaufort County,

18 for example.  I have represented six precincts -- six voting

19 precincts in Beaufort County, which is the town of Washington,

20 Your Honors, as the county seat.  And now I've been reduced

21 from six precincts to three precincts, and those are the

22 African-American precincts in the town of Washington.  And it's

23 obvious to me that this is partisan, racially motivated

24 gerrymandering, and it's offensive.  It's offensive to me.

25 It's offensive to the people that I represent.

1  Q    Thank you.  But I believe my question was, am I correct

2  that the enacted version of Congressional District 1 does

3  include a portion of Gates, Washington, Beaufort, Craven, and

4  Wayne Counties?

5  A    You didn't use "portion" in your first question.

6  Q    If I didn't, that was my mistake.

7  A    You did not.  That's why I went through all the lengthy

8  explanation.  But yes, that is true.

9  Q    Thank you.

10 A    Yes.

11 Q    And the first iteration of the Congressional Plan and the

12 final iteration of the Congressional Plan that was enacted does

13 include portions of Chowan, Perquimans, Pasquotank?

14 A    Portions.  And I will again repeat those portions are

15 predominantly -- overwhelmingly African-American communities.

16 Q    In your letter of July 22nd, you did not say anything

17 about Chowan, Perquimans, or Pasquotank; did you?

18 A    I did not, no.

19 Q    Thank you.  And, now, in the first iteration of the

20 Congressional District, it's correct, isn't it, that your --

21 the 1st Congressional District was drawn into Wake County?

22 A    Wake County?  Yes, sir.

23 Q    Yes, sir.

24 A    That is correct.

25 Q    And I believe you said you were looking at the map, trying

1  to figure out where St. Augustine's and Shaw would be in that?

2  A    Yes.

3  Q    But the version that was enacted went into Durham County

4  rather than Wake County; is that right?

5  A    That is correct.

6  Q    All right.  And the original version of the 1st District

7  enacted in 1991 also went into Durham County, didn't it, or do

8  you recall?

9  A    You're taking me back a long ways.  I don't think so.  I

10  think District 12 went into Durham County, and District 1 went

11  into New Hanover County.

12  Q    Let me see if this helps a little bit, Congressman.  You

13  should have a black notebook up there that on the front says,

14  "Historical Congressional Maps 1991 to 2011."

15  A    Yes.

16  Q    And there's an exhibit sticker down at the bottom,

17  Defendant's Exhibit 126.  And let me ask you to look at

18  district -- at Tab 1, which is taken from the submission for

19  the 1991 Congressional Plan.  If you look at the third page of

20  that, you can see a closeup of District 1.

21  A    I do now recall, Counselor.  I do now recall.  It did go

22  into Durham.

23  Q    Thank you.

24  A    Because Ken Spaulding and Mickey Michaux ran for Congress,

25  I believe.

1  Q    Thank you.  Now, looking back at your letter --

2  A    No, I stand corrected on that.  Michaux and Spaulding ran

3  pre-'91.  So please continue your line.  I'm trying to refresh

4  my memory.  Yes.

5  Q    That's fine.  I realize it was sometime ago.

6  A    Yes.

7  Q    Looking back at your letter, in that second paragraph, the

8  last sentence reads:

9         Additionally, the amended plan -- let me, before I

10 start.  Do you have that letter back in front of you?

11 A    Yes.

12 Q    The last sentence reads:

13        Additionally, the amended plan unnecessarily, quote,

14 "packs," closed quote, new African-American voters from

15 counties not covered by Section 5 of the Voting Rights Act into

16 District 1.

17        Did I read that correctly?

18 A    No.  Are we still on the July 22nd letter?

19 Q    Yes, sir, the second paragraph, the last sentence of the

20 second paragraph.

21 A    The last sentence of the second paragraph.

22 Q    I'm sorry.

23 A    All right.  Additionally -- I'm with you, yes.

24 Q    In that sentence, what do you mean by the word "packs"?

25 A    To pack a community, to me, means to encompass a voting

1  bloc of people and to unnecessarily attach those people to

2  another community to achieve a goal that is not mandated by law

3  or necessary.

4  Q    So in your understanding, does the term "pack" have

5  anything to do with how many people are included in the

6  district, whether it's a supermajority or a bare majority?

7  A    There are degrees of packing, certainly.  But any time you

8  have a district that's already 47 percent African-American, and

9  continuously, for more than a decade, has elected a candidate

10  who is the choice of the African-American community, to then

11  scoop up additional communities of African-American voters, and

12  to add those voters to the existing majority minority district,

13  is -- meets the definition, in my view, of "packing."  It's

14  putting too many into a community in order to achieve a result.

15  Q    All right.  Looking a little further down in this letter,

16  and this has been mentioned earlier today, it's correct, isn't

17  it, that as of the 2010 Census, the 1st Congressional District

18  was underpopulated by over 97,000 people?

19  A    That is accurate.

20  Q    Do you have a sense, based on your knowledge of Eastern

21  North Carolina, how that came to be why the 1st Congressional

22  District came to be so underpopulated compared to, say, the

23  12th that I believe Congressman Watt testified earlier was

24  overpopulated by just a couple thousand?

25  A    I think I know.  North Carolina has been allocated 13

1    representatives based on the census, and that went unchanged

2    after the 2010 Census.  But in the meantime, the population of

3    our state increased to 9 million people, which was about 1-1/2

4    million people more than the prior decade.  And so, by

5    definition, the districts had to increase in ideal size.

6                And, at the same time, concurrent with that was a

7    loss of population in rural communities.  And so the growth of

8    the state coupled with the loss of population in rural

9    communities resulted in a 97,500-person deficit.  And I

10   recognized that clearly when we had these conversations.  I

11   knew we had to find 90-plus-thousand people.

12   Q    Right.  Now, going back to the margins of error that you

13   mentioned -- excuse me -- the margins of victory that you

14   mentioned in your elections, in 2008, when you had a margin of

15   receiving 70.28 percent of the vote, I think is what I have

16   written down, and would I be correct that that means your

17   opponent received 29 point --

18   A    Seventy-two.

19   Q    -- 72 percent of the votes?

20   A    Yes, sir.

21   Q    Right.  Do you know what that translates into in numbers?

22   A    Oh, I would have to use pencil and paper to figure that

23   out.  Probably between 250 and 300,000 votes, I suppose.

24   There's 730,000 people in the district.  Probably 300,000 are

25   registered voters -- 300-plus-thousand are registered voters.

1  And so 10 percent would be -- it probably says that my opponent

2  probably received 80 or 90,000 votes.

3  Q    Compared to your --

4  A    Well in excess of 100,000.

5  Q    Okay.  Do you know if that margin was more or less -- the

6  97,500 more or less than the amount by which the district had

7  become underpopulated?  And if you don't know that --

8  A    I'm doing the math.  I'm doing the math, yes.  I don't

9  know.

10  Q    All right.  Thank you.

11  A    I don't want to guess at it.  I don't know.

12  Q    All right.  Thank you.

13  A    Yeah.

14  Q    I believe you testified earlier that the African-American

15  population of the district as it existed in the 2000s, so in

16  other words, the 2001 Congressional District after the 2000

17  Census, I believe you testified that was around 47 percent?

18  A    My records show 47.66.

19  Q    Do you recall whether that is total black population,

20  voting-age population, or --

21  A    Eighteen and over voting-age population.

22  Q    Do you recall whether it is total black or single-race

23  black, people who -- do you -- I'll put it a different way.

24        Do you recall whether that is limited only to the

25  people who identified themselves on the census as being black,

1  or does it also include the people who identified themselves as

2  being part black?

3  A     I know what you're asking, and I don't know.  I've seen

4  these cross-tabs on the census data, and I don't know if BVAP

5  also includes these multiple categories.  I don't know.

6  Q     All right.  And that was -- that 47 percent was under the

7  2000 Census; is that correct?

8  A     Correct.

9  Q     Would you agree that the census is a snapshot of what a

10 population looks like as of the time it's taken?

11 A     Yes, they do.  The American Community Surveys, you know,

12 during the midterm --

13 Q     Right.

14 A     -- and for that very reason.

15 Q     All right.

16 A     Yes.

17 Q     Let me ask you to pull out the black notebook again, which

18 is Defendant's Exhibit 126.  And let me ask you to look at Tab

19 5.

20 A     All right, sir.

21 Q     And do you see that that says, Congress Zero Deviation?

22 A     Yes, sir.

23 Q     Do you recall whether or not that was the name of the 2001

24 Congressional Plan?

25 A     Yes, it is.

1  Q    All right.  And that's marked as Defendant's Exhibit 4.4A

2  up in the upper right corner of that map?

3  A    Yes.

4  Q    Let me ask you to turn a few pages back to the page that

5  at the top says, voting-age population by race?

6  A    You said "back."  Do you mean forward or back?

7  Q    It would be behind that map, and it's going to be one,

8  two, three, four pages behind that map.

9  A    The map that I'm looking at is the first document under

10 Tab 5.

11 Q    Correct.

12 A    So it would be after the map?

13 Q    After that map, yes, sir.

14 A    After the map, I see Exhibit 4, which is the fourth

15 affidavit of Dan Frey.

16 Q    Right.  Then go three more pages behind that.

17 A    Yes, sir.

18 Q    And you should see one that says, district attributes,

19 Congress Zero Deviation, voting-age pop by race.

20 A    I have it.

21 Q    All right.  And do you see where District 1 is noted in

22 the left-hand margin?

23 A    Yes.

24 Q    And if you go over three columns, do you see the one that

25 says, VA: black?

1  A    Yes.

2  Q    And what does it note for the percentage for District 1 in

3  that column?  And I realize some of these numbers are small.

4  A    They are, and the copies are not as clear as they probably

5  could be.  It appears -- I'm going to go across with you.  I'm

6  seeing District 1, total is 457,936.  VA white is 223,452.

7  Black is 218,732.  Native would be 3,273.  And then I guess

8  Asian/Pacific Islanders would be the next, 2370.  I don't see a

9  percentage.

10  Q    If you look at the line under that, you see that number

11  translated into a percent?

12  A    I do.  47.76 percent.

13  Q    Is that the 47 percent number you've been talking about?

14  A    Absolutely.

15  Q    Now, if you look over in the last column, do you see VA:

16  multi-race?

17  A    Yes.

18  Q    And what's the number and the percentage there?

19  A    .71 percent, less than 1 percent.

20  Q    All right.  Now, let me ask you to look at Tab 6, which is

21  Defendant's Exhibit 4.5A.  And I'll represent to you this is

22  the same map but with data based on the 2010 Census.  And I'm

23  afraid these numbers are going to get even smaller.

