IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DAVID HARRIS, CHRISTINE BOWSER, and SAMUEL LOVE, | ) |
| | ) Greensboro, North Carolina |
| | ) October 15, 2015 |
|    Plaintiff, | ) 9:01 a.m. |
| | ) |
|    vs. | ) |
| | ) |
| PATRICK MCCRORY, in his capacity as Governor of North | ) |
| | ) Case No. 1:13CV949 |
| Carolina, NORTH CAROLINA STATE BOARD OF ELECTIONS, and JOSHUA HOWARD, in his capacity as Chairman of the North Carolina State Board of Elections, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
|    Defendants. | ) |
| | ) |

TRANSCRIPT OF BENCH TRIAL VOLUME III OF III HELD BEFORE
THE HON. **WILLIAM L. OSTEEN, JR.**, UNITED STATES DISTRICT JUDGE
THE HON. **MAX O. COGBURN, JR.**, UNITED STATES DISTRICT JUDGE
THE HON. **ROGER L. GREGORY**, UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:   **KEVIN J. HAMILTON**
                  Perkins Coie, LLP
                  1201 Third Ave., Ste. 4900
                  Seattle, WA 98101-9741

                  **EDWIN M. SPEAS , JR.**
                  **JOHN WARD O'HALE**
                  Poyner Spruill, LLP
                  POB 1801
                  Raleigh, NC 27602-1801

For the Defendant:   **THOMAS A. FARR**
                  **PHILLIP JOHN STRACH**
                  Ogletree Deakins Nash Smoak & Stewart
                  POB 31608
                  Raleigh, NC 27622

1  APPEARANCES, CONTINUED:

2  For the Defendant:   **ALEXANDER MCCLURE PETERS**
                        N.C. Department of Justice
3                       POB 629
                        Raleigh, NC 27602-0629

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22  Court Reporter:      Joseph B. Armstrong, RMR, FCRR
                         324 W. Market, Room 101
23                       Greensboro, NC  27401

24            Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.

25

1                              I N D E X

2   WITNESSES FOR THE DEFENDANT:                        PAGE

3   THOMAS BROOKS HOFELLER
        Direct Examination, Cont'd By Mr. Farr          515
4       Cross-Examination By Mr. Hamilton               564
        Redirect Examination By Mr. Farr                662
5

6   REBUTTAL WITNESS FOR THE PLAINTIFF:

7   STEPHEN DANIEL ANSOLABEHERE
        Direct Examination By Mr. Hamilton              689
8       Cross-Examination By Mr. Farr                   692

9

10   Closing Argument by Mr. Hamilton                   700

11   Closing Argument by Mr. Farr                       710

12   Closing Argument by Mr. Hamilton                   729

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2          (At 9:01 a.m., proceedings commenced.)

3          THE COURT:  All right.  Good morning.  Let me ask, we

4   have a plaintiff's memorandum in support of Exhibit 13.

5   Mr. Farr, do you all know at this point about -- isn't that the

6   email?  Do you all know at this point whether or not it's been

7   previously disclosed.

8          MR. FARR:  Yes, Your Honor, and I would like to

9   address that if I could.

10         THE COURT:  Just briefly right now.  We'll get on

11  with the evidence, but I just want to know what the status of

12  that part was --

13         MR. FARR:  Very briefly, Your Honor.

14         THE COURT:  -- if you know.

15         MR. FARR:  Very briefly, I will say that we have the

16  deposition transcript.  I noted an objection to the document

17  being privileged, and we've confirmed that the state rule under

18  26, I think it must be -- I get all these numbers confused,

19  anyway, it's under Rule 26, Your Honor.  There's a federal rule

20  under 26 that deals with inadvertent disclosures, and the state

21  rule under 26 is nearly identical, and what the state rule says

22  is once an objection is noted, the other side has an obligation

23  to return the exhibit to the party making the objection, and

24  they are not allowed to disclose the exhibit until there's a

25  ruling on whether or not the privilege is appropriate.

 1          There's another federal rule, I think it's 502(b),

 2   which basically says that a waiver in a federal action will not

 3   be considered a waiver -- a disclosure in a state court action

 4   will not be considered a waiver if it would not be considered a

 5   waiver under the Federal Rule 26.  So while they may have

 6   evidence that this document was filed, they had an obligation

 7   to return the document to us once we asserted the privilege,

 8   and there should've been a ruling on whether the document was

 9   privileged or not before it could be filed.

10          THE COURT:  Okay.  All right.  So -- yes, sir?

11   Briefly.

12          MR. HAMILTON:  Just briefly, Your Honor, and we

13   submitted a short brief on this simply to provide the Court

14   with a factual record so you weren't taking counsel's word for

15   it.  The brief was filed not by us, but by defendants in the

16   North Carolina Supreme Court and in this Court.

17          THE COURT:  Let me say this:  I can't speak for the

18   other judges, but I haven't had an opportunity to review your

19   brief.  I was just handed the brief as we walked in this

20   morning.

21          MR. HAMILTON:  Understood.

22          THE COURT:  So all I want to do at this point,

23   yesterday there was a question about whether it had been filed,

24   and Mr. Farr acknowledged that if it had been disclosed and

25   filed and no objection, then privilege had been waived.  As I

understand it now, the contention simply is that it was
disclosed during the deposition, there was an objection, and no
further action has been taken.  So the issue before the Court
is whether there was an inadvertent disclosure of sufficient --
I guess you'd say that nonetheless was insufficient to preclude
the Court from finding waivers.  So the next step for us is to
look at your memo, I think, and see what the history was so we
can figure out what's going on.

          MR. HAMILTON:  I think that's right, Your Honor, and
I think the question for the Court is, and I don't disagree
that there was an objection made on the record in the
deposition when it was produced as an exhibit by us, because it
had been previously produced by counsel, but thereafter counsel
slept on his or her rights.  I mean, there was no issue raised
in the state trial court, no correspondence back and forth give
us the document back or anything like that, and then
subsequently they, not us, they filed it in several public
court filings, where it sits today, and any member of the
public can come and look at that document.

          THE COURT:  I'll take a look at -- we'll take a look
at your motion and see what we come up with.

          MR. HAMILTON:  Thank you, Your Honor.

          THE COURT:  Take that matter under advisement.  All
right.  I have a mystery that I'm going to get resolved this
morning before Dr. Hofeller resumes his testimony because this

1  mystery is interfering with my ability to consider the

2  evidence, and that's the correct pronunciation of

3  Dr. Ansolabehere's name.  Doctor, the B-E-H-E-R-E part, is that

4  one syllable like "bear" or is it two syllables like "be-ere."

5           DR. ANSOLABEHERE:  "Be-here."

6           THE COURT:  "Be-here."  Thank you, sir.  I'll be able

7  to rest easily now.

8           All right.  Mr. Farr, are you ready to resume with

9  your evidence?

10          MR. FARR:  Yes, sir.

11          THE COURT:  You may.

12          MR. FARR:  We'll have Dr. Hofeller return to the

13 witness stand.

14          THE COURT:  Dr. Hofeller, let me say that I know you

15 understand this, but any time we go through an overnight recess

16 and a witness returns to the stand, I do remind them that they

17 are still under oath in this proceeding.  You may take the

18 witness stand.

19          THE WITNESS:  Thank you, Your Honor.  I understand.

20                    THOMAS BROOKS HOFELLER,

21            DEFENDANT'S WITNESS, PREVIOUSLY SWORN

22                 DIRECT  EXAMINATION (Cont'd)

23 BY MR. FARR:

24 Q    So Dr. Hofeller, I want to follow up with a statement you

25 made yesterday, and this -- I'm asking you this question as a

1  fact witness, not as an expert witness.  You testified that

2  when you decided to use the Obama/McCain race that it linked up

3  with other races.  Do you remember that?

4  A    I do.

5  Q    Can you explain to the Court what you meant by that.

6  A    What I meant by that is that the other races, major races,

7  correlate very strongly with the Obama race.  So the

8  presidential race and the gubinatorial races in the Senate --

9         MR. HAMILTON:  Objection, Your Honor, this is not

10  contained in his expert report.  There's no disclosure of any

11  analysis about correlation or analysis of other elections, and

12  I object.  I'm sorry to object on the very first question this

13  morning.  It's not my intention.  It's the same issue we had

14  yesterday with the series of exhibits.

15         THE COURT:  Same issue in terms of not disclosing the

16  expert reports?

17         MR. HAMILTON:  Right, the expert -- the two expert --

18  the Court will recall this case has been delayed considerably

19  by the *Alabama* case.  The original report filed by

20  Dr. Ansolabehere was from December, late December 2013.  His

21  reply was filed on January 29, 2014.  This Court issued an

22  order in May of this year authorizing the filing of

23  supplemental reports in case something had happened in the last

24  year.

25         It's an order dated May 7, 2015, saying, "It's

 1    further ordered that plaintiffs and defendants shall file any

 2    supplemental expert reports by June 1, 2015."  Neither side

 3    did, and so we object to Dr. Hofeller now talking about

 4    correlations with other elections that were never disclosed

 5    before.  We haven't had an opportunity to respond to that.

 6              I mean, that is -- I don't presume to know the

 7    Court's thinking, but I assume that's the whole point of this

 8    disclosure is so that we don't have this sort of Monday morning

 9    surprise and instead we have an orderly process where the

10    experts disclose their opinions and the analysis reaching their

11    opinions, and the other side has an opportunity -- a fair

12    opportunity to respond to it.  That's obviously not happening

13    here.

14              THE COURT:  All right.  Just a moment before we

15    proceed any further.

16              (Off-the-record discussion.)

17              THE COURT:  All right.  Mr. Farr, let me hear from

18    you on what you think your immediate response to this.  Is

19    there anything you can point us to that might cover this

20    information?

21              MR. FARR:  Well, Your Honor, the Court might have a

22    better memory of this than I have, but I recall

23    Dr. Ansolabehere testifying about correlations he made to other

24    elections, and I don't recall any of those -- any of that

25    testimony being in his report.  He was testifying as an expert

1  witness.

2          Dr. Hofeller, in this part of his testimony, is

3  testifying as the map drawer, so this really is not part of his

4  expert report.  It's part of his memory of the facts of what

5  went into drawing the maps, and in any case, assuming he had

6  some obligation to disclose this in an expert report, which we

7  don't think he did, Dr. Ansolabehere did not disclose in his

8  reports, as far as I understand them, and I stand to be

9  corrected, that he had done correlations on other races.

10         So I think that the door was open on that issue, even

11 from an expert witness perspective, but that's not really what

12 he's testifying on here.  He's testifying as a fact witness

13 about how he drew the maps.  And they had a chance to depose

14 him and they had a chance to ask him all the questions that

15 they wanted to ask him about what information he relied upon or

16 what things he looked at or did when he was drawing the maps.

17         THE COURT:  Let's see.

18         MR. HAMILTON:  Your Honor, may I respond?

19         THE COURT:  Give me just a minute.  I want to sort

20 through.  So the -- we have from Dr. Hofeller a second expert

21 report and an expert report.  Those are the two reports from

22 Dr. Hofeller?

23         MR. FARR:  Yes, Your Honor.

24         THE COURT:  Is there anything in those -- I mean, I

25 think from the analysis presented, I don't think there's any

1 surprise that he relied on the Obama vote election results as

2 set forth in Table 3.  Is there anything you can point us to in

3 the reports that would suggest how he did that specifically

4 with reference to I think it's D124 -- is that it?  Which one

5 were we looking at yesterday when we stopped?  Yeah, D124 which

6 has got the '08, '10, and '12 general election returns.  Do you

7 understand my question?

8             MR. FARR:  Well -- yes, Your Honor.  I think it's a

9 little bit of a different issue.  The Exhibit D124 is actually

10 reporting election results.  Dr. Hofeller would testify that he

11 did a correlation while he was drawing the maps of other high

12 profile state-wide elections to validate his view that the

13 Obama election would be an appropriate election used to draw

14 the maps.  So that's a little bit of a different question.

15             He did not disclose in his expert reports that while

16 he was drawing the map he performed those correlations, but

17 that part of his testimony is what he did in drawing the maps,

18 and the plaintiffs had every opportunity to depose him.  They

19 deposed him twice, in fact, and they could have asked him, for

20 example, what did you do to validate your decision to use the

21 Obama election, and they did not do that as far as I know.  So

22 this, again, is a factual issue, not an expert issue.

23             And again, Your Honor, he has testified already that

24 he took steps to prove that the Obama election lined up with

25 other state-wide reports.  That's already in evidence.  This is

 1  just explaining what he did to reach that conclusion.

 2            THE COURT:  Mr. Hamilton?

 3            MR. HAMILTON:  Well, I've got several responses to

 4  that.  First of all --

 5            THE COURT:  Just make them brief.  I'm trying to

 6  figure out where we are at this point.

 7            MR. HAMILTON:  Sure.  First, Dr. Ansolabehere

 8  certainly did discuss correlations.  It was in his expert

 9  report dated January 29, 2014, a year and a half ago.  It --

10  specifically paragraph 31, and he gives the exact correlation

11  to the Obama vote, of course, but also the governor's race in

12  2008 at .90 and the Senate race in 2008.  Those are the three

13  races that we've been talking about.  So this isn't -- this

14  is -- no parallel here.  It was disclosed.

15            Second, in Dr. Hofeller's deposition transcript, he

16  was actually asked:

17            "Did you use the Obama 2008 election results in

18  drawing Congressional 1?

19            Answer, to some extent.

20            Question, did you use any other election results in

21  drawing Congressional 1?

22            Answer, there were none others on the screen."

23            So he was asked.  He didn't answer that question and

24  say, oh, yeah I did the correlations for these other races.

25  This -- this is -- this is new expert testimony.

 1          And then the last point I'll make is we're not

 2    operating on a clean slate.  This Court, of course, set out its

 3    own disclosure rules, but Rule 26 --

 4          THE COURT:  I'm familiar with the disclosure rules,

 5    Mr. Farr, in terms of none others -- no others on the screen,

 6    how to interpret that response.

 7          MR. FARR:  Well, first of all, Your Honor, let me

 8    apologize to counsel and the Court about my incorrect statement

 9    that Dr. Ansolabehere did not include that in his report.  I

10    deeply apologize for that.

11          If you look at the question, the question was what

12    were you looking at on the screen when he was drawing the map.

13    That's different -- that's a different question than did you do

14    anything else to validate your decision to use the Obama plan;

15    and, at best, they can use that question to impeach his

16    testimony.  But, again, this is not expert testimony he's

17    giving here.  This is his recollection of what he looked at and

18    what he did to validate the Obama race.

19          THE COURT:  All right.  Let me say this:  I'm just

20    going to -- I'm speaking for myself.  I want to talk to the

21    other judges in just a second, but this is a problem we run

22    into sometimes when a witness is both a fact expert and a -- a

23    fact witness and an expert witness, and dividing the line as to

24    what is factual testimony as opposed to expert witness

25    testimony can be kind of tricky.

1          Confronted with this in the past, I've actually had a

2  witness take the box, testify as a fact witness, come down and

3  then come back and offer the opinions as an expert.   I

4  understand that doesn't make any sense here, but it's a knotty

5  little issue sometimes.

6          So at this point I think we're going to have to in

7  addition to considering the reports, and take a look at the

8  reports, we're going to have to see at least parts of that

9  deposition testimony if we're going to be called upon to make

10  some finding as to whether or not the response -- I don't mean

11  to suggest it was a false response, but whether or not the

12  response was sufficient to require the evidence be excluded or

13  whether the response should have been -- or whether the

14  response should have been followed up with more pointed

15  questions.   That's a difficult issue.   Let me talk to these

16  judges.

17              MR. HAMILTON:  Your Honor?

18              THE COURT:  Yes, sir.

19              MR. HAMILTON:  May I -- there's an additional

20  passage.

21              (Off-the-record discussion.)

22              MR. HAMILTON:  Thank you, Your Honor.   I failed to

23  draw to the Court's attention I wasn't actually at the

24  deposition, so -- but it's on the same page, page 22 of the

25  September 9, 2015, deposition.

1          "Question, the only election results you utilized in

2   drawing Congressional 12 were the 2008 Obama election results?

3          Answer, that's correct."

4          So there was a followup question.  It was

5   specifically designed to get at this information.

6          THE COURT:  Well, still, I think we have to look at

7   it in context because those may have been the ones he used, but

8   there is an additional question of did you look at anything

9   else and reject it?  Should you have asked that in light of the

10  reports?  That's the question.  Let me talk to these judges

11  just a moment.

12          (Off-the-record discussion.)

13          THE COURT:  All right.  We're going to take the

14  evidence subject to the objection.  At this point in time,

15  I'm -- we're just taking the matter under advisement.  I would

16  like to get -- you'll have to make a call on whether or not

17  it's a lengthy portion of the deposition, enough for me to make

18  a determination as to what the context of those questions were

19  or whether you just want to do the whole thing.  I don't know

20  the answer to that, but at some point I'm probably going to

21  want to take a look at that, but I am concerned about the fact

22  that this didn't show up in the expert report, at least

23  sufficiently to, but we'll see where we get.

24          MR. HAMILTON:  Thank you, Your Honor.  I appreciate

25  that, and at the break we'll hand up the copies of the

1  deposition which I have with me here in court.  May I have a

2  continuing objection, so I don't have to keep jumping up.

3          THE COURT:  Oh, yeah, we'll note --

4          MR. HAMILTON:  Thank you.

5          THE COURT:  To make it clear for the record, the

6  continuing objection relates to Dr. Hofeller's opinion or his

7  explanation based on charts or other as to why -- A, why he

8  rejected elections other than the Obama 2008 race as the basis

9  for map drawing and his opinions as rendered in this case as

10 further explained by the chart, this Defendant's Exhibit 124.

11         MR. HAMILTON:  Thank you so much, Your Honor.

12         THE COURT:  All right.  You may continue, Mr. Farr.

13         MR. FARR:  Thank you, Your Honor.

14 BY MR. FARR:

15 Q    So Dr. Hofeller, starting up again.  Yesterday you

16 testified that you performed an analysis showing that the Obama

17 race linked up with other races as far as revealing Democratic

18 voting strength?

19 A    Yes.

20 Q    And can you tell the Court what you did.

21 A    Well, there are actually two issues involved here.  The

22 first issue is when the database was being prepared, there was

23 a question about which election contests should go into the

24 database.  There were a lot more election contests that were

25 available to be put into the state's database, and I was asked

1  my opinion, as were many other people, and one of the things I

2  did was to look at how these different elections track one

3  another.

4        The other thing I might add, too, is that I didn't

5  draw this plan in a vacuum as far as the data was concerned.

6  First of all, I've drawn numerous plans in the state of North

7  Carolina over decades.  I drew the State Senate districts and

8  the State House districts, and I know from that experience that

9  the underlying political nature of the precincts in the state

10 does not change no matter what race you use to analyze it.

11       The only way the underlying political demographics,

12 if you could use that term, change in a precinct is if the

13 precinct is changed in the nature of the people that are living

14 in the precinct.  So once a precinct is found to be a strong

15 Democratic precinct, it's probably going to act as a strong

16 Democratic precinct in every subsequent election.  The same

17 would be true for Republican precincts.

18       So if you used a conglomeration of elections, my

19 experience is you'd come up with the same -- the same result.

20 You may find a little higher score for the Democrats overall in

21 one election because the candidate did better, or you might

22 find a lower one, but the general ranking of the precincts as

23 to how Republican or how Democratic they are is simply not

24 going to change.

25 Q    All right.  Now, and to clarify again, when you were

1  drawing the map, actually drawing the 12th District, what race

2  did you look at?  What election contest did you look at?

3  A    On the screen when I was drawing the map was the

4  Obama/McCain race shaded in accordance with the two-party vote,

5  which excluded the minor party candidates, and that was the

6  sole thematic display or numeric display on the screen except

7  for one other thing, and that was the population of the

8  precinct because of one person, one vote.  And if, in those few

9  instances where the precinct was broken down because of one

10 person, one vote or some other factor, you also have displayed

11 the populations of the individual box.

12 Q    Okay.  Now, Dr. Hofeller, could you -- there's a white

13 notebook up there that has Dr. Ansolabehere's reports.

14         THE COURT:  All right.  Just to be clear, we're

15 moving off of the objection to material at this point?

16         MR. FARR:  Yes, sir, Your Honor.  I'm done with that.

17         THE COURT:  All right.

18         MR. HAMILTON:  Thank you, Your Honor.

19 BY MR. FARR:

20 Q    Could you turn to Plaintiff's Exhibit 17 in that notebook,

21 which is Dr. Ansolabehere's report of I think December 23,

22 2013?  And I want you to turn to Table 1 which is on page 22.

23 Are you there?

24 A    Yes.

25 Q    Now, Dr. Ansolabehere has got two different compactness

1    tests listed on this table.  I don't want to ask you about the

2    Reock test, okay.  I want to ask you about the test that he

3    describes as ratio of area to perimeter of district.  Do you

4    see that?

5    A    I do.

6    Q    Do you have any opinions about this test as it's reflected

7    in this chart?

8    A    I do.

9    Q    Would you explain them to the Court?

10   A    Yes.  As I thought I heard yesterday, and as I read in

11   Dr. Ansolabehere's testimony, that this is a ratio of the

12   perimeter miles of the district to the square miles of the

13   district, which means in order to get the test result you have

14   to divide the perimeter miles into the square miles, and it

15   will yield actually a smaller amount in square miles.

16            The problem that I have with this page is that the

17   results for both the 2001-2011, which is the 2001 enacted plan,

18   zero deviation, and the Rucho-Lewis, add up to more than the

19   square miles of the state's land area in square miles.  There

20   are 53,000 square miles approximately in the state, and if you

21   add up these numbers, they come out much higher.  If you've

22   divided the perimeter miles into the square miles, it should be

23   much lower, and actually what it turns out to be are numbers

24   like 6.2 or 4.5 or something like that.  So I simply took

25   another look at this, and I said, this doesn't make sense to

1  me.  I have no quarrel whatsoever with his Reock scores.

2  Q    Thank you, Dr. Hofeller.  That's all the questions I have

3  on that.

4          You have in front of you Defendant's Exhibit 124,

5  which we started talking about yesterday.

6          THE COURT:  I got it.  This is part of the objected

7  to material?

8          MR. HAMILTON:  Thank you, Your Honor.  You took the

9  words right out of my mouth.

10 BY MR. FARR:

11 Q    All right.  Dr. Hofeller, can you tell the Court, did you

12 prepare this?

13 A    I'm sorry, it's D124?

14 Q    Yes.

15 A    Yes.

16 Q    And could you tell the Court what this is.

17 A    This is a comparison of the change in black voting-age

18 population, adult voting-age population, which we call black

19 VAP and total black VAP, which is also called by the Census

20 Bureau plus 18 any part black voting-age population, which is a

21 longer title -- probably that's why this is often used --

22 between the 2011 enacted plan and the 2001 enacted plan, and

23 you can see the differences on the third line.

24          This also compares a number of percentages for --

25 well, for several elections over time in the new and old plan.

1    These figures, incidentally, are in another -- another exhibit

2    that's already in the record here, and what it shows is that

3    when the 2011 plan was redrawn from the 2001 plan, the

4    African-American demographics went up at a lower rate than the

5    gain in the Democrats' election contest demographics.

6    Q    All right.  Dr. Hofeller, how did you create this exhibit?

7    A    Specifically?

8    Q    Yeah, what did you -- how did you create it?

9    A    I actually looked at -- at the time I created it, I looked

10   at the figures in Maptitude.

11   Q    And what were the figures in Maptitude that you were using

12   and where did they come from?

13   A    They came from the North Carolina redistricting database

14   which was done by the IT group in the state legislature.

15   Q    Okay.  And I want to make sure that the Court understands

16   one point.  Do you have your first report which is Defendant's

17   Exhibit D-26.1?  It should be up there.

18   A    That would be my second expert report?

19   Q    The second report, yes.

20   A    Okay.  Yes, I do.

21   Q    Could you turn to Map 3.  And this is the map we went over

22   yesterday that reported the percentage of the Obama vote in the

23   2003 Congressional districts.  Do you remember that?

24   A    I'm sorry?

25   Q    Do you remember going over this map yesterday?

1  A    Yes, we went over this map in conjunction with Map 2.  Are

2  we on Map 2 or Map 3?

3  Q    Map 3.

4  A    Okay.

5  Q    And what I want you to explain to the Court, I'm looking

6  at Map 3, and you're reporting that the Obama vote in the 2011

7  1st District was 70.58 percent, and on Exhibit 124 you're

8  reporting it slightly higher at 70.93 percent.  Could you

9  explain that -- why that's different.

10  A    Again, it's two-party vote, and straight --

11  Q    Which one is a two-party vote?

12  A    Well, they're minority candidates that get --

13  Q    No, no, which exhibit -- is Map 3 the two-party vote or is

14  Exhibit 124 the two-party vote?

15  A    I'm sorry, I have to look at --

16  Q    Okay.

17  A    Exhibit 124 is definitely two-party vote, yes.

18  Q    And so could you explain to the Court why the Obama

19  percentage is higher -- slightly higher in Exhibit 124?

20  A    Well, that's if you use two-party votes, the percentages

21  for both candidates will go up.

22  Q    And what's not included in the two-party vote?

23  A    Third parties.

24  Q    Okay.  That's all I have on that, Your Honor.

25  A    Could I add something to that?

 1              MR. HAMILTON:  Well, we would object, Your Honor.

 2   The normal process is a question and then an answer.

 3              THE COURT:  Yeah.  Is further explanation necessary

 4   to respond to the question?

 5              THE WITNESS:  I just wanted to add, Your Honor, that

 6   the two --

 7              THE COURT:  All right.  Answer my question first.

 8              THE WITNESS:  I think it's --

 9              THE COURT:  Is what you want to add necessary to your

10   explanation?

11              THE WITNESS:  I feel it is, Your Honor.

12              THE COURT:  You can explain your answer.  We won't

13   cut you off from that.

14              THE WITNESS:  Thank you, Your Honor.  The scores I

15   used were identical, the data I used were identical for both

16   maps, so it shows the difference between the maps and the

17   importance of these two exhibits.  Map 2 and Map 3 is to show

18   how the partisan nature of the 13 districts changed between the

19   two plans.

20              THE COURT:  All right.  Next question, Mr. Farr.

21              MR. FARR:  Yes, Your Honor.  I'm going to hand an

22   exhibit up to the witness, Your Honor.

23              THE COURT:  All right.  Mr. Hamilton, to be -- while

24   he's doing that, to be clear, on Defendant's Exhibit 124, with

25   respect to the testified to material, I'm assuming, I'm trying

 1  to clarify, in that first spreadsheet at the top, with respect

 2  to the Congressional Plan, the 2010 Census, and the census

 3  information and the 2008 general election returns as relate to

 4  the Obama vote and the Obama percentage -- or maybe the whole

 5  chart.  Is there an objection to that information?

 6          MR. HAMILTON:  Well, yes, is the direct answer.  The

 7  two-party vote explanation here, there's nothing in his expert

 8  reports about that at all.  I mean, he didn't discuss that in

 9  his deposition, so that part of that chart.  The data --

10          THE COURT:  All right.  Hold on just a second.  Let

11  me clarify.  There would also be an objection under the

12  Congressional Plan to the -- at least the Romney vote and the

13  two-party vote and the other information in the two charts

14  below.

15          MR. HAMILTON:  Correct, the two charts below,

16  absolutely.

17          THE COURT:  Okay.  All right.  That's enough for now.

18  You may continue, Mr. Farr.

19          MR. FARR:  All right.

20  BY MR. FARR:

21  Q    Dr. Hofeller, I've handed you Defendant's Exhibit 115.  Do

22  you have that in front of you?

23  A    Yes, I do.

24  Q    And is this something you prepared?

25  A    I did.

1  Q    And could you tell the Court what this is.

2  A    This is essentially the top table in the Exhibit D124 and

3  has the same figures in it that that exhibit did, which is a

4  comparison of the increase in census demographics between the

5  2001 enacted plan and the 2011 enacted plan and the same

6  increase for the Obama percentage in between the plans.

7            So what it says is while the -- for example, while

8  the total black VAP went up 4.02 percentage points, the Obama

9  percent went up 7.85 percentage points.

10 Q    Okay.  And if we went back to Maps 2 and 3 in your second

11 report, I think we'd find that the increase in the Obama

12 percentage is slightly higher.  Can you explain to the Court

13 why that's so.

14 A    I haven't done the math in my head, but it's really a

15 similar increase.

16 Q    But is this -- is this the two-party analysis again in

17 this exhibit?

18 A    Yes, that's -- that's what the exhibit states.

19 Q    Okay.  That's all I have on that, Your Honor.

20           THE COURT:  All right.

21 BY MR. FARR:

22 Q    Now, Dr. Hofeller, I want you to turn to your second

23 report which is Exhibit 26.1.

24           THE COURT:  Again, to clarify for the record, we're

25 moving off the objected to material now?

 1          MR. FARR:  Yes, sir, Your Honor, and I didn't -- I

 2   didn't hear an objection to the exhibit we just --

 3          THE COURT:  All of the objection is related to the

 4   continuing exhibit, so we'll figure out how it all fits

 5   together.  You can continue.

 6          MR. FARR:  I would just point out, Your Honor, the

 7   last exhibit that Dr. Hofeller testified to was on our exhibit

 8   list and was not objected to.

 9          THE COURT:  Okay.

10          MR. HAMILTON:  Just for the record, that's

11   Exhibit D115.

12          THE COURT:  So no objection to 115?

13          MR. HAMILTON:  We have no objection to 115.

14          THE COURT:  Okay.  Thank you.  All right.

15   BY MR. FARR:

16   Q    So Dr. Hofeller, do you have your pointer with you up

17   there?

18   A    Yes, I do.

19   Q    Okay.  If you decide it's helpful to use that, you may.

20   That's going to be up to you, but I want to turn to -- I want

21   to ask you about District 12, how to figure in Greensboro under

22   the '97 Plan, the 2001 Plan and the 2011 Plan.  Okay.  So could

23   you turn, please, to Map 4 in Exhibit 26.1 and tell the Court

24   what that is.

25   A    Map 4?

1  Q    Yes, sir.

2  A    Map 4 is an enlargement of the central portion of the

3  state showing the boundaries of the 12 Congressional Districts

4  enacted in 1997.

5  Q    And what color on that map is the '97 12th Congressional

6  District?

7  A    It's blue.

8  Q    And could you, just for the record, state what counties it

9  was located in.

10 A    It starts out in Mecklenburg County in the south,

11 continues through a corridor in Iredell County, heads east over

12 into Rowan County and then northeast through Davidson County,

13 and then it branches off taking a portion of Forsyth County and

14 Guilford, so it's six counties.

15 Q    Okay.  And now turn to Map 5, and could you tell the Court

16 what that is.

17 A    Map 5 is an enlargement of the central portion of the

18 state again showing the boundaries of the 13 -- now 13

19 districts which were drawn in 2001 as the enacted 2001 map.

20 Q    And so what counties are -- are -- is the 12th District

21 located in under the 2001 Plan?

22 A    Once again, the 12th District in blue starts out in

23 Mecklenburg County, and instead of going through Iredell

24 County, it goes through Cabarrus County into Rowan County and

25 up through Davidson County and then again branches off into

1  Forsyth County and Guilford County.

2  Q    Now, did the 2001 Plan have all the same areas of Guilford

3  County as the '97 Plan?

4  A    No.

5  Q    And how did that change?

6  A    Well, the strong Democratic areas of Guilford County were

7  split in this map and part of them were put into the

8  13th District.  I might add through a noncontiguous, what would

9  be considered now a noncontiguous pathway, the 13th coming down

10 into Guilford County and bisecting the 6th district at a single

11 point of contiguity.  So strength was essentially borrowed, if

12 you might say, from the 20 -- the 1997 map to help form the new

13 13th District.

14 Q    When you say "strength," what do you mean?

15 A    Democratic voting strength.

16 Q    Okay.

17 A    Precincts that had strong Democratic voting

18 characteristics.

19 Q    And what happened to them?

20 A    They went into the 13th.

21 Q    Okay.  All right.  Turn to Map 6.  Could you tell the

22 Court what that is.

23 A    This is a map, again, of the central portion of the state

24 showing the 13 districts in the enacted 2011 map.

25 Q    And what color's the 12th District?

1  A     The 12th District is now red.  The computer does the

2  coloring to make sure that no adjacent districts have the same

3  color in this.

4  Q     All right.  And what counties was the 2011 Congressional

5  District included in?

6  A     It's the same counties that it was included in in the 2001

7  enacted plan.  Do you want me to go through them?

