## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
_____
                                  )
DAVID HARRIS, CHRISTINE           )
BOWSER, and SAMUEL LOVE,          )
                                  )
              Plaintiffs,         )
                                  )
      v.                          )          Case No. 1:13-cv-949
                                  )
PATRICK MCCRORY, in his           )
capacity as Governor of North     )
Carolina, NORTH CAROLINA          )
STATE BOARD OF ELECTIONS,         )
and JOSHUA HOWARD, in his         )
capacity as Chairman of the       )
North Carolina State Board        )
of Elections,                     )
                                  )
              Defendants.         )
_____ )
```

### MEMORANDUM OPINION

Circuit Judge Roger L. Gregory wrote the majority opinion, in
which District Judge Max O. Cogburn, Jr., joined and filed a
separate concurrence. District Judge William L. Osteen, Jr.,
joined in part and filed a dissent as to Part II.A.2:

    "[T]he Framers of the Fourteenth Amendment . . . desired to
place clear limits on the States' use of race as a criterion for
legislative action, and to have the federal courts enforce those
limitations." Richmond v. J.A. Croson Co., 488 U.S. 469, 491
(1989). For good reason. Racial classifications are, after
all, "antithetical to the Fourteenth Amendment, whose 'central
purpose' was 'to eliminate racial discrimination emanating from

official sources in the States.'" Shaw v. Hunt, 517 U.S. 899, 907 (1996) (Shaw II) (quoting McLaughlin v. Florida, 379 U.S. 184, 192 (1964)).

The "disregard of individual rights" is the "fatal flaw" in such race-based classifications. Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 320 (1978); see also J.A. Croson Co., 488 U.S. at 493 (explaining that the "'rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights'" (quoting Shelley v. Kraemer, 334 U.S. 1, 22 (1948))). By assigning voters to certain districts based on the color of their skin, states risk "engag[ing] in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" Miller v. Johnson, 515 U.S. 900, 911–12 (1995) (quoting Shaw v. Reno, 509 U.S. 630, 647 (1993) (Shaw I)). Quotas are especially pernicious embodiments of racial stereotypes because they threaten citizens' "'personal rights' to be treated with equal dignity and respect." J.A. Croson Co., 488 U.S. at 493.

Laws that classify citizens based on race are constitutionally suspect and therefore subject to strict scrutiny; racially gerrymandered districting schemes are no different, even when adopted for benign purposes. Shaw II, 517

2

U.S. at 904–05. This does not mean that race can never play a role in redistricting. Miller, 515 U.S. at 916. Legislatures are almost always cognizant of race when drawing district lines, and simply being aware of race poses no constitutional violation. See Shaw II, 517 U.S. at 905. Only when race is the "dominant and controlling" consideration in drawing district lines does strict scrutiny apply. Id.; see also Easley v. Cromartie, 532 U.S. 234, 241 (2001) (Cromartie II).

This case challenges the constitutionality of two North Carolina congressional districts as racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment. Specifically, this case concerns North Carolina's Congressional District 1 ("CD 1") and Congressional District 12 ("CD 12") as they stood after the 2011 redistricting. The plaintiffs contend that the congressional map adopted by the North Carolina General Assembly in 2011 violates the Fourteenth Amendment: race was the predominant consideration with respect to both districts, and the General Assembly did not narrowly tailor the districts to serve a compelling interest. The Court agrees.

After careful consideration of all evidence presented during a three-day bench trial, the parties' findings of fact and conclusions of law, the parties' arguments, and the applicable law, the Court finds that the plaintiffs have shown

3

that race predominated in both CD 1 and CD 12 and that the defendants have failed to establish that its race-based redistricting satisfies strict scrutiny. Accordingly, the Court holds that the general assembly's 2011 Congressional Redistricting Plan is unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment.

Having found that the 2011 Congressional Redistricting Plan violates the Equal Protection Clause, the Court will require that new congressional districts be drawn forthwith to remedy the unconstitutional districts. See Wise v. Lipscomb, 437 U.S. 535, 539–40 (1978).

Before turning to a description of the history of the litigation and an analysis of the issues it presents, the Court notes that it makes no finding as to whether individual legislators acted in good faith in the redistricting process, as no such finding is required. See Page v. Va. Bd. of Elections, No. 3:13-cv-678, 2015 WL 3604029, at *7 (E.D. Va. June 5, 2015) ("[T]he good faith of the legislature does not excuse or cure the constitutional violation of separating voters according to race."). Nevertheless, the resulting legislative enactment has affected North Carolina citizens' fundamental right to vote, in violation of the Equal Protection Clause.

4

I.

A.

The North Carolina Constitution requires decennial redistricting of the North Carolina Senate and North Carolina House of Representatives, subject to several specific requirements. The general assembly is directed to revise the districts and apportion representatives and senators among those districts. N.C. Const. art. II, §§ 3, 5. Similarly, consistent with the requirements of the Constitution of the United States, the general assembly establishes North Carolina's districts for the U.S. House of Representatives after every decennial census. See U.S. Const. art. I, §§ 2, 4; N.C. Const. art. II, §§ 3, 5; 2 U.S.C. §§ 2a, 2c.

Redistricting legislation must comply with the Voting Rights Act of 1965 ("VRA"). "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting . . . ." South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966), abrogated by Shelby Cnty., Ala. v. Holder, 133 S. Ct. 2612 (2013). Enacted pursuant to Congress's enforcement powers under the Fifteenth Amendment, see Shelby Cnty., 133 S. Ct. at 2619–21, the VRA prohibits states from adopting plans that would result in vote dilution under section 2, 52 U.S.C. § 10301, or in covered juridictions, retrogression under section 5, 52 U.S.C. § 10304.

5

Section 2(a) of the VRA prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). A section 2 violation occurs when, based on the totality of circumstances, the political process results in minority "members hav[ing] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. § 10301(b).

Section 5 of the VRA prohibits a state or political subdivision subject to section 4 of the VRA from enforcing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," unless it has obtained a declaratory judgment from the District Court for the District of Columbia that such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or has submitted the proposed change to the U.S. attorney general and the attorney general has not objected to it. Beer v. United States, 425 U.S. 130, 131-32 (1976). By requiring that proposed changes be approved in advance, Congress sought "'to shift the advantage of time and inertia from the perpetrators of the evil to its victim,' by 'freezing election procedures in the covered areas

6

unless the changes can be shown to be nondiscriminatory.'" _Id._ at 140 (quoting H.R. Rep. No. 94-196, pp. 57-58 (1970)). The purpose of this approach was to ensure that "no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." _Holder v. Hall_, 512 U.S. 874, 883 (1994). Section 5, therefore, prohibits a covered jurisdiction from adopting any change that "has the purpose of or will have the effect of diminishing the ability of [the minority group] . . . to elect their preferred candidates of choice." 52 U.S.C. § 10304(b).

In November 1964, several counties in North Carolina met the criteria to be classified as a "covered jurisdiction" under section 5. _See id._ §§ 10303-10304. As such, North Carolina was required to submit any changes to its election or voting laws to the U.S. Department of Justice ("DOJ") for federal preapproval, a process called "preclearance." _See id._ § 10304(a). To obtain preclearance, North Carolina had to demonstrate that a proposed change had neither the purpose nor effect "of denying or abridging the right to vote on account of race or color." _Id._

The legal landscape changed dramatically in 2012, when the Supreme Court held unconstitutional the coverage formula used to determine which states are subject to the section 5 preclearance requirement. _See Shelby Cnty._, 133 S. Ct. at 2612. As a result

7

of the invalidation of the coverage formula under section 4, North Carolina is no longer obligated to comply with the preclearance requirements of section 5.[1]  See id. at 2631.

## B.

For decades, African-Americans enjoyed tremendous success in electing their preferred candidates in former versions of CD 1 and CD 12 regardless of whether those districts contained a majority black voting age population ("BVAP")—that is the percentage of persons of voting age who identify as African-American.

The general assembly first drew CD 1 in an iteration of its present form in 1992.  Pls.' Ex. 64.  Between 1997 and 2011, the BVAP fell below 50 percent.  The BVAP stood at 46.54 percent, for example, for the plan in place from 1997 to 2001.  Pls.' Ex. 110.  After the 2000 census, the general assembly enacted the 2001 Congressional Redistricting Plan (now referred to as the "benchmark" or "benchmark plan") that redrew CD 1, modestly increasing the BVAP to 47.76 percent.  Pls.' Ex. 111.

The BVAP of former CD 12 mirrored that of former CD 1. Initially in 1991, to comply with the DOJ's then-existing "maximization" policy — requiring majority-minority districts

---

[1] Nothing in Shelby County affects the continued validity or applicability of section 2 to North Carolina.  133 S. Ct. at 2619.  And both sections 2 and 5 were still in full effect when the legislation in this case was enacted.

wherever possible — CD 12 was drawn with a BVAP greater than 50 percent. Pls.' Ex. 72. After years of litigation and the U.S. Supreme Court's repudiation of the maximization policy, see Miller, 515 U.S. at 921–24, the general assembly redrew the district in 1997 with a BVAP of 32.56 percent. Pls.' Ex. 110. The general assembly thus determined that the VRA did not require drawing CD 12 as a majority African-American district. See Cromartie v. Hunt, 133 F. Supp. 2d 407, 413 (E.D.N.C. 2000) ("District 12 [was] not a majority-minority district"). The 2001 benchmark version of CD 12 reflected a BVAP of 42.31 percent. Pls.' Ex. 111.

Despite the fact that African-Americans did not make up a majority of the voting-age population in these earlier versions of CD 1 or CD 12, African-American preferred candidates easily and repeatedly won reelection under those plans. Representative Eva Clayton prevailed in CD 1 in 1998 and 2000, for instance, winning 62 percent and 66 percent of the vote, respectively. Pls.' Ex. 112. Indeed, African-American preferred candidates prevailed with remarkable consistency, winning at least 59 percent of the vote in each of the five general elections under the version of CD 1 created in 2001. Id. Representative G.K. Butterfield has represented that district since 2004. Id. Meanwhile, in CD 12, Congressman Mel Watt won every general election in CD 12 between 1992 and 2012. Id. He never received

9

less than 55.95 percent of the vote, gathering at least 64 percent in each election under the version of CD 12 in effect during the 2000s.  Id.

No lawsuit was ever filed to challenge the benchmark 2001 version of CD 1 or CD 12 on VRA grounds.  Trial Tr. 46:2-7, 47:4-7 (Blue).

C.

Following the census conducted April 1, 2010, leaders of the North Carolina House of Representatives and Senate independently appointed redistricting committees.  Each committee was responsible for recommending a plan applicable to its own chamber, while the two committees jointly were charged with preparing a redistricting plan for the U.S. House of Representatives North Carolina districts.  Senator Rucho and Representative Lewis were appointed chairs of the Senate and House Redistricting Committees, respectively, on January 27 and February 15, 2011.  Parties' Joint Actual Stipulation, ECF No. 125 ¶ 3.

Senator Rucho and Representative Lewis were responsible for developing a proposed congressional map.  Id.  In Representative Lewis's words, he and Senator Rucho were "intimately involved" in the crafting of these maps.  Pls.' Ex. 136 at 17:21-24 (Joint Committee Meeting July 21, 2011).

Senator Rucho and Representative Lewis engaged private redistricting counsel and a political consultant. Specifically, Senator Rucho and Representative Lewis engaged the law firm of Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree") as their private redistricting counsel. In December 2010, Ogletree engaged Dr. Thomas Hofeller, who served as redistricting coordinator for the Republican National Committee for the 1990, 2000, and 2010 redistricting cycles, to design and draw the 2011 Congressional Redistricting Plan under the direction of Senator Rucho and Representative Lewis. Trial Tr. 577:1-23; 587:14-25; 588:1-2 (Hofeller). Dr. Hofeller was the "principal architect" of the 2011 Congressional Redistricting Plan (as well as the state senate and house plans). Id. 586:13-15.

Senator Rucho and Representative Lewis were the sole sources of instruction for Dr. Hofeller regarding the design and construction of congressional maps. See Trial Tr. 589:3-19 (Hofeller). All such instructions were provided to Dr. Hofeller orally – there is no written record of the precise instructions Senator Rucho and Representative Lewis gave to Dr. Hofeller. Id. at 589:14-590:10. Dr. Hofeller never received instructions from any legislator other than Senator Rucho and Representative Lewis, never conferred with Congressmen Butterfield or Watt, and never conferred with the Legislative Black Caucus (or any of its individual members) with respect to the preparation of the

11

congressional maps. Trial Tr. 48:23-25; 49:1-5 (Blue); 588:3-589:13 (Hofeller). Representative Lewis did not make Dr. Hofeller available to answer questions for the members of the North Carolina Senate and House Redistricting Committees. Pls.' Ex. 136 at 23:3-26:3 (Joint Committee Meeting July 21, 2011).

Throughout June and July 2011, Senator Rucho and Representative Lewis released a series of public statements describing, among other things, the criteria that they had instructed Dr. Hofeller to follow in drawing the proposed congressional map. As Senator Rucho explained at the July 21, 2011, joint meeting of the Senate and House Redistricting Committees, those statements "clearly delineated" the "entire criteria" that were established and "what areas we were looking at that were going to be in compliance with what the Justice Department expected us to do as part of our submission." Id. at 29:2-9.

In their June 17, 2011, public statement, Senator Rucho and Representative Lewis highlighted one criterion in their redistricting plan:

> In creating new majority African American districts, we are obligated to follow . . . the decisions by the North Carolina Supreme Court and the United States Supreme Court in Strickland v. Bartlett, 361 N.C. 491 (2007), affirmed, Bartlett v. Strickland, 129 S.Ct. 1231 (2009). Under the Strickland decisions, districts created to comply with section 2 of the Voting Rights Act, must be

12

> created with a "Black Voting Age Population"
> ("BVAP"), as reported by the Census, at the
> level of at least 50% plus one. Thus, in
> constructing VRA majority black <u>districts</u>,
> the Chairs recommend that, where possible,
> these <u>districts</u> be drawn at a level equal to
> at least 50% plus one "BVAP."

Defs. Ex. 5.11 at 2 (emphasis added).

