# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA
# NO. 1:13-CV-00949

DAVID HARRIS and CHRISTINE
BOWSER,

            Plaintiffs,

      v.

PATRICK MCCRORY, in his capacity as
Governor of North Carolina; NORTH
CAROLINA STATE BOARD OF
ELECTIONS; and JOSHUA HOWARD, in
his capacity as the Chairman of the North
Carolina State Board of Elections,

           Defendants.

**PLAINTIFFS' OBJECTIONS AND
MEMORANDUM OF LAW
REGARDING REMEDIAL
REDISTRICTING PLAN**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND ................................................................................. 3

      A.    The Court Issues Its Memorandum Opinion ................................. 3

      B.    The General Assembly Adopts a New Congressional Districting
            Plan ........................................................................................... 5

            1.    The Public Pleads with the General Assembly to Draw
                  Neutral Districts Rather than a Renewed Gerrymander ................... 5

            2.    The Joint Committee Adopts Criteria that Require the
                  General Assembly to Ignore the Racial Consequences of the
                  New Plan and to Give Explicit Partisan Advantage to
                  Republicans ..................................................................................... 6

            3.    The Plan Architects Describe the Goals and Consequences of
                  the New Plan ................................................................................... 9

                  a.    The Plan's Architects Believe this Court Instructed
                        Them to Disregard Race Entirely Because There is No
                        Racially Polarized Voting in North Carolina ......................... 9

                  b.    The Plan's Architects Assert that They Set Out to
                        Replace a Racial Gerrymander with a Partisan
                        Gerrymander ........................................................................ 10

            4.    The Specific Process by which the New Plan Was Drawn
                  Remains a Mystery ....................................................................... 11

            5.    The General Assembly Adopts the New Plan ............................... 13

III.  ARGUMENT ................................................................................... 16

      A.    The General Assembly Failed to Cure the Racial Gerrymander ............... 18

            1.    The General Assembly's Remedial Redistricting Process Is
                  Suspect ......................................................................................... 18

            2.    The General Assembly Failed to Understand, Let Alone
                  Follow, This Court's Instructions to Remedy the Racial
                  Gerrymander of CDs 1 and 12 ...................................................... 21

      B.    In the Alternative, the New Plan Replaces the Unconstitutional
            Racial Gerrymander with an Unconstitutional Partisan Gerrymander ...... 30

            1.    Partisan Gerrymandering Is Unconstitutional ............................... 31

            2.    The General Assembly Freely Admits that It Set Out to Draw
                  a Partisan Gerrymander that Would Advantage Republicans
                  to the Maximum Degree Mathematically Possible ......................... 33

3.      The General Assembly Can Assert No Legitimate Interest in
        "Partisan Advantage" ....................................................................... 36

IV.    CONCLUSION ....................................................................................................... 39

# I.    INTRODUCTION

On February 5, 2016, this Court struck down the enacted congressional plan because it diluted African American voting power by packing African Americans into Congressional Districts ("CDs") 1 and 12 in violation of the Fourteenth Amendment to the United States Constitution. Given the first opportunity to enact a remedy, the North Carolina General Assembly did nothing of the sort; indeed, it didn't even attempt the task.

Told it could not pack African American voters into two districts, it instead scattered them to the winds. The "remedy" adopted by the General Assembly draws Representative Alma Adams, one of North Carolina's two black representatives, out of her district—marooning her *ninety miles* from newly-drawn CD 12 in a district specifically designed to elect Republicans. The "remedy" adopted by the General Assembly has been decried by the state legislative black caucus and North Carolina's black congressional black delegates as a willful attempt to limit minority representation. And perhaps most shockingly, when the Court ordered the General Assembly to remedy its misuse of the Voting Rights Act as a justification for racial gerrymandering, the General Assembly responded by pretending that racially polarized voting simply does not exist.

Thus, in 2011, the General Assembly used race to achieve a districting plan which packed African-American voters into a handful of districts, whitewashing surrounding districts and resulting in suppressed minority influence and an extreme Republican advantage in North Carolina's congressional delegation. Five years later, after this Court

- 1 -

struck down that districting scheme, and in a purported "remedy" to this constitutional violation, the General Assembly has diced up African-American voters across nearly all congressional districts, once again ensuring that minority voter influence is suppressed by the white majority in as many districts as possible, and cementing the extreme Republican advantage achieved through the unconstitutional plan. At the risk of dramatic understatement, the newly-adopted plan fails to adequately remedy the original violation.

Indeed, the General Assembly's remedial redistricting process is all too familiar. The same architects who oversaw the original plan instructed the same mapdrawer who drew the unconstitutional racial gerrymander to draw a new plan. Once again the plan was drawn outside the supervision of any other legislators. Once again the plan is couched in claims that race was not considered, only partisan politics. It is hardly surprising that the resulting "remedy" is no remedy at all.

But even if the General Assembly's new plan were an adequate remedy to the racial gerrymander, it still is not a lawful substitute because, as the plan's architects openly brag, it is a bald partisan gerrymander that maximizes Republican advantage at the expense of traditional districting principles, unmoored by any legitimate principle whatsoever. Under the false impression that partisan gerrymandering is perfectly legal, the plan's architects publicly and proudly proclaimed this as their overarching goal. This partisan gerrymander flatly violates the Constitution—and seeks to make a mockery of this Court's Opinion. This Court should not be a party to the General Assembly's continued manipulations of district lines in defiance of constitutional principles.

Case 1:13-cv-00949-WO-JEP    Document 157    Filed 03/03/16    Page 5 of 44

In short, the Court owes no deference to the remedial plan enacted by the General Assembly, which inspires little trust or confidence, and warrants even less. Defendants cannot demonstrate that the new plan provides a full and fair remedy to the racial gerrymander identified by the Court.

## II.    BACKGROUND

### A.    The Court Issues Its Memorandum Opinion

On February 5, 2016, the Court issued a Memorandum Opinion in which it held that North Carolina's congressional redistricting plan (the "enacted plan") was a racial gerrymander in violation of the Fourteenth Amendment. *See* ECF No. 142 ("Opinion") at 63. Specifically, the Court struck down the enacted plan because CDs1 and 12 were drawn using race as the predominant factor, and Defendants failed to establish that the General Assembly's use of race to draw these districts satisfied strict scrutiny. *Id.*

The Court explained the basis for its strict scrutiny holding in great detail. As to CD 12, the Court found that Defendants failed their strict scrutiny burden because they did not proffer *any* compelling state interest for the General Assembly's predominant use of race as to CD 12. *Id.* at 49-50. The Court made no findings and offered no opinions as to whether or the extent to which racially polarized voting exists in the part of the state in which enacted CD 12 was located.

As to CD 1, the General Assembly argued that creation of CD 1 as a majority-minority district "was reasonably necessary to comply with the VRA." *Id.* at 51. The Court found that the General Assembly failed its strict scrutiny burden as to CD 1 primarily because the General Assembly failed to adequately establish the third *Gingles*

- 3 -

precondition—that a white majority in CD 1 had voted sufficiently as a bloc so as to allow it to usually defeat the minority group's candidate of choice in CD 1. *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Again, the Court did not find an absence of racially polarized voting in North Carolina in general or the area encompassed by CD 1 in particular. Rather, because "racial bloc voting . . . never can be assumed, but specifically must be proved," *Shaw v. Reno*, 509 U.S. 630, 653 (1993), and Defendants conceded that African Americans had been able to elect their candidates of choice in CD 1 since 1992 regardless of whether it was majority-minority, the Court found that Defendants had failed to adduce adequate evidence of *sufficient* racially polarized voting to meet their strict scrutiny burden. *Id.* at 53-55. The Court further noted that although Defendants had offered "generalized" reports showing the existence of racially polarized voting in North Carolina, these reports alone did not provide a strong basis in evidence for the General Assembly to conclude that the VRA compelled it to transform CD 1 into a majority BVAP district. *Id.* at 55-57.

