# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### NO. 1:13-CV-00949

| | |
|---|---|
| DAVID HARRIS and CHRISTINE BOWSER,<br><br>    Plaintiffs,<br><br>    v.<br><br>PATRICK MCCRORY, in his capacity as Governor of North Carolina; NORTH CAROLINA STATE BOARD OF ELECTIONS; and A. GRANT WHITNEY, JR., in his capacity as Chairman of the North Carolina State Board of Elections,<br><br>    Defendants. | **DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS AND MEMORANDUM OF LAW REGARDING REMEDIAL REDISTRICTING PLAN** |

## INTRODUCTION

The North Carolina General Assembly scrupulously followed this Court's order to draw a new congressional redistricting plan that does not use race as the predominant factor in the creation of districts. Indeed, it is beyond dispute that the 2016 Contingent Congressional Plan (hereafter "2016 Congressional Plan") follows traditional redistricting criteria better than any congressional map in North Carolina for at least the past 25 years. The plan contains 87 whole counties and splits only 12 voting districts ("VTDs") across the entire state. No county is split between more than two congressional districts. The new plan is not a gerrymander of any kind: the map speaks for itself.

Plaintiffs have failed to show otherwise. Instead, they mischaracterize the holding of this Court and the legislative history for the 2016 Congressional Plan. Because the General Assembly's compliance with this Court's order is clear, plaintiffs have resorted to advancing new claims for vote dilution and political gerrymandering that were not alleged in their pleadings and have not been previously considered by this Court. Even if the Court had jurisdiction to consider these new claims (which it does not) any such claims are frivolous.

Plaintiffs, whose fees are being paid by the National Democratic Voting Rights Trust (*see* admitted trial exhibit D-32), are asking this Court to usurp the legitimate legislative authority of the elected representatives of the People of North Carolina and draw a map that is more favorable to their political interests. In so doing, they have failed to offer a proposed alternative map or criteria explaining specific alleged errors in the 2016 Congressional Plan. Because plaintiffs' arguments are wholly without merit, their objections should be overruled and this Court should allow elections to proceed under the 2016 Congressional Plan.

## BACKGROUND

### A.     Plaintiffs have only alleged claims for alleged racial gerrymandering and not vote dilution or political gerrymandering.

Plaintiffs alleged a single cause of action in their complaint: that race was the predominant factor in the creation of Congressional Districts ("CD") 1 and 12 and that neither district was narrowly tailored to serve a compelling governmental interest. (Compl., D.E. 1, ¶¶ 68-73) Plaintiffs' claim was based upon the cause of action first

recognized in *Shaw v. Reno,* 509 U.S. 630 (1993) ("*Shaw I*"), and later amplified in *Shaw v. Hunt*, 517 U.S. 889 (1996) ("*Shaw II*"), as well as other Supreme Court cases dealing with racial gerrymandering. *See e.g. Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015).

Plaintiffs did *not* allege a violation of Section 2 of the Voting Rights Act ("VRA") or a constitutional claim of vote dilution based upon race. In fact, plaintiffs alleged that racially polarized voting was absent in both CD 1 and CD 12 because "the white majority did not vote as a bloc to defeat the candidates favored by African American voters." (Compl., D.E. 1, ¶¶ 16-22, 24-29) There are no allegations in the complaint that racially polarized voting existed in either district but only at a level that required the State to create either district at some other quota for black voting age population ("BVAP"), such as 47%. Indeed, any such allegations would conflict with the Supreme Court's holding in *Bartlett v. Strickland*, 556 U.S. 1 (2009), "that a party asserting [Section] 2 liability must show by a preponderance of the evidence that the minority population in a potential district is greater than 50 percent" and that Section 2 protects against "a special wrong when a minority group has 50 percent or more of the voting age population and could constitute a compact voting age majority but despite racially polarized bloc voting, is not put in that district." *Id.* at 19-20.

Plaintiffs did allege that CD 1 and CD 12 disregarded political subdivisions and geographical boundaries and other traditional redistricting principles. (Compl., D.E. 1, ¶¶ 50, 51, 61-63) Plaintiffs complained that CD 1 "weave[d]" through 24 counties and

"contain[ed]" only five whole counties. (*Id.* at ¶ 51) Plaintiffs argued that CD 12 was "not compact," connected "chunks" of Charlotte and Greensboro "connected by a thin strip – averaging only a few miles wide – that tracks I-85" and that the district failed "to comply with traditional districting principles." (*Id.* at ¶¶ 61, 63) Yet in all instances, plaintiffs alleged that the sole motivation for these alleged irregularities was race. Plaintiffs *never* alleged that partisan affiliation played any role in the construction of these districts. In fact, at trial, plaintiffs *disputed* defendants' arguments that both CD 1 and CD 12 were the result of political motivations by the General Assembly to draw ten congressional districts that provided Republican voters with an opportunity to elect their candidates of choice.

### B. The decision by the three-judge court.

The decision by this Court provided the framework used by the General Assembly in enacting the 2016 Congressional Plan. In that decision, Circuit Judge Gregory and District Judges Cogburn and Osteen agreed that CD 1 constituted a racial gerrymander. Circuit Judge Gregory and District Judge Cogburn agreed that CD 12 was also racially gerrymandered. Circuit Judge Gregory authored the opinion of the Court while District Judge Cogburn authored a concurring opinion. District Judge Osteen authored a dissenting opinion as to CD 12. (*See* D.E. 142) Key portions of each opinion dictated the criteria used by the General Assembly in its construction and ratification of the 2016 Congressional Plan.

The Court held that "there is strong evidence that race was the only non-negotiable criterion . . . that traditional redistricting principles were subordinated to race," and that "a Congressional district is crafted because of race when a racial quota is the single factor through which all the drawing decisions are made, and traditional redistricting principles are considered, if at all, solely as they did not interfere with this quota." (D.E. 142, p. 19) The Court described CD 1 as "a textbook example of racial predominance." (*Id.* at 22-28) The Court noted that the State's mapdrawer, Dr. Tom Hofeller, "split counties and precincts when necessary to achieve a 50 percent-plus-one-person BVAP in CD 1." (*Id.* at 29) The Court rejected defendants' argument that the shape of CD 1 was motivated by the partisan intent to draw 10 Congressional districts that gave Republican voters an opportunity to elect their candidates of choice. (*Id.* at 30) The Court concluded that "traditional districting criteria were considered, if at all, solely insofar as they did not interfere with this 50-percent-plus-one person minimum floor" and that "such a racial filter had a discriminatory effect . . . because it rendered all traditional criteria that otherwise would have been 'race neutral' tainted by and subordinated to race." (*Id.* at 32)

Regarding CD 12, the Court found that race was the predominant motive based upon expert testimony presented by plaintiffs, the shape and location of CD 12, the lack of compactness of CD 12, written statements by the redistricting co-chairs, and testimony by former Congressman Mel Watt. The Court rejected testimony by Dr. Hofeller that CD

12 was drawn to be an even stronger Democratic district than the 2001 version so that adjoining districts could be drawn as Republican opportunity districts. (*Id.* at 32-48)

The Court then proceeded to examine whether CD 12 and CD 1 could be justified under a strict scrutiny analysis. The Court correctly noted that defendants never contended that CD 12 was drawn to protect the State from liability under Section 2 and never contended that CD 12 could survive a strict scrutiny analysis. (*Id.* at 40-50)

