NORTH CAROLINA GENERAL ASSEMBLY

NORTH CAROLINA HOUSE OF REPRESENTATIVES

---

TRANSCRIPT OF THE PROCEEDINGS

FLOOR SESSION ONE (11:30 A.M.)

---

In Raleigh, North Carolina

Friday, February 19, 2016

Reported by Rachel L. Hammond, CVR-M

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

**2**

1 (Reporter's note: Proceedings in this matter
2 began at 11:30 a.m. on February 19, 2016.)
3 SPEAKER MOORE: The House will come to order.
4 Members will take their seats. Visitors will retire
5 from the chamber. The Sergeant-at-Arms will close the
6 doors. Members and guests are asked to please silence
7 all electronic devices.
8 This morning's prayer will be offered by
9 Representative Avila. We'd ask all members and all
10 guests in the gallery to please stand for the prayer
11 and remain standing for the Pledge of Allegiance.
12 Representative Avila.
13 (Prayer and the Pledge of Allegiance.)
14 SPEAKER MOORE: The gentleman from Harnett,
15 Representative Lewis, is recognized for a motion.
16 REP. LEWIS: Mr. Speaker, the journal for
17 February 18, has been examined and found to be correct.
18 I move that it stand approved as written.
19 SPEAKER MOORE: Representative Lewis moves that
20 the journal for February 18 be approved as written;
21 those in favor will say "aye."
22 (Voice vote.)
23 SPEAKER MOORE: Those opposed "no."
24 The ayes have it. The journal is approved as
25 written. Notices and announcements -- strike that.

**3**

1 Reports of standing committees.
2 Representative Lewis, the Chair on the
3 Committee -- the Redistricting Committee is recognized
4 to send forward the committee report. The clerk will
5 read.
6 CLERK: Representative Lewis Redistricting
7 Committee reported Senate Bill 2 2016 Contingent
8 Congressional Plan.
9 SPEAKER MOORE: Calendar for this morning.
10 Senate Bill 2, the clerk will read.
11 (Bill read by clerk.)
12 SPEAKER MOORE: The gentleman from Harnett,
13 Representative Lewis, is recognized to debate the bill.
14 The House will come to order.
15 Members, before the gentleman starts, I want to
16 remind the body we do have the court reporter with us
17 again here today. So all of the extra noise and the
18 chatter that is occurring makes it very difficult for
19 her to hear. So, again, if you need to have any extra
20 conversations, I would ask members to please step off
21 the floor to do so or to keep that to a very low tone.
22 The gentleman from Harnett has the floor to
23 debate the bill.
24 REP. LEWIS: Thank you, Mr. Speaker. Members
25 of the House, we are here today to comply with a court

**4**

1 order issued in the Harris versus McCrory case, which
2 instructed us not to hold the 2016 race for the United
3 States House of Representatives under the current map
4 and instructed us to redraw the districts. We, as you
5 know, have appealed and sought a stay of that decision.
6 However, as of this moment, that stay has not been
7 granted. We are still hopefully optimistic that it
8 will, in fact, come. However, out of respect for the
9 rule of law and the court's findings, I will present to
10 you today a 2016 Contingent Congressional Map. I will
11 point out that this map was created based on criteria
12 that was adopted by a Joint Select Committee of the
13 House and the Senate appointed by the Speaker and the
14 President Pro Tem: the committee adopted this criteria
15 on February 16.
16 I will point out to you the criteria on which
17 the maps before you were drawn. First, was the
18 criteria of equal population. All of the districts
19 were drawn with either 733,499 total persons or 733,498
20 total persons. This is as equal as practicable and is
21 in accordance with federal law. Another criteria was
22 contiguity. All the areas of every district are
23 composed within contiguous territories. Another
24 criteria was political data. The stat pack attached to
25 the maps placed on each one of your desk show which

**5**

1 election results were used in building these districts.
2 Race was not considered and is not present in these
3 reports. A further criteria was partisan advantage.
4 We believe that this map will produce an opportunity to
5 elect ten Republican members of Congress, but make no
6 mistake, this is a weaker map than the enacted plan in
7 that respect. The Committee further adopted criteria
8 to do away with the 12th district, which has been
9 described as serpentine in nature because of the shape,
10 the way it appears on a map. The drawing of this
11 corrected -- the drawing of this plan before you
12 corrects that. An additional criteria was compactness.
13 Only 13 counties and 12 voting districts were split in
14 this map. In accordance with the criteria, more whole
15 counties and more whole precincts are the best
16 indicator of compactness that we believe to be
17 available. An additional criteria adopted by the
18 committee was incumbency. In this map, only two
19 incumbent members of Congress reside in the same
20 congressional district, one Republican and one
21 Democrat. They are Representative Holding and
22 Representative Price, both of whom reside within the
23 geographic territory that makes up the proposed 4th
24 Congressional District. Eleven incumbents were placed
25 in a congressional district by themselves.

## 6

1  I want to offer only a bit of historical
2  context that I hope you will consider when you're
3  voting for those maps. The 1992 Congressional Plan
4  split 44 counties; the 1997 plan split 22 counties; the
5  1998 plan split 21 counties; the 2001 plan split 28
6  counties and 22 Voting Tabulation Districts; the 2011
7  Congressional Plan, which I'll refer to henceforth as
8  the enacted plan, split 40 counties and 68 voting
9  districts, or VTDs; and the map that you have before
10 you splits 13 counties and 12 VTDs.
11 I am very proud and appreciative of all of the
12 work that members of the committee gave, that our
13 central staff dedicated themselves to do. I appreciate
14 all of the members who brought forward constructive
15 advice on how to design these maps to comply with the
16 court decision. And I look forward to being able to
17 more fully debate and explain these maps as directed by
18 the Speaker. But I would ask for your support. I
19 believe that this is a major step forward and should
20 the stay not be granted by the U.S. Supreme Court, I
21 believe that this map, drawn in accordance with the
22 criteria that I have mentioned in my earlier remarks,
23 will help us comply with the court order from the
24 Harris case. And I would respectfully ask at the
25 conclusion of this debate that you would vote "aye" on

## 7

1  this bill. Thank you, Mr. Speaker.
2  SPEAKER MOORE: For what purpose does the
3  gentleman from Durham, Representative Michaux, arise?
4  REP. MICHAUX: To speak on the bill.
5  SPEAKER MOORE: The gentleman has the floor to
6  debate the bill.
7  REP. MICHAUX: Mr. Speaker and ladies and
8  gentlemen of the House, I'm not going to ask
9  Representative Lewis any questions on this. I think
10 that has been thoroughly covered in committee, and the
11 record has been made in committee on this. What I want
12 to do very simply is to caution you about what you're
13 about to do. And in order to set the framework for
14 that -- what I want to say about this, I want to quote
15 a couple of things from the Harris decision that got us
16 where we are today. The first is on page 2 of
17 that decision -- page 3 it says, "This does not mean
18 that race can never play a role in redistricting.
19 Legislatures are almost always cognizant of race when
20 drawing district lines, and simply being aware of race
21 poses no constitutional violation. Only when race is
22 the 'dominant and controlling' consideration in drawing
23 district lines does strict scrutiny, strict scrutiny
24 apply." What the Court is saying very simply in this
25 is that race can still be used in drawing lines, but if

## 8

1  you use race, "strict scrutiny" applies. It doesn't
2  mean it can't be applied, but you have to look at it a
3  little bit closer than the way you normally look at.
4  What this body has done in this -- I'm sorry, what the
5  committee has done, is they have taken race out of the
6  equation totally and completely. In other words, this
7  map that you have before you today was drawn without
8  consideration of race.
9  Now everybody tries to think that we're going
10 to have a colorblind situation and wishes for one,
11 which is the ultimate dream in euphoria. Race will
12 always be there because there will always be
13 differences either race, class, whatever way you want
14 to put it. So you cannot, you cannot do maps without
15 including race as a part of it.
16 The second part of that, or other part of that
17 decision says this, "redistricting legislation must,"
18 and I repeat, "redistricting legislation must comply
19 with the Voting Rights Act of 1965." Many people have
20 thought that the Shelby case knocked out the Voting
21 Rights Act. It did not. It only knocked out Section 4
22 from the Voting Rights Act, that section which set up a
23 formula for which preclearance was required. The
24 Voting Rights Act of 1965 still stands. And I repeat,
25 that it says that any district lines must comply with

## 9

1  the Voting Rights Act of 1965. And in that same vein,
2  they said that, "the Voting Rights Act prohibits states
3  from adopting plans that would result in vote dilution
4  under section 2." So, Section 2 basically is the
5  operative clause under which we operate and draw
6  district lines.
7  Now, what you have done with this map is you
8  have gone in the complete opposite, and you have made
9  race a predominant factor again because you left it
10 out. You don't consider whether or not these districts
11 that have been drawn on this map create any dilution of
12 minority registrants, minority voting. You don't have
13 any clue as to whether or not minorities, African
14 Americans in particular, are able to elect
15 representatives of their choice. That's because you
16 cut out race as a factor in determining what these
17 lines are being drawn for. So I say that you set up an
18 unconstitutionally drawn map, and you're sending back
19 another unconstitutionally drawn map. But that is not
20 for me to decide. That is for the Court to decide.
21 But just taking a simple look at it you say, well, how
22 do we do this? All you have to do -- you don't have to
23 make it a predominant factor. You can look at it and
24 you can draw lines that fall within parameters that
25 don't make race a predominant factor and still

Case 1:13-cv-00949-WO-JEP   Document 159-2   Filed 03/07/16   Page 3 of 23

## 10

1  guarantee that you don't have voter dilution and still
2  guarantee that you have a position where African
3  Americans are able to elect persons of their choosing.
4     Now, there is one other thing I want to call to
5  your attention out of that same decision. It says that
6  there is strong evidence -- and this comes from the
7  Harris decision -- "There is strong evidence that race
8  was the only nonnegotiable criterion and that
9  traditional redistricting principles were subordinated
10  to race." I say again, "There is strong evidence that
11  race was the only nonnegotiable criterion." Here
12  again, in these maps that are being drawn, race is the
13  only nonnegotiable criterion that has brought these
14  maps about.
15     Finally, it says, "A congressional district
16  necessarily is crafted because of race, when a racial
17  quota is the single filter through which all
18  line-drawing decisions are made." Now, folks, it
19  doesn't take a rocket scientist or a mathematician to
20  figure that if you're going to draw district lines,
21  you've got to take into account the population of that
22  district. How it affects not just one part of the
23  population, but the total, the total population, and
24  that includes members of any ethnic group, any racial
25  group, anything. It all has to be considered. Here,

## 11

1  in this map that was drawn, none of that was
2  considered. And I say to you that I know what you're
3  going to do. Everybody is going -- both sides are
4  going to probably go lockstep, no question about it.
5  But what you're doing is you're setting up a situation
6  where there is a good possibility of you coming back
7  here again if the courts find that you have not
8  followed their instructions. They could send it back.
9  They could do it themselves, or they could put in a
10  Special Master to draw the lines. There are other
11  things here, everybody says, well, it is confusing.
12  Chaos reigns as a result of this. Well, folks, those
13  of us on this side did not cause that chaos. We were
14  never asked to have any input into this. We got -- to
15  give you an example, this map that you have drawn
16  today, I think the decision was handed down February 5
17  or February 6, and before any criteria was set up, I
18  understand from folks on the other side, that plans
19  were already being drawn and criteria was already being
20  set up -- not having been set up, but maps were being
21  drawn without that. And then to come in on, I think,
22  Tuesday of this -- Monday or Tuesday of this week and
23  pass criteria, and on Wednesday we've got a map, then
24  there's a problem. There are many things wrong with
25  this, and I know this was done in a hurry. But we need

