NORTH CAROLINA GENERAL ASSEMBLY

HOUSE REDISTRICTING COMMITTEE

_____

TRANSCRIPT OF THE PROCEEDINGS

_____

In Raleigh, North Carolina

Friday, February 19, 2016

Reported by Rachel L. Hammond, CVR-M

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

## 2

1     (Reporter's note: Proceedings in this matter
2 began at 9:09 a.m. on February 19, 2016.)
3     REP. LEWIS: The House Committee on
4 Redistricting will come to order. Members will please
5 take their seats. We welcome our visitors to the
6 gallery.
7     Members, as always, the Chair would like to
8 begin by thanking our Sergeant-at-Arms staff for their
9 assistance in setting up the room and in facilitating
10 this meeting. They are Regie Seals, Marvin Lee, David
11 Lynchman, Barry Moore, Young Bay, and John Brandon. We
12 appreciate your hard work, and we thank you for being
13 with us today.
14     Members, as was previously announced, we are
15 going to enter into a period of public comment on the
16 redistricting maps, the Contingent Plan that was passed
17 over to us from the Senate. As the Chair announced
18 last night, it is our intention to take public comment
19 and then begin the committee review of the maps. It
20 was announced that we would take -- that we would begin
21 the committee deliberation after the public comment, or
22 at 10:00, whichever came first. The Chair is aware of
23 only one citizen thus far that has signed up to speak.
24 However, in an indifference to making sure that we can
25 receive the input the public may want to offer, the

## 3

1 Chair is going to declare that any member of the public
2 that arrives to sign up to speak prior to 9:30 will
3 also be extended the opportunity to address the
4 committee.
5     With that said, the chair is pleased to welcome
6 for his remarks Mr. Blake Tedder.
7     Mr. Tedder, if you would, sir, the
8 Sergeant-at-Arms will assist you to the microphone. We
9 welcome you to the House Committee on Redistricting,
10 and you have the floor for up to three minutes, sir.
11     MR. TEDDER: Hi, my name is Blake Tedder, and I
12 am a private citizen from Hillsborough, North Carolina.
13 And I'm really sorry to see that there is not more of
14 your constituents here this morning, and I feel that it
15 may be because they don't feel like their voice will
16 matter at this point in the process. That is my
17 opinion.
18     My statements are scribbled, so I'm going to
19 try to read them as well as I can. As a young person,
20 I look up to this body, the Senate, too -- they're in
21 my remarks, and I believe that each of you is in this
22 for the right reason, to give voice to the people and
23 to your ideas about the future of North Carolina and
24 our prosperity and what we're doing here in the state.
25 I love democracy; I love the plurality of ideas that we

## 4

1 can share; I love good discourse. I am really
2 disappointed though. Over the last couple of days, I
3 have not heard good discourse. I heard on the Senate
4 floor three strong Democrats and others yesterday,
5 Senator Stein, Senator McKissick, and Senator Bryant.
6 They said some really wonderful things about fairness,
7 equality, constitutionality in these maps, and it
8 inspired me. It made me feel great about this process.
9 And what I heard back from Senator Rucho and others was
10 obviously defensive, but it was also protective. And
11 it was saying that, you know, we are placating the
12 courts here. That's what we're doing, and that's what
13 it was about it seemed. We're placating the courts.
14 We're self-preserving our office, our power, but there
15 wasn't really mention of the citizens in what we're
16 doing. And I heard that from the Democrats yesterday,
17 and I wanted to say to this body and to the media that
18 yesterday I declared myself an unaffiliated voter
19 because I'm disappointed in this system. I'm
20 disappointed in a lot of those maps that I've seen.
21 The 1992 map is a mess and the current maps are a mess.
22     So with that, I just want to implore to you all
23 today. I don't know if you can, but why not extend an
24 olive branch? Why not consider the history and legacy
25 of this moment? Why continue the eye-for-an-eye

## 5

1 philosophy of this body? It's the Democrats and the
2 Republicans. Why not be on the right side of history?
3 Why just placate court rulings? Why be nasty and
4 divisive? Why not take the high road? And why not be
5 bold and prove that the Republican leadership is truly
6 the desires of we the people? Make the elections fair.
7 The elections have to be fair, and fair districts are
8 vital to that. So thank you, thank you for hearing my
9 comments.
10     REP. LEWIS: Thank you, sir.
11     Members, the Chair is not aware of any other
12 individual that signed up to speak. However, as
13 previously announced, we're going to stand at ease for
14 about 10 minutes and see if further speakers arrive.
15     (The committee stands at ease.)
16     REP. LEWIS: Members, if the Chair could have
17 your attention. Members, if the Chair could have your
18 attention. We're going to continue to wait for a few
19 moments to see if additional speakers arrive. But I
20 thought we could deal with a bit of housekeeping that
21 may make our proceedings go faster.
22     Members, will you look and see if all of you
23 have in front of you a packet of material that is
24 entitled Senate Bill 2, Second Edition 2016 Contingent
25 Congressional Plan - Corrected? And, if you do, would

**6**

you, please, turn to what I would consider to be the third page. It is actually the back of the second printed page. The heading on that page reads Election Results 2008 General AG, AD, CA. Does everyone see that page? Members, would you also look for just a moment and see if you have at your desk a document entitled 2016 Redistricting Database Field Key? If you do, members, I wanted to point out to you for your convenience the reports that you have, the system that generates these reports, generates them using a series of alphanumeric codes, so I thought it would be perhaps helpful to go through.

If you will notice on the page I asked you to turn to, on the big report that starts out Election Results 2008 General AG, AD, CA, notice the first column says, "District" This is pretty obvious that this refers to the 13 congressional districts as drawn in the plan. But you'll notice right beside that is a code, and the code is EL08G_AG_D. Please note that this corresponds to the key that was also passed out. Where it says EL, that means election; 08, that is the year; underscore AG, that is the candidate, so that would have been -- it will correspond here to the Democratic nominee Cooper; and then, of course, that is what the underscore D means. So as you look at this

**7**

page, you can tell that in the first district the total votes -- the raw votes cast for the Attorney General nominee of the Democrats was 265,043, which equates to that third column which means that he received 79.47 percent.

If you'll look at the fourth column, you'll notice it says the same thing, EL08G_AG, but then it says underscore R. This refers that this was the Republican nominee named Crumley. If you'll look down to make sure we're all reading this report the same way, Crumley received in raw votes 68,474 votes or, next column, 20.53 percent and that the total votes cast in that election were 333,517.

Members, if you'll -- does anyone have any questions about how to read this chart? Would it be helpful if we went through and inserted the names for you now? I just don't want to have to -- to be candid with you, stop during my presentation and do this as I have had to do twice before.