24        If you look one page behind that map, you'll see it

25  says, Exhibit 5, fourth affidavit of Dan Frey, Congress Zero

1  Deviation 2010 Census.  And that's Defendant's Exhibit 4.5?

2  A    Yes.

3  Q    All right.  Now, let me ask you to go to two sheets behind

4  that, and you'll have to turn the page sideways.  And do you

5  see a page that says, stat pack report of total population by

6  race and ethnicity, Congress Zero Deviation?

7  A    Yes.

8  Q    And do you see the column and line for District 1?

9  A    Yes.

10 Q    All right.  Now, let me ask you to follow that line over

11 to the column that says, percent black.  And can you tell me

12 what that number is?

13 A    49.65 percent.

14 Q    All right.  Now, let me ask you to keep going.

15          THE COURT:  Hold on just a second.  I'm not sure

16 we're on the right page.  Down at the bottom of the page on the

17 CM/ECF filings --

18          MR. PETERS:  Yes, sir.

19          THE COURT:  -- 28 of 45, what page are you on?

20          MR. PETERS:  It says 27 of 45.

21          THE COURT:  You said that was 49.65?  Okay.  And you

22 may continue.

23 BY MR. PETERS:

24 Q    Now, let me ask you to keep going over to -- do you see a

25 column that says, (MR) black?

1  A    Yes, sir.

2  Q    All right.  And what is that percentage?

3  A    1.00 percent.

4  Q    All right.  And if you go over two more columns, do you

5  see a column that says, total percent black?

6  A    Yes, sir, 50.65 percent.

7  Q    All right.  Now, let me ask you to look at the next page.

8  And this would be the one I think Judge Osteen was on a minute

9  ago, 28 out of 45.  And we'll look at the same things.

10          Do you see in the line for District 1 a column that

11  says, percent black?

12  A    Yes, sir.

13  Q    And what does it say?

14  A    48.07 percent.

15  Q    All right.  Do you see a column a ways down that says,

16  percent multi-race black?

17  A    Yes, sir, 1.04 percent.  Yes, that is correct.  "MR" means

18  multi-race, yes.

19  Q    All right.  Keep going two more columns, and you'll see

20  one that says --

21  A    Multi-race black, yes.

22  Q    Right.  And what is that number?

23  A    It appears to be .56 percent, less than 1 percent.

24  Q    And then two more columns, do you see, total percent

25  black?

1  A    Yes, sir.

2  Q    And can you read that?

3  A    48.83 percent.

4  Q    So, at least based on this -- these numbers from the 2010

5  Census, the voting-age population of District 1 had actually

6  gone up -- the black proportion of the voting-age population in

7  District 1 had gone up since 2000; had it not?

8  A    That's what this document reveals, and it seems reasonable

9  that that would be correct.

10 Q    Now, let me ask you to look at the next page where it

11 says, Stat Pack Report of Voter Registration by Party and Race,

12 Congress Zero Deviation.  Do you see that?

13 A    Yes.

14 Q    And I'm going to just ask you to look for the line for

15 District 1, and then look all the way over in the last block of

16 columns where it says, Registration by Race Without Regard to

17 Party.

18 A    Yes, sir.

19 Q    And do you see the percent black figure given there?

20 A    It's a smudgy copy, but I'm going to say that it appears

21 to be 50 -- 50.66 percent.

22 Q    That's what it appears to be to me as well.  I agree it's

23 not an ideal copy.  But -- so based on these numbers, according

24 to this data, the majority of the registered voters in District

25 1 as of the 2000 Census were African-American -- identified as

1  African-American; is that correct?

2  A    Yes, as of 2011.

3  Q    Now, let me ask you, are you familiar with how the census

4  counts Hispanics in -- when it does its counting?

5  A    I know the US Census Bureau makes a very deliberate effort

6  to try to accurately take the count, and I know there are

7  various methodologies that are used.  I know there's a lot of

8  advertising in Hispanic communities to encourage an accurate

9  count, and I know the census enumerators literally go into the

10 communities, knock on the doors, and do everything within their

11 power to get an accurate number.

12 Q    What I was -- I didn't -- I don't think I phrased that

13 particularly well.

14        Are you aware whether, in the census, a distinction

15 is drawn between race and ethnicity?

16 A    Yes.

17 Q    And what is that distinction as you understand it?

18 A    I'm not sure I fully understand it because it has evolved

19 over the years.  But ethnicity would be a description of the

20 individual's heritage or lineage and how the person

21 self-identifies.  And so, if a person identifies as black,

22 obviously, the ethnicity would be African-American.  If they

23 identify as mixed race or a -- I forgot the categories, but

24 there are two or three different categories.  But I think all

25 of these are lumped into one category of ethnicity being

1  African-American.

2  Q    All right.  Do you -- well, let me try it this way.  If

3  you still have the notebook in front of you, the one with the

4  plans in it.  And we were on the page that at the bottom says

5  page 29 of 45.

6  A    Yes.

7  Q    And the next page would be page 30 of 45.

8  A    Yes.

9  Q    And at the top, it says, Stat Pack Report of Voter

10 Registration by Gender, Age, and Ethnicity.  Do you see that?

11 A    Yes.

12 Q    And if you look at the last column there, do you see it

13 makes a distinction, simply, Voter Registration By Ethnicity;

14 it makes a distinction between Hispanic and non-Hispanic?

15 A    Yes.

16 Q    Let me ask you to turn back forward to the page that at

17 the bottom is marked page 27 of 45.

18 A    I'm there.

19 Q    All right.  Look at the very last column there -- well,

20 the last two columns.  And do you see columns that say, white,

21 non-Hispanic, and percent white non-Hispanic?

22 A    Yes.

23 Q    In that last column, percent white non-Hispanic, what's

24 the number there?

25 A    270,686.

1   Q    And what's the percentage?

2   A    42.58 or either 56.

3   Q    All right.  And if you look back at the beginning, the

4   early columns in that, where you see white and percent white?

5   A    Yes.

6   Q    The total percentage of white there is shown as

7   44.19 percent; isn't it?

8   A    That is correct.

9   Q    But of those, according to this chart at least,

10  42.58 percent are non-Hispanic whites.

11  A    That is correct.  I suppose because some Hispanics

12  identify as white and some don't.

13  Q    Right.

14  A    Yes.

15  Q    And by the same token, some blacks could identify as

16  Hispanic, and some others might not; is that correct?

17  A    There may be incidence of that, but probably less

18  prevalent as opposed to the other way.

19  Q    And again, on page 28, the one that says 28 of 45, which

20  is the next page.  If you look in the column that says, percent

21  white, for District 1, it says 46.92 percent; is that correct?

22  The column that just says, percent white.

23  A    Percent white is 46.92 percent.

24  Q    Right.

25  A    Yeah.

1  Q    And if you look at the very last column, the percent white
2  non-Hispanic is 45.59 --
3  A    That is correct.
4  Q    -- is that correct?  Excuse me one second, Your Honor.
5           Congressman, let me ask you to look at that page
6  again, the one that's 28 of 45.  And I just want to make sure
7  this is clear for the record.  Up at the top of that page, does
8  it say it's voting-age population by race and ethnicity?
9  A    Yes.  The header says, report -- Pack Report of Voting-Age
10  Population By Race and Ethnicity.
11  Q    And the page ahead of it, the one that at the bottom says
12  27 of 45, that one is headed, Stat Pack Report of Total
13  Population By Race and Ethnicity.
14  A    Yes.  Page 27 of 45 is delineated as total population, and
15  28 is delineated as voting-age population.
16  Q    Now, Congressman Butterfield, Mr. Speas asked you some
17  questions about voting in Northeastern North Carolina, and I
18  think you kind of shorthanded it as east of I-95, what the
19  voting patterns would be, and comparing it to what Senator Blue
20  had testified to this morning.
21           Is it your testimony that racially polarized voting
22  still exists in many places east of I-95?
23  A    It does.  When I did voting rights litigation, it was
24  extremely severe, and there were numerous studies conducted
25  that were accepted by the Court that concluded that with the

1  racially polarized voting as it existed then, with multi-member

2  districts for the state legislature, that it was nearly

3  impossible -- I think the Court may have said 1 out of 100,000,

4  that was the *Gingles* Court, Judge Phillips presiding, 1 out of

5  100,000 chances of being elected.

6          And so, as recently as 30 years ago, voting was so

7  polarized that it was nearly impossible for the preferred

8  candidate to get elected.  That has improved over the years.

9  But I still believe that two out of three white voters in

10 Eastern North Carolina, particularly in Northeastern North

11 Carolina, which I feel that I'm expert enough to testify

12 regarding because I've been there all of my life, have been

13 into every town, village and hamlet and crossroads in

14 Northeastern North Carolina, know thousands of people.  I

15 firmly believe that the preferred candidate of the

16 African-American community probably can expect to get one out

17 of -- if qualified, and we all have different definitions of

18 "qualification," but I think we can probably agree on what

19 "qualification" means, that a qualified -- a qualified

20 candidate who is the preferred candidate of the

21 African-American community, for planning purposes or for

22 strategic purposes, can count on getting one out of three white

23 votes in Northeastern North Carolina.

24          And that means that two out of three will probably

25 not vote for that candidate.  There have been exceptions, I'm

1  proud to report.

2  Q    So just so I'm clear, though, it is your belief that

3  racially polarized voting still exists --

4  A    It still exists without question.

5  Q    -- in Northeastern North Carolina?  I'm sorry?

6  A    It still does exist without question.

7  Q    All right.  Did you believe it was necessary, in drawing

8  the 1st  District, to maintain an African-American population

9  sufficiently high to ensure that African-Americans could elect

10 their candidate of choice?

11 A    I think it was important that the legislature look at

12 voting behavior and past electoral success and failures to

13 determine what is the appropriate level of minority -- of

14 African-American voter registration and voting-age population

15 in order to level the playing field to give the preferred

16 candidate an equal opportunity to get elected.  And I don't

17 believe that an unofficial number, such as greater than

18 50 percent, is suitable because it should be area specific,

19 maybe not county specific, but certainly regional -- region

20 specific, because what -- the coalition politics of Mecklenburg

21 and Wake County unfortunately don't exist in Northeastern North

22 Carolina.

23         And so, the preferred candidate, usually the

24 African-American candidate, must go out and walk the delicate

25 balance between the interests of the white community and the

1  interests of the African-American community, and that's very

2  difficult.

3  Q    And I believe your testimony has been that you believed

4  that the 47.76 percent African -- white voting-age population

5  accomplished what you're describing?

6  A    Without question.  Not just for me personally, and I

7  continue to tell anyone who's willing to listen this -- listen

8  to this.  It's not about my electability, because I am unique,

9  if I must say that about myself, because I've been out there in

10 the trenches for 45 years, served as a judge in most of the

11 counties that I now represent in Congress.  And so, I have some

12 political advantages that other candidates probably will not

13 have in the future.