8  Q     We've done that, so I think that will be sufficient.  And

9  what changes were made in Guilford County in the 2011 plan as

10 compared to the 2001 Plan?

11 A     The 2011 -- I'm sorry, as compared to the 2001 Plan, the

12 part of the 2011 map in Guilford County has portions of the

13 former 1997 12th District in Guilford County added into it, so

14 it's more modeled after that, although there are some

15 differences.

16 Q     And is the 13th District in the 2011 plan located in

17 Guilford County?

18 A     No.  It's located I guess the nearest it comes to Guilford

19 County sort of a tie between Durham County and Wake County, but

20 it's nowhere near Guilford County on the new map.

21 Q     All right.  Could you explain to the Court what Map 7 is.

22 A     Map 7 is a map of the 2001 enacted plan's 13th

23 Congressional District colored in green and also demonstrates

24 the boundary of the 12th District in red.

25 Q     And that's the 12th District in Greensboro, in Guilford

 1  County?

 2  A     A portion in Guilford County, yes.

 3  Q     Okay.  And could you explain to the Court what map No. 8

 4  is.

 5  A     Map No. 8 shows the -- essentially the dividing up, the

 6  reconfiguration of the 13th and other districts in the 2000 --

 7  from the 2001 Plan so all of the colored areas on the map were

 8  in the 13th District as it was constituted in the 2001 Plan --

 9  Q     All right.  And so --

10  A     -- and it shows.

11  Q     Go ahead.

12  A     And it shows where they ended up in the 2011 map.

13  Q     And can you tell the Court what the colors represent for

14  the various districts.

15  A     Yes.  The portion of the old 13th that is in the new

16  13th is in yellow, and it's located in Wake County and

17  Granville County.  The portion of the old or the 2001 13th that

18  is now in the 6th in the present map, the 2011 map is colored

19  blue, and it's in Northern Granville, Person, Caswell,

20  Rockingham and Guilford County.

21  Q     What does the green represent?

22  A     The portion that's shaded green is the portion of the 2001

23  13th that was added to the 2011 4th Congressional District.

24  Q     And then what's the red or pink portion in Guilford

25  County?

1  A    That's the portion of the 2001 13th which was added to the

2  2011 12th District.

3  Q    All right.

4  A    There's one more.

5  Q    Okay.

6  A    Unfortunately, it's too small to see.  There's just a very

7  small portion in -- in the -- in Wake County that has the

8  symbol N2 on it, which actually went into the new 2nd District.

9  Q    All right.  Thank you.  Now, moving to Map 9, could you

10 tell the Court what that is.

11 A    Map 9 -- nine, I'm sorry, is a side-by-side view of the

12 1997 enacted 12th, the 2001 enacted 12th, and the 2011 enacted

13 12th shaded in red showing the counties and the shape of the

14 district.

15 Q    All right.  Thank you.  Could you now turn to Map 10 and

16 tell the Court what this is.

17 A    Map 10 is a comparison of the territories in the 2001 and

18 2011 12th Congressional Districts, and it essentially

19 demonstrates the movement of the 12th District between the two

20 maps.  So the green portion -- the shaded green portion of the

21 map is what Dr. Ansolabehere would call the corollary, and I

22 agree with that.  It was the area that was in both the new and

23 the old 12th.

24          The red area, the red area on the map that's shaded

25 shows the portion of the 2001 12th that was not found in the

1  new 2011, so those were the areas that were removed from the

2  12th.  And the blue areas show -- the blue shading shows those

3  areas which were added to the new 12th that weren't in the old

4  12th.  One notable thing about this map is -- that I feel is

5  important is to note the movement of the corridor that runs

6  between Forsyth, Guilford County and Mecklenburg.  It was moved

7  both to the southeast and also was smaller, and that's borne

8  out by their exhibits that there's less population in that

9  corridor.  That was part of the effort, successful effort, I

10 might add, to balance the populations of the districts all the

11 way around the map.

12 Q    All right.  And now let's turn to Map 11.  Could you tell

13 the Court what that is.

14 A    Map 11 is similar to Map 9 in that it shows the 1997, the

15 2001, and the 2011 enacted maps, again shaded in red, but shows

16 more detail in Guilford County.

17 Q    All right.  And then if we look at Maps 12, 13 and 14, are

18 they just larger versions of each of the maps that are on Map

19 11?

20 A    Map 12 is just a more detailed view, a little better

21 rendition of the VTD lines for the 1997 12th map; 13 is the

22 same thing for the 2001 12th, and Map 14 is for the 2011

23 portion.

24 Q    Dr. Hofeller, can you explain to the Court how these three

25 versions of the 12th District treated the strongly Democratic

1  areas that you talked about that exist up in the northeastern

2  part of the Guilford County?

3  A    Well, it would be easier perhaps if the politics were on

4  the map, but essentially the Map 14 shows that the 2011 map is

5  a little more -- I think significantly more aligned with the

6  '97 map than it is with the 2001 map, particularly in

7  Greensboro.

8  Q    Okay.  And then if you turn to map 15, what does that

9  show?

10  A    That is again a more detailed map of the northeast corner

11  of Guilford County, actually central and northeast corner,

12  showing how the 2001 13th dovetailed into the 2001 12th in the

13  Greensboro area.

14  Q    Okay.  And so what are the green sections on Map 15?

15  A    The green sections shaded green is the 2001 13th, and the

16  red section is the 2001 12th.

17  Q    So if we look at these maps, is it fair to say that the

18  portions of the 2001 13th District were put back into the 2011

19  12th District in northern -- northeastern Guilford County?

20  A    I think what I'd say is that the -- when the 2011 map was

21  drawn, particularly in Greensboro, the alignment was more in

22  line with the '97 map than it was with the 2001 map, and

23  perhaps the main thing about that was the 13th District, which

24  was moved clear over to Wake County, was no longer on the map.

25  The other district which was now in Guilford County was the

1  6th District, which is a Republican district, and in order to

2  make that district more Republican, or actually keep it

3  Republican, the strong Democratic areas of Greensboro had to be

4  removed.  So the portions of the 13th that were -- I'm sorry,

5  portions of Greensboro that were in the 13th in the 2001 Plan

6  were moved to the 12th.

7  Q    All right.  Thank you.  Now, Dr. Hofeller, I want to ask

8  you about Dr. Ansolabehere's envelope theory.  Do you have an

9  opinion on that?

10 A    Yes.

11 Q    Would you tell the Court what that is.

12 A    Well, I think right off, my first impression when I saw

13 the envelope theory was I had never heard that name before so

14 it was a brand-new name to me, and I think I stated that.

15       The second thing that I felt when I saw it was that

16 if you build a minority district in a group of counties and the

17 part -- only part of some of the counties are in the minority

18 district, that it's completely logical that the portions that

19 are in the counties, of the counties that are in the minority

20 district, which in this case would be District 1, would have a

21 much higher number of minority residents or voters -- actually

22 residents -- in them than the portion outside the district, and

23 that it was, I guess, a very fancy way of stating the obvious,

24 and I think the same would be true in the case of the 12th.

25       But the other thing that -- about the envelope is the

1 nature of the envelope in that Dr. Ansolabehere used the same
2 envelope to look at the 2011 map and make his envelope analysis
3 that he did for the '01 map, even though the envelopes were
4 actually different, and that really biases the figures,
5 particularly of what's outside the envelope, but it would bias
6 all the percentages.
7 Q    All right.  Let's explore that a little bit.  Let's --
8 first of all, do you have Dr. Ansolabehere's second report
9 which is Exhibit 18?  It's in that white notebook.
10 A    Exhibit 18?
11 Q    Yes.
12 A    Yes.
13 Q    Okay.  Would you turn to Table 2, which is the second to
14 last page.  Are you there?
15 A    I'm sorry, I was on the wrong -- yes, Table 2.
16 Q    And so in Table 2 Dr. Ansolabehere lists the voting-age
17 population and registered voters for both the city of Durham
18 and the county of Durham, does he not?
19 A    Yes.
20 Q    Now, Dr. Hofeller, if you're familiar with all the
21 counties that were included in both the 2001 1st Congressional
22 District and the 2011 1st Congressional District, you're
23 familiar with the demographics of those counties, are you not?
24 A    Yes, I'd say I am, yes.
25 Q    And all the counties that were in either the 2011 or the

 1  2001 1st District, which county do you think has the highest

 2  population?

 3  A    Oh, without a doubt it would be Durham County.

 4  Q    And which county would have the highest population of

 5  African-Americans as far as like total numbers?

 6  A    Again, I can't state it categorically because I'd have to

 7  have the numbers in front of me, but from my knowledge I would

 8  say it would be Durham County.

 9  Q    All right.  So now let's turn back to Dr. Ansolabehere's

10  first report which is Plaintiff's Exhibit 17.

11  A    Yes.

12  Q    And Table 7 and 8 are looking at the envelope for the 2001

13  and the 2012 -- or 2011 12th District, are they not?

14  A    Seven and eight are an analysis comparing the envelope to

15  the 12th -- the new 12th Congressional District.

16  Q    Right.

17  A    Okay.  The 12th Congressional District.

18  Q    And the 12th Congressional District in the 2001 Plan is in

19  the same county as the 2012 -- or 2011 12th District, correct?

20  A    Yes.

21  Q    And so they're both in the same counties and the total

22  population in those counties, under the 2000 Census, would be

23  the same for both the 2001 12th District and the 2012 District?

24  A    Yes, it's like comparing apples to apples.

25  Q    All right.  Now, let's go to Tables 5 and 6.  So these two

1 tables are purporting to compare the envelope for the 2001 1st

2 District and the 2012 1st District, correct?

3 A    That's correct.

4 Q    And if you look at Table 5 and Table 6 under the column

5 registered voters in group in the envelope, are those numbers

6 the same?

7 A    Yes.

8 Q    Now, was the 1st Congressional District in 2001 in the

9 same counties as the 2011 1st Congressional District?

10 A    No.

11 Q    And was Durham in the 2001 1st Congressional District?

12 A    No.

13 Q    But you heard Dr. Ansolabehere's testimony, and he

14 included Durham County in the envelope that was used to analyze

15 both the first and -- or the 2001 1st and the 2011 1st

16 District, correct?

17 A    Yes.

18 Q    Okay.  Dr. Ansolabehere didn't look at the envelope that

19 was established by the counties that were actually included in

20 the 20011st Congressional District?

21 A    Okay.  I'm sorry, could you ask that again?  I'm trying

22 to --

23 Q    Did Dr. Ansolabehere establish an envelope under his

24 envelope theory for the 2001 1st Congressional District based

25 only on the counties that were actually in the 1st

1 Congressional District in 2001?

2 A    No.

3 Q    Now, he didn't disclose in his report, did he, that his

4 envelope for the 2001 1st Congressional District included

5 Durham County, did he?

6 A    Not that I remember.

7 Q    Okay.  So including Durham County in the envelope he used

8 to analyze the 1st Congressional District, would you agree that

9 that would add a lot of black population into the envelope he

10 was using to analyze the 2001 1st Congressional District that

11 actually was not in the district?

12 A    Well, actually it would add both black and white

13 population to the area that was outside of the district,

14 because none of Durham County was in the district, so it yields

15 a result that is biased.

16 Q    So let's explain to the Court, by adding Durham County to

17 the envelope he used to analyze the 1st District, what impact

18 did that have on both the number and percentage of black

19 population that Dr. Ansolabehere said was outside of the

20 envelope?

21 A    Of course, the number would be changed greatly.  The

22 percentages might be less changed depending on how close the

23 population of Durham is to the median there of the district,

24 but it definitely would bias the results.

25         Of course, another problem with comparing the 2001

1  district to the 2011 district is, of course, the problem of the

2  97,500 persons that had to be added to the new 2011 district.

3  They had to go somewhere.

4  Q    And would that have any sort of impact on his envelope

5  analysis, the underpopulation in the 1st District?

6  A    Well, it would certainly change the numbers on the charts.

7  The -- his conclusions might be similar, but in comparing the

8  two plans, they wouldn't be true and accurate.

9          MR. FARR:  All right.  Your Honor, I have an exhibit

10 for the witness.

11         THE COURT:  All right.

12         MR. FARR:  It's on our exhibit list and it's not been

13 objected to.

14 BY MR. FARR:

15 Q    Dr. Hofeller, I've handed you Exhibit 114.  Did you

16 prepare this exhibit?

17 A    I did.

18 Q    And could you tell the Court what this is.

19 A    This is a table which shows the percentages of total adult

20 black population which would be TVAP, black TVAP for the areas

21 inside of and outside of the districts for the 12th in various

22 maps.  The 2001 enacted plan, the 2011 SCSJ plan, the 2011 Fair

23 and Legal plan, those two plans were the plans that were

24 submitted as proposed maps by parties for the 2011

25 Congressional redistricting, and then on the far right the 2011

1  enacted plan, and it shows those counties that were split.  In

2  any of those plans where you see the kind of dotted shading the

3  county was not involved in a county split in that particular

4  plan.

5  Q    All right.  I want to make sure the Court understands this

6  exhibit, Dr. Hofeller.  In the first column you have the word

7  "county?"

8  A    Yes.

9  Q    What counties are listed under that column?

10 A    Do you want me to read them all off?

11 Q    No, no, I mean, why are they in the column?

12 A    They're in the column because they were split in one of

13 the four plans that I'm demonstrating by this exhibit.

14 Q    Okay.  And the four plans you looked at were the 2001 Plan

15 and then the next plan was proposed by who?

16 A    The Southern Coalition for Social Justice, SCSJ.

17 Q    And was that before the legislature at the time the plans

18 were enacted, as far as you know?

19 A    Yes.

20 Q    And what was the 2001 Fair and Legal plan?

21 A    That was a plan proposed, I believe, by legislators very,

22 very close, within several days, of the enactment of the 2011

23 map.  It really wasn't available to us when we were drawing the

24 plan.

25 Q    Okay.  And then the last column is the enacted plan in

1  2011?

2  A     Yes, Rucho-Lewis 3.

3  Q     All right.  Let's look at Rucho-Lewis 3 for the county of

4  Durham and explain to the Court what outside and inside means

5  so they fully understand this.

6  A     Okay.  Again, if you look at the last two columns on the

7  right under the heading 2011, then you look at the two headers

8  outside and inside, it would tell you that the area outside of

9  the 2011 district was 20.49 percent African-American.  The area

10 inside was 49.02 percent African-American.

11 Q     And so that would be true for all the other entries you

12 have on this exhibit?

13 A     Yes.

14 Q     Did you reach any conclusions after you looked at this

15 exhibit?

16 A     Let me just briefly look at it.

17 Q     Okay.

18 A     With the exception of Greene County, the percentage of the

19 African-American population outside the district was lower than

20 the percentage inside the district, which is exactly what you

21 would think would be the case since the district we're talking

22 about is an African-American majority district.

23 Q     Okay.  So in the enacted plan, the African-American

24 population in Greene County was higher outside the district

25 than inside the enacted 2011 district, is that right?

1  A     That's correct.

2  Q     Now, does that -- and the other plans that you analyzed --

3  how does the black percentage inside and outside of each

4  version of the 1st District compare in those counties that were

5  split?

6  A     Well, the 2001 enacted map, the baseline map as we

7  sometimes refer to it, where there was a county split, the

8  percentage of African-Americans in the portion outside the

9  district was less than the portion inside the district.

10 Q     And that's true for every split county in the 2001 enacted

11 district?

12 A     Yes.

13 Q     And what about the Southern Coalition plan?  How did -- in

14 the counties split by the Southern Coalition plan, how did the

15 black population outside of the district compare to the black

16 population inside the district?

17 A     It was the same as the 2001 enacted plan.  The percentages

18 of the territory outside the districts were smaller than the

19 percentages inside the district.  Again, what you'd expect

20 again in the creation of a minority district.

21 Q     And then, finally, what about the 2011 Fair and Legal

22 version of the 1st District, how were the -- what was -- what

23 were the black percentages in the split counties outside of the

24 district as compared to the portions inside the district?

25 A     The portions inside the district had higher percentages

1  than the portions outside.

2          MR. FARR:  That's all I have on that, Your Honor.

3  May I approach the witness with another exhibit?

4          THE COURT:  You may.

5  BY MR. FARR:

6  Q    Dr. Hofeller, I've handed you an exhibit marked

7  Defendant's 130.  Could you tell the Court what this is.

8  A    This is my third affidavit in this case -- I'm sorry, in

9  the *Dickson* case.  Sometimes they merge together a little bit.

10  It was submitted, I think, on the 10th of December in 2012.

11  Q    All right.  I just want to ask you a very few questions

12  about this exhibit, Dr. Hofeller.  Does this exhibit contain

13  your criticisms of Dr. Peterson's segment analysis?

14  A    Yes.

15  Q    Could you tell the Court where that starts.

16  A    It starts on page 2 under Heading 2, which is

17  Dr. Peterson's segment analysis, and it continues on through

18  page 6 when the report goes into a different topic.

19  Q    And do you recall some of the criticisms you had of

20  Dr. Peterson's segment analysis?

21  A    Well, first of all, I had a great deal of difficulty

22  understanding his segment analysis because when we originally

23  got it, we didn't get any of the underlying data or the pairs

24  of precincts that he paired up against each other, so it took

25  until I could write this third report to get enough data to

1  figure out what he was doing.  So that was one problem right

2  off the bat.

3         When we finally got the data, once again we confirmed

4  that he was making his conclusions based on 29 of the 330

5  pairings that were around the border of this district; and,

6  indeed, in many cases, the precinct inside would be paired with

7  multiple outside precincts or vice-versa.  So when I finally

8  got the actual precinct pairs that he did, one of the first

9  things I did was to look at where they were on a map and say,

10  well, what's the nature of these pairs of precincts that he's

11  used.

12         And so I figured out that just to highlight it that

13  16 out of Dr. Peterson's 29 divergent pairs, which was what he

14  based his decision on, were actually in that corridor area that

15  was connecting Mecklenburg with -- I guess for you, Your

16  Honors, it would be this way -- with Guilford and Forsyth

17  County, so we called that the corridor connection.  And that

18  connection in many cases was only one precinct wide, and the

19  decisions that were made to place that corridor were guided by

20  two things.  One was to get through that corridor area with the

21  least population that you needed; and, two, was the placement

22  of the corridor was guided by the balance of the population

23  between the new 5th and the new 8th District.  So the corridor

24  was moved to the southeast in order to accomplish that

25  adjustment of population.

1          The other thing that's noted about the 12 divergent

2  pairs is they're in areas where the African-American

3  registration is extremely low.  If I were to make a shaded map

4  of those percentages, they would be in the -- a very large

5  category, which would be the very lowest one.  So it didn't

6  take into account as to whether or not, for example, that the

7  black population was 8 percent inside and 6 percent outside

8  rather than some much larger number which would tell a story.

9          Another problem, of course, was that if you're

10  drawing the district, even withstanding if you could take this

11  divergent analysis into account as you're actually drawing the

12  district, which you can't, the software wouldn't accommodate

13  it, and the computers wouldn't accommodate it, you may find

14  that the situation on one side of the corridor precinct was

15  exactly the opposite of the situation on the other side of the

16  precinct, so would you have to arrange that corridor so the

17  political and racial characteristics of the pair-up of the

18  inside and outside precinct were the same, and I don't think

19  you could take that corridor through that way.

20          The other problem was that in some cases the same

21  precinct, either inside or outside, was being paired two times

22  or more with a different precinct on the other side of the

23  line.  So using the same precinct, in my opinion, twice gives a

24  slight bias to it.  So -- and none of the divergent pairs in

25  that corridor had to do with any precincts that had high Obama

1  vote or political vote.

2         So if you subtract those out, you have very few left.

3  You have 11 divergent pairs, if you look at the precincts that

4  were double counted, and I guess my objection to this method

5  was to base what I felt was kind of a sweeping generality of

6  the motivations of how this was drawn -- this district was

7  drawn on the basis of 11 pairings of boundary precincts out of

8  330 precincts, just doesn't make much sense.

9         Another problem that I had with this divergent

10 precinct theory was it doesn't take into account the size in

11 voters or population of the precincts.  So one precinct could

12 be three or 4,000 people, the other precinct could be 500.  So

13 there was no correction for amplitude of the precincts.  What

14 he really made was what I would call a two tailed test, yes or

15 no, based on what was in the precinct.

16        And just for illustrative purposes, I went and

17 analyzed the Obama/McCain vote by precinct in the state of

18 North Carolina, and I found that if you just assigned a one to

19 a precinct where Obama won and a one to -- and a zero to McCain

20 and the reverse for where McCain won, that McCain would have

21 won the election that year.  So it's just -- to me it's just

22 very shaky in terms of being able to draw the conclusions he

23 drew.

24 Q    All right.  Thank you, Dr. Hofeller.  I just have a few

25 more questions.  Could you turn to your first report,

 1  Defendant's Exhibit 25.8, which was, I think, prepared on

 2  January 17, 2014.

 3  A     Okay.

 4  Q     I want you to --

 5  A     Okay.  I'm not there yet.

 6  Q     Okay.  Sorry.

 7  A     Could you give me the name of it.

 8  Q     It's -- the front page says exhibit and expert report of

 9  Thomas B. Hofeller, and there's a blue sticker on the bottom

10  that says Defendant's Exhibit D-25.8.

11  A     25.8?

12  Q     Yep.

13  A     Have it.

14  Q     What I want to do here is I want to turn to the tables in

15  this exhibit to make sure that the Court understands what your

16  tables are.  So let's start with Table 1.

17  A     Yes, sir.

18  Q     Could you tell the Court what Table 1 is.

19  A     Table 1 is just a listing of the cities or towns that were

20  split along the border or split, in some cases, internally one

21  case in the two plans, so on the --

22  Q     For which district?

23  A     For the -- well, for --

24  Q     We're looking at Table 1 right now.

25  A     Table 1 is the 1st District.

1  Q    You're comparing split cities or towns between the 2001

2  Plan and the 2011 1st District, correct?

3  A    Yes.

4  Q    Can you just -- without going over all this, what was your

5  concern about the way Dr. Ansolabehere described the split

6  towns in comparing these two plans?  Did you have any concerns?

7  A    Well, again, I'd have to review my report on the side, but

8  I think I had a concern in his analysis of the plan that there

9  were several cities, three where the splits were either zero or

10  extremely small and were noncontiguous.

11        So in North Carolina sometimes you find that a very

12  small portion of a city is outside of the regular boundary of

13  the city.  It's a little kind of a satellite.  I theorize it

14  usually probably for some utility function, like a dump or

15  water or whatever, and so that would lower the -- in my mind,

16  the significance of the splits of those cities.

17  Q    Okay.  Can you turn to Table 2 and tell the Court what

18  that is.

19  A    Table 2 is essentially the same chart for District 12.

20  Q    Okay.

21  A    And the two plans split the same number of cities, which

22  we both agree on, Dr. Ansolabehere and I; different cities, but

23  the same number.

24  Q    And could you tell the Court what Table 3 is.

25  A    Table 3 is just a resummary of his envelope percentages

1  for the 1st District, both the old map and the new map and the

2  12th District for the old map and the new map.

3  Q    Okay.  Let's look at one of these in detail so the Court

4  understands exactly what you did.  Let's look at Congressional

5  District 1, which is the top chart.  What's the first column

6  there?

7  A    The first column is the party of registration.

8  Q    Okay.  And then what's the second column?

9  A    Second column is the group which subdivides the Democrat

10 and Republican and undeclared into black and white.

11 Q    Okay.  And the third column is?

12 A    And the third column gives the percentages of the group in

13 the old district.

14 Q    Okay.  So, for example, in the Democrat horizontal

15 section, if you look at white, you're saying that 39.6 percent

16 of white Democrats were in the old Congressional District 1?

17 A    And were Democrats.

18 Q    Right, is that correct?

19 A    Yes.

20 Q    Okay.  And then what's -- it says percentage black and

21 percentage white, what does that mean?

22 A    That's just the black figure subtracted from the white

23 figure, so it's an 18.7 percent difference.

24 Q    Okay.  And you used the same methodology on all the other

25 charts on this table, is that correct?

1   A    Yes, if you divided it into four sections, it would be the

2   same.

3   Q    Okay.  All right.  Now, let's now turn to Table 4, and

4   could you tell the Court what this is.

5   A    Table 4 is for the 12th Congressional District, and it

6   compares the 2010 Census data results and the 2008 general

7   election data for president for the areas that are both in the

8   new and old, which is the core of the district in both cases.

9   Q    I think we need to explain this one a little bit,

10  Dr. Hofeller, to make sure the record's clear.  So we're

11  looking at the top chart and the first column on the left-hand

12  side says area examined, correct?

13  A    Yes.

14  Q    And what are the areas that you listed?

15  A    The area in the new and the old, the core area,

16  essentially.

17  Q    Any other areas?

18  A    The second area is the area that was only in the old 12th

19  but wasn't in the new 12th.

20  Q    And the final area?

21  A    The area only in the new 12th that wasn't in the old 12th.

22  Previously we looked at a map of these areas.

23  Q    Okay.  And then there's a next chart moving to the right

24  that says 2010 Census data.  Could you explain that chart,

25  please, to the Court.

1  A    Again, it gives the total population.  To the right of

2  that is the 18 year old total population and the 18 plus total

3  black population and the fourth column is the percent total

4  black.

5  Q    So --

6  A    Black voting-age population for all people who designated

7  black as a single race or part of a multiple race category.

8  Q    Okay.  So the area in the new -- in the old 12th had a --

9  any part black voting-age population of 56 -- 54.22 percent?

10 A    Yes, both in the new and the old.

11 Q    Right.  And then below that you've got area only in the

12 old?  Could you explain that, please.

13 A    Again, this is essentially the area that was removed from

14 the 12th District when it was redrawn, and it was 22.77 percent

15 African-American in adult population.

16 Q    Okay.  And then you've got area only in the new 12th.

17 What does that percentage mean?

18 A    Again, that is the percentage, 43.24 percent, of the total

19 black VAP or total 18 plus total black, which was added to the

20 new 12th as it was constructed.

21 Q    Okay.  And then you have a column that says percent added

22 minus percent removed areas, and you've got a number of

23 20.47 percent.  Could you tell us what that means.

24 A    That was just the difference in percentage between the

25 area added and the area taken out which said that the area

1  added was 20.47 percent more African-American than the area

2  that was taken out.

3  Q    All right.  Now, could you kind of briefly explain the

4  next chart to the right about the 2008 general election and

5  tell the Court what that is.

6  A    This is the same figure for the 2008 general election for

7  president which has the total vote for Obama plus McCain, the

8  total vote in the first column, the total vote for Obama in the

9  second column, the total McCain in the third column, and the

10  percent Obama.  So essentially it says that the core area,

11  which is both in the old 12th and the new 12th, was

12  79.92 percent Obama in terms of the vote.

13         The area that was taken out, which is only in the old

14  and not in the new, was 53.01 percent Obama, and the area that

15  was put into the 12th, that wasn't in the old 12th, is

16  75.39 percent Obama.

17  Q    And then what does the -- you have a figure there percent

18  added minus percent removed in the last column of Table 4 of

19  22.38 percent.  What does that reflect?

20  A    That reflects the difference between the 75.39 and the

21  53.01 percent, so the area put in the 12th had a higher, much

22  higher, presidential vote at 22 percent higher presidential

23  vote for the Democratic candidate than did the area that was

24  taken out.

25  Q    Okay.  Now, the next question is, what is the chart at the

1  bottom of Table 4?

2  A    It's actually a little bit different.  It was put in there

3  to emphasize the differences in population in the counties

4  between the old and new district so --

5  Q    And what does that show about -- you have the urban

6  counties of Guilford, Mecklenburg, and Forsyth, and then you

7  have the three corridor counties.  What does this chart show

8  about how the population changed in the urban counties versus

9  the corridor counties?

10  A    Well, of course, the change in population in the urban

11  counties, the three largest counties, was much different as to

12  those counties, and I think -- I think I explained that before

13  when we started that much more of Guilford was added back into

14  the new 12th District.  That was really to help the 6th

15  District.  Less of Forsyth County was contained in the new

16  district than in the old district by about 90,900, 91,000, and

17  that was done because -- for two reasons.  One because the 5th

18  District was stronger to begin with and could take those

19  Democratic precincts and also because it was really a trade off

20  in the map politically between what you had in Guilford and

21  what you had in Forsyth, sort of like two ears, and so if one

22  went down, the other went up because of what was needed to be

23  done in Mecklenburg for the 8th and the 9th District.

24        And, of course, in Mecklenburg 98,960 more people

25  were added into the new 12th that was constructed; and, again,

1  that was part of -- mostly because of the 8th District because

2  we wanted to withdraw as much of the 8th District from

3  Mecklenburg, and the part we wanted to withdraw, we didn't

4  really want to put in the 9th.  So, again, the Mecklenburg line

5  was more designed to strengthen the 8th by removing it from

6  Mecklenburg County and to strengthen the 9th by where that line

7  went.

8           The corridor, which were the three other counties,

9  Davidson, Rowan, and Cabarrus collectively, had 60,000 less

10 people in them in the new district than they did in the old

11 district; and, again, that was to allow us to do what we needed

12 to do in the metropolitan counties, vis-a-vis the surrounding

13 districts and also for population correction between the east

14 side and the west side of that corridor.

15 Q    Okay.  Dr. Hofeller, I just have a couple more questions,

16 and I'll be done.  Could you turn to Dr. Ansolabehere's second

17 report which is Plaintiff's Exhibit 18.

18 A    Yes.

19 Q    Now, you see his Table 1 where he talks about a

20 correlation between Obama share of two-party vote and racial

21 composition and registered voters and VTDs?

22 A    Yes.

23 Q    So the only question I want to ask you is, did you use

24 registration statistics to draw Congressional District 12?

25 A    No.

Q     And why not?

A     Well, first of all, in my judgment, once again, the best
predicator of future voting behavior is past voting behavior,
and the other thing is that if I'd used registration
statistics, particularly racial registration statistics, I
would have violated my instruction, which was not to use racial
data in drawing the 12th District.

         The other problem I have with using racial
registration statistics in drawing districts is that I don't
believe they're as accurate as some might purport they are.
First of all, if you were going to use registration at all, I
believe you should be using the turnout registration rather
than the total registration because a lot of people aren't
voting, and that would skew the number.  It is not a practice,
in actual district drawing, to use registration numbers.

         You don't account for, for instance, the unaligned
vote.  So how are you going to account for that, so it's just
not practical.  I was told to treat the 12th District as a
political district as it was treated in 1997 by the legislature
and as it was treated in 2001 by the legislature.  It's a
political district, and what was done to the 12th district was
all about politics.  It was to make it a stronger Democratic
district and to place it on the map in the areas where it was
most advantageous to the surrounding districts.

Q     And Dr. Hofeller, you used the term "unaligned voters,"

1  what did you mean by that?

2  A    Those are voters that don't give a party.

3         MR. FARR:  Okay.  Your Honor, that's all I have for

4  now, and I was wondering, since it's a little bit past 10:30,

5  could we take a break?

6         THE COURT:  Let's take five minutes.

7         MR. FARR:  Thank you.  Thanks very much, Your Honor.

8         THE COURT:  We'll stand at ease for five minutes.

9         (At 10:38 a.m., break taken.)

10        (At 10:57 a.m., break concluded.)

11        THE COURT:  All right.  Cross-examination?

12        MR. HAMILTON:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14  BY MR. HAMILTON:

15  Q    Good morning, Dr. Hofeller.  Let's start with where we

16  left off.  One of the things you said twice over the course of

17  your testimony, and again just before you finished, was the

18  best predicator of future behavior is past voting behavior.

19  Did I quote you correctly?

20  A    Yes.

21  Q    Okay.  So if I could direct your attention to the table

22  that's right up there on the easel right next to you, and, Your

23  Honors, there's a witness notebook that we provided to the

24  Court as well, and if it's easier to see, there's a version of

25  this behind Tab 1 and behind -- I guess it's behind Tab 1, and

1   it's behind Tab 12 as well.  Tab 1 and Tab 12 of the notebook

2   before you is the two posters.

3           So Dr. Hofeller, so you'll agree with me that the

4   table in front of you summarizes the election results for the

5   First Congressional District over a series of elections,

6   correct?

7   A    Well, I guess I have to take your -- I have to take your

8   table at face value.  I haven't actually verified all those

9   election figures.

10  Q    You were dealing with the 1st Congressional District and

11  redistricting, were you not?

12  A    Yes.

13  Q    And you were dealing with the 12th, correct?

14  A    Yes.

15  Q    And, in fact, a moment ago you testified that you drew a

16  political district for 12, District 12, correct?