On July 1, 2011, Senator Rucho and Representative Lewis made public their first proposed congressional plan, entitled "Rucho-Lewis Congress," and issued a public statement. Pls.' Ex. 67. The plan was drawn by Dr. Hofeller and contained two majority-BVAP districts, namely CD 1 and CD 12. With regard to proposed CD 1, Senator Rucho and Representative Lewis stated that they had included a piece of Wake County (an urban county in which the state capital, Raleigh, is located) because the benchmark CD 1 was underpopulated by 97,500 people. Senator Rucho and Representative then added:

> Because African Americans represent a high
> percentage of the population added to the
> First District from Wake County, we have
> also been able to re-establish Congressmen
> Butterfield's district as a true majority
> black district under the <u>Strickland</u> case.

Pls.' Ex. 67 at 4.

With regard to CD 12, Senator Rucho and Representative Lewis noted that although the 2001 benchmark district was "not a Section 2 majority black district," there "is one county in the Twelfth District that is covered by Section 5 of the Voting

13

Rights Act (Guilford)." Pls.' Ex. 67 at 5. Therefore, "[b]ecause of the presence of Guilford County in the Twelfth District, we have drawn our proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District." Id.

On July 28, 2011, the general assembly enacted the congressional and legislative plans, which Dr. Hofeller had drawn at the direction of Senator Rucho and Representative Lewis. ECF No. 125 ¶ 5; see Session Law 2011-403 (July 28, 2011) (amended by curative legislation, Session Law 2011-414 (Nov. 7, 2011)). The number of majority-BVAP districts in the 2011 Congressional Redistricting Plan increased from zero to two when compared to the benchmark 2001 Congressional Redistricting Plan. The BVAP in CD 1 increased from 47.76 percent to 52.65 percent, and in CD 12 the BVAP increased from 43.77 percent to 50.66 percent. Pls.' Exs. 106-107.

Following the passage of the 2011 Congressional Redistricting Plan, the general assembly, on September 2, 2011, submitted the plan to the DOJ for preclearance under section 5 of the VRA. See Pls.' Ex. 74 at 10-11. On November 1, 2011, the DOJ precleared the 2011 Congressional Redistricting Plan.

14

D.

1.

Two sets of plaintiffs challenged the 2011 Congressional Redistricting Plan in state court for illegal racial gerrymandering.  See N.C. Conference of Branches of the NAACP v. State of North Carolina, Amended Complaint (12/9/11), ECF No. 44 at Exs. 1-2; Dickson v. Rucho, Amended Complaint (12/12/11), ECF No. 4 at Exs. 3-4.  A three-judge panel consolidated the two cases.

The state court held a two-day bench trial on June 5 and 6, 2013.  See Dickson v. Rucho, J. and Mem. of Op. [hereinafter "State Court Opinion"], ECF No. 30 at Exs. 1-2.  On July 8, 2013, the court issued a decision denying the plaintiffs' pending motion for summary judgment and entering judgment for the defendants.  Id.  The court acknowledged that the general assembly used race as the predominant factor in drawing CD 1. Nonetheless, applying strict scrutiny, the court concluded that North Carolina had a compelling interest in avoiding liability under the VRA, and that the districts had been narrowly tailored to avoid that liability.  With regard to CD 12, the court held that race was not the driving factor in its creation, and therefore examined and upheld it under rational-basis review.

The state court plaintiffs appealed, and the North Carolina Supreme Court affirmed the trial court's judgment.  Dickson v.

Rucho, 766 S.E.2d 238 (N.C. 2014).  The U.S. Supreme Court, however, granted certiorari, vacated the decision, and remanded the case to the North Carolina Supreme Court for further consideration in light of Alabama Legislative Black Caucus v. Alabama, 135 S. Ct. 1257 (2015).  On December 18, 2015, the North Carolina Supreme Court reaffirmed the trial court's judgment.

2.

Plaintiffs David Harris and Christine Bowser are U.S. citizens registered to vote in CD 1 or CD 12, respectively. Neither was a plaintiff in the state-court litigation.

Plaintiffs brought this action on October 24, 2013, alleging, among other things, that North Carolina used the VRA's section 5 preclearance requirements as a pretext to pack African-American voters into North Carolina's Congressional Districts 1 and 12 and reduce those voters' influence in other districts.  Compl. ¶ 3, ECF No. 1.

Plaintiffs sought a declaratory judgment that North Carolina's Congressional Districts 1 and 12, as drawn in the 2011 Congressional Redistricting Plan, was a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.  Id. ¶¶ 1, 6.  Plaintiffs also sought to permanently enjoin the defendants from giving effect to the boundaries of the First and Twelfth Congressional Districts, including barring

16

the defendants from conducting elections for the U.S. House of Representatives based on the 2011-enacted First and Twelfth Congressional Districts. Id. at 19.

Because the plaintiffs' action "challeng[ed] the constitutionality of the apportionment of congressional districts" in North Carolina, 28 U.S.C. § 2284(a), the chief judge of the U.S. Court of Appeals for the Fourth Circuit granted the plaintiffs' request for a hearing by a three-judge court on October 18, 2013. ECF No. 16

A three-day bench trial began on October 13, 2015. After the bench trial, this Court ordered the parties to file post-trial briefs. The case is now ripe for consideration.

## II.

"[A] State may not, absent extraordinary justification, . . . separate its citizens into different voting districts on the basis of race." Miller, 515 U.S. at 911-12 (internal quotations and citations omitted). A voting district is an unconstitutional racial gerrymander when a redistricting plan "cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." Shaw I, 509 U.S. at 649.

17

In a racial gerrymander case, the "plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Miller, 515 U.S. at 916. "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." Id. Public statements, submissions, and sworn testimony by the individuals involved in the redistricting process are not only relevant but often highly probative. See, e.g., Bush v. Vera, 517 U.S. 952, 960-61 (1996) (examining the state's preclearance submission to the DOJ and the testimony of state officials).

Once plaintiffs establish race as the predominant factor, the Court applies strict scrutiny, and "the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." Miller, 515 U.S. at 920. If race did not predominate, then only rational-basis review applies.

For the reasons that follow, the Court finds that the plaintiffs have presented dispositive direct and circumstantial evidence that the legislature assigned race a priority over all other districting factors in both CD 1 and CD 12. There is strong evidence that race was the only nonnegotiable criterion and that traditional redistricting principles were subordinated to race. In fact, the overwhelming evidence in this case shows that a BVAP-percentage floor, or a racial quota, was established in both CD 1 and CD 12. And, that floor could not be compromised. See Shaw II, 517 U.S. at 907 ("Race was the criterion that, in the State's view, could not be compromised; respecting communities of interest and protecting Democratic incumbents came into play only after the race-based decision had been made."). A congressional district necessarily is crafted because of race when a racial quota is the single filter through which all line-drawing decisions are made, and traditional redistricting principles are considered, if at all, solely insofar as they did not interfere with this quota. Id. Accordingly, the Court holds that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Miller, 515 U.S. at 916.

Because race predominated, the state must demonstrate that its districting decision is narrowly tailored to achieve a

19

compelling interest. Even if the Court assumes that compliance with the VRA is a compelling state interest, attempts at such compliance "cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application" of federal law. Id. at 921; see also Bush, 517 U.S. at 977. Thus, narrow tailoring requires that the legislature have a "strong basis in evidence" for its race-based decision, that is, "good reasons to believe" that the chosen racial classification was required to comply with the VRA. Alabama, 135 S. Ct. at 1274. Evidence of narrow tailoring in this case is practically nonexistent; the state does not even proffer any evidence with respect to CD 12. Based on this record, as explained below, the Court concludes that North Carolina's 2011 Congressional Redistricting Plan was not narrowly tailored to achieve compliance with the VRA, and therefore fails strict scrutiny.

A.

As with any law that distinguishes among individuals on the basis of race, "equal protection principles govern a State's drawing of congressional districts." Miller, 515 U.S. at 905. "Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which

race no longer matters . . . ." Shaw I, 509 U.S. at 657. As such, "race-based districting by our state legislatures demands close judicial scrutiny." Id.

To trigger strict scrutiny, the plaintiffs first bear the burden of proving that race was not only one of several factors that the legislature considered in drawing CD 1 and CD 12, but that race "predominated." Bush, 517 U.S. at 963. Under this predominance test, a plaintiff must show that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." Miller, 515 U.S. at 916; see also Alabama, 135 S. Ct. at 1271 ("[T]he 'predominance' question concerns which voters the legislature decides to choose, and specifically whether the legislature predominantly uses race as opposed to other, 'traditional' factors when doing so."). When a legislature has "relied on race in substantial disregard of customary and traditional districting principles," such traditional principles have been subordinated to race. Miller, 515 U.S. at 928 (O'Connor, J., concurring).

When analyzing the legislative intent underlying a redistricting decision, there is a "presumption of good faith that must be accorded legislative enactments." Id. at 916. This presumption "requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." Id. Such restraint is

21

particularly warranted given the "complex interplay of forces that enter a legislature's redistricting calculus," id. at 915–16, making redistricting possibly "the most difficult task a legislative body ever undertakes," Smith v. Beasley, 946 F. Supp. 1174, 1207 (D.S.C. 1996). This presumption must yield, however, when the evidence shows that citizens have been assigned to legislative districts primarily based on their race. See Miller, 515 U.S. at 915–16.

1.

CD 1 presents a textbook example of racial predominance. There is an extraordinary amount of direct evidence – legislative records, public statements, instructions to Dr. Hofeller, the "principal architect" of the 2011 Congressional Redistricting Plan, and testimony – that shows a racial quota, or floor, of 50-percent-plus-one-person was established for CD 1. Because traditional districting criteria were considered, if at all, solely insofar as they did not interfere with this 50-percent-plus-one-person minimum floor, see Shaw II, 517 U.S. at 907, the quota operated as a filter through which all line-drawing decisions had to pass. As Dr. Hofeller stated, "[S]ometimes it wasn't possible to adhere to some of the traditional redistricting criteria in the creation of [CD 1]" because "the more important thing was to . . . follow the instructions that I ha[d] been given by the two chairmen [to

draw the district as majority-BVAP]." Trial Tr. 626:19-627:1 (Hofeller) (emphasis added). Indeed. The Court therefore finds that race necessarily predominates when, as here, "the legislature has subordinated traditional districting criteria to racial goals, such as when race is the single immutable criterion and other factors are considered only when consistent with the racial objective." Bethune-Hill v. Va. State Bd. of Elections, 14-cv-852, 2015 WL 6440332, at *63 (Oct. 22, 2015) (Keenan, J., dissenting) (citing Shaw II, 517 U.S. at 907).

a.

The legislative record is replete with statements indicating that race was the legislature's paramount concern in drawing CD 1. During legislative sessions, Senator Rucho and Representative Lewis made clear that CD 1 "[w]as required by Section 2" of the VRA to have a BVAP of at least 50 percent plus one person. See Pls.' Ex. 139 at 8:19-9:6 (July 25, 2011 Senate Testimony of Rucho) (CD 1 was "required by Section 2" of the VRA to contain a majority BVAP, and "must include a sufficient number of African-Americans so that [CD 1] can re-establish as a majority black district"); id. 17:23-25 (CD 1 "has Section 2 requirements, and we fulfill those requirements"); see also Pls.' Ex. 140, at 30:2-4 (July 27, 2011 House Testimony of Lewis) (Representative Lewis stating that CD 1 "was drawn with race as a consideration, as is required by the [VRA]"); Trial

Tr. 57:24-58:6 (Blue) (Senator Blue, describing conversation with Senator Rucho in which Senator Rucho explained "his understanding and his belief that he had to take [districts of less than 50 percent BVAP] all beyond 50 percent because Strickland informed him that that's what he's supposed to do"); Defs.' Ex. 100 at 29:2-7 (July 22, 2011, House Committee Tr. Lewis) ("In order to foreclose the opportunity for any Section 2 lawsuits, and also for the simplicity of this conversation, we elected to draw the VRA district at 50 percent plus one . . . .").

b.

The public statements released by Senator Rucho and Representative Lewis also reflect their legislative goal, stating that, to comply with section 2 of the VRA, CD 1 must be established with a BVAP of 50 percent plus one person. See, e.g., Defs.' Ex. 5.11 at 2 (June 17, 2011 Joint Public Statement); Pls.' Ex. 67 at 3-4 (July 1, 2011 Joint Public Statement); Pls.' Ex. 68 at 3 (July 19, 2011 Joint Public Statement). Further, in its preclearance submission to the DOJ, North Carolina makes clear that it purposefully set out to add "a sufficient number of African-American voters in order to" draw CD 1 "at a majority African-American level." Pls.' Ex. 74 at 12; see also id. at 13 ("Under the enacted version of District 1, the . . . majority African-American status of the

24

District is corrected by drawing the District into Durham County.").

c.

In light of this singular legislative goal, Senator Rucho and Representative Lewis, unsurprisingly, instructed Dr. Hofeller to treat CD 1 as a "voting rights district," Trial Tr. 478:25-479:11 (Hofeller), meaning that he was to draw CD 1 to exceed 50-percent BVAP. Id. 480:21-481:1 ("My understanding was I was to draw that 1st District with a black voting-age population in excess of 50 percent because of the Strickland case."); see also id. 573:1-6 (Dr. Hofeller's instructions were to draw CD 1 at "50 percent [BVAP] plus one person"); id. 610:3-8 ("[T]he instruction was to draw District 1 with a black VAP level of 50 percent or more."); id. 615:15-21 ("I received an instruction that said . . . that District 1 was a voting rights district."); id. 572:6-17 ("[T]he 1st District was drawn to be a majority minority district."); id. at 615:20-21 ("[B]ecause of the Voting Rights Act, [CD 1] was to be drawn at 50 percent plus."); id. 620:5-11 ("Once again, my instructions from the chairman of the two committees was because of the Voting Rights Act and because of the Strickland decision that the district had to be drawn at above 50 percent."); id. 620:17-20 (agreeing that his "express instruction" was to "draw CD 1 as 50 percent black voting-age population plus one").

25

The Court is sensitive to the fact that CD 1 was underpopulated; it is not in dispute that CD 1 was underpopulated by 97,500 people and that there were efforts to create districts with approximately equal population. While equal population objectives "may often prove 'predominant' in the ordinary sense of that word," the question of whether race predominated over traditional raced-neutral redistricting principles is a "special" inquiry: "It is not about whether a legislature believes that the need for equal population takes ultimate priority," but rather whether the legislature placed race above nonracial considerations in determining <u>which</u> voters to allocate to certain districts in order to achieve an equal population goal. <u>Alabama</u>, 135 S. Ct. at 1270-71.