Having determined that the enacted plan failed constitutional muster, the Court gave the General Assembly the "first opportunity to create a constitutional redistricting plan," *id.* at 63, providing two weeks from the entry of its Opinion for the General Assembly "to remedy the unconstitutional districts." *Id.*

- 4 -

**B.     The General Assembly Adopts a New Congressional Districting Plan**

**1.     The Public Pleads with the General Assembly to Draw Neutral Districts Rather than a Renewed Gerrymander**

On Friday, February 12, 2016, Senate Leader Phil Berger and House Speaker Tim Moore announced that they had appointed a Joint Select Committee on Congressional Redistricting ("Joint Committee"). That same day, the Joint Committee announced that it would host public meetings on Monday, February 15, starting at 10 a.m.[1] In at least several of these public meetings, speakers were asked to provide their race when signing in to speak. Declaration of Kevin J. Hamilton ("Hamilton Decl."), Ex. 1 (Tr. 38:12-13, 62:10-14, 157:19-20, 172:19-173:1, 179:8-11). The public was also permitted to submit written comments to the Joint Committee. *Id.*, Ex. 2. As one would expect, members of the public had different perspectives and provided different input. But by far the most common refrain is that the North Carolina public is entirely fed up with gerrymandering and its pernicious consequences. The footnote below gathers some of these written

---

[1] *See* http://www.ncga.state.nc.us/documentsites/committees/JointSelectCommitteeonCongressionalRedistricting/Joint%20Select%20Committee%20on%20Congressional%20Redistricting%20Public%20Hearing%20Notice.pdf.

comments—from merely the first *eight* pages of an 80-page document. They amount to a

cri de coeur from a despairing electorate.[2]

### 2. The Joint Committee Adopts Criteria that Require the General Assembly to Ignore the Racial Consequences of the New Plan and to Give Explicit Partisan Advantage to Republicans

On Tuesday, February 16, 2016, the Joint Committee met to adopt criteria

governing the development of a new congressional districting plan (the "New Plan"). The

---

[2] *See* Hamilton Decl. Ex 2 at 1 (Robin Withrow: "It is time to end once and for all partisan redistricting"); *id.* (Lisa Jordan: General Assembly should not to adopt "cynical, partisan maps [that] continue to aggressively segregate voters"); *id.* (Noah Grolnick: "It is vital that the redrawing of North Carolina's congressional maps assure politicians do not cho[o]se their voters in a way that makes it easier to get reelected but that voters are able to cho[o]se the . . . politicians to represent them."); *id.* at 2 (Timothy O'Brien: "Please end gerrymandering."); *id.* (Betsy Lowman: "Take political allegiance out of the equation."); *id.* at 3 (Joe Lowman: "The temptation of legislators, Democratic as well as Republican, to cheat when redistricting NC's districts is so great" and "[m]aybe the public [will] respect the House of Representatives [sic] again if districts are formed fairly."); *id.* (Nancy Wilkinson: "Please make sure that all districts are drawn up fairly in a non-partisan manner."); *id.* at 4 (Gregory Kennington: "Please bring democracy back to North Carolina—End political gerrymandering.");*id.* (Gail Bromley: "Both major political parties have done what they can to influence the process to the advantage of the party in power. . . . Partisan politics should not be how these lines are drawn."); *id.* (William Miller: "The present makeup of congressional districts favors incumbents and has contributed to the polarization of North Carolina politics."); *id.* at 5 (Laurin Kier: "I do NOT believe that either the Republicans or the Democrats can be trusted to draw fair, non-partisan Congressional voting districts" and asking that a non-partisan entity redraw the congressional plan); *id.* at 6 (Edith Knight: "Please stop gerrymandered districts in North Carolina, allowing each vote to count. Now, in general elections in my district the outcome is decided before I enter the voting booth."); *id.* (Donna Newman: "If we the People cannot trust that our Legislators are being selected based on the demographics of NC as a whole, and that we are being represented fairly even when in the minority across the State, the whole house of cards will tumble down. Trust, lost in the process, cannot easily be regained. You must start now to regain it."); *id.* at 7 (Robert Doss: "Clearly my input doesn't matter, given the short time frame between soliciting constituent input and actually redrawing the districts. . . . I'm sure you will redraw the districts according to the maps you already have drawn, with no regard to input from me or any other constituents."); *id.* at 8 (Jennie Betton: "Districts should be created by an independent commission without regard to party affiliation or politics. No one likes to play in a game whose outcome is rigged in favor of the rule makers."); *id.* (Cinnamon Frame: "I feel a non-partisan committee should draw the lines -neither party can be trusted to do this fairly and not butcher our representation to suit their own ends."); *id.* (Carroll Heins: "Gerrymandering, whether by Democrats or Republicans-which by definition is for partisan purposes-is counter to, and undermines and weakens, a democratic society.").

Committee was chaired by Senator Bob Rucho and Representative David Lewis, the architects of the original, unconstitutional plan. Lewis proposed six criteria for the Committee's consideration. *See* Hamilton Decl., Ex. 3 (Tr. 13:18-22). These criteria are titled: (1) Contiguity; (2) Compactness; (3) Incumbency; (4) Twelfth District; (5) Partisan Advantage; and (6) Political data. *See id.*, Ex. 4.

Only one of the criteria directly addresses the Court's Order. The "Twelfth District" criterion notes that the Court "criticized the shape" of the enacted CD 12 as "serpentine," and requires the General Assembly to "eliminate the current configuration of" CD 12. *Id.*

None of the criteria indicate that a goal of the New Plan is to ensure that the excess packing of African American voters in CDs 1 and 12—or the suppressed minority influence resulting therefrom—is adequately reversed, or establish a methodology by which the General Assembly would ensure it had done so. Rather, the "Political data" criterion *prohibits* the General Assembly from considering "the race of individuals or voters" in drawing the New Plan, limiting the General Assembly only to consideration of "population data" and "political data." *Id*.

Rather than establish a specific framework to modify the enacted plan as necessary to cure the constitutional violation identified by the Court, the criteria set out to use the vehicle of the Court-ordered redrawing of the congressional plan to pursue another, explicitly partisan aim—effectively locking in the political consequences of the existing racial gerrymander.

The aptly titled "Partisan Advantage" criterion provides:

- 7 -

> The partisan makeup of the congressional delegation under the enacted plan is 10 Republicans and 3 Democrats. The Committee shall make reasonable efforts to construct districts in the . . . Plan to maintain the current partisan makeup of North Carolina's congressional delegation.

*Id.*

The "Compactness" criterion further provides that the General Assembly shall make "reasonable efforts" to improve the compactness of the enacted plan and to reduce the number of county splits in the Plan. *Id.*. But the criterion expressly subordinates these aspirational goals to the pursuit of partisan advantage, providing that counties may be split due to "consideration of incumbency and political impact" (as well as "equalizing population"). *Id.* The "Incumbency" criterion, meanwhile, provides that the General Assembly shall make "reasonable efforts" to avoid pairing incumbents in the Plan. *Id.*

Finally, the "Contiguity" criterion simply provides that districts must be comprised of contiguous territory, including through the use of water contiguity. *Id.*

The General Assembly did not formally "stack rank" these criteria in order of importance. Rather, Lewis clarified that the various criteria were to be applied in such a way that all were implemented. *Id.*, Ex. 3 (Tr. 83:11-16). That is, no matter the other characteristics of the New Plan, the need to draw it to ensure Republicans would maintain a 10-3 advantage was treated as a given. *Id.* (Tr. 62:14-18) (Lewis confirms that "making reasonable efforts would not include violating any of the other criteria that we have passed").

Democratic members of the Joint Committee offered several proposed amendments to these criteria, including that race should be treated as *a* factor to ensure

- 8 -

that the New Plan did not dilute minority voting opportunities, that deviations from compactness should not be permitted based on "political impact," and that communities of interest should be taken into account. All were voted down on party line votes. *See id.* (Tr. 100:11-125:21).

In sum, the criteria adopted to guide the drafting of a remedial plan to adequately and appropriately "unpack" CDs 1 and 12 (a) did not allow the General Assembly to consider the racial ramifications of its actions, and (b) required the General Assembly to exploit the partisan advantage achieved through the existing racial gerrymander.

### 3. The Plan Architects Describe the Goals and Consequences of the New Plan

#### a. The Plan's Architects Believe this Court Instructed Them to Disregard Race Entirely Because There is No Racially Polarized Voting in North Carolina

Lewis and Rucho both asserted that the New Plan was not drawn using racial data and that race was not considered in drawing the New Plan. *See* Hamilton Decl., Ex. 3 (Tr. 40:4-7) (Lewis: "I would reiterate the only way to make sure that race is not the predominant factor is to make sure it's not a factor when the maps are being considered."); *id.*, Ex. 5 (Tr. 18:2-9) (Rucho: race data was not used to create map). According to Lewis, this is because the Court's Opinion *precluded all consideration of race*. *Id.*, Ex. 3 (Tr. 27:3-10); *see also id.* (Tr. 27:23-25) (setting out his understanding that the Court found that there is no racially polarized voting in North Carolina, and so race cannot be considered at all); *id.* (Tr. 28:25-29:4) (same); *id.* (Tr. 32:1-32:9) (same); *id.*, Ex. 6 (Tr. 77:17-22; 98:1-6) (same); *id.*, Ex. 11 (Tr. 15-18) (same). Notably, Lewis admits

- 9 -

that he does not actually *believe* these underlying facts to be true. *See id.*, Ex. 3 (Tr. 41:3-19) (explaining that although he "may agree" that the General Assembly should consider racially polarized voting analyses in drawing the New Plan, "the Court does not").