The Court then rejected defendants' arguments that CD 1 furthered a compelling governmental interest and was narrowly tailored. The Court concluded that the legislative record did not contain a "strong basis in evidence" for creating CD 1 as a Section 2 majority black district. (*Id.* at 50-51) In particular, the Court found that defendants failed to show that the legislature had "a strong basis in evidence of racially polarized voting in CD 1 significant enough that the white majority routinely votes as a bloc to defeat the minority candidate of choice." (*Id.* at 53) The Court repeatedly noted its conclusion that CD 1 was a "majority white" district and that there was no evidence that the "white majority" was voting as a bloc to defeat African Americans' candidates of choice. (*Id.* at 8, 9, 55-57) Because the defendants had "fail[ed] to meet the third *Gingles* factor," the Court concluded that Section 2 did not require that defendants create CD 1 as a majority black district. (*Id.* at 57) For similar reasons, the Court also rejected the argument that CD 1 could be justified under Section 5. (*Id.* at 58-61) The Court therefore enjoined the 2016 elections under the 2011 congressional plan and gave the

state a deadline of February 19, 2016, to enact a new congressional plan that complied with its judgment.  (*Id*. at 63)

The General Assembly also considered the concurring opinion by Judge Cogburn. Judge Cogburn expressed his "concerns about how unfettered gerrymandering is negatively impacting our republican form of government."  (*Id.* at 64)  Judge Cogburn observed that "political gerrymandering rather than reliance on natural boundaries and communities has become the tool of choice for state legislatures in drawing Congressional boundaries . . . ."  (*Id.*)  Judge Cogburn noted that several of the Founding Fathers had engaged in political gerrymandering.  (*Id.* at 65, 66)  Judge Cogburn also noted that CD 12 "runs its circuitous route . . . thanks in great part to a legislature then controlled by the Democrats."  (*Id.* at 66, 67; *see also Shaw I*; *Shaw II*)  Judge Cogburn also stated that "redistricting to protect the party that controls the state legislature is constitutionally permitted and lawful" and that "beyond taking offense at the affront to democracy caused by gerrymandering, Courts will not, however, interfere with gerrymandering that is philosophically rather than legally wrong."  (*Id.* at 67)

In his dissent, written only with regard to CD 12, Judge Osteen agreed with defendants' argument that CD 12 was drawn based upon legitimate political considerations and that race was not the predominant motive.  (*Id.* at 72-100)  Judge Osteen also noted that ordering the State to redraw CD 12 to give it "a more natural shape and compactness score" would require that the State redraw "the surrounding districts (and likely the entire map) . . . ."  (*Id.* at 94)

### C.  Legislative proceedings to comply with the Court's order.

Shortly following the Court's decision, the legislative leaders, Senator Bob Rucho and Representative David Lewis, met with their mapdrawing consultant, Dr. Hofeller, and their legal counsel.  Redistricting concepts were discussed with Dr. Hofeller as leaders made plans to comply with the Court's order.  Dr. Hofeller also drew conceptual maps on his personal computer.  (Tr. H. Redist. Comm., Feb. 19, 2016, at 21, 22, 27; Tr. S. Floor Sess., Feb. 18, 2016, at 32, 34-37)[1]

On February 15, 2016, public hearings were held in six different locations. (Tr. Pub. Hearings, Feb. 15, 2016, at 3)  Input was also received from voters who submitted comments through the General Assembly website. (*Id.*) Partisan statements were given by persons who supported the districts declared illegal by the Court as well as comments from persons who agreed with the Court's decision.  Many persons asked that new districts be based upon whole counties and that precincts not be divided into different districts.  Other speakers recommended that the serpentine CD 12 be eliminated from any new plan and requested that race not be used as a criteria.  (*Id.* at 20, 24; 24-26; 37, 40; 41, 42; 46, 49; 49, 50; 79, 81, 82; 91-93; 105, 106; 134, 138; 177, 179-180; 207, 208; 226, 230)

The General Assembly received this feedback and incorporated it to the extent possible in the mapdrawing process.  On February 16, 2016, the General Assembly's Joint Select Committee on Redistricting ("Joint Committee") met to consider criteria for

---

[1] Condensed copies of transcripts of the proceedings of the House and Senate in the enactment of the 2016 Congressional Plan are being filed with this Response.

a new congressional plan. The Joint Committee consisted of nineteen Senators and nineteen Representatives. (Tr. Joint Comm., Feb. 16, 2016, at 3-6) During the proceedings, the Joint Committee considered and then adopted criteria to be used in drawing a new congressional plan. The criteria included:

- "Equal Population." (*Id.* at 12-18) The Joint Committee adopted this criterion with only one dissenting vote. (*Id.* at 18)

- "Contiguity." (*Id.* at 18-24) The Joint Committee unanimously adopted this criterion. (*Id.* at 24).

- "Political data: the only data other than population to be used shall be election results in statewide elections since 2008, not including two presidential contests. Data identifying race of individuals or voters shall not be used in the construction or consideration of districts in the 2016 Contingent Congressional Plan. Voting Districts, referred to as VTDs, should be split only when necessary to comply with the zero deviation population requirement set forth above in order to ensure the integrity of political data." (*Id.* at 24-47) The Joint Committee adopted this criterion by a vote of 23 to 11.

- "Partisan Advantage: The partisan makeup of the Congressional delegation under the [2011] enacted plan is 10 Republicans and 3 Democrats. The committee shall make reasonable efforts to

construct districts in the 2016 Contingent Congressional Plan to maintain the current partisan makeup of North Carolina's Congressional delegation." (*Id.* at 47-69) The Joint Committee adopted this criterion by a vote of 23 to 11. (*Id.* at 69)

- "12th District: The current General Assembly inherited the configuration of the 12th District from past General Assemblies. The configuration was retained . . . because the district had already been heavily litigated over the past two decades, and ultimately approved by the courts. The *Harris* court has criticized the shape of the 12th District, citing the serpentine nature. In light of this, the Committee shall construct districts in the 2015 [*sic*] Contingent Congressional Plan that eliminate the current configuration of the 12th District." (*Id.* at 70-78) The Joint Committee adopted this criterion by a vote of 33 to 1. (*Id.* at 78)

- "Compactness: In light of the *Harris* court's criticism of the compactness of the 1st and 12th districts, the Committee shall make reasonable efforts to construct districts in the 2016 Contingent Congressional Plan that improve the compactness of current districts and keep more counties and VTDs whole as compared to the current enacted plan. Division of counties shall be made for reasons of equalizing population, consideration of incumbency, and political

impact. Reasonable efforts shall be made not to divide a county into more than two districts." (*Id.* at 79-94) The Joint Committee adopted this criterion by a vote of 27-7. (*Id.* at 94)

- "Incumbency: Candidates for Congress are not required by law to reside in a district they seek to represent; however, reasonable efforts shall be made to ensure that incumbent members of Congress are not paired with another incumbent in one of the new districts constructed in the 2016 Contingent Congressional Plan." (*Id.* at 94-98) The Joint Committee adopted this criterion by a vote of 31-1. (*Id.* at 98)

During the discussion over the criteria, the legislative leaders confirmed several important points. In drawing the new plan, Representative Lewis stated that the criteria would not be ranked in order of importance, that "drawing maps is largely a balancing act," and "that making reasonable efforts would not include violating any of the other criteria . . . ." (*Id*. at 65, 66) On the issue of contiguity, Representative Lewis added that the concept of "point contiguity" would not be used. (*Id.* at 19, 20)[2]

During the discussion, members of the minority party objected to the proposed criterion that race not be considered in the constructions of the new maps. (*Id.* at 27, 28, 29) Representative Lewis responded by stating that because of the finding by the *Harris*