## 12

1  to take the time to make sure that every facet of this
2  thing is covered. A lot of folks don't want to talk
3  about race. I don't particularly. One thing about my
4  good friend Martin Luther King, Jr., Martin told me --
5  I never heard him use the word "colorblind" because in
6  his thinking we will never have a colorblind society.
7  And unfortunately, or fortunately, it is here, and it's
8  faced. And we have to take it into consideration. And
9  when you take it out, then that becomes a predominant
10  factor in this whole thing. So you're going to do what
11  you're going to do, but I don't think you've seen the
12  end of this problem yet.
13     REP. LEWIS: Mr. Speaker.
14     SPEAKER MOORE: For what purpose does the
15  gentleman from Harnett, Representative Lewis, arise?
16     REP. LEWIS: Would the distinguished gentleman
17  from Durham yield to a question?
18     SPEAKER MOORE: Does the gentleman from Durham,
19  Representative Michaux, yield to the gentleman from
20  Harnett?
21     REP. MICHAUX: The gentleman will yield. I
22  don't know how distinguished he is.
23     SPEAKER MOORE: He yields.
24     REP. LEWIS: I yield.
25     REP. LEWIS: Mr. Speaker, I appreciate not only

## 13

1  the distinguished but the well-dressed gentleman taking
2  time to yield to me.
3     Representative Michaux, you referenced the
4  Harris decision in your remarks. Would I be safe to
5  operate under the belief that you have it before you?
6     REP. MICHAUX: You -- yes, sir. Here it is,
7  yes.
8     REP. LEWIS: Thank you. May I ask another
9  question, Mr. Speaker?
10     SPEAKER MOORE: The gentleman is recognized for
11  a second question. Does the gentleman from Durham
12  yield?
13     REP. MICHAUX: Yes, I yield.
14     SPEAKER MOORE: He yields.
15     REP. LEWIS: Thank you, Mr. Speaker.
16  Representative, may I ask you to please look at page 57
17  of that opinion?
18     REP. MICHAUX: 57?
19     REP. LEWIS: Page 57, yes, sir. And, sir, the
20  particular --
21     REP. MICHAUX: Yes, sir, I have it.
22     REP. LEWIS: Right before the number 2 there,
23  there is a sentence that reads in part, "As the
24  defendants," which would have been us, "fail to meet
25  the third Gingles factor, the Court concludes that

## 14

1  section 2 did not require the defendants to create a
2  majority-minority district in CD 1." Is that not
3  saying that the Court finds that racially polarized
4  voting was not present or proven so that we shouldn't
5  have used it in drawing the map?
6  REP. MICHAUX: That's not what it says to me,
7  Representative Lewis. What is says to me is that there
8  was racially polarized showing in that. You didn't
9  meet the requirements, the third requirement of --
10  requirements in the Gingles case. Which set up the
11  fact that if you have racial polarization, you have got
12  to take into consideration these factors.
13  REP. LEWIS: Mr. Speaker, may I ask the
14  gentleman another question?
15  SPEAKER MOORE: Does the gentleman from Durham
16  yield to an additional question?
17  REP. MICHAUX: Yes, I yield.
18  SPEAKER MOORE: He yields.
19  REP. LEWIS: Thank you, Mr. Speaker, and thank
20  you, Representative. If I may, would you turn to
21  page 56 of the same opinion of which we were just
22  looking.
23  REP. MICHAUX: I have it, yes, sir.
24  REP. LEWIS: Thank you, sir. When the Court
25  writes, "the composition and election results under the

## 15

1  earlier version of CD 1 vividly demonstrate that,
2  though not previously a majority-BVAP district, the
3  white majority" -- this is the operative part I'd like
4  your advice on -- "the white majority did not vote as a
5  bloc to defeat the African-Americans' candidate of
6  choice. In fact, precisely the opposite occurred in
7  these two districts: significant crossover voting by
8  white voters supported the African-American candidate."
9  Does that not indicate that the Harris court did not
10  find racially polarized voting?
11  REP. MICHAUX: I'm not sure that it does,
12  Representative Lewis, because you have to have certain
13  iterations in these types of situations. It's known,
14  and it is a known fact, and it has been proved.
15  Gingles proved it and several of the other cases,
16  Stevens' case proved it, that whites sometimes
17  basically vote as a bloc in order to keep
18  African-Americans, or whatever ethnic group, out. And
19  that has happened -- it has happened in my case. I
20  personally had it happen to me. So this iteration in
21  here is actually stating what should not or could not
22  have to happen. And of course, you know, you're on
23  that segment. I've got that page marked also.
24  REP. LEWIS: May I ask the gentleman an
25  additional question?

## 16

1  SPEAKER MOORE: Does the gentleman from Durham
2  yield to an additional question?
3  REP. LEWIS: Yes, sir.
4  SPEAKER MOORE: He yields.
5  REP. LEWIS: Just for the sake of this
6  conversation, Representative Michaux, and I've
7  acknowledged freely in earlier meetings that you are an
8  attorney and I'm not. You're much more versed in the
9  law. Would you acknowledge at least with me -- and I
10  apologize to skip around in this opinion, but do --
11  would I be correct to operate under the understanding
12  of this opinion that at least in the opinion issued in
13  the Harris court, that the third Gingles element of
14  establishing racially polarized voting per this court
15  decision was not met?
16  REP. MICHAUX: Yes, it says that.
17  REP. LEWIS: Thank you, sir. Mr. Speaker, may
18  I ask the gentleman another question on another subject
19  matter?
20  SPEAKER MOORE: Does the gentleman from Durham
21  yield to an additional question from the gentleman from
22  Harnett?
23  REP. MICHAUX: Yes, sir. I yield.
24  SPEAKER MOORE: He yields.
25  REP. LEWIS: Thank you, Mr. Speaker, and thank

## 17

1  you, Representative. You mentioned in your remarks the
2  map that is prepared before us and also perhaps the
3  steps that were taken in the preparation of those maps,
4  I was wondering, sir, if you would speak to what -- and
5  of course, I only ask for your personal knowledge, of
6  what steps the Democratic Party took, or the Democratic
7  members of this House took, to comply with the court
8  order that we were all notified about on February 6.
9  REP. MICHAUX: My answer to you, Representative
10  Lewis, on that is we were not ordered to comply with
11  that decision. You were ordered to comply with that
12  decision. We did not draw the maps. You drew the
13  maps, so that decision was aimed at you. The matter is
14  in court. If the Court wants our advice, we will give
15  them that advice. We tried to give you our advice on
16  the mistakes that you made. You could take them any
17  kind of way you see, and it comes back, you say, well,
18  the minority party helped us do this.
19  This is a problem that you created. This is a
20  problem that you have to solve. If the Courts want our
21  opinion on it, they will ask us, and we are prepared --
22  we will be prepared to answer any questions that the
23  Court raises with us on it. And by the way,
24  Representative Lewis, let me just -- since you are
25  referring to the opinion, you referred to page 55 on

## 18

1   that -- 56 on that.  On 54, "Strikingly, there is no
2   evidence that the General Assembly conducted or
3   considered any sort of a particularized
4   polarized-voting analysis during the 2011 redistricting
5   process."  So I just wanted to clear that up.
6       REP. LEWIS:  Mr. Speaker, may I ask the
7   gentleman another question?
8       SPEAKER MOORE:  Does the gentleman from Durham
9   yield to an additional question?
10      REP. MICHAUX:  Anytime.  Yes, sir.
11      SPEAKER MOORE:  He yields.
12      REP. LEWIS:  Thank you, Mr. Speaker, and thank
13  you, Representative.  I just wanted to -- and this is
14  along the lines of the last question I asked, if I may.
15  Would it be fair to say that you, as a member of the
16  General Assembly, as a member of the Joint Select
17  Committee, and of the House Committee, while, by your
18  own remarks, had the opportunity to participate and
19  offer input to the map, have instead elected not to do
20  that and are preparing instead to offer maps that you
21  developed to the Court?  So it would be fair to say
22  that you declined largely to constructively participate
23  in the legislative process, preferring to focus on the
24  judicial process?
25      REP. MICHAUX:  In the joint meeting of the

## 19

1   committee, several amendments were offered by the
2   minority party.  They were all killed.  In other
3   instances in this body when we have tried to
4   participate and offer what we thought were constructive
5   amendments, whether some, even folks on your side have
6   agreed, we have been struck down.  And here again, I
7   refer to my good friend Martin Luther King, Jr.  Martin
8   said, Mickey, you have always got to be able to -- if
9   they hit you on one side to turn the other cheek and
10  let them hit you on -- you know, don't hit back.  Well,
11  I've been hit on both cheeks by you-all, and I am just
12  not going to let you hit me anymore.  And that's -- I
13  mean, that's it, Mr. Lewis, why should we, why should
14  we -- when you haven't sought our help in the beginning
15  and you haven't sought our help now.  You haven't asked
16  us anything.  You have already gone on and done these
17  maps before we even had a committee meeting.
18      REP. LEWIS:  Mr. Speaker, may I ask the
19  gentleman another question?
20      SPEAKER MOORE:  Does the gentleman from Durham
21  yield to an additional question from the gentleman from
22  Harnett?
23      REP. MICHAUX:  Yes, I yield.
24      SPEAKER MOORE:  He yields.
25      REP. LEWIS:  Thank you, Mr. Speaker, and thank

## 20

1   you, Representative.  I do not have the committee
2   minutes before me, and I am certainly prepared to be
3   corrected.  Did members of the minority party, the
4   Democratic Party, offer amendments in the form of a map
5   or guidelines to how the map should look, or were those
6   amendments largely unrelated to the drawing of a map?
7       REP. MICHAUX:  The amendments affected the
8   criteria under which the maps were to be drawn.
9       REP. LEWIS:  Thank you, sir, for your time.
10  And thank you, Mr. Speaker.
11      SPEAKER MOORE:  For what purpose does the
12  gentleman from Bladen, Representative Brisson, arise?
13      REP. BRISSON:  To see if Representative Lewis
14  will yield for a couple of questions.
15      SPEAKER MOORE:  Does the gentleman from Harnett
16  yield to the gentleman from Bladen?
17      REP. LEWIS:  I do, Mr. Speaker.
18      SPEAKER MOORE:  He yields.
19      REP. BRISSON:  Thank you, Mr. Speaker.  Thank
20  you, Representative Lewis.  It may take me a minute
21  here to get through my questions, but in the beginning
22  when the Courts made the decision, it was certainly
23  on -- obviously it was on district 1 and 12, which was
24  two out of the 13 districts.  And, I guess, I'm
25  certainly not speaking for any of the other members,

## 21

1   but I kind of assumed that should we -- evidently,
2   we've got a problem there.  When we started off I
3   thought, I assumed, that maybe the problem could be
4   worked out in the general consensus of that district.
5   Do you understand what I'm saying?  That maybe it
6   didn't involve the whole state.  One of my questions,
7   how much time did the committee spend on concentrating
8   on trying to get in compliance in that general area
9   versus -- and when was the decision made to do it
10  statewide because it changed?  In the original
11  committee was kind of -- I saw the members.  It looked
12  like that it was maybe not intentionally set up, but
13  basically a lot of -- it was close by neighbors
14  involved in that general vicinity of the state on the
15  committee, maybe one or two scattered out away from,
16  kind of, more distant away.  And after the two
17  questions that I'm trying to ask, and I'll them both is
18  how much time, or if any time was spent on just the
19  general consensus and vicinity of the question -- the
20  two districts in question?  And at what time did the
21  committee decide to expand and redo the whole state?
22  And did the committee look at maybe taking a look at
23  the committee then when they went to the full state to
24  maybe justify expanding the committee or make sure we
25  have broader input from throughout the state?