Representative Michaux.

REP. MICHAUX: Mr. Chairman, I think you went over this the other day when we had the hearing. My -- as I've stated to you before, my problem right now though is that looking at these elections you are following here, the criteria that was set out where

**8**

race was not to become a factor in this, and you don't have anything in here indicating the racial breakdown of these particular races, do you?

REP. LEWIS: No, sir, you are correct.

So, members, if everybody is comfortable with how to read this chart, then the Chair will not go through the rather painstaking process of trying to add names to this. The Chair has officially directed the staff, though, if these charts are ever copied again, to take a Sharpie and to write the name of the individual on top of this printout so that we don't have to do this again.

The Chair will now ask the Sergeant-at-Arms if any other member of the public has sought the opportunity to speak. The Sergeant-at-Arms indicates that no other member of the public has sought to speak. Therefore, we're going to move into the committee review of this bill.

Representative Jones is here, and the Chair will yield the Chair to -- the Chair apologizes. We will call the roll; the clerk will call the roll.

CLERK: Chairman Lewis.
REP. LEWIS: Present.
CLERK: Representative Jones.
REP. JONES: Here.

**9**

CLERK: Representative Brawley.
REP. BRAWLEY: Present.
CLERK: Representative Cotham.
Representative Davis.
REP. DAVIS: Here.
CLERK: Representative Farmer-Butterfield.
REP. FARMER-BUTTERFIELD: Here.
CLERK: Representative Hager.
REP. HAGER: Here.
CLERK: Representative Hanes.
REP. HANES: Here.
CLERK: Representative Hardister.
REP. HARDISTER: Here.
CLERK: Representative Hurley.
REP. HURLEY: Here.
CLERK: Representative Jackson.
REP. JACKSON: Here.
CLERK: Representative Johnson.
Representative Jordan.
Representative McGrady.
REP. MCGRADY: Here.
CLERK: Representative Michaux.
REP. MICHAUX: Here.
CLERK: Representative Moore.
REP. MOORE: Here.

**Page 10**

CLERK: Representative Stam.

REP. STAM: Here.

CLERK: Representative Stevens.

REP. STEVENS: Here.

CLERK: Representative Dixon.

REP. LEWIS: Members, prior to beginning, the Chair would like to extend the courtesy of our gallery to students that are visiting today from the Longleaf School of the Arts in Raleigh. If you would stand, we would love to welcome you to our committee.

At this time, the Chair is going to yield the chair to Vice Chairman Jones.

REP. JONES: Good morning, members of the committee, Senate Bill 2 is now before us. Representative Lewis, you're recognized to present the bill.

REP. LEWIS: Thank you, Mr. Chairman, and good morning, members. I appreciate all of you taking the time to be here today to consider the Senate Bill 2, which is now before us. Members, I just want to state for the record, I realize some of you have heard these very similar remarks before, but on February 16 the Joint Select Committee that was appointed to deal with congressional redistricting met and adopted seven criteria to be used in drawing the 2016 Contingent

**Page 11**

Congressional Redistricting Map. A map was produced using those criteria, and while I will, of course, take questions from the committee at the direction of the Chair, I first want to take a moment to walk through the criteria and to discuss, generally, how this map addresses each of these.

Equal population, all of the districts were drawn with either 733,499 people or 733,498 total people. This is as equal as practical and in accordance with federal law.

Contiguity, all of the areas in every district are composed of contiguous territory.

Political data, the stat report shows which election results were used in building these districts. Race was not considered and is not present on these reports.

Partisan advantage, we believe this map will produce an opportunity to elect ten Republican members of Congress, but make no mistake, this is a weaker map than the enacted plans in that respect.

The 12th district, the map does away with the serpentine 12th district dating back to 1992.

Compactness, only 13 counties and 13 VTDs were split in this map. In accordance with the criteria, more whole counties and more whole precincts are the

**Page 12**

best indicator of compactness that we believe to be available.

Incumbency, only two incumbents reside in the same congressional district, or in our parlance, are double-bunked, one Republican and one Democrat. They are Representative Price and Representative Holding. Both reside in the proposed geographical area of the Fourth Congressional District.

Mr. Chairman, I realize many of the members in this room have sat through this select committee. Many also joined yesterday to listen in to the Senate discuss this bill. So in the interest of time and at your direction, I will yield to all inquiries.

REP. JONES: Thank you, Representative Lewis. Representative Michaux, you're recognized.

REP. MICHAUX: Thank you, Mr. Chairman. I have -- as you might imagine, a series of questions. Representative Lewis, first you left out -- you didn't mention the other criteria about race not being a factor in this, and that is a part of the criteria that was used in drawing these maps; is that not true?

REP. LEWIS: Yes, sir, Representative Michaux. If I failed to say that, in the area of political data, the stat pack that you have shows which election results were used. Race was not considered and is not

**Page 13**

present in these reports.

REP. JONES: Representative, if you would, please go through the Chair for follow-up.

REP. MICHAUX: Yes, sir, I do have a follow-up. Representative Lewis, in drawing these districts -- first of all, let me ask you, was there any attention paid to whether or not these maps which you have drawn have addressed the problem of vote dilution?

REP. LEWIS: Thank you for the question, Representative Michaux. The criteria that was used in drawing the map are the criteria that I listed earlier in our discussion. However, based on a series of questions that were asked before the Senate Redistricting Committee and also during the Joint Redistricting Committee and also conversations that I've had with you, I would like on that one subject -- or on the subject of race in general, to submit for the record of the committee, the expert report by Dr. Allan J. Lichtman. This is a report that was prepared for -- or in, pardon me, the Dickson versus Rucho case, and I believe that this was an expert witness hired by the Plaintiffs. So, Mr. Chairman, I'm going to submit this for the record.

REP. JONES: Thank you, Representative Lewis. Follow-up, Representative Michaux.

**14**

REP. MICHAUX: Yes, sir. You are now submitting that to this committee, and you have not submitted it to us before?

REP. LEWIS: Representative Michaux, I have been very clear that we did not use race in drawing these maps. I have not looked at any racial data. I merely submit a report that the Democrats who challenged the maps before paid for.

REP. JONES: Further follow-up, Representative?

REP. MICHAUX: Yes, sir. I've got several follow-ups. The contention in not including race, from what I understand, the reason that you did not include race in it was because it is your feeling that the decision that came out of the Harris case said we could not use race; am I correct in that?

REP. LEWIS: Representative, thank you for that question. As I've said before, before this committee and before you, you know that I am not an attorney. However, I believe that the entire decision from the Harris case has been made available to all of the members, and as such, I would also like to make sure that that is a part of the permanent record, Mr. Chairman.