14          And so, while I'm concerned about my own electoral

15 success, I'm also concerned about the success of those who

16 follow me.  And I believe that 47 percent is a suitable number

17 that in a qualified candidate who is the choice of the

18 African-American community can be competitive in the 1st

19 Congressional District.

20 Q    Do you believe a suitably qualified African-American

21 candidate in the 1st District who is the candidate of choice of

22 African-American voters could be elected if the black

23 voting-age population was reduced from 47.76 percent?

24 A    Conceivably, yes.

25 Q    How far do you think it could be reduced?

1  A     I wouldn't take it below 45.

2  Q     So you think if it went under 45, then that would call --

3  A     I think the playing field is level at 47.  I think at 46,

4  it gets to be a little bit more difficult; 45, it gets more

5  difficult, but still competitive.  And I think the law should

6  just guarantee the ability to compete fairly, and so, I feel

7  most comfortable with 47.

8  Q     All right.  And do you have an understanding of whether

9  the 1st Congressional District -- well, let me approach it this

10  way.

11        Let me ask you to look one more time at the white

12  notebook, Tab 19 behind your name, the third paragraph that

13  begins at the bottom of page 1 with the words, "from the

14  beginning..."

15  A     Yes, sir.

16  Q     Could you read that first sentence, please.

17  A     Okay.  Quote:  "From the beginning, I simply ask that you

18  start with my current district and add 97,500 people to comply

19  with one person, one vote requirements in a manner that would

20  comply with the Voting Rights Act."

21  Q     And when you say "in a manner that would comply with the

22  Voting Rights Act," which parts of the Voting Rights Act were

23  you -- did you have in mind?

24  A     Section 2, principally, that is, that the minority -- that

25  the African-American vote not be diluted to such an extent that

1   the vote -- the voters would be unable to influence the outcome

2   of an election.

3   Q    And it's true, isn't it, that District 1 was initially

4   drawn to comply with Section 2 of the Voting Rights Act?

5   A    It was.  I remember it very well.

6   Q    Despite the fact that it also happens to include many

7   counties that were at the time covered by Section 5?

8   A    A substantial number of District 1 counties are Section 5

9   counties, and there are historical reasons for that.

10  Northeastern North Carolina was the venue for most of the slave

11  plantations in North Carolina during the period of slavery.

12  And when slavery ended 150 years ago, many African-Americans

13  continue to live on the soil.

14            And they, through the years, have began to have

15  families and to multiply, and the population -- the population

16  of African-American communities continues to be high as

17  compared to the white communities.  In Ward County, for

18  example, majority-black.  Halifax County, majority

19  African-American.  Northampton County, Hertford County, Bertie

20  County, all of these counties are majority African-American and

21  there are historical reasons for it.

22  Q    And when you said here, "comply with the Voting Rights

23  Act," you specifically had in mind Section 2?

24  A    Yes.

25            MR. PETERS:  All right.  I have no further questions.

1   Thank you very much.

2           THE COURT:  Redirect?

3           MR. SPEAS:  Just a couple of clarifying questions.

4   Thank you, Congressman Butterfield.

5                   REDIRECT EXAMINATION

6   BY MR. SPEAS:

7   Q    You were asked a series of questions about the 2001 Plan

8   measured both by Census 2000 data and then by Census 2010 data;

9   correct?

10  A    Yes.

11  Q    When a legislature enacts -- when the legislature enacted

12  the 2001 Plan, it only had the 2000 Census data; correct?

13  A    That would seem to be logical.  It was the following year,

14  yes.

15  Q    And it did not have any 2010 Census data to submit to the

16  Department of Justice for Section 5 preclearance purposes?

17  A    That is correct.

18  Q    And only by peering into some crystal ball could the

19  General Assembly in 2001 guess what the numbers would be in

20  2010?

21  A    That would be correct.

22  Q    Okay.  Now, one final question.  All the years you've

23  spent in voting rights litigation, it is your understanding

24  that each district must be narrowly tailored to meet the

25  requirements of Section 2?

1  A    One size fits all does not work in North Carolina, and I

2  don't believe would work in any southern state whatsoever.    In

3  order to draw a fair map that meets the requirements of the

4  Constitution and the State Constitution, I believe that you

5  have to perhaps maybe not look at county-specific data, but at

6  least regional data.

7            Look at the north -- look at -- because even the

8  voting behavior between Durham and the other part of the

9  district is different.   There's a lot of coalition building in

10 Durham.   That was alluded to earlier.   Polarization is -- I'm

11 not going to say nonexistent in Durham, but it's not as -- at

12 the level that it is in Halifax County.   And so I believe that

13 any responsible map drawer should look at regional data in

14 order to determine the severity of the polarization in voting

15 and to narrowly tailor that map to meet that data.

16 Q    Would it be accurate, Congressman Butterfield, that

17 Congress -- that Congressional District 1, as now configured,

18 includes a county, Durham County, where racially polarized

19 voting is probably among the least in the state; and at the

20 same time, Bertie County, for example, where racial polarized

21 voting may be higher?

22 A    That's a good example, Mr. Speas.   Durham County, which is

23 the county I spent many years of my formative life in as a

24 college student and as a law student, black leaders in Durham

25 fought some real tough battles over the years.   And it grew out

1  of that a sense of working together in the political arena.

2          And even though there continue to be differences in

3  Durham between the racial groups, there is cohesion on many of

4  the political issues.  And we don't have, in Bertie County of

5  Eastern North Carolina, that degree of cooperation.

6  African-Americans and whites like each other and get along, but

7  when it comes to the voting booth, their behavior is in stark

8  contrast.

9  Q    To Durham?

10 A    Sir?

11 Q    To Durham County?

12 A    In stark contrast to Durham County, yes.

13          MR. SPEAS:  Thank you very much, Congressman.

14          THE WITNESS:  Yes.

15          MR. PETERS:  Your Honor, just one or two questions.

16                      RECROSS-EXAMINATION

17 BY MR. PETERS:

18 Q    Congressman Butterfield, Mr. Speas asked you about the

19 census data -- the 2000 Census data when the 2001 Plan was

20 adopted, and the General Assembly not having a crystal ball to

21 see what things were going to look like come the 2010 Census.

22 But would you agree that the 2000 -- applying the 2010 Census

23 to the 2001 District is useful in seeing what the population of

24 the district actually looked like by the end of the decade?

25 A    It's good for an analysis.  It's probative of reaching

1  what a fair district should look like.  I would agree with

2  that, that the 2010 data when compared to the 2001 data is

3  probative in reaching a result, yes.

4  Q    Do you know which census data the United States Justice

5  Department would have used in evaluating the benchmark for

6  Section 5 submission?

7  A    I don't know.

8            MR. PETERS:  I have nothing further, Your Honor.

9  Thank you.

10           MR. SPEAS:  No questions, Your Honor.

11           THE COURT:  You may step down.

12           (At 4:07 p.m., witness excused.)

13           MR. SPEAS:  Thank you.  May Congressman Butterfield

14 be excused?

15           THE WITNESS:  Should I leave these exhibits?

16           THE COURT:  Any objection to Congressman Butterfield

17 being excused?

18           MR. PETERS:  Oh, no, Your Honor.  We appreciate

19 Congressman Butterfield him being here and wish him safe

20 travels.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  All right.

23           MR. SPEAS:  Your Honor, we would call our first

24 expert witness, Dr. David Peterson.  Dr. Peterson, if you would

25 come around, please, and be sworn.

1          (Witness sworn by the clerk.)

2          MR. SPEAS:  Your Honor, if I may, I have a collection

3     of witness notebooks.

4          THE COURT:  All right.

5          MR. SPEAS:  If I may, this notebook contains

6     documents that Dr. Peterson will be talking about.  I hope I

7     have them in better order this time, Your Honor.  There's three

8     of those for the judges and one for Mr. Farr, and the remainder

9     for the clerks.  Oh, you need one.  May I approach the witness,

10    Your Honor?

11         THE COURT:  You may.

12                         DAVID PETERSON,

13              PLAINTIFF'S WITNESS SWORN AT 4:09 p.m.

14                      DIRECT EXAMINATION

15    BY MR. SPEAS:

16    Q    Dr. Peterson, would you state your name for the record,

17    please.

18    A    Yes, my name is David West Peterson, P-E-T-E-R-S-O-N.

19    Q    And would you review for the Court your educational

20    background?

21    A    Yes.  I have a bachelor's degree from the University of

22    Wisconsin, and master's and Ph.D. degrees from Stanford

23    University, all in electrical engineering.

24    Q    And would you describe for the Court your work experiences

25    after receiving your Ph.D?

1  A    Yes.  After I got my Ph.D, I went into the Army for a

2  couple of years where I served at the Institute for Exploratory

3  Research at Fort Monmouth, New Jersey, doing basic research.

4  And then I took a faculty position at Northwestern University,

5  where I taught in the School of Management subjects,

6  statistics, operations, research, generally-applied

7  mathematics, computer applications, that sort of thing.

8           And then I took a professorship at Duke University,

9  where -- in the School of Business there.  And I continue to

10 teach operations research, statistics, applied mathematics,

11 computer applications, and that sort of thing.  And after I had

12 been there half dozen years or so, I got involved with

13 attorneys doing consulting work and helping with statistical

14 aspects of their cases, which led to the formation of a small

15 consulting firm.  We did consulting and software development.

16          The firm was called PRI Associates.  And in working

17 with them, I worked, I suppose, with 1,000 or so different

18 legal teams on various statistical issues, such as employment

19 discrimination, political redistricting, jury selection,

20 high-tech intellectual property disputes, and so forth.

21 Q    Are you the author of any scholarly articles in

22 professional and academic journals?

23 A    I'm coauthor of a book called *Use of Statistics in EEO*

24 *Litigation*.  I'm sole author of another book on the use of

25 statistics and litigation, and I'm the author of several dozen

1  articles that have appeared in professional journals, refereed

2  professional journals.

3  Q    And are your books about statistics and litigation now

4  in -- they've been out in a number of versions; is that

5  correct?

6  A    Yes.  My first book on the subject came out in -- I think

7  it was 1978, or thereabouts, and it's now in something like its

8  30th edition.

9  Q    Okay.  And have you qualified -- been qualified and

10  testified as an expert in any lawsuits?

11  A    I have, in both state and federal courts.

12  Q    And do you have an estimate of the number?

13  A    Hard to say, but certainly at least 50 cases, and most

14  likely more.

15  Q    And were you qualified and testified as an expert in the

16  *Cromartie* litigation concerning Congressional District 1 that

17  was litigated back in the 1990s?

18  A    Yes.

19  Q    Dr. Peterson, if you would turn to Tab 1 in the notebook

20  in front of you.  Let me ask you if, at the -- toward the end

21  of Tab 1, there appears Appendix A, which is a longer version

22  of your qualifications and experience than you just described?