17  A    Yes.

18  Q    So you must have at the time -- I mean, you may not recall

19  it today, but at the time you must have been aware of who was

20  winning and losing elections in those two districts, right?

21  A    Well, I think that it's clear that in the 12th and the

22  1st, as they've been constituted since 1997, that the

23  Democratic candidate is one, yes.

24  Q    And in this case in CD 1 and CD 12, the Democratic

25  candidate in both instances were African-American, correct?

1  A      Yes.

2  Q      And they not only won, but they won by pretty significant

3  margins of victory, is that true?

4              MR. FARR:  Object to the form.

5              THE COURT:  Well, to the extent he knows, he can

6  answer the question.

7              THE WITNESS:  They won decisively.

8  BY MR. HAMILTON:

9  Q      Thank you.

10             MR. HAMILTON:  If I might approach the easel, Your

11 Honor.

12             THE COURT:  You may.

13 BY MR. HAMILTON:

14 Q      The document that you're looking at now, and for the Court

15 it's behind Tab 12 in the witness notebook, is the same data

16 with respect to the 12th Congressional District.  Do you see

17 that, sir?

18 A      Yes.

19 Q      And it's also true in the 12th Congressional District that

20 the African-American candidate of choice won decisively in

21 every election since 1992, correct?

22 A      That's correct.

23 Q      Now, a moment ago you were talking about Dr. Peterson's

24 segment analysis.  Do you recall that testimony?

25 A      I do.

1  Q    You raised several concerns about it?

2  A    I did.

3  Q    You're familiar with the Court's decision in the *Cromartie*

4  case, at least to the extent that you know that the Court cited

5  Dr. Peterson and relied on his analysis in its *Cromartie*

6  decision?  You know that, don't you, sir?

7           MR. FARR:  Your Honor, I'll object since he wasn't

8  allowed to testify about his understanding of cases in direct

9  examination.

10          THE COURT:  If I understand it, there's two opinions,

11  and there's a little different analysis as to Peterson's

12  testimony in those two opinions.

13          MR. HAMILTON:  Maybe I can rephrase the question.

14  All I want to know is if he's aware of the discussion and the

15  Supreme Court decisions.

16          THE COURT:  Yes.

17  BY MR. HAMILTON:

18  Q    Are you aware of the discussion of Dr. Peterson's analysis

19  in the *Cromartie* decision by the United States Supreme Court?

20  A    Insofar as it's been mentioned previously in this

21  courtroom, it's been a long time since I've read the *Cromartie*

22  cases, and I don't honestly remember any specific citation to

23  Dr. Peterson.  That's really kind of a legal analysis question.

24  Q    Okay.  And I take it that you yourself in the *Cromartie* --

25  were you involved in the *Cromartie* cases?

1    A    Well, certainly not at the Supreme Court level.

2    Q    Well --

3    A    I did --

4    Q    At any level were you involved, sir?

5    A    I don't remember to be honest.  It would be in my resume

6    if it's in there.  Everything that I've been involved in.  I

7    certainly was aware of them when they were going on and what

8    they were about.

9    Q    And did you review the segment analysis offered by

10   Dr. Peterson in the *Cromartie* case, the actual analysis that he

11   did in that case, did you review it?

12   A    No, I've never seen it actually.

13   Q    So as you sit here today, you can't -- you can't tell this

14   Court whether the analysis that Dr. Peterson conducted in this

15   case is the same or different than the analysis that he offered

16   in those cases, right?

17   A    No, I can't really tell you because I've never seen it.

18   Q    So we don't know whether the critiques you're offering

19   here today would have applied with equal force or perhaps or

20   just as misguided as that same critique applied to the same

21   analysis or the analysis offered in *Cromartie*, correct?

22           MR. FARR:  Objection, Your Honor.

23           THE WITNESS:  I don't understand.  Could you explain

24   the misguided --

25           THE COURT:  Hold on just a second.

 1              THE WITNESS:  I'm sorry, Your Honor.

 2              MR. HAMILTON:  It was a poorly phrased question.

 3              THE COURT:  How about rephrasing the question, and

 4     make it a little -- one question at a time.

 5              MR. HAMILTON:  Thank you.

 6     BY MR. HAMILTON:

 7     Q    Dr. Hofeller, since you didn't analyze, you didn't review

 8     Dr. Peterson's segment analysis in the original *Cromartie*

 9     cases, you can't offer an opinion about how this border segment

10     analysis offered here is the same or different than the border

11     segment analysis offered there, right?

12     A    I can tell you neither if it was exactly the same method,

13     nor what actual data led to what actual conclusions.

14     Q    All right.  A moment ago -- let me direct your attention

15     to Exhibit D114.  It was one of the loose exhibits offered by

16     counsel a minute ago, and I think I put it right in front of

17     you so it would be easy to find.  D114.

18     A    Yes.

19     Q    All right.  Now, if I understand this table, you prepared

20     this, right?

21     A    I'm sorry, I didn't hear the last part of your question.

22     Q    You prepared this table?

23     A    I did.

24     Q    When did you prepare this table?

25     A    Probably a week before last, I'm not sure.

1  Q    A week before last.  This is not included in your expert

2  report, is it?

3  A    No.

4  Q    So this was prepared and created after the Court's

5  deadline for supplemental expert reports on June 1, right?

6  A    Well, I didn't read the Court's supplemental order, so --

7  Q    It was after June 1 you created this?

8  A    Yes.

9  Q    Okay.  So let's look at it.  You talked a little bit about

10 it.  In all of these places where there's these dashes in the

11 columns instead of actual numbers, those are places where the

12 county was not split, right?

13 A    Either not split or not in the district at all.

14 Q    Okay.

15 A    In the case of the 2011 plan, Jones County wasn't in that

16 district.

17 Q    All right.  And if we look -- and we're looking at four

18 different plans here; the 2001 Plan, the 2011 SCSJ plan, the

19 2011 Fair and Legal plan, and then the enacted plan, correct?

20 A    Yes.

21 Q    And of all four of those, the enacted plan splits the most

22 counties, that's pretty clear from this table, isn't it?

23 A    Yes.

24 Q    And in the enacted plan, just focusing on that, in every

25 single county, every single county, the black voting-age

1  population included in the district, this is the First

2  Congressional District, exceeds the black voting-age population

3  that's outside the district?

4  A    Are you talking about --

5  Q    All -- every single one except for one in the enacted

6  plan, correct?

7  A    The 2011 plan.  Yes, that's correct.

8  Q    And when you say 2011, that -- the 2011 I just want to

9  make sure we're talking about the same plan.  The 2011 plan is

10 the plan that was adopted, sometimes we're calling it the

11 Rucho-Lewis Plan, that's the plan that was adopted that exists

12 today?

13 A    Yes, but the same situation is true for the three other

14 plans, too, except there are no counties.

15 Q    Well, there's another difference with the other -- two of

16 the three other plans were never adopted into law?

17 A    No, but I think -- I think that they're more apt

18 comparisons because if you remember, one of the problems with

19 building the new 1st Congressional District in 2011 was that

20 the Congressional District was 97,500 plus people short, and so

21 there were a lot more difficulties involved in forming that

22 district.

23        The other thing that was important about the first --

24 the 2011 plan was that the placement of the 2011 plan, the

25 placement of it was primarily dictated by politics and by the

1  policy decisions, the partisan policy decisions of the people

2  who were instructing me to draw it.  And so the configuration

3  of the first was really all about, for the most part, the

4  politics of the surrounding districts and how that enabled us

5  to do what we wanted to do with those surrounding districts.

6  Q    Okay.  Well, we'll get to your instructions in a second,

7  but my question actually was about the number of split counties

8  in the enacted plan, and I think that your answer to the

9  question is, with the exception of one county on this list, and

10 that's Greene County, in every other instance, in every single

11 instance in which a county is split, the portion that's inside

12 has a higher black voting-age population than the portion

13 that's outside.  Can you answer that question, sir?

14 A    The answer is true, but I might further explain it by

15 saying, as I did before, that if the 1st District was drawn to

16 be a majority minority district, and the surrounding districts

17 were not, that would be logically expected as indicated.

18 Q    Sure.  It would be logically expected that there would be

19 more African-Americans inside the district if you were using

20 race as a criteria to draw the district in order to get the

21 black voting-age population above 50 percent, correct?

22 A    I don't agree with the premise of your question.

23 Q    Okay.  Well, your instructions were to draw that district

24 more than 50 percent black?

25 A    Yes, but that isn't the question you asked me.

1  Q    Okay.  But that -- I understand, but you didn't agree with

2  my premise, so I'm asking you a different question now which

3  is, your instructions were to draw CD 1 as 50 percent black

4  voting-age population or higher.  True?

5  A    No, my instructions were to -- well, 50 percent plus one

6  person.

7  Q    So in light of those instructions, it's not surprising

8  that we would see in every instance in which there's a split

9  county that you're going to see more African-Americans inside

10 than outside, right?  That just follows?

11 A    Yes, but even if it were drawn as a political draw, and it

12 were a very strong Democratic district, the same would be true.

13 Q    You talked a moment ago about Dr. Ansolabehere's envelope

14 theory, and if I heard you right, I think you said -- you were

15 criticizing that where he's talking about split districts, and

16 you said if you're building a minority district and only part

17 of the district is going to be in or out, then it's just

18 logical that you'd have this result where you'd have more

19 African-Americans inside than out, and it's just, I think you

20 said, Dr. Ansolabehere's it's just a fancy way of stating the

21 obvious, and the obvious is that if you set out to build a

22 minority district then, of course, the part that's in instead

23 of the part that's out is going to have greater black

24 voting-age population, right?

25 A    Well --

 1          MR. FARR:  Objection, Your Honor.  It's like a

 2   compound question, Your Honor.

 3          THE COURT:  Well, there was a lot of preface to the

 4   question, but Dr. Hofeller seems to have followed it.  If you

 5   understand the question, you can answer.

 6          THE WITNESS:  Yes, Your Honor.  Okay.  That's true in

 7   part.  The other part of it is, as I stated just a few minutes

 8   ago, even if it were drawn as a Democrat district without

 9   regard to race, I would expect to see the same result.

10   BY MR. HAMILTON:

11   Q    Okay.  Let's look at Exhibit D124.  Again, it's one of the

12   loose exhibits that was handed up to you.  This is the one as

13   to which we've had some discussion about admissibility.  Do you

14   see that?  Do you have that in front of you, sir?

15   A    D124?

16   Q    Yes.

17   A    Yes.

18          MR. HAMILTON:  And, Your Honor, at this point --

19          THE COURT:  I understand.  You're asking the question

20   subject to our ruling.

21          MR. HAMILTON:  Of course.  Yes, that, but I also

22   wanted to clarify because Your Honor asked earlier this morning

23   about the box at the top of Exhibit 124.

24          THE COURT:  Uh-huh.

25          MR. HAMILTON:  And we do not have an objection to

 1  that table.  I want to make that clear for the record.

 2           THE COURT:  Okay.  I didn't --

 3           MR. HAMILTON:  I don't -- I think I reserved an

 4  objection earlier, and I just want to make it clear that we

 5  don't object to that part of this case.

 6           THE COURT:  It's just the two boxes below that?

 7           MR. HAMILTON:  That's right.

 8           THE COURT:  All right.

 9           MR. HAMILTON:  Thank you.

10  BY MR. HAMILTON:

11  Q    Now, the question I have for you on Exhibit D124 is when

12  was this document created?

13  A    I think the same time as the previous document.

14  Q    About two weeks ago?

15  A    Yes.

16  Q    Do you know why it wasn't produced to the plaintiffs in

17  this case until yesterday, if you know?

18  A    Well, it's really my job to prepare the materials, not to

19  get them into the record.

20           THE COURT:  So the answer is you don't know?

21           THE WITNESS:  I don't know, Your Honor.

22           THE COURT:  All right.

23  BY MR. HAMILTON:

24  Q    Let's start at the beginning here, you received your Ph.D

25  from Claremont Graduate School in 1980?

1   A    Yes, it's now called Claremont University Center.

2   Q    You've never been a tenured member of any university

3   faculty, correct?

4   A    That's correct.

5   Q    And, in fact, you've never been employed in any capacity

6   as a faculty member of any university or college, right?

7   A    That's true.

8   Q    Fair to say that you have not published a great deal of

9   scholarly articles or studies?

10  A    That's true, and what I have is in my resume.

11  Q    Now, you mention an article that you published over the

12  few others.  You testified to that yesterday, is that right?

13  A    Are you referring to the article on compactness?

14  Q    Yes.

15  A    Yes.

16  Q    Okay.  But you've never been the sole author of any

17  article in an academic journal, correct?

18  A    That's true.

19  Q    Now, you've worked for various Republican organizations

20  for many years?

21  A    I've worked for Republican organizations, Democratic

22  organizations, and minority group organizations.

23  Q    Fair to say the large majority of your work has been with

24  Republican organizations and candidates, isn't that true, sir?

25  A    That would be fair to say, yes.

1  Q    You worked as a consultant for the National Republican

2  Congressional Committee in the 1990 redistricting cycle?

3  A    Yes.

4  Q    And you served as a redistricting director for the

5  Republican National Committee from 1999 to 2003, right?

6  A    Yes, I did.

7  Q    And then, again, as redistricting coordinator for the

8  Republican National Committee from 2009 to 2011, right?

9  A    Yes.

10  Q    And since that time, you've been a private consultant

11  working with the Republicans, right?

12  A    I'm not sure "the Republicans."  You mean with --

13  Q    Republican party organizations or candidates --

14  A    Yes.

15  Q    -- or campaign committees?

16  A    Yes.

17  Q    Had a lot of business this last redistricting cycle,

18  meaning the 2010 cycle, right?

19  A    I'm sorry, again, your question was a little fast for me.

20  Q    I'm sorry.  You've had a lot of business this

21  redistricting cycle in 2010 and thereafter, right?  You worked

22  in a lot of different places?

23  A    Okay, I'll agree with that.

24  Q    You assisted in the redistricting in the state of

25  Virginia, correct?

A    Well, I testified in the *Bethune-Hill* case.  I wasn't

involved in drawing the plans.

Q    Fair enough.  So in that case you testified on behalf of

the Republican intervenors in connection with a case that was

very similar to this case, challenging a number of House and

delegate districts in the House of Delegates in the

Commonwealth of Virginia, right?

A    Actually, I think to be accurate to the record, the people

I worked for were the legislative leaders on the Republican

side.

Q    Who had intervened in the lawsuit?

A    Yes.

Q    That's the case we've sometimes been calling *Bethune*

during this proceeding here?

A    Yes, that's what I'd refer -- *Bethune-Hill*.

Q    And you were also in the courtroom during the trial of the

*Page* case that was a challenge to Virginia's Congressional

redistricting a year before that, weren't you?  At least for

part of the time?

A    You know, that was in -- I'm sorry, I'm trying to refresh

my memory.  That was in Richmond also.

Q    That was in Richmond, *Bethune-Hill* was in Alexander.

A    I actually do think I was in the room for that.

Q    And were you paid to be there or did you just show up out

of curiosity to watch some of the trial?

1  A    Well, I wasn't getting hourly pay.  I have a retainer, a

2  monthly retainer, from the Republican National Committee, and I

3  was interested in the case, and I wanted to go down and hear

4  it, and it was also close by.

5  Q    Okay.  And did somebody ask you to go, or did you just go

6  because it was close by?

7  A    I think it was more of my own volition than anything else.

8  Q    Now, you were involved in other states as a consultant on

9  behalf of Republican Party organizations or elected officials

10 during this redistricting cycle other than just Virginia and

11 North Carolina, right?

12 A    I guess I'd really have to review my resume.

13 Q    Let me -- let me -- I'll do it for you, and you tell me if

14 I misstate anything.  You were involved in Texas?

15 A    I was involved but peripherally involved.  I wasn't

16 really, to my recollection, involved in any court cases having

17 to do with the legislative districts or the congressional

18 districts.  I did do some work in county level cases.

19 Q    Okay.  Well, and so just to be clear, I don't mean to make

20 this confusing, but you were either involved in litigation or

21 in drawing the map or consulting with the legislators about how

22 to draw the map in the following states:  One is Texas, right?

23 A    Okay.  I think we could clarify it a little bit in Texas.

24 Q    Sure.

25 A    We were, of course, from the national viewpoint very

1  interested in Texas; and, of course, as I do in many states, I

2  draw maps to find out what can be done.  Sometimes I like to

3  call them goal post maps.  You know, what would happen if the

4  Republicans drew the best map, what would happen if the

5  Democrats drew the best map.  Kind of gives somebody at least a

6  logical perspective to see what they're asking for because some

7  people ask for things that are ridiculous.

8  Q    You were also -- I'm sorry, I didn't mean to interrupt

9  you.

10 A    I'm sorry.  Okay.

11 Q    I just wanted to move along because I really just want to

12 establish you've been involved in a number of different states

13 recognizing --

14 A    Yes, but the degree to which I've actually guided the map

15 drawing, other than advising people on how to redistrict and

16 how they could get into trouble and warning about things, is

17 different from they depended on my advice while they were

18 actually drafting and took it.

19 Q    Fair enough.  Fair enough.

20 A    Okay.

21 Q    You were involved with Florida, correct?

22 A    Not really.

23 Q    You had no involvement in the Florida redistricting or any

24 of the litigation after that?

25 A    Well, I had involvement in the litigation because you

 1  subpoenaed me for the Florida case, but that subpoena was never

 2  I believe -- again, I'm not an attorney.  I don't think it was

 3  ever really executed.

 4  Q    You were involved in Maryland?

 5  A    Yes, there was a case in Maryland.

 6  Q    You were involved in Mississippi?  You even filed a

 7  declaration in Mississippi, didn't you?

 8  A    I'm sorry, I don't really remember.  There was a lot of

 9  work going on, but if it's in my resume, I certainly went

10  there.

11  Q    While we find the citation for that, how about Arizona?

12  You were involved in 2000 -- in this cycle in Arizona, too,

13  weren't you?

14  A    This cycle?

15  Q    Yeah, in 2010?

16  A    Yes.

17  Q    South Carolina?

18  A    Once again, I'd have to check my resume.

19  Q    Okay.

20  A    It doesn't really come to mind right off.

21  Q    Missouri?

22  A    Yes.

23  Q    New York?

24  A    Yes, but that was a county case.

25  Q    On behalf of Republican legislators or party

1  organizations, correct?

2  A    Well, it wouldn't have been leg -- it might have been

3  county legislators; but, actually, I don't think that my expert

4  report was ever actually submitted.  I looked at the

5  demographics of Nassau County.

6  Q    You were also involved in the *Penway versus Harry* case in

7  Texas?  Galveston?

8  A    Yes.

9  Q    Now, all this work is through your business Geographic

10  Strategies, LLC, correct?

11  A    Well, we just went through a long number of cases.

12  Q    Yes.

13  A    Some of these cases I wasn't paid for specifically.  I

14  mean, for instance, my involvement in the *Page* case was just

15  voluntary, so most -- the bulk of the work was through the LLC,

16  yes.

17  Q    And that's called Geographic Strategies?

18  A    Geographic Strategies, LLC, yes.

19  Q    Dale Oldham is your partner in that company?

20  A    He is.

21  Q    He's sitting here in the courtroom today?

22  A    He is.

23  Q    He was also with you in Virginia during the *Bethune* trial?

24  A    No, I don't believe so.

25  Q    You don't believe Dale was in the courtroom when you

1  testified?

2  A     I don't remember his being in the courtroom.

3  Q     Okay.  And what you do through Geographic Strategies is

4  provide redistricting services to your clients, whoever they

5  might be?

6  A     Yes, and I think we also mention litigation support.

7  Q     Okay.  Now, I take it Geographic Strategies, LLC, you're

8  not the only person out there in the world that does this sort

9  of thing to assist political parties on either side of the

10  spectrum in connection with redistricting, true?

11  A     That's true.

12  Q     You have competitors out there?

13  A     I guess you could say that, yes.

14  Q     I'm sure you're the very best anyone could ever hire, but

15  there are other choices out there, isn't that true, sir?

16  A     Well, thank you very much.  Yes, there are other choices.

17  Q     And redistricting services, consulting, map drawing, all

18  that, that's -- fair to say that's the core of what your

19  business does, Geographic Strategies?

20  A     That's fair.

21  Q     Your clients are looking to you to advise them or maybe in

22  some cases actually draw a map that will stand up to a legal

23  challenge, true?

24  A     I would hope so, yes.

25  Q     And --

1  A    That's kind of a two-part question, so maybe you could ask

2  it in two different parts.  I might give a different answer to

3  each part.

4  Q    Well, your clients are looking -- when you're drawing a

5  map for a client on behalf of Geographic Strategies, LLC, your

6  clients are looking to you to draw a redistricting plan that

7  will stand up to legal challenge?

8  A    Again, I hate to mince words here, but if I'm drawing maps

9  or advising a client, I might, from my perspective as a

10 non-attorney, and I always recommend to all my clients that

11 they get an attorney, a counsel, never travel without counsel

12 essentially, that I might say to them, I don't think we should

13 do this or that, and I think we should do this, but ultimately

14 it's their decision as to how they want to proceed.  Otherwise,

15 I wouldn't have clients.

16 Q    Of course.  And you're not a lawyer?

17 A    No.

18 Q    We've established that.  So, of course, you would tell

19 them, rely on legal advice, right?

20 A    I always advise people that they should get competent

21 legal advice.

22 Q    So in your declaration, your expert reports, there's --

23 there's a variety of different statements about *Strickland and*

24 *Cromartie*, and other Supreme Court cases.  You're not a lawyer,

25 you're not offering legal opinion on what those cases mean,

1  right?

2  A     I would just be putting down my view of how I understand

3  them.

4  Q     And how --

5  A     Knowing that it's -- it's not in the context of

6  litigation, a legal opinion.

7  Q     Okay.

8  A     But I might tell a client at some point you really should

9  look at this case, it applies.  Just as all academics, too,

10 would be, if they're actually doing redistricting work, would

11 be familiar with the case law.

12 Q     Sure.  And you would tell them you really should look at

13 these cases and talk to a lawyer about what they might mean as

14 applied to this factual situation, correct?  Because you

15 wouldn't be offering them legal advice?

16 A     I don't offer legal advice.

17 Q     Because you're not licensed to practice law?

18 A     That's right.

19 Q     So the Court -- you'll agree with me that the Court can

20 read *Strickland* and *Cromartie* and all those other cases and

21 decide what they mean and they shouldn't really pay much

22 attention to your declaration on those points because you're

23 not a lawyer.

24 A     Well, I think they can give it the weight that they think

25 it deserves.  It's not a legal opinion, but --

1  Q    Okay.  Fair enough.

2  A    Whether or not they're going to pay attention to it is

3  really up to them.

4  Q    It's up to the Court.

5  A    Sure.

6  Q    You were personally involved in the redistricting in North

7  Carolina at the time the General Assembly drew these maps,

8  right?  That's what we've just established for the last couple

9  of hours.

10 A    Yes.

11 Q    In fact, you were intensely involved in this process?

12 A    I think that's a fair statement.

13 Q    It's also accurate they call you the principal architect

14 of the congressional plan that we're examining here today?

15 A    I think that's been stated for the record.

16 Q    So when we're looking at these enacted plans, these maps

17 that we've been focusing on for the last couple of days, we're

18 really looking at your handiwork?  You know every single dot

19 and squiggle on those maps because you drew them, right?

20 A    I think that's a bit of an overreach.  One of the things

21 that happens is sometimes other maps are looked at, but it was

22 my job to keep and examine and give my opinion on the actual

23 copy of the map as it was being drawn.  So I don't describe

24 myself as being the sole decision-maker.  The decision-makers

25 in this map are the members of the General Assembly who are

1  responsible for the map.

2  Q    Of course.  And you didn't have the power to adopt the map

3  or enact it into law; that was the power that rested in the

4  General Assembly of North Carolina, correct?

5  A    For sure, yes.

6  Q    Okay.  If the plan is struck down, though -- the plan that

7  got struck down is the plan that you were intensely involved in

8  and that you drew pursuant to the instructions of your clients,

9  correct?

10  A    I guess that's a fair statement, yes.

11  Q    Now, you weren't hired by the North Carolina General

12  Assembly as a whole, isn't that true?

13  A    I was hired by the law firm.

14  Q    And when you say "the law firm," you mean Mr. Farr's law

15  firm?

16  A    Ogletree Deakins.

17  Q    Ogletree Deakins.  And his client was Senator Rucho and

18  Representative Lewis, wasn't it?

19  A    I think you have to ask him who his formal clients are.

20  Q    You don't know?

21  A    Well, I don't -- for sure, Senator Rucho and

22  Representative Lewis were clients, but, officially, there might

23  be somebody else involved.  I just don't know.

24  Q    You don't know.  But that somebody else wasn't the General

25  Assembly as a whole; it was Mr. Farr's law firm, Ogletree

1  Deakins?

2  A    Yes.

3  Q    How many times did you meet separately with the Democratic

4  Caucus while you were drawing these plans?

5  A    I don't recall ever meeting with them.

6  Q    How many times did you meet with the Democratic leadership

7  in the North Carolina General Assembly while you were drawing

8  these plans?

9  A    I didn't meet with them at all.

10 Q    Well, how about joint meetings of the Democrat and

11 Republican leadership?  How many times did you meet in a joint

12 setting with the Democrats and the Republicans to talk about

13 the map you were drawing?

14 A    I don't know that there were any joint sessions, but I

15 didn't meet with -- I already told you I didn't meet either

16 jointly or singularly with the Democratic leadership.

17 Q    Fair to say that you never once talked personally with

18 Representative Mel Watt about the 12th District and the 2011

19 Redistricting Plan, correct?

20 A    Yes, that's correct.

21 Q    It's also fair to say that you've never talked once to

22 Representative G.K. Butterfield, you know, from the 1st

23 Congressional District about the 2001 [sic] Redistricting Plan,

24 right?

25 A    I'm sorry, which plan did you say?

1  Q    2011 Redistricting Plan?

2  A    Okay.  That's true.

3  Q    The fact is you took your directions with respect to

4  drawing these two congressional districts from Senator Rucho

5  and Representative Lewis, right?

6  A    That's correct.

7  Q    Didn't get instructions from any other member of the

8  General Assembly?

9  A    I was responsible to these two individuals for the map,

10 and any map that would have come forth to go into bill form to

11 go to the floor would need their approval.

12 Q    So it's fair to say you answer to them?

13 A    I felt I did.

14 Q    And they gave you directions for drawing the map?

15 A    Yes.

16 Q    But they didn't give you directions in any written

17 document, isn't that true?

18 A    I think I already testified to that in other cases in

19 depositions, yes.

20 Q    Well, you might have, but, unfortunately, you know, I have

21 to bring that up here because these --

22 A    Right, no, I didn't get written instructions.  I'm sorry.

23 Q    So we're not going to see any documents saying, hey, here

24 is the criteria for drawing these maps that they gave to you;

25 so be sure you do X or be sure you do Y?  They didn't do that,

1  right?

2  A    You would find no document that says, to me from them,

3  here is what we want you to do in writing.

4  Q    And there's no email in which they send those same

5  instructions in email?

6  A    No.

7  Q    To the best of your knowledge, there's no written record

8  anywhere of the instructions you got from Senator Rucho and

9  Representative Lewis?

10 A    That's my recollection, yes.

11 Q    Now, Dr. Hofeller, I note you've got a Toshiba laptop,

12 right?

13 A    I do.

14 Q    Runs Windows 7?

15 A    Yes.

16 Q    How many other computers do you have?

17 A    Personally?

18 Q    Yes.

19 A    I have a desktop computer at home.

20 Q    Yes.

21 A    Which I use primarily for personal stuff.  Sometimes I

22 bring items over to email them or print them.  I don't have a

23 printer now working off my Toshiba, so I have to --

24         JUDGE OSTEEN:  All right.  Let's just stick to the

25 numbers for right now.

 1          THE WITNESS:  Yes, Your Honor.  I have this -- I

 2  believe it's a Dell, but I'm not sure.

 3  BY MR. HAMILTON:

 4  Q    The desktop computer at home.  Okay.  Do you have any

 5  other computers at home?

 6  A    There's another computer at home, which my wife uses

 7  exclusively.

 8  Q    Okay.  And how about at work?

 9  A    Well, work is home.

10  Q    So this is -- which is the computer -- so you've got three

11  computers here, one of which is exclusively your wife's.

12  You've got a desktop and a Toshiba laptop, and those are the

13  only two computers that you use in connection with your work?

14  A    Once in a while, if I'm up at the Republican National

15  Committee -- I have an account there.  I would have to say, for

16  all practical purposes, I don't really have a computer there.

17  I would have to log on to somebody else's machine.

18  Q    But you do that --

19  A    I don't do -- I don't really do redistricting work up

20  there --

21  Q    I see.

22  A    -- on districting.

23  Q    Most of your redistricting work is done in your office,

24  which is at home?

25  A    Yes.

1  Q    You save all that information on a computer or hard drive

2  on the laptop?  On the desktop?  Where is it stored?

3  A    Well, the computers all have hard drives, and all the data

4  is stored on those hard drives.

5  Q    So we've been talking about Maptitude, and you testified a

6  moment ago this morning that you did some, you know, kind of

7  what-if maps early in the process, and we've got all these

8  other kinds of maps that are drawn up.  Is that data all saved

9  on your hard drive on your -- on the one Toshiba, or do you

10 have an external drive?  I'm just trying to understand where

11 the information is stored.

12 A    Okay.  The information -- my redistricting computer that I

13 draw plans on is the Toshiba.  It's the only computer that has

14 Maptitude resident on it.  The other computer doesn't.  And the

15 data is all stored on the hard drive, but there's also a

16 backup.

17 Q    A backup electronic hard drive?

18 A    You know, an external disk drive that serves as a backup.

19 I'm not so sure I know how to retrieve data from it because

20 I've never had a disk crash, so I haven't had to scream for

21 help.

22 Q    How often do you back it up?

23 A    Actually, right now, except when I'm on the road, it's

24 being backed up constantly.

25 Q    And you have an email account, right, Dr. Hofeller?  I

1 think we actually read it yesterday in connection with one of

2 the documents we were looking at --

3 A    Well, my wife and I share an email account.

4 Q    And what is that email address?

5 A    Celticheal@aol.com.

6 Q    Okay.  Celticheel?  H-E-E-L at aol dot com?

7 A    C-E-L-T-I-C-H-E-A-L.  My wife wanted to get celtichealer,

8 but the account is so old that they wouldn't give us that many

9 letters.

10 Q    Okay.  And that's the -- and you use email to communicate

11 with people in connection with your business?

12 A    I do.

13 Q    Okay.  And that's the -- but that's the only email that

14 you use for that purpose?

15 A    No, I have an account at the RNC.

16 Q    You have an email account there?

17 A    I do.

18 Q    And what's your address there?

19 A    Thofeller at -- I think it's gop.com now.  It used to be

20 rnchq.org.

21 Q    Are those the only two email accounts you have?

22 A    I have a Gmail account, but I really don't use it.  I

23 think I've only sent one message on it, and it was personal.

24 Q    Okay.  So your -- and then -- so we've got those three

25 email accounts:  The AOL account, the gop.com account, and then

1  this Gmail account that you don't use?

2  A    I opened it up and decided it was too much trouble to use.

3  Q    Totally understand.  Those are the only three email

4  accounts you have?

5  A    Yes.

6  Q    Okay.  And so if someone wants to reach out to you and

7  communicate with you in connection with -- maybe they want to

8  hire you, they would send the email to the celticheal@aol.com,

9  is that right?

10 A    If they were going to communicate to me by email, they

11 might phone me.

12 Q    Well, sure, of course, or meet with you personally; but if

13 they wanted to communicate by email, that's the way they would

14 do it; they would send it to that account?

15 A    Yep, that's true.

16 Q    But you didn't use that account in connection with

17 redistricting in North Carolina, right?

18 A    I don't know what you mean by "that account."

19 Q    That account, the celticheal@aol.com.  If we were to go

20 through your inbox and all the stored email, there would be

21 nothing in there about North Carolina's redistricting because

22 there would be nothing in there, is that right?

23 A    No.

24 Q    There is some information in there?

25 A    I have communicated between myself and my client, the

1  attorneys.

2  Q    With respect to redistricting in North Carolina?

3  A    Yes.

4  Q    So a moment ago you said that you were told that the

5  directions for drawing CD 1 and CD 12 were all oral.  Do you

6  recall that?