To accomplish equal population, Dr. Hofeller intentionally included high concentrations of African-American voters in CD 1 and excluded less heavily African-American areas from the district. During cross-examination, Dr. Hofeller, in response to why he moved into CD 1 a part of Durham County that was "the heavily African-American part" of the county, stated, "Well, it had to be." Trial Tr. 621:3-622:19 (Hofeller); <u>see</u> <u>id.</u> 620:21-621:15; <u>id.</u> 640:7-10; <u>see also</u> <u>Bush</u>, 517 U.S. at 962 ("These findings – that the State substantially neglected traditional districting criteria such as compactness, that it was committed from the outset to creating majority-minority districts, and

that it manipulated district lines to exploit unprecedentedly detailed racial data – together weigh in favor of the application of strict scrutiny." (emphasis added)). Dr. Hofeller, after all, had to "make sure that in the end it all adds up correctly" – that is, that the "net result" was a majority-BVAP district. See Trial Tr. 621:3-622:19 (Hofeller); see also id. 620:21-621:15; id. 640:7-10.

Dr. Hofeller certainly "ma[de] sure that in the end it add[ed] up correctly." Id. 621:7. The BVAP substantially increased from 47.76 percent, the BVAP in CD 1 when the benchmark plan was enacted, to 52.65 percent, the BVAP under the 2011 Congressional Plan – an increase of nearly five percentage points. Pls.' Ex. 69 at 111. And, while Dr. Hofeller had discretion, conceivably, to increase the BVAP to as high as he wanted, he had no discretion to go below 50-percent-plus-one-person BVAP. See Trial Tr. 621:13-622:19 (Hofeller). This is the very definition of a racial quota.

d.

The Supreme Court's skepticism of racial quotas is longstanding. See generally J.A. Croson Co., 488 U.S. at 469 (minority set-aside program for construction contracts); Bakke, 438 U.S. at 265 (higher education admissions). The Court, however, has yet to decide whether use of a racial quota in a legislative redistricting plan or, in particular, use of such a

27

quota exceeding 50 percent, establishes predominance as a matter of law under Miller.[2]  See Bush, 517 U.S. at 998 (Kennedy, J., concurring) (reserving the question).  But see League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 517 (2006) (Scalia, J., concurring in the judgment in part and dissenting in part) ("[W]hen a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation and strict scrutiny is therefore triggered.").[3]  The Court recently has cautioned against "prioritizing mechanical racial targets above all other districting criteria" in redistricting. Alabama, 135 S. Ct. at 1267, 1272–73.  Although the Court in Alabama did not decide whether the use of a racial quota exceeding 50 percent, standing alone, can establish predominance as a matter of law, the Court made clear that such "mechanical racial targets" are highly suspicious.  Id. at 1267.

There is "strong, perhaps overwhelming" direct evidence in this case that the general assembly "prioritize[ed] [a] mechanical racial target[] above all other districting criteria" in redistricting.  See id. at 1267, 1272–73.  In order to

---

[2] This Court need not reach this question because there is substantial direct evidence that traditional districting criteria were considered, if at all, solely insofar as they did not interfere with this 50-percent-plus-one-person quota.

[3] Chief Justice Roberts, Justice Thomas, and Justice Alito appear to agree with Justice Scalia's statement.  Id.

achieve the goal of drawing CD 1 as a majority-BVAP district, Dr. Hofeller not only subordinated traditional race-neutral principles but disregarded certain principles such as respect for political subdivisions and compactness. See Stephenson v. Bartlett, 562 S.E. 2d 377, 385-89 (N.C. 2002) (recognizing "the importance of counties as political subdivisions of the State of North Carolina" and "observ[ing] that the State Constitution's limitations upon redistricting and apportionment uphold what the United States Supreme Court has termed 'traditional districting principles' . . . such as 'compactness, contiguity, and respect for political subdivisions'" (quoting Shaw I, 509 U.S. at 647)).

Dr. Hofeller testified that he would split counties and precincts when necessary to achieve a 50-percent-plus-one-person BVAP in CD 1. Trial Tr. 629:17-629:24 (Hofeller); see also Pls.' Ex. 67 at 7 (July 1, 2011 Joint Public Statement) ("Most of our precinct divisions were prompted by the creation of Congressman Butterfield's majority black First Congressional District."). Dr. Hofeller further testified that he did not use mathematical measures of compactness in drawing CD 1. Pls.' Ex. 129 (Hofeller Dep. 44:19-45:12). Had he done so, Dr. Hofeller would have seen that the 2011 Congressional Redistricting Plan reduced the compactness of CD 1 significantly. Pls.' Ex. 17, Table 1; see also Trial Tr. 689:22-690:1-11 (Ansolabehere).

Apparently seeing the writing on the wall, the defendants make the passing argument that the legislature configured CD 1 to protect the incumbent and for partisan advantage.[4]  Defs.' Findings of Fact, ECF No. 138 at 74.  The defendants, however, proffer no evidence to support such a contention.  Id.  There is nothing in the record that remotely suggests CD 1 was a political gerrymander, or that CD 1 was drawn based on political data.  Compare Trial Tr. 479:4-479:22 (Hofeller) ("Congressional District 1 was considered by the chairs to be a voting rights district . . . so it had to be drawn in accordance with the fact that it needed to be passed through . . . Section 2 and also Section 5."); with id. ("[M]y instructions from the two chairmen were to treat the 12th District as . . . a political [district]").  It cannot seriously be disputed that the predominant focus of virtually every statement made, instruction given, and action taken in connection with the redistricting effort was to draw CD 1 with a BVAP of 50 percent plus one person to comply with the VRA.  See, e.g., Trial Tr. 479:4-479:22 (Hofeller).

---

[4]  The defendants have suggested that CD 1's configuration was necessary to add voters to the district to equalize population.  Defs.' Findings of Fact, ECF No. 138 at 74.  As discussed earlier, Alabama squarely forecloses this argument as a matter of law, holding that "an equal population goal is not one factor among others to be weighed against the use of race to determine whether race predominates."  135 S. Ct. at 1270.

e.

Even if the Court assumes, _arguendo_, that this is a "mixed-motive suit" – in which a state's conceded goal of "produc[ing] majority-minority districts" is accompanied by "other goals, particularly incumbency protection" – race can be the predominant factor in the drawing of a district without the districting revisions being "purely race-based." _Bush_, 517 U.S. at 959 (emphasis omitted). Indeed, the Supreme Court has observed that "partisan politicking" may often play a role in a state's redistricting process, but the fact "[t]hat the legislature addressed these interests [need] not in any way refute the fact that race was the legislature's predominant consideration." _Shaw II_, 517 U.S. at 907; _see also_ _Alabama_, 135 S. Ct. at 1271 (remanding to trial court to determine whether race predominated even though "preserving the core of the existing district, following county lines, and following highway lines played an important boundary-drawing role"); _Bush_, 517 U.S. at 962 (finding predominant racial purpose where state neglected traditional districting criteria such as compactness, committed itself to creating majority-minority districts, and manipulated district lines based on racial data); _Clark v. Putnam Cnty._, 293 F.3d 1261, 1270 (11th Cir. 2002) ("[The] fact that other considerations may have played a role in . . . redistricting does not mean that race did not predominate.").

31

As the Supreme Court has explained, traditional factors have been subordinated to race when "[r]ace was the criterion that, in the State's view, could not be compromised," and when traditional, race-neutral criteria were considered "only after the race-based decision had been made." Shaw II, 517 U.S. at 907. When a legislature has "relied on race in substantial disregard of customary and traditional districting practices," such traditional principles have been subordinated to race. Miller, 515 U.S. at 928 (O'Connor, J., concurring). Here, the record is unequivocally clear: the general assembly relied on race – the only criterion that could not be compromised – in substantial disregard of traditional districting principles. See, e.g., Trial Tr. 626:19-627:1 (Hofeller).

Moreover, because traditional districting criteria were considered, if at all, solely insofar as they did not interfere with this 50-percent-plus-one-person minimum floor, see Shaw II, 517 U.S. at 907, the quota operated as a filter through which all line-drawing decisions had to pass. Such a racial filter had a discriminatory effect on the configuration of CD 1 because it rendered all traditional criteria that otherwise would have been "race-neutral" tainted by and subordinated to race. Id. For these reasons, the Court holds that the plaintiffs have established that race predominated in the legislative drawing of

CD 1, and the Court will apply strict scrutiny in examining the constitutionality of CD 1.

2.

CD 12 presents a slightly more complex analysis than CD 1 as to whether race predominated in redistricting. Defendants contend that CD 12 is a purely political district and that race was not a factor even considered in redistricting. Nevertheless, direct evidence indicating racial predominance combined with the traditional redistricting factors' complete inability to explain the composition of the new district rebut this contention and leads the Court to conclude that race did indeed predominate in CD 12.

a.

While not as robust as in CD 1, there is nevertheless direct evidence supporting the conclusion that race was the predominant factor in drawing CD 12. Public statements released by Senator Rucho and Representative Lewis reflect this legislative goal. In their June 17, 2011, statement, for example, Senator Rucho and Representative Lewis provide,

> In creating new majority African American districts, we are obligated to follow . . . the decisions by the North Carolina Supreme Court and the United States Supreme Court . . . . Under the[se] decisions, districts created to comply with section 2 of the Voting Rights Act, must be created with a "Black Voting Age Population" ("BVAP"), as reported by the Census, at the level of at

33

least 50% plus one.  Thus, in constructing
VRA majority black <u>districts</u>, the Chairs
recommend that, where possible, these
districts be drawn at a level equal to at
least 50% plus one "BVAP."

Defs.' Ex. 5.11 at 2 (emphasis added).  This statement describes
not only the new CD 1, as explained above, but clearly refers to
multiple districts that are now majority minority.  This is
consistent with the changes to the congressional map following
redistricting:  the number of majority-BVAP districts in the
2011 plan, compared to the benchmark 2001 plan, increased from
zero to two, namely CD 1 and CD 12.  Tr. 59:25-60:6 (Blue).  The
Court cannot conclude that this statement was the result of
happenstance, a mere slip of the pen.  Instead, this statement
supports the contention that race predominated.

The public statement issued July 1, 2011, further supports
this objective.  There, Senator Rucho and Representative Lewis
stated, "Because of the presence of Guilford County in the
Twelfth District [which is covered by section 5 of the VRA], we
have drawn our proposed Twelfth District <u>at</u> a black voting age
level that is above the percentage of black voting age
population found in the current Twelfth District."  Pls.' Tr.
Ex. 67 at 5 (emphasis added).  As explained, section 5 was
intended to prevent retrogression; to ensure that such result
was achieved, any change was to be precleared so that it did
"not have the purpose and [would] not have the effect of denying

34

or abridging the right to vote on account of race or color."
Beer, 425 U.S. at 131-33. Despite the fact that nothing in
section 5 required the creation of a majority-minority district
in CD 12,[5] this statement indicates that it was the intention in
redistricting to create such a district—it was drawn at a higher
BVAP than the previous version. This statement does not simply
"show[] that the legislature considered race, along with other
partisan and geographic considerations," Cromartie II, 532 U.S.
at 253; instead, reading the text in its ordinary meaning, the
statement evinces a level of intentionality in the decisions
regarding race. The Court will again decline to conclude that
it was purely coincidental that the district was now majority
BVAP after it was drawn.

Following the ratification of the revised redistricting
plan, the North Carolina General Assembly and attorney general
submitted the plan to the DOJ for preclearance under section 5.
Pls.' Ex. 74. The submission explains,

> One of the concerns of the Redistricting
> Chairs was that in 1992, the Justice
> Department had objected to the 1991
> Congressional Plan because of a failure by
> the state to create a second majority
> minority district combining the African-
> American community in Mecklenburg County
> with African-American and Native American
> voters residing in south central and
> southeastern North Carolina.

---

[5] See infra Part II.B.

_Id._ at 14.   The submission further explains that Congressman Watt did not believe that African-American voters in Mecklenburg County were politically cohesive with Native American voters in southeastern North Carolina.   _Id._   The redistricting committee accordingly drew the new CD 12 based on these considerations, _id._ at 15, including DOJ's 1992 concern that a new majority-minority district be created—a concern that the U.S. Supreme Court handily rejected in _Miller_, when it repudiated the maximization policy, _see_ 515 U.S. at 921–24.   The discussion of CD 12 in the DOJ submission concludes, "Thus, the 2011 version maintains, and in fact increases, the African-American community's ability to elect their candidate of choice in District 12."   Pls.' Ex. 74 at 15.   Given the express concerns of the redistricting committee, the Court will not ascribe the result to mere coincidence and instead finds that the submission supports race predominance in the creation of CD 12.

b.

In addition to the public statements issued, Congressman Watt testified at trial that Senator Rucho himself told Congressman Watt that the goal was to increase the BVAP in CD 12 to over 50 percent.   Congressman Watt testified that Senator Rucho said "his leadership had told him that he had to ramp up the minority percentage in [the Twelfth] Congressional District up to over 50 percent to comply with the Voting Rights Law."

36

Trial Tr. 108:23-109:1 (Watt). Congressman Watt sensed that Senator Rucho seemed uncomfortable discussing the subject "because his leadership had told him that he was going to have to go out and justify that [redistricting goal] to the African-American community." Id. at 109:2-3; see also id. at 136:5-9 ("[H]e told me that his leadership had told him that they were going to ramp -- or he must ramp up these districts to over 50 percent African-American, both the 1st and the 12th, and that it was going to be his job to go and convince the African-American community that that made sense.").

Defendants argue that Senator Rucho never made such statements to Congressman Watt, citing Senator Rucho and Congresswoman Ruth Samuelson's testimony in the Dickson trial. Defs.' Proposed Findings of Fact, ECF No. 138, at 40 (citing Dickson Tr. 358, 364). Nevertheless, after submitting Congressman Watt to thorough and probing cross-examination about the specifics of the content and location of this conversation, the defendants declined to call Senator Rucho or Congresswoman Samuelson to testify, despite both being listed as defense witnesses and being present throughout the trial. The Court is thus somewhat crippled in its ability to assess either Senator Rucho or Congresswoman's Samuelson's credibility as to their claim that Senator Rucho never made such statements. Based on its ability to observe firsthand Congressman Watt and his

37

consistent recollection of the conversation between him and Senator Rucho, the Court credits his testimony and finds that Senator Rucho did indeed explain to Congressman Watt that the legislature's goal was to "ramp up" CD 12's BVAP.