Because he maintained that race was not considered in drawing the New Plan, Lewis could not answer questions as to whether African-American voters have a reasonable opportunity to elect candidates of their choice under the New Plan, reiterating only that it was drawn using the criteria set out above. *See id.*, Ex. 6 (Tr. 50:10-51:4); *see also id.*, Ex. 5 (Tr. 44:13-24); *id.* (Tr. 35:12-37:24) (responding to complaint that representative cannot vote for a plan unless he knows it complies with the VRA, which requires consideration of racial data, by stating that race was not considered in drawing the New Plan and the representative could vote accordingly).

### b. The Plan's Architects Assert that They Set Out to Replace a Racial Gerrymander with a Partisan Gerrymander

In the course of floor debate regarding the criteria and the New Plan itself, the New Plan's architects candidly stated that it is intended to be—and is—a partisan gerrymander designed to maximize partisan advantage for Republicans.

Describing the "Political Advantage" criterion, Lewis "acknowledge[d] freely that [the New Plan] would be a political gerrymander." *Id.*, Ex. 3 (Tr. 46:5-11); *see also id.*, Ex. 6 (Tr. 39:18-20). Lewis emphasized that the General Assembly intended to draw the map to gain partisan advantage for the Republican majority because he believes that "electing Republicans is better than electing Democrats." *See id.*, Ex. 6 (Tr. 43:16-19); *cf. id.* (Tr. 64:16-21) (Representative Jones: "So thank you, Representative Lewis, for your

- 10 -

honesty and integrity and transparency and coming right out and saying that. Yes, I do believe, as we adopted in the committee, that there was an attempt made at that partisan advantage.").

Lewis reiterated what the "Partisan Advantage" criterion states plainly: the Plan attempts to lock in the existing 10-3 Republican-to-Democrat composition of the congressional delegation. Lewis explained that the New Plan would seek to calcify a "10-3" split in specific because he did not believe it mathematically possible to further benefit Republicans given the demographics of North Carolina. *Id.*, Ex. 3 (Tr. 47:18-48:10); *see also id.* (Tr. 54:9-55:8) (acknowledging that it is possible to draw more a more evenly balanced map, but that his intent is to establish a 10-3 map to the extent possible). Finally, Lewis acknowledged that the New Plan was drawn to lock in the partisan advantage achieved through the use of the unconstitutional enacted plan. *Id.* (Tr. 58:19-59:13).

### 4. The Specific Process by which the New Plan Was Drawn Remains a Mystery

Although the criteria set out by the General Assembly are clearly stated, as was Lewis's explication of the meaning of those criteria, the legislative record remains unclear as to when or how the New Plan was actually drawn.

It *is* clear that Dr. Thomas Hofeller, who drew the unconstitutional enacted plan, also drew the New Plan, and was or will be paid using public funds. Hamilton Decl., Ex. 6 (Tr. 35:11-36:2). Rucho and Lewis were remarkably vague, however, as to *when* or *how* Hofeller drew the New Plan. When asked whether the New Plan had been drawn in

- 11 -

advance before the public hearings and adoption of criteria on February 15 and 16, respectively, "the response was 'I can't say.'" *Id.* (Tr. 57:23-58:2). Rucho and Lewis did their best to evade questions about the mapdrawing process, *see generally id.*, Ex. 10 (Tr. 36-46); *id.* (Tr. 39:3-11) (Rucho refusing to answer question regarding when Hofeller's maps were transferred to legislative system), imploring legislators to just "look at this map and base it on its merits," *id.* (Tr. 38:3); *see also id.* (Tr. 38:11-22) ("[T]here will be plenty of opportunities to do depositions and witnesses in front of the court in answering all of these questions that you're addressing."). Eventually, it became evident that the New Plan had been drawn in whole or part *before* the public hearings and the adoption of the criteria that were supposed to guide that very drafting. *Id.*, Ex. 11 (Tr. 24:14-25:24); *see also id.*, Ex. 6 (Tr. 16:4-15).

Nor is it clear *how* Hofeller drew the New Plan. Lewis represented that Hofeller drew the map using data from various statewide elections between 2008 and 2014 to meet the criteria above, including ensuring a 10-3 Republican advantage, and that Hofeller did not use race in drawing the New Plan. *Id.*, Ex. 6 (Tr. 44:23-45:21, 47:6-9). If the statement sounds familiar, it's with good reason:  Hofeller testified similarly at trial regarding enacted CD 12. Opinion at 40-41. In particular, Hofeller testified that he "did not look at race at all when creating the [original] districts." *Id.* at 41. The Court specifically found this testimony was not credible. *Id.* at 42-43.

Hofeller was not restricted to state computers in drawing the New Plan, drafting "concepts" on his private computer *before* the Joint Committee adopted the criteria that supposedly govern how the Plan was to be drawn, and making "additional changes" on a

- 12 -

state computer thereafter. *Id.*, Ex. 11 (Tr. 24:14-25:24). To the best of Plaintiffs' knowledge, during debate over the New Plan, Rucho and Lewis did not disclose any written materials or instructions given to Hofeller as to how he should draw the New Plan. Hofeller did not testify before the Joint Committee or the General Assembly.

### 5. The General Assembly Adopts the New Plan

On February 19, 2016, the General Assembly voted to adopt the New Plan. *See* ECF No. 149.

The General Assembly did not limit changes to the enacted plan to those necessary to unpack CDs 1 and 12 and make necessary population adjustments to surrounding districts. Rather, given the stated goal of preserving the 10-3 partisan split generated by the existing racial gerrymander notwithstanding the unpacking of a large number of (typically Democratic-leaning) African-American voters into surrounding districts, the General Assembly embarked on a whole-scale restructuring of the enacted plan. As Table 1 below demonstrates, although the General Assembly claims that it did not consider race in redrawing the map, it did, in fact, greatly reduce the BVAP of both CDs 1 and 12. It also greatly reduced the BVAP of CD 4, which had previously had by far the largest BVAP of any district other than CDs 1 and 12. Moreover, although one would normally expect that the greatest changes would be to the two districts being challenged, this is not the case. The New Plan in fact preserves more of CD 1's core population than it does for seven of the State's other districts.

- 13 -

| Table 1 | | | |
|---|---|---|---|
| District No.[3] | Enacted Plan BVAP | New Plan BVAP | Population Maintained from Existing District |
| 1 | 52.7% | 44.5% | 509,435 (69.45%) |
| 2 | 16.5% | 19.7% | 131,753 (17.96%) |
| 3 | 18.4% | 21.2% | 591,457 (80.64%) |
| 4 | 31.7% | 22.4% | 455,478 (62.10%) |
| 5 | 12.2% | 14.0% | 536,258 (73.11%) |
| 6 | 14.8% | 19.9% | 367,222 (50.06%) |
| 7 | 17.4% | 20.2% | 527,462 (71.91%) |
| 8 | 18.3% | 22.4% | 311,051 (42.41%) |
| 9 | 12.4% | 19.6% | 288,215 (39.29%) |
| 10 | 11.2% | 11.6% | 587,352 (95.99%) |
| 11 | 3.2% | 3.3% | 707,568 (96.46%) |
| 12 | 50.7% | 36.2% | 382,379 (52.13%) |
| 13 | 17.0% | 21.2% | 0 |

Under the enacted plan, there were two black incumbents (Representatives G.K. Butterfield and Alma Adams). The New Plan draws Representative Adams out of CD 12, which she currently represents, despite requests that she be kept in a district in which she had a fair opportunity to be reelected. Hamilton Decl., Ex. 6 (Tr. 73:14-22). Representative Adams, who resides in Greensboro, is now located 90 miles away from

---

[3] These figures are taken from reports and data available on the General Assembly's website. http://www.ncleg.net/representation/redistricting.aspx.