---

[2] *See Shaw v. Hunt*, 861 F. Supp. 408, 468 (E.D.N.C. 1994), *rev'd*, 517 U.S. 899 (1996) ("*Shaw II*").

court that there was no basis in evidence showing the existence of racially polarized voting, race "should not be considered." (*Id.* at 26, 27, 30)

In response to a question by Senator Floyd McKissick, Representative Lewis stated that "racially polarized voting" was "the trigger to draw a VRA district" and that because the court had "found that there was not [*sic*] racially polarized voting," "race should not be a consideration in drawing the maps." (*Id.* at 30-31)

Following the conclusion of the Joint Committee's meeting on February 16, 2016, Dr. Hofeller downloaded a concept for a congressional plan from his personal computer to a computer maintained by the General Assembly. Dr. Hofeller then used the state's computer to complete a congressional map that followed the criteria adopted by the Joint Committee. (Tr. H. Redist. Comm., Feb. 19, 2016, at 21)

On February 17, 2016, Representative Lewis presented the proposed 2016 Congressional Map to the Joint Committee. Representative Lewis explained how the proposed map complied with the criteria adopted by the Joint Committee on February 16, 2016. (Tr. Joint Comm., Feb. 17, 2016, at 11-12) Representative Lewis stated that race was not considered and that racial statistics were not included in the statistical reports provided to the Joint Committee. Representative Lewis advised that the map was "a weaker map" for Republicans as compared to the 2011 plan but that the 2016 plan gave Republican voters the opportunity to elect 10 members of Congress. He stated that the map eliminated the serpentine CD 12 and that the map divided only 13 counties and 13

VTDs (or precincts).[3]  Representative Lewis also explained that only two incumbents (Democratic Congressman David Price and Republican Congressman George Holding) were placed in the same district and that all of the other eleven members of Congress were placed in districts by themselves. (*Id.* at 12, 31-32)

A member of the minority party, Senator McKissick, requested that staff provide a report showing the registration and racial statistics for all of the proposed new districts. (*Id.* at 14, 15, 36-38, 40, 41) A member of the majority party, Senator Harry Brown, spoke on the issue of competitiveness and noted that in 2008 several Democratic candidates would have won statewide elections in the proposed District 13.  (*Id.* at 40) Representative Lewis noted that Wilson, Pitt, and Durham Counties were divided to take into account the residency of incumbents. (*Id.* at 49, 50) Representative Mike Hager, a Republican, observed that the minority party had not offered any alternative maps.  (*Id.* at 53, 54)

Representative Bert Jones, also a Republican, congratulated the redistricting chairs for drawing a new map under "very difficult time limits" that only divided 13 counties and 13 precincts. (*Id.* at 56, 57) Representative Jones also recalled the history of political gerrymandering by Democrat-controlled General Assemblies and he observed that the Democratic candidate for Attorney General in 2008 won all 13 of the proposed districts, demonstrating the ability of a strong Democratic candidate to win each of the districts.

---

[3] The divided precinct report produced by staff indicated that only 12 precincts (or VTDs) are divided by the 2016 Congressional Plan. (Frey Decl., Ex. 19)

(*Id.* 58, 59)  By a vote of 24 to 11, the Joint Committee adopted a motion to favorably report the 2016 Congressional Plan to the General Assembly. (*Id.* at 66-72)

On Thursday, February 18, 2016, the proposed 2016 Congressional Plan was reviewed and approved by the Senate Redistricting Committee.  Senator Rucho began the meeting by confirming that Senator McKissick had received the report he had requested showing the registration and racial statistics for all of the proposed districts.  (Tr. S. Redist. Comm., Feb. 18, 2016, at 2)  Senator Rucho advised that the plan was being offered to comply with the Court's Order in *Harris*. (*Id.* at 7)  Representative Lewis was invited by the Senate to appear before the Committee, and he again explained the criteria used to draw the map.  (*Id.* at 9-11)  Senator Harry Brown, a Republican, again noted that the Democratic candidate for Attorney General won all thirteen proposed districts under the 2008 election results.  (*Id.* at 19) Representative Lewis stated that the 2008 presidential race was not used to draw the proposed districts because of criticisms from the Court. (*Id.* at 20) Representative Lewis noted that VTDs or precincts were only split to equalize population.  (*Id.* at 40)

Kara McCraw, an employee of the Legislative Analysis Division, then reported that the 1992 Congressional Plan divided 44 counties, that the 1997 plan divided 22 counties, that the 1998 plan divided 21 counties, that the 2001 plan divided 28 counties, that the 2011 plan divided 40 counties, and that the 2016 proposed plan divided only 13 counties.  McCraw also stated that the 2001 plan divided 22 precincts and that the 2011 plan divided 68 precincts.  McCraw stated that the proposed 2016 plan divided only 12

precincts. (*Id.* at 41-42) The Committee then approved the 2016 Congressional Plan by a vote of 12 to 5.  (*Id.* at 58-63)

Later, on February 18, 2016, the Senate met to consider the 2016 Congressional Plan. (Tr. S. Floor Sess., Feb. 18, 2016, at 22) All the same issues that had been discussed during the meetings of the Joint Committee were raised again during the floor debate. The President Pro Tempore of the Senate, Senator Phil Berger, concluded the debate by summarizing the position of the majority party.  Senator Berger noted that this Court had held "that race should not be used as a factor."  (*Id.* at 104-16)  Because all of the criteria were used to draw the congressional map, it was not drawn to "maximum political advantage."  (*Id.* at 107-08)[4]  Senator Berger emphasized that the 2016 Congressional map was drawn to "harmonize" all of the criteria adopted by the Joint Committee and to comply with the Court's Order.  *(Id.* at 106-07, 109)  Senator Berger also stated that because all of the criteria were used, none of the districts constituted a political gerrymander. (*Id.* at 108-09)  After Senator Berger concluded his remarks, the Senate voted to approve the plan by a vote of 32-15.  (*Id.* at 110)

On Friday, February 19, 2016, the House Redistricting Committee met to consider the 2016 Congressional Plan.  The Committee provided an opportunity for members of the public to speak on the proposed plan, but only one member of the public appeared for this opportunity. (Tr. H. Redist. Comm., Feb. 19, 2016, at 2)  Representative Lewis again reviewed the criteria used for drawing the plan. (*Id.* at 11-12)  Representative Michaux, a

---

[4] In fact, Senator Berger noted his view that a congressional plan with 11 Republican-leaning districts could be drawn, but had not. (Tr. S. Floor Sess. Feb. 18, 2016, at 107-08)

Democrat, asked Representative Lewis if any attention was paid to whether the maps "addressed the problem of vote dilution." (*Id.* at 12) Representative Lewis responded by referring Representative Michaux to the discussions they had had during the Joint Redistricting Committee and then submitted into the record three expert reports prepared by Dr. Allan J. Lichtman. Dr. Lichtman has appeared as an expert for Democratic plaintiffs in *Dickson v. Rucho*, 781 S.E.2d 404 (N.C. 2015) and *Covington v. State of North Carolina*, 1:15-cv-399 (M.D.N.C.). (*Id.* at 13)[5] Representative Lewis reminded Representative Michaux that race was not considered in drawing the districts because of the *Harris* court's decision "that racially polarized voting did not exist," and that racially polarized voting was "one of the triggers that would require race to be used." (*Id.* at 12-13, 15, 16-19) Representative Hager supported Representative Lewis's statements by reading relevant portions of the opinion by the *Harris* court. (*Id.* at 23-26) The House Committee then voted to favorably recommend the 2016 Congressional Plan by a vote of 12 to 6.