Case 1:13-cv-00949-WO-JEP   Document 159-2   Filed 03/07/16   Page 6 of 23

22

1     REP. LEWIS: Thank you for that question,
2  Representative. Let me do my very best to answer.
3  First of all, you are right when you say the case that
4  was brought and adjudicated by the three-judge panel
5  involved the 1st Congressional District and the 12th,
6  not all 13. However, when you're drawing districts,
7  what you're talking about is assigning geographic areas
8  where 733,498 or 499 people can elect a member to the
9  U.S. House. So, when you change lines in one part of
10 the state, you are essentially moving people. And as
11 you move people that a cause in one district almost
12 certainly causes a change in those around it. So what
13 you'll notice when you look at the proposed map is that
14 some districts seem to have changed very little. The
15 11th, for instance, the mountain district, really I
16 think the only change that was made there had to do
17 with trying to equalize some population because
18 additional population had been pushed west, if you
19 will, from the 10th and from the 5th. So, as far as
20 the time spent, what the committee did was debate the
21 criteria that we felt would help us comply with the
22 Harris court decision. We respect the judges and want
23 to honor both the written law and the spirit in which
24 they issued the opinion. But in candor, there was not
25 a great deal of curative language in the opinion that

24

1  before, this map divides only 13 counties and only 12
2  VTDs. So this map, to the extent that it has to be
3  used because a stay is not granted, at least based on
4  the criteria adopted by the committee, is a superior
5  map and we believe complies with what we were ordered
6  to do by the Court.
7     REP. BRISSON: Thank you.
8     SPEAKER MOORE: Does the gentleman from Bladen
9  wish to ask an additional question?
10    REP. BRISSON: I just --
11    SPEAKER MOORE: Or does the gentleman wish to
12 debate the bill?
13    REP. BRISSON: I just wanted to ask to make
14 sure that I got my question, both questions answered.
15    SPEAKER MOORE: Does the gentleman from Harnett
16 yield to an additional question?
17    REP. LEWIS: I yield.
18    SPEAKER MOORE: He yields. The gentleman is
19 recognized -- and Representative Brisson, I am trying
20 to do this orderly because the court reporter is trying
21 to make a record, so bear with me on that. The
22 gentleman has the floor for a question.
23    REP. BRISSON: Thank you, Mr. Speaker. Thank
24 you, Representative Lewis. What -- so did the
25 committee ever look at expanding when we decided to

23

1  said had you done X, Y and Z, we would not have found
2  the way we found. So what the committee did instead is
3  it went through in a full and open session in which
4  amendments were, in fact, considered, and it adopted
5  criteria that it felt would help us be able to comply
6  with the court order. Those, as I have said, were the
7  equal population, the contiguity, the political data,
8  partisan advantage, doing away with the serpentine
9  nature of the 12th, compactness, and incumbency. So
10 once the committee adopted those criteria, we set about
11 and have been able to produce a map which is based on
12 those criteria.
13    I think what you're asking about in particular
14 is there are some counties that seem to be
15 geographically far away from either the 1st or the 12th
16 that their district lines have changed. And I will
17 openly concede that you are right in the observation
18 that you have made. But, again, for lack of a better
19 analogy, if you picture a child playing with a balloon,
20 when the child will squeeze the balloon in one part,
21 another part will change its shape. And that is
22 largely why districts all across the state changed.
23 But, again, I would point out, even though certain
24 counties may have changed the district they were in or
25 certain counties may be divided that weren't divided

25

1  go -- that was one of my questions, expanding the
2  committee to make sure that we had a pretty much
3  representation statewide on the committee?
4     REP. LEWIS: Thank you for that question,
5  Representative. And I did fail to answer it the first
6  time you asked it, I apologize. The Speaker and the
7  President Pro Tem made these appointments about a week
8  ago today. We have been operating under -- I think
9  even those opposed to the maps, would acknowledge that
10 we have been operating under a very compressed
11 timetable. And when the decisions were made, I did not
12 ask the Speaker and the President Pro Tem to expand the
13 membership of the committees. They certainly have the
14 authority to do that. I don't even know, in candor,
15 that it was contemplated to expand the committee. We
16 did make clear though, in every effort that we could,
17 that all members of the General Assembly, regardless if
18 they were voting members of the committee or not, were
19 encouraged to attend the committee and were certainly
20 given a chance to speak. I think, in fact, I think
21 several did actually ask questions or take part in the
22 debate that were not actually seated members of the
23 committee. And I would point out that while it is
24 pretty much an expected tradition of the General
25 Assembly that a member of the General Assembly that

26

1  wants to address a standing committee can certainly do
2  so, I think we actually went above and beyond trying to
3  reassure members that their input or their questions
4  were welcomed whether or not they were a seated member
5  of the committee.
6      REP. BRISSON:  Thank you, Representative Lewis.
7  Mr. Speaker, can I speak on the bill?
8      SPEAKER MOORE:  The gentleman has the floor to
9  debate the bill.
10     REP. BRISSON:  Thank you, Mr. Speaker.  Ladies
11 and gentlemen, I just -- and I know that we have ended
12 up with less split counties, divided counties, which is
13 great.  But I just want to remind this body that with
14 small populated counties, and I represent -- two out of
15 three that I represent are kind of considered small
16 population -- any time that the smaller counties have
17 to be divided, it does make a big difference to the
18 people.  Maybe not statewide concerns, but the
19 general -- people in general in small populations, they
20 feel like divided, when you divide them, they are not
21 whole.  And we don't get a whole lot of recognition
22 with the small population to begin with.  We don't feel
23 that maybe our word is not heard.  Our message is not
24 heard quite as well as the larger counties populated.
25 But when you divide us in half or take a third of our

27

1  folks, it does have the people concerned that maybe we
2  don't end up with the representation in Congress or
3  wherever it be.  And that is my concern and it is all
4  about the small populated.  Anytime that we can do
5  anything to help those situations, I hope that we will
6  certainly consider that.  Thank you so much, Mr.
7  Speaker.
8      SPEAKER MOORE:  For what purpose does the
9  gentleman from Wake, Rep. Martin, arise?
10     REP. MARTIN:  To see if the gentleman from
11 Harnett would yield to a few questions.
12     SPEAKER MOORE:  Does the gentleman from
13 Harnett, Representative Lewis, yield to the gentleman
14 from Wake?
15     REP. LEWIS:  I yield, Mr. Speaker.
16     SPEAKER MOORE:  He yields.
17     REP. MARTIN:  Thank you, Mr. Speaker, and thank
18 you, Representative Lewis.  I was in attendance in the
19 committees and tried to pay attention to the questions
20 that were asked.  Unfortunately, I made the mistake of
21 the sitting next to Representative Torbett, and we were
22 cutting up in class a little bit.  So, Representative
23 Lewis, I may repeat some of the questions that you have
24 already attempted to answer and for that I apologize,
25 but blame Representative Torbett for that.

28

1      Mr. Speaker, the first question I would ask the
2  gentleman from Harnett is regarding Dr. Hofeller who I
3  believe he said was the map drawer.  And my question
4  is, was Dr. Hofeller paid for his services with public
5  funds?  And if so, how much did he receive in public
6  money?
7      REP. LEWIS:  Thank you for that question,
8  Representative.  Dr. Hofeller has not, to my knowledge,
9  invoiced the state yet.  I do anticipate that he will.
10 I don't have access to that at the moment.  It
11 certainly would not exceed the 25,000 that was
12 authorized to Chairman Rucho and myself on behalf of
13 the Republicans and the 25,000 that was authorized to
14 the Democrats to be able to produce the maps.  But I
15 don't have an exact figure.  I'm sorry.
16     REP. MARTIN:  Thank you, sir.  Mr. Speaker, to
17 ask another question of the gentleman.
18     SPEAKER MOORE:  Does the gentleman from Harnett
19 yield to an additional question from the gentleman from
20 Wake?
21     REP. LEWIS:  I yield.
22     SPEAKER MOORE:  He yields.
23     REP. MARTIN:  Thank you, Mr. Speaker.  Thank
24 you, Representative Lewis.  Representative Lewis has
25 been quite up front that this is an attempt to get ten

29

1  seats for Republicans and three for Democrats and that
2  this has partisan purposes.  So my question to the
3  gentleman from Harnett is, is this essentially a
4  partisan gerrymander?
5      REP. LEWIS:  Well, thank you for that question,
6  Representative.  To be clear, the map that you have
7  before you was drawn using criteria that was openly
8  debated and adopted by the Joint Redistricting
9  Committee.  Those factors that went into this were of
10 course the requirement to have equal population,
11 contiguity.  Political data did play a part in drawing
12 the map.  We did seek partisan advantage in drawing the
13 map.  We did seek to eliminate the shape of the 12th
14 Congressional District.  We did strive for compactness,
15 a lot to what Representative Brisson was just referring
16 to, trying not to split the smaller rural counties if
17 we could.  And we considered incumbency.  So, as I said
18 earlier in the committee, when a partisan such as you
19 or I look at a political map, some of us see an evil
20 sinister gerrymander if it doesn't meet the objectives
21 that we would like for it to meet.  And some see it as
22 a work of art or a work of good public policy.  So I
23 would submit to you that the map was drawn based on the
24 criteria adopted by the committee, and is, in fact,
25 good public policy.

30

1      REP. MARTIN:  Thank you, Representative Lewis.
2  And, Mr. Speaker, to see if the gentleman would yield
3  to another question.
4      SPEAKER MOORE:  Does the gentleman from Harnett
5  yield to an additional question from the gentleman from
6  Wake?
7      REP. LEWIS:  I yield.
8      SPEAKER MOORE:  He yields.
9      REP. MARTIN:  And I apologize, Mr. Speaker, you
10  can rule me out of order pretty quickly, but a slight
11  editorial comment.  Representative Lewis and I are both
12  fathers, and I will note that when our babies made
13  their first production in their diaper, we think it is
14  beautiful also.  And I will withdraw that, and with it,
15  an apology.
16      Representative Lewis, the next question I would
17  have for you is do you believe that a partisan
18  gerrymander -- that -- I will restate that.  That a
19  plan that would elect ten Republicans and three
20  Democrats in a state that is much more evenly divided
21  in electorates would violate the U.S. Constitution or
22  our State Constitution?
23      REP. LEWIS:  Thank you for that question,
24  Representative.  To be clear, when I went through the
25  criteria earlier, we did not look at political

31

1  registration because we believe that election results,
2  election outcome are much better predictors of how the
3  people actually vote than partisan registration is.  I
4  mean, you and I have had conversations in the past
5  about the continued growth of the total percentage of
6  voters that choose to list themselves as unaffiliated.
7  We have talked about that in the past.  So we believe
8  that we looked at the political results of past
9  elections and have been able to produce a map that will
10  still require the political parties or the individual
11  seeking to be elected within those districts to offer a
12  good solid candidate who can appeal to their base, be
13  it Democrat or Republican, but also be able to appeal
14  to the ever-growing unaffiliated.  So, we believe that
15  while -- and I freely acknowledge that I sought
16  partisan advantage as based on the criteria in drawing
17  this map.  We do believe that the map has been drawn in
18  a fair and open attempt to comply with the court
19  ruling.
20      REP. MARTIN:  Mr. Speaker, to see if the
21  gentleman would yield to another question.
22      SPEAKER MOORE:  Does the gentleman from Harnett
23  yield to an additional question from the gentleman from
24  Wake?
25      REP. LEWIS:  I yield.