REP. JONES: So noted.

REP. LEWIS: Thank you, sir. And it is our

**15**

understanding of this decision, Representative, that the Court has found that there was not racially polarized voting, which is a requirement in order to consider race in drawing the maps. So, again, race was not considered in the preparation of these maps.

REP. JONES: Follow-up, Representative Michaux?

REP. MICHAUX: Yes. Are you aware of the fact that the Court, in its ruling, indicated that their ruling does not mean that race can never play a role in redistricting and that legislatures must always be cognizant of race when drawing district lines? Are you aware of that being a part of that decision?

REP. LEWIS: Thank you for the question, Representative. What I am aware of is based on our reading of the opinion the Court said that racially polarized voting did not exist, and therefore that would be one of the triggers that would require race to be used. And we did not use race in drawing these maps.

REP. JONES: Representative Michaux, a follow-up?

REP. MICHAUX: Yes. Then your understanding of that indicates that you did not -- that because it said there was no polarization in there? Is that what you are telling us? That the district that was drawn

**16**

before showed no racial polarization?

REP. LEWIS: Representative Michaux, in the reading of this case, and you may have it before you, I have some notes. But I don't have the actual case. That is, as I have tried to explain before, our understanding of the decision is that race should not be a factor in the drawing of these lines, and therefore, race was not one of the criteria that was used in drawing these maps.

REP. JONES: Follow-up?

REP. MICHAUX: Yes, I have a follow-up. Let me move to another point then because this point was also raised in the Harris case, and that is the matter of one vote, one person. Under Section 2 of the Voting Rights Act, if you've read that, I don't know what your lawyers have told you about that. But I think Section 2 of the VRA says that you have to follow the 14th Amendment in allowing for one vote, one person. Was this taken into consideration when your maps were drawn?

REP. LEWIS: Thank you for the question, Representative. As you recall, we adopted criteria, and one of the criteria that was adopted was the fact that we should have equal population. All of the districts were drawn with either 733,499 total persons

**17**

or 733,498 total persons. This is as equal as practical and, our belief, is in accordance with federal law.

REP. JONES: Follow-up?

REP. MICHAUX: Yes. Then moving a little bit further on that point, by not including race -- and Section 2 of the Voting Rights Act also indicates that minorities, in particular African Americans, must live in districts or be in districts where they have the choice of electing their own representative, have a chance to do that. Was that taken into consideration when you drew these maps?

REP. LEWIS: Representative, thank you for the question. As you recall, this committee adopted the criteria that would be used in drawing the maps. I went over it in my opening remarks. I would be happy to do it again.

REP. JONES: Follow-up?

REP. MICHAUX: Follow-up. Is it your contention then that what you have drawn does, in fact, allow African Americans in this state to elect persons of their choice?

REP. LEWIS: Representative, as I have stated during the Joint Select Committee, we all debated various criteria that should be used. The criteria

18

that the Joint Select Committee used that were adopted and used in drawing these maps were the following: Equal population, contiguity, political data, partisan advantage, 12th district, compactness, and incumbency.

REP. JONES: Follow-up, Representative Michaux?

REP. MICHAUX: That being the case, Mr. Chairman, in not considering race, how can you assure us then, number one, if you don't consider race that you are following the 14th Amendment in the terms of one vote, one person. And how can you assure us that the African American community under that criteria that you have enunciated and under the court decision, that African Americans in this state will have an opportunity to elect persons of their choice?

REP. LEWIS: Well, thank you for that question, Representative. To be clear, we believed, and still believe, that the enacted map -- and for the record, when I refer to the enacted map, I am referring to the 2011 Redistricting Plan -- addressed the concerns that to the best of our ability. When this contingent map was prepared, we believe that the consideration of race was not going to be allowed by this court, and so we did not consider race in drawing these maps.

REP. MICHAUX: Follow-up, Mr. Chair.

REP. JONES: Representative, I will grant you

19

another follow-up. Follow-up.

REP. MICHAUX: Okay. Thank you, sir. Forgive me for trying to elicit this information, but you know what I'm after, I think. If you, in fact, drew these maps without regard to race, how can they be basically constitutional? Following Section 2 of the Voting Rights Act and following the 14th Amendment, how can you think that these maps will be considered constitutional when you have not considered in your drawings a significant portion of the population?

REP. LEWIS: Thank you for your question. It is my understanding of the Harris decision that racially polarized voting was not in North Carolina. That is one of the criteria that are required to consider race. Therefore, we did not consider race in the drawing of these maps.

REP. MICHAUX: I'm going to leave that question -- I have a couple of more follow-ups if you don't mind, Mr. Chair.

REP. JONES: Okay, let's go with two more, and I'd like to give some other people a chance to weigh in. And we'll come back after that. Two more follow-ups, Representative Michaux.

REP. MICHAUX: That will be fine. Who drew these maps, this map?

20

REP. LEWIS: The maps were drawn at the direction of the Chairs. The exact map drawer's name is Tom Hofeller.

REP. MICHAUX: So Dr. Hofeller did draw this map?

REP. LEWIS: Yes, sir.

REP. MICHAUX: All right. My last question on the round --

REP. JONES: Last follow-up.

REP. MICHAUX: My last follow-up on this round, was it drawn here in North Carolina, or was it drawn in Washington?

REP. LEWIS: It was most certainly drawn here in North Carolina.

REP. JONES: Representative Jackson, you're recognized.

REP. JACKSON: Thank you, Mr. Chairman. Representative Michaux started some of my questions. I think we all agree we want the federal court to be able to act as quick as possible. In attempt to clarify some of the things that were asked in the Senate yesterday, I just had a few questions on that. You said Dr. Hofeller drew this new map, and it was certainly drawn in North Carolina; is that correct?

REP. LEWIS: Yes, sir.

21

REP. JONES: Follow-up?

REP. JACKSON: Follow-up. Was it drawn on a legislative computer or a private computer when it was originally drawn?

REP. LEWIS: Representative Jackson, in an attempt to comply with the court order and with all due respect what I believe to be a very compact time schedule, the Chairs met with our redistricting consultant, who I've already told the representative from Durham, it was Dr. Hofeller. And I am certain that Dr. Hofeller worked on his own computer in drafting the concepts that we discussed. He then brought the concepts to the General Assembly, loaded the concepts on, and made additional changes in criteria on the state computer. So the answer would be to your question would be both.

REP. JACKSON: Follow-up.

REP. JONES: Further follow-up.

REP. JACKSON: And do you know when he brought that to the legislature and loaded it on the computer?

REP. LEWIS: Representative, let me glance at my notes. I believe it would have been on the 16th of this month, which I think would have been Tuesday. I apologize my calender is not pulling up.