23  A    Yes.

24  Q    And is that accurate?

25  A    It is, even though it bears a date from a couple of years

1    ago, it's essentially up to date.  I haven't done much in the

2    last couple of years.  I've been mostly retired.

3    Q    Tree farming, I believe?

4    A    Tree farming, yes.

5              MR. SPEAS:  Your Honors, I would tender Dr. Peterson

6    to the Court as an expert in the field of applied mathematics.

7              MR. STRACH:  No objection, Your Honor.

8              THE COURT:  All right.  Dr. Peterson then may testify

9    as an expert in the field of applied mathematics.

10   BY MR. SPEAS:

11   Q    Dr. Peterson, would you describe for the Court the

12   analysis that you undertook for the plaintiffs in this case?

13   A    Yes.  I examined the 1st Congressional District and the

14   12th Congressional District, as presently constituted, and

15   addressed the issue of whether the borders of each appear to

16   have been constructed more for the purpose of collecting

17   Democrats within, or more for the purpose of collecting blacks

18   within.

19   Q    And what conclusion did you reach with respect to those

20   two districts?

21   A    Well, I did something that I call a segment analysis.  And

22   what the segment analysis shows is that race better accords

23   with each of the two boundaries than does political party

24   preference.

25   Q    In other words, race more than politics accounts for the

1  boundaries of Congressional 1 and 12?

2  A     Yes, that's correct.

3           MR. SPEAS:  My colleague, Mr. Hamilton, has informed

4  me that the document that Dr. Peterson is speaking from is

5  Plaintiff's Exhibit 15.  I apologize for that.  Thank you,

6  Mr. Hamilton.

7  BY MR. SPEAS:

8  Q     Would you, Dr. Peterson, talk to the Court a little bit

9  about the concept of a segment analysis?  What are you doing?

10  A     Sure.  A segment analysis arises from the following line

11  of thought:  Let's suppose someone hands us a map with a

12  hand-drawn line on it along with a question of is there some

13  objective way that you could determine why that line was drawn

14  the way that it was?  And if the line was drawn, let's say, as

15  an attempt at a contour line, we would expect that if we walk

16  along the path on the ground traced out by that line, that we

17  could reasonably expect to see that, most of the time at least.

18  The land is higher on the one side of the path than it is on

19  the other side of the path.  And if we observe that that's the

20  case, that gives us some confidence that maybe the purpose

21  behind that line was that it was an attempt at drawing a

22  contour line.

23           Alternatively, if, as we walk along the path traced

24  out by that line, we see that, oh, say, the property on one

25  side of the line is under different ownership than property on

1    the other side of the line, that would give us some confidence

2    that perhaps the line was drawn as a boundary line depicting

3    ownership or separating ownership of the land.

4         The question that was posed to me, basically, was

5    here's the boundary of a political district.  What can you say

6    about why it was placed just where it was?  And, in particular,

7    can you say anything about whether it seems to have, built the

8    way it was -- have been built the way that it was for the

9    purposes of collecting blacks within; or does it seem -- is the

10   evidence stronger that it was built, perhaps, with the purpose

11   of collecting Democrats within?  So that's the question that a

12   segment analysis attempts to address.

13        I'm going to walk along the boundary, at least in

14   concept, and basically look, first, at the issue of whether the

15   line seems to have been drawn for the purpose of collecting

16   Democrats inside.  And if that's the case, what we should

17   expect to see as we walk along the line is that the

18   representation of Democrats on the inside of the path is

19   greater than the representation of Democrats on the outside.

20        On the other hand, if the line was drawn for the

21   purpose of collecting blacks within, we would expect to see as

22   we walk along that the representation of blacks on the inside

23   is greater than the representation of blacks on the outside.

24   And what a segment analysis does is, basically, go around the

25   boundary of each of the two districts and -- twice; once

1  looking at the representation of blacks inside and out, and

2  once looking at the representation of Democrats inside and out.

3  Q    And Dr. Peterson, behind Tab 1, does there appear your

4  second affidavit marked Plaintiff's Exhibit 15; and I would ask

5  you whether or not that is the -- sets forth your results of

6  your segment analysis for Congressional District 12?  Tab 1,

7  second affidavit.

8  A    Yes, that is a description of my analysis -- my segment

9  analysis of the 12th District.

10 Q    Would you, Dr. Peterson, walk the Court through that --

11 A    Sure.

12 Q    -- and explain it to them.

13 A    Sure.  A segment analysis, under the present

14 circumstances, is rather limited by the availability of data.

15 What we have at hand is precinct-by-precinct data on the

16 representation of Democrats among the population, and we have

17 precinct-by-precinct data on the representation of blacks

18 within the population.  And as it happens, the boundary of the

19 12th District -- let me talk first about the 12th District --

20 pretty much follows precinct lines, so that as one walks along

21 the border of the 12th District, there is an inside precinct

22 and then an immediately adjacent outside precinct.

23        And as we progress along the boundary a little ways,

24 eventually, one of the precincts changes, either the inside

25 precinct changes or the outside precinct changes, and we enter

 1  upon a new segment of the district boundary, the voting

 2  district boundary.

 3          And it happens, going precinct by precinct, the

 4  boundary of the 12th District breaks into a total of 330

 5  segments, each segment characterized by an inside precinct and

 6  an outside precinct.  And for each precinct, we can measure the

 7  representation of blacks in that precinct, inside and outside,

 8  and compare the two and determine which is greater.

 9          And we can also compare the representation of

10  Democrats on the inside precinct and the outside precinct,

11  compare the two, and determine on which side of the path the

12  representation is greater.

13          The segments on which the -- for which the

14  representation of blacks on the inside is greater than on the

15  outside, I call Type B -- B for black -- segments.  And the

16  segments for which the representation of Democrats on the

17  inside is greater, I call Type D segments, Democrat segments.

18          And as it happens, not too surprisingly, most of the

19  segments, most of the 330 segments are Type B segments, and

20  most are also Type D segments.  And, in fact, most segments are

21  both Type B and Type D.

22          But the question here is, really, can one determine

23  whether there is more support, whether there's more evidence

24  that the boundary was placed for the purpose of collecting

25  blacks within or for the purpose of collecting Democrats

 1   within.  And to examine that issue, we have to look at the

 2   segments which are not both Type B and Type D.

 3            For example, if we have a segment that's Type B, but

 4   not Type D, that is, blacks are represented inside to a greater

 5   extent than they are represented outside, but Democrats are

 6   represented outside to a greater extent than they are

 7   represented inside, such a segment is consistent with the

 8   hypothesis that race, to an extent, greater than political

 9   considerations accounts for the placement of that segment or

10   that portion of the boundary of the 12th District.  A segment

11   like that supports what I call the race hypothesis, that race

12   was more important than political affiliation in accounting for

13   the placement of that particular segment of the 12th District.

14            On the other hand, a segment might be such that the

15   representation of Democrats on the inside is greater than the

16   representation on the outside, but the representation of blacks

17   on the outside is greater than on the inside.  And such a

18   segment I call a Type P segment because it supports the party

19   hypothesis more than it supports the race hypothesis.

20            And what I do, then, in a segment analysis is go

21   around and count up the number of Type B segments -- the number

22   of Type R segments, sorry, the ones that support the race

23   hypothesis, and the number of Type B segments, the ones that

24   support the party hypothesis over the race hypothesis.  And the

25   results of those counts are shown in Table 1.

1  Q    I'll put Table 1 up on the screen.

2         MR. SPEAS:  And Table 1, Your Honors, is on page 6 of

3  Exhibit 26 -- Exhibit 15 under Tab 1.  Table 1, Tables of

4  District 12 Segments By Race and Party Type.

5  A    And I would like to direct the Court's attention, first,

6  to the first pair of numbers.

7  Q    Is your pointer working?

8  A    Well, no, actually.

9  Q    Technical flaw.

10  A    We'll try using words instead.  Here we go.  In the

11  northwest corner there, there's a pair of numbers, 6 and 8.

12  And those represent the results of one segment analysis.  In

13  that particular analysis, there were six segments that were of

14  the race type; that is, they supported the race hypothesis over

15  the political hypothesis; and there were eight segments that

16  did just the opposite, supported the party hypothesis over the

17  race hypothesis.

18         But in doing that segment analysis, I used the entire

19  black population for purposes of measuring the race within each

20  precinct; that is, I noted the proportion of the entire

21  population associated with each precinct that were blacks.

22  Now, there are other ways, as has been brought out already

23  today in testimony, of measuring the representation of blacks.

24  One could use, for example, a black voting-age population.

25  Well, that's covered in the next line down.

1          If we use black voting-age population as a basis for

2     doing a segment analysis, in the first column there, the pair

3     of numbers, 7 and 7, show up underneath the first two that we

4     talked about.  And that reflects the fact that for that

5     particular segment analysis, there were seven segments that

6     supported the race hypothesis and seven segments that supported

7     the political hypothesis.  Same number of segments in each

8     case.

9          But as there are different ways of measuring the

10    representation of blacks, so, too, are there different ways of

11    measuring the representation of Democrats.  And what was done

12    in the first column there is to base the representation of

13    Democrats on the percentage of registered voters in each

14    precinct who are registered as Democrats.

15         The next column over -- in fact, the next three

16    columns over are all based not on just voter registration party

17    identities, but rather, on behaviors of voters in actual

18    elections.  So the next column over pertains to the 2008

19    gubernatorial election in North Carolina.  The next column over

20    pertains to the 2008 presidential election in North Carolina.

21    And the final column -- ah, we have a cursor on the screen here

22    that may help -- thank you very much, Stacy.  In the 2010

23    election, we have the senatorial election in North Carolina.

24         So we have four different ways of measuring the

25    representation of Democrats coupled with three different ways

 1  of measuring the representation of blacks for a total of 12

 2  different studies, 12 different segment analyses, the results

 3  of all of which are presented in this one table.

 4  Q    Clarifying point, Dr. Peterson.  So it's -- Table 1 sets

 5  forth the results of not a single segment analysis, but 12

 6  segment analyses?

 7  A    That's correct, yes.

 8  Q    Thank you.

 9  A    The same analysis repeated using different measures of

10  racial representation and different measures of representations

11  of Democrats.

12          I should mention that the final line in the table is

13  all based on the representation of blacks among registered

14  voters.  That's the third way that I measured black

15  representation.

16          If you look over in the rightmost two columns, you'll

17  see going down there that, in every case, the number of

18  segments supporting the race hypothesis exceeds the number of

19  segments supporting the party hypothesis.

20          Looking at the first column on the left under the one

21  that we started at up in the northwest corner, we see that in

22  that instance, the race hypothesis is supported by six

23  segments, whereas the party hypothesis is supported by eight

24  segments.  So, looking at the overall balance just with that

25  one study, there's more support in the segment analysis for the

 1  party hypothesis, that the boundary was drawn for political

 2  reasons rather than race.