7  A    Yes.

8  Q    So the emails that we would see in there, I take it, are

9  not directions relating to the construction of CD 1 and CD 12?

10 A    No.

11 Q    Well, what would they be then if they weren't discussions

12 of how to draw those two districts, sir?

13 A    Well, I wrote a lot of -- I'm sorry.

14         MR. FARR:  Your Honor, I would just like to object at

15 this point in time.  I don't really know what this has to do

16 with his --

17         JUDGE OSTEEN:  Let me see counsel up here at the

18 bench so we don't tip the witness.

19         Dr. Hofeller, sometimes I'll bring counsel up here.

20 I think it'd be awfully hard to have to sit and listen to a

21 discussion about objections to testimony without that shaping

22 testimony.  So sometimes I'll do it at the bench.

23         (Bench conference as follows:)

24         JUDGE OSTEEN:  Okay.  The way I see this going so far

25 is the question about how did you get your instructions to

1   narrow down the field to -- because what we've heard -- the

2   only set of instructions that we've got -- I think it's fair

3   that his having testified that my instructions were oral, these

4   were my clients --

5           THE REPORTER:  I'm sorry, I can't hear.

6           JUDGE OSTEEN:  These were my clients and to ensure --

7   to -- and the instructions were oral to ensure that there's no

8   other source of instructions that would come in to play here.

9   I'm assuming the answer is going to be, no, that I didn't get

10  any other instructions.  It seems to me a little bit of inquiry

11  in terms of what kind of communications.  Well, if it's

12  anything but instructions, without going into the substance of

13  it.  Does that make any sense to you?

14          MR. FARR:  Yes, Your Honor, I would just say that

15  it's hard to ask the witness hypothetical questions about

16  emails that he may or may not have received.

17          JUDGE OSTEEN:  The danger I see is the witness -- I

18  think I'm going to instruct the witness at this point, and

19  these other judges may disagree, just to -- without going into

20  the substantive content is describe the nature of the emails

21  first to confirm, and let's see if that gets us to confirm any

22  formally written instructions.  Does that seem reasonable?

23          MR. FARR:  I would defer to the Court, Your Honor.

24  Again, I just think it's hard for the witness -- I don't

25  remember who emailed me last week.  So it's hard to be

1  responsive to hypothetical questions about what you might have

2  been told in an email or not; and if they have emails, then

3  they ought to show them to him.

4         MR. HAMILTON:  Your Honor, this witness has been very

5  clear from the beginning that there's no writings at all.  This

6  is all done in a verbal way.  I think that's telling and

7  relevant and that --

8         JUDGE OSTEEN:  There aren't any emails on the exhibit

9  list at this point.  So you don't dispute that testimony?

10        MR. HAMILTON:  Well, we just heard for the first time

11 that he's got all sorts of -- well, he's got communications

12 relevant to the North Carolina redistricting in email, just not

13 what he would call --

14        JUDGE OSTEEN:  It's a pretty broad category --

15        MR. HAMILTON:  It is, it is.

16        JUDGE OSTEEN:  -- show up for your deposition

17 (inaudible) --

18        MR. HAMILTON:  Exactly.

19        JUDGE OSTEEN:  The key point to you at this point is

20 simply is there anything in there that might have been an

21 instruction?  I understood his answer to be no.

22        MR. HAMILTON:  Right.

23        JUDGE OSTEEN:  So I'll let you test it a little bit,

24 but I think because we're talking about, as I understood it,

25 communications between this expert engaged by this firm, the

 1  danger of treading into attorney-client communications runs

 2  high, but to the extent -- you're entitled to confirm, as best

 3  you can, that there's no instructions included.

 4          So I'm inclined at this point to instruct him that he

 5  can describe without going into the substantive comment --

 6  content, just the nature of the communications to further

 7  explain no written instructions.

 8          MR. HAMILTON:  And I will try and stay within the

 9  bounds there.

10          JUDGE OSTEEN:  You stay on your toes if he starts

11  drifting.

12          MR. FARR:  And I will just say if he remembers, Your

13  Honor.

14          JUDGE OSTEEN:  If he remembers.

15          MR. FARR:  Okay.  Thank you.

16          (Bench conference concluded.)

17          (Discussion among judges.)

18          (Bench conference as follows:)

19          JUDGE OSTEEN:  All right.  One concern that we all

20  have is to the extent there may -- and I'm not suggesting this

21  happened, but this is an issue.  If there were other

22  instructions given with respect to the map drawing that came

23  through counsel that are contrary to or maybe over and above

24  what he's testified to in terms of the legislature, then I

25  think that would be fair game on inquiry because we've got an

1  issue in there.

2         So at this point I'm going to give the instruction

3  that I talked about; but to the extent there were directives,

4  I'm going to expand it to say to the extent there were any

5  directions given with respect to map drawing, then you need to

6  describe that.  Do you understand that?

7         MR. FARR:  I think so, Your Honor.

8         JUDGE OSTEEN:  So it's without revealing substantive

9  content, describe the nature of the communications with one

10  exception, and, that is, if there were any additional

11  instructions given on behalf of the legislature or given with

12  respect to the drawing of the maps, you need to talk about

13  that, and then we'll have to go through it piece by piece on

14  that.  Is that clear?

15         MR. HAMILTON:  I think so.

16         JUDGE COGBURN:  If the instructions relate to the

17  facts, doing what he was told to do, then that's fair game.  If

18  he's a traditional expert, and he looked at reports (inaudible)

19  was told to do (inaudible) --

20         MR. HAMILTON:  Sure.

21         JUDGE COGBURN:  In other words, you can't

22  (inaudible)--

23         THE REPORTER:  I can't hear.  I don't think that

24  microphone I working --

25         MR. HAMILTON:  Understood, understood.  I'm not

 1  intending -- I don't want to get into Mr. Farr's --

 2          JUDGE OSTEEN:  We want to make sure you all

 3  understood the added component to the instruction I'm getting

 4  ready to give so he knows where we're going.

 5          MR. HAMILTON:  Okay.  I appreciate that.

 6          JUDGE OSTEEN:  Anything you want to add?

 7          JUDGE GREGORY:  No.

 8          MR. FARR:  Thank you, Your Honor.

 9          (Bench conference concluded.)

10          JUDGE OSTEEN:  All right.  Dr. Hofeller, I hope you

11  recall the question.  I'm not sure I fully recall the question,

12  but the question related to email communications that you may

13  have had with counsel in this matter.  And I'm going to

14  instruct you to answer the question with the following

15  instruction:  One, in responding to the question to the best

16  you can, describe the nature of the communications without

17  describing any substantive content of the communications.  Do

18  you follow that?

19          THE WITNESS:  I do, Your Honor.

20          JUDGE OSTEEN:  And second, to the extent you received

21  any instructions in your capacity, as the individual drawing

22  the maps on behalf of the legislature, with respect to the maps

23  themselves or how they were to be drawn, then I need you to

24  describe that through these emails.  Do you understand that?

25          THE WITNESS:  Yes, Your Honor.

 1              JUDGE OSTEEN:  All right.  You may answer the

 2   question.

 3              MR. HAMILTON:  Thank you, Your Honor.

 4   BY MR. HAMILTON:

 5   Q    So let's start with -- you -- I believe we've established

 6   that there are emails that you received relating to

 7   redistricting as a general matter on your email accounts, one

 8   or more of your email accounts, correct?

 9   A    Yes, from all across the country.

10   Q    Okay.  Well, I'm actually interested in whether you

11   received communications directly or indirectly from Senator

12   Rucho or Representative Lewis with respect to drawing CD 1 and

13   CD 12 during the 2011 redistricting cycle in North Carolina?

14   A    I did not.

15   Q    Okay.  So maybe you could describe for us the nature --

16   without getting into the substance of them, the nature of the

17   communications.  I'm trying to understand the line between

18   this -- you received communications about this subject, but you

19   didn't receive instructions.  So I just want to make sure we're

20   talking about it mean -- what an instruction is.

21              Did you receive guidance from Senator Rucho or

22   Representative Lewis with respect to CD 1 and CD 12?

23   A    Via email?

24   Q    Via email.

25   A    No.

1  Q    Okay.  Did you receive instructions from Senator Rucho or

2  Representative Lewis through counsel with respect to how to

3  draw CD 1 or CD 12, and by counsel, I mean --

4  A    Not to my recollection.  I mean, that's been four years

5  ago.  I just don't remember everything, but I do not recall any

6  written instructions on how to draw the two districts you had

7  in mind either directly or indirectly via email.

8  Q    Okay.  And so there was no sort of general guidance, draw

9  CD 1 as a majority-black district or let's talk about politics

10 with respect to CD 12?  Nothing like that we're going to find

11 in your emails?

12 A    To the best of my recollection, yes.

13 Q    All right.  So you were -- did you receive instructions --

14       JUDGE OSTEEN:  Hold on.  To the best of your

15 recollection, the "yes" means you agree with Mr. Hamilton that

16 will not be in your email?

17       THE WITNESS:  To the best of my recollection, it will

18 not be in my emails, yes, Your Honor.

19       JUDGE OSTEEN:  I wasn't sure what the "yes" meant in

20 response to the question.  You may continue.

21       THE WITNESS:  I'm sorry, I apologize.

22 BY MR. HAMILTON:

23 Q    Were you told to restrict your communications to verbal

24 instructions only with respect to CD 1 and CD 12?

25 A    As a general rule in redistricting, also in some cases in

1  life in general, I think a person needs to be pretty

2  circumspect about what they email.  I have general instruction

3  material that I do for people in redistricting and explain to

4  them that emails are forever, and you really should be very

5  circumspect about what you send.  Is that responsive to your

6  question?

7  Q    Sure.

8  A    Okay.

9  Q    And "emails are forever," meaning they can be -- they can

10 be requested in discovery if things go south and there's

11 litigation, correct?

12          MR. FARR:  Objection to the form of the question,

13 Your Honor.

14          JUDGE OSTEEN:  No, he can ask what he meant by the

15 response.

16 BY MR. HAMILTON:

17 Q    What do you mean by "emails are forever"?

18 A    I mean that generally they are resident on your computer

19 as long as the disk drive is available.

20 Q    Right, but you're not --

21 A    And we've seen a lot of that in the national news lately.

22 Q    We're not -- your concern isn't that your hard drive is

23 going to fill up with email.  Your concern when you say "emails

24 are forever" is that the emails might prove what instructions

25 you were given, isn't that true?  That's why you tell people

 1  don't -- be careful with what you send in email?

 2  A    Again, I don't quite agree with the premise of your

 3  question.  I just think that in regard to anything to do with

 4  redistricting, as to plans that are being drawn, it's better

 5  not to do it via email, yes, because it's there.

 6  Q    But what's wrong with it being there, sir?

 7  A    Well, because some discussions you may have while you're

 8  drafting plans or something that's going on may involve ideas

 9  or situations which everybody agrees later are bad ideas and

10  shouldn't be done, and so it might not be wise to debate all

11  these things over what is in the last analysis of public

12  source.

13  Q    Okay.  So you follow -- this is, I take it, some general

14  advice you offer to your redistricting clients wherever they

15  might be?

16  A    Yes.

17  Q    And you followed that practice here?

18  A    Yes.

19  Q    To the best of your recollection, there are no written

20  instructions in email or text messages, paper, stone tablets,

21  carrier pigeons, anything; there's just nothing, right?

22  A    I mean, the term "written instructions" is pretty wide and

23  general.  I mean, there might be an instruction like when are

24  you going to be ready, could you get ready sooner.

25  Q    Okay.

1  A    But if you're talking about instructions on what to draw

2  and how to draw it, no.  I mean, does that answer your question

3  for you?

4  Q    Yeah, I think so.

5  A    Okay.

6  Q    How about -- I'm just -- now you've raised a question in

7  my mind about whether we're defining instructions differently.

8  How about instructions about the black voting-age population to

9  include or exclude within a particular district?  Did you

10  receive those kinds of instructions in any form of writing,

11  including email?

12  A    No.

13  Q    Now, one of the things that Senator Rucho and

14  Representative Lewis instructed you to do was to, quote, avoid

15  setting a racial quota, closed quote, right?

16  A    Again, I'd have to say what was the context of the use of

17  the term "racial quota"?

18  Q    Well, it's in your second report, which is Exhibit D26.1?

19  A    Okay.

20  Q    Do you have it there in front of you?

21  A    I do.

22  Q    Let me direct your attention to paragraph 32 and

23  specifically line 12, and I'll read it, and you tell me if I've

24  read it correctly.  It starts with the words "this, of course,

25  would."  Do you see that?  It's exhibit --

1  A    I'm on page 12.

2  Q    Of D26.1, page 12, paragraph 32, line 12, far right-hand

3  side.

4  A    I got it, I'm sorry.

5  Q    Quote, this, of course, would have been setting a racial

6  quota, a process which the drafters of the new map were

7  instructed to avoid by the chairman of the General Assembly's

8  Redistricting Committee, closed quote.  Did I read that

9  correctly?

10  A    Yes.

11  Q    Does that refresh your recollection that you were

12  instructed to avoid setting a racial quota?

13  A    Okay.  If I may, if I could read the entire paragraph and

14  understand the context of it?

15  Q    Sure.

16  A    Okay.  If I might say, this is with regard to the 12th

17  District?

18  Q    That's fine.

19  A    Okay.

20  Q    But you were instructed to avoid setting a racial quota,

21  correct?

22  A    I was instructed not to use race at all in the

23  construction of that district.

24  Q    Well, sir, that's not what you said in paragraph 32.  And

25  the question I have for you with respect to paragraph 32 is you

 1  were -- you said, "This, of course, would have been setting a

 2  racial quota, a process which the drafters of the new map were

 3  instructed to avoid by the chairman of the General Assembly's

 4  Redistricting Committee."  That's what you wrote in your

 5  report, right?

 6  A    I did, and that was my understanding of what the

 7  instructions meant to me.

 8  Q    Okay.

 9  A    And, that is, to have set a number would be analogous to

10  having a bright line, and there was no bright line.  There was

11  not any line.

12  Q    And those are the instructions you received?

13  A    My instructions were to draw the district as a political

14  district.

15  Q    I'm sorry, sir.  The instructions you received were to --

16  in part, were to avoid setting a racial quota?

17  A    I don't believe I said that those were the instructions I

18  received was not to set a racial quota.

19  Q    Well, then what --

20  A    I believe that -- if a racial quota -- if I had set a

21  racial quota in my mind, that that would have been in violation

22  of the instructions to use race in the drawing of District 12.

23  Q    Well, let's just return to line 12.

24  A    Okay.

25  Q    Paragraph 32, "this would have been setting a racial

1   quota, a process which the drafters of the new map were

2   instructed to avoid" -- now, maybe I stop there.  Maybe this is

3   the problem.   The drafters of the new map, that's you, right,

4   because you're drafting this map?

5   A     Yes.

6   Q     And when we say "were instructed to avoid by," the person

7   who is giving the instructions are the chairman of the General

8   Assembly's Redistricting Committee.  That's Senator Rucho and

9   Representative Lewis, correct?

10  A     Well, perhaps I didn't state that sentence as artfully as

11  I might have.  I was given instructions to not use race.  That

12  was a political district, and it was a political draw.

13  Q     Okay.

14  A     And a quota would be using race.

15  Q     I guess --

16  A     I just want to continue to say, nobody every mentioned the

17  word "quota" to me.  Senator Rucho or Representative Lewis,

18  they didn't use the word "quota."

19  Q     Okay.  So the instructions that are described in 32,

20  paragraph 32 of your report, you didn't receive those?  You

21  didn't receive -- you weren't instructed to avoid a racial

22  quota?

23  A     I was instructed to use race in any form except perhaps

24  with regard to Guilford County.

25  Q     Now, we can't actually test that because we don't actually

 1  have the instructions you received.  Those must have been in

 2  person or by telephone, right?  They weren't in any email or

 3  document?

 4  A    I think -- I've stated many, many times that District 12

 5  in 1997 was justified and accepted as a politically drawn

 6  district.  It was drawn as a political district in 2001, and

 7  the instructions were to treat it in the same manner as it was

 8  treated two times before.  The only difference is the politics

 9  of the district were going to be different because the

10  policy -- the political policy goals of the Republican majority

11  were different than the political policy goals of the

12  Democratic majority in the previous redistricting.

13  Q    Understood, but that, of course, was not an answer to the

14  question that I asked you.  So let me ask it again.

15          You understood from your instructions that use of a

16  racial quota would be improper in any context?  Whether it's CD

17  12 or any other district, a racial quota is inappropriate,

18  isn't that true?

19  A    In that district, yes.

20  Q    In any district, using a fixed numerical racial quota is

21  illegal; you know that?

22          MR. FARR:  Objection, Your Honor.  I thought he

23  wasn't a legal expert.

24          JUDGE COGBURN:  If he knows.

25          JUDGE OSTEEN:  Yeah.  I'll let him answer to the

1  extent of his understanding with the caveat he's not an expert.

2  BY MR. HAMILTON:

3  Q    Can you answer the question, sir?

4  A    The answer to your question is with regard to North

5  Carolina District 1 and District 12, the instruction was to

6  draw District 1 with a black VAP level of 50 percent or more.

7  The instructions for District 12 was to treat it as a political

8  district.

9  Q    You're understanding -- you've drawn maps in states all

10 across the United States, right?  Been involved probably in

11 redistricting probably longer than I've been alive.  You have a

12 pretty good understanding of --

13 A    Are you over 50?

14 Q    You have a pretty good understanding of what's permissible

15 and what's not permissible in drawing maps in redistricting?

16 A    Well, what's permissible and not permissible is in a

17 constant state of evolution.

18 Q    Okay.  Fair enough.

19 A    Okay.  So I try and keep abreast of it because I'm not a

20 lawyer.

21 Q    Fair enough.  I think we've established that.  As we sit

22 here today, you know, that, for example, using a 55 percent

23 fixed numerical percentage of black voting-age population would

24 be improper, isn't it true?

25 A    Again, you're asking me to draw a legal conclusion.  I

1   think perhaps after some of the cases that are ongoing come to

2   their ultimate conclusion, that might be different.

3   Q    But you don't know right now?  As you sit here today, you

4   don't know whether using a 55 percent black voting-age

5   threshold to create a district would be proper or improper?

6   You don't know; the law is in a state of flux?

7            MR. FARR:  Your Honor, this is an argument over the

8   law between the lawyer and the witness.

9            JUDGE OSTEEN:  Yeah, he said he doesn't know.  Let's

10  move on, Mr. Hamilton.

11           MR. HAMILTON:  All right.

12  BY MR. HAMILTON:

13  Q    At the end of this process, sir, you never appeared before

14  the General Assembly to explain the methodology you used to

15  draw the maps, correct?

16  A    Yes.  Yes, you're correct, I did not appear.

17  Q    And you never appeared in any forum to allow the

18  membership of the General Assembly as a whole to ask you

19  questions about the maps?

20  A    That's true.

21  Q    Never appeared before the Democratic Caucus?

22  A    I did not.

23  Q    Never appeared before the Black Caucus to describe your

24  maps and how you drew them?

25  A    I did not.

1  Q    Didn't meet with Representative Butterfield?

2  A    I did not.

3  Q    Didn't meet with Representative Watt?

4  A    I did not.

5  Q    And you certainly never released a public statement saying

6  that either of these districts were political gerrymanders

7  designed to benefit Republicans and disadvantage Democrats,

8  right?

9  A    I'll answer that yes, but I would like to clarify that by

10 saying that it never would have been my job as a redistricting

11 consultant to the two chairmen of the respective committees to

12 explain or speak for the map.  It was their map that they were

13 presenting for approval to the legislature, and it would have

14 been their job to explain the map, not mine.

15 Q    Okay.  Fair enough.

16 A    I don't know in any circumstance in any state with

17 partisan map drawing where a line-drawing consultant, or even

18 many experts, would be asked to get up and explain the map to a

19 legislative body as a surrogate for the legislative leadership.

20 It would be kind of incomprehensible to me.

21 Q    So the answer is you never released a public statement;

22 it's not your job to do that?

23 A    That's right.

24 Q    Okay.  And you never said it publicly in a speech or other

25 public statement not in writing that this was a political

1  gerrymander designed to advantage Republicans and disadvantage

2  Democrats?

3  A    You mean after the fact, after it was --

4  Q    No, at the time the legislature was considering this?

5  A    While they were considering it?

6  Q    Um-hum.

7  A    No.

8  Q    Never said that in an email?

9  A    Not that I can recollect.

10 Q    So in all this discussion about the political goals of the

11 map, the General Assembly, as a whole, never heard that

12 explanation, at least from you, at the time they adopted this

13 map?

14 A    Not from me.

15 Q    Neither did the Democratic Caucus; they never heard it

16 from you either, did they?

17 A    No.

18 Q    And neither did the Black Caucus?

19 A    No.

20 Q    Now, let's talk a little bit about the specific

21 instructions you received from Senator Rucho and Representative

22 Lewis.  They told you to draw the map in such a way as to pass

23 muster under both Section 2 and Section 5 of the Voting Rights

24 Act, correct?

25 A    That was one of the criteria that they enunciated, yes.

1  Q    And you knew it was an important criteria?

2  A    Of course.

3  Q    And you knew that the Voting Rights Act would be an issue

4  in drawing at least some of the districts in North Carolina

5  this cycle?

6  A    Well, it'd certainly be an issue because it had to be

7  precleared under Section 5.

8  Q    Right.  And there were at least 40 counties in North

9  Carolina that are covered by -- that at the time were covered

10 by Section 5, correct?

11 A    Yes.

12 Q    So in order to comply with Section 5 of the Voting Rights

13 Act, you have to make sure there's no retrogression in those

14 covered counties, is that right?

15 A    It would be wise to avoid a retrogression, although I

16 think when you talk about retrogression of a voting rights

17 district, you're talking really about retrogression of the

18 district.  I mean, just as a hypothesis, if you're drawing a

19 map and you're drawing a minority district, it may actually

20 move out of one county and into another county.  So you're

21 looking at retrogression of the district.

22 Q    Okay.  Fair enough.  But the key in -- the key question is

23 whether the minority community has the ability to elect and

24 whether the drawing of the district has retrogressed, or

25 impaired, the ability of the minority community to elect the

 1  candidate of its choice.  Isn't that the test under Section 5?

 2          MR. FARR:  Objection.

 3          MR. HAMILTON:  Your Honor, he received instructions

 4  to avoid this very problem.  If he doesn't understand it and he

 5  doesn't know, then he can say that.  I'm not examining him --

 6          JUDGE OSTEEN:  Well, let's take him through step by

 7  step.  He received instructions, but if you want to go

 8  specifically through what the instructions were or what his

 9  conclusions were and so on -- but it seems to me you've gone

10  from that instruction directly to what's his opinion on what

11  Section 5 requires, which takes us immediately into a legal

12  conclusion.  So let's rephrase the question.

13          MR. HAMILTON:  I will.

14  BY MR. HAMILTON:

15  Q    Let me back up.  You received instructions to comply with

16  the Voting Rights Act, and specifically with Section 5 of the

17  Voting Rights Act, in drawing these districts, correct?

18  A    I received an instruction that said because of the fact

19  that District 1 was a voting rights district, it had been from

20  its very inception from the '90s on, because of the Voting

21  Rights Act, it was to be drawn at 50 percent plus.

22  Q    And did you understand what the term "retrogression"

23  meant?

24  A    Well, sometimes it means different things to different

25  people in different concepts, but my --

1  Q    Did you -- I'm sorry.

2  A    I'm sorry.  But my general academic view of it is is the

3  minority ability to elect the preferred candidate of their

4  choice enhanced or made less.

5  Q    Right.  So it would be in your understanding -- just

6  asking you to elaborate on that a little bit.  If the ability

7  to elect is impaired, then your understanding is there would be

8  retrogression?

9  A    Yes, but, then again, I'm not deciding a legal case.  I

10  didn't have to decide with regard to District 1 exactly what

11  that meant because the instruction was very clear as to what

12  was required both racially and politically on that district.

13  Q    Let me direct you to the tab in the witness notebook in

14  front of you with your name on it, and it's the tab marked Tab

15  700, and it's an excerpt from the Federal Register.  I just

16  want to know if you -- you mentioned a moment ago that

17  different people interpret retrogression in different ways, and

18  I'm wondering have you ever seen the Department of Justice's

19  guidance on retrogression under Section 5 that was issued in

20  connection with this redistricting cycle?  Did you see this?

21  A    I indeed did see it, yes.

22  Q    Okay.  So let's -- and you reviewed it in connection with

23  drawing these maps?

24  A    I would say I would be more apt to say I reviewed it in

25  general with drawing maps all over the country.

1   Q    So let me direct your attention to page 7471, which is on

2   the third page of this document?

3   A    I'm there.

4   Q    Okay.  And at the right-hand column, I'm going to read it

5   and ask if you noticed -- if you read this part of the

6   guidance, quote:

7             A proposed plan is retrogressive under Section 5 if

8   its net effect would be to reduce minority voters' effective

9   exercise of the electoral franchise when you compare it to the

10  benchmark plan."  And then it cites a Supreme Court case.

11            "In 2006, Congress clarified that that means the

12  jurisdiction must establish that its proposed redistricting

13  plan will not have the effect of diminishing the ability of any

14  citizen of the United States because of race, color, or

15  membership in a language minority group defined in the Act to

16  elect their preferred candidate of choice, closed quote.

17            You saw that?

18  A    I did.

19  Q    And you understood that the ability to elect was important

20  to that analysis?  That's consistently your understanding?

21  A    That's what the Justice Department says is required.

22  Q    Okay.  So let's look on a little bit further in this

23  guidance, the next full paragraph starting with "in

24  determining," far right column, same page, 7471:

25            "In determining whether the ability to elect exists

1  in the benchmark plan and whether it continues in the proposed

2  plan, the Attorney General does not rely on any predetermined

3  or fixed demographic percentages at any point in the

4  assessment.  Rather, in the Department's view, this

5  determination requires a functional analysis of the electoral

6  behavior within the particular jurisdiction or election

7  district, closed quote.

8           Did I read that correctly?

9  A    Yes.

10 Q    And that's also consistent with your understanding, isn't

11 it?

12 A    Well, it's what the Justice Department has said that is

13 required.

14 Q    And you were certainly aware that at least the Justice

15 Department believes that a functional analysis was important in

16 determining whether a plan is retrogressive?

17 A    That's what they say, yes.

18 Q    Okay.  And then one last piece of this, and then we'll

19 move on.  In the lower right-hand corner, far right column,

20 page 7471, words begin "therefore":

21           "Therefore, election history and voting patterns

22 within the jurisdiction, voter registration, and turnout

23 information and other similar information are very important to

24 the assessment of the actual effect of a redistricting plan,

25 closed quote.

 1           Do you see that?

 2   A    I do.

 3   Q    And that's consistent with your understanding of the

 4   Justice Department's view of retrogression?

 5   A    I'm certainly not going to argue with the Justice

 6   Department about what they say, yes.

 7   Q    And it's consistent with your understanding of their

 8   position?

 9   A    That's true, yes.

10   Q    And it doesn't really matter what attributes there are to

11   a map if it doesn't get precleared.  That's sort of a pretty

12   important part or was a pretty important part of adopting a

13   redistricting map that's in a covered jurisdiction, correct?

14   A    Well, yes, if the plan doesn't get precleared, you're

15   going to have to redraw it or litigate it.

16   Q    Now, the map -- your map -- the maps that were drawn here,

17   Section 1 and Section 12, they were both precleared, correct?

18   A    Yes.

19   Q    So there was no problem, at least from the Justice

20   Department's point of view, with preclearance, right?

21   A    That's true.

22   Q    You weren't surprised by that decision, were you?

23   A    No.

24   Q    I mean, in fact, the black voting-age population in CD 1

25   increased rather than holding steady or decreased, so there

1  really was no question that there was going to be preclearance,

2  correct?

3  A    That would have been my understanding, but, you know, with

4  the Justice Department, you never know.

5  Q    Now, with respect to Section 2, it was your understanding

6  that the 1st Congressional District was to be known as a Voting

7  Rights Act district, correct?

8  A    Once again, my instructions from the chairman of the two

9  committees was because of the Voting Rights Act and because of

10 the *Strickland* decision that the district had to be drawn at

11 above 50 percent.

12 Q    Okay.

13 A    I didn't really have to interpret in that case, and I

14 would have left that interpretation up to the attorneys

15 involved.  As it turns out, it's my understanding they were

16 advising the chairman of the committee.

17 Q    Sure.  And whatever that discussion was, it filtered back

18 to you with the express instruction you have to draw CD 1 as

19 50 percent black voting-age population plus one?

20 A    That was my instruction.

21 Q    And there were no -- there's no question about that here;

22 you had to consider the race of the population as you were

23 moving -- you were drawing the lines of CD 1, moving population

24 in, moving population out.  You had to be looking at the race

25 of the voters in order to do that because that's the only way

1  you can make sure that you were going to get the 50 percent

2  plus one, right?

3  A    Well, if you add 97,000 people to the district, which is

4  underpopulated, and you add areas in that are not large enough

5  and you take areas out that are high enough in percentage and

6  you take areas out that are very low in percentage, you have to

7  make sure that in the end it all adds up correctly, yes.

8  Q    And when you say "adds up correctly," you mean adds up by

9  the racial totals, black, white, and whatever other category?

10 A    Well, the percentage total, yes.

11 Q    Percentage totals?

12 A    Yes.

13 Q    So just to be clear, and then I'll move on, you did, in

14 fact, consider race in drawing CD 1?

15 A    Yes, but I also considered many other factors, too.

16 Q    Fair enough.  But to achieve the 50 percent black

17 voting-age population for CD 1, you had to either move black

18 voting-age population into CD 1 or white voting-age population

19 out in order to achieve that 50 percent total.  No other way to

20 do it, right?

21 A    Well, the net result had to be 50 percent.

22 Q    Now, the instructions you received didn't give you

23 discretion, well, you know, if you feel like it or as long as

24 it's consistent with other goals to get to 50 percent .1, or

25 plus one, it was this is -- this is what's going to be -- it

1   has to be at least 50 percent plus one, and then, beyond that,

2   you can go up one if you want, true?

3   A    I don't think I would characterize it quite that way.  I

4   can go as high as I want.

5   Q    Okay.  But the -- okay.  Well, then, you had to be -- but

6   it's -- the instructions you received was it had to be

7   50 percent black voting-age population plus one and -- period,

8   regardless of any other goals you might have?

9   A    Well, I certainly didn't interpret it that it had to be

10  exactly 50 percent plus one, if I understand your question

11  correctly.

12  Q    And I'm not trying to play games here, but it had to be --

13  it had -- the floor was 50 percent plus one, and then it had to

14  be in some range -- reasonable range right above that?

15  A    Yes, but there were no limits on that range.

16  Q    Okay.  All right.  Fair enough.  But there was a limit on

17  the range going down?  It had to be 50 percent plus one; it

18  couldn't be anything less than that?

19  A    That's correct.

20  Q    Regardless of any other --

21  A    But there are many ways that that district could have been

22  drawn to achieve that.

23  Q    Sure, but the one nonnegotiable one -- the criteria was it

24  had to be 50 percent black voting-age population plus one in

25  addition, of course, to --

```
 1              MR. FARR:  Objection --

 2              THE WITNESS:  I'm sorry.

 3              MR. FARR:  -- to the term "nonnegotiable."

 4              JUDGE OSTEEN:  All right.  I'll allow it.  We

 5    understand your point.  You can move on.

 6              MR. HAMILTON:  Okay.

 7              THE WITNESS:  Am I answering the question?

 8    BY MR. HAMILTON:

 9    Q    No, you don't need to.

10    A    Okay.  Thank you.

11    Q    Let's turn to Plaintiff's Exhibit 11, and it's behind --

12    it's in the notebook in front of you behind the Tab 11.  Do you

13    see that?

14    A    Yes.

15    Q    Now, this is an email from you to Joel Raupe, is that

16    right?

17    A    Yes.

18    Q    Am I pronouncing the name correctly?

19    A    Yes.

20    Q    Who is Joel Raupe?

21    A    Joel Raupe was retained, I believe, by the legislature to

22    give general assistance to plan drafting and analysis.

23    Q    And is he a lawyer?

24    A    No.

25    Q    So he's another redistricting consultant that does the
```

 1  same sort of thing that you do?

 2  A    I wouldn't say he does the same thing I do.

 3  Q    I'm sure there are very few who do.

 4  A    Okay.  With regard to this project, he was a minor person.

 5  Q    Okay.  And so you were emailing him on a Sunday at

 6  5:26 p.m. in June of 2011, attaching a congressional map, is

 7  that right?