And, make no mistake, the BVAP in CD 12 was ramped up: the BVAP increased from 43.77 percent to 50.66 percent. Pls.' Exs. 106-107. This correlates closely to the increase in CD 1. Such a consistent and whopping increase makes it clear that the general assembly's predominant intent regarding district 12 was also race.

c.

The shape of a district is also relevant to the inquiry, as it "may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." Miller, 515 U.S. at 913. CD 12 is a "serpentine district [that] has been dubbed the least geographically compact district in the Nation." Shaw II, 517 U.S. at 906.

Under the benchmark 2001 plan, CD 12 had a Reock score[6] of .116, the lowest in the state by far. Pls.' Ex. 17, Expert

---

[6] The Reock score is "a commonly used measure of compactness that is calculated as the ratio of the area of a district to the area of the smallest inscribing circle of a district." Pls.'

Report of Stephen Ansolabehere, at 22. Under the new plan, the Reock score of CD 12 decreased to .071, remaining the lowest in the state by a good margin. Id. A score of .071 is low by any measure. At trial, Dr. Ansolabehere testified that a score of .2 "is one of the thresholds that [is] commonly use[d] . . . one of the rules of thumb" to say that a district is noncompact. Trial Tr. 354:8-13.

Defendants do not disagree. At trial, Dr. Hofeller testified that in redrawing CD 12, he made the district even less compact. Id. 658:3-5; see also id. at 528:1 (Hofeller) ("I have no quarrel whatsoever with [Ansolabehere's] Reock scores."); id. at 656:20-21 (Hofeller) ("When I calculated the Reock scores, I got the same scores he did. So, obviously, we're in agreement."). And importantly, Dr. Hofeller did not "apply the mathematical measures of compactness to see how the districts were holding up" as he was drawing them. Pls.' Ex. 129 (Hofeller Dep. 45:3-7). Nevertheless, Dr. Hofeller opined that "District 12's compactness was in line with former versions of District 12 and in line with compactness as one would understand it in the context of North Carolina redistricting . . . ." Id. (Hofeller Dep. 45:20-23). While he did not recall

---

Ex. 17, Expert Report of Stephen Ansolabehere, at 5. As "[t]he circle is the most compact geometric shape," the Reock score of a perfect square "would be the ratio of the area of a square to the area of its inscribing circle, or .637." Id. n.1.

any specific instructions as to compactness, he was generally "to make plans as compact as possible with the goals and policies of the entire plan," id. (Hofeller Dep. 44:25-45:2)— that is, as the defendants claim, to make the state more favorable to Republican interests, a contention to which the Court now turns.

d.

Defendants claim that politics, not race, was the driving factor behind the redistricting in CD 12. The goal, as the defendants portray it, was to make CD 12 an even more heavily Democratic district and make the surrounding counties better for Republican interests. This goal would not only enable Republican control but also insulate the plan from challenges such as the instant one. See Cromartie II, 532 U.S. at 258; Cromartie I, 526 U.S. at 551-52 ("Evidence that blacks constitute even a supermajority in one congressional district while amounting to less than a plurality in a neighboring district will not, by itself, suffice to prove that a jurisdiction was motivated by race in drawing its district lines when the evidence also shows a high correlation between race and party preference.").

Dr. Hofeller testified to this singular aim time and again at trial: "My instructions from the two chairman [Senator Rucho and Congressman Lewis] were to treat District 12 as a political

40

district and to draw it using political data and to draw it in such a manner that it favorably adjusted all of the surrounding districts." Trial Tr. 495:12-15 (Hofeller); see also, e.g., id. 479:20-22 ("So my instructions from the two chairmen were to treat the 12th District exactly as it has been treated by the Democrats in 1997 and 2001 as a political draw."); id. 496:10-13, 15-22 ("It really wasn't about -- totally about the 12th District. It was about what effect it was having on the surrounding districts. . . . [T]he 6th District needed to be made better for Republican interests by having more Democratic votes removed from it, whereas the 5th District had a little more strength in it and could take on some additional Democratic areas in -- into it in Forsyth County.").

Dr. Hofeller testified that he complied with Senator Rucho and Representative Lewis's instructions and did not look at race at all when creating the new districts. Using Maptitude,[7] Dr. Hofeller provided, "On the screen when I was drawing the map was the Obama/McCain race shaded in accordance with the two-party vote, which excluded the minor party candidates, and that was the sole thematic display or numeric display on the screen except for one other thing, and that was the population of the precinct because of one person, one vote," id. 526:3-8

---

[7] Software commonly used in redistricting. Trial Tr. 343:14 (Ansolabehere).

(Hofeller); see also id. at 496:4-5 ("[T]he thematic was based on the two-party presidential vote in 2008 Obama versus McCain."); id. at 662:1-17 (stating that only one set of election results can be on the screen at a time and that the only results Dr. Hofeller had on his screen were the 2008 Obama election results). Hofeller testified that it was only after the fact that he considered race and what impact it may or may not have had. Id. at 644:24-45:1 ("[W]hen we checked it, we found out that we did not have an issue in Guilford County with fracturing the black community.").

Despite the defendants' protestations, the Court is not persuaded that the redistricting was purely a politically driven affair. Parts of Dr. Hofeller's own testimony belie his assertions that he did not consider race until everything was said and done. At trial, he testified that he was "aware of the fact that Guilford County was a Section 5 county" and that he "was instructed [not] to use race in any form except perhaps with regard to Guilford County." Id. at 608:23-24, 644:12-13 (emphasis added). Dr. Hofeller also testified in his deposition that race was a more active consideration: "[I]n order to be cautious and draw a plan that would pass muster under the Voting Rights Act, it was decided to reunite the black community in Guilford County into the Twelfth." Pls.' Ex. 129 (Hofeller Dep. 75:13-16); see id. (Hofeller Dep. 37:7-16) ("[M]y understanding

42

of the issue was because Guilford was a Section 5 county and because there was a substantial African-American population in Guilford County, that if the portion of the African-American community was in the former District 13 . . . which was a strong Democratic district was not attached to another strong Democratic district [and] that it could endanger the plan and make a challenge to the plan.").[8]

Moreover, Senator Rucho and Representative Lewis themselves attempted to downplay the "claim[] that [they] have engaged in extreme political gerrymandering." Pls.' Ex. 68 at 1. In their joint statement published July 19, 2011, they assert that these claims are "overblown and inconsistent with the facts." Id. The press release continues to explain how Democrats maintain a majority advantage in three districts and a plurality advantage in the ten remaining districts. Id. at 2. This publication serves to discredit their assertions that their sole focus was to create a stronger field for Republicans statewide.

That politics not race was more of a post-hoc rationalization than an initial aim is also supported by a series of emails presented at trial. Written by counsel for

---

[8] Moreover, Dr. Hofeller's assertion that he, the "principal architect," considered no racial data when drawing the maps rings a somewhat hollow when he previously served as the staff director to the U.S. House Subcommittee on the Census leading up to the 2000 census. See Defs.' Ex. 129, Hofeller Resume, at 6.

43

Senator Rucho and Representative Lewis during the redistricting, the first email, dated June 30, 2011, was sent to Senator Rucho, Representative Lewis, Dr. Hofeller, and others involved in the redistricting effort, providing counsel's thoughts on a draft public statement "by Rucho and Lewis in support of proposed 2011 Congressional Plan." See Pls.' Ex. 13. "Here is my best efforts to reflect what I have been told about legislative intent for the congressional plans. Please send me your suggestions and I will circulate a revised version for final approval by [Senator Rucho] and [Representative Lewis] as soon as possible tomorrow morning," counsel wrote. Id. In response, Brent Woodcox, redistricting counsel for the general assembly, wrote, "I do think the registration advantage is the best aspect to focus on to emphasize competitiveness. It provides the best evidence of pure partisan comparison and serves in my estimation as a strong legal argument and easily comprehensible political talking point." Id. Unlike the email at issue in Cromartie II, which did not discuss "the point of the reference" to race, Cromartie II, 532 U.S. at 254, this language intimates that the politics rationale on which the defendants so heavily rely was more of an afterthought than a clear objective.

This conclusion is further supported circumstantially by the findings of the plaintiffs' experts, Drs. Peterson and Ansolabehere. At trial, Dr. Peterson opined that race "better

44

accord[ed] with" the boundary of CD 12 than did politics, based on his "segment analysis." Trial Tr. 211:21-24 (Peterson); see id. 220:16-18, 25. This analysis looked at three different measures of African-American racial representation inside and outside of the boundary of CD 12, and four different measures of representations of Democrats for a total of twelve segment analyses. Id. at 213:24-214:2, 219:5, 9-11. Four of the twelve studies supported the political hypothesis; two support both hypotheses equally; while six support the race hypothesis—"and in each of these six, the imbalance is more pronounced than in any of the four studies favoring the Political Hypothesis." Pls.' Ex. 15, Second Aff. of David W. Peterson Ph.D., at 6; see also Trial Tr. 219-20 (Peterson).

Using different methods of analysis, Dr. Ansolabehere similarly concluded that the new districts had the effect of sorting along racial lines and that the changes to CD 12 from the benchmark plan to the Rucho-Lewis plan "can be only explained by race and not party." Trial Tr. 314, 330:10-11.

Defendants argue that these findings are based on a theory the Supreme Court has rejected—that is, Dr. Ansolabehere used only party registration in his analysis, and the Supreme Court has found that election results are better predictors of future voting behavior. Defs.' Findings of Fact, ECF No. 128, at 79 (citing Cromartie I and II). But Dr. Ansolabehere stated that

45

he understood the Supreme Court's finding and explained why in this situation he believed that using registration data was nonetheless preferable: registration data was a good indicator of voting data and it "allowed [him] to get down to [a deeper] level of analysis." Trial Tr. 309:7-8, 349:2-3 (Ansolabehere). Moreover, Defendants themselves appear to have considered registration data at some point in the redistricting process: in their July 19, 2011, statement, Senator Rucho and Representative Lewis consider the numbers of registered Democrats, Republicans, and unaffiliated voters across all districts. Pls.' Ex. 68 at 2.

While both studies produce only circumstantial support for the conclusion that race predominated, the plaintiffs were not limited to direct evidence and were entitled to use "direct or circumstantial evidence, or a combination of both." Cromartie I, 526 U.S. at 547; see also id. at 546 ("The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor, one requiring the trial court to perform a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977))). The defendants' argument that Dr. Peterson's analysis is "of little to no use" to the Court, as he "did not and could not conclude" that race

46

predominated, Defs.' Proposed Findings of Fact, ECF No. 138, at 77 (emphasis omitted), is unavailing in this regard.

The defendants contend that, to show that race predominated, the plaintiffs must show "alternative ways" in which "the legislature could have achieved its legitimate political objectives" that were more consistent with traditional districting principles and that resulted in a greater racial balance. Cromartie II, 532 U.S. at 258; see Defs.' Proposed Findings of Fact, ECF No. 138, at 62. The Supreme Court, however, limited this requirement to "a case such as [the one at issue in Cromartie II]," id.—that is, a case in which "[t]he evidence taken together . . . [did] not show that racial considerations predominated," id. Here, the evidence makes abundantly clear that race, although generally highly correlative with politics, did indeed predominate in the redistricting process: "the legislature drew District 12's boundaries because of race rather than because of political behavior." Id. Redistricting is inherently a political process; there will always be tangential references to politics in any redistricting—that is, after all, the nature of the beast. Where, like here, at the outset district lines were admittedly drawn to reach a racial quota, even as political concerns may have been noted at the end of the process, no "alternative" plans are required.

47

e.

In light of all of the evidence, both direct and circumstantial, the Court finds that race predominated in the redistricting of CD 12. Traditional redistricting principles such as compactness and contiguity were subordinated to this goal. Moreover, the Court does not find credible the defendants' purported rationale that politics was the ultimate goal. To find that otherwise would create a "magic words" test that would put an end to these types of challenges. See Dickson v. Rucho, No. 201PA12, 2015 WL 9261836, at *53 (N.C. Dec. 18, 2015) (Beasley, J., dissenting) ("To justify this serpentine district, which follows the I-85 corridor between Mecklenburg and Guilford Counties, on partisan grounds allows political affiliation to serve as a proxy for race and effectively creates a "magic words" test for use in evaluating the lawfulness of this district.") To accept the defendants' explanation would "create[] an incentive for legislators to stay "on script" and avoid mentioning race on the record." Id. The Court's conclusion finds support in light of the defendants' stated goal with respect to CD 1 to increase the BVAP of the district to 50 percent plus one person, the result of which is consistent with the changes to CD 12.

B.

The fact that race predominated when the legislature devised CD 1 an CD 12, however, does not automatically render the districts constitutionally infirm. Rather, if race predominates, strict scrutiny applies, but the districting plan can still pass constitutional muster if narrowly tailored to serve a compelling governmental interest. Miller, 515 U.S. at 920. While such scrutiny is not necessarily "strict in theory, but fatal in fact," Johnson v. California, 543 U.S. 499, 514 (2005), the state must establish the "most exact connection between justification and classification." Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720 (2007).

The Court's strict-scrutiny analysis for CD 12 is straightforward. The defendants completely fail to provide this Court with a compelling state interest for the general assembly's use of race in drawing CD 12. Accordingly, because the defendants bear the burden of proof to show that CD 12 was narrowly tailored to further a compelling interest, and the defendants failed to carry that burden, the Court concludes that

49

CD 12 is an unconstitutional racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.[9]

The defendants do, however, point to two compelling interests for CD 1: the interest in avoiding liability under the "results" test of VRA section 2(b) and the "nonretrogression" principle of VRA section 5. Although the Supreme Court has yet to decide whether VRA compliance is a compelling state interest, it has assumed as much for the purposes of subsequent analyses. See, e.g., Shaw II, 517 U.S. at 915 ("We assume, arguendo, for the purpose of resolving this suit, that compliance with § 2 [of the VRA] could be a compelling interest. . . ."); Bush, 517 U.S. at 977 ("[W]e assume without deciding that compliance with the results test [of the VRA] . . . can be a compelling state interest."). The Court, therefore, will assume, arguendo, that compliance with the VRA is a compelling state interest. Even with the benefit of that assumption, the 2011 Congressional Redistricting Plan does not survive strict scrutiny because the defendants did not have a "strong basis in evidence" for concluding that creation

---

[9] Even assuming, arguendo, that there was a compelling interest under the VRA, the Court finds, for principally the same reasons discussed in its analysis of CD 1, that the defendants did not have a "strong basis in evidence" for concluding that creation of a majority-minority district – CD 12 - was reasonably necessary to comply with the VRA. Alabama, 135 S. Ct. at 1274.