- 14 -

CD 12, in CD 13, which is one of the districts designed to elect a Republican representative.[4]

On February 17, 2016, the other current black incumbent, Representative Butterfield, sent a letter to Senate President Pro Tempore Phil Berger and House Speaker Tim Moore objecting to the criteria used to draw the Plan on the grounds that they "do not comply with the U.S. Constitution, the Voting Rights Act of 1965, or basic fairness." Hamilton Decl. Ex. 7. Similar objections to the New Plan have been raised by the North Carolina Legislative Black Caucus, which objects that the New Plan "do[es] not protect the voting interest of African-American communities."[5]

Consistent with the General Assembly's priori decision, the New Plan purposefully cements into place the existing "10-3" partisan delegation, which is incongruent with recent congressional voting behavior in the "purple" state of North Carolina. Two elections were run under the unconstitutional enacted plan. In 2012, more voters cast ballots for Democratic congressional candidates, and Republicans prevailed in

---

[4] *See* http://www.ncleg.net/GIS/Download/District_Plans/DB_2016/Congress/CCP16_Corrected/CCP16_Corrected_11x17.pdf.

[5] *See* "Rep. Pierce, Legislative Black Caucus criticize new N.C. district maps," *Daily Journal* (Feb. 22, 2016), http://yourdailyjournal.com/news/local-news-5/22075/rep-pierce-legislative-black-caucus-criticize-new-n-c-district-maps; *see also* N.C. State Senator Erica Smith Ingram, Press Conference of the North Carolina Legislative Black Caucus, Held at the North Carolina General Assembly (Feb. 19, 2016), *available at* https://www.youtube.com/watch?v=GmXUCwaMsMU, 0:10-0:22; 2:35-3:04 (last accessed 2/27/16) ("The entire redistricting process is yet another disenfranchising overreach that eviscerates the voting rights of North Carolinians. . . . While it has been claimed that race was not a factor in drawing the district [CD 1], the outcome of the resulting lines must be weighed so as not to result in segregation and disparate impacts for minority representation.").

- 15 -

9 out of 13 races (69%). In 2014, 44% of voters cast ballots for Democratic candidates (one Republican ran unopposed), and Republicans prevailed in 10 out of 13 races (77%).

| Table 2 | | | |
|---|---|---|---|
| Election | Number of Votes Cast for Democrats | Number of Votes Cast for Republicans | Republican Advantage |
| 2012[6] | 2,218,357 (50.9%) | 2,137,167 (49.1%) | 9-4 |
| 2014[7] | 1,234,027 (44.2%)[8] | 1,555,364 (55.8%) | 10-3 |

## III. ARGUMENT

This Court afforded the General Assembly "a reasonable opportunity . . . to meet constitutional requirements by adopting a substitute measure" in place of the unconstitutional racial gerrymander it enacted five years ago. Opinion at 62. There is no question that this Court has both the authority and the responsibility to ensure the General Assembly's new congressional plan is in fact a true and legal remedy. *See McGhee v. Granville, N.C.*, 860 F.2d 110, 115 (4th Cir. 1988) (district court may consider "whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place"); *see also Wilson v. Jones*, 130 F.

---

[6] 2012 election results are available on the North Carolina State Board of Elections website. http://results.enr.clarityelections.com/NC/42923/123365/Web01/en/summary.html

[7] 2014 election results are available on the North Carolina State Board of Elections website as well. *See* http://er.ncsbe.gov/.

[8] Representative Pittenger (R) ran unopposed in CD 9 in 2014, thereby distorting the vote share between the parties in 2014, as tens of thousands of votes would have been cast in CD 9 for even an unsuccessful Democratic challenger. For example, in 2012, the Democratic challenger received more than 171,500 votes. *See* http://results.enr.clarityelections.com/NC/42923/123365/Web01/en/summary.html. That is, had a Democratic challenger run in 2014, the overall percentage share of votes cast between Republicans and Democrats would be even more balanced, as it was in 2012.

- 16 -

Supp. 2d 1315, 1322 (S.D. Ala. 2000), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000) ("When . . . the districting plan is offered as a replacement for one invalidated by the court and will be implemented solely by virtue of the court's power, the court has an independent duty to assess its constitutionality[.]"). Indeed, a remedial plan which itself fails constitutional muster is afforded no deference at all. *See White v. Weiser*, 412 U.S. 783, 797 (1973) ("[T]he District Court should defer to state policy in fashioning relief only where that policy is consistent with constitutional norms and is not itself vulnerable to legal challenge."); *McGhee*, 860 F.2d at 115 ("If the legislative body fails to respond or responds with a legally unacceptable remedy, 'the responsibility falls on the District Court.'") (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)).

Courts routinely refuse to defer to legislative remedies that fail to lawfully and effectively remedy the original violation. *See, e.g., Large v. Fremont Cnty., Wyo.*, 670 F.3d 1133, 1135 (10th Cir. 2012) (affirming district court's order rejecting the County Board of Commissioners' proposed remedial plan); *Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038, 1040 (8th Cir. 1997) (affirming district court's order rejecting school board's proposed remedial plan: in light of district court's "duty to adopt a plan that would steer clear of racial gerrymandering and yet would vindicate the rights of the minority voters within the [school district]," it "need not defer to a state-proposed remedial plan . . . if the plan does not completely remedy the violation"); *Buchanan v. City of Jackson, Tenn.*, 683 F. Supp. 1537, 1541 (W.D. Tenn. 1988) (rejecting city board of commissioners' proposed remedy to VRA violation: "The court must not . . . defer blindly to legislative prerogative.").

- 17 -

The General Assembly's remedial plan is entitled no deference here, as it merely replaces one unconstitutional districting scheme with another.

## A. The General Assembly Failed to Cure the Racial Gerrymander

The General Assembly's "all or nothing" approach to race in redistricting runs counter to legal precedent and this Court's Opinion, resulting in a New Plan that only perpetuates the racial gerrymander of the enacted plan.

### 1. The General Assembly's Remedial Redistricting Process Is Suspect

As an initial matter, the Court should view the redistricting process—and the General Assembly's protestations that it paid no heed to race—with great skepticism. In its Opinion, the Court noted how the initial redistricting process was shrouded in mystery. For instance, all instructions were provided by Rucho and Lewis to Hofeller orally, without any "written record" of the actual criteria that governed the enacted plan. Opinion at 11. Hofeller never communicated with other legislators about his redistricting task, nor was the mapdrawer made available to answer questions from other legislators. *Id.* at 11-12. Moreover, Hofeller testified at trial that he "did not look at race at all when creating the new districts," *id.* at 41, but this Court found his testimony was not credible, *id.* at 42-43.

The General Assembly's remedial redistricting process is no more transparent. Once again, Hofeller rearranged district lines at the behest of Rucho and Lewis. Hamilton Decl., Ex. 6 (Tr. 35:11-36:2). Once again, we have no written record of those instructions. Lewis confirmed that Hofeller began drawing the New Plan *before* the Joint

Committee adopted the criteria that supposedly govern how the Plan was to be drawn.[9] *Id.*, Ex. 11 (Tr. 24:14-25:24). At no point did Hofeller provide any testimony on the House or Senate floor on the New Plan; indeed, the Plan's architects refused to make him available. *See id.*, Ex. 11 (Tr. 54:3-13) (Lewis: "I don't know where Dr. Hofeller is at the moment, and I would not contemplate, as he was a consultant for Chairman Rucho and myself, that he would be made available to the committee.").

Indeed, the General Assembly's treatment of Representative Adams suggests that its purported criteria are little more than after-the-fact justifications for what the mapdrawer had already largely accomplished behind closed doors. The New Plan draws Representative Adams out of CD 12, which she currently represents. The published criteria, coincidentally, affirmatively state that "[c]andidates for Congress are not required by law to reside in a district they seek to represent." *Id.*, Ex. 4. This provision stands out as a defensive statement of what the mapdrawers are not required to do (draw all incumbents in their respective districts), as opposed to an affirmative statement of what the mapdrawers *will* do.

Contrary to the architects' suggestion that the redistricting process is irrelevant, *see id.*, Ex. 10 (Tr. 37:23-38:22), a full substantive and procedural understanding of the

---

[9] Even if Hofeller did abide by the criteria adopted after he began drawing the New Plan, given his race-based redistricting of the original unconstitutional plan, it is dubious he could have "turned off" his extensive knowledge regarding the location of minority populations in drawing the New Plan. *See Wilson*, 130 F. Supp. 2d at 1330 ("Given [mapdrawer's] knowledge of the extent and location of the county's black population, and that of the others involved in the plan's production, the Court believed it unlikely that any subsequent plan could be guaranteed not to be based on the same over-emphasis on race. Thus, the Court concluded that a remedy for the over use of race would be more convincingly provided by someone who had no prior knowledge of the location and extent of the County's black population.").