The House met to consider the 2016 Congressional Plan later on February 19, 2016. Representative Lewis again explained the criteria used to draw the proposed plan. (Tr. H. Floor Sess., Feb. 19, 2016, at 3-7) Representative Lewis and Representative Michaux debated the meaning of the Court's decision in *Harris*. (*Id.* at 7-20) Many of

---

[5] Dr. Lichtman opined that in North Carolina a congressional district with a BVAP between 40% to 50% as well as strong Democratic districts in which African Americans constitute a majority of registered Democrats, provide black voters with districts in which they have an equal opportunity to elect their candidates of choice. (See Affidavit of Allan J. Lichtman (January 18, 2012) at ¶¶ 8-14, Second Affidavit of Allan Lichtman p. 3, 4, 8, 9, and Table 4)

the issues already discussed by the Joint Committee and House Redistricting Committee were again discussed and debated. Representative Lewis noted that the *Harris* opinion "did not find racially polarized voting" and that during the legislative proceedings no member of the House or Senate had offered any evidence of racially polarized voting. (*Id.* at 79) Representative Lewis stated that the maps did not guarantee the election of 10 Republicans and again noted that the Democratic candidate for Attorney General had won all 13 districts in the 2008 General Election. (*Id.* at 79-80) Finally, Representative Lewis stated that all of the criteria for the maps had been approved by the Joint Committee, that all of the criteria were "considered together," and that "every effort had been made to harmonize them." (*Id.*) The House then approved the 2016 Contingent Congressional Plan by a vote of 65 to 43.

D.     **Characteristics of the 2016 Congressional Plan.**

A copy of the 2016 Congressional Plan, together with the political statistics used to draw the plan, was filed with the Court on February 19, 2016. (D.E. 149; D.E. 149-1; *see also* Declaration of Dan Frey ("Frey Decl."), Ex. 17)[6]

As explained by the legislative leaders, the 2016 Plan is based upon whole counties with none of the districts drawn to resemble the 2011 version of CD 1 and CD 12. Maps showing the counties won by Senator Richard Burr in 2010, Governor Pat McCrory in 2012, and Senator Thom Tillis in 2014—all three of whom are Republicans—show that Republican voters are more dispersed throughout the state than

_____

[6] The Frey Declaration is filed with this Response as an attachment.

Democratic voters.  As a result, congressional districts based upon whole counties naturally result in a larger number of Republican-leaning congressional districts.  (Frey Decl. ¶¶ 5, 6, 7 and Exs. 2, 3, 5, 6, 8, 9)  Thus, congressional districts based upon whole counties naturally favor voters who vote for Republican congressional candidates.  However, Democrats enjoy a registration advantage in 12 of 13 districts in the 2016 plan.  Democrats are in the majority of registered voters in the 2016 versions of CD 1 and 12 and a plurality of registered voters in CD 2, CD 3, CD 4, CD 6, CD 7, CD 8, CD 9, CD 10, CD 11 and CD 13.  Registered Republicans are not a majority in any district and a bare plurality only in CD 5.  In all of the districts, registered Democrats and unaffiliated voters constitute a super majority of all registered voters.  (Frey Decl. ¶¶ 50-64, Ex. 13)

In comparing election results under the 2001, 2011, and 2016 congressional plans, more Democratic candidates for statewide office would have won more of the congressional districts in the 2016 plan as compared to the 2011 plan.  (Frey Decl. ¶¶ 8-35, Exs. 10, 11)  Under the 2001 Congressional Plan, the 2011 Congressional Plan and the 2016 Congressional Plan, Democratic candidates for statewide office won 10 of 10 statewide elections in CDs 1, 4, and 12 based upon the 2008 and 2012 election results.  (*Id.* Exs. 10, 11)  Based upon the 2008 election results, in the 2016 congressional districts, Democratic candidates also won 5 of 10 statewide races in CD 3; 2 of 10 statewide races in CD 5; 4 of 10 statewide races in CD 6; 7 of 10 statewide races in CD 7; 4 of 10 statewide races in CD 8; and 3 of 10 statewide races in CD 9.  (*Id.* Ex. 10)

While race was not considered in the construction of the 2016 districts, Senator McKissick requested that race statistics be made part of the legislative record. *See supra* at 12. These statistics show that the 2016 version of CD 1 has a BVAP of 44.46% while the 2016 version of CD 12 has a BVAP of 36.20%. Eight other districts have a BVAP of approximately 20% or higher: CD 2 (19.69%); CD 3 (21.19%); CD 4 (22.40%); CD 6 (19.86%); CD 7 (20.24%); CD 8 (22.41%); CD 9 (19.63%); and CD 13 (21.18%). (*Id.* Ex. 16). Thomas Mills, a prominent Democratic consultant, has stated that, historically, districts established with a BVAP of 20% or higher have performed as districts in which Democratic candidates can be competitive. (*See* Politics North Carolina (Feb. 24, 2016) (attached))

The expert for the plaintiffs in *Dickson v. Rucho*, 781 S.E.2d 404 (N.C. 2015) and *Covington v. State of North Carolina*, 1:15-cv-399 (M.D.N.C.), Dr. Allan Lichtman, has testified that in North Carolina strong Democratic districts in which African Americans constitute a majority of registered Democrats are districts that provide African Americans with an equal opportunity to elect their candidates of choice. (*See supra* at 15 n. 2) The 2016 versions of CD 1 and CD 12 fit Dr. Lichtman's definition. Democrats constitute 66.34% of the registered voters in the 2016 version of CD 1 while African Americans constitute 61.85% of the registered Democrats in that district. In the 2016 version of CD 12, Democrats constitute 51.25% of all registered voters while African Americans constitute 62.29% of registered Democrats. (Frey Decl. ¶¶ 78, 79, Ex. 5) Dr. Lichtman also opined that in North Carolina African Americans have an opportunity to elect their

candidates of choice in districts where the BVAP is "substantially below" 40 percent. (Second Affidavit of Allan Lichtman, pp. 10-12) Dr. Lichtman specifically referenced a state senate district which included BVAP of only 21.1% as an example of a district won by an African American candidate in two different elections. *Id.* Without regard to CD 1 and CD 12, four of the 2016 congressional districts have a BVAP in excess of 21.1%: (CD 3, CD 4, CD 8, and CD 13).

## ARGUMENT

A. **Plaintiffs have not complied with this Court's directive regarding the scope of their objections.**

On February 23, 2016, this Court entered an order setting a briefing schedule regarding plaintiffs' objections to the 2016 Congressional Plan. The Court was very clear in its directions to plaintiffs regarding their objections: "[p]laintiffs are directed to state with *specificity* the factual and legal basis for each objection." (D.E. 153 at 1) (emphasis added) Plaintiffs failed this task miserably.

Plaintiffs' refusal to identify specific deficiencies is likely because the 2016 Congressional Plan follows traditional redistricting criteria more faithfully than any prior congressional plan in North Carolina in at least 25 years. The new plan divides fewer counties and VTDs than any plan since the 1980s. Where it does divide counties, it divides them into a fewer number of congressional districts than prior plans.[7] Moreover,

---

[7] For example, the original 1992 Congressional Plan divided at least seven counties into three Congressional Districts. *See infra* at 33, 34. In contrast no county is divided into three districts in the 2016 Plan.

where VTDs are split, it is solely to ensure no population deviation among the 13 districts.