32

1      SPEAKER MOORE:  He yields.
2      REP. MARTIN:  Thank you, sir.  Representative
3  Lewis, my question actually is intended to get more at
4  the issue not of partisan registration but actual
5  election results, and more specifically, election
6  results in congressional elections since we are talking
7  about congressional districts here.  So my question is,
8  do you believe that it is constitutional under the
9  federal and the state constitutions to draw a plan, to
10  have a plan that elects ten Republicans and three
11  Democrats where election results of the past several
12  cycles are much more -- would suggest a much more --
13  are much closer than a ten to three margin?
14      REP. LEWIS:  Thank you for that question,
15  Representative.  And let me try to answer it a
16  different way.  But for the criteria adopted by the
17  committee which instructed the map drawers to do
18  certain things like try to maintain compactness, try to
19  make, you know -- take incumbency into account, try to
20  make the districts look more compact, be more compact,
21  keep more counties compact, we could have been much
22  more aggressive partisan-wise trying to obtain a map
23  that would elect 11 Republicans.  But you can't really
24  do that if you simply consider partisanship as a part
25  of the criteria adopted by the committee, which is what

33

1  we did.
2      REP. MARTIN:  Mr. Speaker, to see if the
3  gentleman would yield to another question.
4      SPEAKER MOORE:  Does the gentleman from Harnett
5  yield to an additional question from the gentleman from
6  Wake?
7      Actually before the gentleman does -- before
8  these students leave, the students up on the right, the
9  Chair wanted to recognize a group of elementary
10  students from Easley Elementary School in Durham.
11  Would you all please stand so that we can welcome you
12  and thank you for being with us today.  From Durham
13  your representatives are Representative Hall,
14  Representative Michaux, I believe Representative Meyer
15  has part of Durham.  Am I missing anybody?
16      REP. MICHAUX:  Luebke.
17      SPEAKER MOORE:  Representative Luebke is not
18  here, I don't think.  So those are your representatives
19  also.  Thanks for being with us today.
20      Sorry for the interruption.  I believe the
21  gentleman from Wake was stating a question at this
22  point.  The gentleman from Wake has the floor to
23  continue propounding the question to the gentleman from
24  Harnett.
25      REP. MARTIN:  Thank you very much, Mr. Speaker.

## 34

Representative Lewis, the question I'm going to ask is an attempt to restate the question I've previously asked, and the fault is all with me for not stating it clearly. You've produced a district with ten Republicans, likely to elect ten Republicans and three Democrats. You stated, I think, just stated that you could have even done 11 Republicans and two Democrats, and I am trying to understand and get an answer from you as to whether or not you think that the plan you have now with the partisan result it has, in light of congressional election results of North Carolina, is constitutional?

REP. LEWIS: Representative, thank you for that question. As -- and I'm not trying to sound like a broken record. I know that you're an attorney. I'm not. I will tell you that the committee adopted criteria, one of which was to seek partisan advantage for the Republicans. Now, if you ask me personally if I think that is a good thing, I will tell you I do. I think you are a great man. I think you are a fine public servant. I think electing Republicans is better than electing Democrats. So I drew this map in a way to help foster what I think is better for the country.

REP. MARTIN: Mr. Speaker, to see if the gentleman would yield to another question.

## 35

SPEAKER MOORE: Does the gentleman from Harnett yield to an additional question from the gentleman from Wake?

REP. LEWIS: I yield.

SPEAKER MOORE: He yields.

REP. MARTIN: Thank you, Mr. Speaker. And let me add for the record that I think the gentleman from Harnett is a fine public servant also with the interest in the public at heart, and to boot, he has wonderful hair also.

Mr. Speaker and members, I do feel that we have a tendency to treat questioning on the floor of the General Assembly like a cross-examination. We've heard the adage, physician heal thyself. I think in this case lawyer heal thyself is appropriate. So I don't want to turn this into a cross-examination, but I've tried to answer the question about his opinion on the constitutionality of a partisan gerrymander. I don't think it has been answered, but to avoid this from turning into cross-examination, I would like to move on to another question. And that question is, Dr. Hofeller and anyone else involved in the map drawing, what data did they use to meet your stated criteria of attempting to get a ten to three Republican advantage?

REP. LEWIS: Well, thank you for that question,

## 36

Representative. On every member's desk and also before every member in the committee, the Joint Committee, the Committee in the Senate, and the Committee in the House, is a stat pack, if you will, that lists a variety of races that over 2008, 2010, and 2014, we list out all of the political contests that were used. I'll be happy, if you would like me to, to let you know which ones they were, but I think it's pretty clear to the members and on the record which political contests we used. Just real quick, Attorney General 2008, Commissioner of Agriculture 2008, you know, in fact -- yeah, I mean, we used a variety of political contests from 2008 through 2014, all of which we provided to the members on their desk.

REP. MARTIN: Mr. Speaker, to see if the gentleman would yield to another question.

SPEAKER MOORE: Does the gentleman from Harnett yield to an additional question from the gentleman from Wake?

REP. LEWIS: Yes, sir, I yield.

SPEAKER MOORE: He yields.

REP. MARTIN: Thank you, Mr. Speaker. And Mr. Speaker, the gentleman from Harnett has been most gracious with his time in committee, in several committee meetings over going through the lists and

## 37

explaining what the races are and what the codes meant. But I do want to ask just a couple of clarifying questions on that if I could. Representative Lewis, would it be accurate to say that the mapmakers considered every one of the races that's listed in the charts that were presented at committee several times.

REP. LEWIS: Yes, sir.

REP. MARTIN: And another question, Mr. Speaker.

SPEAKER MOORE: Does the gentleman wish to ask an additional question?

REP. MARTIN: Yes, sir.

SPEAKER MOORE: And does the gentleman from Harnett yield to an additional question?

REP. LEWIS: Yes, sir.

SPEAKER MOORE: He yields.

REP. MARTIN: Thank you, Mr. Speaker. And, Representative Lewis, are there any races that are not listed on these charts that the mapmakers considered?

REP. LEWIS: No, sir.

REP. MARTIN: Mr. Speaker, to see if the gentleman would yield to another question.

SPEAKER MOORE: Does the gentleman yield to an additional question?

REP. LEWIS: I yield.

**38**

1     SPEAKER MOORE: He yields.

2     REP. MARTIN: Thank you, Mr. Speaker. Thank

3 you, Representative Lewis. In looking at those

4 different races, did you weigh, for example, the

5 results in lieutenant gubernatorial elections equally

6 with those of say a gubernatorial election?

7     REP. LEWIS: Thank you for that question,

8 Representative. I think it is important to understand,

9 the races that we used were statewide. We were trying

10 to get, you know, the broadest swath of data that would

11 apply equally in every district. I've had a couple of

12 members say, well, why didn't you look at the race for

13 Congress and whatnot, and it was just too hard to

14 figure out how the data -- you know, for districts that

15 have changed over time would work. So in terms of did

16 we weigh them equally, to be candid with you, I think

17 that those of us that spend way too much time in

18 politics know that certain races, maybe weren't as

19 equal as they should be because one party or the other

20 either had a nonincumbent candidate that was trying to

21 seek the office, which we believe -- you know, I'm sure

22 you would agree, that most of the time, most the time

23 incumbency is an advantage. Sometimes it might have

24 been an underfunded campaign. So we looked at all of

25 them, but, no, my gut would tell me that I would gain

**39**

1 more or garner more by looking at the Governor's

2 results than I would the Lieutenant Governor's results

3 and so on. But we looked at all of them and tried to

4 blend the results. I mean, you know, frankly they

5 don't always come up like we want them to. The

6 Attorney General, the Democratic nominee for AG has won

7 in all 13 of these. So certainly the strength of the

8 candidate, if that is what you're trying to ask,

9 certainly that matters.

10     REP. MARTIN: Mr. Speaker, to see if the

11 gentleman would yield to another question.

12     SPEAKER MOORE: Does the gentleman from Harnett

13 yield to an additional question from the gentleman from

14 Wake?

15     REP. LEWIS: I yield. Yes, sir.

16     SPEAKER MOORE: He yields.

17     REP. MARTIN: Thank you, Mr. Speaker. I would

18 like to thank the gentleman from Harnett for his

19 patience also.

20     SPEAKER MOORE: Representative Martin, I

21 apologize, the gentleman's time has expired. The Chair

22 will, however, at the Chair's discretion will allow the

23 gentleman to ask one additional question.

24     REP. MARTIN: I would be happy to yield in my

25 time if that is permissible under the rules because

**40**

1 this is my fault.

2     SPEAKER MOORE: It is actually the gentleman's

3 time spending to ask the question. But the Chair will

4 give the gentleman one additional question.

5     REP. MARTIN: Thank you, Mr. Speaker.

6 Representative Lewis, the question I would ask is, do

7 you believe under these maps that African American

8 voters have a reasonable opportunity to elect a

9 candidate of their choice in any of the districts

10 you've drawn? And if so, which of those districts do

11 they have such an opportunity? And if so, how did you

12 determine that?

13     REP. LEWIS: Thank you for that question,

14 Representative. As I've said before, the criteria that

15 we used in drawing these maps has been spelled out.

16 One of those criteria was not race. Race was not

17 considered in the drawing of these maps. I do not know

18 what the racial composition of the voters that reside

19 in these districts is. So I don't feel that is a

20 question that I can give a direct answer to as race was

21 not among the criteria considered when we drew these

22 maps, based on our understanding of the Harris case,

23 which said that racially polarized voting did not

24 exist. Thank you.

25     SPEAKER MOORE: And, Representative Martin,

**41**

1 should the gentleman wish additional questions, the

2 gentleman will be recognized a second time for that in

3 just a bit if the gentleman so desires.

4     For what purpose does the lady from Buncombe,

5 Representative Fisher, arise?

6     REP. FISHER: To ask a question of the bill

7 sponsor, please.

8     SPEAKER MOORE: Does the gentleman from Harnett

9 yield to the lady from Buncombe?

10     REP. LEWIS: Yes, sir. I yield.

11     SPEAKER MOORE: He yields.

12     REP. FISHER: Take a breath, Representative. I

13 know you've been on the spot for a little while, but I

14 appreciate your taking a moment to answer. I had a

15 concern passed along to me and because it happens to

16 deal with my district, which I thought was kind of

17 unusual because I thought that this was only going to

18 deal with a couple of congressional districts, but it

19 seems like it is stretching even further west. Can you

20 tell me why, for example, Calvary Baptist Church area

21 on Haywood Road in West Asheville might have been moved

22 from the 10th to the 11th district?

23     REP. LEWIS: Thank you for the question,

24 Representative. And sadly, while I know you represent

25 one of the most beautiful parts of our state, I am not

42

1  immediately familiar with the church that you
2  referenced.  I will tell you that the changes that were
3  made in Buncombe County were to equalize population
4  that had been moved around because other districts were
5  redrawn.
6      REP. FISHER:  A follow-up.
7      SPEAKER MOORE:  Does the gentleman from Harnett
8  yield to an additional question from the lady from
9  Buncombe?
10     REP. LEWIS:  Yes, sir.  I yield.
11     SPEAKER MOORE:  He yields.
12     REP. FISHER:  And I think then from your
13 answer -- from your previous answer, that I can assume
14 that the same would be true for having moved part of
15 Biltmore Forest in Asheville to the 11th, east of
16 Sweeten Creek Road, from the 11th to the 10th.  And
17 then an area of North Asheville in Woodfin from the
18 10th to the 11th; am I assuming correctly?
19     REP. LEWIS:  Thank you for the question,
20 Representative.  The reason that we would have divided
21 counties would have been one of the criteria that was
22 listed earlier and considered by the committee.  I have
23 a map on my desk that shows only whole VTDs of Buncombe
24 County.  I'm afraid I just don't know -- my wife
25 actually fussed at me because I've been gone for two

43

1  weeks doing this.  She would like to go to Grove Park
2  this weekend.  So maybe I could visit Biltmore Forest
3  when I'm there, but I don't that we're going to be able
4  to make it.
5      REP. FISHER:  Well, I hope you'll be able to.
6  There's a great Arts and Crafts Mission Furniture
7  Conference going on there right now that my daughter
8  helped plan.  But I think --
9      SPEAKER MOORE:  Does the lady wish to ask an
10 additional question?
11     REP. FISHER:  I would like to speak on the bill
12 for just briefly, Mr. Speaker.
13     SPEAKER MOORE:  The lady is recognized to
14 debate the bill and to do a public service announcement
15 for Asheville as well.
16     REP. FISHER:  Sure, I can do an advertisement
17 anytime.  I'm very proud of my town.  I appreciate the
18 representative taking the time to try to address my
19 questions.  But the point, I guess, I would like to
20 make in having asked the questions in the first place
21 is that we are, again, embarking on an exercise that
22 will further confuse the voters.  I know from having
23 listened to the four or so hours of the public hearing
24 that we had several examples of people who have gone to
25 their polling places, filled out their ballot, only to