REP. JACKSON: Follow-up.

22

1  REP. JONES: Follow-up.
2  REP. JACKSON: And would it be fair to say that
3  he originally drew a version of this map on his private
4  computer prior to this committee meeting and voting on
5  the criteria to be used earlier this week?
6  REP. LEWIS: I'm certain that he drew various
7  concepts on his computer.
8  REP. JACKSON: Thank you, Mr. Chair.
9  REP. JONES: Thank you. Representative Davis.
10  REP. DAVIS: Thank you, Mr. Chairman. A
11  question for Representative Lewis if I may. First off,
12  Representative Lewis, I want to thank you for your
13  leadership and hard work in this endeavor, also your
14  transparency and your honesty in answering the
15  questions that are being posed to you during these
16  committee hearings. My question would be, were there
17  any changes to the map that we looked at before the
18  Senate reviewed it and are now -- in other words, did
19  the Senate make any changes to that map? And if so, if
20  you could, please, explain what they are?
21  REP. LEWIS: Yes, sir, thank you. The Senate
22  amended the map in accordance with the rules, and the
23  exact nature of the amendment was based on older
24  information we had -- the Chairs had mistakenly placed
25  the residences of Representative Adams and

23

1  Representative Walker both in the 13th District. That
2  was not the Chairs' intent. Therefore, the Chairs
3  instructed Dr. Hofeller, frankly, to make necessary
4  changes. The exact nature of those changes I would be
5  happy to try to get for you. But a summary of it would
6  be that two whole precincts and one partial precinct
7  were moved to make sure that Representative Adams and
8  Representative Walker no longer resided in the same
9  congressional seat. That is the only change that was
10  made from when the committee reviewed the map.
11  REP. DAVIS: Thank you, Representative Lewis.
12  Thank you, Mr. Chairman.
13  REP. JONES: Thank you. Representative Hager,
14  you're recognized.
15  REP. HAGER: Thank you, Mr. Chairman. I have a
16  question for the bill sponsor. And just a quick
17  statement, you know, I hold an engineering degree, and
18  with a degree in thermodynamics and metallurgy, I deal
19  with things that stay pretty much the same everyday.
20  But I'm learning from Representative Michaux that the
21  law is a little bit more fluid and changes from
22  day-to-day, it seems like.
23  I have a question for you, is it your
24  understanding that the three threshold conditions from
25  the Gingles, Thornburg v. Gingles case that the third

24

1  one is the white majority must regularly vote as a bloc
2  to defeat the minority-supported candidate; is that
3  correct? Is that the way we understand that?
4  REP. LEWIS: Representative Hager, I appreciate
5  your question. As you are an engineer, I am a farmer.
6  So I will have to say that I am almost certain that is
7  correct, but I don't have that information before me.
8  REP. HAGER: Thank you. Follow-up.
9  REP. JONES: Follow-up.
10  REP. HAGER: This is more of a statement -- and
11  I want to aid a little bit in Representative Lewis'
12  statement. I've looked up the case which is, you know,
13  the Harris v. McCrory case, which is 100 pages long,
14  and I outlined some things in it I think Representative
15  Lewis was talking about. If you go to page, I think it
16  is 53 in the report, I think it is the Gregory majority
17  opinion. About midways through the first paragraph it
18  says, "a failure to establish any one of the Gingles
19  factors is fatal to the defendants' claim." Now, if
20  you flip over to page 55 at the start of the second
21  paragraph, "the defendants contend that there is some
22  evidence that the general assembly considered 'two
23  expert report' that 'found the existence of racially
24  polarized voting in' North Carolina. These generalized
25  reports, standing alone, do not constitute a 'strong

25

1  basis in evidence' that the white majority votes as a
2  bloc to defeat the minority's preferred candidate of
3  choice in District 1." Then you flip over to page 56
4  about middle-ways through the second paragraph, "the
5  white majority did not vote as a bloc to defeat
6  African-Americans' candidates of choice. In fact,
7  precisely the opposite occurred in these two districts:
8  Significant crossover voting by white voters supported
9  the African-American candidate." I think,
10  Representative Lewis, that is what you were referring
11  to if I'm not mistaken. Am I missing something on
12  that?
13  REP. STAM: Mr. Chairman, before he answers,
14  could I raise the point of order that he is practicing
15  law without a license.
16  REP. HAGER: I think, Mr. Chair --
17  REP. JONES: Duly noted, but we will allow
18  Representative Lewis to respond.
19  REP. HAGER: I think I said the other day that
20  any good engineer can make a good lawyer.
21  REP. LEWIS: Mr. Chairman, in response to the
22  representative, I would make the following statements:
23  First is, I do believe he has accurately read the
24  record as he reflected. Second, I would reiterate to
25  the committee that the Joint Select Committee

26

1 established the criteria by which this map was drawn,
2 and those are the criteria by which it is drawn. And
3 those are the criteria by which the committee should
4 judge the merits of the map.
5     REP. JONES: Further discussion, further
6 debate?
7     REP. MICHAUX: If nobody else, can I --
8     REP. JONES: Representative Michaux, are you
9 seeking recognition?
10     REP. MICHAUX: Yes, sir, I sure am.
11     REP. JONES: You are recognized for a question.
12     REP. MICHAUX: Thank you. Chairman Lewis, let
13 me ask you this, when was work started on the maps --
14 on this map?
15     REP. LEWIS: Representative Michaux, I will
16 tell you that in an attempt to comply with the Harris
17 decision, which I believe came out at 6:00 on a Friday
18 night, I think it was Friday the 6th. Sometime that
19 following week Chairman Rucho and I met with our
20 consultant to talk about if we were going to be
21 mandated to draw new maps if we were not going to be
22 successful in our attempt to receive a stay, what might
23 we be able to do to comply. That was the week after
24 the decision came, but I don't recall the exact day.
25     REP. JONES: Follow-up?