 3          The next line down, we noticed the balance was just

 4  even, so there's a tie.  The next line down, we know that,

 5  again -- we see again that the balance tips in favor of the

 6  political hypothesis.

 7          Moving over to the next column, we see the same

 8  pattern again.  The top entry favors the political hypothesis.

 9  The next entry down, there's an even balance.  The third line

10  down, again, the balance tips in favor of the political

11  hypothesis.  But in the last two columns in every single case,

12  the balance tips in favor of the race hypothesis.  And

13  furthermore, it tips more extremely in favor of the race

14  hypothesis in each of those six cases than in any of the cases

15  in which it tips in favor of the political hypothesis.

16          Viewed as a whole, Table 1 indicates that there's

17  more support for the race hypothesis than for the political

18  hypothesis.

19  Q    Thank you, Dr. Peterson.  For just a minute, I'd like you

20  to focus on the segment analysis, comparing the 2008

21  presidential results with three different measures of the black

22  population.  Is it true that in every one of those analyses,

23  the race hypothesis better explains the boundary of the

24  district than the party hypothesis?

25  A    Yes, that is true.

1  Q    Okay.  Now, Dr. Peterson, did you repeat this segment

2  analysis for Congressional District 1?

3  A    Yes, same analysis, but, of course, different data.

4  Q    And if you would turn to page 2 of the notebook in front

5  front of you, there appears your fourth statistical report

6  marked Plaintiff's Exhibit 16.  And I would ask you,

7  Dr. Peterson, if that sets out your segment analysis for

8  Congressional District 1?

9  A    Yes, it does.

10 Q    And would you describe for the Court that study.

11 A    Yes.  This is the same analysis that I did for the 12th

12 District, except I did it for the 1st District.

13 Q    And are the results of your study for Congressional

14 District 1 set forth in Table P5.1 --

15 A    Yes.

16 Q    -- appearing on page 6 of Plaintiff's Exhibit 16 and now

17 on the screen?

18 A    Yes, that is correct.

19 Q    Okay.  And would you review with the Court the results set

20 forth in Table P5.1 on page 6?

21 A    Yes.  The -- again, there wasn't just one segment analysis

22 that was done.  There were 12 analyses done using three

23 different measures of racial representation -- of black

24 representation, rather, and four different measures of the

25 representation of Democrats.  And what you see there is that in

 1   the first column, in every single instance, the race hypothesis

 2   is more strongly supported than the political hypothesis.

 3           And in the last column, in every single case, the

 4   race hypothesis is supported more strongly than the political

 5   hypothesis.  And in the bottom row, which overlaps the first

 6   and last columns, the same is true.

 7           Only for the four studies sort of in the middle upper

 8   central part of the table is there a departure from this

 9   pattern.  And, in the second column, the top pair of numbers, 8

10   and 9, show that there's slightly more support for the

11   political hypothesis than for the race hypothesis.

12           And the next one down, the 7 and the 8, show that,

13   again, there's slightly more support for the political

14   hypothesis than for the race hypothesis.

15           And then moving over to the next column, looking at

16   the first two rows, we see there are two ties there; in the

17   first instance, eight segments supporting the race hypothesis

18   over the political hypothesis, and eight segments supporting

19   the political hypothesis over the race hypothesis.  And the

20   next line down is 6 and a 6.

21           So, overall, there are eight instances in which the

22   segment analysis comes out more strongly in favor of the race

23   hypothesis than the party hypothesis, two instances in which

24   there's a tie, and two instances in which the political

25   hypothesis is ever so slightly favored over the race

1  hypothesis.  Again, in every instance in which the race

2  hypothesis has more support than the political hypothesis, the

3  degree of imbalance is greater than in any instance in which

4  the political hypothesis has more support than the race

5  hypothesis.

6            Overall, I think you have to say that Table P5.1, the

7  segment analyses, are more strongly supportive of the race

8  hypothesis than they are of the political hypothesis.

9  Q    So is it correct, Dr. Peterson, that based on your segment

10 analysis for Congressional District 1 and Congressional

11 District 12, as enacted by the defendants in 2011, you conclude

12 that the race hypothesis better accounts for the boundary of

13 both districts than the political hypothesis?

14 A    Yes, that is correct.  And I should point out, I think,

15 that this is not the first time I've ever done a segment

16 analysis.

17 Q    I wanted to talk just a little bit about that.  You did

18 this once before, I believe?

19 A    I have, yes.

20 Q    And could you explain to the Court the circumstances under

21 which you undertook to do a segment analysis and what you

22 found?

23 A    I did this in connection with a *Cromartie* litigation in

24 the Wake of the 1990 Census.  And again, it was the 12th

25 District which was being challenged.  And the results that I

1    found in that instance were just the opposite of what I found

2    this time.  So I found that there was more support for the

3    political hypothesis than for the race hypothesis.

4    Q    And do you -- are you aware of the black voting-age

5    population percentage in the version of Congressional District

6    12 you were examining in the *Cromartie* legislation --

7    litigation?

8    A    No.

9    Q    Okay.  Now, Dr. Hofeller, I believe, undertook to respond

10   to your segment analysis for Congressional District 12; is that

11   correct?

12   A    Yes.

13   Q    And is that set out at Tab 3 of of your witness notebook,

14   which is the affidavit of Thomas Hofeller, or the portion of it

15   that Mr. Hofeller filed in the *Dickson* matter on January 9,

16   2012?

17   A    Yes.

18   Q    And can you describe for the Court the response

19   Dr. Hofeller made to your analysis of Congressional 12?

20   A    Yes.  Dr. Hofeller responds just to my second affidavit,

21   the one that addresses District 12.  So far as I'm aware, he

22   has made no response to my analysis of District 1.

23           His response to my analysis begins on page 17 of his

24   affidavit, in paragraph 45, and pretty much runs to the end of

25   that affidavit.  And it seems to me that the real meat of his

1  response is contained in his paragraph 59 on page 21.  And his

2  paragraph 59 rests on an analysis of the data shown in his

3  Appendix 2.

4  Q    And can we put Appendix 2 on the -- thank you.

5         Is this Appendix 2 from --

6  A    Yes, it is.

7  Q    -- Mr. Hofeller's response?

8  A    Yes.

9  Q    And can you use that to explain his response?

10 A    Sure -- well, yes, as best I understand it.  What

11 Dr. Hofeller does is to distinguish three different geographic

12 areas.  There's a geographic area that is in both the old

13 version of District 12 and in the new.  It's what he refers to

14 as -- well, an area in the new and the old 12th.  You might

15 think of it, I suppose, as some sort of core area.

16        And then there's an area that is only in the old 12th

17 District but not in the new, so it was taken out of the 12th

18 District in the process of forming the new.  And then there's

19 an area that's only in the new, something which was not in the

20 old, but now it's in the new.

21        And for each of these areas, in Appendix 2,

22 Dr. Hofeller supplies some data, on the one hand, the

23 representation of blacks in that area; and on the other, the

24 representation of Democrats based on the 2008 presidential

25 election.

1        And what he does is to note in a central column here

2   that the representation of black voting -- representation of

3   blacks among the voting-age population in the first of these

4   districts, the core district, the part that's in the old 12th

5   District and also in the new, that the representation of blacks

6   among the voting-age population is 54.22 percent.  And then

7   underneath that, that the representation of blacks among the

8   voting-age population only in the old 12th District, but not in

9   the new, is 22.77 percent.  And then underneath that, that the

10  representation of blacks only in the new portion of the 12th

11  District but not in the old is 43.24 percent.  And then

12  underneath that, he shows 20.47 percent, which is the

13  difference between the 43.24 percent and the 22.77 percent.

14       So we'll hold that thought and move on to the

15  analogous data here for the representation of Democrats.  And

16  what he shows in this table is that in the core area, the

17  representation of Democrats as measured by the presidential

18  election in 2008 was 79.92 percent.  The representation of

19  Democrats only in the old 12th District was 53.01 percent.  And

20  that the representation of Democrats in the new part of the

21  12th District is 75.39 percent.  And, again, underneath that,

22  there is a percentage shown, 22.38 percent, which is the

23  difference between 75.39 percent and 53.01 percent.

24       Now, by some process, which is not entirely clear to

25  me, Dr. Hofeller reaches the conclusion stated in the last

1  sentence of his paragraph 59, which is, quote:

2          "The only political decision which one can perceive

3  by the desire to place the lower performing VTDs into the 12th

4  District is an attempt to submerge Republican vote in a safe

5  Democrat seat."

6          I have to confess, I don't see how he gets there from

7  the data in Appendix 2.  And, indeed, I don't even understand

8  what that conclusion means, but --

9  BY MR. SPEAS:

10  Q    Did you undertake to examine Dr. Hofeller's response to

11  your Congressional 12 affidavit?

12  A    Well, as I interpret Appendix 2, it was meant for us

13  somehow to look at the 20.47 percent and the 22.38 percent and

14  come to some sort of conclusion.  And the only conclusion that

15  leaps out at me is that, in taking out part of the

16  12th District and replacing it with a new piece of North

17  Carolina not previously in the 12th District, this had the

18  effect of increasing the representation of blacks by this

19  20.47 percent.

20          That's really not a percentage increase, but it's a

21  difference in the two representations that I've already

22  described the calculation of.  But it also had the effect of

23  changing the representation of Democrats in the 12th District.

24  And the difference calculated, analogously, is 22.38 percent.

25          And it seems to me that the comparison that's invited

1  here is the 22.38 percent against the 20.47 percent.  And

2  maybe, what we're supposed to observe here is that the

3  22.38 percent being greater than the 20.47 percent, we should

4  infer that it was politics more than race that influenced the

5  creation of the new 12th District.

6         And if that is the right interpretation, that's a

7  false conclusion for reasons which I hope presently to

8  demonstrate.

9  Q    And do you explain why that is a false conclusion in your

10  third affidavit, which appears after Tab 4, and which is marked

11  as Defendant's Exhibit D118?

12  A    Yes.

13  Q    And would you explain for the Court what is set forth in

14  that third affidavit?

15  A    It may be most expeditious to look at Table P3.1 at least

16  briefly.

17  Q    And that's now on the screen.  And Table P3.1 appears in

18  that report as -- at the end as immediately following your

19  signature page; correct?

20  A    Yes, immediately following page 7.

21  Q    Could you explain what appears on Table P3.1?

22  A    Yes.  What appears on -- one of the things that we learned

23  from the segment analyses, both of the 1st District and the

24  12th District, is that it makes a difference how you measure

25  black representation or how you measure the representation of

1  Democrats in a precinct.

2         And so what I've done in Table P3.1 is just to take

3  Dr. Hofeller's Appendix 2 table, which measures race only one

4  way and measures Democrat percentages only one way, and expand

5  it to measure race three different ways, the three ways that

6  were used in the segment analysis, and political affiliation

7  four ways, the four ways that are used in the segment analysis,

8  instead of just the one way that's used in Appendix 2.