 8  A    Yes.  I was essentially -- I don't recall completely, but

 9  I was probably at that time up north in the DC area, Washington

10  DC area, I'm sorry.

11  Q    And this email, it's from -- it says Tom

12  Hofeller-redistricting.  We can't see the actual email address

13  here, but do you know which email address that's from?

14  A    At that point it would have been THofeller@rnchq.org.

15  Q    So that's the one you described a little while ago that

16  you said now it's GOP.  This is the earlier version of the same

17  account?

18  A    Yes.  It's -- actually, both addresses work now, which

19  means I get twice as much junk mail.

20  Q    All right.  So in the email you say, quote, here is my

21  latest version of the congressional map.  It puts the county

22  back together.  It corrects some boundary line errors and

23  smooths out the boundaries of the 1st Congressional District

24  while maintaining its majority African-American status.  I hope

25  that the issues on the majority districts in the House plan get

 1  resolved," signed Tom.

 2          Is that what you wrote?

 3  A    That's right there in my email, yes.

 4  Q    And so what we're doing here -- when you say "maintaining

 5  its majority African-American status," you mean keeping the

 6  black voting-age population at 50 percent or higher, correct?

 7  A    That would be correct.

 8  Q    And why were you sending this to Mr. Raupe?

 9  A    I was sending it to Mr. Raupe in case the chairman of the

10  committee wanted to see the map where it was at that time.  If

11  we're going to talk about the map, for instance, it's pretty

12  hard for them to talk with me about the map if they can't see

13  the map.

14  Q    Sure.  Fair enough.

15  A    Okay.

16  Q    You're familiar with the concept of traditional

17  redistricting principles?

18  A    I am.

19  Q    And keeping existing precincts intact is a traditional

20  redistricting principle, no?  Isn't it?

21  A    It's described that way by some, yes.

22  Q    So is respecting -- well, let me ask you:  What do you

23  mean by "it's described by some"?  You don't consider keeping

24  existing precincts intact as a traditional redistricting

25  principle?

1  A    I think, all things considered, it's probably better to

2  split less precincts; but, remember, a precinct is an

3  administrative unit, and one of the problems that we have in

4  North Carolina -- I can say "we" because I live here now -- is

5  the precincts are very large and, in some cases, very

6  irregularly shaped, and in many cases, their boundaries don't

7  follow community-of-interest lines of any sort.  There's one,

8  for instance, in Lee County that I think has 17,000 people in

9  it, and it goes a long way.

10          So some states' precincts or, as we call them

11  sometimes, VTDs are much easier to deal with than other states'

12  VTDs because of the way the policies that the different

13  counties or states have in drawing them.  I wouldn't rate that

14  high on the list of established redistricting principles, and,

15  in fact, that hasn't always been the case in North Carolina.

16  Q    Okay.  How about respect for county lines?  That's a

17  traditional redistricting criteria, isn't it?

18  A    It is.

19  Q    Now, because CD 1 was treated as a Voting Rights Act

20  district, you sometimes treated traditional redistricting

21  criteria a secondary importance when drawing the map, correct?

22  A    Sometimes it wasn't possible to adhere to some of the

23  traditional redistricting criteria in the creation of the

24  district, and the more important thing was to make a district

25  which would achieve preclearance and follow the instructions

1    that I had been given by the two chairmen.

2              MR. HAMILTON:  Your Honor, may I approach the easel?

3    BY MR. HAMILTON:

4    Q    All right.  Let me direct your attention to Exhibit 67.

5    It's in the notebook in front of you behind the tab numbered

6    67, and if I could have Ms. Herring put that up on the screens.

7    Let me direct your attention to page 7 and specifically

8    paragraph 7 of this exhibit.  Tell me when you're there.

9              Did you find where we are, Dr. Hofeller?

10   A    Yes.  I'm reading it.

11   Q    Oh, okay.

12   A    Okay.

13   Q    So in the last part of this paragraph -- well, first of

14   all, what is this document?

15   A    This is a public statement issued by Senator Rucho and

16   Representative Lewis regarding the proposed Congressional map

17   released, I guess, around July 1, 2011.

18   Q    Did you assist in putting this together?

19   A    No.

20   Q    So this would be the sort of statement that was issued to

21   the General Assembly at the time the redistricting plans were

22   put before the General Assembly?

23   A    Well, again, I think you would have to talk to them.  I

24   think their purpose was just to make a public statement.  So

25   certainly the members of the General Assembly would have this.

1   I'm not sure it was designed specifically for them.  I think it

2   was a general public statement.

3   Q    You've seen this before?

4   A    Before today?

5   Q    Yes.

6   A    Yes.

7   Q    Okay.  So let's start with paragraph 7 in which Senator

8   Rucho and Representative Lewis are talking about whole counties

9   and whole precincts.  Do you see that?

10  A    I do.

11  Q    And the last sentence there:  "Most of our" -- well,

12  actually, let me -- I'll just read the whole paragraph:

13          "Counties and precincts are two specific examples of

14  communities of interest.  Like other interests, they must be

15  balanced.  We've attempted to respect county lines and whole

16  precincts when it was logical to do so and consistent with

17  other relevant factors.  Our plans include 65 whole counties.

18  Most of our precinct divisions were prompted by the creation of

19  Congressman Butterfield's majority-black 1st Congressional

20  District or when precincts needed to be divided for compliance

21  with the one-person, one-vote requirement."

22          Do you see that?

23  A    I do.

24  Q    So when it was necessary to split precincts in CD 1 in

25  order to draw a majority-black voting age population, they were

1  split, true, when it was necessary?

2  A    Again, I'm not quite sure on the chronology of this

3  statement, how it relates to the release of which map.  I can

4  tell you that Congressman Butterfield objected to the first

5  congressional plan that was released.

6  Q    But that's not my question, sir.  My question is --

7          MR. FARR:  Can he answer his question, Your Honor?

8          JUDGE OSTEEN:  Yeah, let him --

9          MR. HAMILTON:  Your Honor, he's not answering the

10 question.  I am trying to be --

11         MR. FARR:  Yes, he is.

12         JUDGE OSTEEN:   I think he's explaining his answer.

13 So let's go back.  The question -- well, state the question

14 again, and then if you can answer the question yes or no, do

15 so, and then you may explain your answer.

16 BY MR. HAMILTON:

17 Q    So when it was necessary to split precincts to draw

18 Congressional District 1 with a majority black voting-age

19 population, they were split, isn't that true?

20 A    That would be one reason, yes.

21 Q    And the same thing was true for the counties?  When it was

22 necessary to split a county in order to achieve a 50 percent

23 plus one black voting-age population in CD 1, they were split?

24 A    Yes, but I could give a better, more complete answer if I

25 understood the chronology of and the relationship of this

 1  particular document to the release of which plan.

 2  Q    Okay.  Let me direct your attention to page 1 of this

 3  document.

 4  A    Okay.

 5  Q    Second paragraph, first page:  "Today, we are pleased to

 6  release our proposed 2011 congressional plan, closed quote.

 7          Does that help establish the chronology that this was

 8  a statement issued by Senator Rucho and Representative Lewis on

 9  the day that they released the congressional plan?

10  A    I understand the day when it was released.  I don't

11  recall, five years later, whether that was the statement in the

12  release, and with regard to the release, the first plan or the

13  second plan.

14  Q    All right.  Now, there's nowhere in this statement, is

15  there, where Senator Rucho or Representative Lewis explained

16  that this is a political gerrymander designed to assist

17  Republican candidates and disadvantage Democratic candidates?

18  They don't say that in here anywhere, do they?

19  A    You know, I'd have to read the whole statement to know

20  that for sure, but --

21  Q    Well --

22  A    -- I would say from my experience that public statements

23  that are made on redistricting plans sometimes do not state

24  political goals because the politicians don't want to state

25  them publicly.

```
 1  Q     I see.

 2  A     I think everybody -- from my knowledge and everything that

 3  I heard and saw, everybody understood in the state, Republicans

 4  and Democrats, that since Republicans were drawing the map, the

 5  Republicans would be drawing the map to the advantage of

 6  Republican candidates and incumbents.

 7  Q     Well, that's not, of course, what this statement says, is

 8  it?

 9  A     No.

10  Q     Okay.  Let's look at what it actually says.  From the very

11  beginning -- the first sentence:  "From the beginning, our goal

12  has remained the same:  The development of fair and legal

13  congressional and legislative districts, closed quote.

14          Do you see that?

15  A     Yes.

16  Q     And then there is a discussion at the very end of the

17  document about creating more competitive districts, page 7, but

18  down at the bottom of the page now.

19  A     Um-hum.

20  Q     And it says:  "The federal and state constitutions allow

21  legislatures to consider partisan impacts in making

22  congressional redistricting decisions.  While we have not been

23  ignorant of the partisan impacts of the districts we have

24  created, we have focused on ensuring that the districts will be

25  more competitive than the districts created by the 2001
```

1  legislature.  Along those lines, we wish to highlight several

2  important facts.  First, in 12 of our proposed 13 districts in

3  the 2008 General Election, more voters voted for Democratic

4  candidates for attorney general, Roy Cooper, than those who

5  voted for the Republican candidate.

6        "Second, registered Democrats outnumber registered

7  Republicans in 10 of our proposed 13 districts.  And, finally,

8  the combination of registered Democrats plus unaffiliated

9  voters constitutes very significant majorities in all 13

10 districts, closed quote.

11        Did I read that correctly?

12 A    Yes.

13 Q    There's nothing in there about a partisan gerrymander

14 designed to assist Republican candidates and disadvantage

15 Democratic candidates, isn't that right?

16 A    That's true, but I think that everybody, again, reading it

17 would know that the vote for Democratic Attorney General

18 Candidate Roy Cooper was an extremely high victory margin, and

19 also talking about registration is not talking about expected

20 election outcomes.  That's precisely why we don't use them in

21 drawing plans.

22 Q    Sure, but in putting together this statement and issuing

23 it for the consideration of the General Assembly in assessing

24 the plan they were releasing, this is what they said.  They

25 didn't say anything about not using voter registration or the

 1  extremely high turnout or -- they simply said nothing of the

 2  sort.

 3  A    No, it was just a public statement.

 4  Q    Just a public statement --

 5  A    Yes.

 6  Q    -- for consideration by the General Assembly in

 7  considering its plan?

 8  A    To take it as they understood it.

 9          MR. HAMILTON:  Your Honor, I'm about to switch

10  topics.  I'm happy to continue, but it's 12:30.

11          JUDGE OSTEEN:  How much longer do you think you have?

12          MR. HAMILTON:  Probably another hour.

13          JUDGE COGBURN:  Are we going to get through today?

14          MR. HAMILTON:  Oh, absolutely.

15          MR. FARR:  Your Honor, we're going to have to have

16  some redirect on this witness, and we have two more witnesses.

17          MR. HAMILTON:  I can go through at lunchtime and see

18  what I can do to shorten it up.

19          JUDGE OSTEEN:  If you'll use your lunch to make the

20  examination more compact by way of a Reock -- I can't even

21  pronounce the word right now.  If you'll use it to make it more

22  compact -- how about we stick to maybe 45 minutes for lunch.

23  All right.  Let's take a 45-minute lunch recess.

24          (At 12:36 p.m., break taken.)

25          (At 1:20 p.m., break concluded.)

 1          JUDGE OSTEEN:  All right.  A couple quick

 2   housekeeping matters.  Because we have law clerks over here,

 3   today I'm going to ask all the spectators to stay around in the

 4   back part of the gallery.  I don't anticipate -- ordinarily,

 5   that part is open, but it's a little different seating

 6   arrangements, so stay around to that side.

 7          In anticipation of the fact that it may look like a

 8   four-alarm fire drill when we end this case and everybody

 9   leaves, in case I forget, to allow for the preparation of an

10   expedited transcript, which we think will be done and completed

11   on Monday, we're going to extend the findings of fact deadline

12   to the following Monday.  We're going to give an extra three

13   days to allow for preparation of that transcript.

14          MR. HAMILTON:  Thank you, Your Honor.

15          JUDGE OSTEEN:  So I would say, unless something

16   changes, proposed findings of fact and conclusions of law --

17   and, frankly, if you're going to get a transcript, I would like

18   citations in the findings of fact so we know where in the

19   record to go.  That will be due Monday, if my math is correct,

20   October 26 by 5:00.

21          MR. SPEAS:  Your Honor, if I may raise one more

22   housekeeping matter?  We've been keeping up with the time, and

23   our understanding was that the time would be divided equally.

24   Assuming six-hour court days, the defendants have exceeded

25   their time at this point.  We just wanted to bring that to the

1   Court's attention.

2          JUDGE OSTEEN:  When did you all start yesterday?

3   About 11?

4          MR. FARR:  Yes, Your Honor.  I mean, I didn't know

5   that anyone was keeping track of it.  We certainly didn't hear

6   that from the Court.

7          JUDGE OSTEEN:  Well, yeah, that's an agreement

8   between the parties.  We did -- the anticipation was, certainly

9   as expressed, that the time would be divided equally.

10          With cross-examination, I mean, it's -- if we're

11  going to get through today, then everything is going to have to

12  be shrunk or compacted from here on out to move through.  This

13  is not a jury trial.  All of the judges up here know how to

14  find facts, listen to the evidence, and draw reasonable

15  conclusions; and these two can get it on one try, and I

16  guarantee you I can get it without having heard it twice.  So

17  let's remember that and keep on moving for the rest of the

18  time.  We'll just do the best we can.

19          At this point, I will say, Mr. Speas, I don't have

20  any sense that the defendants have -- by comparison, that the

21  defendants have unfairly prolonged their part, but if everybody

22  can keep moving --

23          MR. SPEAS:  I just note for the record that by our

24  records, they have -- we have used 6 hours and 54 minutes.

25  They have used 9 hours and 24 minutes.

 1          JUDGE OSTEEN:  Well, it feels like everybody used 60

 2   hours.  So let's just move along as best we can.

 3          MR. HAMILTON:  Thank you, Your Honor.

 4   BY MR. HAMILTON:

 5   Q    Dr. Hofeller, I put back up the table of election results

 6   from the 1st Congressional District, and that's behind Tab 1 in

 7   your notebook, if you would like to look at it; and I will ask

 8   you to assume with me that the black voting-age population

 9   numbers are accurate.  They're drawn from other documents in

10   the record, but assuming those are true, it is -- it's fair to

11   say, first looking at the percentage of vote in all these

12   elections from 1992 to 2014, in the 1st Congressional District,

13   I think you testified earlier that it was the African-American

14   candidate of choice won decisively, correct?

15   A    I did.

16   Q    Okay.  And so something -- something is going on here.  In

17   every election, there was a significant number of other voters

18   that were voting with the African-American community in those

19   districts that brought their vote total up considerably.  So

20   let me give you a specific example.  1998, the black voting-age

21   population in CD 1 was 46.54 percent.  Do you see that?

22   A    Yes.  And I might ask, do you mean BVAP or do you mean

23   T-BVAP?

24   Q    The black voting-age population we're using is any part

25   black?

1          MR. FARR:  For what year is that?

2          MR. HAMILTON:  I just randomly picked one as 1998.

3          THE WITNESS:  Okay, well, yes, it's 46.54.

4   BY MR. HAMILTON:

5   Q    And, yet, Eva Clayton, the African-American candidate of

6   choice, received 62.24 percent of the vote, correct?

7   A    That's correct.

8   Q    So we don't need to do a lot of fancy calculations here to

9   understand that there was a significant number of white voters

10  who crossed over and voted with the African-American community

11  in order to yield that kind of a winning percentage, correct?

12         MR. FARR:  Objection.

13         THE WITNESS:  Yes, we -- we don't know precisely --

14  for purposes of analyzing the votes as opposed to drawing a

15  district, I would -- it would be interesting to see what the

16  turnout figures were.

17  BY MR. HAMILTON:

18  Q    Sure, but as a functional or as a practical matter, there

19  was a sufficient number of white voters who voted with the

20  African-American community to elect those candidates by

21  decisive margin in each one of these elections, right?

22         MR. FARR:  Objection, Your Honor.  There's no

23  foundation for that.

24         JUDGE OSTEEN:  Well, I'm going to see -- I'm going to

25  allow him to answer.

 1          THE WITNESS:  I think that even taking into account

 2    that there are other races involved, that it was certainly

 3    significant number -- amount of crossover.  Of course, how much

 4    you get in the election, too, depends on the candidates that

 5    are running and the kind of campaigns they're running and

 6    whether it's a serious candidacy, et cetera, but I think that's

 7    the case.  We just don't know what the turnout was, how many

 8    people actually voted and how many people were registered.

 9    BY MR. HAMILTON:

10    Q    Sure.  And between 1998, when the plan was -- the 1997

11    plan was first implemented, and the 2012 election, in each of

12    those instances, the black voting-age population was less than

13    50 percent, isn't that right?

14    A    Between 1998 and 2010, yes.

15    Q    And, yet, in each of those elections, the African-American

16    candidate won?

17    A    Yes, another consideration you would also want to know is

18    what is the percentage of non-Hispanic whites, but, okay, I'll

19    go with that.

20    Q    So by definition, at least in CD 1, there wasn't racially

21    polarized voting in CD 1 sufficient to prevent the

22    African-American community from electing their candidate of

23    choice.  We know that, don't we?

24          MR. FARR:  Objection, Your Honor.  There's been no

25    polarization study offered.

1      JUDGE OSTEEN:  Well, he's an expert on -- I think it

2 included voter behavior, or something of that effect.  So to

3 the extent he can -- I'll allow the question to the extent he's

4 able to respond.

5      THE WITNESS:  Again, if you're going to do a

6 polarization study, you might not know what the degree of

7 polarization would be for the ability of black candidates to

8 elect their preferred candidate of choice unless you looked at

9 election and registration data and also if you looked at other

10 races in the area.  Again, these are -- these are strong

11 Democratic districts, and I don't think they're heavily

12 contested.

13 BY MR. HAMILTON:

14 Q    Okay.  They're strong Democratic districts, not heavily

15 contested with a black voting-age population of less than

16 50 percent, but, nonetheless, they're able to elect the

17 African-American candidate of choice in every one of those

18 elections between 1998 and 2012?

19 A    Yes, but I'm not sure which -- to the extent that the BVAP

20 measures that, the amplitude of it.

21 Q    By the way, as long as we are talking about polarized

22 voting analyses, you didn't do a polarized voting analyses for

23 the General Assembly at the time that you were preparing these

24 maps, correct?

25 A    That's true.

1  Q    And one of the things that happened in CD 1 is that you

2  moved Durham County -- or part of Durham County into CD 1 that

3  hadn't been there before, correct?

4  A    I did, and the reason that that was done --

5  Q    Well, I'm just asking whether you did it.

6  A    Okay, but I would like to --

7  Q    And I'll ask you in a sec -- the part of Durham County

8  that you moved in was the heavily African-American part of

9  Durham County, isn't that true?

10  A    Well, it had to be.

11  Q    Okay.  And *Gingles* said -- you were involved in the

12  *Gingles* case, weren't you, sir?

13  A    I was.

14  Q    You were an expert in that case, weren't you?

15  A    I was.

16  Q    And you read the *Gingles* decision?

17  A    A long time ago.

18  Q    But you know that *Gingles* said that there was no racially

19  polarized voting in Durham County?  You remember that, don't

20  you, sir?

21         MR. FARR:  Objection, Your Honor.  That's not what

22  *Gingles* said.

23         JUDGE OSTEEN:  Well, he's asked what he recalls, so

24  he can answer the question.

25         THE WITNESS:  Again, since I haven't read *Gingles* for

1  a long period of time --

2  BY MR. HAMILTON:

3  Q    You don't recall?

4  A    Well, I don't recall specifically what the decision said.

5  Is that fair?

6  Q    That's fair.  I'm not asking you specifically, but,

7  generally speaking, you have a recollection, don't you, that

8  *Gingles* said there was no racially polarized voting in Durham

9  County?

10            MR. FARR:  Objection, Your Honor.

11            JUDGE OSTEEN:  If you recall, you can answer.

12            THE WITNESS:  I don't recall enough to state it as a

13  fact, but I think that was generally found, that there wasn't

14  that level of polarization.

15  BY MR. HAMILTON:

16  Q    Thank you.  Now, let's talk about CD 12 for a minute.

17  When you started with drawing CD 12, where did you start?  Did

18  you have -- did you take up -- pull up the old version of CD 12

19  and overlay that on the screen and then start making changes to

20  it?

21  A    I don't remember specifically, but I'm pretty sure that I

22  actually copied the old version of 12 -- well, the whole map --

23  Q    Including --

24  A    -- and made a 2011 version.

25  Q    Okay.

1  A    But it was a long road between putting the old 2001 map in

2  there and getting to the point where you had the 2011 map; but,

3  as I stated before, we wanted to keep District 12 in the same

4  area was -- primarily because that's what we wanted to do to

5  accomplish our political policy goals with regard to the

6  districting plan.

7  Q    Now, with respect to drawing the 12th Congressional

8  District, Senator Rucho and Representative Lewis expressed some

9  concerns about complying with the Voting Rights Act in that

10 district, isn't that true?

11 A    I don't know.  I would have to see the documents where

12 they actually made that expression to see if that was

13 specifically what they said.

14 Q    Well, let's talk generally about what they said.  They

15 expressed some concerns about avoiding retrogression under

16 Section 5 and, in particular, in Guilford County, correct?

17 A    Well, I don't see how you can retrogress a political

18 district in terms of the Voting Rights Act.  You might

19 encounter a fracturing complaint but not a retrogression

20 complaint.

21 Q    Guilford County was a covered jurisdiction under Section 5

22 at the time you were drawing these maps, correct?

23 A    Yes.

24 Q    And Guilford County had a substantial number of

25 African-American population?

1  A     It did.

2  Q     So let's look again at Exhibit 67.  Your Honor, if I might

3  remove the easel?  Can we display Exhibit 67 on the screen?

4           All right.  This is the statement we were looking at

5  a little while ago from Senator Rucho and Representative Lewis,

6  is that right.

7  A     The July 1st statement?

8  Q     Correct.

9  A     Yes.

10  Q     Now, if I could direct your attention to page 5 of this

11  statement.  In the middle of the sentence -- I mean, in the

12  middle of the paragraph, and I'll read it, it begins, "because

13  of the presence."  Do you see that?

14  A     Yes.

15  Q     Quote:  Because of the presence of Guilford County in the

16  12th District, we have drawn our proposed 12th District at a

17  black voting-age level that is above the percentage of the

18  black voting-age population found in the current 12th District.

19  We believe that this measure will ensure preclearance of the

20  plan, closed quote.

21           Did I read that correctly, sir?

22  A     You did read it correctly.

23  Q     And that's a true statement, correct?

24  A     It wasn't as I was instructed to draw the plan, no.

25  Q     You don't have any reason to argue with Senator Rucho or

1  Representative Lewis about what they said in this statement, do

2  you?

3  A    I don't want to be put in the position of arguing with

4  them, but all I can tell you is what my instructions were in

5  drawing the plan, which is not the way the district was drawn.

6  Again, this is a public-facing statement.  It's really a

7  political statement.

8  Q    They instructed you to place, quote, substantial

9  African-American population, closed quote, in Guilford County

10 in CD 12, isn't that true?

11 A    My instructions in drawing the 12th District were to draw

12 it as it were a political district, as a whole.  We were aware

13 of the fact that Guilford County was a Section 5 county.  We

14 were also aware of the fact that the black community in

15 Greensboro had been fractured by the Democrats in the 2001 map

16 to add Democratic strengths to two Democratic districts.

17 During the process, it was my understanding that we had had a

18 comment made that we might have a liability for fracturing the

19 African-American community in Guilford County between a

20 Democratic district and a Republican district.  When the plan

21 was drawn, I knew where the old 97th, 12th District had been

22 drawn, and I used that as a guide because one of the things we

23 needed to do politically was to reconstruct generally the

24 97th district; and when we checked it, we found out that we did

25 not have an issue in Guilford County with fracturing the black

 1 | community.

 2 | Q     Do you recall your deposition being taken on May 6, 2014?

 3 | A     I recall giving a deposition.  I don't know the date.

 4 | Q     And do you recall being asked the following question and

 5 | being -- giving the following answer, and this is page 37 of

 6 | the deposition transcript?

 7 |           "Question:  Did you receive an instruction from

 8 |       Representative Lewis and Senator Rucho to draw the

 9 |       12th District as a black voting-age level that is

10 |       above the level -- black voting-age level in the

11 |       current 12th District?

12 |           Answer:  Actually, my understanding of the issue

13 |       was because Guilford was a Section 5 county and

14 |       because there was a substantial African-American

15 |       population in Guilford County, the portion of the

16 |       African-American community was in the former

17 |       District 13 was a strong -- which was a strong

18 |       Democratic district was not attached to another

19 |       strong Democratic district that it could endanger

20 |       the plan and make a challenge to the plan."

21 |           Do you recall that?

22 |           MR. FARR:  Your Honor, may I request that the witness

23 | be shown his testimony instead of being asked whether he

24 | recalled it?

25 |           JUDGE OSTEEN:  Well, let's see what he says first,

 1 and then if he needs to look at it, he can.

 2          THE WITNESS:  I would really like to see the context,

 3 if I might?

 4          MR. HAMILTON:  May I approach?

 5          THE WITNESS:  Okay.  I've read it.

 6 BY MR. HAMILTON:

 7 Q    Does that refresh your recollection that that was your

 8 testimony in your deposition?

 9 A    Well, I stand by my testimony, but that does not say that

10 the 12th District was to be drawn as if it were a voting rights

11 district or if it were to attain any specific level of black

12 population.

13 Q    Fair enough.  You're right; it doesn't say that.

14 A    Could I finish?

15          MR. HAMILTON:  Well, I don't think there's a question

16 pending, Your Honor.  I'm happy to allow him, but we're --

17          JUDGE OSTEEN:  Yeah, we want to try to move along, so

18 let's stick to answering the questions, and I think you have.

19 Next question.

20 BY MR. HAMILTON:

21 Q    In the benchmark plan, Guilford County was split between

22 multiple districts, including CD 12, correct?

23 A    I'm sorry.  Could you repeat that?

24 Q    In the benchmark plan, the 2001 Plan, this county,

25 Guilford County, was already split between districts, including

1  CD 12?

2  A    Yes.

3  Q    And you reunited a portion of Guilford County back into CD

4  12, correct?

5  A    Yes.

6  Q    Not all of it, just a piece of it?

7  A    That's correct.

8  Q    And the piece of it was the piece with the substantial

9  African-American population.  That's the part that got moved

10  into CD 12, correct?

11  A    Yes, but it wasn't moved into CD 12 because it had a

12  substantial black population.  It was moved into CD 12 because

13  it had a substantial Democratic political voting record and

14  because I was looking at the old District 97 and those portions

15  had come -- were part of the old District 97.

16  Q    And the part without a substantial African-American

17  population, that was the part of Guilford County that was not

18  moved into CD 12, correct?

19  A    Again, I didn't look at the black population while I was

20  drawing it.  I was looking at the political data.

21  Q    So Guilford County remains fractured in the enacted plan

22  as well as in the benchmark plan, correct?

23  A    Yes, but my recollection was it was fractured three ways

24  in the 2001 Plan and two ways in the successor 2011 Plan.

25  Q    Okay.  Let me back up.  At the beginning, when you were

1   starting this process of drawing these maps, you collected some

2   data -- or, rather, the State assisted you in collecting some

3   data upon which you would be drawing the map, correct?

4   A    The State produced a database, which was incorporated into

5   their system and our system.

6   Q    And that included the results of past elections and past

7   voter registration, correct?

8   A    Yes.

9   Q    And they were gathering those results to be put into a

10  database that could be used to draw the new maps?

11  A    They had a very large database, yes, which you could

12  choose portions to use and portions not to use.

13  Q    For the purpose of drawing the maps?

14  A    Precisely.

15  Q    And in your view, it was felt that the data is required in

16  order to draw lines and make the evidence -- make the decisions

17  that need to be made; that was the standard practice, right?

18  A    You never know while you're drawing a map what information

19  some people may want to know about the map, particularly the

20  incumbent members.  And so it's always better to err towards a

21  larger database than you might prefer yourself just to make

22  sure you don't have to go back and catch up on something.

23  Q    Sure.  And the data that was collected included voter

24  registration data?

25  A    It did.

1  Q    That wasn't a rookie mistake, was it?

2  A    A rookie mistake?

3  Q    It wasn't a rookie mistake to collect voter registration

4  data in connection with drawing in this redistricting process?

5  A    No.

6  Q    Now, when you were drawing CD 12, I believe you testified

7  that you had the 2008 Presidential Election results on your

8  screen.  Do you recall that testimony?

9  A    I did.

10 Q    That's the Obama vote in 2008?

11 A    Yes.

12 Q    And when you were drawing the map, you did not look at the

13 governor 2008 election as you drew the map, correct?

14 A    That's correct.

15 Q    And you did not use the 2010 Senate data, correct?

16 A    That's right, because I had looked at it previously, and I

17 had analyzed it and actually made a correlation of it before we

18 started drawing.

19       MR. HAMILTON:  I move to strike, Your Honor.  This is

20 not responsive, and it's not in his expert report either, and I

21 didn't ask for it.

22       JUDGE OSTEEN:  I understand.  I think he's entitled

23 to explain his answer.  You looked at the data and made a

24 conclusion, correct?

25       THE WITNESS:  Yes, Your Honor, I looked at the other

1  data, and I concluded that it tracked -- all of these races

2  tracked each other, and there was no need to use an additional

3  race while drafting.

4  BY MR. HAMILTON:

5  Q    Now, the 2008 Presidential Election, that's the election

6  that you primarily relied on, right?

7  A    Yes.

8  Q    That was a pretty unusual election, wasn't it?

9  A    Well, it was a Democratic-Republican presidential

10  election.

11  Q    Sure.  And the Democratic nominee was Barack Obama,

12  correct?

13  A    Yes.

14  Q    Barack Obama is an African-American, true?

15  A    He certainly is.

16  Q    He was a black man running for president?

17  A    Yes.

18  Q    It was the first time the Democrats had ever nominated an

19  African-American candidate for president?

20  A    That's true.

21  Q    The first time in our nation's history since the founding

22  of the country that an African-American candidate ran for

23  president as the nominee of one of the two major American

24  parties, isn't that right?

25  A    To the best of my recollection.

Q    And that wasn't a secret here or anywhere else.  There was

a lot of talk about that during the course of that election,

isn't that true?

A    I think everybody was aware of it in the country, yes.

Q    And in your experience, as a political consultant drawing

maps for 40 some years, the race of a candidate can have an

effect on voter behavior, true?

A    Sometimes yes, sometimes no.

Q    And sometimes yes right here in North Carolina, isn't that

true?

A    Sometimes yes, sometimes not.

Q    Okay.  The Obama campaign in 2008 went out of its way to

try and mobilize the African-American community across the

country, including in North Carolina, isn't that true?

A    I don't think that I was particularly cognizant of the

campaign plan for both presidential campaigns in North

Carolina.

Q    So if some people didn't want to vote for an

African-American candidate, that would make them unlikely to

vote for Barack Obama, correct?

A    If they decided they couldn't vote for any

African-American candidate, it would follow logically that they

wouldn't vote for Barack Obama.

Q    And it would also -- the reverse is also true, that if an

African-American voter wanted to vote for an African-American

1    candidate because he was the first presidential candidate, that

2    would make it more likely that that voter would vote for

3    President Obama, isn't that true?

4    A     Well, I would say it would be likely in any circumstance,

5    from what we know about voting behavior in the state, that

6    African-Americans would vote for the Democratic nominee,

7    whoever that nominee was.  I think the better analogy is to say

8    the turnout was probably increased.

9    Q     Who ran for governor in 2008 in North Carolina?

10   A     I believe Governor Perdue.

11   Q     What was his [sic] race?

12   A     White.

13   Q     Not a black man?

14   A     No.

15   Q     Who ran for Senate in North Carolina in 2008?

16   A     I don't rightly recall right now.

17   Q     Do you recall his race?

18   A     I think the candidates were white.

19   Q     Neither one were a black man running either for Senate or

20   the governorship, correct?

21   A     If I don't remember who it was, I couldn't say.

22   Q     But the only data you used to draw this map was from the

23   first presidential race in American history with an

24   African-American major political party candidate, right?

25   A     That's right, but as I've already stated, I knew that that

1    race tracked all the other races.  While he might have gotten a

2    slightly higher vote, the precincts would still fall out in the

3    same order.