of a majority-minority district – CD 1 - was reasonably necessary to comply with the VRA.  <u>Alabama</u>, 135 S. Ct. at 1274. Accordingly, the Court holds that CD 1 was not narrowly tailored to achieve compliance with the VRA, and therefore fails strict scrutiny.

1.

a.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." <u>Thornburg v. Gingles</u>, 478 U.S. 30, 47 (1986). Section 2 of the VRA forbids state and local voting procedures that "result[ ] in a denial or abridgement of the right of any citizen of the United States to vote on account of race[.]" 52 U.S.C. § 10301(a). "Vote dilution claims involve challenges to methods of electing representatives - like redistricting or at-large districts – as having the effect of diminishing minorities' voting strength." <u>League of Women Voters of N.C. v. North Carolina</u>, 769 F.3d 224, 239 (4th Cir. 2014); <u>see also</u> <u>Shaw II</u>, 517 U.S. at 914 ("Our precedent establishes that a plaintiff may allege a § 2 violation . . . if the manipulation of districting lines fragments politically cohesive minority voters among several districts or packs them into one district or a

51

small number of districts, and thereby dilutes the voting strength of members of the minority population.").

The question of voting discrimination <u>vel non</u>, including vote dilution, is determined by the totality of the circumstances. <u>Gingles</u>, 478 U.S. at 43-46. Under <u>Gingles</u>, however, the Court does not reach the totality-of-the-circumstances test unless the challenging party is able to establish three preconditions. <u>Id.</u> at 50-51; <u>see also</u> <u>Bartlett</u> <u>v. Strickland</u>, 556 U.S. 1, 21 (2009) ("[T]he <u>Gingles</u> requirements are preconditions, consistent with the text and purpose of § 2, to help courts determine which claims could meet the totality-of-the-circumstances standard for a § 2 violation."); <u>Jenkins v. Red Clay Consol. Sch. Dist. Bd. of</u> <u>Educ.</u>, 4 F.3d 1103, 1135 (3d Cir. 1993) ("[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three <u>Gingles</u> factors but still have failed to establish a violation of § 2 under the totality of circumstances.").

Unlike cases such as <u>Gingles</u>, in which minority groups use section 2 as a sword to challenge districting legislation, here the Court is considering the general assembly's use of section 2 as a shield. The general assembly, therefore, must have a "strong basis in evidence" for finding that the threshold conditions for section 2 liability are present: "first, 'that

52

[the minority group] is sufficiently large and geographically compact to constitute a majority in a single member district'; second, 'that [the minority group] is politically cohesive'; and third, 'that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'" Growe v. Emison, 507 U.S. 25, 40 (1993) (quoting Gingles, 478 U.S. at 50-51). A failure to establish any one of the Gingles factors is fatal to the defendants' claim. Gingles, 478 U.S. at 50-51; see also Overton v. City of Austin, 871 F.2d 529, 538 (5th Cir. 1989). For the reasons stated below, the Court finds that the defendants fail to show the third Gingles factor, that the legislature had a "strong basis in evidence" of racially polarized voting in CD 1 significant enough that the white majority routinely votes as a bloc to defeat the minority candidate of choice.

b.

"[R]acial bloc voting . . . never can be assumed, but specifically must be proved." Shaw I, 509 U.S. at 653. Generalized assumptions about the "prevalence of racial bloc voting" do not qualify as a "strong basis in evidence." Bush, 517 U.S. at 994 (O'Connor, J., concurring). Moreover, the analysis must be specific to CD 1. See Alabama, 135 S. Ct. at 1265. Thus, evidence that racially polarized voting occurs in pockets of other congressional districts in North Carolina does

not suffice.  The rationale behind this principle is clear: simply because "a legislature has strong basis in evidence for concluding that a § 2 violation exists [somewhere] in the State" does not permit it to "draw a majority-minority district anywhere [in the state]."  Shaw II, 517 U.S. at 916-17 ("[The argument] that the State may draw the district anywhere derives from a misconception of the vote-dilution claim.  To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members.  It does not.").

Strikingly, there is no evidence that the general assembly conducted or considered any sort of a particularized polarized-voting analysis during the 2011 redistricting process for CD 1.  Dr. Hofeller testified that he did not do a polarized voting analysis for CD 1 at the time he prepared the map.  Trial Tr. 639:21-25 (Hofeller).  Further, there is no evidence "'that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'"  Growe, 507 U.S. at 40 (quoting Gingles, 478 U.S. at 51).  In fact, based on the defendants' own admission, "African American voters have been able to elect their candidates of choice in the First District since the district was established in 1992."  Defs.' Memo. of Law in Opp. to Pls.' Mot. for Sum. J. (June 23, 2014),

54

ECF No. 76, at 2, 8. This admission, in the Court's view, ends the inquiry. In the interest of completeness, the Court will comment on an argument the defendants' counsel made at trial and in their posttrial brief.

The defendants contend that there is some evidence that the general assembly considered "two expert reports" that "found the existence of racially polarized voting in" North Carolina. Defs.' Findings of Fact, ECF No. 138 at 93. These generalized reports, standing alone, do not constitute a "strong basis in evidence" that the white majority votes as a bloc to defeat the minority's preferred candidate of choice in CD 1. Moreover, it is not enough for the general assembly to simply nod to the desired conclusion by claiming racially polarized voting showed that African-Americans needed the ability to elect candidates of their choice without asserting the existence of a necessary premise: that the white majority was <u>actually</u> voting as a bloc to defeat the minority's preferred candidates. See, e.g., Rodriguez v. Pataki, 308 F. Supp. 2d 346, 438-39 (S.D.N.Y. 2004) (rejecting an "analysis [that] examines racially polarized voting without addressing the specifics of the third <u>Gingles</u> factor, which requires white majority bloc voting that usually defeats the [minority]-preferred candidate" and noting that "[e]ven if there were racially polarized voting, the report does not speak—one way or the other—to the effects of the polarized

55

voting"), aff'd, 543 U.S. 997 (2004); Moon v. Meadows, 952 F.
Supp. 1141, 1149-50 (E.D. Va. 1997) (state could not justify
redistricting plan under section 2 where "white bloc voting does
not prevent blacks from electing their candidates of choice" as
"black candidates . . . were elected despite the absence of a
black majority district"). "Unless [this] point[] [is]
established, there neither has been a wrong nor can be a
remedy." Growe, 507 U.S. at 40.

Contrary to the defendants' unfounded contentions, the
composition and election results under earlier versions of CD 1
vividly demonstrate that, though not previously a majority-BVAP
district, the white majority did not vote as a bloc to defeat
African-Americans' candidate of choice. In fact, precisely the
opposite occurred in these two districts: significant crossover
voting by white voters supported the African-American candidate.
See Strickland, 556 U.S. at 24 ("In areas with substantial
crossover voting it is unlikely that the plaintiffs would be
able to establish the third Gingles precondition – bloc voting
by majority voters" and thus "[i]n those areas majority-minority
districts would not be required in the first place").[10] The

---

[10] The defendants' reliance on Strickland is misplaced. A
plurality in Strickland held that section 2 did not require
states to draw election-district lines to allow a racial
minority that would make up less than 50 percent of the voting
age population in the new district to join with crossover voters

56

suggestion that the VRA would somehow require racial balkanization where, as here, citizens have not voted as racial blocs, where crossover voting has naturally occurred, and where a majority-minority district is created in blatant disregard for fundamental redistricting principles is absurd and stands the VRA on its head. As the defendants fail to meet the third Gingles factor, the Court concludes that section 2 did not require the defendants to create a majority-minority district in CD 1.

2.

Turning to consider the defendants' section 5 defense, the Supreme Court has repeatedly struck down redistricting plans that were not narrowly tailored to the goal of avoiding "'a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" Bush, 517 U.S. at 983 (quoting Miller, 515 U.S. at 926); see also Shaw II, 517 U.S. at 915–18 (concluding that districts were not

_____

to elect the minority's candidate of choice. 556 U.S. at 25 (plurality). That is, section 2 does not compel the creation of crossover districts wherever possible. This is a far cry from saying that states must create majority-BVAP districts wherever possible – in fact, the case stands for the opposite proposition: "Majority-minority districts are only required if all three Gingles factors are met and if § 2 applies based on a totality of the circumstances." Id. at 24 (emphasis added). As extensively discussed, the general assembly did not have a "strong basis in evidence" to conclude that the threshold conditions for section 2 liability were present.

narrowly tailored to comply with the VRA). Indeed, "the [VRA] and our case law make clear that a reapportionment plan that satisfies § 5 still may be enjoined as unconstitutional," as section 5 does not "give covered jurisdictions carte blanche to engage in racial gerrymandering in the name of nonretrogression." Shaw I, 509 U.S. at 654–55. "A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression." Id. Applying that principle below, it is clear that CD 1 is not narrowly tailored to the avoidance of section 5 liability.

a.

In Alabama, the Supreme Court made clear that section 5 "does not require a covered jurisdiction to maintain a particular numerical minority percentage." 135 S. Ct. at 1272. Rather, section 5 requires legislatures to ask the following question: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect its candidate of choice?" Id. at 1274. There is no evidence that the general assembly asked this question. Instead, the general assembly directed Dr. Hofeller to create CD 1 as a majority-BVAP district; there was no consideration of why the general assembly should create such a district.

While the Court "do[es] not insist that a legislature guess precisely what percentage reduction a court or the Justice Department might eventually find to be retrogressive," the legislature must have a "strong basis in evidence" for its use of racial classifications. Id. at 1273–74. Specifically, the Supreme Court noted that it would be inappropriate for a legislature to "rel[y] heavily upon a mechanically numerical view as to what counts as forbidden retrogression." Id. at 1273. That is precisely what occurred here: the general assembly established a mechanical BVAP target for CD 1 of 50 percent plus one person, as opposed to conducting a more sophisticated analysis of racial voting patterns in CD 1 to determine to what extent it must preserve existing minority percentages to maintain the minority's present ability to elect its candidate of choice. See id. at 1274.

b.

Although CD 1 has been an extraordinarily safe district for African-American preferred candidates of choice for over twenty years, the 2011 Congressional Redistricting Plan increased CD 1's BVAP from 47.76 percent to 52.65 percent. Despite the fact that African-Americans did not make up a majority of the voting-age population in CD 1, African-American preferred candidates easily and repeatedly won reelection under earlier congressional plans, including the 2001 benchmark plan. Representative Eva

59

Clayton prevailed in CD 1 in 1998 and 2000, for instance, winning 62 percent and 66 percent of the vote, respectively. Pls.' Ex. 112. Indeed, African-American preferred candidates prevailed with remarkable consistency, winning at least 59 percent of the vote under each of the five general elections under the benchmark version of CD 1. Id. In 2010, Congressman Butterfield won 59 percent of the vote, while in 2012 – under the redistricting plan at issue here – he won by an even larger margin, receiving 75 percent of the vote. Id.

In this respect, the legislature's decision to increase the BVAP of CD 1 is similar to the redistricting plan invalidated by the Supreme Court in Bush. See 517 U.S. at 983. In Bush, a plurality of the Supreme Court held that increasing the BVAP from 35.1 percent to 50.9 percent was not narrowly tailored because the state's interest in avoiding retrogression in a district where African-American voters had successfully elected their representatives of choice for two decades did not justify "substantial augmentation" of the BVAP. Id. Such an augmentation could not be narrowly tailored to the goal of complying with section 5 because there was "no basis for concluding that the increase to a 50.9% African-American population . . . was necessary to ensure nonretrogression." Id. "Nonretrogression is not a license for the State to do whatever it deems necessary to ensure continued electoral success; it

60

merely mandates that the minority's <u>opportunity</u> to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." <u>Id.</u> While the BVAP increase here is smaller than that in <u>Bush</u>, the principle is the same. Defendants show no basis for concluding that an augmentation of CD 1's BVAP to 52.65 percent was narrowly tailored when the district had been a safe district for African-American preferred candidates of choice for over two decades.

In sum, the legislators had no basis - let alone a strong basis - to believe that an inflexible racial floor of 50 percent plus one person was necessary in CD 1. This quota was used to assign voters to CD 1 based on the color of their skin. "Racial classifications of any sort pose the risk of lasting harm to our society. They reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin." <u>Shaw I</u>, 509 U.S. at 657.

For these reasons, the Court finds that CD 1 cannot survive strict scrutiny. Accordingly, the Court is compelled to hold that CD 1 violates the Equal Protection Clause of the Fourteenth Amendment.


III.

Having found that the 2011 Congressional Redistricting Plan violates the Equal Protection Clause, the Court now addresses

61

the appropriate remedy. Plaintiffs have requested that we "determine and order a valid plan for new congressional districts." Compl., ECF No. 1 at 19. Nevertheless, the Court is conscious of the powerful concerns for comity involved in interfering with the state's legislative responsibilities. As the Supreme Court has repeatedly recognized, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." Wise, 437 U.S. at 539. As such, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise . . . its own plan." Id. at 540. Under North Carolina law, courts must give legislatures at least two weeks to remedy defects identified in a redistricting plan. See N.C. Gen. Stat. § 120-2.4.

The Court also recognizes that individuals in CD 1 and CD 12 whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. "Those citizens 'are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan.'" Page, 2015 WL 3604029, at *18 (quoting Cosner v. Dalton, 522 F. Supp. 350, 364 (E.D. Va. 1981)). Therefore, the Court will require that new districts be drawn within two weeks of the

62

entry of this opinion to remedy the unconstitutional districts. In accordance with well-established precedent that a state should have the first opportunity to create a constitutional redistricting plan, see, e.g., Wise, 437 U.S. at 539-40, the Court allows the legislature until February 19, 2016, to enact a remedial districting plan.

## IV.

Because the plaintiffs have shown that race predominated in CD 1 and CD 12 of North Carolina's 2011 Congressional Redistricting Plan, and because the defendants have failed to establish that this race-based redistricting satisfies strict scrutiny, the Court finds that the 2011 Congressional Redistricting Plan is unconstitutional, and will require the North Carolina General Assembly to draw a new congressional district plan. A final judgment accompanies this opinion.

SO ORDERED.

2/5/16

Roger L. Gregory
United States Circuit Judge

COGBURN, District Judge, concurring:

I fully concur with Judge Gregory's majority opinion. Since the issue before the court was created by gerrymandering, and based on the evidence received at trial, I write only to express my concerns about how unfettered gerrymandering is negatively impacting our republican form of government.