- 19 -

remedial process is critical for this Court to execute its "independent duty" to assess the validity of the New Plan, *Wilson*, 130 F. Supp. 2d at 1322. Where the General Assembly's flawed process failed to survive constitutional scrutiny the first time, its failure to provide details regarding when, where, and how new district lines were drawn inspires little basis for renewed confidence. *See* Hamilton Decl., Ex. 10 (Tr. 39:17-40:6) (Sen. Bryant: "It's concerning to me since I can't get an answer to the question about when the data was imported into our computers and get a sense of that process, then who's accountable for the criteria and what loopholes . . . might there have been with the criteria being honored . . . . I think there's still a question about how much we can trust the honoring of this criteria given that we don't know more information about this process."); *id.* (Tr. 45:20-46:4) (Sen. McKissick: "[P]erhaps the consultant wasn't completely bound by the criteria that were subsequently established, and that . . . opens up the potential for race as well as party affiliations and other parameters to have been considered when the maps were being drawn even though by the time they were imported in the . . . state system, to provide us with the map here today, it would have been potentially sanitized, so to speak.").

There is thus little indication that the General Assembly's remedial process was anything more than a mummer's farce in which "legislators . . . stay 'on script' [by] avoid[ing] mentioning race on the record." Opinion at 48 (citation omitted). If the General Assembly were committed to curing the racial gerrymander consistent with this Court's Opinion, it would have done so in an open and transparent manner. Instead the Court is left to guess whether the "criteria" adopted by the General Assembly—and the

- 20 -

architects' statements that race was not a factor—were in fact guiding principles or simply window dressing to a backroom deal.[10]

## 2. The General Assembly Failed to Understand, Let Alone Follow, This Court's Instructions to Remedy the Racial Gerrymander of CDs 1 and 12

Even if the mapdrawers did ignore race altogether, their refusal to so much as consider the consequences of the New Plan on minority voters hardly cures the racial gerrymander. On the contrary, their concerted effort to cement the practical effect of the original racial gerrymander on minority voters only perpetuates the constitutional injury.

The mapdrawers' asserted approach to race was premised on a fundamental misunderstanding of this Court's Opinion. According to Lewis, this Court's Opinion precluded any consideration of race. Hamilton Decl., Ex. 3 (Tr. 27:3-10) ("It is my understanding in reading . . . the opinion that race is not to be a factor in drawing the districts."). Lewis's "understanding" is based on his belief that "the Harris opinion found that there was not racially polarized voting in this state, and, therefore, the race of the

---

[10] This is particularly true because the New Plan's architects repeatedly made clear that although they acknowledge the need to comply with the Court's Opinion, they disagree with it whole-heartedly. *See* Hamilton Decl., Ex. 3 (Tr. 9:15-23) (Rucho, noting that he "still believe[s] that the maps that are presently enacted are fair, legal, and constitutional" and that complying with the Court's order is a "precaution"); *id.* (Tr. 12:15-13:3) (Lewis, noting that he "respectfully disagree[s] with the three-judge panel['s]" decision and is "confident that . . . the enacted map will ultimately be upheld on appeal"); *id.* (Tr. 13:4-7) (Lewis: "I reiterate that while the 2011 plan was dictated by the Cromartie and Strickland decisions of the U.S. Supreme Court, we will move forward to establish a plan based on the Harris opinion"); *id.* (Tr. 28:21-23) (Lewis: "We did not use race when we drew the 12th. The Court has found those both to be racial gerrymanders."); *id.* (Tr. 40:8-11) (Lewis: "This Court — I'll go one step further. With the utmost respect to the — to the Court, this Court was shown that race was not a factor that was considered in drawing of the 12th, but they still found that it was a factor."); *id.*, Ex. 5 (Tr. 8:12-17) (Rucho noting that "we still believe that the enacted maps are fair, legal, and constitutional. That has been validated by a number of North Carolina courts.").

- 21 -

voters should not be considered." *Id.* (Tr. 27:22-25); *see also id.* (Tr. 28:24-29:3) ("[T]hey also found, based on my reading of the opinion —which is certainly not spit in their face, just trying to read what they said—that there's not racially polarized voting. If that is indeed the case, then race should not be a factor."); *id.* (Tr. 32:5-8) ("If we're going to redraw the maps with the Harris order, which says there's not racially polarized voting, then we believe that race should not be a consideration in drawing the maps."). Notably, Lewis does not actually *believe* that there is "not racially polarized voting in this state." In response to a legislator's suggestion that the mapdrawers "go back and look at" previous racially polarized voting analyses "and use those studies as part of the database that would be used to move forward and draw . . . these districts," Lewis maintained, "I may agree with you, but the Court does not." *Id.* (Tr. 41:3-18).

But Lewis's extrapolations from this Court's Opinion are baseless. The Opinion begins by noting that "[l]egislatures are almost always cognizant of race when drawing district lines, and simply being aware of race poses no constitutional violation." Opinion at 3. At no point did the Court find as a matter of fact that there is no racially polarized voting in North Carolina. In fact, because Defendants failed to proffer any compelling state interest for the General Assembly's predominant use of race in drawing CD 12, the Court made no findings and offered no opinions as to whether or the extent to which racially polarized voting exists in that part of the state. Nor did the Court find an absence of racially polarized voting in North Carolina in general or the area encompassed by CD 1 in particular. Rather, because "racial bloc voting . . . never can be assumed, but specifically must be proved," *Shaw*, 509 U.S. at 653, and Defendants conceded that

- 22 -

African Americans had been able to elect their candidates of choice in CD 1 since 1992 regardless of whether it was majority-minority, the Court found that Defendants had failed to adduce adequate evidence of *sufficient* racially polarized voting to meet their strict scrutiny burden. Opinion at 53-55. The Court further noted that although Defendants had offered "generalized" reports showing the existence of racially polarized voting in North Carolina, these reports alone did not provide a strong basis in evidence for the General Assembly to conclude that the VRA compelled it to transform CD 1 into a majority BVAP district. *Id.* at 55-57.

In other words, this Court found that Defendants had failed to establish their burden to demonstrate that the VRA compelled the predominant use of race in drawing CDs 1 and 12. This hardly amounts to a proclamation that racially polarized voting is non-existent in the State, or that race—and the rights of minority voters—is entirely irrelevant to the redistricting process.[11] The General Assembly's response, however, was *to dismiss race altogether* as a consideration in the New Plan. *See* Hamilton Decl., Ex. 3 (Tr. 40:4-7) (Rep. Lewis: "I would reiterate the only way to make sure that race is not the predominant factor is to make sure it's not a factor when the maps are being considered."). But in light of North Carolina's long and sordid history with drawing district lines that disadvantage minority voters (including as recently as the enacted plan), this Court neither endorsed—nor should it countenance—the General Assembly's ostrich-like approach to race, failing to so much as consider the effect of the New Plan on

---

[11] Indeed, the idea that a state could default on its burden of proof to defend a racial gerrymander, and then seize on that very default as a reason to ignore race altogether is as offensive as it is unsupported.

- 23 -

African-American voters. Hamilton Decl., Ex. 12 (Tr. 65:15-22) (Rep. Jackson: "I'm telling you that that is a novel legal argument to say that in the south, when you draw congressional seats, you use race not at all in consideration."). Just weeks ago, this Court condemned the General Assembly's utter failure to analyze racial voting patterns in its myopic pursuit to pack African-American voters into a handful of districts. *See* Opinion at 54 ("Strikingly, there is no evidence that the general assembly conducted or considered any sort of a particularized polarized-voting analysis during the 2011 redistricting process for CD 1."); *id.* at 59 (criticizing the General Assembly's failure "to conduct[] a more sophisticated analysis of racial voting patterns in CD 1 to determine to what extent it must preserve existing minority percentages to maintain the minority's present ability to elect its candidate of choice."). It is hardly an appropriate response to then blindly ignore race altogether, once again shrugging off any attempt at thoughtful consideration, let alone a "sophisticated analysis," of race in redistricting. *See* Hamilton Decl., Ex. 10 (Tr. 61:15-17) (Sen. Stein: "[T]his effort suffers from the same infirmity as the last, which is there has been no analysis of racially polarized voting.").