Instead of identifying specific deficiencies with the new CD 1 or CD 12, plaintiffs' objections are nothing more than a broadside attack on the new congressional map. Plaintiffs' objections do not contain a single factual allegation that race predominated in the drawing of new CD 1 or CD 12, that traditional redistricting principles were subordinated to race in any way, or that a "racial quota" was used as a basis for the new CD 1 and CD 12—the grounds of their claims to relief in this action. To the contrary, plaintiffs concede that race was not a factor in the drawing of the new CD 1 and 12. Accordingly, on this basis alone, plaintiffs' objections should be overruled.[8]

Highlighting plaintiffs' failure to identify specific alleged deficiencies in new CD 1 or 12 is their failure to produce a map for the Court demonstrating how they would remedy the violations. *See Shaw II*, 517 U.S. at 916 n.8; *See League of United Latin American Citizens v. Perry*, 548 U.S. 399, 426-30 (2006) ("*LULAC*"); *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994). Despite the fact that it is routine in redistricting cases for the challengers to produce alternative maps, plaintiffs here have never

_____

[8] Tellingly, instead of specifically identifying deficiencies in the new congressional map, plaintiffs use the bulk of their "objections" to complain about the legislature's *process* of enacting the map. (D.E. 151-1, pp. 6-36) These complaints are baseless. The General Assembly had two weeks to accomplish what would ordinarily take five or six months. Despite the short timeframe, the General Assembly held public hearings across the State, convened a special joint committee to adopt criteria and draw the map prior to the legislative session, convened an extra session, held multiple redistricting committee meetings, allowed an opportunity for public comment after the plan was released, and enacted the plan over a two-day period allowing the minority party in the legislature plenty of opportunity to debate the plan and submit alternatives if they had so chosen.

submitted an alternative map. Plaintiffs did not submit alternative districts at any time during the discovery phase of this case. They did not submit alternative plans during the trial of this matter. And now they have not produced alternative districts demonstrating with specificity their perception of "legal" districts as compared to the new plan duly enacted by the State. Moreover, during the recent legislative session which produced the 2016 Congressional Plan, plaintiffs' allies in the North Carolina General Assembly refused to submit alternative congressional plans for the legislature's consideration. (Tr. Joint Comm., Feb. 16, 2016, at 130, 155-61) This refusal came despite the fact that members of the minority party were authorized to spend up to $25,000 to hire a consultant to draw an alternative plan (the same amount that the Republican majority authorized itself to spend on a mapdrawing consultant). (Tr. H. Redist. Comm., Feb. 19, 2016, at 29-30)

Plaintiffs and their allies prefer to broadly attack the new congressional plan rather than identify specific alleged deficiencies as directed by this Court. The Court should reject this approach.

### B. This Court's review of the 2016 Congressional Plan is limited to CDs 1 and 12 and plaintiffs' racial gerrymandering claims.

Plaintiffs' wholesale attack on the entire 2016 Congressional Plan is foreclosed by Supreme Court precedent. In *Upham v. Seamon*, 456 U.S. 37 (1982), the Supreme Court considered a three-judge court's rejection and redrawing of a congressional plan enacted by the Texas legislature. There the United States Attorney General objected to two districts and refused to preclear them under Section 5 of the Voting Rights Act. The

three-judge court proceeded to draw a remedial plan which resolved the Attorney General's Section 5 objections to those two districts. The three-judge court, however, did not stop there. The three-judge court also redrew several other districts which it perceived did not meet the non-retrogression standard of Section 5. *Upham*, 456 U.S. at 39-40.

This was error. The Supreme Court reiterated the principles for judicial review of redistricting plans:

> From the beginning, we have recognized that "reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." We have adhered to the view that state legislatures have "primary jurisdiction" over legislative reapportionment . . . . Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'"

*Id.* (citing *White v. Weiser*, 412 U.S. 783, 794–95 (1973) (internal citations and quotations omitted)).

The Court also explained it is error for a lower court to order a remedial plan "that reject[s] state policy choices more than was necessary to meet the *specific constitutional violations involved.*" *Id.* (citing *Whitcomb v. Chavis*, 403 U.S. 124, 160–61 (1971)) (emphasis added). Further, an "appropriate reconciliation of these two goals [meeting

Constitutional requirements and State political policy] can only be reached if the district court's modifications of a state plan are *limited to those necessary* to cure any constitutional or statutory defect." *Id.* (emphasis added). Under these established principles, it was erroneous for the three-judge court to make changes to districts that were not the subject of the original Section 5 objection.

The Fourth Circuit, in a case cited by plaintiffs, has similarly rejected court-drawn remedial plans that strayed from the original violation. In *McGhee v. Granville Cnty., N.C.*, 860 F.2d 110 (4th Cir. 1998), the court explained:

> Where, however, the legislative body does respond with a proposed remedy, a court may not thereupon simply substitute its judgment of a more equitable remedy for that of the legislative body; it may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet *the same standards applicable to an original challenge of a legislative plan in place.*

*Id.* at 115-18 (emphasis added). Thus, as in *Upham*, a court may not roam around the new map seeking other districts to "remedy." Instead, the court must "accord great deference to legislative judgments about the exact nature and scope of the proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions." *Id.*

As in *Upham*, the Fourth Circuit in *McGhee* rejected a remedial plan that went beyond fixing the original violation found by the district court. *McGhee* was a Section 2 vote dilution case where plaintiffs challenged the at-large electoral system for county

commissioners in Granville County, North Carolina. The county responded to the Section 2 violation by adopting a new plan which increased the number of county commissioners from five to seven, and replaced the at-large system with seven single-member districts. The plaintiffs, however, were not satisfied. They conceded that the single-member districts drawn by the county gave African American voters the best opportunity to elect representatives of choice that could be given them under a solely single-member districting plan. Nonetheless, they requested that the district court impose a unique system of voting called "limited voting," wherein commissioners would continue to be elected at-large, but voters would be allowed only three votes or less if they chose when voting for commissioners. The district court agreed and imposed plaintiffs' remedy on the county.

The Fourth Circuit unanimously reversed. It held that the district court's remedy had gone beyond the "specific violation alleged and established" – "'vote dilution' by the 'submergence' of minority voters' potential voting power through the use of an at-large electoral process." *McGhee*, 860 F.2d at 115. Indeed, the plaintiffs' "concession" that the violation had been remedied through redistricting "establish[ed] the plan as a legally adequate one that should have been accepted in deference to the affected local government's primary jurisdiction to ordain its electoral process." *Id*. at 118. The Fourth Circuit also rejected any argument that the possibility that the county's remedial plan might violate Section 2 in other ways should result in a court-imposed plan: [w]hether other elements of the County's remedial plan may *now or in time cause*

*different forms of cognizable [Section] 2 harm* to these persons as a discrete sub-group of the original plaintiff class *is not before us*. We *only* determine here that as to the class of which they are members in this litigation the County plan adequately remedies the dilution-by-submergence *violation specifically alleged and established* in respect of that entire class." *Id.* at 119 n.10 (emphasis added).

Similarly, plaintiffs' concession here that race was not a factor, much less the predominant factor, in drawing any of the districts in the 2016 Congressional Plan, including CDs 1 and 12 "establishes the plan as a legally adequate one" that should be accepted. *Id.* at 118. The Court need go no further.

### C. The 2016 Congressional Plan completely remedies the constitutional issues identified by this Court.

The constitutional deficiencies identified by this Court have been completely remedied by the 2016 Congressional Plan. In order to ensure that race was not the predominant motive in the drawing of new CD 1 and CD 12, the legislature adopted criteria expressly prohibiting the consideration of race in the formulation of the new congressional plan. As a result, data regarding the race of voters was not used in the drawing of the districts, and in fact was not even loaded into the computer used by the mapdrawer to construct the districts. When the proposed new map was released, no race data accompanied it.