44

1  find out that they didn't know who their congressperson
2  was.  So they were surprised to see either one name or
3  another on their ballot.  They thought that this person
4  was their Congressperson, but it turns out it was
5  somebody else.  And I would just caution us that if
6  we're going to have to do this, there needs to be some
7  way, some efficient way, to educate the voters about
8  the changes that are being made.  And try to make it
9  easier for them to do what is their right to do, which
10 is exercise their vote.  So, I just felt it important
11 to make the body aware, or again aware, of how
12 difficult this whole thing is making it for the voters
13 in North Carolina.  Thank you, Mr. Speaker.
14     SPEAKER MOORE:  Members, I hope you'll join me
15 in welcoming, we have another school group with us
16 today.  We have students from the Longleaf School of
17 the Arts here in Raleigh with us.  If you all would
18 please stand and let us welcome you.  Thank you for
19 being with us today.
20     For what purpose does the lady from Wilson,
21 Representative Farmer-Butterfield, arise?
22     REP. FARMER-BUTTERFIELD:  To speak on the bill.
23     SPEAKER MOORE:  The lady has the floor to
24 debate the bill.
25     REP. FARMER-BUTTERFIELD:  Thank you,

45

1  Mr. Speaker.  I feel compelled to speak on this as an
2  African American.  If I think about redistricting for
3  me in my district, I went from Wilson and Edgecombe to
4  Wilson and Pitt.  My constituents from Edgecombe and
5  Wilson were reluctant about the change in terms of
6  redistricting as it related to my having Pitt County.
7  But if I look back, I am happy with Pitt County and I
8  consider it a blessing that I was able to move from
9  Wilson, Edgecombe with experience and represent the
10 economic engine of the East in Pitt County.
11     So today in looking at the congressional
12 districts, I want to talk about the process.  Public
13 hearings were convened before the release of draft maps
14 for the public to view.  Was that really cost efficient
15 and necessary?  Nothing was available for the public to
16 respond to.  Why would we do that?  Let's talk about
17 moving from one extreme to the other.  In drawing the
18 initial maps, we went from African Americans exceeding
19 50 percent in those districts, the two key districts
20 that we're talking about that have been changed.  Now,
21 we are looking at no consideration at all for race.
22 It's overreaching in that the maps guarantee election
23 of ten Republicans and three Democrats so it said.
24 Democrats are 43 percent of the voters in this state
25 and only given an opportunity for three districts for

Case 1:13-cv-00949-WO-JEP   Document 159-2   Filed 03/07/16   Page 12 of 23

46

1    Congress doesn't seem balanced at all. In fact, one of
2    the districts that was recently drawn, we were told
3    that it was leaning Republican. What about
4    legislators, are they required to protect minority
5    communities from racially polarized voting patterns?
6    Yes, they are. Voter discrimination matters. If,
7    indeed, public hearings mattered and the input of
8    African Americans had been taken into consideration,
9    perhaps we would not be in this position we are in
10   today. In fact, I know we would not be in the position
11   we are in today.
12       Finally, when the leadership was asked in
13   committee this morning if the map was drawn prior to
14   the public hearings held on Monday and prior to the
15   criterion being decided on Tuesday the response was, I
16   can't say. So given all of these factors I share with
17   you, I ask that you vote against these maps that have
18   been redrawn. Thank you.
19       SPEAKER MOORE: For what purpose does the
20   gentleman from Forsyth, Representative Hanes, arise?
21       REP. HANES: To ask the bill sponsor a question
22   and to speak on the bill.
23       SPEAKER MOORE: Does the gentleman from Harnett
24   yield to the gentleman from Forsyth?
25       REP. LEWIS: I yield.

47

1    SPEAKER MOORE: He yields.
2    REP. HANES: Representative Lewis, let's talk
3    about race for just a second, and some of the
4    representatives here know that I like this
5    conversation. And I fashion myself as a person who can
6    do it -- talk about race without getting racial. So I
7    want to ask you a question, and it is a little nuanced
8    from the questions that have been asked to you
9    regarding race this morning. Representative Lewis,
10   does race impact the maps that have been drawn? The
11   question is not did you consider race, but does race
12   impact the maps that have been drawn?
13       REP. LEWIS: Thank you for the question,
14   Representative. All I can tell you is that race was
15   not a consideration when the maps were drawn. I am
16   not, to be candid with you, sure I truly understand the
17   nature of the nuanced question.
18       REP. HANES: Okay. Okay. Thank you.
19   Mr. Speaker, to speak on the bill, please.
20       SPEAKER MOORE: The gentleman from Forsyth has
21   the floor to debate the bill.
22       REP. HANES: So, ladies and gentlemen, let's
23   have a brief conversation about race, and it goes all
24   of the way back to the beginning. So as you know, in
25   the beginning God created heaven and earth. He created

48

1    man and woman and said, this is good. And then he
2    created America, and he said, I like that too. And
3    then black folk and white folk got together in a most
4    disagreeable one-sided contract negotiation. And I can
5    assure you that both black folk and white folk got to
6    America on a boat. Okay? And over the years black
7    folk, my folks, continued to have disagreement about
8    this contract that we got brought into here. And over
9    the years we got our freedom. Representative Michaux
10   was elected to the House of Representatives, and here
11   we are today talking about race and elections.
12       The question I asked was, does race impact this
13   map? That is either directly or indirectly. And the
14   answer is, of course it does: of course it does. What
15   we have here is we have Democrats submerged in majority
16   Republican districts, ten of them, and Republicans
17   submerged in majority Democratic districts, three of
18   them. Of course, it matters. If you look at the
19   numbers for the state, there are 1.9 million
20   Republicans: 95 percent of them are white. The
21   2.6 million Democrats: 41 percent of them are black.
22   So saying in some way that we did not use race is
23   frankly just simple subterfuge toward achieving a
24   broader goal. And that is a goal that was admitted
25   during our committee, and that goal was the maintenance

49

1    of districts that disenfranchise Democrats. And in
2    many ways, whether that is intentional or not, those
3    districts silenced the voices of people who look like
4    me.
5        Two of the largest minority populations in this
6    state, Forsyth and Guilford County, have been silenced
7    with regard to congressional politics. We could have
8    gone nine to four, with a district there in the Triad
9    maintained Representative Alma Adams, and we could have
10   achieved this goal of eliminating the serpentine
11   districts, as we've called them, of the 12th district.
12   And we could have been gone away from here hours ago.
13   We chose not to do that, and we continue to think about
14   these maps as not impacting race.
15       Let me just make one more statement, and it is
16   from a op-ed I wrote in the Winston-Salem Chronicle
17   this week. And I want to read for you the last
18   paragraph of that statement as it regards to how we
19   need to think about and how race actually does matter,
20   you know, for us. I said, "Black people are, in fact,
21   people and should be counted in the whole! Our lives,
22   our voices, and our votes matter from Murphy to Manteo.
23   We are part of the fabric of North Carolina and have
24   earned our right to representation through
25   constitutionally consistent districts in every corner

## 50

1   of this state. We paid for that right by whip, through
2   blood, by protest, and through eventual freedom. It is
3   never the wrong time to do the right thing." Thank
4   you.
5       SPEAKER MOORE: For what purpose does the
6   gentleman from Rockingham, Representative Jones, arise?
7       REP. JONES: To debate the bill.
8       SPEAKER MOORE: The gentleman has the floor to
9   debate the bill.
10      REP. JONES: Thank you, Mr. Speaker. Ladies
11  and gentlemen of the House, I have to say that I have
12  been quite fascinated with so many aspects of this
13  debate, and discussion throughout the committee process
14  and today on the floor, and I just want to speak to
15  that a little bit. You know, as someone who has lived
16  in the state of North Carolina for all of my life and
17  has been kind of a student of election history over the
18  past few decades in particular, I continue to be quite
19  fascinated and have really enjoyed this conversation,
20  particularly when we have heard about gerrymandering.
21  And I think it behooves us a little bit to consider
22  maybe a little trip down memory lane when we think
23  about gerrymandering. Because, quite frankly, I'm not
24  sure that a lot of people knew that the word was
25  invented until Republicans took the majority in 2010.

## 51

1   I never really heard it reported on very much through
2   the media. I never heard it spoken about in the
3   General Assembly. I thought it was fascinating as we
4   were in committee this week as we saw the maps up on
5   the wall that went all the way back to 1992 at least.
6   I also happen to recall a time that the state
7   legislature looked very different than it does today.
8   And, you know, there was no stone unturned. We
9   remember a time of single-member districts and
10  two-member districts and three-member districts and
11  four-member districts. You know, whatever it took to
12  keep the majority in the time at the majority that
13  seemed to be fine. And so a lot of the voices that I
14  hear today representing the minority party that used to
15  be in the majority, I have to wonder, you know, where
16  were those voices in the Democratic Party for decades
17  and decades and decades?
18      You know, I've heard it also a lot of
19  complaining about the fact that there are ten
20  Republican congressman and three Democrats. That there
21  currently are and that these maps as, Representative
22  Lewis has been very candid and transparent and honest,
23  something that I for one greatly appreciate, and
24  would've greatly appreciated that conversation over the
25  decades. So thank you, Representative Lewis, for your

## 52

1   honesty and integrity and transparency in coming right
2   out and saying that, yes, I do believe as we adopted in
3   the committee that there was an attempt made at that
4   partisan advantage. And I keep hearing the complaints
5   from the other side that enjoyed that partisan
6   advantage because of gerrymandering for so many
7   decades.
8       I would just remind the members of this body
9   that if you look over the last 40 years and see how
10  North Carolinians have voted consistently in federal
11  races, I would remind you that in eight of the last
12  nine presidential elections, they have voted
13  Republican. That is 89 percent of the time. And I
14  would remind you that you may not know that in the last
15  16 United States Senate races in North Carolina, 13 of
16  those races went Republican. That was 81 percent of
17  the time. So to me, I don't see a problem in thinking
18  that if you have ten Republicans and three Democrats,
19  which is 77 percent, you might could make the argument
20  that Republicans are underrepresented. But the point
21  of the matter is these maps are not your problem. The
22  problem is that your national party has left the values
23  of the majority of the people in North Carolina. And I
24  would take you back to the 2010 election of the
25  legislature when this Republican majority gained its

## 53

1   majority by 16 votes. Those were under maps that the
2   Democrats drew. And fortunately, we had court cases
3   over the years that eliminated the two and three and
4   four-member districts, and we have the pod system now
5   where you can't just divide counties wherever. But I
6   would just remind the listeners and the voters and the
7   students from North Carolina to study your history and
8   to understand when you hear all these comments and all
9   these complaints about gerrymandering, well, we sat at
10  the master's feet for decades and perhaps some people
11  learned something. But I would suggest that they are
12  fair. Okay? I understand the Democrats don't like it.
13  The Republicans didn't like the map for decades, but
14  they are fair, they are legal, and they are by the
15  rules.
16      And finally, ladies and gentlemen, I would not
17  accept that Democrats cannot be elected in these
18  districts. If you look at the voting data before you,
19  for instance, we mentioned this in committee, the 2008
20  election for the Attorney General, the Democrat won 13
21  out of 13 of these congressional districts. You go
22  down the line, the State Auditor, the Democrat won 9 of
23  13 of these districts. I believe the Commissioner of
24  Insurance won a majority of these districts. And so,
25  ladies and gentlemen, I would submit that the people of

## 54

1  North Carolina are not robots. They have the perfect
2  opportunity to elect the candidate of their choice, and
3  they can and they do cross party lines whenever they
4  feel it necessary. They look at the candidates. And
5  so I would suggest that we trust the voters of North
6  Carolina to go out there and make their choice.
7  Recognize that we are putting forward fair and legal
8  maps based on what the courts have directed us to do,
9  and I commend, for one, the people who have worked
10  very, very hard. I want to mention once again the
11  staff that has worked hard, the people that have worked
12  hard to put this forward. We have been given a very
13  difficult task in a very short period of time, and I
14  think we should be proud of the process and the
15  results. Thank you, Mr. Speaker.
16      SPEAKER MOORE: For what purpose does the
17  gentleman from Cumberland, Representative Floyd, arise?
18      REP. FLOYD: Inquiry, with the Chair.
19      SPEAKER MOORE: The gentleman may state his
20  inquiry.
21      REP. FLOYD: It is a very simple inquiry, Mr.
22  Chair. Are we going to meet the 5:00 deadline?
23      SPEAKER MOORE: One way or another.
24      For what purpose does the gentleman from
25  Haywood, Representative Queen, arise?