27

1     REP. MICHAUX: Yes. There has been some
2 information by some people on your side over here, that
3 work was being done on these maps prior to the criteria
4 being adopted by this body; is that true?
5     REP. LEWIS: I would say, sir, that I'm sure
6 Dr. Hofeller made a variety of conceptual maps. The
7 map before you was drawn based on the criteria adopted
8 by this committee.
9     REP. JONES: Is there a follow-up?
10     REP. MICHAUX: I just have a statement if you
11 don't mind, Mr. Chair.
12     REP. JONES: You are recognized for your
13 statement, Representative Michaux.
14     REP. MICHAUX: I'm glad to hear Representative
15 Hager over there reading from the decision because
16 there are so many other things that he left out in
17 reading his decision -- reading from the decision. For
18 instance the idea that race should not be used as a
19 factor was not what this court said. This court has
20 said that it can be used, but it doesn't have to be the
21 predominant factor in this situation.
22     The second statement I make to you is that you
23 have still used race as a predominant factor by not
24 using race at all. What you have done is you have
25 overextended yourself in this situation by not using

28

1 race and by not understanding the fact that there is a
2 bit of -- a whole lot of voter dilution in here.
3 There's whole lot of the fact that an African American
4 under that dilution theory will not have an opportunity
5 to elect a officer of their own choice. All of that is
6 rampant within what is now being proposed for this body
7 to act on. But the main thing is that race is still an
8 undercurrent in this whole thing that you have tried to
9 obviate and take out. So what I'm saying to you is
10 that we will probably be back here if the Court doesn't
11 decide to do it themselves.
12     REP. JONES: Thank you, sir. Representative
13 Stam, you are recognized.
14     REP. STAM: Yes, I'm wondering if
15 Representative Jackson would yield for a question.
16     REP. JONES: Representative Jackson, does the
17 gentleman yield?
18     REP. JACKSON: Yes, sir.
19     REP. JONES: Representative Stam.
20     REP. STAM: Representative Jackson, this may be
21 totally irrelevant, but I want to just complete the
22 record there. Two days ago when we met as a Joint
23 Select Committee and we passed the motion allowing
24 both -- well, the minority party to hire a consultant
25 up to $25,000, you asked whether that would include

29

1 work that had been done previously, and the answer was
2 no. The question is, do you know if the minority
3 caucus or you or Representative Michaux or Senator Blue
4 had consulted with anyone to work on a map before
5 Wednesday?
6     REP. JONES: Representative Jackson, you are
7 recognized to answer the question.
8     REP. JACKSON: Thank you, Mr. Chairman.
9 Representative Stam, I did ask that question about
10 the -- any fees, because I was concerned that the
11 majority had already engaged a mapmaker who had drawn a
12 map and that we were doing a bit of reverse engineering
13 and had drawn a map we liked and then came up with
14 criteria. And so I wanted to make it clear on the
15 record that that -- what we were voting on would not
16 pay for any of that work that had been done. It would
17 only be paid for that time going forward. However,
18 after that meeting it was made clear to both the
19 minority leaders in both chambers, the House and the
20 Senate, that that was a mistake, what was said, and
21 that either party was allowed to use that $25,000 to
22 pay for any work that had been done on maps prior to
23 their passage this week. As far as what the minority
24 caucus had done, to my knowledge, the first indication
25 that we had that we would be provided an opportunity to

30

spend any public funds was when we saw that handout. And to my knowledge, no work had been done with any mapmaker prior to that offer being made. And then at that point it was discussed whether we had time to turn around a map in 24 hours, and it was decided that we would not do so.

REP. LEWIS: Mr. Chairman.

REP. JONES: Representative Lewis.

REP. LEWIS: May I ask the gentleman from Wake a question?

REP. JONES: Does the gentleman yield?

REP. JACKSON: Certainly.

REP. JONES: Representative Lewis.

REP. LEWIS: Representative Jackson, were you aware that the three-judge panel in the Harris case had offered a ruling where they challenged the constitutionality of the enacted maps, and that ruling came out on February the sixth.

REP. JACKSON: Yes, sir. I remember being notified that evening of the decision.

REP. LEWIS: May I ask another question?

REP. JONES: Follow-up. Do you yield, Representative?

REP. JACKSON: Yes, sir.

REP. LEWIS: Thank you, Representative Jackson.

31

Thank you, Mr. Chairman. Assuming that the U.S. -- the maps for the U.S. House of Representatives cannot be used in the March 15 primary as the court decision said, what is the remedy to that?

REP. JACKSON: I'm sorry, can I ask you to repeat your question?

REP. JONES: Representative Lewis.

REP. LEWIS: Perhaps I can be more clear. Assuming that the ruling in the Harris case is upheld and that the enacted plan cannot be used in the March 15 primary, would the remedy to that not be to produce another map?

REP. JONES: Representative Stam, did you have a follow-up -- I'm sorry. Representative Jackson, are you --

REP. JACKSON: I will attempt to answer that.

REP. JONES: Okay, representative Jackson, you are recognized. I'm sorry.

REP. JACKSON: Having not been the experts that many of you are on redistricting, I believe our state law requires us to be given at least two weeks to redraw the map. There's been a lot of testimony this week about how we have only been given two weeks to redraw and things of that nature, but I believe that is actually a state law that requires -- and that the

32

federal precedent is that legislative bodies be given an opportunity to redraw before the court step in. If the legislature failed to act by today I guess at 5:00, close of business court, I believe the federal court would have a -- they could draw the maps themselves. They could appoint a Special Master. That has been recently done in Virginia, which, of course, is part of the fourth circuit. And had them draw it as well would be my understanding of the possibilities.

REP. LEWIS: May I ask another question, Mr. Chairman?

REP. JONES: Follow-up.

REP. JACKSON: Yes, sir.

REP. JONES: He yields.

REP. LEWIS: Representative Jackson, please understand with respect, I'm not asking you to speak to anything that you don't have personal knowledge of. I am simply asking you, is it not a logical -- is it not a logical query that someone on the Democratic Party was alerted to the fact that new maps would possibly need to be drawn and submitted by today. So is it not at least a reasonable belief that work somewhere in Washington or Hillsborough Street, or wherever the work was done, was probably commenced. And, again, I'm not asking you to speak to anything of which you don't have

33

personal knowledge. I'm just asking you, is that not a rational belief that based on the court decision that it would seem that the Democrats had prevailed in court that the Democrats would start working on maps?

REP. JONES: Representative Jackson.

REP. JACKSON: Thank you, Mr. Chairman. Let me address that a couple of ways. One is, I'm sure there were probably 169 members of the General Assembly that started drawing some of these maps in their own mind about how they would like their congressional district to look. I'm sure that the individual members of Congress started doing that, but to my knowledge, the Democratic Caucus on either side did not start to draw the maps because we didn't know what the criteria would be established. For instance, it was decided at the Tuesday meeting of this committee that you had to produce an entire state map of all 13 congressional districts in order to put forth any amendments this morning. There might have been members who thought that we were just going to redraw the 1st and the 12th and a few districts around there that would need to be done. I have no idea if that work started or not. I anticipate that somebody in DC looked at these maps five years ago and said if we ever get a redraw, this is what we would push for.