9         And the reason why I said maybe we'll just look at

10 Table P3.1 briefly is that it's a mess.  There's a lot of data

11 there, and it's very difficult to pick stuff out.  So I suggest

12 we segue to Table P3.2, which is now on the screen, and which

13 appears immediately after P3.1 in your affidavit.

14 A    Yes.

15 Q    Can you describe for the Court --

16 A    Yes.  In Table P3.2, what I've done is, essentially, 12

17 different versions or 12 different variations on the study that

18 I think Dr. Hofeller presents in his Appendix 2.

19        So, once again, there are 12 entries there

20 corresponding to the three different ways of measuring the

21 representation of blacks and the four different ways of

22 measuring the representation of Democrats that we encountered

23 previously in connection with segment analyses.

24        And, in each case, in the body of the table, I've

25 entered a P if the comparison afforded by the -- by parallel

1    analysis of Dr. Hofeller's Appendix 2 supports the party

2    hypothesis over the race hypothesis.  And I've entered an R

3    where the opposite is true, where doing the type of analysis

4    that I attribute to Dr. Hofeller, in his Appendix 2, it turns

5    out that the comparison of the two percentages is such as to

6    favor the race hypothesis over the political hypothesis.  And

7    the percentages being compared are shown in that table across

8    the top there, the 16.49 percent, the 22.38 percent, the

9    19.64 percent, and the 25.31 percent, all being percent --

10   percent representations of Democrats.

11           And going down the left side of the table, the

12   21.46 percent, the 20.48 percent, and the 25.17 percent being

13   the representations -- changes in the representations of

14   blacks.  And the comparison of the percentages shown in the

15   column headings and the percentages shown in the row headings

16   gives rise to the R or P in the body of the table.

17           And, as we look across this table, we see that in

18   five instances, there are Ps, and in seven instances, there are

19   Rs, which is to say the -- on balance, the evidence here would

20   seem to tip in favor of the race hypothesis over the political

21   hypothesis.

22   Q    And what, Dr. Peterson, is displayed in Table P3.3

23   immediately below?

24   A    Well, that's another analysis of almost the same type,

25   except that if we could go back to -- if we could go back to

 1  Appendix 2 for a minute, I want to point something out.

 2  Q    Do we have -- Appendix 2 is now on the screen.

 3  A    Here we are.  Okay.  And what I would like to point out is

 4  that when we were calculating the difference in representation

 5  of blacks, what we did was to -- in that table and looking at

 6  the column pretty much in the middle of the table, what we did

 7  was to subtract 22.77 percent from 43.24 percent, coming up

 8  with the 20.47 percent.  Well, that's one way of measuring the

 9  differences between two percentages, but there's lots of other

10  ways.

11          And one of the most common is to take the ratio.

12  Suppose we divide the 43.24 percent by 22.77 percent and see

13  what percentage there has been an increase in the

14  representation of blacks.  And suppose we do the same thing

15  with respect to Democrats.  In the rightmost column, what we'll

16  do is instead of subtracting one percentage from the other,

17  we'll take the ratio of the 75.39 percent to 53.01 percent and

18  use that as a measure of the difference between those two

19  percentages.

20  Q    And are the results of that --

21  A    And if you -- if you repeat the analysis that I reported

22  on in Table P3.2, using percentage increases instead of simple

23  difference increases, you get Table 3.3.

24  Q    And it's back on the screen -- okay.  It's back on the

25  screen.

1  A    And it's back on the screen now.  Again, the percentages

2  are arrayed across the top and down the left side of the table.

3  You compare those two at a time, and register a P or an R in

4  the body of the table depending as the percentage in the row is

5  greater or less than the percentage in the column.  And, my

6  goodness, in every single case, the race hypothesis is -- has

7  more support than the political hypothesis.

8  Q    Dr. Peterson, at the end of the day, after analyzing --

9  conducting this analysis of Congressional District 12, the

10 segment analysis, in the application of your expertise in

11 applied mathematics, what is your view with regard to the

12 question whether race or politics better accounts for the

13 boundary of Congressional 12?

14 A    Well, the segment analysis shows that with respect both to

15 the 1st District and to the 12th District, that there is more

16 evidence that -- there's a better correlation with race than

17 with political considerations in the placement of the boundary.

18        The -- my re-analysis of Dr. Hofeller's Appendix 2

19 indicates, in the first instance, the 12 studies that are

20 reported in Table 3.2, that on balance, there's more support

21 for the race hypothesis than the political hypothesis.  And in

22 Table P3, which reports on another dozen analyses based on

23 Dr. Hofeller's Appendix 2, that, once again, race better

24 accounts for the boundary than the political hypothesis.

25        MR. SPEAS:  Thank you, Dr. Peterson.  No more

1    questions at this time.

2              THE COURT:  Cross-examination?

3              MR. STRACH:  Thank you, Your Honor.  Good afternoon,

4    Dr. Peterson.

5              THE WITNESS:  Mr. Strach.

6              MR. STRACH:  Yes, Phil Strach for the defense.  We've

7    met, it's been several years now, in your deposition; is that

8    correct?

9              THE WITNESS:  That's right, yes.

10             MR. STRACH:  I've got just a few questions for you

11   about your analysis.

12                        CROSS-EXAMINATION

13   BY MR. STRACH:

14   Q    I want to focus, first of all, though, on making it clear

15   in my mind what you are not concluding.

16   A    Okay.

17   Q    Based on a review of your reports, you are not saying, are

18   you, that if race, quote:  "Better accounts for the boundary"

19   of the 12th or the 1st, that therefore, race predominated or

20   was the motivating factor for the district?

21   A    That's correct, I am not saying that.

22   Q    All right.  And it's also fair to say, isn't it,

23   Dr. Peterson, that you're not drawing any conclusions about a

24   causal effect between what the map drawer was doing and what

25   was -- and the motive.  You're drawing a correlation, not

1   causation; is that correct?

2   A    That's right.  What I'm looking at is an effect.  I'm not

3   opining as to why that happened the way that it did.

4   Q    All right.  Now -- and that's important, I think, because

5   it's true, isn't it, Dr. Peterson, that you've never actually

6   drawn a redistricting map; isn't that right?

7   A    I have participated in the redistricting process, but not

8   at the point of actually drawing districts.

9   Q    All right.  And at least as of the time that we had our

10  deposition together, you were not familiar with a computer

11  program called Maptitude; is that correct?

12  A    Not familiar enough to be able to use it.  I may have seen

13  it on a lab visit that I made, but I'm not -- I'm not familiar

14  with it to the point that I could actually use it.

15  Q    Okay.  And is it your understanding that, at least in this

16  particular case, it was the computer program Maptitude that was

17  used by Dr. Hofeller to draw these districts?

18  A    I don't have an understanding on that point.

19  Q    All right.  And let me make sure I understand the way you

20  conduct your segment analysis.  If I am correct, your analysis,

21  as you said, walks around the boundary of the district; is that

22  right?

23  A    Conceptually, yes.

24  Q    All right.  And you understand, don't you, Dr. Peterson,

25  that when a map drawer draws a district, they do not draw it in

1  a sequential manner like that?

2  A    Well, yes and no.  The person who constructed both the

3  12th District and the 1st District was obviously working with

4  precinct-sized chunks of North Carolina, because the

5  boundaries, in so many instances, follow precinct lines, not

6  all instances, but in many instances.  So it's pretty clear

7  that precincts figured in the creation both of the 12th and of

8  the 1st District, but I can't say that the focus of the person

9  who was constructing the map was on segments and their inside

10  and outside precincts.

11  Q    In other words, it's probably pretty unlikely that the map

12  drawer or a map drawer would draw one segment of a district and

13  then analyze it for race versus party, and then proceed to the

14  next district and so forth in drawing the district.

15  A    Not exactly that way.  I think it's more likely that the

16  voting district drawer would consider the inclusion of a

17  precinct within or perhaps consider exchanging it with another

18  precinct or something like that.  I think precincts loomed

19  large in the decision process, but exactly how they were used,

20  I can't say.

21  Q    And your analysis looks at each -- I think what you called

22  inside precinct, and then compares it to the precinct

23  immediately on the outside of the boundary; correct?

24  A    Yes.

25  Q    But when someone's drawing a map, they may very well pick

1  one precinct at the southern part of the district in exchange

2  for a precinct at the top part of the district?

3  A    They might, yes.

4  Q    So when a map is actually being drawn, it's not

5  necessarily a one-to-one inside versus outside choice?

6  A    That's correct.

7  Q    And your analysis assumes a binary choice for the map

8  drawer when selecting the precinct?

9  A    Not really.  What it's looking at is an overall pattern.

10  And, in that sense, it's much like the calculation of a

11  correlation.

12        MR. STRACH:  Okay.  Your Honor, I'm about to go into

13  another line that could take us a while, and I'm happy to do

14  that at your --

15        THE COURT:  One second.  Keep on going for a while

16  longer.

17        MR. STRACH:  All right.  Thank you, Your Honor.

18  BY MR. STRACH:

19  Q    Dr. Peterson, could you explain to the Court the concept

20  of -- we talked about this at your deposition, called -- let me

21  find it in my notes here, Forensic Decision Analysis?

22  A    Sure.  I wrote a book about Forensic Decision Analysis.

23  And it's a -- it's an approach to trying to figure out why

24  decisions were made the way they were after the fact.

25  Q    Is your segment analysis a species of this Forensic

1    Decision Analysis?

2    A    It is, but it's -- but it's a better illustration of the

3    kind of compromise sometimes one has to make with a good

4    Forensic Decision Analysis to apply it in practical

5    circumstances.  It's not a very good example of a Forensic

6    Decision Analysis or at least an ideal Forensic Decision

7    Analysis.

8    Q    Right.  And that's because with a Forensic Decision

9    Analysis, ideally, you're able to account for all of the

10   alternative decisions that were available to a decision-maker

11   in evaluating what motivated the decision; is that right?

12   A    Yes.

13   Q    And in your segment analysis, it's not possible for you to

14   have accounted for all the many other factors or variables that

15   a map drawer had to think about when choosing to select or

16   deselect a particular precinct?

17   A    That's correct.  And part of the difficulty is the

18   unavailability of data.  We have data only at the precinct

19   level.  And even what's available at the precinct level is

20   pretty much in summary form.  So there's a limit to how close

21   we can actually get to the decision process in a segment

22   analysis.

23   Q    All right.  So, for instance, if the map drawer with

24   respect to, say, District 12 is trying to accomplish a

25   political result in four or five of the surrounding districts

1  to that district, your segment analysis can't perfectly capture

2  the extent to which that political goal factored into the

3  boundary?