4    Q    You addressed compactness measures in your report, right?

5    A    I did.

6    Q    And courts look at compactness measures in these sorts of

7    lawsuits from time to time?

8    A    Yes.

9    Q    You even warn people in your PowerPoint presentations on

10   redistricting, when you're training people on redistricting

11   topics, quote -- to quote:  Be careful of the compactness

12   standards you adopt.  They may come back to bite you on the

13   rear in court, closed quote.  That's from your slide

14   presentation, right?

15   A    Yes.

16   Q    And you addressed Dr. Ansolabehere's use of the Reock

17   test.  I can skip through this.  You don't have any quarrel

18   with using that measure for measuring compactness, the Reock

19   test, right?

20   A    A Reock test, like many of the other tests, has its own

21   weaknesses and strengths.

22   Q    Sure.

23   A    And the problems you have with using the Reock test in

24   North Carolina is that many, many of the districts cross the

25   border of the state, including the 1st District, and that has a

1  great deal to do with the answers you get.

2  Q    But in the affidavit you filed in the Mississippi

3  redistricting litigation, you yourself relied on the Reock test

4  to measure -- to evaluate compactness of a district, isn't that

5  true, sir?

6  A    In the Mississippi case?

7  Q    Yes.

8  A    I don't remember.

9            MR. HAMILTON:  May I approach the witness, Your

10 Honor?

11 BY MR. HAMILTON:

12 Q    So I've handed you a copy of your deposition taken on

13 August 10, 2012, in the *Dickson* matter.  Do you recall being

14 deposed in connection with that matter, sir?

15 A    I'm sorry, could I just familiarize myself with this,

16 please?

17 Q    Sure.

18 A    Okay.

19 Q    Does that refresh your recollection that you used the

20 Reock test in connection with the Mississippi litigation?

21 A    Am I supposed to be reading on page --

22 Q    I'm trying to shortcut this by --

23 A    I told you I honestly don't remember.

24 Q    Okay.

25 A    Okay.  I'm sorry.

1  Q    And that's fine, and I don't mean to test your memory.

2  God knows, I've forgotten many things myself, but let's just go

3  through the transcript.  It's on page 251 of the deposition

4  taken August 10, 2012.  Question, line 2:

5              "Question?  The other statement that I want to

6         ask you about is in Exhibit 429 in paragraph 5, 6,

7         and 7.  You're reporting on compactness scores, is

8         that correct?"

9         Your answer was "Yes."

10        Question:  And I want to just clarify.  I think

11        it's in the context of the affidavit.  Is the Reock

12        test the test that you were using to generate those

13        scores?

14        Answer:  I'm not sure I remember which test I

15        used.

16        Question:  Well, if you look at paragraph 4,

17        you're talking about the Reock test.

18        Answer:  Okay.  Well, then probably yes.

19        Question:  So the opinions you expressed in this

20        affidavit in the Mississippi case were based on

21        the -- on just one compactness test?

22        Answer:  Yes."

23        Did I read that correctly?

24 A    Yes, but I don't know what the opinions I expressed were,

25 and I don't have the document that I was asked to talk about in

1   the deposition.  So I know nothing of the context of this whole

2   matter.

3   Q    You also used the Reock test in the *Bethune* case in your

4   testimony here, didn't you?

5   A    In my testimony?

6   Q    In the *Bethune* case in Virginia?

7   A    In *Bethune*?

8   Q    Yes.

9   A    Yes.

10  Q    So it's -- you're familiar with the test, and it's not an

11  illegitimate test to measure compactness?  It has its

12  strengths; it has its weaknesses?

13  A    Yes, but I think it would be fair to say that you would

14  have to talk about what I said about using compactness tests in

15  general and in the context of Virginia.

16  Q    You don't -- we can go through the actual calculation of

17  the Reock scores, but you don't disagree with

18  Dr. Ansolabehere's calculation of the Reock scores from the

19  North Carolina congressional districts, do you?

20  A    When I calculated the Reock scores, I got the same scores

21  he did.  So, obviously, we're in agreement.

22  Q    Okay.  And you'll agree with me that both the enacted and

23  the benchmark CD 12 has a miserable Reock score, right?  That's

24  how you would describe it?

25  A    Is that what I said?

1  Q     That's what you said in your first report, but I'm asking

2  you today --

3  A     No, I mean, I don't know whether I said miserable or not.

4  Q     All right.  Well, let's take --

5  A     I will take your word for it if that's what you say I

6  said.

7  Q     Why don't you take a look at your first report,

8  paragraph 37.  It's right in front of you.

9  A     Can you tell me what exhibit that is, please?

10 Q     It should be a loose document.

11        MR. HAMILTON:  May I assist the witness, Your Honor?

12        JUDGE OSTEEN:  Yes.

13        THE WITNESS:  Is that D25A?

14 BY MR. HAMILTON:

15 Q     Probably.

16 A     Okay.  Thank you.

17 Q     Both enacted and benchmark CD 12 have miserable Reock

18 scores, correct?

19 A     Yes, well, the redistricting history of congressional

20 redistricting in North Carolina has a lot of low Reock scores

21 in the districts.  And I agree with you, yes, that I said it

22 was a miserable score, both of them.

23 Q     And enacted CD 1 is even less compact than the benchmark

24 CD 1?  It dropped?

25 A     In terms of the Reock test, yes.

1  Q    And so is 12; it dropped?

2  A    Yes.

3  Q    So at least in the case of CD 12, you took a district with

4  a miserable Reock score and made it even less compact?

5  A    Marginally, yes.

6  Q    Okay.  Just a couple more things.  Let's take --

7  A    Can I -- I might add to you on that answer that one of the

8  reasons that District 12 has a lower score as it does is

9  because the number of square miles in the district is

10  considerably less, and that impacts a lot on the score.

11  Q    If I can direct your attention in the witness notebook to

12  Dr. Ansolabehere's reports.  It's behind Tab 17 and Tab 18, and

13  they are Plaintiff's Exhibits 17 and 18.

14  A    Yes.

15  Q    You've reviewed these reports before, haven't you?

16  A    Yes.

17  Q    You prepared your own reports in response?

18  A    Yes.

19  Q    You accept the data used by Dr. Ansolabehere in these

20  reports as accurate, isn't that true?

21  A    I do now.

22  Q    You did at the time of your deposition.  I assume you

23  still do?

24  A    I don't.

25  Q    You don't accept the data?

1  A    You mean the underlying data or the --

2  Q    Correct, the underlying data.

3  A    The underlying data -- well, we're all operating off the

4  same database and same geographic files, yes.

5  Q    And recognizing that you disagree with Dr. Ansolabehere's

6  conclusions, you accept that he correctly performed the

7  analyses that he set out to do in his report, right?

8  A    Well, I've looked and since then I've changed my mind

9  about this ratio-of-area-to-perimeter district.  On the face of

10 it, it's totally illogical.

11 Q    Let's put that one aside.  Other than that --

12 A    Okay.

13 Q    -- you accept that Dr. Ansolabehere correctly performed

14 the analyses set out in his reports, right?

15 A    He made the calculations, yes.  I already stated earlier

16 today that in his envelope analysis, he used a larger envelope

17 for -- well, he didn't use the envelopes for the districts.  He

18 combined the two envelopes which biased the scores.

19 Q    Let's look at tables in Exhibit 17.  Page 22 is where the

20 tables start.  Putting aside the area -- the

21 ratio-of-area-to-perimeter test, because I know you have a

22 concern about those, putting those aside, none of the data in

23 these tables are inaccurate in your judgment?

24 A    Once again, I have to say that as he constructed the

25 envelope, the data that he gave for the envelope is correct.

1   What I question is what he used for the envelope.

2   Q    All right.  Fair enough.  And if you take a look at the

3   maps attached to Exhibit 17, and I believe they start on

4   page 26 of Dr. Ansolabehere's report, you agree that those maps

5   accurately depict what they purport to depict?  No challenge on

6   that score, right?

7   A    I think that's true, yes.  They would be much better maps

8   if they were colored actually.

9   Q    Okay.  Let's look at the rebuttal report, and, again, it's

10  at the very end.  It's, I think, the second to the last page.

11  There's a data in those reports.

12              JUDGE OSTEEN:  You switched to P18?

13              MR. HAMILTON:  Say again?

14              JUDGE OSTEEN:  You switched to --

15              MR. HAMILTON:  This is Plaintiff's Exhibit 18 on

16  page 18.

17  BY MR. HAMILTON:

18  Q    Those tables, one and two -- the data in the tables are

19  accurate, as far as you know?

20  A    No.

21  Q    You have a concern about those?

22  A    Yes, I don't think his correlations are correct.  I was

23  not able to replicate his correlations.

24  Q    You didn't do any correlation analysis in either of your

25  reports, did you?

1   A     No, but that's not what you asked me.

2   Q     All right.  One more thing here, sir, just to finish up.

3           MR. HAMILTON:  May I approach the witness, Your

4   Honor?

5   BY MR. HAMILTON:

6   Q     I'm handing you a copy of your deposition, and this is the

7   deposition of September 8 -- I'm sorry, September 9, 2015, in

8   this matter.  This is the one that you probably heard us

9   talking about a little earlier this morning.  The question

10  actually begins on page 21 at the bottom of the page, and the

11  question was:

12          Question:  By contrast, did you use that data to

13       draw Congressional District 1, the voting-age

14       population, by race?

15          Answer:  To some extent, yes."

16          Next question --

17  A     I'm sorry, I need to -- okay, yes.

18  Q     Next question, we're on page 22, line 4:

19          Question:  Did you also use the Obama 2008

20       election results in drawing Congressional 1?"

21          Your answer was:  "To some extent."

22          Question:  Did you use any other election

23       results in drawing Congressional District 1?

24          Answer:  There were none others on the screen.

25          Question:  And the same is true with respect to

1      Congressional 12?  There were no other results other

2      than Obama 2008?

3          Answer:  You can only have one on the screen at

4      a time."

5          And then skipping down to line 24 --

6          JUDGE COGBURN:  Are you going to ask if those were

7  his answers?

8  BY MR. HAMILTON:

9  Q    Were those your answers, sir?

10 A    Yes.

11 Q    Line 24, page 22:

12         Question:  The only election results you

13      utilized in drawing Congressional 12 were the 2008

14      Obama election results?

15         Answer:  That's correct."

16         Was that your testimony, sir?

17 A    Yes.

18         MR. HAMILTON:  No further questions, Your Honor.

19         JUDGE OSTEEN:  Redirect?

20         MR. FARR:  Thank you, Your Honor.

21                    REDIRECT EXAMINATION

22 BY MR. FARR:

23 Q    Dr. Hofeller, would you turn to this white witness

24 notebook that counsel for the plaintiffs gave you and turn to I

25 believe it's Plaintiff's Exhibit 700.  It's the Department of

1  Justice regulations for Section 5.

2  A    Yes, I have it.

3  Q    Okay.  I want you to turn to page 7472.

4  A    Yes.

5  Q    Okay.  Do you see in the middle column it talks about the

6  use of 2010 Census data?

7  A    Yes.

8  Q    And could you just read the first sentence into the record

9  there.

10  A    "The most current population data are used to measure both

11  the benchmark plan and the proposed redistricting plan."

12  Q    Okay.

13          MR. FARR:  Now, I have a few questions about that,

14  Your Honor, if I might approach the witness and use the charts

15  the plaintiffs used.  And could we please ask for the screen

16  shot to be taken down.

17          JUDGE OSTEEN:  The what?

18          MR. FARR:  The screen shot.  I don't need that.

19          JUDGE COGBURN:  That's all we were looking at.

20  BY MR. FARR:

21  Q    Okay.  I want to look at these two charts that plaintiffs'

22  counsel showed you, Dr. Hofeller, if I don't break everything.

23  We're going to start with the 1st Congressional District

24  election results that plaintiffs' counsel went over with you,

25  and what they have listed here is in this column BVAP.  Do you

1  see that?

2  A    Yes.

3  Q    Now, do you know whether or not the BVAP that they had

4  listed here is single race black voting-age population or any

5  part black or total black voting-age population?

6  A    Actually, I believe I asked counsel that, and he said it

7  was any part black.

8  Q    So you recall him telling you that from 2002 through 2010

9  47.76 -- he represented to you that was any part black

10 voting-age population?

11 A    Yes, but actually the 47.76 is only a snapshot in time in

12 the year 2000.

13 Q    Okay.  But my question is, other than what plaintiffs'

14 counsel represented to you, do you know if that's single race

15 voting-age population or any part black voting-age population?

16 Do you have knowledge whether that's true or not?

17 A    I have no knowledge except for what the counsel from --

18 that the plaintiffs' counsel told me.

19 Q    Okay.  And do you know whether or not 47.76 percent they

20 listed for the 2010 election, is that for the 2000 Census or

21 2010 Census?  Do you know?

22 A    No.

23 Q    Okay.  He didn't tell you which census it was from, did

24 he?

25 A    That's true.

```
 1  Q    But your recollection is he represented that 47.76 was any
 2  part black voting-age population?
 3  A    Yes.
 4  Q    Okay.  And he also represented for 2012 that the
 5  percentage he's listed was any part black voting-age population
 6  from the 2010 Census?
 7  A    Yes.
 8  Q    Okay.  All right.  And from 2002 to 2010, we're talking
 9  about the 2001 version of the 1st District?
10  A    That's correct.
11  Q    From 2012, we're talking about the 2011 version of the 1st
12  District?
13  A    Correct.
14  Q    All right.  Now, on the percent of the vote, did counsel
15  disclose to you the actual margin of victory?
16  A    No.
17  Q    Okay.  Did counsel disclose to you whether or not the
18  margin of victory was less or greater than the amount by which
19  the 1st District was underpopulated --
20          JUDGE OSTEEN:  Okay, Mr. Farr, counsel at this point
21  is not on trial.  The question is what do those statistics
22  mean.
23          MR. FARR:  Okay.  Let me --
24          JUDGE OSTEEN:  I think you can ask the same question.
25          MR. FARR:  Let me see if I can ask it another way.
```

 1  BY MR. FARR:

 2  Q    Does this chart, Dr. Hofeller, reveal the actual margin of

 3  victory in these elections by how many votes the candidates

 4  received?

 5  A    None of the absolute numerical votes are on the chart.

 6  Q    Okay.  And from this column percent of vote, can you

 7  determine whether or not the actual margin of victory for the

 8  candidate was greater or less than the amount by which the

 9  district was underpopulated?

10  A    No.

11  Q    Does this chart tell you anything about white turnout?

12  A    Doesn't tell me about any turnout.

13  Q    Black or white?

14  A    That's true.

15  Q    And does this chart tell you anything about how much money

16  was spent by the candidates in any of these elections?

17  A    No.

18  Q    All right.  Same series of questions about this chart,

19  which --

20          MR. FARR:  Your Honor, this has not been marked as an

21  exhibit.  I don't know if it should be or not.

22          JUDGE OSTEEN:  Is it one of the stipulated exhibits

23  that's been sitting up over there, I think, the whole case?  Do

24  you want to mark it?

25          MR. FARR:  I don't know.  Is that an exhibit in --

 1           MR. HAMILTON:  We're having them mark the copy that

 2     is in the Court's notebook.  We don't need to put these giant

 3     poster boards in.  It's exactly the same thing.

 4           MR. FARR:  Okay.  That would be fine.

 5           JUDGE OSTEEN:  Are both -- one of them is at 1 and

 6     one is at 12?  Yeah, okay.  So the chart you were just

 7     referring to with respect to CD 1 is an enlargement of the

 8     chart found at Plaintiff's Exhibit 1, and the chart you're now

 9     referring to is an enlargement of the exhibit found at

10     Plaintiff's Exhibit 12.  Is that right?

11           MR. FARR:  Okay.

12           MR. HAMILTON:  In fact, I -- I'm sorry for the

13     confusion.

14           JUDGE OSTEEN:  We'll go on the numbers again.

15           MR. HAMILTON:  I don't think the numbering is right,

16     so I think we should just assign these two documents completely

17     new numbers at 500 and 501, or something, just to make it

18     clear.

19           JUDGE OSTEEN:  Are you good with that?

20           MR. FARR:  I would be fine if we could say that the

21     chart on the 1st Congressional District is Plaintiff's

22     Exhibit 500 and the chart on the 12th District is Plaintiff's

23     Exhibit 501.  That would be fine.

24           JUDGE OSTEEN:  Okay.  You got that, Ms. Powell?

25     Thank you.

1          MR. HAMILTON:  Thank you.

2   BY MR. FARR:

3   Q    So, Dr. Hofeller, I believe we just said this is

4   Plaintiff's Exhibit 501, which is a chart about election

5   results in the 12th Congressional District over the years, and

6   I wanted to ask you, do you have any personal knowledge about

7   whether the information that's in the column titled "Black

8   Voting-age Population" is either single race black or any part

9   black voting-age population?

10  A    I haven't had an opportunity to check that, no.

11  Q    Okay.  And do you know whether or not the percentage

12  listed in Plaintiff's Exhibit 501 for black voting-age

13  population in 2010, is that for the 2000 Census or 2010 Census?

14  A    Well, it would have to be for the 2000 Census because it's

15  the same as the years previous.

16  Q    Okay.  So they didn't -- as far as you can tell, they

17  didn't put the black voting-age population for Congressional

18  District 12 for 2010 -- they didn't use the 2010 Census for

19  that, based on your observations of this chart?

20  A    I don't know whether they used the 2010 Census for all

21  those numbers of 42.31 or they used the 2000 Census.  So it was

22  the 2010 census -- the 2000 Census because there's no marking

23  on the chart to indicate which census the data came from.

24  Q    Okay.  So you just don't know which census this is from

25  from just looking at this chart?

1  A     That's true.

2  Q     And the election results, again, we don't have the actual

3  margins of victory on Plaintiff's Exhibit 501?

4  A     That's true.

5  Q     And there's nothing on this exhibit that shows how much

6  money was spent by either candidate in these elections?

7  A     No.

8  Q     All right.  So, Dr. Hofeller, in evaluating any efforts to

9  redraw the 1st Congressional District in 2011, would it be

10 pertinent or relevant to know the margins of victory of the

11 incumbent candidate and compare that against the amount by

12 which the district was underpopulated?  Would that be a factor

13 you would have taken into consideration?

14 A     It could be, yes.

15        MR. FARR:  Your Honor, may I approach?

16        JUDGE OSTEEN:  You may.

17 BY MR. FARR:

18 Q     Dr. Hofeller, I've handed you an exhibit we've marked

19 Defendant's Exhibit 13.  Have you seen this before?

20 A     Yes.

21 Q     Do you know what this is?

22 A     This is a legislator's guide that was put out I believe by

23 the General Assembly staff prior to the beginning of the actual

24 line drawing process to review some of the information needed

25 to begin the process.

1  Q     Okay.

2  A     I think I remember hearing that it was, in some cases, an

3  update of the previous document.

4            MR. HAMILTON:  Objection, Your Honor, to this line of

5  questioning.  It's beyond the scope of cross-examination.

6            MR. FARR:  It's not, Your Honor, because counsel has

7  asked Dr. Hofeller whether there was any written instructions

8  on redistricting criteria, and this, in fact, shows that there

9  were.

10            MR. HAMILTON:  That's apparently an effort to impeach

11  his own witness.  He testified, I think we went over this for

12  maybe half an hour, that there were no written instructions

13  with respect to the redistricting.  I think I tested the

14  Court's patience with that line of questions until we finally

15  stopped.  So I don't think it's appropriate for him to impeach

16  his own witness.  And, in any event, it's beyond the scope.

17            JUDGE OSTEEN:  Give me just a second.

18            (Discussion between judges.)

19            JUDGE OSTEEN:  Let's make it brief, Mr. Farr, but if

20  this takes us down the road of a guide and instructions, then

21  I'm going to reopen cross to examine -- or I know there'll be a

22  recross anyway, but I understand your point on what you're

23  saying, and we'll allow -- we'll grant you some latitude to

24  address that.

25            MR. HAMILTON:  Thank you, Your Honor.

 1  BY MR. FARR:

 2  Q    So, Dr. Hofeller, do you know what this exhibit is,

 3  Defendant's Exhibit 13?

 4  A    Yes.

 5  Q    And could you explain again what it is?

 6  A    Again, it was really a redistricting summary, much like

 7  the one that was issued in the previous redistricting,

 8  outlining the political and legal -- mostly the legal

 9  requirements and the process itself and how it unfolds and

10  information about how many districts are going to be drawn.

11  It's a guide that was written by staff.

12  Q    What's the publication date on this exhibit?

13  A    March of 2011.

14           MR. FARR:  Okay, Your Honor, I'll just let the

15  exhibit speak for itself otherwise.  So I'll move on to another

16  exhibit.

17           JUDGE OSTEEN:  Hold on just a second.

18           (Discussion between judges.)

19           JUDGE OSTEEN:  Mr. Farr, at this point I understand

20  your point, but he's identified it -- in terms of speaking for

21  itself, with respect to this particular witness, I'm not real

22  clear on the relevance of it at this point.

23           MR. FARR:  Well, could I ask him another question?

24           JUDGE OSTEEN:  You sure can.

25  BY MR. FARR:

1  Q    All right.  Dr. Hofeller, go back to Exhibit D13.  Have

2  you ever seen this exhibit before?  It's the legislator's guide

3  for redistricting?

4  A    Oh, I'm sorry.  We're back there.  Yes.

5  Q    And had you reviewed that exhibit during the time frame or

6  close to the time frame on which it was published?

7  A    Yes, I read it.

8           MR. FARR:  That's all, Your Honor.

9           JUDGE OSTEEN:  All right.

10 BY MR. FARR:

11 Q    Now, I've just handed you Defendant's Exhibit D5.11.  Do

12 you recall during your testimony on cross-examination by

13 plaintiffs' counsel -- if you would look to your witness

14 notebook that plaintiffs' counsel gave you, Dr. Hofeller.  Do

15 you see this notebook?

16 A    I do.

17 Q    Okay.  Under Tab 18 --

18 A    Yes, I have it.

19 Q    Excuse me, it's Tab 67.

20 A    Yes.

21 Q    Plaintiffs' counsel cross-examined you on one of the

22 statements that were issued by the redistricting chairs during

23 the course of redistricting, is that right?

24 A    Yes.

25 Q    He didn't question you on some of the other statements

 1  that were issued by the chairs, is that correct?

 2  A    Yes.

 3  Q    And can you look at Exhibit D5.11 and tell me whether or

 4  not -- as far as you know, is that a complete set of all the

 5  statements made by the redistricting chairs during the

 6  redistricting process?

 7  A    I believe it is, yes.

 8  Q    All right.  I want you to first look at the statement.  It

 9  starts on the -- it's the 9th page of Exhibit D5.11, and it's a

10  statement issued by the chairs on June, 22, 2011.  If you could

11  find that, please.

12  A    June 17?

13  Q    6/22/11 is the statement.

14  A    The 9th page?

15  Q    Yeah.  The pages, unfortunately, are not numbered.  So you

16  just have got to take the 9th page.  There should be a

17  statement there that says June 22, 2011.

18  A    Up at the top right-hand corner?

19  Q    Yes.

20  A    Yes.  Which page?

21  Q    I'm trying to find it.

22  A    Okay.

23  Q    I want you to read a statement.  Okay.  I found it.  Turn

24  to page 4 of that particular statement.

25  A    Yes.

1  Q    Do you see the third paragraph on that page, starts with

2  "while districts"?

3  A    Yes.

4  Q    Could you read that paragraph into the record, please.

5  A    "While districts that adjoin minority-black districts may

6  become more competitive for Republican candidates because of

7  compliance with the VRA, such competitiveness results from

8  compliance with the VRA.  This in opposition of the prior

9  legislative leadership intentionally cracking majority-black

10 districts required by the VRA to ensure the reelection of white

11 incumbents".

12 Q    Okay.  Thank you.  Now, I want you to read one more

13 statement from exhibit --

14           JUDGE GREGORY:  Tell us, what does that rebut?

15           MR. FARR:  Sir?

16           JUDGE GREGORY:  What does that rebut?

17           MR. FARR:  I'm sorry, Your Honor?

18           JUDGE GREGORY:  What does that rebut?

19           MR. FARR:  It's rebutting the fact that the

20 leadership in the General Assembly never meant anything about

21 the political impact of the plans.  There was a long line of

22 questions of Dr. Hofeller where they read one of the

23 statements --

24           JUDGE GREGORY:  Well, your witness said he didn't

25 know anything about the intent on Guilford County in terms of

 1   drawing it at a level that's higher than the existing number of

 2   blacks.  So what are you rebutting from this?

 3           MR. FARR:  Your Honor, what I'm rebutting is that

 4   counsel was allowed to cross-examine this witness on one

 5   statement made by the legislative leaders.  They didn't look at

 6   all five statements, and he did not point to the statements

 7   made by the legislative leaders stating that politics played a

 8   role in the creation of these districts.

 9           JUDGE GREGORY:  It looks like you haven't laid a

10   foundation of this one that he knows about statements made by

11   other persons anyway, but it's getting late now.  That's fine.

12           MR. FARR:  Thank you, Your Honor.

13   BY MR. FARR:

14   Q    Dr. Hofeller, I want you to turn to the last statement by

15   the congressional leaders -- or the legislative leaders.  It's

16   dated July 19, 2011.

17   A    Yes, I have it.

18   Q    All right.  Could you turn to page 4 of that statement?

19   A    Yes.

20   Q    Okay.  Could you -- would you go down to the first

21   sentence in the third line from the bottom and read the rest of

22   that statement -- rest of that paragraph into the record?

23           MR. HAMILTON:  Objection, Your Honor, there's no

24   foundation that this witness has ever read or seen this

25   document before, and he's not the author since we know -- or at

 1  least it hasn't been established that he's the author.  So

 2  we're just reading a document he doesn't have anything to do

 3  with into the record, and I don't think that's an appropriate

 4  use of this document.

 5          JUDGE OSTEEN:  Didn't you do the same thing with the

 6  other document, the public statement, the July public statement

 7  that we had the discussion about, didn't know if it was the

 8  first map and so on?

 9          I mean, this is in the record, and we can read this.

10  So let's just make it -- during direct, there was comment on

11  Rucho and Lewis public statements.  Now we're getting -- kind

12  of going down the road a little bit.  We're capable of sorting

13  that out.  Let's quickly wrap this up.

14          Where were you, Mr. Farr?  I am going to overrule --

15  well, hold on a second.

16          (Discussion between judges.)

17          JUDGE OSTEEN:  I'll tell you what.  If you'll just

18  identify it again.  We don't need it read again.  Just identify

19  what you wanted him to look at.

20          MR. FARR:  Okay.  Thank you, Your Honor.

21          JUDGE OSTEEN:  It's D511.  It's the 7/19/2011 public

22  statement, page --

23          MR. FARR:  It's pages 4 and 5.  May I just read the

24  sentence and ask him a question, Your Honor?

25          JUDGE OSTEEN:  You may.

1  BY MR. FARR:

2  Q    The last sentence in this statement, Dr. Hofeller, says:

3  "By continuing to maintain this district as a very strong

4  Democratic district, we understand the districts adjoining the

5  12th District will be more competitive for Republican

6  candidates."

7         Now, is that statement consistent with the

8  instructions you received from the redistricting cochairs?

9  A    Yes.

10        MR. FARR:  No further questions, Your Honor.

11        JUDGE OSTEEN:  Mr. Hamilton?

12        MR. HAMILTON:  No recross, Your Honor.

13        JUDGE OSTEEN:  All right.  You may step down.

14        THE WITNESS:  Thank you, Your Honor.

15        (At 2:28 p.m., witness excused.)

16        MR. FARR:  Your Honor, could we just have two minutes

17 to go to the back of the courtroom because we may have a

18 proposal for shortening the rest of the proceeding?  Can we

19 just consult with our client for a second, and then we'll come

20 back?

21        JUDGE OSTEEN:  We're going to take a 5-minute recess.

22        (At 2:29 p.m., break taken.)

23        (At 2:36 p.m., break concluded.)

24        MR. FARR:  Your Honor, given where we stand in

25 today's proceedings, we were going to call Senator Rucho and

1    Representative Samuelson to give their version of the

2    conversation with Representative Watt.  They have already given

3    that testimony in the *Dickson* case.  So we're just going to

4    submit their testimony in the *Dickson* on that issue and will

5    not be calling them as a witness.

6              JUDGE OSTEEN:  Any objection to our consideration of

7    that testimony?

8              MR. HAMILTON:  No objection, Your Honor.

9              MR. FARR:  And --

10             JUDGE OSTEEN:  Hold on just a second.  All right.

11   Yes, sir?

12             MR. FARR:  Your Honor, we would like to submit an

13   exhibit to the Court that relates to the email where we were

14   having the attorney-client privilege issue discussion.  It's

15   the deposition transcript from the deposition where this

16   exhibit came up.  I would just like -- we don't have to argue

17   that at the moment.

18             JUDGE OSTEEN:  Let me see where we are on the

19   evidence.  Will there be any additional evidence -- or

20   witnesses called by the defense?

21             MR. FARR:  No, Your Honor.  That's it.

22             JUDGE OSTEEN:  Okay.  So we're getting the

23   straightening out exhibits.  All right.  So you've got the

24   deposition testimony you want to submit in relation to the --

25   where is that motion now?

1          MR. HAMILTON:  To be clear, I don't mean to

2     interrupt, we have a very, very short rebuttal.

3          JUDGE OSTEEN:  Right.  I am going to get all the

4     exhibits straightened out, and then we'll hear from your -- if

5     you have rebuttal evidence, we'll take it then.

6          MR. FARR:  Your Honor, I have a copy of the

7     plaintiff's exhibit attached to the transcript, Plaintiff's

8     Exhibit 564.  Is that right?

9          MR. HAMILTON:  That was --

10          MR. FARR:  The document we're contesting about

11     attorney-client privilege.

12          MR. HAMILTON:  That's right.

13          MR. FARR:  So I've got their exhibit and the

14     deposition transcript.  We've marked the deposition transcript

15     as Defendant's Exhibit 131, and I'd just like to hand that up

16     to the Court.

17          JUDGE OSTEEN:  Okay.  That's with respect to

18     Plaintiff's Exhibit 13, or is that the --

19          MR. HAMILTON:  That's correct, Your Honor.

20          JUDGE OSTEEN:  Okay.

21          MR. HAMILTON:  Exhibit 564 is Plaintiff's Exhibit 13.

22          MR. FARR:  Oh, okay, I'm sorry.  564 is the *Dickson*

23     deposition sticker.  May I hand it up?

24          JUDGE OSTEEN:  Yes.  And you'd like us to consider

25     that in relation to their efforts to admit that exhibit?

1          MR. FARR:  Yes, Your Honor.

2          JUDGE OSTEEN:  Okay.

3          MR. HAMILTON:  Now, Your Honor, Mr. Strach, when

4    appropriate, would like to move all our exhibits into evidence

5    at this point in time.

6          JUDGE OSTEEN:  All right.  Mr. Strach, I don't know

7    how you intend to do this, but we'll do it in such a fashion as

8    to communicate effectively to Ms. Powell.

9          MR. STRACH:  I'm going to try, Your Honor.  What I

10   was going to do -- I think that both parties agree with this,

11   but at Docket Entry 95, a lot of materials from the *Dickson*

12   case were filed with this Court and then additional materials

13   were sent to the Court on a CD.  And, Your Honor, we were going

14   to move into admission into the trial record all the

15   information that was filed.  I'll give you the docket entry

16   number.

17         JUDGE OSTEEN:  All right.

18         MR. STRACH:  It's Docket Entry 95, filed July 1,

19   2015.  I'm going to call it plaintiffs' and defendant's joint

20   notice of filing the state court record in *Dickson v. Rucho*.

21   Your Honor, that contained the record on appeal in the North

22   Carolina Supreme Court in the *Dickson* case.  That case number

23   in the North Carolina Supreme Court is No. 201PA12-2, and that

24   filing included the record on appeal and what are called the

25   Rule 9D exhibits and materials that were also filed with the

1  state supreme court.

2      JUDGE OSTEEN:  All right.  And in terms of

3  plaintiffs, no objection to our accepting those?

4      MR. HAMILTON:  No objection, Your Honor.

5      JUDGE OSTEEN:  All right.

6      MR. STRACH:  And, Your Honor, to the extent not

7  covered by the above, we're going to move in -- we're going to

8  move to admit our specific exhibits that we've presented and

9  prepared for use at trial.  Defendants -- we would move in

10 Defendant's Exhibits 1 through 122.  Your Honor, to our

11 knowledge those -- none of those are -- well, some of them are

12 objected to, but they were all disclosed, and we're going to

13 ask to move in Defendant's Exhibit 1 through 122, including all

14 the subparts and A versions of those exhibits.