Voters should choose their representatives. Mitchell N. Berman, Managing Gerrymandering, 83 Tex. L. Rev. 781 (2005). This is the "core principle of republican government." Id. To that end, the operative clause of Article I, § 4 of the United States Constitution, the Elections Clause, gives to the states the power of determining how congressional representatives are chosen:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. As redistricting through political gerrymander rather than reliance on natural boundaries and communities has become the tool of choice for state legislatures in drawing congressional boundaries, the fundamental principle of the voters choosing their representative has nearly vanished. Instead, representatives choose their voters.

64

Indeed, we heard compelling testimony from Congressman G. K. Butterfield (CD 1) and former Congressman Mel Watt (CD 12) that the configuration of CD 1 and CD 12 made it nearly impossible for them to travel to all the communities comprising their districts. Not only has political gerrymandering interfered with voters selecting their representatives, it has interfered with the representatives meeting with those voters. In at least one state, Arizona, legislative overuse of political gerrymandering in redistricting has caused the people to take congressional redistricting away from the legislature and place such power in an independent congressional redistricting commission, an action that recently passed constitutional muster. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, ___ U.S. ___, 135 S. Ct. 2652, 192 L. Ed. 2d 704 (2015).

Redistricting through political gerrymandering is nothing new. Starting in the year the Constitution was ratified, 1788, state legislatures have used the authority under the Elections Clause to redraw congressional boundaries in a manner that favored the majority party. For example, in 1788, Patrick Henry persuaded the Virginia legislature to remake its Fifth Congressional District to force Henry's political foe James Madison to run against James Monroe. Madison won in spite of

65

this, but the game playing had begun. In 1812, Governor Elbridge Gerry signed a bill redistricting Massachusetts to benefit his party with one district so contorted that it was said to resemble a salamander, forever giving such type of redistricting the name gerrymander. Thus, for more than 200 years, gerrymandering has been the default in congressional redistricting.

Elections should be decided through a contest of issues, not skillful mapmaking. Today, modern computer mapping allows for gerrymandering on steroids as political mapmakers can easily identify individual registrations on a house-by-house basis, mapping their way to victory. As was seen in Arizona State Legislature, supra, however, gerrymandering may well have an expiration date as the Supreme Court has found that the term "legislature" in the Elections Clause is broad enough to include independent congressional redistricting commissions. 135 S. Ct. at 2673.

To be certain, gerrymandering is not employed by just one of the major political parties. Historically, the North Carolina Legislature has been dominated by Democrats who wielded the gerrymander exceptionally well. Indeed, CD 12 runs its circuitous route from Charlotte to Greensboro and beyond -- thanks in great part to a state legislature then controlled by

66

Democrats.  It is a district so contorted and contrived that the United States Courthouse in Charlotte, where this concurrence was written, is five blocks within its boundary, and the United States Courthouse in Greensboro, where the trial was held, is five blocks outside the same district, despite being more than 90 miles apart and located in separate federal judicial districts.  How a voter can know who their representative is or how a representative can meet with those pocketed voters is beyond comprehension.

While redistricting to protect the party that controls the state legislature is constitutionally permitted and lawful, it is in disharmony with fundamental values upon which this country was founded.  "[T]he true principle of a republic is, that the people should choose whom they please to govern them."  Powell v. McCormack, 395 U.S. 486, 540–41, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969) (quoting Alexander Hamilton, 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876)).  Beyond taking offense at the affront to democracy caused by gerrymandering, courts will not, however, interfere with gerrymandering that is philosophically rather than legally wrong.  As has been seen in Arizona, it is left to the people of the state to decide whether they wish to select their representatives or have their representatives            select            them.

OSTEEN, JR., District Judge, concurring in part and dissenting in part:

I concur with the majority in finding that Plaintiffs have met their burden of proving that race predominated in the drawing of North Carolina's First Congressional District ("CD 1") and that Defendants have failed to show that the legislature's use of race in the drawing of that district was narrowly tailored to serve a compelling governmental interest. I also concur with the majority with respect to North Carolina's Twelfth Congressional District ("CD 12") in that, if race was a predominant factor, Defendants did not meet their burden to prove that CD 12 was narrowly tailored to serve a compelling state interest. However, I respectfully dissent from the majority in that I find that Plaintiffs have not met their burden of proving that race predominated in the drawing of CD 12. As a result, I conclude that the district is subject to and passes the rational basis test and is constitutional. I differ with the well-reasoned opinion of my colleagues only as to the degree to which race was a factor in the drawing of CD 12.

I.  <u>CONGRESSIONAL DISTRICT I</u>

With respect to my concurring opinion, I only add that I do not find, as Plaintiffs have contended, that this legislative effort constitutes a "flagrant" violation of the Fourteenth Amendment.  The majority opinion makes clear that bad faith is

68

not necessary in order to find a violation. (Maj. Op. at 4.)
Although Plaintiffs argued that the actions of the legislature
stand in "flagrant" violation of Fourteenth Amendment principles
(See Pls.' Trial Br. (Doc. 109) at 7.), Plaintiffs also conceded
at trial they did not seek to prove any ill-intent. (Trial Tr.
at 16:20-25.) Nevertheless, I wish to emphasize that the
evidence does not suggest a flagrant violation. Instead, the
legislature's redistricting efforts reflect the difficult
exercise in judgment necessary to comply with section 5 of the
Voting Rights Act ("VRA") in 2010, prior to the Supreme Court's
decision in Shelby County v. Holder, ____ U.S. ____, 133 S. Ct.
2612 (2013). Shelby struck down as unconstitutional the formula
created under section 4 of the VRA and, resultingly, removed
those covered jurisdictions from section 5. Id.

In Shelby, the Supreme Court recognized the success of the
VRA. Id. at 2626 ("The [Voting Rights] Act has proved immensely
successful at redressing racial discrimination and integrating
the voting process."). However, the Court also described its
concern with an outdated section 4 formula and the restrictions
of section 5:

> Yet the Act has not eased the restrictions in § 5 or
> narrowed the scope of the coverage formula in § 4(b)
> along the way. Those extraordinary and unprecedented
> features were reauthorized — as if nothing had
> changed. In fact, the Act's unusual remedies have
> grown even stronger. When Congress reauthorized the

69

Act in 2006, it did so for another 25 years on top of the previous 40 — a far cry from the initial five-year period. Congress also expanded the prohibitions in § 5. We had previously interpreted § 5 to prohibit only those redistricting plans that would have the purpose or effect of worsening the position of minority groups. In 2006, Congress amended § 5 to prohibit laws that could have favored such groups but did not do so because of a discriminatory purpose, even though we had stated that such broadening of § 5 coverage would "exacerbate the substantial federalism costs that the preclearance procedure already exacts, perhaps to the extent of raising concerns about § 5's constitutionality." In addition, Congress expanded § 5 to prohibit any voting law "that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States," on account of race, color, or language minority status, "to elect their preferred candidates of choice." In light of those two amendments, the bar that covered jurisdictions must clear has been raised even as the conditions justifying that requirement have dramatically improved.

Shelby Cnty., 133 S. Ct. at 2626-27 (internal citations omitted).

Although no court has held that compliance with section 5 is a compelling state interest, the Supreme Court has generally assumed without deciding that is the case. See Bush v. Vera, 517 U.S. 952, 977 (1996); Shaw v. Hunt, 517 U.S. 899, 915 (1996) ("Shaw II"). Compliance with section 5 was, in my opinion, at least a substantial concern to the North Carolina legislature in 2011, a concern made difficult by the fact that, at least by 2013 and likely by 2010, see Nw. Austin Mun. Util. Dist. No. 1 v. Holder, 557 U.S. 193 (2009), coverage was "based on decades-

70

old data and eradicated practices" yet had expanded
prohibitions. Shelby, 133 S. Ct. at 2617.

As a result, while I agree with my colleagues that CD 1, as
drawn, violates the Fourteenth Amendment, I do not find that
violation to be flagrant, as argued by Plaintiffs. (See Pls.'
Trial Brief (Doc. 109) at 7.) Instead, I simply find the
violation as to CD 1 to be the result of an ultimately failed
attempt at the very difficult task of achieving constitutionally
compliant redistricting while at the same time complying with
section 5 and receiving preclearance from the Department of
Justice. In drawing legislative districts, the Department of
Justice and other legislatures have historically made similar
mistakes in their attempts to apply the VRA. See generally,
e.g., Ala. Legislative Black Caucus v. Alabama, ____ U.S. ____,
135 S. Ct. 1257 (2015); Miller v. Johnson, 515 U.S. 900 (1995);
Shaw v. Reno, 509 U.S. 630 (1993) ("Shaw I"); Page v. Va. State
Bd. of Elections, Civil Action No. 3:13cv678, 2015 WL 3604029
(E.D. Va. June 5, 2015). Further, the difficult exercise of
judgment involved in the legislature's efforts to draw these
districts is reflected in the differing conclusions reached by
this court and the North Carolina Supreme Court. See generally
Dickson v. Rucho, No. 201PA12-3, 2015 WL 9261836 (N.C. Dec. 18,
2015). Contrary to Plaintiffs' suggestion, I find nothing

flagrant or nefarious as to the legislature's efforts here, even though I agree that CD 1 was improperly drawn using race as a predominant factor without sufficient justification.

## II. CONGRESSIONAL DISTRICT 12

Turning to my dissent regarding whether Plaintiffs have carried their burden of showing that race was the dominant and controlling consideration in drawing CD 12, a brief history of redistricting efforts in the state will provide helpful context to the current situation. In 1991, North Carolina enacted a Congressional Districting Plan with a single majority-black district — the 1991 version of CD 1. The 1991 version of CD 1 was a majority single-race-black district in both total population and voting age population ("VAP"). The State filed for preclearance from the Department of Justice for the 1991 plan under section 5 of the VRA, and there was no objection to the 1991 version of CD 1 specifically. See Shaw II, 517 U.S. at 902, 912; (Defs.' Ex. 126, Tab 1, "Section 5 Submission for 1991 Congressional Redistricting Plan".) There was, however, a preclearance objection to the 1991 Congressional Plan overall because of the State's failure to create a second majority-minority district running from the southcentral to southeastern region of the State. Shaw II, 517 U.S. at 902, 912.

72

As a result of this objection, the General Assembly drew a new Congressional Plan in 1992. The 1992 plan included a different version of CD 1 that was majority minority but did not include any portion of Durham County. The General Assembly also created a second majority-minority district (CD 12) that stretched from Mecklenburg County to Forsyth and Guilford Counties and then all the way into Durham County. The Attorney General did not interpose an objection to the 1992 Congressional Plan.

Under the 1992 Congressional Plan, CD 12 was drawn with a single-race total black population of 56.63% and a single-race black VAP ("BVAP") of 53.34%. (Defs.' Ex. 126, Tab 2, "1992 Congressional Base Plan #10"; Defs.' Ex. 4.1A; Defs.' Ex. 4.) Under a mathematical test for measuring the compactness of districts called the "Reock" test (also known as the dispersion test), the 1992 CD 12 had a compactness score of 0.05. (Trial Tr. at 351:24-352:16.)

The 1992 districts were subsequently challenged under the VRA, and in Shaw I, the Supreme Court found that the 1992 versions of CD 1 and 12 were racial gerrymanders in violation of the Fourteenth Amendment. 509 U.S. 630 (1993). The case was remanded for further proceedings. Id. On appeal again after remand, in Shaw II, the Supreme Court again found that the 1992

73

version of CD 12 constituted a racial gerrymander.  517 U.S. at 906.

Following the decision in Shaw II, in 1997 the North Carolina General Assembly enacted new versions of CD 1 and CD 12.  The 1997 version of CD 12 was drawn with a black total population of 46.67% and a black VAP of 43.36%.  (Defs.' Ex. 126, Tab 3, "97 House/Senate Plan A".)

The plan was yet again challenged in court, and in Cromartie v. Hunt, 34 F. Supp. 2d 1029 (E.D.N.C. 1998) (three-judge court), rev'd, 526 U.S. 541 (1999) ("Cromartie I"), a three-judge panel held on summary judgment that the 1997 version of CD 12 also constituted a racial gerrymander in violation of the Fourteenth Amendment, although the decision was reversed by the Supreme Court on appeal.

On remand, the district court again found the 1997 version of CD 12 to be an unconstitutional racial gerrymander in violation of the Fourteenth Amendment, Cromartie v. Hunt, 133 F. Supp. 2d 407 (E.D.N.C. 2000) (three-judge court), a ruling that the State again appealed, Hunt v. Cromartie, 529 U.S. 1014 (2000).  The Supreme Court reversed the district court, finding that politics, not race, was the predominant motive for the

74

district.  Easley v. Cromartie, 532 U.S. 234 (2001) ("Cromartie II").[1]

In 2001, the North Carolina General Assembly enacted the Congress Zero Deviation Plan for redistricting based upon the 2000 Census ("2001 Congressional Plan").  (Defs.' Ex. 126, Tab 5, "Congress Zero Deviation 2000 Census"; Defs.' Ex. 4.4A; Defs.' Ex. 4.4.)

Under the 2000 Census, the 2001 version of CD 12 was drawn with a single-race black total population of 45.02% and an any-part black total population of 45.75%.  (Pls.' Ex. 80.)  Single-race black VAP was 42.31% and any-part black VAP was 42.81%.  (Id.)

In every election held in CD 12 between 1992 and 2010, without exception, the African-American candidate of choice, Congressman Mel Watt, prevailed with no less than 55.95% of the vote, regardless of whether the black VAP in CD 12 exceeded 50%, and regardless of any other characteristic of any specific

_____

[1] They reversed the trial court despite evidence such as: (1) the legislature's statement in its 1997 DOJ preclearance submission that it drew the 1997 CD 12 with a high enough African-American population to "provide a fair opportunity for incumbent Congressman Watt to win election"; (2) the admission at trial that the General Assembly had considered race in drawing CD 12; and (3) the district court's rejection of evidence that the high level of black population in CD 12 was sheer happenstance.