Lewis could not have been more wrong in asserting that "the only way to make sure that race is not the predominant factor is to make sure it's not a factor when the maps are being considered." Hamilton Decl., Ex. 3 (Tr. 40:4-7). In fact, the General Assembly needed only to look next door to Virginia to determine how to lawfully and appropriately approach race in drawing a remedial plan. Just last month, a three-judge district court in Virginia adopted a remedial map to replace a racial gerrymander enacted by the Virginia General Assembly in 2011. The court set forth the mapdrawer's remedial process,

- 24 -

demonstrating both how to avoid using race as the predominant factor and how to appropriately evaluate the implications of district lines on racial minorities.

> In drawing [the remedial plan's] Third District, [the mapdrawer] chose the Tidewater region as its center. To achieve population equality in the District, he was guided by the neutral goals of compactness, contiguity, and avoiding unnecessary city or county splits, rather than any racial considerations. Those districts abutting the Third District were then drawn to achieve equal population, following the same major considerations. The BVAP of the neutrally drawn Third District was 45.3%. Based on the record evidence, [the mapdrawer] determined that a BVAP "somewhat above" 40% would preserve African-American voters' ability to elect the representative of their choice in the Third District. There was thus no need for [the mapdrawer] to alter [the remedial plan] to increase the BVAP of the Third District.

*Personhuballah v. Alcorn*, No. 3:13CV678, 2016 WL 93849, at *6 (E.D. Va. Jan. 7, 2016) (citation omitted); *see also id.* ("And because racial considerations did not predominate in the drawing of [the remedial plan], the Plan is not subject to strict scrutiny."). Virginia's remedy to race-based redistricting, then, was to draw district lines in pursuit of traditional districting principles and then employ a racially polarized voting analysis to determine whether changes were necessary to minimize any unintended, collateral damage to minority voting rights. *See id.* at *9 (extolling fact that the remedial plan "honors the principles underlying Sections 2 and 5 of the Voting Rights Act"). That plan demonstrates that a constitutional remedy to a racial gerrymander is, in fact, a thoughtful and studied understanding of the implications of redistricting on race.

Here, by contrast, the General Assembly failed to conduct the racial analysis it otherwise would have considered but for its fundamental misreading of the Court's

- 25 -

Opinion. *See* Hamilton Decl., Ex. 3 (Tr. 41:3-18). It is thus apparent that the General Assembly embarked on a remedy without any understanding of the original violation.

### 3. The New Plan Fails to Remedy the Racial Gerrymander

The General Assembly's fundamentally flawed reading of this Court's Opinion infected not only the remedial process but the resulting New Plan as well. The General Assembly's purported failure to consider the impact of redistricting on racial minorities is apparent in the New Plan's failure to remedy the impact of redistricting on racial minorities.

First, notwithstanding the New Plan's supposed focus on partisan advantage and incumbent protection, the New Plan draws only two incumbent members of Congress out of their districts, including Representative Alma Adams, one of only two African-American incumbents in the State. Representative Adams is now marooned *ninety miles* from CD 12, her original district, in CD 13, in which she has no hope of being elected. Thus the impact of undoing the racial gerrymander that for so long placed minority voters at a disadvantage is a New Plan that uniquely impacts, if not specifically targets, one of only two minority incumbents. *See* Hamilton Decl., Ex. 10 (Tr. 104:21-105:5) (Sen. Robinson: "[W]hen you're taking one incumbent and you're targeting that one incumbent and that incumbent is only the second African American woman elected from this state since it began to elect African Americans after Reconstruction and then make it almost virtually impossible to elect another either Democrat or African American in that area,

then this smacks in the face of equal protection under the law.").[12] As a result, Representative Adams is cut off from her previous constituency, and CD 12's African-American voters are cut off from their duly-elected candidate of choice.

Second, the New Plan manages to unpack heavily African-American districts by dispersing African-American voters across nearly every other district, ensuring that minority voters have no more influence than under the original racial gerrymander. The New Plan reduces the BVAP in CDs 1 and 12, as well as in CD 4, which originally had the heaviest concentration of African-American voters other than the two majority-minority districts struck down by this Court. *See supra* tbl.1. Remarkably, despite the fact that these districts collectively saw a 32 percentage point reduction in BVAP, none of those displaced African-American voters were placed in a district that would afford them even the faint hope of an opportunity to elect a candidate of their choice. Instead, the New Plan dices up the excess BVAP from these districts and scatters it in small portions across every other district in the plan. *See id.* (BVAP increase, ranging from 0.1 to 7.2 percentage points, in all ten remaining districts).

Perhaps most notably, at the same time that the New Plan strands Representative Adams far from CD 12, it fractures the African-American community in Forsyth and Guilford counties, Representative Adams' other major former constituencies. Greensboro (and Guilford County) are carved up between CDs 6 and 13. *See* Hamilton Decl., Exs. 8, 9. Meanwhile, Forsyth County is pulled into CD 5. It perhaps goes without saying that

---

[12] The General Assembly obviously was aware of the race of Representative Adams, one of only two African-American representatives in the delegation.

the General Assembly's fracturing of the African-American community in the Piedmont region stands in stark contrast with its expressions of policy that accompanied the enacted plan. *See* Pl. Ex. 74, at 14-15 (the enacted plan's architects took steps to ensure that "African-American voters in Guilford and Forsyth" were "protected"); *see also* Pl. Ex. 68, at 4 (same).

In short, just as the General Assembly originally used "section 5 preclearance requirements as a pretext to pack African-American voters into North Carolina's congressional Districts 1 and 12 and reduce those voters' influence in other districts," Opinion at 16, so, too, does the General Assembly now use this Court's Opinion striking down the unconstitutional plan to disperse African-American voters across ten districts and drown out those voters' influence in each and every one of them.

Once again, Virginia's remedial plan demonstrates that unpacking a racially gerrymandered district would, under natural and ordinary circumstances, lead to enhanced minority opportunity in a neighboring district. That court noted that "by 'packing' more African-American voters than required into the Third District, the Enacted Plan fragmented the African-American vote in the surrounding districts." *Personhuballah*, 2016 WL 93849, at *8 n.11. In unpacking Virginia's Third District, thus, the remedial plan resulted in a neighboring district in which, for the first time, "minority voters' candidates of choice would also receive over 60% of the vote." *Id.* at *9. Here, by contrast, the original "fragment[ation]" of minority voters achieved by the original racial gerrymander has been replaced with a new fragmentation of minority voters across multiple districts. In the end, the New Plan washes out minority influence to

- 28 -

the same extent as the original plan. *See* Hamilton Decl., Ex. 10 (Tr. 84:2-4) (Rucho: "[W]e wanted to achieve the same goals . . . that were achieved on the previous map[.]"). Given the intense focus on race in the construction of the enacted plan and the resulting trial in this Court, the fact that the New Plan was designed and drawn by the same architects and mapdrawer responsible for the enacted plan, and the opaque remedial redistricting process, it is more than a little doubtful the General Assembly was, as Lewis proclaims, simply unaware of the race of those voters it moved out and divvied up. But even if it was, the General Assembly's failure to consider the effects of the New Plan on racial minorities so as to actually remedy the original violation warrants no deference by this Court. *See Harvell*, 126 F.3d at 1040 (district court "need not defer to a state-proposed remedial plan . . . if the plan does not completely remedy the violation").

Finally, the extent of the New Plan's changes to districts other than those struck down by this Court reflects the great lengths to which the General Assembly went to avoid a fair and full remedy. *Cf. Rybicki v. State Bd. of Elections of State of Ill.*, 574 F. Supp. 1082, 1124 (N.D. Ill. 1982) ("Because our finding of liability is limited to two relatively small groups of districts, we believe that the remedy should be designed to ameliorate the effects of unconstitutional vote dilution in those two areas."). In fact, more than half of the unchallenged districts were altered more drastically than CD 1. *See supra* tbl.1. This wholesale realignment of district lines across the entire map was necessary to mitigate the practical effect of undoing the racial gerrymander. In 2011, the General Assembly effectively minimized minority influence by packing African Americans into a handful of districts. In 2016, that scheme was foiled by this Court's

- 29 -

Opinion. Unchastised, the General Assembly sought to ensure that unpacking minority districts would have no impact on the suppressed minority influence achieved by its original, unconstitutional plan. In other words, by purposefully locking in place the same result as the racial gerrymander struck down by this Court, the General Assembly sought and managed to *not remedy* the constitutional harm to Plaintiffs and hundreds of thousands of other African-American voters in North Carolina.

In sum, the New Plan is built on the back of the unconstitutional racial gerrymander that preceded it, purposefully and practically perpetuating its injurious effect on minority voters previously located in CDs 1 and 12. In misunderstanding this Court's ruling and refusing to address the actual violation found therein, the General Assembly has openly disregarded both this Court's Opinion and the rights of Plaintiffs and other minority voters. The General Assembly's purported "remedy" is no remedy at all. Plaintiffs respectfully submit that the General Assembly's New Plan should be rejected.