Moreover, in attempting to comply with this Court's Order, the legislature hewed much more closely to traditional redistricting principles such as compactness and contiguity than prior legislatures in enacting congressional districts. A mere visual review

of the new plan demonstrates that fewer counties are divided, a minimal number of VTDs were split, and that the overall plan and each district is significantly more compact than prior plans.

At the request of Senator McKissick, an African American Democrat, legislative staff generated statistical reports regarding the race of voters in the 2016 Congressional Plan. To the extent that race was part of the legislative critics' debate on the new plan, it was inserted there by the minority party's leaders of the General Assembly. There is no evidence that race was a factor, much less the predominant factor, in the drawing of the 2016 Congressional Plan. In any event, the racial statistics requested by Senator McKissick offer further evidence that race was not a factor. Those statistics demonstrate that the BVAP of CD 12 dropped from 50.66% to 36.20%. The BVAP of CD 1 dropped from 52.65% to 44.46%. (Frey Decl. Ex. 16) It cannot be credibly contended that any "racial quota," and certainly not a desire to draw districts at a BVAP of 50% and above, was a factor in the drawing of the new CD 1 and CD 12.

While defendants continue to respectfully disagree that the State used a "racial quota" in the drawing of the 2011 Congressional Plan, the plaintiffs now openly advocate for their own racial quota. Plaintiffs opine that in drawing new congressional districts, the State "needed only look next door to Virginia" and the remedial process adopted by the court in that case. (D.E. 154-1 at 24) However, the Virginia mapdrawer hired by the Court adopted a racial quota, something that has been criticized by this Court. The only difference was the BVAP level at which he set his quota. While this Court criticized the

State for drawing CD 1 at a level just above 50%, the Virginia mapdrawer adopted a quota of "somewhat above 40%." *Personhuballah v. Alcorn*, No. 3:13cv678, 2016 WL 93849, at \*6 (E.D. Va. Jan. 7, 2016) (internal quotations omitted).[9] Plaintiffs' insistence that the General Assembly should have traded one alleged quota for another quota is baseless and should be rejected.[10]

Nor is there any evidence that traditional redistricting principles were subordinated to race or any other criterion, including partisan advantage. Simply looking at the new map confirms that it follows traditional redistricting criteria better than any North

---

[9] The decision in *Personhuballah* does not support plaintiffs' arguments that this Court should not only refuse to defer to the policy choices made by the North Carolina General Assembly, but also consider new claims for vote dilution and political gerrymandering. The *Personhuballah* court was forced to adopt a judicially drawn plan because the Virginia General Assembly failed to enact a new plan. *Personhuballah*, 2016 WL 93849 at \*1-2. The court noted that "judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Id.* at \*2 (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)). The key difference between this case and *Personhuballah* and *Abrams v. Johnson*, 521 U.S. 74 (1997) (the case primarily relied upon by the *Personhuballah* court) is that in those cases, the courts were faced with the task of actually drawing new plans because the legislatures had failed to enact plans remedying Constitutional violations found in a prior court order. *Abrams* 521 U.S. at 78. A higher standard applies to court-drawn plans than plans enacted by a legislature. *Upham*, 456 U.S. at 42-43 (citing *Wise v. Lipscombe*, 427 U.S. 535, 540 (1978)); *Connor v. Finch*, 431 U.S. 407, 414 (1977). Thus, in deciding upon an appropriate court-drawn plan to implement because of the legislature's failure to enact a new plan, the courts in both *Personhuballah* and *Abrams* were obligated to "be guided by principles of federal law – in particular the Voting Rights Act." *Personhuballah*, at \*8 (citing *Abrams*, 521 U.S. at 96). Even where the legislature has refused to act, the courts are still required to defer to "the General Assembly's redistricting choices . . . ." *Id.* at \*7. In this case, the North Carolina General Assembly has not failed to act. Instead, it has enacted a plan that remedies the prior violations found by this Court.

[10] In any case, plaintiffs' arguments are moot because the 2016 version of CD 1 has a BVAP of 44.46%. (Frey Decl., Ex. 16)

Carolina congressional map in the past 25 years. Overall the map divides only 13 counties. No county is divided into more than two congressional districts. The plan also divides only 12 VTDs. It does not employ "point contiguity" or "double crossover contiguity" as did some prior congressional plans in North Carolina. This is particularly the case with the districts challenged here, CD 1 and CD 12. The new CD 1 includes 11 whole counties and only three divided counties. The counties that were divided were divided so that the incumbents (Butterfield, Price, Jones) could be located in districts they currently represent. The new CD 12 is drawn wholly within Mecklenburg County and does not divide any VTDs.

Plaintiffs' Objections alleging that the new plan does not remedy the racial gerrymanders found by the Court are frivolous. For example, plaintiffs rely on the fact that Representative Alma Adams is not drawn into the new CD 12. (D.E. 154-1, p. 26) This ignores that the new CD 12 was drawn to eliminate the "serpentine" shape of the prior CD 12 that was criticized by this Court. It also ignores that Representative Adams is drawn into the new CD 13 and is the only incumbent Member of Congress residing in that district. It also ignores that a white incumbent Congressman, Representative George Holding, a Republican, was also drawn out of his district and "doublebunked" with another white incumbent, Representative David Price, a Democrat.

Next, plaintiffs complain about the BVAP percentages in districts other than CD 1 and CD 12. Plaintiffs fail to explain how a plan that reduces BVAP in the challenged districts, and results in smaller BVAP percentages in other districts, can possibly

constitute a racial gerrymander. Instead, plaintiffs invite this Court, in the remedial phase of this action, to recognize an "influence" claim on behalf of African Americans in the 2016 Congressional Plan. (D.E. 154-1 at 28 (complaining that the new plan reduces African American "influence" in the districts surrounding CD 1 and CD 12)) There is no basis whatsoever for any such claim under the United States Constitution, and any interpretation of the Constitution recognizing such a claim would violate the Equal Protection Clause.

The Supreme Court has squarely rejected claims that a state's failure to create "influence" districts constitutes a discriminatory effect under Section 2, much less a racial gerrymandering claim. *See LULAC*, 548 U.S. at 445-46. Thus, North Carolina's failure to create alleged "influence" districts in the 2016 Congressional Plan cannot constitute an unconstitutional racially discriminatory effect under the Constitution.[11]

The Supreme Court has also warned against the constitutional dangers underlying plaintiffs' influence theories. In *LULAC*, the Court rejected an argument that the Section 2 "effects" test might be violated because of the failure to create a minority "influence" district. The Court held that "if Section 2 were interpreted to protect this kind of influence, it would necessarily infuse race into virtually every redistricting, raising serious constitutional questions." *LULAC,* 548 U.S. at 445-46 (citing *Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring)). Recognizing a claim on

---

[11] In any case, to the extent "influence" districts are construed as districts that are more competitive for Democratic candidates, many districts in the 2016 Plan are more competitive for Democrats as compared to the 2011 Plan. *See infra* at pp. 37-38.

behalf of African Americans for influence districts "would grant minority voters 'a right to preserve their strength for the purposes of forging an advantageous political alliance,'" a right that is not available to any other voters. *Strickland*, 556 U.S. at 15 (citing *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004), *cert. denied*, 544 U.S. 961 (2005)). This argument also raises the question of whether such a claim would itself run afoul of the equal protection guarantees of the Fourteenth Amendment. Nothing in federal law "grants special protection to a minority's group's right to form political coalitions." *Strickland*, 556 U.S. at 15. Nor does federal law grant minority groups any right to the maximum possible voting strength. *Id.* at 15-16. This Court should reject plaintiffs' invitation to join them in standing on constitutional quicksand.