## 55

1      REP. QUEEN: To speak on the bill.
2      SPEAKER MOORE: The gentleman has the floor to
3  debate the bill.
4      REP. QUEEN: You know, we have heard a lot of
5  good points being made, but whenever your criteria is
6  for political advantage, this General Assembly is
7  disenfranchising voters. Where politicians get to
8  select their voters versus voters selecting their
9  politicians, something is awry.
10      Now, Representative Jones was talking about
11  history and the 2010 election was a historic one
12  because it was the first election since Citizens United
13  was passed, and there was about $20 million that was
14  never in our elections that swung a lot of them. I was
15  in that election, and I experienced that tsunami of
16  outside money. So things have historically affected
17  races, but for this body to work on a bill that
18  basically empowers the politicians, not the citizens,
19  for the vote when the absolute foundation of our system
20  is one vote per citizen and every vote is equal. I
21  think if there was a -- or I will just -- I'll say, how
22  does -- whenever you do that, whenever you gerrymander
23  in a manner that we are speaking and in the manner it
24  was done after the last census by this body, how does
25  that affect the voters' trust in the system? Will

## 56

1  their vote count equally or have they been
2  disenfranchised by the drawing of the district that
3  they live in where their vote really won't count in
4  that particular district? And one of the things that
5  I'll use as a data point on that is registered voters
6  self-identify themselves in this state, over
7  2.76 million Democrats and 2.01 million Republicans.
8  The democrats self-identify, but they are
9  disenfranchised in many of their districts by the
10  gerrymandering that has gone on. If we want to make
11  voting a truthful one vote per person, we need to
12  recognize every vote should count equally. I don't
13  think we're doing that here. I think it is clearly the
14  criteria that has been stated, been stated quite
15  clearly that that's not what we're doing, but that is
16  what we should be doing. So that's that point. The
17  second one is, in my region I would contend the
18  criteria that should be in addition to one vote per
19  citizen and every vote counts equally, that should be
20  certainly the criteria, the first one. The second one
21  is communities of interest should be contained in this
22  compactness. And I live in the mountains, as you all
23  know, and we have one urban core, one city, Asheville,
24  a wonderful city, that has been the center of our
25  mountain region since our state was founded. It has

## 57

1  grown to be a fabulous center. Well, the
2  gerrymandering last time that the courts have thrown
3  out -- or -- has taken our urban core away from our
4  region. So our congressman does not have the city of
5  his region in his district. So whether he's a Charles
6  Taylor or Heath Shuler, he's Democrat or Republican,
7  because you know the 11th district has flipped back and
8  forth for decades, but we always had a unified district
9  with our urban core in it. But for complete political
10  advantage, our congressional district has been neutered
11  from its urban core, and we all know that the urban
12  cores drive the economics of regions. So for these two
13  reasons I think this is a very unfortunate bill because
14  neither of these important issues, communities of
15  interest and one vote per citizen, are embodied in the
16  criteria that have been used to draw it. Thank you.
17      REP. STAM: Mr. Speaker.
18      SPEAKER MOORE: For what purpose does the
19  gentleman from Wake, Representative Stam, arise?
20      REP. STAM: Would Representative Queen yield
21  for one question?
22      SPEAKER MOORE: Does the gentleman from Haywood
23  yield to the gentleman from Wake?
24      REP. QUEEN: I will.
25      SPEAKER MOORE: He yields.

58

1      REP. STAM: Representative Queen, I chaired our
2  State Platform Committee for a few years; it's
3  available. Have you ever thought of maybe changing the
4  policies and platform of your party so that you would
5  attract voters?
6      REP. QUEEN: I try to speak to the needs of the
7  citizens in this state every day, Representative Stam.
8      SPEAKER MOORE: For what purpose does the
9  gentleman from Wake, Representative Martin, arise?
10     REP. MARTIN: Mr. Speaker, I think to speak a
11  second time.
12     SPEAKER MOORE: The gentleman is recognized to
13  speak on the bill a second time.
14     REP. MARTIN: Thank you very much, Mr. Speaker.
15  Members, I'll leave the gentleman from Harnett alone
16  now. He was good to indulge me in a long series of
17  questions. But I do want to respond to a couple of
18  statements that were made both in the course of this
19  debate and throughout the committee debate and also to
20  the press.
21     There has been a contention made somehow that
22  Democrats failed to participate in this process, that
23  we offered no alternatives, and nothing could be
24  further from the truth. We offered several
25  amendments -- which I think I'm correct in saying that

59

1  the record will show were opposed by every single
2  Republican member of the committees. In those
3  committees the Democratic members of the committee told
4  you that you needed to draw districts that gave
5  minority voters the opportunity to elect candidates of
6  their choice, that you have said that you refuse to
7  even consider that data. The Democratic members of
8  these committees told you that they thought it was
9  important to keep Representative Alma Adams, a highly
10  capable minority member of the North Carolina
11  Congressional Delegation, a district in which she has a
12  hope of getting reelected, but you declined to
13  incorporate that request. We told you that it is
14  important to consider one of the basic principles of
15  redistricting, communities of interest, which you heard
16  the gentleman from Bladen, Representative Brisson, I
17  think elude to in his comments and also the gentleman
18  from Forsyth, Representative Hanes, talk about also.
19  But you declined to incorporate that input. And
20  without a doubt, we told you that we did not want to
21  see a partisan gerrymander. Yet you shamelessly and
22  proudly got up and proclaimed that that was exactly
23  what you were going to do. We participated in full;
24  you just chose to ignore our participation. Anyone who
25  says differently is selling something.

60

1      The gentleman from Rockingham, Representative
2  Jones, also talked about the importance of history, and
3  any Democrat that gets up and tells you that Democrats
4  have not participated in partisan gerrymandering
5  doesn't know what they're talking about and is paying
6  no attention to history. But that's a very 20th
7  Century way of looking at things, and it is not what
8  the public in North Carolina in the 21st Century wants
9  to hear. Folks, people are turning away from your
10  party and mine.
11     Representative Stam's comment about platforms
12  and so forth was from out of nowhere. Democrats have
13  had success in elections as much as Republicans. I
14  think the statistics show and the consensus is we are a
15  purple state now, but in the end, we are a state that
16  is losing a partisan flavor because voters are turning
17  away in droves from you and us. The leading candidate
18  right now for your presidential nomination is a guy who
19  gave significant amounts of money to Hillary Clinton,
20  the leading candidate for my party's nomination. The
21  other leading candidate for my party's nomination is a
22  senator who was unaffiliated until 2015. That should
23  tell both of our parties something. We ignore what the
24  voters are telling us at our peril. They do not want
25  to see partisan gerrymanderers like what the Democrats

61

1  used to do and what the Republicans are doing now.
2      Now, I was not here the last time Democrats
3  drew statewide districts, but I was here and
4  participated significantly in drawing the Pender and
5  New Hanover districts, which were ordered by the
6  courts. That district came into my committee with a
7  two to one Republican advantage, and it left with a two
8  to one Republican advantage. There was probably no way
9  for us to screw with the partisan mixture of that, but
10  we didn't. And it left -- I think it is safe to say,
11  with the two Republican members from those counties
12  very satisfied with the result. So don't try to lay
13  the guilt of the Democratic party's past on me. I can
14  say that I never have and never will support partisan
15  gerrymandering, and I think it is safe to say that a
16  good number of my colleagues on the other side of the
17  aisle joined me in that also.
18     So folks, let's join together and at least
19  acknowledge that the public does not think that the
20  definition of fair is the childish statement, you did
21  it first. These districts are going to pass just like
22  the gerrymandered districts that Democrats did in the
23  past passed also. I'm under no illusions that we have
24  the ability to stop it. But next time we have the
25  chance to do this, let's find a better way.

## 62

1  SPEAKER MOORE: For what purpose does the
2  gentleman from Durham, Representative Michaux, arise?
3  REP. MICHAUX: To ask Representative Lewis a
4  question.
5  SPEAKER MOORE: Does the gentleman from Harnett
6  yield to the gentleman from Durham?
7  REP. LEWIS: I yield.
8  SPEAKER MOORE: He yields.
9  REP. MICHAUX: And, David, honestly, this will
10 be my last question to you. In drawing the maps, was
11 anything made or said or asked to what extent we must
12 preserve the existing minority percentages in order to
13 maintain the minority's present ability to elect its
14 candidate of choice?
15 REP. LEWIS: Representative, thank you for the
16 question. It is my understanding of the Harris
17 decision that they did not find the tests were met that
18 racially polarized voting existed and, as such, we did
19 not consider race in any way when we drew these
20 districts.
21 REP. MICHAUX: Thank you.
22 SPEAKER MOORE: For what purpose does the
23 gentleman from Cumberland, Representative Lucas, arise?
24 REP. LUCAS: To speak briefly on the bill.
25 SPEAKER MOORE: The gentleman has the floor to

## 63

1  debate the bill.
2  REP. LUCAS: Thank you, Mr. Speaker. Ladies
3  and gentlemen, I have sat here very attentively as I
4  have contemplated what we are about to do. And that
5  is, we are about to sanction maps that will identify
6  folk who will represent us in the United States
7  Congress. And I would have to say that we should live
8  in a democracy. We do live in a democracy. And when
9  you live in a democracy, our personal feelings and
10 doubts ought to be superseded by what is best for our
11 people. And I'm not so sure that I'm getting that.
12 I've heard some snide snickering. I've heard some
13 snide remarks about, well, you all gerrymandered, so
14 therefore, we're going to do it. Well, if it was wrong
15 then, it is wrong now. Let's do what's right by the
16 people of this great state of North Carolina. They
17 deserve better than this. It is not about partisan
18 bickering. I am saddened to see that we're turning it
19 into that. It should be about who can best do the job
20 for the people of this great state. And people who
21 live in this state, many of them are now saying I don't
22 care whether you are identified as a Democrat or as a
23 Republican. They want to be identified as a citizen,
24 an independent. And they want to have good
25 representation. And that model is trending more and

## 64

1  more, and the more we sit here and bicker, the more
2  we're going to see that trend grow.
3  We, last session, I thought were on the right
4  track here in the House when we voted to have an
5  independent commission draw boundary lines, and I
6  thought that was great. I wish that we could get the
7  Senate on board to do the very same thing. That is the
8  most honest and the fairest way to get what we want to
9  have done accomplished. Let's get serious about this;
10 let's stop this partisan bickering; let's move on for
11 the state of North Carolina. Thank you.
12 SPEAKER MOORE: For what purpose does the
13 gentleman from Durham, Representative Hall, arise?
14 REP. L. HALL: To speak on the bill.
15 SPEAKER MOORE: The gentleman has the floor to
16 debate the bill.
17 REP. L. HALL: Thank you, Mr. Speaker. And I
18 want to certainly give thanks to all of those who
19 worked on these maps and have made what I will take to
20 be an effort to satisfy some different interests.
21 I referenced it yesterday when we talked about
22 what we were going to do for voting, and I want to
23 reference it again today because I think we may be
24 missing the boat on this. And I think because you
25 occupy this leadership position and the Court has told