**34**

1   REP. LEWIS: Thank you.
2   REP. JONES: Thank you. Representative
3   Stevens, you are recognized.
4   REP. STEVENS: Thank you. And I do believe I
5   probably have a series of questions, but,
6   Representative Lewis, just going to what Representative
7   Jackson said, if one of our objectives was to sort of
8   do away with the serpentine shape of 12 as suggested by
9   the Court, do you know how many districts -- how many
10  counties 12 went through to begin with?
11  REP. LEWIS: Representative Stevens, that is
12  certainly a very logical question. I apologize that,
13  off the top of my head, I cannot remember the exact
14  number of counties that the 12th went through.
15  REP. JONES: Follow-up.
16  REP. STEVENS: Basically, I think
17  Representative Hager was just telling me that the 12th
18  touched every district but the -- the 12th and 1st
19  touched every district but the 11th and the 7th. So,
20  redistricting -- or looking at those two maps we're
21  essentially going to affect everything but the 7th and
22  the 11th; is that correct?
23  REP. JONES: Representative Lewis.
24  REP. LEWIS: Thank you. Let me answer that as
25  accurately as I can. It is a logical belief that if

**35**

1   you redraw lines in one area, what you're really
2   talking about is assigning voters to voting districts.
3   As a voting district changes in one place it will
4   certainly -- well, it would almost certainly have to
5   change in another, or you can't maintain the one
6   person, one vote. So, again, I wanted to reiterate
7   that that is the reason that this committee adopted the
8   criteria that it did and has produced this Contingent
9   Congressional Map.
10  REP. STEVENS: Thank you.
11  REP. JONES: Follow-up.
12  REP. STEVENS: Thank you. And the Harris court
13  specifically said that the shape of that district was
14  persuasive circumstantial evidence that race for its
15  own sake and not other controlling principles was their
16  dominant and controlling rationale. That the
17  serpentine district that has been dubbed the least
18  geographically compact district in the nation needed to
19  be fixed.
20  REP. LEWIS: I believe that is a correct --
21  thank you for that. I believe that is a correct
22  reading of what they wrote. I would point out that as
23  I have said in previous committee meetings, we as the
24  Republican majority, inherited that map from previous
25  general assemblies dating back I believe to the early

**36**

1   '90s, and we largely kept the district as a strongly
2   Democratic district hoping to forestall or to insulate
3   the state from lawsuits. I guess we weren't successful
4   on that front.
5   REP. STEVENS: Follow-up.
6   REP. JONES: Follow-up.
7   REP. STEVENS: And, in fact, district 12 has
8   been a subject of multiple litigation and gone all of
9   the way up to the Supreme Court and back and been found
10  to be constitutional and legal; is that correct?
11  REP. LEWIS: Yes, ma'am. And that's largely
12  why we kept it.
13  REP. STEVENS: Now --
14  REP. JONES: Follow-up.
15  REP. STEVENS: Thank you. And as to drawing
16  each of these districts, did you take into account the
17  factor of equal population?
18  REP. LEWIS: Yes, ma'am.
19  REP. JONES: Follow-up.
20  REP. STEVENS: And in drawing each of these
21  districts, did you take into account the principle of
22  contiguity?
23  REP. LEWIS: Yes, ma'am.
24  REP. JONES: Follow-up.
25  REP. STEVENS: And did you take into account,

**37**

1   in drawing each of these districts, the political data?
2   REP. LEWIS: Yes, ma'am.
3   REP. JONES: Follow-up.
4   REP. STEVENS: And in doing these districts,
5   did you take into account partisan advantage?
6   REP. LEWIS: Yes, ma'am.
7   REP. JONES: Follow-up.
8   REP. STEVENS: Thank you. And in taking into
9   account the 12th district, did you do away with the
10  serpentine format that the courts complained about?
11  REP. LEWIS: Yes, ma'am.
12  REP. JONES: Follow-up.
13  REP. STEVENS: Thank you. And in taking into
14  account compactness, did you do that, particularly, I
15  guess, in relation to district 12 -- I mean district 1?
16  REP. LEWIS: Yes, ma'am, compactness was a
17  factor.
18  REP. JONES: Follow-up.
19  REP. STEVENS: And did you take into account
20  incumbency?
21  REP. LEWIS: Yes, ma'am, as directed by this
22  committee.
23  REP. JONES: Follow-up.
24  REP. STEVENS: Yes, sir. And didn't you --
25  didn't the Senate make the change to try to deal with

**38**

1 the one bad issue of incumbency that we had and that
2 was with Ms. Adams making sure she was in a separate
3 district from Mr. Walker?
4     REP. LEWIS: The Senate did correct that
5 because it was a fairly easy correction to make.
6 Unfortunately, the situation in the 4th is not an easy
7 correction to make because of where the residence of
8 Representative Holding is.
9     REP. JONES: Thank you, Representative Stevens.
10 Representative Farmer-Butterfield, you are recognized.
11     REP. FARMER-BUTTERFIELD: Thank you, Mr. Chair.
12 I wanted to ask whether or not the legislative staff
13 assisted with the map drawing at all, and if so, how?
14 I know that you said Hofeller did it.
15     REP. LEWIS: Well, thank you for that question,
16 Representative. I don't know exactly how to answer
17 what nature of help you mean. Certainly the ISD staff
18 was very active with providing the computer and the
19 printers and whatnot that this committee authorized.
20 The General Assembly police authorized Dr. Hofeller to
21 have access to the one area that he was assigned to
22 work. I think we might have given him some coffee.
23     REP. JONES: Is there a follow-up?
24     REP. FARMER-BUTTERFIELD: Follow-up. Anything
25 important?

**39**

1     REP. LEWIS: Thank you for that question. I
2 would say that all of that is important.
3     REP. FARMER-BUTTERFIELD: Follow-up.
4     REP. LEWIS: Yes, ma'am.
5     REP. JONES: Follow-up.
6     REP. FARMER-BUTTERFIELD: To avoid convolution,
7 was the map that was drawn of the new congressional
8 districts drawn prior to approval of the criterion and
9 prior to the public hearings held on Monday?
10     REP. LEWIS: I think it would not be possible
11 for me to know what Dr. Hofeller had drawn. I think
12 there were a lot of conceptual ideas. The map that you
13 have before you is drawn based on the criteria adopted
14 by the committee.
15     REP. JONES: Ladies and gentlemen, further
16 discussion, further debate?
17     Okay. Representative Stam.
18     REP. STAM: Yes, three quick points, not a
19 question. First of all, while I think the enacted map
20 follows what the law was when we drew it to start with,
21 this map actually is a lot prettier, a lot more
22 compact. It's prettier. Second point, the minority
23 complains about our interpretation of the Harris
24 decision. We will find out, I guess, whether the
25 Harris three-judge court meant what it said in its