4  A    That's correct.  All I'm doing is measuring sort of an

5  overall correlation.  I'm looking at the result, not the

6  process.

7  Q    Okay.  Let's talk about -- well, let me actually go back

8  to the *Cromartie* case and your analysis in the *Cromartie* case.

9  I want to make sure that this is clear to the Court.  In the

10 *Cromartie* case, you were hired by the State --

11 A    Yes.

12 Q    -- at that point in time; right?

13 A    Yes.

14 Q    And the State, in that case, was trying to defend the 12th

15 District from a racial gerrymandering claim much like this one;

16 correct?

17 A    That's correct.

18 Q    And you were hired -- were you hired by Mr. Speas in that

19 case?

20 A    I don't recall who actually hired me, but I worked with

21 Mr. Speas in that case.

22 Q    All right.  In that case, your analysis produced a result

23 that was favorable to the position Mr. Speas's client was

24 taking in the case?

25 A    Yes.

1  Q    And that particular conclusion was that race couldn't have

2  predominated because politics was a, quote, "better explanation

3  for the district"?

4  A    Yes.

5  Q    All right.  So --

6  A    Well, I don't know that I reached the conclusion that race

7  couldn't have predominated.  What I showed was that, according

8  to a segment analysis, politics was a better explanation for

9  the boundary than was race.

10 Q    And in that case, you understood that the burden was on --

11 the State simply had to show that something else better

12 explained the district in that case; is that correct?  In other

13 words --

14 A    Could you rephrase the question?

15 Q    You were working on this side of the aisle in that case --

16 A    Right, that's true.

17 Q    -- right?  And so, what you had to show, the burden wasn't

18 on the State.  You just simply had to show --

19       MR. SPEAS:  Your Honor, objection.  He's questioning

20 him about a legal matter.

21       THE COURT:  Yeah, I agree.  Let's rephrase the

22 question.

23       MR. STRACH:  All right.

24       THE COURT:  I think it's getting a little confusing

25 in terms of an applied mathematics expert talking about burdens

1  of proof in a courtroom.

2          THE WITNESS:  Right.  I'm not a lawyer.

3          THE COURT:  Hold on just a second.

4          THE WITNESS:  Sure.

5          THE COURT:  I'm not sure a foundation's been laid

6  enough to get into something along this --

7          MR. STRACH:  All right.  Thank you, Your Honor.

8          THE COURT:  -- at least as the question was framed.

9  BY MR. STRACH:

10 Q    I think -- so I'll just leave it at in that particular

11 case, though, you were working on the behalf of the State; is

12 that correct?

13 A    Yes.

14 Q    And in this particular case, though, you were working on

15 behalf of the challengers challenging the claim --

16 A    That's correct, yes.

17 Q    -- is that correct?  All right.  Thank you.  All right.

18 Let's look at District 12, Dr. Peterson.

19 A    Okay.

20 Q    I want to focus on that.  And I want to look at, first of

21 all, you mentioned in your testimony with regard to the 12th

22 District, I believe that the way you call it in your report is

23 there's 330 pairs?

24 A    Well, 330 segments, which means 330 pairs of precincts.

25 Q    Okay.  And out of those 330 segments, sort of going around

1  the 12th District, you could only use 29; is that correct?

2  A    I don't have a figure in mind, but that's about right.

3  Q    All right.  And that's because in the vast majority of

4  those pairs or those segments, you couldn't make a

5  determination of race versus party based on the data you had?

6  A    That's right.  There was a lot of -- most of the pairs, 80

7  to 90 percent of the pairs were both type -- what I call Type B

8  and Type D pairs; that is, the representation of blacks was

9  greater inside than outside, and the representation of

10 Democrats was greater inside than outside for most of the way

11 around both of those boundaries.

12 Q    And Dr. Peterson, are you familiar with a concept called

13 multicollinearity?

14 A    I am, but I don't see how that applies under these

15 circumstances.

16 Q    Do you agree with me that, in North Carolina, there's a

17 high correlation between race, including black, and

18 registration in the Democratic Party?

19 A    I believe there is, yes.

20 Q    And also voting behavior, there's a high correlation

21 between race being black and voting for Democrat candidates?

22 A    Yes.

23 Q    All right.  And so, is it likely that you could only look

24 at 29 out of the 330 segments because there's such a high

25 correlation of multicollinearity between race and party in

1  North Carolina with respect to blacks and Democrats that it

2  significantly reduced the population of segments that you could

3  look at?

4  A    To me, "multicollinearity" means something quite different

5  from that.  But, I think, just put in simple words, it is true

6  that for most of the way around the boundary, both the 12th

7  District and the 1st District, blacks are represented more

8  heavily inside than outside, and so, too, are Democrats.

9  Q    All right.  So in your second affidavit, which, I believe,

10 is P15, which I think is behind Tab 1 in your notebook,

11 Dr. Peterson, if you could pull that out.

12 A    Sure.

13 Q    I want to take a look at your chart in paragraph 14.  And

14 we, in your direct testimony -- are you there?  Tab 1, it

15 should be page 6.

16 A    Yes.

17 Q    And in that chart, you tallied up the results of the 12

18 studies; correct?

19 A    Yes.

20 Q    And so, there are 12 results, and each result is either a

21 P, or an R, or it's tied; is that correct?

22 A    In effect, yes.  I didn't actually record Ps and Rs here,

23 but --

24 Q    Right.  And that's what I want to -- I want to look at the

25 Ps -- I know they're not in your report, but I want to look at

1  the actual number of Ps and Rs.

2  A    Sure.  Let's do it.

3  Q    Okay.  So, when I look at this chart, I tally up -- and

4  you tell me if I'm wrong -- that there are six Rs all together?

5  A    Yes, that's right.

6  Q    Okay.  So six studies in which you would contend that race

7  was the better hypothesis?

8  A    Yes, there's more support for the race hypothesis than the

9  political hypothesis.

10 Q    All right.  And then, of the 12, as I count them, there

11 are four Ps; is that correct?

12 A    Yes, that's correct.

13 Q    And then, there are two that are neutral, or tied?

14 A    Yes.

15 Q    All right.  So, in all of the 12 studies for the 12th

16 District and your segment analysis, what you have actually are

17 six in which the race hypothesis, you say, is -- better

18 accounts for it, but six where race was not the better

19 hypothesis; is that correct?

20 A    That is true.

21 Q    All right.  And then, Dr. Peterson, if you would explain

22 to the Court -- there's a paragraph in your affidavit here

23 about it.  Would you explain to the Court what you mean by an

24 unequivocal pair?

25 A    Yes.  There are some segments that no matter how you

1 measure race and no matter how you measure party affiliation,

2 turn out to be either Type R segments, that is, they support

3 the race hypothesis over the political hypothesis; or they turn

4 out to be Type P, they support the political hypothesis over

5 the race hypothesis.  But their number is very small; there's

6 one of each.

7          So, in common with all 12 of these studies, there is

8 one segment in the 12th District which is, in every study, a

9 Type R segment, and there is one segment which is, in every

10 single study, a Type P segment.  One of each.

11 Q    Okay.  So in those instances, the data is unequivocal as

12 to one or the other?

13 A    I'm -- well, I would say they are equivocal with respect

14 to the two hypotheses.  There's equal support for the two.

15 Q    Okay.  And that's the point.  So, where you look only at

16 the unequivocal pairs, one being a P and one being an R, then

17 you would have to conclude with respect to those that race and

18 party are equal explanations?

19 A    If that was the only thing I knew about it, that is the

20 conclusion I would reach --

21 Q    All right.

22 A    -- but I happen to know more.

23 Q    Right.  Okay.  And let's look at some of the more.  Let's

24 look at your third affidavit, which is -- I believe it's behind

25 Tab 4.  And, in particular, I want to look at Table 3.2 that

1  you looked at with Mr. Speas.

2  A     I've got it.

3  Q     Got it?  All right.  Are you aware, Dr. Peterson, of

4  testimony by Dr. Hofeller in the *Dickson* case, the State case,

5  that when the 12th District was being drawn, the data that was

6  being used to draw that was voting -- black voting -- or

7  voting-age population and the percent of Obama-McCain vote?

8  A     I don't know that I'm acquainted with that testimony, but

9  that is the import, I think, of his Appendix 2.

10 Q     Right.  Okay.  That being that when one looks at the

11 percentage of Obama vote in the selected precincts that -- in

12 his Appendix 2, the percentage of Obama -- the Obama percentage

13 was higher than the race percentage; correct?

14 A     Yes --

15 Q     Okay.

16 A     -- in Table P3.2, not in Table P3.3.

17 Q     Right.  Now, in Table P3.2, I'm not sure it was shaded on

18 the version that was on the computer earlier, but in the actual

19 affidavit, Dr. Peterson, I believe you shaded a particular unit

20 on Table P3.2; is that correct?

21 A     I did, and it hasn't come through on the copies, but I can

22 tell you what should have been shaded, what, in fact, was

23 shaded.

24 Q     All right.  The one that should have been -- was shaded in

25 your original report was the bloc that is the intersection of

1  the row of voting-age population and the column of percent

2  Obama; correct?

3  A    Yes, that is correct.

4  Q    And in that particular bloc, your study concluded that

5  party was the better indicator?

6  A    Well, I would attribute the study to Dr. Hofeller, but,

7  yes.

8  Q    So when you look at the data that Dr. Hofeller said that

9  he looked at in drawing the 12th District, then your data shows

10 that party is the better explanation; is that true?

11 A    In the Table P3.2 analysis, not in the Table 3.3 analysis.

12 Q    All right.  And now, let's look at Table 3.3.  In Table

13 3.3, what you did was you converted Dr. Hofeller's data to

14 ratio; is that correct?

15 A    Yes, as an alternative way of measuring the difference

16 between two numbers.

17 Q    All right.  And what evidence do you have that converting

18 those numbers to ratios is more reliable or valid?

19 A    There's -- I can't say that one is more reliable or valid

20 than the other.  They're just two different ways of looking at

21 the same data.

22 Q    All right.  And the way you did the data happened to

23 support your theory of the case; correct?

24 A    It happened to.  I didn't know it was going to before I

25 did it.

1  Q    All right.  Let's focus for a moment on the 1st District.

2  Let's turn back to your fourth affidavit, which, again, I

3  believe -- well, it's a different one.  I believe that's under

4  Tab 2 in your notebook, Dr. Peterson?

5  A    Yes.

6  Q    And in particular, I want to look again -- first of all,

7  let's talk about those unequivocal pairs again, segments.

8  A    Yes.

9  Q    Isn't it true that with regard to the 1st District, again,

10 you found two unequivocal pairs, and one was P and one was R?