15      Your Honor, if it's okay, I'll highlight some of the

16 objections.  There's a few --

17      JUDGE OSTEEN:  All right.  Let me -- let me get the

18 numbers.  Are there any other numbered exhibits, or do 1

19 through 122 take care of everything?

20      MR. STRACH:  No, 1 through 122 will take care of all

21 the exhibits that were disclosed pretrial.

22      JUDGE OSTEEN:  Okay.

23      MR. STRACH:  Then we have Defendant's Exhibits 124

24 through 131 -- I'm sorry, let me read these out.  Defendant's

25 Exhibit 124, which is a comparison chart of the 2011/2001

enacted plans for the 1st District.  Defendant 126, that's the

historical congressional maps binder.  D128, which is the

Michigan Law Review article regarding compactness.  D129, which

is Appendix 1 to the Tom Hofeller resume.  D130, which is the

third affidavit of Tom Hofeller in the *Dickson v. Rucho* case.

D131, which are depo excerpts from the Tom Hofeller deposition

in *Dickson v Rucho*.

JUDGE OSTEEN:  Then we have 500 -- or you may be

getting there.  Those are Plaintiff's Exhibits 500 and 501.

MR. STRACH:  And then finally, Your Honor, I would

just note the plaintiffs yesterday moved in four of our

exhibits that, just for the record, I'll state what those were.

Those were Defendant's 5.11, Defendant's Exhibit 30,

Defendant's Exhibit 19, and Defendant's Exhibit 118.

JUDGE OSTEEN:  Okay.  All right.  So 1 through 122.

I don't recall there being any objection to the 124, -6, -8,

-9, -30, and -31.  Am I right about that?

MR. HAMILTON:  There is a pending objection to

Exhibit 121.

JUDGE OSTEEN:  Right, but that's in that second --

the second group, 124 --

MR. STRACH:  No, Your Honor, that's in the first

group.  121?

JUDGE OSTEEN:  He said 121, but right now, I'm just

talking about that second batch of numbers:  124, -6, -8, 129,

1 -30, and -31.  I think I remember those exhibits.  I don't

2 think there's any objection to those.

3          MR. HAMILTON:  If the Court would give me just a

4 moment to --

5          JUDGE OSTEEN:  I'm going backwards on you.  Sorry

6 about that.

7          MR. HAMILTON:  That's all right.  It's not a problem.

8 So we have no objection to Exhibit 124.

9          JUDGE OSTEEN:  Okay.

10          MR. HAMILTON:  I think that's right.  We do object to

11 Exhibit 124, I'm sorry.  Your Honor, this is the one where we

12 have no objection to the top box --

13          JUDGE OSTEEN:  Okay.  So there is --

14          MR. HAMILTON:  -- but we do have a continuing

15 objection to the bottom two boxes, the bottom two-thirds of

16 that document, which was not produced before.  So that's

17 Exhibit 124.  126, the map binder, we have no objection to.  I

18 love reading the Michigan Law Review, so we have no objection

19 to Exhibit 128.

20          JUDGE OSTEEN:  Tip of the hat to Judge Gregory?

21          MR. HAMILTON:  129 is the appendix of the Hofeller

22 CV.  So that's fine.  No objection there.  No objection to

23 either 130 or 131.

24          JUDGE OSTEEN:  Okay.  So that leaves us with 124,

25 which we're going to take a little closer look at.  So that

1 leaves us 1 through 122.

2       MR. HAMILTON: And the only objection there, Your

3 Honor, is Exhibit 121.

4       JUDGE OSTEEN: And what was 121?

5       MR. HAMILTON: It was an analysis by Dr. Barry

6 Burden, I believe, and it was a document -- our primary

7 objection aside from hearsay is that it's irrelevant. It was a

8 document prepared long after these maps were drawn, and it has

9 no relevance to the issue --

10       JUDGE OSTEEN: Is that the one you withdrew your

11 objection on and then it turned out it had been prepared two

12 weeks ago, or something like that?

13       MR. HAMILTON: No.

14       JUDGE OSTEEN: Okay. All right. Let's just for

15 purposes -- then I'll admit Documents 1 through 120,

16 Document 122, Documents 126, 128, 129, 130, and 131, all

17 defendant exhibits. I'll note the objection right now to 124.

18 We'll take that one under advisement. And with respect to

19 Exhibit 121, again, we will take that under advisement. I'll

20 simply note for the record that Defendant's Exhibits 11, 30,

21 19, and 118 are admitted in both cases.

22       MR. STRACH: All right. Then I have just one other

23 thing, Your Honor. We would like to go ahead and formally move

24 admission of our deposition counter-designations, just to be on

25 the safe side. Those were filed at Docket Entry 117 on

1  September 28, 2015.

2             JUDGE OSTEEN:  Let me see.  Have you all looked at

3  them?  Are there any objections to the counter-designations?

4             MR. HAMILTON:  No, Your Honor.  I think we can

5  jointly move the admission of the designations plus the

6  counter-designations.

7             JUDGE OSTEEN:  All right.  And that's Document 117 is

8  where those were found?

9             MR. STRACH:  Ours are Docket 117.  I'm not sure where

10  the plaintiffs are.

11            MR. HAMILTON:  I'm afraid, as I stand here, I can't

12  recite the docket numbers.

13            JUDGE OSTEEN:  Well, we will -- to the extent the

14  plaintiffs' pretrial disclosures include -- included deposition

15  counter-designations, we'll allow those as part of the record.

16            MR. HAMILTON:  Thank you, Your Honor.

17            MR. STRACH:  Thank you, Your Honor.  That's all we

18  have.

19            JUDGE OSTEEN:  All right.  We still have obviously,

20  just to be clear, issues remaining with respect to plaintiff --

21  in addition to what I just described, issues remaining with

22  respect to Plaintiff's Exhibit 13, which we will resolve later.

23  We have the Hofeller testimony, including Defendant's

24  Exhibit 124, which was objected to on the basis of not

25  disclosed -- properly disclosed as part of the expert

testimony.  And then we have objections outlined in both of the
motions in limine, which I think are still under advisement at
this point.

All right.  So that -- does that take -- anything I
need to be aware of?

JUDGE COGBURN:  Do we have the charts in?  That's 500
and 501.

MR. HAMILTON:  Those have not been admitted yet, Your
Honor.  As soon as we have an opportunity to present our
rebuttal case, I was going to offer those.

JUDGE OSTEEN:  Defendant's Exhibit 121, there is an
objection.  Refresh my -- maybe we can get this resolved.  For
what -- I can't remember where 121 came up.  Do you remember
where that one was presented?

MR. HAMILTON:  It didn't, Your Honor.  There was no
witness that discussed it.  It was simply part of the mass of
documents that's to the right of the Court.

JUDGE OSTEEN:  It's listed as an expert report by
Barry Burden, Ph.D, that was submitted with NAACP versus
McCrory, et al.

MR. FARR:  Yes, Your Honor, that was a public
document.  There's a docket entry number for it in the United
States versus North Carolina lawsuit that was tried in front of
Judge Schroeder.  We can provide that docket entry, and that
was -- we offered that because Dr. Burden gave testimony in

that case and a report that racially polarized voting is still

very strong and prevalent in the state of North Carolina.

MR. HAMILTON: And, Your Honor, Dr. Burden testified

in a different case, not the state case, a whole different --

and he was never disclosed as an expert in this case, never

deposed. It's simply not a relevant exhibit in this case for

that proposition. So, your Honor, we would object to its

admission.

JUDGE OSTEEN: All right. I am going to -- I'll

simply leave -- take it -- it is an expert report. If it

wasn't disclosed -- I understand it's part of the public record

in another case. That doesn't immediately make it relevant or

admissible in this case. I will leave you with this,

Mr. Farr -- well, let me see.

(Discussion between judges.)

JUDGE OSTEEN: Mr. Farr, at this point, it's an

expert report; and if it wasn't part of the disclosures, I

don't find it's admissible. But if you're taking aback -- if

that comes as something of a surprise -- well, let me back up.

It's not admissible because, as an expert report, it wasn't

part of the disclosures in this case, but I'll give you a

couple of days -- or not I -- the Court will give you a couple

of days if you want to submit something before we get started

that you think should convince us otherwise.

MR. FARR: That will be fine, Your Honor. Thank you

1  very much.

2          JUDGE OSTEEN:  All right.  All right then.  The

3  plaintiffs have rebuttal evidence?

4          MR. HAMILTON:  We do, Your Honor.  At this point --

5  maybe we'll do this in reverse order and offer Exhibits 500 and

6  501.  Those are the two big election tables that we had.

7          JUDGE OSTEEN:  All right.  Are they plaintiff's

8  exhibits?

9          MR. HAMILTON:  I think they're Plaintiff's

10  Exhibit 500 and 501.

11          JUDGE OSTEEN:  Plaintiff's Exhibits 500 and 501,

12  which is enlargements of exhibits appearing in the Hofeller

13  notebook at Tabs 1 and 12, are admitted.

14          MR. HAMILTON:  Thank you.  Then we would also offer

15  Exhibit 700, which is the excerpt from the Federal Register.

16  It's the very last tab in the page, and, of course --

17          JUDGE OSTEEN:  Any objection to that?

18          MR. HAMILTON:  -- the Court can find it in the

19  Federal Register, but this, I thought, would be convenient.

20          JUDGE OSTEEN:  I would prefer not to have go looking.

21  Thank you.

22          MR. FARR:  No objection, Your Honor.

23          JUDGE OSTEEN:  All right.  Then the exhibit labeled

24  in the Hofeller notebook as Tab 700, the Federal Register

25  excerpt, is admitted.

 1            MR. HAMILTON:  Thank you.  We just have less than 10

 2   minutes with Dr. Ansolabehere.

 3            JUDGE OSTEEN:  All right.

 4            MR. HAMILTON:  Doctor?

 5            JUDGE OSTEEN:  Doctor, since there's been a break in

 6   your testimony, I won't have you re-sworn, but I will remind

 7   you you are still under oath in this proceeding.

 8            THE WITNESS:  Thank you.

 9                 STEPHEN DANIEL ANSOLABEHERE,

10            PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

11                     DIRECT EXAMINATION

12   BY MR. HAMILTON:

13   Q    Good afternoon, Doctor.  Do you have the Stephen

14   Ansolabehere notebook there next to you?

15   A    I do.

16   Q    Okay.  If you could turn to your first report and to the

17   table that calculates the area-to-perimeter-ratio calculation

18   that we've been talking about.  I believe it's page 22 of

19   Plaintiff's Exhibit 17, Table 1.  Do you have that there in

20   front of you?

21   A    I do.

22   Q    So can you explain -- and then there's some -- there was

23   some testimony in the defendants' case from Dr. Hofeller about

24   his confusion over how the numbers were calculated here.  Can

25   you explain?

1 A    Again, as I mentioned yesterday, this came from ArcGIS,

2 which is basic software for mapmaking, and the question came up

3 yesterday about what the units were.  Last night, I confirmed

4 what the units are.  These are actually square meters per

5 kilometer.  That's what ArcGIS area calculation is in.  So this

6 is square meters per kilometer, which I misspoke and said miles

7 yesterday.

8 Q    And why is it that it calculates it in square meters

9 rather than in miles?

10 A    It's just a lot of software is in the metric standard

11 because it's used internationally.

12 Q    All right.  Now, Dr. Hofeller also had some opinions on

13 your envelope analysis, the analysis of the counties around the

14 CD 1 and CD 12 that you analyzed during the course of your

15 expert testimony.  Do you recall that --

16 A    I do.

17 Q    -- analysis?  And, first of all, was this the subject of

18 any of Dr. Hofeller's expert reports?

19 A    I don't recall reading anything in his expert reports

20 critiquing my definition of the envelope or my envelope

21 analysis.

22 Q    Okay.  So this is the first time you've heard this

23 criticism from Dr. Hofeller?

24 A    Correct.

25 Q    Okay.  So -- and what's the answer?  I mean, why is it --

1   why -- I believe Dr. Hofeller testified that it introduces bias

2   into the analysis if you include both the counties that were

3   touched by the benchmark plan and by the enacted plan.  Is

4   Dr. Hofeller correct on that?

5   A    No.

6   Q    And can you explain why?

7   A    The concept here is like the analysis with Voting

8   Tabulation Districts.  The analysis of the counties is --

9   they're a definition of where the district is located, where

10  the state legislature chose to locate the district; in which

11  counties, that's a broad definition of the area; or in which

12  VTDs, under the old map or the new map, and that's explained in

13  the report.

14         So the concept for the county envelope is all the

15  counties in which it was placed under the old map or the new

16  map and where the boundaries happen to go within that envelope.

17  Same with Voting Tabulation Districts.  So all the Voting

18  Tabulation Districts in which -- or for which the legislature

19  under one map or the other had the boundary of the district.

20  Q    And Dr. Hofeller suggested that the appropriate way to

21  look at this is only benchmark alone or for enacted plan alone.

22  Do you agree with that?

23  A    No, I disagree.

24  Q    Okay.  And what would be wrong with doing it that way, or

25  would it?

1  A     The problem is you'd be kind of comparing apples and

2  oranges if you followed the approach that he had suggested on

3  the stand because you would be actually shifting the baseline

4  of what the area of comparison is.  You'd be saying, well, it

5  was in this region in that time and in this region in that

6  time.  If they were in different regions, that would be fine,

7  but that would be more like a renumbering of the districts.

8  But this district is roughly located in this region.  The broad

9  stroke definition is all the counties in which it appeared in

10  either version of the map, and the narrowly defined definition

11  is all the VTDs in which it was defined in one version of the

12  map.

13          MR. HAMILTON:  Thank you.  No further questions, Your

14  Honor.

15          JUDGE OSTEEN:  Cross-examination?

16                    CROSS-EXAMINATION

17  BY MR. FARR:

18  Q     Doctor, in your report, did you disclose that you had used

19  all the counties in both the 2001 and the 2011 1st District as

20  your envelope?

21  A     My writing of it was that -- my understanding, the way I

22  read the words as I wrote them.  If it wasn't clear, nobody

23  asked me a question to clarify that.

24  Q     Okay.  Did you take a look at how the envelope would look

25  for CD 1 if you only looked at the counties that were CD 1 in

1  2001?

2  A    No, because that would -- I'm looking at the region where

3  the district is located under either map, and that would be

4  kind of part of the definition of the region, not my entire

5  definition of the region.

6  Q    But if you had been wanting to see -- you used the term

7  "racial sorting" several times.  If you wanted to see the

8  racial sorting, as you described it, that was done by the

9  individuals who supported and voted for the 2001 1st

10  Congressional District, wouldn't it have been appropriate to

11  look at the county in which that district was located?

12  A    If I was just looking at one district in one cycle without

13  comparison with other districts, the only information I'd have

14  to define the region would be just that set of counties.  I

15  think that's what the question is asking, is that right?

16  Q    You're saying that if you had done this in 2001, you would

17  have looked at the -- as the envelope for the 2001

18  Congressional District 1, you would have looked at the counties

19  in which it was actually located?

20  A    In '97 and in 2001.

21  Q    Right.  You wouldn't have included Durham County in that?

22  A    If I was -- in that context, that was how I would define

23  it, but the legis -- definition of which county is which

24  counties the legislature chose to locate the map under both

25  versions of the plan.

Q    Okay.  Now, you have another chart in one of your reports
where you talk about the population in Durham County, the total
population and the African-American population?

A    Correct.

Q    Is it fair to say that in all the counties that were
either in the first -- the 2011 1st District or the 2011 1st
District, that Durham is the most populous county?

A    I don't have the population statistics in front of me, but
it might be.

Q    You wouldn't --

A    I don't recall.

Q    You don't recall that.  Okay.  Was Durham County -- do you
know enough to know whether or not the total population and the
black population in Durham County is one of the higher
population totals amongst all the counties that would be in
either the 2001 or the 2011 1st District?

A    I would have to look at the data to make that analysis.

Q    So you have no idea?

A    I know in the report I report, you know, what the total
populations are and what percentage is Durham County.  This is
in Exhibit 18, my response report.  So what percentage of the
population from Durham County is put in CD 1 and what the black
percentage of that -- of the county is that was put in CD 1
versus the white percentage of the population that was not or
was.

```
 1  Q    But you couldn't say whether or not Durham County was one
 2  of the more -- had one of the larger populations of the
 3  counties in the 1st District --
 4  A    I did not do a comparison county by county of the
 5  populations.
 6            MR. FARR:  That's all, Your Honor.  Thank you.
 7            JUDGE OSTEEN:  Anything in response to that?
 8            MR. HAMILTON:  No redirect, Your Honor.
 9            JUDGE OSTEEN:  All right.  Dr. Ansolabehere, you may
10  step down.  Thank you.
11            (At 3:02 p.m., witness excused.)
12            JUDGE OSTEEN:  Further evidence, Mr. Hamilton?
13            MR. HAMILTON:  No further evidence, Your Honor.
14  Plaintiffs rest.
15            (Discussion between judges.)
16            JUDGE OSTEEN:  Mr. Farr, let me ask you one question
17  with respect to Plaintiff's Exhibit 13, which is the email and
18  attorney-client privilege that's been asserted.  There was an
19  assertion made, and we're not -- or at least I'm not clear on
20  the response that this document was later filed by the
21  defendants as part of the record in the Supreme Court.  Is that
22  correct or incorrect, or we're not sure about that at this
23  point?
24            MR. FARR:  Your Honor, I don't know.  It's possible
25  that that happened as part of a joint filing.  I'm sure that we
```

did not file it on our own; and, honestly, I had forgotten that
the exhibit existed until I saw it today.

There was a massive filing in the *Dickson* case, as
there was in this case, but, basically, we agreed to throw the
whole kitchen sink into the record before the North Carolina
Supreme Court; and our argument would be that under Rule 26,
either if you look at the state rule or the federal rule, once
we objected to that document and claimed that it was
privileged, it should have been returned to us, destroyed,
sequestered. Those are the rule -- the terms that are used in
Rule 26, and that was the obligation of the plaintiffs to do
that.

And I plead guilty, Your Honor, if it was jointly
filed with, you know, 500,000 other pages of paper, then I
didn't catch that. If that constitutes a waiver, then we waive
it. But I really do believe, Your Honor, the thing shouldn't
even have been in the record because the plaintiffs owed us an
obligation under Rule 26 to hand the thing back to us or
destroy it or retrieve it or seek a ruling from the Court on
whether it was privileged.

JUDGE OSTEEN: Well, what I'm inclined to do is just
keep it under advisement; but if there's nothing filed to
suggest contrary to what's been asserted, that it was filed by
the defendants in the Supreme Court or as part of a record,
then we'll proceed ahead on that finding. Yes, sir, Mr. Speas?

1          MR. SPEAS:  Your Honor, if I could just clarify.  The

2  documents were filed in the trial court by the defendants.  The

3  documents, as filed in the trial court by the defendants,

4  included Exhibit 13.  When the appeal was filed, the parties

5  jointly filed the record on appeal.

6          JUDGE OSTEEN:  Okay.  So it was the first filing that

7  you contend in the trial court?

8          MR. SPEAS:  Yes.

9          JUDGE OSTEEN:  Take a look at that and check it out

10  pretty quickly.

11          MR. FARR:  Your Honor, can we have overnight to look

12  at that and respond?

13          JUDGE OSTEEN:  Yeah, I mean, I didn't expect it

14  today, but we gave you until I think maybe Monday to respond to

15  the other thing, whatever it was, and so same time frame for

16  this in terms of verifying the facts.

17          MR. FARR:  All right.  We'll find out for sure, Your

18  Honor; and as I said, if we filed it, which I have no idea

19  whether we did or we didn't with lots of other things, then I

20  guess we waived it.

21          JUDGE OSTEEN:  Judge Gregory has got a question.

22          JUDGE GREGORY:  I have one question, counsel.  Assume

23  just for the sake of argument you get past waiver.

24          MR. FARR:  I'm sorry, Your Honor?

25          JUDGE GREGORY:  Assume for the sake of argument right

now that you get beyond the question of waiver.  You propose

that this is attorney-client privilege?

          MR. FARR:  Yes, sir, I sure do.

          JUDGE GREGORY:  And you hired the expert in this

case?

          MR. FARR:  Yes.

          JUDGE GREGORY:  And there's an old term, I guess I'm

sort of a dinosaur, but we call it a res gestae.  You're part

of the res gestae of this case, the most important part, right?

Weren't you engaged before any drawings were done?

          MR. FARR:  Yes, Your Honor.

          JUDGE GREGORY:  And you actually hired the expert

before the drawings were done?

          MR. FARR:  I did.

          JUDGE GREGORY:  So if the question comes up as to

whether instructions were given, are you claiming that you can

raise the attorney-client privilege if we ask whether

instructions were given through you for the drawing of these

plans?

          MR. FARR:  I don't think there's anything in that

email about instructions, Your Honor, and I do think there is

an argument that discussions between counsel and expert

witnesses under the new Rule 26 are protected from discovery.

          JUDGE GREGORY:  Yeah, they're normally in a different

context than this, though.  But, anyway, I just put that on

1  notice on that question to you.

2        MR. FARR:  All right.  Thank you very much.

3        JUDGE OSTEEN:  All right.  So here is what we're

4  going to do.  We're going to -- I need about 15 minutes to kind

5  of get things in place for arguments.

6        Arguments, roughly speaking, if you don't get any

7  questions, then you ought to target -- we'll say 20 minutes,

8  but if -- I would say it's reasonably likely both sides may

9  receive some questions.  We don't have a red, green, or yellow

10  light here, so we won't cut anybody off right at 20 or 25

11  minutes; but I can assure you that at about 30 minutes, we

12  won't be listening to you much anymore.  I mean that with all

13  due respect to both sides.  You've still got findings of fact

14  and conclusions of law that are going to be presented.  So

15  there will be plenty of opportunity to close out this case.

16        So, roughly speaking, target 20 to 30 minutes for

17  your arguments.  We will, I think, try to stop promptly at the

18  30-minute mark, which I think is plenty of time, given the

19  briefing that has transpired and will transpire in relation to

20  the findings of fact.

21        Any questions about that?  Mr. Hamilton?

22        MR. HAMILTON:  No, Your Honor, no questions.

23        JUDGE OSTEEN:  Mr. Farr?

24        MR. FARR:  No, Your Honor.

25        JUDGE OSTEEN:  Do you all anticipate dividing your

1  argument at all, or will one lawyer for both sides handle it?

2         MR. HAMILTON:  From the plaintiffs, I'll be

3  presenting the closing argument.

4         MR. FARR:  I'll be doing it for the defendants, Your

5  Honor.  I hope to not be up here for 20 minutes.  I think we

6  filed a brief, and you're getting findings of facts from us,

7  and I also think the arguments are pretty plain from the way

8  the evidence came out.

9         JUDGE OSTEEN:  That sounds good.  We'll be in recess

10 for 15 minutes.

11         (At 3:10 p.m., break taken.)

12         (At 3:32 p.m., break concluded.)

13         JUDGE OSTEEN:  All right.  Closing arguments?

14 Mr. Hamilton, are the plaintiffs ready to proceed?

15         MR. HAMILTON:  We are, Your Honor.

16         JUDGE OSTEEN:  All right.  You may do so.

17         MR. HAMILTON:  Good afternoon, Your Honors.  Let me

18 start by thanking the Court on behalf of all the lawyers

19 appearing before you today on behalf of the plaintiffs for your

20 courtesy and patience over the course of the last week.  It has

21 been an honor and pleasure to appear before you, and I thank

22 you for that.

23         There's been a lot of evidence presented over the

24 last few days, but the case before you boils down to a very

25 simple proposition.  May North Carolina's General Assembly

1  purposely transform North Carolina's 1st and 12th Congressional

2  District into 50 percent black voting-age population districts

3  when African-American voters in both of these districts had

4  already been electing their candidates of choice without fail

5  for 20 years?  The answer to this question has been addressed

6  and definitively settled by the United States Supreme Court in

7  its recent *Alabama* decision, which unambiguously condemned the

8  kind of misguided interpretation of the Voting Rights Act we've

9  seen here.

10       What the State did was turn the Voting Rights Act on

11  its very head.  The record showed that over the last 20 years

12  voters were joining together and voting across racial lines in

13  these two districts, and the result was that African-American

14  candidates of choice were winning elections, not just some of

15  the time, but all of the time.

16       The Voting Rights Act was designed to break down

17  barriers to equal participation in the political process.  It

18  was designed to encourage just this kind of -- just this kind

19  of state of affairs where voters vote for candidates based on

20  the content of their policies and not the color of their skin.

21       The Voting Rights Act most certainly was not designed

22  to require a State to segregate African-Americans into majority

23  and minority districts whenever possible.  The very idea is

24  repugnant to everything the Civil Rights Movement fought for

25  and everything the statute stands for.

```
 1          So the first question before the Court is whether
 2  race predominated in the drawing of these two districts.
 3  That's the key inquiry of predominance, and, here, that's
 4  really easy because they told us.  This is a direct evidence
 5  case.  It's not a circumstantial evidence case.  It's not the
 6  kind of case you need to look at district shapes or really
 7  weigh compactness and try to decipher what they're up to
 8  because they told us.  They told us what they were doing and
 9  why when they drew these two congressional districts, just like
10  Alabama did in the *Alabama* case.
11          Now, there's plenty of circumstantial evidence as
12  well, all of which just confirms what the legislature was up to
13  and told us outright.  So let's perhaps start with the direct
14  evidence.
15          It's clear and undisputed that Senator Rucho and
16  Representative Lewis, the map drawers, or those controlling the
17  map drawers, believed that compliance with the Voting Rights
18  Act required them to consider race when drawing CD 1 and CD 12.
19  That means that the General Assembly used -- the means that
20  they used to that end was a 50 percent black voting-age
21  population.
22          JUDGE OSTEEN:  Walk me through what you contend is
23  the direct evidence with respect to CD 12.
24          MR. HAMILTON:  CD 12 -- and we've put it up here on
25  the board.  The evidence is -- well, first of all, we can look
```

at the black voting-age population.  It changed more

dramatically than CD 1.  It went 43.8 percent all the way up to

50.7 percent.  At the time, in the public statement Senator

Rucho and Representative Lewis stated that, quote, because of

the presence of Guilford County in the 12th District, we've

drawn our proposed 12th District at a black voting-age level

that's above the percentage of the black voting-age population

found in the current 12th District.  That's Plaintiff's

Exhibit 67.

Now, it's instructive to compare that statement with

the facts in the *Alabama* case.  In *Alabama*, the problem was

that the General Assembly there, the legislature in *Alabama*,

said their view of retrogression is you've got to keep the

black voting-age population where it is or higher, but it can't

ever drop below, and the Supreme Court emphatically rejected

that and said that mechanical, numerical view is inconsistent.

And part of the reason we've put the Department of

Justice regulations into evidence, it's a little odd, but it's

important.  This is a functional analysis.  As the Supreme

Court said in *Alabama*, they asked the wrong question.

JUDGE OSTEEN:  Well, how do you equate what Rucho and

Lewis said about the map in their public statement and what the

map drawer said in terms of "I was instructed to make the

neighboring districts heavily or more strongly Republican but

race was not a factor"?

1          MR. HAMILTON:  There are two responses to that, Your

2  Honor.  First, we have Dr. Ansolabehere's testimony and

3  analysis of both the VTDs and then the larger county areas

4  where it clearly shows clear evidence --

5          JUDGE OSTEEN:  That's the opinion circumstantial

6  evidence.  We're on direct.

7          MR. HAMILTON:  That's right.  And then, in addition,

8  there was use of the Obama 2008 Presidential Election, which

9  correlates very closely with registered black voters, and, in

10  fact, again, we put that evidence up on the board here.

11          The correlation -- the idea that you're going to take

12  a singular unique event in American history, the first

13  African-American candidate nominated for president from either

14  major party, and suggest that that's not related to race, that

15  doesn't pass the straight-face test, with all due respect.  It

16  is -- of course, that had an influence on the way voters voted,

17  and it had a very close correlation between the location of

18  registered voters, African-American registered voters, and the

19  Obama vote.  And, of course, it's not hard to see.  That's

20  common sense.

21          Of course, there's going to be some number of

22  Republican African-American voters who are going to say this is

23  my first opportunity to vote, and there's going to be some

24  population of them that is going to cross over to vote.  That

25  makes sense.

         1          JUDGE OSTEEN:  That's true with white and black

         2   Democratic voters.

         3          MR. HAMILTON:  Absolutely true, which is another way

         4   of saying that race matters in an election.  I don't think that

         5   was disputed.  I don't think Dr. Hofeller disputes that.

         6   Frankly, I don't think defendants dispute that, and the

         7   evidence that they put in this morning was that there's still

         8   racially polarized voting in the state of North Carolina, and I

         9   don't disagree that there is in places but not in sufficient

        10   numbers in this -- in these two districts to defeat the

        11   African-American community's ability to elect the candidate of

        12   choice.

        13          So the question is, in drawing these districts, did

        14   the legislature ask the right question under the *Alabama*

        15   analysis?  And I would submit that they did not in either of

        16   these two districts.  CD 1 is just easy.  It's a flat numerical

        17   target.  There was no narrow tailoring.  There was no effort at

        18   narrow tailoring.  Now, I'm not casting aspersions on what the

        19   General Assembly did.  They were advised by their lawyers that,

        20   in their reading of *Strickland*, it required the creation of a

        21   50-percent-plus-one district.  I think that is a patently

        22   improper and erroneous construction of what the three judges

        23   who signed the majority --

        24          JUDGE OSTEEN:  *Strickland* doesn't allow a Court --

        25   you may disagree with this -- doesn't allow a Court to fashion

a remedy. *Gingles*, whatever the pronunciation is, if that

issue exists, then *Strickland* does stand for the proposition

that we, the Supreme Court, are going to require a majority

minority district, and we're not going to allow you -- or we're

not going to permit a crossover district to be substituted for

that. It's too hard to analyze.

MR. HAMILTON: Sure, but remember, in *Strickland*, the

plurality opinion went out of its way to say, you know, in a

district where there's majority -- where there's white voters

crossing over and voting with black voters, we can't imagine

how you could establish the *Gingles* factors. It just doesn't

make any sense, and then they express -- they kind of scratch

their head and say -- of course, in this case, for some reason,

it's undisclosed in the record. The parties stipulated to

that. So it's a very odd factual record before the Court.

JUDGE OSTEEN: Would you agree that under the

language of *Strickland*, for *Strickland* to apply, there first

has to be a wrong as established by the *Gingles* factors?

MR. HAMILTON: Absolutely, absolutely. And an

important -- the factor that I'm afraid has not been really

brought out well in the briefing, the remedy has to match the

violation for Section 2. So you can't say there's racially

polarized voting in this part of the district, so we're going

to create an African-American district in that part, and this

case is an excellent example of that.

1    Durham County -- I asked the questions today.  The

2 point of asking those questions is Durham County -- and *Gingles*

3 itself said there's no evidence of racially polarized voting in

4 *Gingles* [sic] County, and on the guise of creating a Section 2

5 district in CD 1, they carved up Durham County and took out the

6 African-American piece.  Why?  I mean, on what theory could

7 that possibly be something commanded by the Voting Rights Act

8 when there's no racially polarized voting?  How do we know

9 that?  Because of *Gingles*.

10    JUDGE OSTEEN:  How do you -- in contending there's no

11 racially polarized voting, and I understand you didn't have --

12 nobody had the study done, but G.K. Butterfield testified about

13 the "east of 95" effect, and, frankly -- I'm not saying

14 ultimately what I would find, but let's assume for a second

15 that his testimony was such as to assign great weight to it.

16 If you move CD 1 around to the east, as was done, how does --

17 how do those pieces -- I guess the ultimate question is how do

18 we weigh or how should I weigh Butterfield's testimony with

19 respect to the polarized voting that still exists east of 95?

20    MR. HAMILTON:  Well, I don't think there's any

21 dispute about that, about the fact that in some areas there's

22 polarized voting, but you can see -- I don't have the tables up

23 here, but the election tables, I think, are really -- and part

24 of the reason we blew them up like this is I think they're

25 really telling.  You have minority-minority districts.  So that

 1  is black voting-age population of less than 50 percent and a

 2  consistent string, not just some of the time, all of the time

 3  where, you know, right down the line, every single time,

 4  they're voting.  I mean, that's happening -- it's not to say

 5  that there's no polarized voting.  There certainly might be in

 6  pockets, and there probably is in almost every state in this

 7  union, but the question -- that's not the question.