election, demonstrating clearly that African-Americans did not require a majority of the VAP to elect their chosen candidate. The relevant election results are set forth in the following table:

| Twelfth Congressional District Election Results and Black Voting | | | |
|---|---|---|---|
| Year | BVAP | Percent of Vote | Candidate |
| 1992 | 53.34% | 70.37% | Mel Watt |
| 1994 | 53.34% | 65.80% | Mel Watt |
| 1996 | 53.34% | 71.48% | Mel Watt |
| 1998 | 32.56% | 55.95% | Mel Watt |
| 2000 | 43.36% | 65.00% | Mel Watt |
| 2002 | 42.31% | 65.34% | Mel Watt |
| 2004 | 42.31% | 66.82% | Mel Watt |
| 2006 | 42.31% | 67.00% | Mel Watt |
| 2008 | 42.31% | 71.55% | Mel Watt |
| 2010 | 42.31% | 63.88% | Mel Watt |

A.    **The 2011 Redistricting Process**

Following the 2010 Census, Senator Robert Rucho and Representative David Lewis were appointed chairs of the Senate and House Redistricting Committees, respectively, on January 27, 2011, and February 15, 2011. (See Parties' Joint Factual Stipulation (Doc. 125) ¶ 3.)

Jointly, Senator Rucho and Representative Lewis were responsible for developing a proposed congressional map based upon the 2010 Census. (Id.) Under the 2010 Census, the 2001

76

version of CD 12 was overpopulated by 2,847 people, or 0.39%. (Defs.' Ex. 4.5 at 3.)

They hired Dr. Thomas Hofeller to be the architect of the 2011 plan, and he began working under the direction of Senator Rucho and Representative Lewis in December 2010.[2] Senator Rucho and Representative Lewis were the sole source of instructions for Dr. Hofeller regarding the criteria for the design and construction of the 2011 congressional maps.

Throughout June and July of 2011, Senator Rucho and Representative Lewis released a series of public statements describing, among other things, the criteria that they had used to draw the proposed congressional plan. As Senator Rucho explained at the July 21, 2011 joint meeting of the Senate and House Redistricting Committees, those public statements "clearly delineated" the "entire criteria" that were established and "what areas [they] were looking at that were going to be in compliance with what the Justice Department expected [them] to do as part of [their] submission." (Pls.' Ex. 136 at 29:2-9 (7/21/11 Joint Committee Meeting transcript).)

---

[2] Dr. Hofeller had served as Redistricting Coordinator for the Republican National Committee for the 1990, 2000, and 2010 redistricting cycles. (See Trial Tr. at 577:1-23 (Testimony of Dr. Thomas Hofeller).)

77

**B.** **The Factors Used to Draw CD 12**[3]

On July 1, 2011, Senator Rucho and Representative Lewis made public the first version of their proposed congressional plan, Rucho-Lewis Congress 1, along with a statement explaining the rationale for the map. Specifically with regard to CD 12, Senator Rucho and Representative Lewis noted that although the 2001 benchmark version of CD 12 was "not a Section 2 majority black district," there "is one county in the Twelfth District that is covered by Section 5 of the Voting Rights Act (Guilford)." (Pls.' Ex. 67 at 5.) Therefore, "[b]ecause of the presence of Guilford County in CD 12, we have drawn our proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District." (Id.) Although the proposed map went through several iterations, CD 12 remained largely unchanged from Rucho-Lewis 1 throughout the redistricting process. (Compare Defs.' Ex. 4.7 (Rucho Lewis 1), with Defs.' Ex. 4.11 (Rucho Lewis 3).)

---

[3] CD 12 contains pieces of six counties: Mecklenburg, Cabarrus, Rowan, Davidson, Forsyth, and Guilford. A line of precincts running through Cabarrus, Rowan, and Davidson counties connects population centers in Mecklenburg (Charlotte), Forsyth (Winston Salem), and Guilford (Greensboro). CD 12 splits thirteen cities and towns. (Pls.' Ex. 17 ¶ 17.)

It is clear from both this statement and the record that race was, at the very least, one consideration in how CD 12 was drawn. These instructions apparently came, at least in part, from concerns about obtaining preclearance from the DOJ. (See Trial Tr. at 645:4-20 (Dr. Hofeller: "[M]y understanding of the issue was because Guilford was a Section 5 county and because there was a substantial African-American population in Guilford County, . . . that it could endanger the plan" unless Guilford County was moved into CD 12.); see also Pls.' Ex. 129 (Hofeller Dep. 75:13-16) ("So in order to be cautious and draw a plan that would pass muster under the VRA it was decided to reunite the black community in Guilford County into the 12th.").) Testimony was elicited at trial that Dr. Hofeller was in fact told to consider placing the African-American population of Guilford County into CD 12 because Guilford County was a covered jurisdiction under section 5 of the VRA. (See Trial Tr. at 608:19-24 (Dr. Hofeller "was instructed [not] to use race in any form [in drawing CD 12] except perhaps with regard to Guilford County" (emphasis added)).)[4]

_____

[4] I share the majority's concern over the fact that much of the communication regarding the redistricting instructions given to Dr. Hofeller were provided orally rather than in writing or by email. (Maj. Op. at 11.) As a result, the process used to draw CD 12 is not particularly transparent in several critical areas.

79

That race was at least present as a concern in the General Assembly's mind is further confirmed when looking to the General Assembly's 2011 preclearance submission to the Department of Justice. There it explained that it drew "District 12 as an African-American and very strong Democratic district that has continually elected a Democratic African American since 1992," and also noted that CD 12 had been drawn to protect "African-American voters in Guilford and Forsyth." (Pls.' Ex. 74 at 15 (emphasis added).)

The DOJ preclearance submission also explained that the General Assembly had drawn CD 12 in such a way to mitigate concerns over the fact that "in 1992 the Justice Department had objected to the 1991 Congressional Plan because of a failure by the State to create a second majority-minority district combining the African-American community in Mecklenburg County with African American and Native American voters residing in south central and southeastern North Carolina." (Id. at 14.) The preclearance submission further stated that "the 2011 version [of CD 12] maintains and in fact increases the African American community's ability to elect their candidate of choice." (Id. at 15.) I note that I interpret this statement slightly differently from the majority. (See Maj. Op. at 36). I conclude that this statement describes one result of how the

80

new district was drawn, rather than the weight a particular factor was given in how to draw the district in the first place. Essentially, I would find this statement is an explanation by legislature that because they chose to add Guilford County back into CD 12, the district ended up with an increased ability to elect African- American candidates, rather than the legislature explaining that they chose to add Guilford County back into CD 12 because of the results that addition created.

However, while it is clear that race was a concern, it is also clear that race was not the only concern with CD 12.   In their July 19, 2011 Joint Statement, Senator Rucho and Representative Lewis stated that the version of CD 12 in Rucho-Lewis Congress 2, the second map that they put forward, was based upon the 1997 and 2001 versions of that district and that the 2011 version was again drawn by the legislative leaders based upon political considerations.   According to them, CD 12 was drawn to maintain that district as a "very strong Democratic district . . . based upon whole precincts that voted heavily for President Obama in the 2008 General Election."   (Defs.' Ex. 72 at 40-44 "19 July Joint Statement" (noting that the co-chairs also "[understood] that districts adjoining the Twelfth District [would] be more competitive for Republican candidates"); Trial

Tr. at 491:2-493:13; Defs.' Ex. 26.1 at 21-22, Maps 2 and 3.)[5]
The co-chairs stated that by making CD 12 a very strong
Democratic district, adjoining districts would be more
competitive for Republicans. (Id.)

Further, Dr. Hofeller testified that he constructed the
2011 version of CD 12 based upon whole Voting Tabulation
Districts ("VTDs") in which President Obama received the highest
vote totals during the 2008 Presidential Election, indicating
that political lean was a primary factor. (Trial Tr. at 495:20-
496:5, 662:12-17.) The only information on the computer screen
used by Dr. Hofeller in selecting VTDs for inclusion in the CD
12 was the percentage by which President Obama won or lost a
particular VTD. (Trial Tr. at 495:20-496:5, 662:12-17.)
Dr. Hofeller has also stated that there was no racial data on
the screen when he constructed the district, providing some
support for the conclusion that racial concerns did not
predominate over politics. (Trial Tr. at 526:3-11.)

Although Plaintiffs argue that the primary difference
between the 2001 and 2011 versions of CD 12 is the increase in

---

[5] The use of election results from the 2008 presidential
election was the subject of some dispute at trial. However,
regardless of the merits of either position, I find nothing to
suggest those election results should not be properly considered
in political issues or political leanings as described
hereinafter.

black VAP, allegedly due to the predominance of race as a factor, Defendants contend that by increasing the number of Democratic voters in the 2011 version of CD 12 located in Mecklenburg and Guilford Counties, the 2011 Congressional Plan created districts that were more competitive for Republican candidates as compared to the 2001 versions of these districts, including Congressional Districts 6, 8, 9, and 13, a stated goal of the redistricting chairs. (See Trial Tr. at 491:2-495:19; Defs.' Ex. 26.1 at 22-23, maps 2 and 3; Defs.' Ex. 126, Tab 6, Tab 12.)[6] Defendants argue that the principal differences between the 2001 and 2011 versions of CD 12 are that the 2011 version: (1) adds more strong Democratic voters located in Mecklenburg and Guilford Counties; (2) adds more Democratic voters to the 2011 version of CD 5 because it was able to accept additional Democrats while remaining a strong Republican district; (3) removes Democratic voters from the 2011 CD 6 in Guilford County and places them in the 2001 CD 12; and (4) removes Republican voters who had formerly been assigned to the 2001 CD 12 from the corridor counties of Cabarrus, Rowan,

---

[6] Plaintiffs did not dispute persuasively that CD 5, CD 6, CD 8, and CD 13 became more competitive for Republican candidates. Dr. Stephen Ansolabehere's analysis was limited to movement into and out of CD 12, without regard to the effects in surrounding districts.

Davidson and other locations. (Trial Tr. at 491:6-493:13, 495:9-19, 561:5-562:14; Defs.' Ex. 31 at 220, 247-49.)

Defendants also contend, or at least intimate, that the final black VAP of the 2011 version of CD 12 resulted in part from the high percentage of African-Americans who vote strongly Democrat. They note that, both in previous versions of CD 12 and in alternative proposals that were before the General Assembly in 2010, African-Americans constituted a super-majority of registered Democrats in the district, citing the 2001 Twelfth Congressional Plan (71.44%); the Southern Coalition for Social Justice Twelfth Congressional Plan (71.53%); and the "Fair and Legal" Twelfth Congressional Plan (69.14%). (Defs.' Ex. 2 ¶ 27; Defs.' Ex. 2.64; Defs.' Ex. 2.66; Defs.' Ex. 2.67.)[7] Defendants are apparently making the same argument the State has made several times previously: the percentage of African-Americans added to the district is coincidental and the result of moving Democrats who happen to be African-American into the district.

C. <u>Racial Concerns did not Predominate</u>

Equal protection principles deriving from the Fourteenth Amendment govern a state's drawing of electoral districts.

_____

[7] In comparison, the statewide percentage of Democrats who are African-American is 41.38%. (Defs.' Ex. 62 at 83-84, F.F. No. 173.)

<u>Miller</u>, 515 U.S. at 905.  The use of race in drawing a district is a concern because "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters."  <u>Shaw I</u>, 509 U.S. at 657.  To prove a claim of racial gerrymandering, Plaintiffs first have the burden to prove that race was the predominant factor in the drawing of the allegedly gerrymandered districts. <u>Id.</u> at 643; <u>see also</u> <u>Page</u>, 2015 WL 3604029, at *6.  Predominance can be shown by proving that a district "is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles," (i.e., proving predominance circumstantially), <u>Shaw I</u>, 509 U.S. at 642, or by proving that "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.  . . . [and] that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations" (i.e., proving predominance directly), <u>Miller</u>, 515 U.S. at 913, 916.

Plaintiffs can meet this burden through direct evidence of legislative purpose, showing that race was the predominant factor in the decision on how to draw a district.  Such evidence

85

can include statements by legislative officials involved in drawing the redistricting plan and preclearance submissions submitted by the state to the Department of Justice. Shaw I, 509 U.S. at 645; Clark v. Putnam Cty., 293 F.3d 1261, 1267-68, 1272 (11th Cir. 2002); Page, 2015 WL 3604029, at *9. Plaintiffs can also meet this burden through circumstantial evidence such as the district's shape, compactness, or demographic statistics. See, e.g., Shaw II, 517 U.S. at 905. Circumstantial evidence can show that traditional redistricting criteria were subordinated and that a challenged district is unexplainable on grounds other than race. Plaintiffs do not need to show that race was the only factor that the legislature considered, just that it predominated over other factors. Clark, 293 F.3d at 1270 ("The fact that other considerations may have played a role in . . . redistricting does not mean that race did not predominate.").

If race is established as the predominant motive for CD 12, then the district will be subject to strict scrutiny, necessitating an inquiry into whether the use of race to draw the district was narrowly tailored to meet a compelling state interest. See Bush, 517 U.S. at 976. The Supreme Court has assumed without deciding that compliance with sections 2 and 5 of the VRA is a compelling state interest. Shaw II, 517 U.S. at

86

915; <u>Bush</u>, 517 U.S. at 977. Defendants in this case contend that, if the court finds that either district was drawn predominantly based on race, their maps are narrowly tailored to avoid liability under these sections in satisfaction of strict scrutiny.

Just as with CD 1, the first hurdle Plaintiffs must overcome is to show that racial concerns predominated over traditional criteria in the drawing of CD 12. As stated above, it is in this finding that I dissent from the majority.

Most importantly, as compared to CD 1, I find that Plaintiffs have put forth less, and weaker, direct evidence showing that race was the <u>primary</u> motivating factor in the creation of CD 12, and none that shows that it predominated <u>over</u> other factors.[8] Plaintiffs first point to several public statements that they argue demonstrate the State's intent to

---

[8] In their Proposed Findings of Fact and Conclusions of Law, Plaintiffs point to the increase in black VAP from 42.31% to 50.66% as direct evidence of racial intent. (<u>See</u> Pls.' Proposed Findings of Fact and Conclusions of Law, supp. pt. 3 (Doc. 137-2) ¶ 103.) I disagree, and would find that on these facts, the black VAP increase is a result, not an explanation, and thus is at most circumstantial evidence of a legislature's <u>intent</u> in drawing the district. While CD 12 certainly experienced a large increase in black VAP, it is still Plaintiffs' burden (especially given the high correlation between the Democratic vote and the African-American vote) to prove that race, not politics, predominated and that the increase is not coincidental and subordinate to traditional political considerations.

draw CD 12 at a majority black level and argue that this stated goal demonstrates that race predominated. However, I find that the statements issued by the redistricting chairs show only a "consciousness" of race, rather than a predominance, and by themselves do not show an improperly predominant racial motive. See Bush, 517 U.S. at 958.