**B.    In the Alternative, the New Plan Replaces the Unconstitutional Racial Gerrymander with an Unconstitutional Partisan Gerrymander**

Even if the remedial plan were not deemed an outright racial gerrymander like its predecessor, it is only because the General Assembly has stumbled out of the frying pan and into the fire. Having misinterpreted the jurisprudence regarding the use of race in redistricting, the General Assembly also grossly misinterprets the law governing partisan gerrymandering. The architects of the New Plan believe partisan gerrymandering is legitimate and entirely permissible. As set out below, it is not. And the plan's architects

- 30 -

asserted time and again that their "remedial" plan to cure a racial gerrymander is nothing but a bald-faced partisan gerrymander. Even assuming the New Plan is an effective remedy for the existing racial gerrymander—which it is not—the Court should refuse to be party to the Republican Majority's attempt to rig the democratic process in North Carolina.

### 1. Partisan Gerrymandering Is Unconstitutional

For over thirty years, the United States Supreme Court has explicitly recognized that partisan gerrymandering is unconstitutional. *See generally Davis v. Bandemer*, 478 U.S. 109 (1986). Just last year, the Supreme Court once again recognized "the problem of partisan gerrymandering—the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015). In *Arizona State Legislature*, the Court could not have been clearer: "'[P]artisan gerrymanders,' this Court has recognized, 'are incompatible with democratic principles.'" *Id.* (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality opinion) (brackets omitted); *see also Vieth*, 541 U.S. at 293 ("[A]n excessive injection of politics [in districting] is unlawful."); *id.* at 316 (concluding that "partisan gerrymandering that disfavors one party is [not] permissible" as such "legislative classifications 'reflec[t] no policy, but simply arbitrary and capricious action'") (Kennedy, J., concurring) (quoting *Baker v. Carr*, 369 U.S. 186, 226 (1962)).

The New Plan's architects were apparently unaware of this long line of Supreme Court precedent. As Lewis openly proclaimed: "I acknowledge freely that this would be a

- 31 -

political gerrymander, *which is not against the law*." Hamilton Decl., Ex. 3 (Tr. 46:5-11) (emphasis added); *id.*, Ex. 10 (Tr. 83:13-15) (Rucho: "[T]here is nothing wrong with political gerrymandering. I won't accept that as being criticism."). Just as the New Plan's architects fundamentally misunderstand this Court's opinion with respect to the role of race in redistricting, *see supra* Section III.A.2, so, too, do they fundamentally misunderstand the legal implications of a partisan gerrymander. Based on their flawed understanding of the law, they set out to draw—and in fact achieved—a partisan gerrymander of epic proportions.

While the Supreme Court has determined that partisan gerrymandering is incompatible with democracy and contrary to the U.S. Constitution, it has not yet developed a single, overarching framework under which all such claims may be litigated. *See Arizona State Legislature*, 135 S. Ct. at 2658; *see also Hunt v. Cromartie*, 526 U.S. 541, 551 n.7 (1999) ("This Court has recognized . . . that political gerrymandering claims are justiciable under the Equal Protection Clause although we were not in agreement as to the standards that would govern such a claim."). The Court need not take on that task here, because whatever the standard may be that would govern all partisan gerrymandering claims, the General Assembly's remedial map here reflects an "excessive injection of politics" that necessarily fails constitutional scrutiny. The General Assembly's extraordinary concession with respect to both its unabashed intent to partisan gerrymander and its specificity in how it carried out that gerrymander to the maximum extent reflects the extreme circumstances here warranting judicial intervention.

- 32 -

### 2. The General Assembly Freely Admits that It Set Out to Draw a Partisan Gerrymander that Would Advantage Republicans to the Maximum Degree Mathematically Possible

Lest there be any doubt as to whether this is a partisan gerrymander, one need only ask Lewis: "I acknowledge freely that this would be a political gerrymander." Hamilton Decl., Ex. 3 (Tr. 46:5-11); *see also id.* (Tr. 51:12-52:1) ("[W]e want to make clear that we . . . are going to use political data in drawing this map. It is to gain partisan advantage on the map. I want that criteria to be clearly stated and understood.. . . . I'm making clear that our intent is to use — is to use the political data we have to our partisan advantage."). The New Plan's architects proudly defended their partisan gerrymander despite criticism from other legislators. *See, e.g.*, *id.*, Ex. 10 (Tr. 94:22-95:1) (Sen. Jackson: "And we know the map is politically gerrymandered because Representative Lewis told us so. Debating whether the map is politically gerrymandered is like debating the moon landing. It happened."); *id.* (Tr. 97:8-14) ("No system of redistricting is perfect, but ours wins the prize for absolute worst. We are living with an open acknowledgement that we draw the map to favor one party, this map. In a few years that's going to seem about as strange and sad as Jim Crow laws seem to us now.").

The General Assembly's purported criteria only confirm Lewis's stated intent to maximize partisan advantage. In a criterion titled simply "Partisan Advantage," the General Assembly provides:

> The partisan makeup of the congressional delegation under the enacted plan is 10 Republicans and 3 Democrats. The Committee shall make reasonable efforts to construct districts in the . . . Plan to maintain the current partisan makeup of

- 33 -

North Carolina's congressional delegation.[13]

Hamilton Decl., Ex. 4. Not only was "Partisan Advantage" included as an express priority, the other purported criteria were specifically designed to give way to this overarching goal. For instance, the "Compactness" criterion prescribes that "[d]ivision of counties shall only be made for reasons of equalizing population, consideration of incumbency and *political impact*." *Id.* (emphasis added). Indeed, a proposed amendment striking "political impact" from the list of permissible bases to deviate from compactness was voted down, Hamilton Decl., Ex. 3 (Tr. 100:11-125:21), and rejected out of hand by the Plan's architect, *id.* (Tr. 77:13-80:19). According to the General Assembly, therefore, "political impact" is on par with population equality in this remedial plan, a preordained "part of the redistricting background, taken as a given." *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270 (2015).

Of course, the proof is in the pudding, as the New Plan fully embodies the partisan gerrymander the mapdrawers set out to create. The current 10-3 Republican advantage in North Carolina's congressional delegation was not only borne of the General Assembly's unconstitutional racial gerrymander, it is entirely at odds with North Carolina voting patterns. *See supra* tbl.2. Despite the fact that North Carolina voters are more evenly split along political lines, the General Assembly locked in place a political result that minimizes minority and Democratic participation.

---

[13] During debate on this criterion, Lewis clarified that the various criteria were to be applied in such a way that all were implemented. Hamilton Decl., Ex. 3 (Tr. 62:19-23, 83:14-21). That is, no matter the other characteristics of the plan, the need to draw it to ensure Republicans would maintain a 10-3 advantage was treated as a given. *Id.*

- 34 -

Indeed, Lewis confirmed that had he thought it was mathematically possible to increase the partisan advantage beyond the 10-3 split achieved by the unconstitutional plan (and perpetuated by the New Plan), he would have done so. In response to a question about the incongruity between a 10-3 split and voter demographics in North Carolina, Lewis unequivocally asserted: "I propose that we draw the maps to give a partisan advantage to ten Republicans and three Democrats because I do not believe it's possible to draw a map with 11 Republican and two Democrats." Hamilton Decl., Ex. 3 (Tr. 47:18-48:10). While "[e]xcessiveness is not easily determined," *Vieth*, 541 U.S. at 293 (Kennedy, J., concurring), where the mapdrawer freely admits that the partisan advantage achieved through redistricting reaches the maximum mathematical degree feasible, there can be little doubt that the plan reflects an unlawful "excessive injection of politics," *id.*

One need only look at the New Plan to verify that the General Assembly held true to its promise to maximize Republican advantage at the expense of traditional criteria.[14] The western hook of CD 1 divides the City of Durham, resulting in the "stovepipe" CD 4, which scoops in pockets of Democrats to ensure that CD 2 remains a Republican stronghold. Lewis confirmed that this split was necessitated by "political concerns," namely, the General Assembly's express goal of partisan advantage. Hamilton Decl., Ex. 5 (Tr. 42:21-43:2). Other major (and Democrat and African-American-heavy) cities are likewise sliced and diced between districts, including Charlotte, Greensboro, and Raleigh. *See id.*, Ex. 8. It thus comes as no surprise that Rucho and Lewis argued vociferously

---

[14] *See* map at
http://www.ncleg.net/GIS/Download/District_Plans/DB_2016/Congress/CCP16_Corrected/CCP16_Corrected_11x17.pdf.

against adoption of a proposed criterion designed to avoid unnecessary splits of municipalities. *See id.*, Ex. 3 (Tr. 115:4-121:9).