African Americans vote overwhelmingly for Democratic candidates. *Hunt v. Cromartie*, 526 U.S. 541, 550 (1999). Plaintiffs' claim that defendants did not remedy the racial gerrymanders found by the Court amounts to nothing more than a claim that the 2016 Congressional Plan fails to maximize the ability of African American voters to form alliances to elect Democratic candidates. Plaintiffs cite no precedent supporting the argument that this constitutes vote dilution in violation of Section 2. Regardless, plaintiffs have never asserted a vote dilution claim in this litigation and the Court is not authorized to provide them one in the remedial phase of a racial gerrymandering case. *See Upham*, 456 U.S. at 39-40 (citing *Whitcomb*, 403 U.S. at 160-61); *see also McGhee*, 860 F.2d at 115-18.

In any event, apart from generalized hyperbole, plaintiffs do not specifically explain how the 2016 Congressional Plan results in vote dilution. Obviously any redrawing of the districts is going to shift voters—of all races—to other districts. Exactly how many African American voters must be moved into or out of a district for vote dilution to occur? Plaintiffs offer no guidance. And because plaintiffs have offered no congressional map of their own, neither defendants nor the Court have any idea how plaintiffs believe it "should" have been drawn to avoid alleged vote dilution.

Moreover, during the legislative process which resulted in the enactment of the 2016 Congressional Plan, defendants discovered that the racial makeup of CD 1 and CD 12 comports with the percentages that the leading redistricting expert for North Carolina plaintiffs in other cases says are "just right" for African Americans to elect a candidate of choice. Dr. Allan Lichtman has opined that a congressional district in North Carolina with a BVAP between 40% to 50%, as well as strong Democratic districts in which African Americans constitute a majority of registered Democrats, provide black voters with districts in which they have an equal opportunity to elect their candidates of choice. (Affidavit of Allan J. Lichtman (January 18, 2012), ¶¶ 8-14; Second Affidavit of Allan J. Lichtman ¶¶ 3, 4, 8, 9, and Table 4) CD 1 in the 2016 Congressional Plan has a BVAP of 43.81%. CD 1 is a strong Democratic district (Democrats are 66.34% of the registered voters) and African Americans comprise 61.85% of the Democratic voters. While CD 12 has a lower BVAP percentage (36.20%), it is also a strong Democratic district (51.25%) and African Americans will have the ability to control the primary in that district too (as

they are 62.29% of the Democrats in that district). Thus, to the extent plaintiffs are attempting to sneak in a vote dilution claim under the cover of their racial gerrymandering arguments, it is baseless and should be rejected.

### D. The 2016 Congressional Plan is not a "political gerrymander."

Plaintiffs' arguments regarding the General Assembly's consideration of partisan advantage as one redistricting criterion are meritless.

First, the 2016 Congressional Plan is not a "gerrymander" at all. The hallmark of a gerrymander is the subordination of traditional redistricting criteria to some other goal. It is beyond dispute, however, that the 2016 Congressional Plan follows traditional redistricting criteria better than any congressional map in North Carolina for at least the past 25 years. The 2016 Congressional Plan contains 87 whole counties and splits only 12 VTDs across the entire state. No county is split between more than two congressional districts.

The extent to which the 2016 Congressional Plan follows traditional redistricting criteria is all the more striking when compared to the 1992 Congressional Plan. In the 1992 plan the General Assembly, then controlled by Democrats, unveiled the version of CD 12 that this Court has criticized as "serpentine." CD 12 in the 1992 plan started in Gaston County, meandered its way into Charlotte in Mecklenburg County, then snaked its way over to Iredell and Rowan counties to pick up (and submerge) Republican voters, then slithered over to Winston-Salem, then Greensboro, and finally Durham, to pick up African American voters. To accomplish this contorted path, the 1992 plan divided 44

counties, seven of which were split between three congressional districts. Moreover, that plan split at least 77 VTDs. (Frey Decl., ¶¶ 97-99)

The 1992 Congressional plan was drawn by John Merritt, an aide to white Democratic Congressman Charlie Rose, and endorsed by the National Committee for an Effective Congress. *Shaw*, 861 F. Supp. at 466. However, the plan was introduced into a public hearing by the Executive Director of the NC NAACP, not Mr. Merritt. *Id.* The odd shapes and locations of districts were the result of the legislature's intent to protect at least four incumbent white Democratic Congressmen. *Id.* at 465, 467-68. The Democratic legislature accomplished their goal by packing Republican voters into a small number of districts, thereby decreasing the influence of Republican voters in other districts. *Pope v. Blue*, 809 F. Supp. 392, 394 (W.D.N.C. 1992) (three-judge court), *aff'd* 506 U.S. 801 (1992). The General Assembly departed from traditional redistricting principles to achieve these goals and instead created the most non-compact congressional districts in the history of North Carolina. *Shaw*, 861 F. Supp. at 469.

The 1992 plan also employed the novel concept of "point contiguity." Both CD 1 and CD 3 were contiguous at the same "point," or an area of the map with no geographic space and consisting solely of a mathematical point. This allowed CD 1 to cut through CD 3 (represented by white incumbent Democrat Martin Lancaster) "without destroying the technical contiguity of either district." *Id.* at 468. Similarly, a review of the 1992 map shows that the 1992 version of CD 12 completely dissects the 1992 version of CD 6 running through Forsyth, Guilford, and Alamance Counties. To achieve "contiguity" for

CD 6, the General Assembly used "several 'point contiguities' and 'double crossovers' that exist in the district's design." *Id.* at 469. These facts, and a review of the map itself, show the extreme steps taken by a Democratic controlled General Assembly to draw a congressional plan that strongly favored Democratic voters and Democratic Congressman.

Significantly, the 1992 plan, unanimously regarded as the product of true gerrymandering, survived a political gerrymandering challenge in one of the seminal cases on this issue. *Pope*, 809 F. Supp. at 392. Tellingly, plaintiffs fail to cite *Pope* even though it was summarily affirmed by the Supreme Court, 506 U.S. 801 (1992), and is therefore binding precedent on this Court. *See Pope*, 809 F. Supp. at 395 n.2 (noting that "a summary affirmance by the Supreme Court, pursuant to the exercise of its appellate jurisdiction, creates precedential authority binding on the lower courts").

In *Pope*, the three-judge court recognized that even under *Davis v. Bandemer*, 478 U.S. 109 (1986), a redistricting plan is not unconstitutional merely because it "makes it more difficult for a particular group in a particular district to elect the representatives of its choice." *Pope*, 809 F. Supp. at 396 (quoting *Bandemer*, 478 U.S. at 131). While the Supreme Court has never agreed or decided on what evidence, if any, could possibly establish such a claim, *Vieth v. Jubelirer*, 541 U.S. 267, 281 (2004), it is clear that at a minimum it would take the results of more than one election under the challenged redistricting plan. *Pope*, 809 F. Supp. at 396. Here, as in *Pope*, "we do not even have a single election to corroborate the plaintiffs' allegations of disproportionate

representation" and any political gerrymandering claim would necessarily fail. *Id*. Even if such evidence could be developed, the claim would still fail because "the power to influence the political process is not limited to winning elections." *Id*. at 397 (quoting *Bandemer*, 478 U.S. at 132). Individuals who vote for a losing candidate are "deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district." *Id*. Thus, there is simply no legal basis for a political gerrymandering claim here.