## 65

1  you to back and draw these districts, they really
2  weren't saying come back and draw the districts for
3  yourself or to perpetuate your party's power. They
4  were under the impression, and if they didn't
5  explicitly say it, I think they meant to say it, and
6  thought you understood it, that these districts should
7  be drawn for the people of the state of North Carolina.
8  Now we've already heard people talk about the
9  statistics and whether or not there is a certain number
10 of Democrats, a certain number of Republicans and
11 almost an equal number of unaffiliated as there are
12 Republicans, certainly a much larger number of
13 registered Democrats. So we know factually,
14 statistically that is the case. Now that would be
15 turned on the head by the 10-3 districts that we've
16 drawn here now. That is a fact. We can't get around
17 it. And Representative Lewis did say that was his
18 intention, so that has been achieved. So the partisan
19 advantage has been maintained, but not really in
20 compliance with the registered voters of North
21 Carolina.
22 I heard in response to the question about
23 expert map drawers that there was some confusion that
24 maybe the Democrats had authorized or entered into a
25 contract for the person who drew these maps to be paid

66

1   from the $25,000 that the committee indicated could be
2   used by Democrats.  We did not do that.  I hope there
3   is no accounting problem, that someone gets confused
4   and thinks that the $25,000 that was supposed to be
5   authorized by the committee to Democrats had been
6   waived and authorized to be paid to the person who drew
7   these maps who we don't know how much he charged for
8   them.  But we certainly did not -- and under the terms
9   of the committee, I think it says they have to be
10  authorized and released by us.  We did not do that, and
11  I just want to make sure that is clear on the record
12  because I heard it stated otherwise.
13       Now, we've ended up with a difference without a
14  distinction here, 10-3, that was our intent to keep it
15  the way it was, and so we understand that.  Not maps
16  for the citizens, maps to keep the partisan advantage.
17  And much has been made and I understand it, that the
18  intent was to maintain this partisan advantage.  I
19  appreciate those who in this House, and that is one
20  thing we did agree on, at least the majority of us,
21  that we need a Redistricting Committee.  A lot of
22  people signed onto that bill that went out of here and
23  voted for it because we recognized we need a
24  Redistricting Committee.
25       We could have tried to do work in the spirit of

67

1   a redistricting committee, try to draw fair districts
2   for the citizens of North Carolina, try to have
3   communities of interest together so they can be
4   represented effectively and efficiently, and not make a
5   partisan advantage or make an incumbency advantage the
6   priority.  We didn't do that.
7       I want to make sure that it is clear on the
8   record as well, and there has been some reference to
9   it, I think Representative Martin who was at the
10  committee meetings when the criteria was adopted.  Now,
11  Representative Hagar said that they were working on the
12  maps for two weeks before we came to Raleigh, and that
13  was his statement in the committee.  That was before
14  the maps were even issued.  So if there was some
15  question of someone saying we can't comment as to
16  whether these maps were drawn before the criteria was
17  established, go back and check the record.  That was a
18  statement from Representative Hager, and I believe him
19  to be an honest Representative.
20       The question now is, what happened in the
21  committee?  When we adopted the criteria for the maps
22  that were already being drawn or worked on for two
23  weeks.  So you wonder, does the criteria come first, or
24  do the maps come first?  But at any rate, on the
25  timeline when we went to adopt the criteria, I think

68

1   Representative Martin already referenced it, and you
2   can go back and check the record.  That every
3   Democratic criteria that was put forward was voted down
4   along party lines, every one.  Certainly you had a
5   two-thirds one-third majority on the committee, and
6   every one was voted down.  That it is important to
7   note that one of those criteria specifically stated
8   division of counties shall only be made for reasons of
9   equalizing population, preserving communities defined
10  by actual shared interests.  That shared interest has
11  been addressed by people already, and some of you I'm
12  sure have districts but are not satisfied because
13  communities of shared interest were not respected.  And
14  Representative Brisson was certainly right to bring
15  that forward and ask that question, how did you violate
16  that principle?  Well, the answer, again, was, when
17  that request was put forward in committee, it was voted
18  down.  We take people at their word in what
19  they're saying, but we also can't live in an alternate
20  reality.
21       Race is on the ground in North Carolina based
22  on where we live, based on hundreds of years of
23  history, and Jim Crow laws and slavery and
24  discrimination and redlining.  It's there.  We see it
25  every day when we drive through communities on our way

69

1   to Raleigh.  We live it every day when we're back home,
2   and it is still there.  We talk about it in our
3   university system and other places when we do
4   budgeting.  We see it, and we know it.  So to draw
5   this plan and say we don't recognize race in North
6   Carolina, and we recognize the racial impact of the
7   plan.  But we won't say the word.  We're going to do
8   enough in theory to get by the court order, but we're
9   not going to do enough to do good service to the
10  citizens of North Carolina and respect them I think is
11  a short coming that we could do better.  So I hope, as
12  someone has already said, that we'll make sure we get a
13  redistricting commission.  We shouldn't have to have
14  this discussion.  We should be able to recognize what
15  the composition of the voters of North Carolina is,
16  what they would express, and not hold them back from
17  being able to work together and be effectively
18  represented.
19       I heard, finally, a lot of times throughout the
20  committee discussions sitting there -- and one of the
21  responses continued to be, well, when you were in
22  charge, you did it.  Now, I don't remember how many of
23  you remember Sherman and Mr. Peabody when they used to
24  get in the time machine, and they would go back in
25  history and visit all of these different places.  Well,

Case 1:13-cv-00949-WO-JEP   Document 159-2   Filed 03/07/16   Page 18 of 23

70

1    the people of North Carolina are trying to go forward,
2    and we continue to talk about rebranding this state and
3    looking at the future.  Hopefully, as Representative
4    Jones said, you learn not what to do going forward by
5    the failings of Democratic redistricting efforts.  You
6    should have learned what not to do going forward in
7    redistricting.  And so, the canority (ph) of saying,
8    well you did it so I can do it, and there should not be
9    any response is not enough.  We should be trying to get
10   better.  That is what redistricting commission is
11   about.  And so again, I hope that we will leave that
12   behind, leave it behind with the Model T, leave it
13   behind with the horse and buggy, leave it behind with
14   the flip phone.  We're not going back.  Unaffiliated
15   voters are about to eclipse registered Republican
16   voters in North Carolina.  Let's go forward.  Let's not
17   continue to use the mistakes of the past as
18   justification for making mistakes now that will affect
19   our future.  So I hope you'll vote against this bill.
20   Put us to the test to do better.  Let's free ourselves
21   from the mistakes of the past.  Let's pursue a better
22   future for the citizens of North Carolina.  Let's draw
23   a map that lets them be full participants in their
24   government.  Thank you.
25       SPEAKER MOORE:  For what purpose does the

71

1    gentleman from Rutherford, Representative Hager, arise?
2        REP. HAGER:  To speak on the bill.
3        SPEAKER MOORE:  The gentleman has the floor to
4    debate the bill.
5        REP. HAGER:  Thank you, Mr. Speaker.  You know,
6    we've said this several times.  I've said it in
7    committee and to everyone that would listen,
8    Representative Stam accused me of practicing law
9    without a license, but I think I'm okay on the floor
10   just as long as I don't do it outside of here.
11       Representative Michaux and I have talked about
12   this, you know, page 53 of the statement from the
13   three-judge court says, "A failure to establish any
14   (one) of the Gingles factors is fatal to the
15   defendants' claim."  Now, there is three thresholds we
16   talked about to meet, and I'm going to go over them
17   real quick because I've got other stuff we need to talk
18   about.  Vote dilution must meet all three of these
19   thresholds.  This report said that the vote dilution
20   has to -- as a failure of it has shown because there is
21   no voting prioritization in there.  It shows it time
22   and time again in this.  Representative Jones contends
23   that we are in violation of the Voter Rights Act of
24   Section 2, and he made the statement that sometimes
25   whites vote as a bloc.  Well, that's not one of the

72

1    criteria.  The criteria says they regularly vote as a
2    bloc, not sometimes.  Sometimes is not the requirement.
3    It's regularly.
4        Now, again, and I would like to talk a little
5    bit of what Representative Hall talked about.  I did
6    not say in committee that we had been working on the
7    those for two -- I said, you guys had the same
8    opportunity as we did to work on those.  That is what I
9    said.  You can check the record.  And you would think
10   that most folks in this body would say, well, my
11   district is a gerrymandered district because I won by
12   32 percent my first election.  Let me read you a little
13   statistics from the first election I had.  In
14   Rutherford County, there's 22,000 Democrats, 12,000
15   Republicans, and 8,000 Independents.  I agree with what
16   Representative Jones says.  People aren't dumb.
17   They're going to vote where their philosophy is.
18   They're going to vote where their values are: 22,000
19   Democrats, 12,000 Republicans, and I won by 32 percent.
20   The voters know what is going on.  They will vote with
21   their values.  The voters of the Democrats did not
22   leave the party; the party left them.
23       SPEAKER MOORE:  For what purpose does the
24   gentleman from Rockingham, Representative Jones, arise?
25       REP. JONES:  To debate the bill a second time.

73

1        SPEAKER MOORE:  The gentleman is recognized to
2    debate the bill a second time.
3        REP. JONES:  Thank you, Mr. Speaker.  I realize
4    the hour is late, and I will try to make a few brief
5    points.  I would just suggest that the minority side
6    has used the vast majority of the time in debate today.
7    So there are a few points that I think deserve to be
8    made just simply for the record.
9        First of all, briefly I would just humbly
10   suggest that we do not live in a democracy.  We live in
11   a constitutional republic.  And there is quite a change
12   about that, you know, democracy is like two lions and a
13   lamb deciding what to have for dinner.  And I would say
14   that things would look very different in our country
15   and if we were really a democracy.  But this is the out
16   workings of a system -- of a constitutional republic,
17   and that is why we are here today as representatives of
18   the people to do the work of the people.
19       Secondly, I would just say that with all due
20   respect, there is a degree of hypocrisy to stand up and
21   just suggest that this is no more than partisan
22   bickering.  Nobody is saying that, well, you know,
23   is just great that one side is doing it because the
24   other side used to do it.  But I would suggest that
25   everyone in this room, every representative in this

74

1 room, benefited from the system whether you are in the
2 General Assembly or not, and I was not in the general
3 assembly in the past decade. But in the past decade
4 and some of you in the decades before that benefited
5 from this system quite well, and I never heard a
6 complaint. I never heard a suggestion that we need to
7 change the process. We need to do something
8 differently.
9      Thirdly, I just want to reiterate, just
10 remember these three numbers, 89 percent in the last 40
11 years, the people of North Carolina have voted for the
12 Republican candidate for president 89 percent of the
13 time; 81 percent in the last 16 U.S. Senate races in
14 the last 40 years the people of North Carolina have
15 voted for the Republican candidate 81 percent of the
16 time. And then 77 percent, 77 percent is ten
17 Republicans out of 13 congressional districts. So I
18 would suggest that all of the stuff that we've heard
19 today that, in fact, that is not overrepresentation,
20 that these maps are not overrepresenting. The people
21 of North Carolina have clearly stated that on the
22 federal level, they are identifying more with the
23 Republican Party and that -- you can't gerrymander a
24 statewide election, okay? So when you --
25      REP. HAMILTON: Mr. Speaker.