**40**

1 opinion or did not mean what it said in its opinion.
2 My third point is a -- I guess I'll say an accusation,
3 but it is not an accusation of criminality or
4 immorality or anything like that. But if the minority
5 really did not think about working on any map or do any
6 work on any map from February 5, I believe it would be,
7 until Tuesday -- I would interject that when I was in
8 the minority, I had no trouble at all getting
9 nonpartisan staff to prepare maps for me -- then I
10 would accuse the minority of political negligence, if
11 you can't find a staff person in research division to
12 help you with a map.
13     REP. JONES: Representative Michaux.
14     REP. MICHAUX: Mr. Chairman, just I have a
15 couple of comments on that. Number 1 is, Mr. Stam, you
16 don't know what we have done. That is number 1. So
17 what you're saying to me is just completely and totally
18 out of order. Number 2, number 2 is that if we did
19 have anything, why would we give it to you when you
20 created the mess to start with and not give it to the
21 courts? So, I mean, that's --
22     REP. STAM: Mr. Chairman.
23     REP. MICHAUX: So to accuse us of anything at
24 all when you don't know what we have done or anything
25 like that is simply just out of character and totally

**41**

1 wrong.
2     REP. STAM: Mr. Chairman, would
3 Representative --
4     REP. JONES: Representative Stam, I will allow
5 you to respond.
6     REP. STAM: Will Representative Michaux yield
7 for a question?
8     REP. MICHAUX: Yes.
9     REP. JONES: Does the gentleman yield?
10     REP. MICHAUX: Gladly.
11     REP. JONES: He yields.
12     REP. STAM: Representative Michaux, I asked
13 Representative Jackson this question. He didn't know
14 the answer. Did you consult, before Tuesday, with a
15 map drawer, either privately or here at the General
16 Assembly before Tuesday to try to get a map drawn?
17     REP. MICHAUX: Very gently as I can say it,
18 Representative Stam, that is none of your business.
19     REP. STAM: So, do I -- a follow-up question.
20     REP. JONES: Representative Stam, you're
21 recognized.
22     REP. STAM: So do I take it that the answer is
23 yes, you did?
24     REP. MICHAUX: You can't take the answer -- you
25 can't take it whatever the answer is. You know better

## 42

1  than that.
2  Representative, may I follow up? I'm sorry,
3  Mr. Chairman, I got a little bit thrown off there. But
4  may I follow-up?
5  REP. JONES: Representative Michaux, you're
6  recognized.
7  REP. MICHAUX: Thank you. That is what you get
8  when you've got two folks who have law degrees.
9  REP. JONES: Amen.
10  REP. MICHAUX: But anyway, Representative
11  Lewis, is it your contention that political
12  gerrymandering cures racial gerrymandering?
13  REP. LEWIS: Well, thank you for that question,
14  Representative, and for the opportunity to try and
15  explain that. You know, it has always amazed me -- and
16  I know we have a group of students here today and the
17  name of the school implies that they understand art --
18  it's just always amazed me that if from an individual's
19  political point of view, they like the outcome a map
20  produces, they think the map is a good map. It looks
21  good. If they don't, they think it is a gerrymandering
22  mess. So I would say to you that the criteria that was
23  used to draw this map were the following: Equal
24  population, contiguity, political data, partisan
25  advantage, doing away with the serpentine nature of the

## 43

1  12th district, compactness and incumbency.
2  REP. MICHAUX: Follow-up.
3  REP. JONES: Follow-up.
4  REP. MICHAUX: But no racial data or anything
5  was used to do that?
6  REP. LEWIS: Respectfully, sir, I have already
7  answered that, and race was not used in the drawing of
8  this. In fact, I think my exact words were race was
9  not considered and is not present on the reports.
10  REP. MICHAUX: Well, the reason I --
11  REP. JONES: Follow-up.
12  REP. MICHAUX: I'm sorry, Mr. Chairman. May I?
13  The reason I know that is because you keep repeating
14  the same things over and over again. That is why I am
15  repeating my question over and over again. Let me make
16  one final --
17  REP. JONES: One final follow-up,
18  Representative Michaux.
19  REP. MICHAUX: In the matter of retrogression,
20  was retrogression considered -- and listen, the reason
21  I asked that is because we now have two Congresspersons
22  of color, and the way you have drawn this map basically
23  knocks out one of those persons of color. Is
24  retrogression included in there?
25  REP. LEWIS: Thank you for that question,

## 44

1  Representative Michaux. I have often found if you
2  can't get the answer you want, continue to ask the
3  question. Let me reiterate the factors used in drawing
4  this map, if I could. They are: Equal population,
5  contiguity, political data, partisan advantage, doing
6  away with the serpentine nature of the 12th District,
7  compactness, and incumbency. Thank you for the
8  opportunity to clarify that.
9  REP. JONES: Thank you. Representative
10  Farmer-Butterfield, you are recognized.
11  REP. FARMER-BUTTERFIELD: I think that
12  Representative Michaux pretty much covered what I was
13  going to say.
14  REP. JONES: Thank you very much.
15  Further discussion, further debate?
16  Representative Jackson.
17  REP. JACKSON: Thank you, Mr. Chairman. I had
18  a follow-up. What is the gentleman's name that drew
19  the map, again?
20  REP. LEWIS: Dr. Tom Hofeller.
21  REP. JACKSON: Is Dr. Hofeller --
22  REP. JONES: Follow-up.
23  REP. JACKSON: Follow-up. Is Dr. Hofeller
24  still in North Carolina? And if so, would he be made
25  available to this committee to answer some of the

## 45

1  questions that you cannot answer for us today?
2  REP. LEWIS: Representative Jackson, I don't
3  know where Dr. Hofeller is at the moment, and I would
4  not contemplate, as he was a consultant for Chairman
5  Rucho and myself, that he would be made available to
6  the committee. I also will not seek to get the
7  consultants that may or may not have produced such a
8  fiery response from Representative Michaux to appear
9  before the committee to share the information that they
10  may or may not have produced in the two weeks since
11  they knew they were going to have to produced them.
12  REP. JONES: Okay. Just for the record, let
13  the Chair state that there is going to be a vote here
14  shortly, and we are not going to wait for Dr. Hofeller
15  to come from wherever he may be.
16  Representative Davis, you are recognized.
17  REP. DAVIS: Thank you, Mr. Chairman. A
18  comment if I may. I have been listening to the debate,
19  and I am really disappointed in the attitude of the
20  minority party Representative Michaux. It is like you
21  have set up a double standard. I mean, the minority
22  party wants transparency from the majority party. You
23  want truthful answers to the questions you have asked
24  today, which Representative Lewis and the others have
25  done. But yet when the majority party asks you

## 46

questions, it is none of our business. And I don't think you can have it both ways, sir. I think it would really be very beneficial to all involved if the minority party would be as honest and transparency as the majority party has been in these proceedings. And I really think it's very unfortunate, and I don't think it is very fruitful for this discussion.