11 A    I have to look at the affidavit to see because --

12 Q    Sure.  If you look at paragraph 16 --

13 A    Paragraph 16, right.  Yes.  One of each.

14 Q    Okay.  So as with the 12th District, with the 1st

15 District, when you looked only at the data that was segments

16 that were unequivocal, they basically cancelled each other out,

17 race versus party?

18 A    That's right, yes.

19 Q    All right.  Okay.  And then let's look at --

20        MR. STRACH:  Excuse me for a moment, Your Honor.

21 Okay.

22 BY MR. STRACH:

23 Q    If we look, Dr. Peterson, at -- this is your fourth

24 affidavit, page 6.  And, again, this is your Table P5.1 on

25 page 6.

1   A    Got it.

2   Q    All right.  So, again, if you try to find the intersection

3   here in this chart, the study that represents the intersection

4   between voting-age population and votes for the -- in the

5   presidential race; right?

6   A    Yes.

7   Q    Black voting-age population is in the middle, 2008

8   president is a column second from last.  And if you trace the

9   intersection of those two pieces of data, that study showed

10  that race and politics were tied; is that correct?

11  A    Yes.

12  Q    Dr. Peterson, let me talk a little bit about the mechanics

13  of -- and in particular, talking about the 12th Congressional

14  District, talk about the mechanics of constructing the

15  district.  When I -- if I use the term "Transit VTD," do you

16  have any idea what that means?

17  A    Not exactly, but as you talk, I may develop an

18  understanding.

19  Q    All right.  So, if you have a population in the district

20  in the north and a population in the district in the south,

21  you've got to connect the two somehow; is that correct?

22  A    If they're going to be in the same district, yes.

23  Q    Right.  And that goes back to the fact that, sometimes,

24  decisions up here affect decisions down here, and then you've

25  got to connect the two; is that fair?

1  A    Yes.

2  Q    Do you -- did you attempt to do any analysis or does your

3  segment analysis account at all for decisions that have to be

4  made in terms of which -- choosing a corridor or transit VTDs

5  to go from one population to another?

6  A    No, it just looks at the overall result, doesn't look at

7  the process.

8  Q    All right.  And then, when you were deciding which VTDs or

9  segments would be a P versus an R, you actually started by

10 looking at which segments, which would be a B versus a D --

11 A    Yes, that's correct.

12 Q    -- black versus Democrats; is that right?  And as I

13 understand the analysis, you decided whether it was a B or a D

14 by adding up, say, the number of Democrats inside -- the inside

15 VTD and subtracting the number of Democrats from outside the

16 VTD; is that fair?

17 A    No, that's not right.

18 Q    Explain to the Court how you did that.

19 A    Sure.  What I did was to look to the inside to see what

20 the representation of Democrats was; that is, among, let's say,

21 registered voters, what percentage of people residing in the

22 inside precinct were registered as Democrats among the totality

23 of voters who were registered.

24        And then, I did a similar thing for the outside

25 precinct.  And I compared those two percentages, the two

1  representations, degrees of presence of Democrats.  And then I

2  did the analogous thing for blacks.

3  Q    And you looked at which one was higher?

4  A    And I just looked at which one was higher, yes.

5  Q    Okay.  And you just looked at the raw numbers; correct?

6  A    And determined which of the numbers was greater, inside or

7  outside.

8  Q    It didn't matter if it was even greater just by one?

9  A    That's right.

10  Q    So even by one person could determine --

11  A    Well, one -- one percentage say.

12  Q    Okay.  One percentage could determine a segment's fate of

13  being labeled a B versus a D?

14  A    Yes, that's true.

15  Q    All right.  And you could have -- if you had wanted to,

16  you could have weighted the percentages instead of taking the

17  raw data; correct?

18  A    Could have done?  I can't think of any reason why the

19  results would be more meaningful or reliable than the results

20  obtained the way I did it.

21  Q    But you didn't do a weighted percentage?

22  A    I told you everything I did.  I didn't do anything else.

23  Q    All right.  Now, your segment analysis is also not able to

24  take into account decisions that are made by the map drawers

25  with regard to protecting incumbents?

1   A    That's right.  Again, I didn't look at process.  What I've

2   done is just look at the overall result.

3   Q    And you don't try to account for the impact of under or

4   overpopulation in a district?

5   A    Well, not explicitly.  Again, I assume some account was

6   taken of over or underpopulation in the choice of precincts to

7   include or exclude.  But, again, I didn't look at process.  The

8   segment analysis looks only at overall result.

9   Q    All right.  You don't make any attempt to try to control

10  for things like under or overpopulation?

11  A    That's right.  I didn't try to reconstruct the decision

12  process in its detail.

13  Q    Okay.  And it's also true, Dr. Peterson, that you did not

14  do any segment analysis for the alternative or competing plans

15  that were introduced in the legislature for -- certainly for

16  Congressional Districts?

17  A    That's right.  The only segment analysis I've done in

18  connection with this litigation are the two on which I have

19  reported.

20  Q    All right.  So we have no frame of reference in terms of

21  other plans and how they might have fared with the 12th and 1st

22  Congressional District?

23  A    Would you repeat the question, please?

24  Q    So we don't have a frame of reference for how the enacted

25  plans might have fared compared to a segment analysis of other

1  competing plans?

2  A     Right.   The only comparison I can offer is the one that I

3  mentioned already in connection with the 12th District as it

4  existed in the 1990s.

5            MR. STRACH:   That's all I have, Your Honor.

6            THE COURT:   Redirect.

7            MR. SPEAS:   Three or four quick questions, Your

8  Honor.

9                      REDIRECT EXAMINATION

10 BY MR. SPEAS:

11 Q    Dr. Peterson, would you turn to, I believe, the last --

12 next to the last page of Tab 1 where -- your second affidavit,

13 Plaintiff's Exhibit 15.   And is that a map of Congressional

14 District 12?

15 A     I have it.

16 Q    And the yellow color signifies what?

17 A     Those would be inside border precincts.   Those are

18 precincts which were involved in the segment analysis of the

19 12th District on the inside.

20 Q    Is this district a single precinct wide for much of the

21 way?

22 A     For much of the way, it is a single precinct wide, yes.

23 Q    And there are interior precincts only in the city of

24 Charlotte, the city of Greensboro, and the city of

25 Winston-Salem?

1   A    Yes, I believe that -- well, actually, there's a third --

2   there are four areas in which there are inside precincts.

3   Q    Okay.  So, while you did not examine the core precincts in

4   your segment analysis --

5   A    If the pinkish ones are termed "core precincts."

6   Q    Yes.  The truth is, most of the precincts in Congressional

7   12 were examined?

8   A    It looks like most of them did get included in the segment

9   analysis, yes.

10  Q    And that's because it's a single precinct wide through

11  much of its --

12  A    That's right, so they got included on the left side and on

13  the right side.

14  Q    All right.  And now, you -- Mr. Strach asked you about a

15  number of issues about your methodology that you used here.

16  A    Yes.

17  Q    Did you use precisely the same methodology in *Cromartie*

18  that you used here?

19  A    I know of no differences.  My intent was to use exactly

20  the same, and I believe I did use exactly the same.

21  Q    Okay.  And the strength of the *Cromartie* analysis are

22  reflected here, the weaknesses of the *Cromartie* analysis are

23  reflected here?

24  A    Yes.

25  Q    And at the end of the day, in your professional opinion as

1    an expert in applied mathematics, do you still conclude that

2    race, not politics, on balance, accounts better for the

3    boundary of the district?

4    A    That is true, yes.

5              MR. SPEAS:  One final question.  May I approach the

6    witness, Your Honor?

7              THE COURT:  You may.

8    BY MR. SPEAS:

9    Q    I'm going to place in front of you, Dr. Peterson, the

10   historical congressional map book labeled Defendant's

11   Exhibit 126.  And I would ask you, Dr. Peterson, just to turn

12   Tab 3 of that document.  And I would ask you if that is the

13   1997 Congressional Plan that included Congressional 12

14   litigated in *Cromartie*?

15   A    I don't know.  It might be.  I'm, at this point, not as

16   familiar with the old District 12 as once I was.

17   Q    Assuming it is --

18   A    All right.

19   Q    -- would you look, then, at the third page, has -- it said

20   the voting-age population or that version of Congressional

21   District 12.  And what is it?

22   A    It says here 43.36 percent.

23   Q    Okay.  And if you could look quickly at Tab 12 in

24   Exhibit 126, and is that the current plan?

25   A    Again, I don't know.  It might well be.  I don't know that

1    it's not.

2    Q    Assuming it is, would you turn to the voting-age

3    population for that district and tell me what the voting-age

4    population for Congressional 12 might be?

5    A    We need to specify a page for the Court, it seems to me.

6    How can we do that?

7    Q    Will you read page --

8    A    Page 3 of 9.

9    Q    And what is the voting-age population there?

10   A    It appears to be 50 point --

11   Q    Sixty-six?

12   A    -- sixty-six.  Could be.  Could be 88.  But in any event,

13   it's over 50 percent.

14   Q    Would it be -- if these numbers are correct, then, in the

15   version of Congressional District 12 that you examined in

16   *Cromartie*, the black voting-age population was 6 percent lower

17   than the black population in the version of Congressional

18   District 12 you have examined here?

19   A    That appears to be the case.

20              MR. SPEAS:  No other questions.

21              THE COURT:  Anything in response?

22              MR. STRACH:  Nothing in response.

23              THE COURT:  You may step down.

24              MR. SPEAS:  May Dr. Peterson --

25              THE COURT:  Any objection to Dr. Peterson being

1   excused?

2           MR. STRACH:  No, Your Honor.

3           THE COURT:  All right.  He may be excused.

4           THE WITNESS:  Thank you.

5           (At 5:28 p.m., witness excused.)

6           THE COURT:  All right.  So, hopefully, we'll have

7   some air conditioning tomorrow.  Should we start right in with

8   your other expert or will there be other evidence?

9           MR. HAMILTON:  No, Your Honor.  Our last witness.

10  Will be Dr. Steven Ansolabehere, and we'll start with him right

11  at 9:00.

12          THE COURT:  All right.  Very good.  And then you all

13  will be ready to move along with your evidence tomorrow as

14  well?

15          MR. FARR:  Yes, Your Honor.

16          THE COURT:  All right.  Then, anything we need to

17  take up before we recess?

18          MR. FARR:  Not from the defendants, Your Honor.

19          THE COURT:  All right.  We'll see everybody in the

20  morning, then, at 9:00.  We'll be in recess until tomorrow

21  morning at nine.

22          (At 5:29 p.m., proceedings adjourned.)

23

24

25

1                         * * * * *

2                   C E R T I F I C A T E

3       I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.

4

5                          _____

6       Date: 10/19/2015   Joseph B. Armstrong, RMR, FCRR
                           United States Court Reporter
7                          324 W. Market Street
                           Greensboro, NC  27401
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25