 8          The question is as -- again, I'm sorry to keep

 9  referring to the *Alabama* case, but the right question is

10  what -- at what level do we need to have black voting-age

11  population in order to ensure that the minority community has

12  the ability to elect?  The DOJ guidelines on retrogression

13  speak exactly to that same question.

14          So, yes, there may be some polarized voting, but

15  unless it's sufficient to defeat the minority communities'

16  ability to elect the candidate of their choice, it's background

17  noise.  It affects certainly where you have to draw the line to

18  prevent retrogression, but it doesn't -- it doesn't mean that

19  you don't have a Section 2 issue.

20          And so, you know, here, the districts that were

21  created that were in the 46, 47 percent black voting-age

22  population were terrific examples of an application of the

23  Voting Rights Act that worked.  They were -- they were examples

24  that we should all be applauding at the behavior of the voters

25  in those districts, and that's the problem here is that the

legislature took those and dismantled them on a theory and, I
would submit, a misreading of the decision in *Bartlett v.*
*Strickland*, that on their theory would require raising --
significantly raising the black voting-age population.  That's
not what the Voting Rights Act -- that's not what the Voting
Rights Act requires at all.

Now, I'd like to talk just a couple minutes on narrow
tailoring.  Obviously, because the defendants have not even
tried to defend CD 12 as a Voting Rights Act district, as they
call it, they haven't even attempted to show any kind of narrow
tailoring.  So that -- we just put that aside at the outset.
They waived whatever defense they might have had, and there's
no argument there.

As to CD 1, there was no effort at narrow tailoring.
Their argument is almost even weaker in CD 1 because of the use
of a flat numerical threshold.  Narrow tailoring would be,
well, we're going to do a racially polarized voting analysis
and determine, gee, you only need to have a 46 percent black
voting-age -- maybe it's a 40 percent.  Maybe it's a
47 percent, whatever it is.  You know, if the legislature had
done that and used that as the basis for drawing these
districts, absolutely fine.  That's what's called a strong
basis in evidence for drawing these districts, but they didn't.
Instead, they used this misinterpretation of *Strickland* and
applied a 50 percent BVAP rule.  That's been condemned by

1    *Alabama*.  That was the problem in the *Page* --

2           JUDGE OSTEEN:  Isn't the 50 percent plus one just a

3    majority minority number as established by the cases?

4           MR. HAMILTON:  It is.  Well, it is a majority

5    minority number, absolutely, but it is not, in fact, what was

6    required.

7           Your Honor, I have about five minutes left.  I would

8    like to save it for rebuttal, if I might?

9           JUDGE OSTEEN:  Actually, that will give you about six

10   minutes in rebuttal, by my count.

11          MR. HAMILTON:  Thank you.

12          JUDGE OSTEEN:  All right.  Mr. Farr?  Hold on just a

13   second.  Mr. Farr?

14          MR. FARR:  Your Honor, we filed our brief.  You've

15   heard the evidence.  I think the Court knows most of what our

16   arguments are in this case.  I think you understand that we

17   contend that the 12th Congressional District was a political

18   draw.  It was based upon the Obama/McCain election and was also

19   based upon how that district affected the surrounding

20   districts.

21          I want to focus on the 1st District because I really

22   need to clear up a few things that don't seem to be clear.

23          JUDGE GREGORY:  I wanted to ask you about the 12th

24   District if you are moving to the 1st.

25          MR. FARR:  Okay, sir.

```
 1              JUDGE GREGORY:  Unless you will get back to the 12th?

 2              MR. FARR:  No, Your Honor, please, go ahead.

 3              JUDGE GREGORY:  Counsel, we agree that is direct

 4    evidence we have as to the intent as to the statements that

 5    your clients made in the record.  You don't agree that's

 6    direct?

 7              MR. FARR:  No, sir, I sure don't, Your Honor.  What

 8    happened was --

 9              JUDGE GREGORY:  It says, "Because of the presence of

10    Guilford County in the 12th District, we have drawn our

11    proposed 12th District..."  They didn't limit it to Guilford

12    County.  They said, "We have drawn our proposed 12th District

13    at -- and that's a key word, that preposition 'at' -- a black

14    voting-age level that is above the percentage of black

15    voting-age population found in the current 12th."

16              It didn't say because -- as a result of what we have

17    drawn resulted in that level.  It said, no, it was drawn at a

18    black voting-age level, which means it established a floor,

19    which was the existing BVAP for that county.  Is that not --

20    how is that not correct?

21              MR. FARR:  Your Honor, with all due respect, I don't

22    agree with your interpretation --

23              JUDGE GREGORY:  I didn't ask you to agree with my

24    interpretation.  I asked if you agree with English, the

25    language.
```

                    1          MR. FARR:  The statement speaks for itself, Your

                    2    Honor.

                    3          JUDGE GREGORY:  I'm asking you how is that not direct

                    4    evidence when the person -- the only two people responsible for

                    5    drawing this plan said that's what they did.

                    6          MR. FARR:  Because, Your Honor, we believe that what

                    7    they were saying in that statement is after they based the

                    8    district on political data, the maps came out, and I hope this

                    9    is clear to the Court.  There's a map notebook.  I think it's

                   10    Exhibit 25.  These are all the maps that were available to the

                   11    General Assembly before the plans were enacted, and those

                   12    maps -- when someone proposes a plan, they have the racial

                   13    statistics as part of the stat pack.  So once the district was

                   14    drawn and it turned out that the black population was above the

                   15    prior district, that at the time was an argument to argue for

                   16    the preclearance of the plan.

                   17          So, Your Honor, I understand what the statement says.

                   18    I'm not going to argue with you about that, but we believe that

                   19    that statement was made not as a cause -- reflecting a cause of

                   20    the drawing of the district, but that was a result of what

                   21    happened --

                   22          JUDGE GREGORY:  Fair enough, counsel, but does that

                   23    change it from being direct evidence?  That's your spin, your

                   24    argument, but that doesn't change whether it's direct evidence,

                   25    does it?

1        MR. FARR:  Well, Your Honor --

2        JUDGE GREGORY:  Does it change whether it's direct

3   evidence?

4        MR. FARR:  I don't think it's direct evidence, Your

5   Honor.

6        JUDGE GREGORY:  I didn't ask you do you think it is,

7   but would it change whether it's direct evidence just because

8   you have a different spin on it?  It says what it says, doesn't

9   it?

10       MR. FARR:  It says what it says, Your Honor, and we

11   don't agree that that's direct evidence of intent.

12       JUDGE GREGORY:  All right.  So we can't believe what

13   they said?  You didn't put them on today, right?

14       MR. FARR:  They testified in the other case, Your

15   Honor.

16       JUDGE GREGORY:  Well, we had a trial here for us to

17   hear.  You didn't want us to hear it?

18       MR. FARR:  Your Honor, I was -- it was our

19   understanding that we were running out of time.

20       JUDGE GREGORY:  No, I didn't hear anybody --

21       MR. FARR:  Also, Your Honor --

22       JUDGE GREGORY:  No one cut you off.

23       MR. FARR:  I would say the plaintiffs had them on

24   their call list, and they didn't call them as plaintiffs either

25   as witnesses.

1          JUDGE OSTEEN:  Let me ask a followup question to what

2    Judge Gregory is saying, and that is the last sentence of that

3    quote.  There was clearly from Dr. Hofeller some instruction,

4    depending on how it's construed, about compliance with

5    Section 2 and Section 5, and that was an objective maybe with

6    respect to CD 1, maybe with the overall plan.  And the last

7    sentence says, "We believe that this measure will ensure

8    preclearance of the plan."

9          If your objective is concern over preclearance with

10   the Department of Justice, does that last sentence also or --

11   no, we won't say also.  Does that last sentence suggest that

12   there was a minimum and we wanted to ensure that District 12

13   either remained at or above the prior black voting-age

14   population?

15          MR. FARR:  Your Honor, certainly preclearance was an

16   issue in that district because Guilford County was in the

17   district.  It's our position that the district was drawn based

18   upon political data; that once the district was drawn and the

19   statistics came out, the reality that the black population had

20   gone up in the district was an argument to be made to support

21   the preclearance of the plan.

22          JUDGE GREGORY:  So you got lucky.  You'd have the

23   Court believe that it was out of luck.  You said, well, we drew

24   a totally blind race.  It was political, but it just so

25   happened that it worked.  Now it becomes just an argument but

1  not an intent from the beginning.  Is that your argument?

2          MR. FARR:  I don't think I'd put it that way, Your

3  Honor --

4          JUDGE GREGORY:  You didn't put it that way, but

5  that's the natural extension of your argument, isn't it?

6          MR. FARR:  I don't think so, Your Honor.

7          JUDGE GREGORY:  Counsel, you said that -- didn't you

8  say that it turned out once we finished, we looked at the map

9  and said, oh, look it comes out to be at this amount, but we

10  had no idea where it would come out.  Isn't that the natural --

11  it's just a post hoc argument but not any pre-intention at all,

12  right?  That's what you're arguing?

13          MR. FARR:  Your Honor, I'm not sure I understand your

14  question, Your Honor.

15          JUDGE GREGORY:  You understand it.  You just don't

16  want to answer it.

17          What I'm saying is that you said that you had no

18  intent at all looking at race, it was only political, and this

19  statement said it was drawn "at".  "At" is a very important

20  preposition.  It didn't say "resulted in."  It said it was

21  drawn "at."  "At" refers to the antecedent of drawn, at a

22  voting-age level, not -- it's not what -- it's not that it

23  serendipitously ends up being so, but drawn at a level.  I

24  mean, I don't know how you get away from the English.  I mean,

25  that's King's English in terms of how you read statutes all the

time and reading a statement that's a very important statement

here, and you're saying this was only just really the luck of

the draw that it happened.

MR. FARR: Your Honor, I think that, as the Supreme

Court noted in the *Cromartie* case, there's a very high

correlation between blacks and people who vote for Democrats.

So by increasing the Democratic strength in that district, it

was not surprising that the black voting-age population went

up, but it was a result of the political criteria that was used

to draw the district.

JUDGE GREGORY: And you use the election of President

Obama, but not the election -- the results that happened on the

same day, the very same day, for other candidates, correct?

MR. FARR: Well, that's because, Your Honor, that was

the first presidential race since '76 where a Democratic

candidate had carried the state except for when President

Clinton won, I believe, in '96, and it was a good test for

Democratic strength. It was a good test for Democratic

turnout. If the intent of the map drawer was to draw strong

Republican districts, that would be the best race to look at.

And also, Your Honor, as Dr. Hofeller testified, he checked the

Obama race with other races, and they tracked -- if we had used

the other races, the results would have been the same.

Now, could I move to Congressional District 1 for a

second?

1          JUDGE GREGORY:  I'm good.

2          MR. FARR:  All right.  Thank you, Your Honor.

3          I just wanted to say a couple things about

4   Congressional District 1.  Of course, we do not think that race

5   was the predominant motive for Congressional District 1.  There

6   were lots of other factors that went into it.  But I do want to

7   talk about the evidence as it relates to Congressional

8   District 1 if the Court found that race was the predominant

9   motive.

10          JUDGE OSTEEN:  There's really no dispute in terms of

11  the instructions to Dr. Hofeller that CD 1 was to be drawn at

12  50 percent plus one.

13          MR. FARR:  That's right, Your Honor, but we think if

14  you read the *Cromartie* case, the pretty predominant motive,

15  particularly when there's a high correlation between black

16  voters and voting for Democrats, it's a very demanding burden,

17  and you have to show that the race -- that the district is

18  unexplainable but for race; and we've explained other criteria

19  that were considered in drawing that district, including the

20  severe underpopulation issue, which was the reason why it was

21  drawn into Durham.

22          Also, drawing the district into Durham allowed the

23  General Assembly to create Congressional District 4 as a very

24  strong Democratic district, and the first Congressional

25  District was also based largely on the prior 1st Congressional

District.  So there were other traditional criteria that went

into the consideration of the 1st Congressional District.

        In *Vera v. Bush*, the Supreme Court said that you

don't prove racial predominance just because race was a factor

in drawing a district.  We don't dispute that it was a factor

in drawing the 1st Congressional District, but we don't think

it was the predominant factor.

        JUDGE OSTEEN:  All right.

        MR. FARR:  Now, if the Court finds that it was the

predominant factor, I want to talk about the *Alabama* case.

        The *Alabama* case was a Section 5 case.  It wasn't a

Section 2 case.  The mechanical formula that the State adopted

was a rule that they came up with, no precedent from the

Supreme Court, that they were going to keep all their districts

at their prior percentages of black population, including

districts that were drawn at 70 percent, 65 percent, very, very

high percentages of black population that we don't have here.

That was the mechanical rule that the Supreme Court disagreed

with in the *Alabama* case in the context of Section 5.

        North Carolina followed a rule that was established

by the US Supreme Court in *Strickland*.  North Carolina did not

come up with the 50-percent-plus-one rule.  The US Supreme

Court did.

        And turning back to *Alabama*, Your Honor, what the

*Alabama* Court said, which we think helps us, is that it's not

the State's obligation to prove a Section 2 violation.  They
have to show there was good reason to think that there might be
a Section 2 violation, even if a Court might subsequently find
that there wasn't sufficient evidence to find a Section 2
violation.

JUDGE OSTEEN:  Okay.  And I -- do you agree with what
I asked earlier in terms of *Strickland* discussing the remedy,
but also saying you only get to this remedy when there is a
violation, and the factors to establish a violation are those
set forth in *Gingles*?

MR. FARR:  Exactly right, Your Honor, and our
position is if those factors aren't present, then there
shouldn't be a 47 percent district drawn in Northeastern North
Carolina.

JUDGE OSTEEN:  All right.  So then the other --

MR. FARR:  It should go away.

JUDGE OSTEEN:  In terms of intent and direct
evidence, there's a lot of discussion -- or there is some
evidence, shall we say, that this map was drawn to comply with
*Strickland* which suggests that it was drawn to create a
majority minority district.

I don't know that I've seen anything to suggest that
the legislature first analyzed the *Gingles* factors to ensure
that there was a problem that needed to be remedied under
*Gingles*.

1          MR. FARR:  Well, thanks for asking that question,

2    Your Honor, because that's a good thing to clear up right now.

3    In fact, the legislature did that.

4          First of all, you had the historical precedent of the

5    district being drawn as a voting rights district, and there's

6    two types of districts that are pertinent here.  One is a

7    majority-black district and the other would be a majority

8    minority coalition district, where the non-Hispanic whites are

9    in the minority in the district.  The 1st District has always

10   been drawn as a majority non-Hispanic white district.  Whites

11   have never been in the majority in the 1st District.

12         There's also something called a "crossover district."

13   That's where whites are in the majority, and they cross over to

14   support the black candidate of choice.  It's never been a

15   crossover district.  So this district has been, in voting

16   rights terms, a majority-black district beginning.  It was a

17   majority black district in total population in -- maybe even in

18   '97, and in voting-age population it's always been a majority

19   minority coalition district.  It's never been a majority-white

20   district.

21         JUDGE OSTEEN:  The third factor in *Gingles*, though,

22   is the minority must be able to demonstrate that the white

23   majority vote sufficiently as a bloc to enable it in the

24   absence of special circumstances, usually to defeat the

25   minority's preferred candidate.

1          MR. FARR:  Thank you for that question, Your Honor.

2    In fact, the General Assembly had two studies performed and two

3    different experts, one submitted by the NAACP named Dr. Ray

4    Block, I think his name was, and then the legislature hired

5    someone named Tom Brunell.  Both of them did polarization

6    studies for all of the counties, including in the 1st

7    Congressional District.

8          Mr. Block only looked at black/white races that had

9    taken place from 2006 through 2010; and in doing that, he

10   missed a couple of counties where there had not been a

11   black/white race.  So Dr. Brunell looked at racial polarization

12   in all the counties in the northeast; and between Dr. Brunell

13   and Dr. Block, both of those experts gave testimony that there

14   was statistically significant racially polarized voting in all

15   those counties in which the 1st District was finally enacted.

16         And the other evidence, Your Honor, that supports

17   that is that counsel for the NAACP made a statement that there

18   was very strong racially polarized voting in North Carolina.

19   The NAACP, through the Southern Coalition for Social Justice,

20   proposed a majority minority coalition district in the

21   northeastern part of North Carolina as the 1st Congressional

22   District.  The Democratic leadership proposed a majority

23   minority coalition district in that part of the state.  Those

24   two groups, plus the legislative Black Caucus, proposed

25   legislative plans; and in all three of those legislative plans,

all three of those groups proposed majority-black or majority minority coalition districts in every county that's in the 1st Congressional District, including Durham.

Now, I do want to say something about Durham, Your Honor.

JUDGE OSTEEN:  I want to talk about G.K. Butterfield for a minute.

MR. FARR:  Okay.

JUDGE OSTEEN:  There may be -- let's assume there is expert testimony out there.  G.K. Butterfield -- Congressman Butterfield came into this Court and said with respect to CD 1, as it was presently constituted, he felt like, generally speaking -- I think it was a 70 -- maybe a 70, 75 percent of the white bloc would not cross over and vote for a black candidate, but he thought that with -- there was 20, 25, or 30 percent who would, better than it had been in years past.  So if I weigh Congressman Butterfield's testimony significantly, is that at odds with whatever the experts have said?

MR. FARR:  Well, I think that was important testimony, Your Honor, and I think it's also important to note that, again, the district was underpopulated by over 97,000 people.  So Congressman Butterfield seems to think and testified that he thought there was still racially polarized voting in that part of the state that required an elevated percentage of black population for black voters to have an

equal opportunity to elect their candidate of choice.  He

didn't come in and say that we could use a 20 percent district,

which is the black population in the state.  It's about

22 percent.  He didn't advocate for that.  He didn't advocate

for a 35 percent district.  He testified that -- I believe he

said it needed to be at 47 percent in his opinion.

Well, here is what the *Strickland* --

JUDGE OSTEEN:  Didn't he say they could go maybe as

low as 35 to 37 percent, but he would prefer to be in the mid

40s?

MR. FARR:  I thought he said 45 to 47, Your Honor.  I

thought he said 45 would be a difficult race, and 47 would be

the preferred number is what he talked about.

So the question is what 97,000 voters do you put into

the district to make sure that African-Americans have an equal

opportunity to elect candidate of choice at 47 percent?  How do

you factor in the fact that Congressman Butterfield is an

incumbent?  He's very popular with all constituents.

One thing that has not come before the Court, the

plaintiffs want to look at the voting percentages.  We have

evidence and the trial court in the *Dickson* case looked at

evidence about what the actual vote differences were in these

elections.

So, for example, I know in 2010, and I'm pretty sure

there's another election for Congressman Butterfield where his

margin of victory was less than -- I mean, substantially less than 97,000 people, which is the amount of people that would have to be added to that district to bring it up to one person, one vote.  And this goes directly to what Justice Kennedy wrote about in the *Strickland* case, and he said that if there's racially polarized voting, and if the *Gingles* factors are present -- and there's a question, Your Honor, really whether the *Gingles* factors are things like disparities in education and income and whatever.  There is testimony in the record -- ample testimony in the record that that still exists in the area of the 1st Congressional District, but there's a question about whether a legislature has to actually have that type of information.  It's arguable that the legislature just needs to have the three *Gingles* preconditions, and -- which is blacks can be a majority in a single-member district or the black population is geographically compact, they're cohesive, and there's racially polarized voting.

So what *Strickland* said, Justice Kennedy, is that it's very difficult to decide exactly what the right type of voters that you need to bring in when you change a district. It's very hard to determine the impact of incumbency because certainly it's likely that Congressman Butterfield would do better in his district than a newcomer.  I think the political science on that is indisputable.

So what the Court in *Strickland* said was that courts

and legislatures meet a judicially manageable standard, and
that's -- that was the reason for the 50-percent-plus-one rule.

I mean, arguably, Your Honor, as you pointed out, if
the 50 percent plus one is not needed, then the district goes
away. Then we shouldn't even have to be talking about a
47 percent district at that point in time. I don't think any
witness in this case, either in the *Dickson* state court trial
or this case, is advocating that we abolish a district in
Northeastern North Carolina that has a significantly high
percentage of black population.

In fact, Your Honor, again, all the districts that
have been proposed, even in 2011, are majority minority
coalition districts. They're not majority non-Hispanic white
districts. I think you may recall the evidence that in -- at
the time of the 2010 Census, the 1st Congressional District had
over 50 percent registered -- over 50 percent of the registered
voters were African-Americans.

So the question I would leave the Court with, Your
Honor, is we think both of these districts are legal. We think
Dr. Ansolabehere's use of registration statistics to try to
prove intent in the 12th District has been already ruled out by
the Supreme Court. We think the enacted 1st District complies
with the *Strickland* case, the *Cromartie* case. We think it
complies with the *Alabama* case because the *Alabama* case says we
just have to have good reasons, a strong basis in the evidence.

We don't have to prove that an actual violation took place; but

if the Court finds that there is a violation, what exactly is

the criteria that we're supposed to follow?

In *Cromartie*, the plaintiffs have an obligation --

even if they prove that race was the predominant motive for 12,

they have an obligation in *Cromartie* of offering another map

which shows how District 12 could be drawn without race being

the predominant motive but still achieving the legitimate and

political goals of the General Assembly. They've not offered

such a map.

And in the 1st District, Your Honor, how is the State

supposed to know what they should be doing in drawing the 1st

District? What's the basis for drawing the district at 47 or

48 percent black voting-age population. With a minority-white

population, you're creating a majority minority coalition

district. And in *Strickland*, there's a footnote and some text

actually where the Court says that the Supreme Court's never

recognized a majority minority coalition district as a proper

remedy for a Section 2 violation.

So when you're looking at *Alabama* and you're looking

at the 1st District -- if you're looking at the *Alabama* case,

the Court there says North Carolina doesn't have to prove an

actual violation. They have to have a strong basis in evidence

to support the district, but they can accomplish that if they

have good reason to think that a VRA district is required, and

1 | they don't have to get the numbers exactly right.

2 | North Carolina did not adopt a mechanical rule

3 | requiring super majority-black districts as was the case in

4 | *Alabama*. The VRA district in the northeast was drawn slightly

5 | above 50 percent, and we think the evidence shows there was

6 | more than good reason to do so.

7 | We also think, Your Honor, the plaintiffs have not

8 | articulated why the State should be obligated to draw a

9 | majority minority coalition district instead of a

10 | majority-black district; and if the plaintiffs are correct that

11 | there's no racially polarized voting in the 1st District

12 | anymore, which I find it hard to believe that they think that,

13 | but if that's what the Court finds, then the remedy is that the

14 | 1st District goes away. There would be no obligation on the

15 | part of the State to draw any district in the northeast with

16 | any elevated black population.

17 | JUDGE COGBURN: If the defendants, though, believe

18 | that they needed to draw a majority minority district in the

19 | 1st District, is it just coincidental that when they got to the

20 | 12th District, they turned a 42 percent black population

21 | district into a majority minority district of over 50 percent?

22 | Is that just -- did they just get caught up in this -- in

23 | trying to create majority minority districts over in 1 and just

24 | got carried away in 12 and went from 42 to 50?

25 | MR. FARR: Well, Your Honor, the answer to that

question is there's a very, very high correlation between black

voters and voting for Democratic candidates.  So if you --

JUDGE COGBURN:  And that's the -- if you just went

with that, if you just went with that, then you just might as

well never worry about having any question about section

factors.  The argument is always going to be we didn't -- yes,

there were -- there were lots of blacks that were moved, but we

did it because they were Democrats, and there would never be a

question about it because 90 percent of the time, based on what

you're saying, the African-American voters would be

Democratically registered.

MR. FARR:  Well, that's true; they would be

Democrats.  So if you were going to make a stronger Democratic

district in the 12th and you were going to make a stronger

Republican district in the 8th and if you were going to take

the 13th district out of Guilford County, it's very likely that

in that part of the state the percentage of black population

would go up because there's such a high correlation between

black voters and the Democratic vote.

And I would point the Court out, Your Honor, to

Justice Thomas' opinion in the *Cromartie* case, that's the first

*Cromartie* case, where he says drawing a majority-black district

does not establish a racial gerrymander when there's a high

correlation between black voters and voting for Democrats where

the legislature's intention is to draw a very strong Democratic

1    district.

2          Unless the Court has any other questions -- and I

3    would just conclude by saying thank you, Judges, very much for

4    putting up with us and being as cordial as you were.  We

5    appreciated it as much as the plaintiffs' counsel do.  Thank

6    you.

7          MR. HAMILTON:  I would like to address a couple of

8    things.  First of all, *Alabama* was not a Section 5 or a

9    Section 2 case.  *Alabama* was a *Shaw* case based on the

10   Fourteenth Amendment for race-based redistricting just like

11   here, and the error in the -- identified by the Supreme Court

12   in the *Shaw* case was that the Court asked -- the legislature

13   asked the wrong question, and what they should have asked was

14   to what extent must we preserve existing minority percentages

15   to maintain the ability to elect?  That's the correct question,

16   not how can we maintain existing levels, and that is exactly

17   what was wrong in *Alabama*.

18         *Cromartie* was a circumstantial case.  Sure, you have

19   to -- and the discussion about putting in an alternative map is

20   in a circumstantial case.  In a direct evidence case, you don't

21   need anything like that.  We don't need to put in any

22   circumstantial evidence or maps to show that it could have been

23   drawn another way, because the fact of the matter is they told

24   us what they were doing.  They said they were drawing the

25   districts based on race.

1        If the Fourteenth Amendment means anything, it means

2   that is a suspect use of race, and we're into strict

3   scrutinyville; and application of the strict scrutiny test

4   requires narrow tailoring of the sort that in neither

5   district -- they didn't even attempt it in CD 12, and in CD 1,

6   because of the misinterpretation of *Strickland*, they didn't

7   believe that they were entitled to.

8        JUDGE COGBURN:  We have to find, though, that it was

9   done -- that it was unexplainable other than by race, and

10  the -- with regard to 12 -- I mean, the way 12 was originally

11  drawn, did that not create a situation where when someone is

12  trying to do it -- to go to a political advantage, they're

13  going to wind up having to switch African-American voters in

14  and out of that district in order to do that?

15       MR. HAMILTON:  Sure, they could have, but I submit

16  there's a couple of problems here.  The first is, again, the

17  quote we put up here, and I think that it was the subject of a

18  couple of questions from the Court earlier, that they moved --

19  in CD 12, the proposed -- you know, proposed political

20  gerrymander, they actually moved people because of their race,

21  a substantial African-American population, and they said they

22  did.  That's just direct evidence, and I completely agree with

23  the questions from the Court.

24       Now, *Bartlett v. Strickland* actually said, quote:

25  It's difficult to see how the majority bloc voting requirement

could be met in a district where, by definition, white voters
joined in sufficient numbers with minority voters to elect the
minority's preferred candidate.  That's at page 1224.  And, in
addition, said:  In areas with substantial crossover voting, it
is unlikely that the plaintiffs would be able to establish the
third *Gingles* precondition, bloc voting by majority voters.
That's page 1248.

And I think, Your Honor, you asked a moment ago, I
don't see any evidence in the record that the legislature did
any kind of *Gingles* analysis.  That's exactly right, Your
Honor, because they didn't.  They didn't analyze any of this
stuff.  Yes, there were polarized --

JUDGE OSTEEN:  Let me ask you about this total
percentage on the charts, the 500 and 501 chart.

MR. HAMILTON:  Yes.

JUDGE OSTEEN:  You've got a total black voting-age
population, let's say, for example, 47 percent.  Then we have a
margin of victory of 66 percent, but at least with respect to
the chart, there's nothing in there, as Dr. Hofeller pointed
out, to explain what the turnout was so you have some idea how
that percentage victory compares to the composition of the
district.

MR. HAMILTON:  Sure.

JUDGE OSTEEN:  So how do you walk us through the
coalition or crossover to get to the point where you can

conclude, as was suggested, I think, that there is a 20 percent

crossover or some percentage crossover?

MR. HAMILTON: Well, let's think -- number one, we

know as a matter of fact that the black voting-age population

was below 50 percent. So however -- and we know a second fact,

that is, the outcome of the election, the African-American

preferred candidate one. So it wouldn't matter -- turnout

doesn't matter because every single African-American voter

could turn out and vote for the African-American preferred

candidate, and they would still lose if there was --

JUDGE COGBURN: Not if they were the only people --

JUDGE OSTEEN: You're assuming --

MR. HAMILTON: Fair enough.

JUDGE OSTEEN: You're assuming it's 100 percent

turnout to match the stats up, but we don't know that that's

the case. So without a breakdown -- assume the 47 percent

equals 50,000 voters. Well, it may have been 50,000 plus -- or

not plus. That 50,000 comprises 60 percent of the winning

margin. That's an extreme, and I'm not suggesting how it

happened, but that's -- statistically speaking, when we talk

about crossover, I can't -- I'm -- again, walk me through how I

reach that conclusion from what we've got in front of us.

MR. HAMILTON: There's no evidence that's been

offered by defendants that the turnout rates differ between

African-American voters and white voters or other minority

voters.  There's simply no evidence in the record.  So the only

thing the Court can conclude is that they turn out in equal

numbers, and so assuming, and --

JUDGE OSTEEN:  How can I assume that?

MR. HAMILTON:  I'm sorry?

JUDGE OSTEEN:  How would I assume that?

MR. HAMILTON:  Well, you have no evidence to suggest

otherwise.  You have registered voters that vote in the

population, you've got the election results, and you know what

the population statistics are for each of these districts.

JUDGE OSTEEN:  True.

MR. HAMILTON:  So there's no -- there's no -- I mean,

let's just back up one step in the analysis.  One thing we

know, and I think we would all probably agree, is that the

African-American candidate of choice won for 20 years straight

in these districts even when the black voting-age population

was well below 50 percent.  There was no need -- it's a

functional analysis.

Remember the question that the Court said in *Alabama*.

It's the right question.  "To what extent must we preserve

existing minority percentages to maintain the ability to

elect?"  That's the question that should have been asked, and

that's the question that was not asked because of this

interpretation of *Strickland* that somehow have to -- have to --

regardless of the voter behavior in the district, you have to

1 increase the African-American black voting-age population,

2 which has the effect of sorting voters by race.  That is

3 exactly what the Voting Rights Act does not mean.

4          JUDGE GREGORY:  In response to that, that chart shows

5 that either crossover voting occurs or either that it's not

6 required for African-Americans to elect the preferred choice.

7          MR. HAMILTON:  That's right.  That's exactly right.

8 And the question here is what -- you know, is did the General

9 Assembly have a substantial basis in evidence?  Did they have

10 good reason to draw what they did?  And the fact of the matter

11 is they didn't because they didn't do a racially polarized

12 voting analysis.  They didn't analyze to what extent they

13 needed -- they didn't do the functional analysis required to

14 determine the question, as described by the Court either in

15 *Alabama* or Department of Justice in the guidance.

16          So the Supreme Court in the *Miller* case wrote that

17 the essence of the Equal Protection claim recognized in *Shaw* is

18 that the State has used race as a basis for separating voters

19 into districts.  The *Shaw* Court condemned those redistricting

20 plans because they "threatened to carry us further from the

21 goal of the political system in which race no longer matters, a

22 goal that the Fourteenth and Fifteenth Amendments embody and to

23 which the Nation continues to aspire."

24          In this case, the General Assembly used race, not

25 politics, as a predominant factor.  They told us that they did

1  it, and then they did it in these two congressional districts.

2  I'd submit that they are -- this constitutionally suspect use

3  of race was neither required by a compelling state interest nor

4  narrowly tailored to advance any such interest.

5          The Voting Rights Act is a powerful and important

6  tool, and it took an enormous amount of energy and courage to

7  pass, and the misinterpretation of the statute and threat that

8  if we don't interpret it as this construction of *Gingles*, then

9  there will be no Voting Rights Act districts does a disservice

10 to the voters of the state of North Carolina.

11         Plaintiffs respectfully ask this Court to invalidate

12 these two districts and to implement appropriate, immediate,

13 and effective remedies for the folks of this state.  Thank you

14 all.

15         JUDGE OSTEEN:  We're going to step down and greet the

16 lawyers, and we will go ahead and recess Court.

17         (At 4:22 p.m., proceedings concluded.)

18                       *  *  *  *  *

19                   C E R T I F I C A T E

20     I certify that the foregoing is a correct transcript
       from the proceedings in the above-entitled matter.

21

22

23  Date: 10/20/2015     Joseph B. Armstrong, RMR, FCRR
                         United States Court Reporter
24                       324 W. Market Street
                         Greensboro, NC  27401

25