First, Plaintiffs cite to the July 1, 2011 press release where the redistricting chairs explained that:

> Because of the presence of Guilford County [a section 5 jurisdiction under the VRA] in the Twelfth District, we have drawn our proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District. We believe this measure will ensure preclearance of the plan.

(Pls.' Ex. 67 at 5.) This statement seems similar to, and perhaps slightly more persuasive than, the statements that the Supreme Court found unpersuasive in Cromartie II. In Cromartie II, the Supreme Court considered a statement by the mapmaker that he had "moved [the] Greensboro Black Community into the 12th, and now need to take about 60,000 out of the 12th." See 532 U.S. at 254. The Court in that case noted that while the statement did reference race, it did not discuss the political consequences or motivation for placing the population of Guilford County in the 12th district. Id. Here, while the statement by the co-chairs does reference political consequences

88

(ensuring preclearance), it still does not rise to the level of evidence that the Supreme Court has found significant in other redistricting cases. See Bush, 517 U.S. at 959 (O'Connor, J., principal opinion) (Texas conceded that one of its goals was to create a majority-minority district); Shaw II, 517 U.S. at 906 (recounting testimony that creating a majority-minority district was the "principal reason" for the 1992 version of District 12); Miller, 515 U.S. at 907 (State set out to create majority-minority district). While this statement, like the statement in Cromartie II, provides some support for Plaintiffs' contention, it does not rise to the level of showing predominance. It does not indicate that other concerns were subordinated to this goal, merely, that it was a factor.[9]

The co-chairs' later statement that this result would help to ensure preclearance under the VRA similarly falls short of explaining that such actions were taken in order to ensure preclearance, or that a majority BVAP (or even an increase in BVAP) was a non-negotiable requirement.[10] In fact, the co-chairs

_____

[9] The statement by Dr. Hofeller, set out below, furthers this finding in that he testified that Guilford County was placed in CD 12 as a result of an effort to re-create the 1997 CD 12.

[10] The State's DOJ submission is in a similar stance, in that while it explains that the BVAP of CD 12 increased, it does

89

explicitly state in the same release that CD 12 was created with "the intention of making it a very strong Democratic district" and that that it was not a majority black district that was required by section two (insinuating that it became so as a result of the addition of Guilford County, rather than Guilford being added in order to achieve that goal), belying that there was any mechanical racial threshold of the sort that would lend itself to a finding of predominance. (Pls.' Ex. 67 at 5.)

Further, regarding the placement of Guilford County into CD 12, Dr. Hofeller testified as follows:

> My instructions in drawing the 12th District <u>were to draw it as it were a political district, as a whole.</u> We were aware of the fact that Guilford County was a Section 5 county. We were also aware of the fact that the black community in Greensboro had been fractured by the Democrats in the 2001 map to add Democratic strengths to two Democratic districts. During the process, it was my understanding that we had had a comment made that we might have a liability for fracturing the African-American community in Guilford County between a Democratic district and a Republican district. When the plan was drawn, I knew where the old 97th, 12th District had been drawn, and I used that as a guide because one of the things we needed to do politically was to reconstruct generally the 97th district; and when we checked it, we found out that we did not have an issue in Guilford County with fracturing the black community.

(Trial Tr. at 644:11-645:1 (emphasis added).)

not show that the State had any improper threshold or racial goal. (<u>See</u> Pls.' Ex. 74 at 15.)

Dr. Hofeller's testimony shows that, while the map drawers were aware that Guilford County was a VRA county and that there were possibly some VRA concerns surrounding it, the choice to place Guilford County in CD 12 was at least in part also based on a desire to reconstruct the 1997 version of CD 12 for political reasons and doing so also happened to eliminate any possible fracturing complaint. This is furthered by Dr. Hofeller's deposition testimony, in which he explained that while the redistricting chairs were certainly concerned about a fracturing complaint over Guilford County, "[his] instruction was not to increase [the black] population. [His] instruction was to try and take care of [the VRA] problem, but the primary instructions and overriding instruction in District 12 was to accomplish the political goal." (Pls.' Ex. 129 at 71:19-24.)[11]

---

[11] It should be noted that Guilford County had been placed in District 12 before but had been moved into the newly-created District 13 during the 2001 redistricting process. This occurred as a result of North Carolina gaining a thirteenth congressional seat and needing to create an entirely new district. As Dr. Hofeller testified, in 2011, CD 13, which in 2001 had been strongly Democratic, was being moved for political reasons, and thus the districts surrounding District 13 would necessarily be different than they had been in 2001. As the legislature wished for these districts to be strongly Republican, moving Guilford County, which is strongly Democratic, into the already Democratic CD 12 only made sense. (Pls.' Ex. 129 at 71:6-18.) Given that as a result of CD 13's move, Guilford County was going to end up being moved anyways, the decision to re-create the 1997 version of CD 12 as a way to avoid a VRA claim does not persuade me that the choice to move

Compare these statements with those made about CD 1, where Dr. Hofeller repeatedly testified that he was told "to draw that 1st District with a black voting-age population in excess of 50 percent because of the Strickland case." (See Trial Tr. at 480:21-481:1.) He also testified that this goal for CD 1 could not be compromised, explaining that while he had some leeway in how high he could take the BVAP of the district, he could not go lower than 50% plus 1. (Trial Tr. at 621:13-622:19.) These are the sorts of statements that show predominance, rather than consciousness, of race and are clearly distinguishable from those made about CD 12, where there is only evidence that race was one among several factors.

Based upon this direct evidence, I conclude that race was a factor in how CD 12 was drawn, although not a predominant one. A comparison of the legislative statements as to CD 12 with those made with respect to CD 1 is illustrative, given that the legislature clearly stated its intention to create a majority-minority district within CD 1.

Compared with such open expressions of intent, the statements made with respect to CD 12 seem to be more a description of the resulting characteristics of CD 12 rather

Guilford County to CD 12 was in and of itself predominantly racial.

92

than evidence about the weight that the legislature gave various factors used to draw CD 12. For example, as the majority points out, in the public statement issued July 1, 2011, Senator Rucho and Representative Lewis stated, "[b]ecause of the presence of Guilford County in the Twelfth District [which is covered by section 5 of the VRA], we have drawn our proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District." (Pls.' Tr. Ex. 67 at 5; (Maj. Op. at 35).) While the majority reaches an imminently reasonable conclusion that this is evidence of an intention to create a majority-minority district, I, on the other hand, conclude that the statement reflects a recognition of the fact the black VAP voting age was higher in the new district because of the inclusion of a section 5 county, not necessarily that race was the predominant factor or that Guilford County was included in order to bring about that result. It seems clear to me that some recognition of the character of the completed CD 12 to the Department of Justice addressing the preclearance issue was necessary. However, that recognition does not necessarily reflect predominant, as opposed to merely significant, factors in drawing the district.

93

Plaintiffs also point to circumstantial evidence, including the shape of the district, the low compactness scores, and testimony from two experts who contend that race, and not politics, better explains the choices made in drawing CD 12.

As regards the district's shape and compactness, as Defendants point out, the redistricting co-chairs were not working from a blank slate when they drew the 2011 version of CD 12. CD 12 has been subject to litigation almost every single time it has been redrawn since 1991, and, although Plaintiffs are correct that it has a bizarre shape and low compactness scores, it has always had a bizarre shape and low compactness scores. As such, pointing out that these traditional criteria were not observed by the co-chairs in drawing CD 12 is less persuasive evidence of racial predominance than it might otherwise be, given that to create a district with a more natural shape and compactness score, the surrounding districts (and likely the entire map) would have to be redrawn. It is hard to conclude that a district that is as non-compact as CD 12 was in 2010 was revised with some specific motivation when it retains a similar shape as before and becomes slightly less compact than the geographic oddity it already was.

As for Plaintiffs' expert testimony, I first note that Dr. David Peterson's testimony neither establishes that race was

94

the predominant motive for the drawing of CD 12 nor does it even purport to. As Dr. Peterson himself stated, his opinion was simply that race "better accounts for" the boundaries of CD 12 than does politics, but he did not have an opinion on the legislature's actual motivation, on whether political concerns predominated over other criteria, or if the planners had non-negotiable racial goals. (Trial Tr. at 233:17-234:3.)

Further, when controlling for the results of the 2008 presidential election, the only data used by the map's architect in drawing CD 12, Dr. Peterson's analysis actually finds that politics is a <u>better</u> explanation for CD 12 than race. (Defs.' Ex. 122 at 113-15.) As such, even crediting his analysis, Dr. Peterson's report and testimony are of little use in examining the intent behind CD 12 in that they, much like Plaintiffs' direct evidence, show at most that race may have been one among several concerns and that politics was an equal, if not more significant, factor.

As for Dr. Ansolabehere, his testimony may provide some insight into the demographics that resulted from how CD 12 was drawn. However, even assuming that his testimony is to be

credited in its entirety, I do not find that it establishes that race predominated as a factor in how CD 12 was drawn.[12]

First, as Defendants point out, Dr. Ansolabehere relied on voter registration data, rather than actual election results, in his analysis. (Trial Tr. at 307:4-308:9.) Even without assuming the Supreme Court's admonishment about the use of registration data as less correlative of voting behavior than actual election results remains accurate, Dr. Ansolabehere's analysis suffers from a separate flaw. Dr. Ansolabehere's analysis says that race better explains the way CD 12 was drawn than does political party registration. However, this is a criterion that the state did not actually use when drawing the map. Dr. Hofeller testified that when drawing the districts, he examined only the 2008 presidential election results when deciding which precincts to move in and out of a district.[13] (See

_____

[12] I note that Dr. Ansolabehere testified that he performed the same analysis in Bethune-Hill v. Virginia State Board of Elections, Civil Action No. 3:14CV852, 2015 WL 6440332 (E.D. Va. Oct. 22, 2015), and that the three-judge panel in that case rejected the use of his analysis. Id. at *41-42.

[13] While Plaintiffs criticize this use of an admittedly unique electoral situation, the fact that the 2008 presidential election was the only election used to draw CD 12 does not, in and of itself, establish that politics were merely a pretext for racial gerrymandering. In my opinion, the evidence does not necessarily establish the correlation between the specific racial identity of voters and voting results; instead, a number of different factors may have affected the voting results.

Trial Tr. at 495:20-502:14.)    This fact is critical to the usefulness of Dr. Ansolabehere's analysis because, absent some further analysis stating that race better explains the boundaries of CD 12 than the election results from the 2008 presidential election, his testimony simply does not address the criteria that Dr. Hofeller actually used.    Plaintiffs contend that the legislature's explanation of political motivation is not persuasive because, if it were the actual motivation, Dr. Ansolabehere's analysis would show that the boundaries were better explained by voter registration than by race.    However, because Defendants have explained that they based their political goals on the results of the 2008 presidential election, rather than voter registration, Dr. Ansolabehere's analysis is simply not enough to prove a <u>predominant</u> racial motive.

     This is particularly true when the other evidence that might confirm Dr. Ansolabehere's analysis is less than clear,

---

(<u>Compare</u>, <u>e.g.</u>, Trial Tr. at 325:7-9 ("There's huge academic literature on this topic that goes into different patterns of voting and how Obama changed it . . .") <u>with</u> Trial Tr. at 403:17-18 ("you can't tell at the individual level how individuals of different races voted"); <u>id.</u> at 503:7-10 ("we're looking for districts that will hold their political characteristics, to the extent that any districts hold them, over a decade rather than a one or two year cycle.").)    As a result, I do not find the use of the 2008 presidential election to be pretext for racial gerrymandering.

and in fact provides some hesitation as to the analysis, rather than corroborating it. Specifically, Dr. Ansolabehere applied his envelope analysis to CD 12, a district that was originally drawn in order to create a majority-minority district, has retained a substantial minority population in the twenty years since its creation, and was extremely non-compact when originally drawn. Therefore, absent some consideration of other factors – the competitiveness of surrounding, contiguous districts and the compactness of those districts – it is difficult to place great weight on Dr. Ansolabehere's analysis. In other words, if a district starts out as an extremely gerrymandered district, drawn with race as a predominant factor, I do not find compelling a subsequent study concluding that race, and not politics, may be a better predictor of the likelihood of voter inclusion in a modification of the original district. See Bethune-Hill, 2015 WL 6440332 at *42 ("If a district is intentionally designed as a performing district for Section 5 purposes, there should be little surprise that the movement of VTDs into or out of the district is correlated – even to a statistically significant degree – with the racial composition of the population.").

As the Supreme Court has explained, Plaintiffs' burden of proving that racial considerations were "dominant and

controlling" is a demanding one. See Miller, 515 U.S. at 913, 929. In my opinion, Plaintiffs have not met that burden here as to CD 12. Plaintiffs' direct evidence shows only that race was a factor in how CD 12 was drawn, not the "dominant and controlling" factor. As for their circumstantial evidence, Plaintiffs must show that the district is unexplainable on grounds other than race. Id. at 905. Here, Defendants explain CD 12 based on the use of political data that Plaintiffs' experts do not even specifically address. As the Court in Cromartie II explained, in cases where racial identification correlates highly with political affiliation, Plaintiffs attacking a district must show "at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles [and] that those districting alternatives would have brought about significantly greater racial balance." Cromartie II, 532 U.S. at 234, 258. Plaintiffs have not done so here. In essentially alleging that political goals were pretext, they have put forth no alternative plan that would have made CD 12 a strong Democratic district while simultaneously strengthening the surrounding Republican districts and not increasing the black VAP. As such, they have not proven that politics was mere pretext in this case.

Finally, mindful of the fact that the burden is on Plaintiffs to prove "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations" (i.e., proving predominance directly), Miller, 515 U.S. at 913, 916, it is not clear whether compliance with section 5, although it necessarily involved consideration of race, should be considered a "neutral" redistricting principle or a purely racial consideration. Although I reach the same decision regardless, I conclude that actions taken in compliance with section 5 and preclearance should not be a factor that elevates race to a "predominant factor" when other traditional districting principles exist, as here, supporting a finding otherwise. As a result, the fact that certain voters in Guilford County were included in CD 12 in an effort to comply with section 5, avoid retrogression, and receive preclearance does not persuade me that race was a predominant factor in light of the other facts of this case.

As Plaintiffs have failed to show that race was the predominant factor in the drawing of CD 12, it is subject to a rational basis test rather than strict scrutiny. Because I find that CD 12 passes the rational basis test, I would uphold that district as constitutional.