In short, taking the New Plan's architects at their word, the General Assembly purposefully engineered the New Plan to lock in place the 10-3 Republican advantage from the previous unconstitutional gerrymander in an unabashed effort to maximize partisan aims at the expense of approximately half of the North Carolina electorate.

### 3. The General Assembly Can Assert No Legitimate Interest in "Partisan Advantage"

The General Assembly cannot defend its express prioritization of "Partisan Advantage" as a legitimate state interest that would survive any level of judicial scrutiny, let alone as a legitimate districting principle. Its admitted partisan manipulation extends far beyond politics as usual—and far beyond what courts have tolerated when it comes to the consideration of politics in redistricting.

It is no secret that politics is often part and parcel of the redistricting process. *See Davis*, 478 U.S. at 115 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 754 (1973)) ("'It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. . . . The reality is that districting inevitably has and is intended to have substantial political consequences.'"). In recognition of this fact, the Supreme Court has identified several instances where political considerations do not offend constitutional principles. For example, the Court has acknowledged that it may be an appropriate political consideration to ensure that incumbents are not drawn into the same district or drawn out of their districts. *See Bush v.*

- 36 -

*Vera*, 517 U.S. 952, 964 (1996) (recognizing "incumbency protection, at least in the limited form of avoiding contests between incumbents," as a legitimate state interest in defending against a racial gerrymandering claim) (internal citations and quotation marks omitted); *Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (including "avoiding contests between incumbent Representatives" in list of legislative policies that might justify minor population deviations in congressional plan); *Burns v. Richardson*, 384 U.S. 73, 89 n.16 (1966) ("The fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness."). Additionally, the Court has recognized that the pursuit of political balance may justify district lines. *See Bush*, 517 U.S. at 964-65 (citing *Gaffney* for the proposition that states "may draw irregular district lines in order to allocate seats proportionately to major political parties"); *Gaffney*, 412 U.S. at 748 (quoting *Reynolds v. Sims*, 377 U.S. 533 (1964)) ("*Reynolds* recognized that 'the achieving of fair and effective representation for all citizens is . . . the basic aim of legislative apportionment.'"); *id.* at 752-53 ("We are quite unconvinced that the reapportionment plan . . . violated the Fourteenth Amendment because it attempted to reflect the relative strength of the parties in locating and defining election districts. . . . The very essence of districting is to produce a different—a more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats.").

But the General Assembly's express and unabashed objective of "Partisan Advantage" is much more than a basic acknowledgment that "partisan political

considerations . . . played a role in drawing district lines," *Page II*, 2015 WL 3604029, at *13, as is commonly the case, *see id.* ("It would be remarkable if they did not."). Nor is it an effort at protecting incumbents; indeed, "Incumbency" is a distinct and independent criterion rather than a component of the General Assembly's "Partisan Advantage" goal. Hamilton Decl., Ex. 4. Rather, it is an intentional manipulation of district lines for the purpose of disadvantaging and drowning out more than half of the electorate because of those citizens' political views. Whatever the aims of individual Republican legislators, the General Assembly can hardly claim that the *State of North Carolina itself* has a legitimate interest in drawing district lines out of a singular desire to erect barriers to the political process for a subset of its citizens. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (when legislation "seems inexplicable by anything but animus toward the class it affects . . . it lacks a rational relationship to legitimate state interests"); *see also id.* at 633 ("A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."). In other words, the General Assembly's expressed goal of ensuring that instead of voters choosing their representatives, "representatives [will] choose their voters," Opinion at 64 (Cogburn, J., concurring), and the extent to which it achieved that goal here, is "incompatible with democratic principles," *Arizona State Legislature*, 135 S. Ct. at 2658 (quoting *Vieth*, 541 U.S. at 292).

The unique auspices of the New Plan, thus, reflect the very narrow, highly unusual, and truly extraordinary circumstances of this case, offering a blatant partisan gerrymander in an utter misunderstanding (or perhaps in open defiance) of constitutional

- 38 -

principles. Few cases have presented such a stark record of partisan gerrymandering—where the legislature openly declares that it was trying to draw districts to ensure a specific partisan delegation at odds with the demographics of the state, without even pretending to couch that goal in genericized efforts to safeguard incumbents or maintain district cores. Just as this Court took the mapdrawers at their word in crediting direct evidence that the enacted plan was nothing short of a racial gerrymander, so too should the Court now take them at their word that the New Plan is a partisan gerrymander in violation of the Constitution. Indeed, if the circumstances here do not present grounds for striking down a map as a partisan gerrymander, nothing ever will.

At bottom, the General Assembly viewed this Court's opinion as an open invitation to draw a blatant, unapologetic partisan gerrymander under the mistaken assumption that this is perfectly legal. It is not. It offends not only the First and Fourteenth Amendments to the Constitution, but also this judicial proceeding and all North Carolina voters.[15]

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request this Court reject the New Plan based on its failure to provide a legal remedy to the original racial gerrymander

---

[15] While Judge Cogburn's concurrence notes that "it is left to the people of the state to decide whether they wish to select their representatives or have their representatives select them," Opinion at 67 (Cogburn, J., concurring), the people of North Carolina have little recourse outside the judiciary. Unlike Arizona, North Carolina provides no direct democracy measures such as a ballot initiative process by which the people can circumvent a General Assembly whose majority party benefits from gerrymandering. Indeed, "the people of the state" are fed up with the General Assembly's partisan shenanigans, and many called on to the General Assembly to turn over redistricting to a neutral body. *See supra* n.2. But their pleas have fallen on deaf ears, as the General Assembly has effectively entrenched the partisan decisionmakers who unabashedly seek to squelch the will of the people.

and proceed to adopt a lawful remedial plan that fully and fairly remedies the constitutional violation.

Respectfully submitted, this the 3rd day of March, 2016.

By: */s/ Kevin J. Hamilton*

    Kevin J. Hamilton
      Washington Bar No. 15648
    William B. Stafford
      Washington Bar No. 39849
    Khamilton@perkinscoie.com
    WStafford@perkinscoie.com
    PERKINS COIE LLP
    1201 Third Avenue, Suite 4800
    Seattle, WA 98101-3099
    Telephone: (206) 359-8741
    Facsimile: (206) 359-9741

    John M. Devaney
      D.C. Bar No. 375465
    Marc E. Elias
      D.C. Bar No. 442007
    Bruce V. Spiva
      D.C. Bar No. 443754
    JDevaney@perkinscoie.com
    MElias@perkinscoie.com
    BSpiva@perkinscoie.com
    PERKINS COIE LLP
    700 Thirteenth Street, N.W., Suite 600
    Washington, D.C. 20005-3960
    Telephone: (202) 654-6200
    Facsimile: (202) 654-6211

*Attorneys for Plaintiffs*

By: */s/ Edwin M. Speas, Jr.*

    Edwin M. Speas, Jr.
      N.C. State Bar No. 4112
    John W. O'Hale
      N.C. State Bar No. 35895
    Caroline P. Mackie
      N.C. State Bar No. 41512
    espeas@poynerspruill.com
    johale@poynerspruill.com
    cmackie@poynerspruill.com
    POYNER SPRUILL LLP
    P.O. Box 1801 (27602-1801)
    301 Fayetteville St., Suite 1900
    Raleigh, NC 27601
    Telephone: (919) 783-6400
    Facsimile: (919) 783-1075

*Local Rule 83.1 Counsel for Plaintiffs*

- 40 -

# CERTIFICATE OF SERVICE

On March 3rd, 2016, I will electronically file the foregoing with the Clerk of

Court using the CM/ECF system, which will then send a notification of such filing (NEF)

to the following:

Alexander McC. Peters
Senior Deputy Attorney General
apeters@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919)716-6900
Facsimile: (919)716-6763

*Counsel for Defendants*

Thomas A. Farr
Phillip J. Strach
Michael D. McKnight
thomas.farr@ogletreedeakins.com
phil.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART. P.C.
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919)787-9700
Facsimile: (919)783-9412

*Co-counsel for Defendants North
Carolina State Board of Elections and
Joshua Howard, in his capacity as
Chairman of the North Carolina State
Board of Elections*

*/s/ Edwin M. Speas, Jr.*