More importantly, plaintiffs' allegation that the 2016 Congressional Plan is a "political gerrymander" fails as a matter of fact. First, plaintiffs resort to mischaracterizing the criteria adopted by defendants to comply with this Court's order. The criterion called "partisan advantage" was only one of seven criteria. The language of the criterion stated that the "committee shall make *reasonable efforts* to construct districts in the 2016 plan to maintain the current partisan makeup of North Carolina's Congressional delegation." Despite plaintiffs' assertions, defendants did not set out to maximize the number of Republicans elected under the congressional plan or make districts with the highest possible Republican voting margins. Instead, the criterion stated that the legislature should make reasonable efforts to maintain the existing partisan balance in North Carolina's congressional delegation. Moreover this criterion was balanced against and harmonized with the other criteria such as compactness, contiguity, equal population, use of whole counties, and use of whole precincts. A mere visual review of the 2016 Congressional Plan shows that the legislature followed all of the

criteria, including this one.  The Court should reject plaintiffs attempt to take this criterion out of context and magnify it to the exclusion of all the others.

Second, plaintiffs ignore the actual statistical facts regarding the political results of the districts in the 2016 Congressional Plan.  For example, it is a fact that the number of registered Democrats exceeds the number of registered Republicans in all but one of the districts in the new plan.  (Frey Decl., Ex. 13)  In addition, voters who tend to vote for Republican candidates are more dispersed throughout the state.  Voters who tend to vote for Democratic candidates are more concentrated and in fewer counties.  (Frey Decl., Exs. 2, 3, 5, 6, 8, and 9)  Thus, as a matter of demography, and not politics, creating congressional districts with more whole counties results in more districts containing more voters who tend to vote for Republican candidates.

It is also a fact that based on election data the districts in the 2016 Congressional Plan are weaker for Republican candidates than under the 2011 plan.  For example, plugging 2008 election data into the districts under the new plan demonstrates that the share of votes for Republican candidates is less in the new plan as compared to the 2011 plan. (Frey Decl. Ex. 10)  The same is true when using election data from 2012.  (Frey Decl. Ex. 11)  In comparing election results under the 2001, 2011, and 2016 congressional plans, more Democratic candidates for statewide office would have won more of the congressional districts in the 2016 plan as compared to the 2011 Plan.  (Frey Decl. ¶¶ 8-35, Exs. 10, 11).  Under the 2001 Congressional Plans, the 2011 Congressional Plan and the 2016 Congressional Plan, Democratic candidates for

statewide office won 10 of 10 statewide elections in CDs 1, 4, and 12 based upon the 2008 and 2012 election results.  (*Id.* Ex. 10, 11).  Based upon the 2008 election results, in the 2016 Congressional districts, Democratic candidates also won 5 of 10 statewide races in CD 3; 2 of 10 statewide races in CD 5; 4 of 10 statewide races in CD 6; 7 of 10 statewide races in CD 7; 4 of 10 statewide races in CD 8; and 3 of 10 statewide races in CD 9.  (*Id.* at Ex. 10).

Rather than accept these statistical facts, plaintiffs advocate for a political quota based on the statewide share of votes received by Democratic and Republican candidates.  (D.E. 154-1 at 15-16, 18-19, 34)[12]  Plaintiffs provide no legal support for a rule that would require political proportionate representation in redistricting.  There is certainly no support for imposing a political quota on a State in the context of enacting a remedial plan in a racial gerrymandering case.  Indeed, the Supreme Court in *Vieth* made this clear: the Constitution "guarantees equal protection of the law to persons, not equal representation in government to equivalently sized groups.  It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers."  *Vieth*, 541 U.S. at 288.  The Supreme Court also rejected the notion that "majority status in statewide races establishes majority status for district contests."  *Id.* at 288.  Thus, even if plaintiffs could force a

---

[12] Presumably, the statewide percentage of votes cast for Republican and Democratic candidates may have some relevance if all of North Carolina's representatives were elected in one 13-person multimember Congressional District.  Plaintiffs have not argued that North Carolina be reduced to one 13-member multimember district and there is no legal basis for imposing such a remedy.

political quota onto the State, the Supreme Court has already rejected the standard they would use to do it.

Finally, the statistical facts conclusively demonstrate that the legislature did not target Democrats in the new congressional plan. If the 2016 Congressional Plan results in the election of ten Republican candidates and three Democratic candidates, it will be because thousands of registered Democrats and unaffiliated voters voted for Republican candidates across the State. It is statistically impossible for Republican candidates to win any of the districts in the 2016 Congressional Plan with votes only from registered Republicans. Why do many voters registered as Democrats vote for Republican congressional candidates? The answer to that question involves a "sea of imponderables" that the Equal Protection Clause does not address and that judges are ill-equipped to decide. *Vieth*, 541 U.S. at 290.[13] Accordingly, this Court should reject plaintiffs' political gerrymandering arguments.

## CONCLUSION

Based on the foregoing, the Court should overrule plaintiffs' objections, and allow North Carolina's congressional elections to proceed under the 2016 Congressional Plan.

_____

[13] Nor does the Constitution "answer the question whether it is better for Democratic voters to have their State's congressional delegation include 10 wishy-washy Democrats (because Democratic voters are 'effectively' distributed so as to constitute bare majorities in many districts), or 5 hardcore Democrats (because Democratic voters are tightly packed in a few districts). Choosing the former 'dilutes' the vote of the radical Democrat; choosing the latter does the same to the moderate. Neither Article I, § 2, nor the Equal Protection Clause takes sides in this dispute." *Vieth*, 541 U.S. at 288 n.9.

Respectfully submitted, this the 7th day of March, 2016.

NORTH CAROLINA DEPARTMENT OF
JUSTICE

/s/ Alexander McC. Peters
Alexander McC. Peters
Senior Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919)716-6900
Facsimile: (919)716-6763
*Counsel for Defendants*

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr
N.C. State Bar No. 10871
Phillip J. Strach
N.C. State Bar No. 29456
Michael D. McKnight
N.C. State Bar No. 36932
thomas.farr@ogletreedeakins.com
phil.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919)787-9700
Facsimile: (919)783-9412
*Co-counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I, Thomas A. Farr, hereby certify that I have this day electronically filed the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS REGARDING REMEDIAL REDISTRICTING PLAN** with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

PERKINS COIE LLP
John M. Devaney
Marc E. Elias
Bruce V. Spiva
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
JDevaney@perkinscoie.com
MElias@perkinscoie.com
BSpiva@perkinscoie.com
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

Kevin Hamilton
1201 Third Ave., Suite 4800
Seattle, WA 98101-3099
Khamilton@perkinscoie.com
Telephone: (206) 359-8741
Facsimile: (206) 359-9741
*Attorneys for Plaintiff*

POYNER SPRUILL LLP
Edwin M. Speas, Jr.
John W. O'Hale
Caroline P. Mackie
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
espeas@poynerspruill.com
johale@poynerspruill.com
cmackie@poynerspruill.com
Telephone: (919) 783-6400
Facsimile: (919) 783-1075
*Local Rule 83.1 Attorney for Plaintiffs*

This the 7th day of March, 2015.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr (N.C. Bar No. 10871)
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: 919.783.9412
thomas.farr@odnss.com

*Counsel for Defendants*

24040456.1