75

1      SPEAKER MOORE: For what purpose does the lady
2 from New Hanover, Representative Hamilton, arise?
3      REP. HAMILTON: To see if the gentleman would
4 yield for a question.
5      SPEAKER MOORE: Does the gentleman from
6 Rockingham yield to the lady from New Hanover?
7      REP. JONES: I will gladly yield when I
8 conclude my remarks.
9      SPEAKER MOORE: He doesn't yield at this time.
10 The lady will be recognized if she would like to ask a
11 question later.
12      The gentleman from Rockingham has the floor to
13 continue debating the bill.
14      REP. JONES: Thank you, Mr. Speaker. So, the
15 point that I'm making is that I believe it is wrong to
16 suggest that a split of the three Democrats and ten
17 Republicans is somehow very unfairly wrong. This is a
18 federal election, and when you look at the federal
19 elections that we have conducted over the past 40 years
20 for the U.S. Senate and for the President of the United
21 States, it is very clear that even in a greater
22 percentage of the time, the people have voted for the
23 Republican nominee.
24      Finally, I would like to also talk about voter
25 registration. We keep hearing voter registration, and

76

1      I think Representative Lewis has very aptly said that
2 we believe that voting history, voting result is a
3 better indicator than voter registration. And the
4 other side continues to point out that we have more
5 registered Democrats than we do registered Republicans
6 in this state, and that is true. And it is also true
7 that we have a rising number of unaffiliated voters.
8 And quite frankly, we incentivize that with the laws in
9 this state because we allow unaffiliated voters to vote
10 in the primary of their choice. It is very easy for
11 people to go back and forth or whatever. But we
12 incentivize people often times to be unaffiliated. I
13 would simply suggest to you that if every registered
14 Democrat goes out and votes Democrat and the registered
15 Republicans vote Republican, and you can split
16 unaffiliateds down the middle, I think Democrats would
17 do very well under these maps. It is very clear that
18 Democratic candidates can win in these districts as
19 we've pointed out. It has been done in other races
20 before.
21      And, finally, my last point, we keep hearing
22 this call for a somehow independent redistricting
23 committee and this idea that maybe we will put on two
24 Democrats and two Republicans, and then we're going to
25 have this one individual that has the great wisdom of

77

1 King Solomon that has absolutely no partisan
2 affiliation, has no bias whatsoever. Somehow there's
3 this one perfect individual out there that is going to
4 have no bias and is going to have the wisdom of Solomon
5 and we're going to have these perfect maps. And,
6 ladies and gentlemen, I would conclude that that is not
7 going to happen because it is not possible to find that
8 individual. So, again, we thank you for the debate.
9      And, Mr. Speaker, if the lady has her question,
10 I would be happy to yield.
11      SPEAKER MOORE: Does the lady from New Hanover
12 wish to propound a question to the gentleman from
13 Rockingham?
14      REP. HAMILTON: I do, sir.
15      SPEAKER MOORE: She is recognized, and the
16 gentleman has indicated he would yield. The lady has
17 the floor to state her question.
18      REP. HAMILTON: Thank you, Representative
19 Jones. Just curious, over the last 40 years how many
20 state elections that are also run statewide, for
21 instance Governor, Attorney General, et cetera, how
22 many of those positions have elected Republican versus
23 Democrat?
24      REP. JONES: Thank you to the lady for that
25 question; I appreciate that. The point I was making is

Case 1:13-cv-00949-WO-JEP   Document 159-2   Filed 03/07/16   Page 20 of 23

## 78

1  that this is a federal election. And I don't have the
2  statistics in front of me; perhaps you do. My point is
3  that I think it's irrelevant because we're talking
4  about a federal election, and we all know that there
5  are people in this state that might vote one way on the
6  local election or even the state election but they see
7  the national parties in a very different way. And the
8  minority here can respectfully disagree, but there are
9  many people that feel that on the national level that
10  your party has moved quite a bit to the left and away
11  from the majority of the voters in this state. And
12  that is reflected in the fact that they have voted
13  89 percent of the time for the Republican candidate for
14  president, 81 percent of the time for the Republican
15  candidate for the U.S. Senate. And they might do that,
16  and they might still vote Democrat on a local or state
17  level.
18      REP. HAMILTON: Thank you.
19      SPEAKER MOORE: For what purpose does the
20  gentleman from Harnett, Representative Lewis, arise?
21      REP. LEWIS: I wanted to ask a series of
22  questions to Representative Michaux. No, Mr. Speaker,
23  I would like to speak a second time.
24      SPEAKER MOORE: The gentleman is recognized to
25  debate the bill a final and second time.

## 79

1      REP. LEWIS: Thank you, Mr. Speaker. Mr.
2  Speaker and members, I want to thank all of you for
3  your patience today, for the dignity that has been
4  shown in this chamber. Obviously, this is an issue
5  that all of us care very much about in our attempt to
6  best comply with the court ruling. I did want to state
7  a couple of last thoughts for the record and prior to
8  the vote if I could.
9      First of, with all due respect, the Harris
10  opinion does not find racially polarized voting, nor
11  has any member of the body submitted any kind of
12  document showing that there is racially polarized
13  voting in the state. Further, I realize the time has
14  been short, but we've even had members of the minority
15  stand up and speak about possible ways that districts
16  could have been drawn. Yet despite the fact that
17  central staff and even special staff was made available
18  to them, nobody has submitted a map showing how they
19  think the districts should be drawn.
20      I also want to say that these plans in no way
21  guarantee the election of ten Republicans. If you will
22  look at -- I know the lady from New Hanover asked about
23  statewide election results; they're actually -- most of
24  them are on our desk. And you will see that in all 13
25  of these districts, for instance, Attorney General

## 80

1  Cooper won them. I think -- I'm not going to go into
2  what some has been said before, but I think it has a
3  great deal to do with the quality of the candidate and
4  the message that they have in trying to elect -- or
5  trying to offer themselves.
6      The final thing that I would like to say is
7  while it has been talked about much throughout the
8  committee and through today's hearing, we did adopt in
9  an open forum what the criteria for these maps would
10  be. We did say that all of the criteria would be
11  considered together, and we would make every effort to
12  harmonize them. I believe the map that you have before
13  you addresses the concerns of the Harris opinion. I
14  believe it provides a way for us to move forward and to
15  move on and comply with the order of the Court, and I
16  would respectively ask for your support in voting "aye"
17  on adopting these maps. Thank you, Mr. Speaker, and
18  thank you, members of the House.
19      SPEAKER MOORE: Further discussion, further
20  debate. If not, the question before the House is the
21  passage of Senate Bill 2 on its second reading. Those
22  in favor will vote "aye;" those opposed will vote "no."
23  The clerk will open the vote.
24      The clerk will lock the machine and record the
25  vote; 65 having voted in the affirmative and 43 in the

## 81

1  negative. Senate Bill 2 passes its second reading and
2  will be read a third time.
3      Further discussion, further debate?
4      For what purpose does the gentleman from
5  Cumberland, Representative Floyd, arise?
6      Further discussion, further debate? If not the
7  question before the House is the passage of Senate Bill
8  2 on it's third reading. Those in favor will say
9  "aye."
10      (Voice vote.)
11      SPEAKER MOORE: Those opposed "no."
12      (Voice vote.)
13      SPEAKER MOORE: In the opinion of the Chair,
14  the ayes have it. The ayes do have it. Senate Bill
15  2 passes its third reading. The bill is ordered
16  enrolled.
17      Special message from the Senate, the clerk will
18  read.
19      CLERK: House Bill 2, Senate Committee
20  Substitute, third edition. A bill to be entitled An
21  Act to Revise Procedures for the Conduct of the 2016
22  Primary Election to Comply with the Court Order in
23  Harris v. McCrory.
24      SPEAKER MOORE: The bill is ordered calendared
25  for immediate consideration. The clerk will read.

## 82

1  REP. FLOYD: Mr. Speaker.
2  SPEAKER MOORE: Just a moment. The clerk will
3  read the bill.
4  CLERK: Representative Jones and Hardister,
5  House Bill 2. A bill to be entitled An Act to Revise
6  Procedures for the Conduct of the 2016 Primary Election
7  to Comply with the Court Order in Harris v. McCrory.
8  The General Assembly of North Carolina enacts.
9  SPEAKER MOORE: For what purpose does the
10 gentleman from Cumberland, Representative Floyd, arise?
11 REP. FLOYD: Inquiry, Mr. Speaker.
12 SPEAKER MOORE: The gentleman may state his
13 inquiry.
14 REP. FLOYD: I know my light came on but I also
15 thought I pushed the red button for the last vote.
16 SPEAKER MOORE: How does the gentleman wish to
17 be recorded on the passage of the previous bill on the
18 vote?
19 REP. FLOYD: No.
20 SPEAKER MOORE: The gentleman was recorded as a
21 "no" vote on the prior bill. If the gentleman would
22 like to change it to a yes the Chair will be glad to do
23 that.
24 For what purpose does the gentleman from
25 Rockingham, Representative Jones, arise?

## 83

1  REP. JONES: To debate the bill.
2  SPEAKER MOORE: The gentleman has the floor to
3  debate the bill.
4  And again, members, we would ask that the
5  conversations could be held down. We still have our
6  court reporter here recording the proceedings.
7  The gentleman has the floor.
8  REP. JONES: Thank you, Mr. Speaker. Ladies
9  and gentlemen of the House, House Bill 2 that we passed
10 yesterday the Senate has amended and we are in support
11 of the Senate Committee Substitute. The difference is
12 that section 3 of that bill is taken out. We discussed
13 yesterday that section 3 has to do with the
14 presidential election, the electors to the electoral
15 college. And what we voted to do yesterday was to
16 adopt the old or existing congressional primary -- I'm
17 sorry. Congressional maps for the parties to use to
18 submit their presidential electors. That was done by
19 request with both political parties. However, they've
20 changed their mind on that, they would rather go with
21 the new districts if there are new districts and so
22 this section has been taken out. And so what that
23 simply means is that if this plan goes forth and there
24 is a congressional primary on June 7 and we adopt these
25 congressional maps or any congressional maps, whatever

## 84

1  congressional districts we end up using to elect our
2  congressmen, we will use those same districts to select
3  the presidential electors. So that is the change, and
4  I would ask for a green vote that we support the Senate
5  Committee Substitute to House Bill 2.
6  SPEAKER MOORE: So, does the gentleman wish to
7  make a motion to concur with the Senate Committee
8  Substitute for House Bill 2?
9  REP. JONES: Yes, sir. I make a motion to
10 concur.
11 SPEAKER MOORE: The gentleman has made that
12 motion and has debated the motion. Further discussion,
13 further debate on the motion to concur? If not, the
14 question before the House is the motion to concur with
15 the Senate Committee Substitute to House Bill 2. Those
16 in favor will vote "aye" those opposed will vote "no."
17 The clerk will open the vote.
18 Do the following members wish to record on this
19 vote: Representatives Cleveland, Steinburg, Whitmire,
20 and Blust?
21 The clerk will lock the machine and record the
22 vote: 75 having voted in the affirmative and 30 in the
23 negative. The motion to concur with the Senate
24 Committee Substitute to House Bill 2 is adopted. The
25 bill is ordered enrolled and sent to the Governor by a

## 85

1  special messenger.
2  The House will be at ease.
3  (At ease.)
4  SPEAKER MOORE: The House will come back to
5  order. Members, the House is about to go into recess
6  until 3:00. However, I want the members to know at
7  3:00 there will be no votes. The only purpose for the
8  3:00 session is for ratification. We are going to wait
9  on ratification for awhile until we hear some news
10 perhaps from Washington. So for those members who
11 would like to be back at 3:00, you're welcome to do so,
12 but the Chair does not anticipate any votes at that
13 time.
14 Notices and announcements?
15 For what purpose does the lady from Yancey,
16 Representative Presnell, arise?
17 REP. PRESNELL: For a moment of personal
18 privilege.
19 SPEAKER MOORE: The lady has the floor to speak
20 to a point of personal privilege.
21 The house will come to order.
22 REP. PRESNELL: I just wanted to wish my seat
23 mate, Representative Turner, a Happy Birthday.
24 SPEAKER MOORE: Further notices and
25 announcements? If not, the House will stand in recess

Case 1:13-cv-00949-WO-JEP   Document 159-2   Filed 03/07/16   Page 22 of 23

86

```
1        until 3:00 p.m.
2        (THE PROCEEDINGS IN THIS MATTER ADJOURNED AT 1:34 P.M.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

87

STATE OF NORTH CAROLINA
COUNTY OF WAKE
                CERTIFICATE
    I, Rachel L. Hammond, a Notary Public in and for the State
of North Carolina duly commissioned and authorized to
administer oaths and to take and certify hearings, do hereby
certify that on February 19, 2016, this hearing was held before
me at the time and place aforesaid, that all parties were
present as represented, and that the record as set forth in the
preceding 86 pages represents a true and accurate transcript of
the proceedings to the best of my ability and understanding.
    IN WITNESS WHEREOF, I have hereto set my hand, this the
25th day of February, 2016.

                    _____
                        Notary Public

                    Rachel L. Hammond
                    Notary Number
                    201126500152