REP. JONES: Representative Michaux, you are recognized just to respond to Representative Davis.

REP. MICHAUX: Yes, sir. I'm sorry you take offense at that, Representative Davis, but the fact of the matter is we did not create this mess. And we should not be saddled with the responsibility coming to you to try to -- you never asked us for our help to start with. So why should we come in now and try to help you get out of the hole that you dug? That's all that I'm saying. Now, whatever you call it, however you want to look at it, I can't help that, but that's where I'm coming from. And the fact of the matter is that the courts are now involved, and anything that we have to say, we will say it to the courts because you will not respect, basically, anything that we say on anything that we have done since you have had control. You don't ask us for anything -- let me give you -- let me give you a prime example if I can.

## 47

REP. JONES: Briefly, please.

REP. MICHAUX: Yes. When we were in charge, every time we had a Board of Elections, Board of Governors Election, we came to you and asked you who do you want on -- who of your party do you want on that board? And we always granted you that. We have never been granted the same type of recognition that we gave you all. So, yes, however, you want to characterize it, I stand by it.

REP. JONES: Thank you, Representative Michaux. The Chair will recognize Representative Hager. The Chair will make a statement, and then the Chair will recognize Representative Lewis for a motion.

REP. HAGER: Thank you, Mr. Chairman. See if Representative Michaux would yield for a question.

REP. JONES: Does the gentleman yield?

REP. MICHAUX: Yes.

REP. JONES: Representative Hager.

REP. HAGER: Representative Michaux, do you know if the minority party is planning to submit any invoices for reimbursement for anything associated with map drawing?

REP. MICHAUX: I don't have any idea of that. I have not talked to my leader yet.

REP. HAGER: Thank you.

## 48

REP. JONES: The chair will waive his statement. Representative Lewis, we'll give you the last word, and you're recognized for a motion.

REP. LEWIS: Mr. Chairman and members, I do just want to again thank you for your participation in this. I do just want to state for those who maybe were not here during the Joint Select Committee that it was the intention of the Chairs and the members and certainly the Speaker's office and the President Pro Tem's office to empower and provide the resources necessary for all members to fully be able to participate. It is dishonest to say that partisan politics don't play a big part in everything that we do up here, but it is also dishonest to say that a legitimate effort wasn't made to make sure that all members that wanted to fully participate and engage in this process and to try to offer solutions as opposed to simply organizing and rallying around talking points to attack the solutions that are proposed. I am certain that a good effort was made to empower that and to allow that level of participation.

I do hope that as we move forward, I hope that the Court will recognize that we have, to the best of our understanding, complied with the decision that they have asked us to do. We have done that by an open

## 49

committee in which full -- which amendments were allowed, which votes were recorded, drafted criteria that we felt complied with that decision. And that is what brings us to have Senate Bill 2 before us.

I do appreciate the remarks that were made, that the shapes of the map are prettier. I think, in fact, they are. I would state, again, for the record, that we are still hopeful that a stay will be issued by the U.S. Supreme Court because we are very concerned about the confusion that's caused by stopping an election that is underway. We heard yesterday that over 23,000 ballots have already been mailed out that do contain the race for the U.S. House of Representatives.

And, finally, I just want to say, for the record, and I will say again on the floor, while we are still in an uncertain time, it is very important for anybody that receives a ballot to fully exercise their right and to go ahead and vote for the U.S. House of Representatives on the ballot that is there. If, in fact, those races don't count, no harm, no foul. But if you do not vote, then you are missing your opportunity to register the candidate of your choice should the stay be granted.

Mr. Chairman, may I be recognized for a motion?

## 50

1  REP. JONES: Representative Lewis, you are so
2  recognized.
3  REP. LEWIS: Mr. Chairman, I move that the
4  House Committee on Redistricting give a favorable
5  report to Senate Bill 2.
6  REP. JONES: Representative Lewis has properly
7  moved that we give a favorable report to Senate Bill 2.
8  Those in favor will vote "aye," those opposed will vote
9  "no." The clerk will call the roll.
10  CLERK: Representative Lewis.
11  REP. LEWIS: Aye.
12  CLERK: Representative Jones.
13  REP. JONES: Aye.
14  CLERK: Representative Brawley.
15  REP. BRAWLEY: Aye.
16  CLERK: Representative Cotham.
17  REP. COTHAM: No.
18  CLERK: Representative Davis.
19  REP. DAVIS: Yes.
20  CLERK: Representative Farmer-Butterfield.
21  REP. FARMER-BUTTERFIELD: No.
22  CLERK: Representative Hager.
23  REP. HAGER: Aye.
24  CLERK: Representative Hanes.
25  REP. HANES: No.

## 51

1  CLERK: Representative Hardister.
2  REP. HARDISTER: Aye.
3  CLERK: Representative Hurley.
4  REP. HURLEY: Aye.
5  CLERK: Representative Jackson.
6  REP. JACKSON: No.
7  CLERK: Representative Johnson.
8  REP. JOHNSON: Aye.
9  CLERK: Representative Jordan.
10  REP. JORDAN: Aye.
11  CLERK: Representative McGrady.
12  REP. MCGRADY: Aye.
13  CLERK: Representative Michaux.
14  REP. MICHAUX: No.
15  CLERK: Representative Moore.
16  REP. MOORE: Nay.
17  CLERK: Representative Stam.
18  REP. STAM: Aye.
19  CLERK: Representative Stevens.
20  REP. STEVENS: Aye.
21  REP. JONES: With 12 votes in the affirmative
22  and 6 in the negative, the motion carries. Senate Bill
23  2 is given a favorable report. And this committee is
24  adjourned. Thank you, ladies and gentlemen.
25  (THE PROCEEDINGS IN THIS MATTER ADJOURNED AT 10:26 A.M.)

## 52

STATE OF NORTH CAROLINA
COUNTY OF WAKE
CERTIFICATE

I, Rachel L. Hammond, a Notary Public in and for the State of North Carolina duly commissioned and authorized to administer oaths and to take and certify hearings, do hereby certify that on February 19, 2016, this hearing was held before me at the time and place aforesaid, that all parties were present as represented, and that the record as set forth in the preceding 52 pages represents a true and accurate transcript of the proceedings to the best of my ability and understanding.

IN WITNESS WHEREOF, I have hereto set my hand, this the 25th day of February, 2016.

_____
Notary Public

Rachel L. Hammond
Notary Number
201126500152