STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION
11 CVS 16896
11 CVS 16940

MARGARET DICKSON, *et al.*,

Plaintiffs,

v.

ROBERT RUCHO, in his official capacity
only as the Chairman of the North
Carolina Senate Redistricting
Committee, *et al.*,

Defendants.

*Consolidated Cases*

NORTH CAROLINA STATE CONFERENCE
OF BRANCHES OF THE NAACP *et
al.*,

Plaintiffs,

v.

STATE OF NORTH CAROLINA *et al.*,

Defendants.

**SECOND AFFIDAVIT OF ALLAN J. LICHTMAN**

I, Allan J. Lichtman, being first duly sworn, depose and say:

1. I am over 18 years of age, legally competent to give this affidavit and have personal
knowledge of the facts set forth in this affidavit.

2. I am a Distinguished Professor of History at American University in Washington, DC
and formerly Associate Dean of the College of Arts and Sciences and Chair of the Department of

1

History. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, and historical and quantitative methodology. I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as <u>Political Methodology</u>, <u>Journal of Interdisciplinary History</u>, <u>International Journal of Forecasting</u>, and <u>Social Science History</u>. In addition, I have coauthored <u>Ecological Inference</u> with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as <u>Journal of Law and Politics</u>, <u>La Raza Law Journal</u>, <u>Evaluation Review</u>, <u>Journal of Legal Studies</u>, and <u>National Law Journal</u>. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies, published in such academic journals as <u>The Proceedings of the National Academy of Sciences</u>, <u>The American Historical Review</u>, <u>Forecast</u>, and <u>The Journal of Social History</u>. Quantitative and historical analyses also ground my books, <u>Prejudice and the Old Politics: The Presidential Election of 1928</u>, <u>The Thirteen Keys to the Presidency</u> (co-authored with Ken DeCell), <u>The Keys to the White House</u>, and <u>White Protestant Nation: The Rise of the American Conservative Movement</u>. My most recent book, <u>White Protestant Nation</u>, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America.

3. I have worked as a consultant or expert witness for both plaintiffs and defendants in some eighty voting and civil rights cases. These include several cases in the state of North Carolina. In late 2011, I was the expert witness in Illinois for the prevailing state parties in

2

separate litigation challenging both the adopted state plan for the State House and for Congress.[1]
My work includes more than a dozen cases for the United States Department of Justice and cases
for many civil rights organizations. I have also worked as a consultant or expert witness in
defending enacted plans from voting rights challenges. A copy of my resume and a table of cases
are attached as Appendix I of this report.

4. I have been asked to consider the African-American voting age population (VAP)
needed for State House, State Senate, and Congressional Districts in North Carolina that provide
African Americans the ability to elect candidates of their choice. In particular I have been asked
to consider whether it is necessary to create such districts that are 50 percent or more African-
American in their voting age population.

5. My expected fee in this matter is $400 per hour. I have enclosed an updated CV and a
table of cases in which I have provided written or oral testimony.

**Summary of Opinions**

- **Districts that are between 40% and 49%+ African-American in their voting age
  populations provide African-American voters an excellent ability to elect
  candidates of their choice to legislative positions.**

- **The win rate for African-American candidates and white candidates of choice of
  African-American voters in such districts is 90 percent.**

---

1 The State House litigation in Illinois was *Radogno v. Illinois State Bd. of Elections*, 2011 WL 5025251, *8 (N.D. Ill.
Oct. 21, 2011) and the Congressional litigation was *Committee For A Fair and Balanced Map, et al., v. Illinois State
Board of Elections* 2011 U.S. Dist. LEXIS 144302, (N. D. Ill. December 15, 2011).

- This win rate is no different than the win rate for African-American candidates and white candidates of choice of African-American voters in districts that are more than 50% African-American in their voting age populations.

- The insistence on creating African-American ability districts that are 50 percent or more African-American in their voting age population needlessly wastes African-American votes and diminishes the opportunity for African-American voters to influence the political process across the state of North Carolina.

- Such diminished opportunities are demonstrated by a comparison of previous state legislative districts with current legislative districts enacted by the North Carolina General Assembly.

- The report of state's expert Dr. Thomas L. Brunell exhibits numerous serious problems and cannot by itself be relied upon to assess the African-American percentage needed to create African-American ability districts for state legislature in North Carolina.

- Notwithstanding these problems, a close reanalysis of Dr. Brunell's findings demonstrates that they sustain the opinions numerated above.

**Data and Methods**

6. The voting analysis in this report relies on standard data utilized in social science: VTD by VTD (Voter Tabulation District) election returns for each candidate per election studied, with candidates identified by race and VTD by VTD breakdowns of voting age African Americans and whites, which includes a small number of Asians and members of other races. The election and demographic data and the racial identification of candidates were obtained from the NC State Board of Elections via counsel. To estimate the voting of African Americans and

4

whites, the analysis utilizes the standard methodology of ecological regression that I have employed in some 80 previous cases and applied to the analysis of many thousands of elections and the study of numerous redistricting plans. The ecological regression procedure estimates the voting behavior of demographic groups such as African Americans and whites by comparing the racial composition of VTDs to the division of the vote among competing candidates in each VTD. It produces an equation that estimates both the turnout and voting for each candidate by each voter group. The procedure was accepted by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30 (1986), and applied by the Court to single-member districts plans in *Quilter v. Voinovich,* 113 S. Ct 1149 (1993). My analysis based on these methods was cited authoritatively several times by the United States Supreme Court in the Congressional redistricting case, *League of United Latin Am. Citizens (LULAC) v. Perry,* 548 U.S. 399 (2006).[2]

7. This report also follows standard practice in the field by using the results of past elections and voting patterns by minority and white voters to assess prospects for minority voters in newly crafted districts. This method is utilized on a standard basis when there is population growth and shifts in population that require the redrawing of districts in which the electorate will not be precisely the same as in previous districts. In this case, moreover, the analysis is highly reliable in that it covers a large number of districts that will include most of the electorate included in newly drawn districts. The electoral analysis is also specific to State House, State Senate, and Congressional elections.

**Results of Analysis: 40%+ African-American Voting Age Population Districts**

---

2 For a scholarly analysis of ecological regression and why it works well in the context of analyzing the voting of racial groups, see, Allan J. Lichtman, "Passing the Test: Ecological Regression in the *Garza* Case and Beyond," *Evaluation Review* 15 (1991). Bernard Grofman, the expert witness in the *Gingles* case, and myself were co-originators of the specific statistical methodology used here, see, Bernard Grofman, Lisa Handley, Richard G. Niemi, *Minority Representation and the Quest for Voting Equality* (New York: Cambridge University Press, 1992), pp. 102, 146.

8. The results of analysis apply to the two most recent elections years of 2008 and 2010 and cover all previous State House, State Senate, and Congressional Districts. It focuses on districts with African-American candidates (contested and uncontested) that are 40 percent or more African-American in their voting age populations, either as created under the 2000 Census or as previously constituted under the 2010 Census. It also considers some districts that are less than 40 percent African-American in their voting age populations, but in which African-American candidates prevailed. The study examined Democratic primary elections, given that African Americans are overwhelmingly Democratic in North Carolina and general elections. It covers not only the two most recent years, but also provides balance by including one good Democratic year in North Carolina – 2008 – and one good Republican year in North Carolina – 2010.

9. Previous State House Districts offer an excellent opportunity to test scientifically, the proposition that the provision of districts with the ability of African-American voters to elect candidates of their choice requires the creation of districts that are 50 percent or greater in their African-American voting age population. This is because there are 11 previous State House districts that are between 40% and 49%+ African-American VAP according to the 2010 census and 10 previous State House districts that are 50 percent or more African-American VAP. The results of analyzing these two sets of districts, presented below, clearly **reject the need to create 50%+ African-American VAP districts. These results show that African-American voters in districts between 40 percent and 49%+ African-American VAP have at least an equal**

**ability to elect candidates of their choice as African-American voters in districts that are 50 percent or more African-American VAP.[3]**

10. Table 1 reports the results of analyzing the 11 State House districts that are between 40% and 49%+ African-American VAP. These results indicate that of the 11 districts studied, African-American candidates prevailed in all elections in 10 districts, and a white candidate who was not the candidate of choice of African-American voters prevailed in one election. **Thus the win rate for African-American candidates in districts that are 40%+ African-American VAP, but also below 50% African-American VAP is 91 percent, demonstrating that African-American voters in these districts have a powerful ability to elect an African American to the state legislature.** The only exception to this near universal pattern was House District 102, where the white incumbent, Becky Carney, was not the candidate of choice of African-American voters in the 2010 Democratic primary contest and went on to win in the general election that year. Ecological regression analysis also discloses that this was also a very low turnout election in which less than 5 percent of whites or blacks of voting age participated.

11. Table 2 reports the results of analyzing the 10 State House districts that are 50%+ African-American VAP. African-American candidates prevailed in 8 of these 10 districts. Thus the win rate for African-American candidates in these districts is 80 percent, below that of the districts between 40% and 49%+ African-American VAP. In another district, House District 27, a white candidate of choice of African-American voters prevailed. Thus the win rate for African-American candidates and candidates of choice of African-American voters was 90

---

3 HD 43 is 54.7% African-American VAP according to the 2010 census and 48.7 percent African-American VAP according to the 2000 census. HD 107 is 47.1% African-American VAP according to the 2010 census and 50.5 percent African-American VAP according to the 2000 census. The classification of these two districts into separate categories according to the 2010 data does not affect the results of analysis given that both districts elected black candidates in 2008 and 2010.

percent in these districts, about equal to that of the districts between 40% and 49%+ African-American VAP. The only exception to this near universal pattern occurred in House District 8. According to ecological regression analysis, the white incumbent for House District 8, Edith Warren, was not the candidate of choice of African-American voters in either the 2008 or 2010 Democratic primary contest and prevailed in both general elections. However, the white candidate won with more than 60 percent of the vote and would have won even if this district were 60 percent African-American VAP.

12. With respect to State Senate Districts, the results of analysis sustain the finding that districts that are between 40% and 49%+ African American VAP provide African-American voters the clear ability to elect candidates of their choice to the state legislature. The State Senate does not include any previous districts that are 50%+ African-American VAP. Table 3 reports the results of analyzing the eight State House districts that are between 40% and 49%+ African-American VAP. These results indicate that of the eight districts studied, African-American candidates prevailed in all elections in six districts, and according to ecological regression analysis, a white candidate of choice of African-American voters prevailed in all elections in another district. The lone exception to this pattern, according to ecological regression analysis, is in Senate District 3, where a white candidate who was not the Democratic primary candidate of choice of African-American voters was elected in 2008 and 2010. Thus, in 40%+ black voting age population districts, African-American candidates or the candidates of choice of African-American voters prevailed in all elections in 7 of 8 districts, for a win rate of 88 percent.

13. With respect to Congressional Districts, there are two districts that are above 40% African American VAP, but below 50% African American VAP. There are no districts that are 50%+ African American VAP. The results of analysis reported in Table 4 demonstrate that of

8

two districts studied, African-American candidates prevailed in all elections in both districts. Thus, in 40%+ congressional districts, candidates or the candidates of choice of African-American voters prevailed in all elections in 2 of 2 districts, for a win rate of 100 percent.

14. **The results of combining the analyses of elections for State House, State Senate, and Congress demonstrate that either African-American candidates or candidates of choice of African-American voters prevailed in all elections in 19 of 21 districts that are 40%+ African-American VAP, but below 50% African-American, for a win rate of win rate of 90 percent. This win rate is the same as the win rate of 90 percent in 50%+ African-American districts.** Thus, the results of analysis clearly demonstrate it is not necessary in North Carolina to create effective African-American ability districts with African-American voting age populations of 50 percent or more. To the contrary, the result of creating such districts is to waste African-American votes that could expand the ability of African Americans to influence the political process in other districts.

15. Tables 5 and 6 show the results of creating unnecessary 50%+ African-American districts for State House and State Senate. As compared to the previous benchmark plans, the enacted plans needlessly pack African Americans into districts greater than 50 percent African-American voting age population, which substantially diminishes the influence of African-American voters in other House and Senate districts. As indicated in Table 5, the previous benchmark State House plan has 32 districts that are 30% or more African American voting age population, compared to only 26 in the enacted State House plan. As indicated in Table 6, the previous benchmark State Senate plan has 15 districts that are 30% or more African American voting age population, compared to only 10 in the enacted State Senate plan.

9

**African-American Voter Opportunity in Districts Less Than 40 Percent African American Voting Age Population**

16. The results of past elections also demonstrate that African-American voters have an opportunity to elect candidates of their choice in legislative districts that are substantially below 40 percent African-American voting age population. The analysis will consider first Senate Districts and then House Districts that are below 40 percent African-American voting age population in which African Americans have won elections to the state legislature.

17. Senate District 5 is only 31 percent African-American VAP, however African-American voters were able to elect an African-American candidate of choice in this district in the 2008 general election. As indicated in Table 7, ecological regression analysis demonstrates that 97 percent of African-American voters voted for Don Davis, the African-American Democratic candidate. In turn, 30 percent of white voters crossed over to vote for Davis. This combination of near unanimous African-American support for Davis combined with the white crossover vote was sufficient for Davis to prevail in the election. As also indicated in Table 7, in 2010, African-American cohesion remained constant with 97 percent of African-American voters backing Davis. However, white crossover voting declined to 21 percent, with the result that Davis's white Republican opponent Louis Pate won the election. Thus in SD 5, the African-American candidate prevailed in the good Democratic year of 2008, but lost in the good Republican year of 2010. These results demonstrate that depending on political circumstance, African-American voters have an opportunity to elect a candidate of their choice even in a district that is only about 31 percent African-American VAP.

18. Similar results prevail in Senate District 24, which is only 21.1 percent African-American VAP. As in SD 5, African-American voters were able to elect an African-American

10

candidate of their choice in this district in the 2008 general election. As indicated in Table 8, ecological regression analysis demonstrates that 99 percent of African-American voters voted for Tony Foriest, the African-American Democratic candidate. In turn, 38 percent of white voters crossed over to vote for Foriest. This combination of near unanimous African-American support for Foriest combined with the white crossover vote was sufficient for Foriest to prevail in the election. As also indicated in Table 8, in 2010, African-American cohesion remained roughly constant with 97 percent of African-American voters backing Foriest in a three-way contest against white Republican Gunn and white Libertarian Coe. However, white crossover voting declined to 27 percent, with the result that Foriest's white Republican opponent Gunn won the election. Thus in SD 24, the African-American candidate prevailed in the good Democratic year of 2008, but lost in the good Republican year of 2010. These results demonstrate that depending on political circumstance, African-American voters have an opportunity to elect a candidate of their choice even in a district that is only about 21 percent African-American VAP.[4]

19. House District 39 is only 34.9 percent African-American VAP population. However, African-American voters were able to nominate and elect an African-American candidate of their choice, Linda Coleman, in this district in the 2004, 2006, and 2008 elections. In 2009, Coleman resigned her seat and a white Democrat defeated a white Republican in the 2010 general election. The elections from 2004 through 2008 demonstrate that African-American voters have an opportunity to elect a candidate of their choice even in a district that is only about 35 percent African-American VAP.

20. House District 41 is only 12.1 African American VAP. However, African-American voters were able to nominate and elect an African-American candidate of their choice, Ty

---

[4] It is also worth noting that according to sign-in results, African-American turnout in both SD 5 and SD 24 was higher than white turnout in 2008. African-American turnout declined relative to white turnout in 2010, but was still very slighter higher in both districts.

Case 1:13-cv-00949-WO-JEP   Document 159-11   Filed 03/07/16   Page 11 of 26

Harrell, in this district in both the 2006 and the 2008 general elections. In 2009, Harrell resigned his seat and a white Democrat lost to a white Republican in the general election. The elections from 2006 and 2008 demonstrate that African-American voters have an opportunity to elect a candidate of their choice even in a district that is only about 12 percent African-American VAP.

**Analysis of the Report of State's Expert Thomas L. Brunell**

21. The Brunell report exhibits five significant problems. First, it is highly selective in its choice of elections. Second, it is also highly selective in that it sometimes reports the results of its ecological regression analysis and sometime reports only the results of its homogeneous VTD analysis. Third, it relies only on an analysis of racially polarized voting. As the analysis above indicates, the presence of racially polarized voting by itself does not mean that it is necessary to create 50% African-American VAP districts to provide African-American candidates the ability to elect candidates of their choice. Fourth, Dr. Brunell does not report the actual results of the elections he analyzes, an essential element in analyzing the effectiveness of districts for African-American voters. Fifth, Dr. Brunell does not report turnout in any of his electoral analyses, another important element of an effectiveness analysis. In fact, close analysis of the Brunell report demonstrates why African-American candidates have been overwhelmingly successful in winning elections in State House and Senate districts that are greater than 40 percent but less than 50 percent African-American VAP.

22. The Brunell results, presuming their accuracy, demonstrate that African Americans vote overwhelmingly for African-American Democratic candidates (the African-American candidates in such districts are Democrats), whereas there is considerable white crossover voting for African-American Democratic candidates. It is the combination of such high levels of African-American cohesion, combined with sufficient white crossover voting that enables

12

African Americans to nearly always prevail in districts that are 40% African-American VAP, but less than African-American majority VAP in general elections. Likewise, as will be additionally demonstrated below, African Americans typically dominate the primary elections in such districts given their overwhelmingly Democratic proclivities, compared to the predominantly Republican proclivities of whites in North Carolina.[5]

23. These favorable circumstances for African-American candidates are demonstrated first in Dr. Brunell's statewide analysis of the 2008 general election for president in which the African-American Democratic candidate Barack Obama competed against the white Republican candidate John McCain. Dr. Brunell conducted a homogeneous VTD analysis and an ecological regression analysis for 51 of what he calls "counties of interest" in this election. He does not report his ecological regression results for the 51 counties statewide that he studied, but does report his homogeneous VTD results for numerous VTDs across the 51 counties. His homogeneous VTD analysis demonstrates that Obama averaged 97.8 percent of the vote in 64 VTDs that are 90%+ African-American in their voters and 39.7 percent of the vote in 358 VTDs with less than 10% African-American voters (Brunell Report, p. 8). Given the large numbers of homogeneous VTDs, these results should be consistent with ecological regression results. If we apply these homogeneous VTD results to a VTD that is 40 percent African-American voting age population, the expected vote for an African-American Democrat under the presumption of equal turnout is 62.94 percent (.4 * .978 + .6 * .397 = .6294). Thus, even if white turnout was much higher than African-American turnout (which is not generally the case in North Carolina general elections), African-American candidates would still be presumptive winners in a 40% African-American voting age population district.

---

[5] As indicated above, Dr. Brunell does not report turnout in any of his electoral analyses.

13

24. Similar results are obtained from Dr. Brunell's only other statewide analysis of a general election. This is the 2004 general election for State Auditor in which the African-American Democratic candidate Ralph Campbell competed against the white Republican candidate Leslie Merritt. Dr. Brunell again conducted a homogeneous VTD analysis and an ecological regression analysis his 51 "counties of interest" in this election. Again, he does not report his ecological regression results for all counties, but does report his homogeneous VTD results for numerous VTDs across the 51 counties. His homogeneous VTD analysis includes a larger number of VTDs than for the presidential contests. These results demonstrate that Campbell averaged 96.3 percent of the vote in 70 VTDs that are 90%+ African-American in their voters and 39.3 percent of the vote in 407 VTDs with less than 10% African-American voters. (p. 11). If we apply these homogeneous VTD results to a VTD that is 40 percent African-American voting age population, the expected vote for an African-American Democrat under the presumption of equal turnout is 62.1 percent (.4 * .963 + .6 * .393 = .6210). These results are nearly identical to those for the 2008 presidential general election. Once again, even if white turnout was much higher than African-American turnout, African-American candidates would still be presumptive winners in a 40% African-American voting age population district.

25. The results for these two statewide elections also demonstrate why African-American candidates have been able to prevail overwhelmingly in Democratic primaries in districts that are greater than 40 percent but less than 50 percent African-American VAP. Dr. Brunell's results indicate that African Americans are near unanimous in their Democratic loyalties, whereas about 60 percent of whites are loyal to Republicans in general elections. The average African-American vote for the Democratic candidate in the two statewide general elections studied by Dr. Brunell is 97.1 percent, whereas the average white vote for the Democratic candidate is 39.5

14

percent. If we apply these results to the potential African-American and white vote in a Democratic primary, the results show that the potential African-American percentage of voters in a 40 percent black voting age population district is 62.1 percent (.4 * .971/(.4 * .971+ .6 * .395) = .621). Thus, even if white Democrats turned out at higher rates than African-American Democrats, which is not generally the case in North Carolina, African Americans would still dominate the Democratic primary.

26. These findings for primary elections are validated by the statewide results of the 2008 Democratic primary for president, which Dr. Brunell analyzes. Although Dr. Brunell found racially polarized voting in this primary, the African-American candidate Barack Obama still easily prevailed statewide against white opponents with 56.1 percent of the vote, even though the statewide African-American voting age population is only 21 percent according to the 2010 Census. An application of Dr. Brunell's results to a 40 percent African-American district would demonstrate a substantially higher percentage vote for the African-American candidate. According to Dr. Brunell's homogeneous VTD analysis across his 51 "counties of interest," Obama averaged 92.0 percent of the vote in 97 VTDs that are 90%+ African-American in their voters and 43.8 percent of the vote in 161 VTDs with less than 10% African-American voters. (p. 5). If we apply these homogeneous VTD results to a VTD that is 40 percent African-American voting age population, the expected vote for an African-American Democrat under the presumption of equal turnout is 63.1 percent (.4 * .92+ .6 * .438 = .631).

27. Dr. Brunell also provides some highly selected analyses of African-American versus white elections in State House and Senate districts. Dr. Brunell's results, supplemented by additional analyses of the districts he examines, again show why African-American candidates overwhelmingly prevail in districts that are greater than 40 percent but less than 50 percent

15

African-American VAP. The State House and State Senate districts that Dr. Brunell considers are analyzed below. Dr. Brunell does not analyze any of the African-American vs. white contests that took place in U. S. Congressional Districts (see Table 4 below).

28. State Senate District 20 (Durham County). This district is 44.6 percent African-American voting age population according to the 2010 Census. Dr. Brunell analyzes only the 2010 general election in this district in which the African-American Democrat Floyd McKissick, Jr. competed against the white Republican John Tarantino. Although Dr. Brunell finds racially polarized voting in this election, (p. 15) he fails to note that the African-American candidate McKissick, Jr. overwhelmingly prevailed in 2010 with 73.1 percent of the vote. Dr. Brunell also fails to consider the 2008 general election in Senate District 20, in which the African-American Democrat McKissick, Jr. prevailed with 73.6 percent of the vote.

29. State Senate District 5 (Greene, Pitt, and Wayne Counties). This district is 31 percent African-American voting age population according to the 2010 Census. Once again, Dr. Brunell analyzes only the 2010 general election in this district in which the African-American Democrat Don Davis lost to the white Republican Louis Pate (p. 18). He fails to analyze the 2008 general election in Senate District 5, in which Davis prevailed over Pate, despite racially polarized voting. Thus, as indicated in the analysis of Senate District 5 presented above, African-American candidates have the ability to prevail in districts that are well below 40 percent African-American voting age population.

30. State Senate District 13 (Hoke and Robeson Counties). This district is 27.2 percent African-American voting age population according to the 2010 Census. For this district, Dr. Brunell analyzes the 2008 Democratic primary election in which the African-American

16

candidate Benjamin Clark lost to the white candidate David Weinstein. Dr. Brunell reports that he found racially polarized voting in this contest, but fails to note the low percentage of African-American voting age population in this district (p. 22).

31. State Senate District 3 (Edgecombe, Martin, and Pitt Counties). This district is 46.9 percent African-American voting age population according to the 2010 Census. For this district, Dr. Brunell analyzes the 2010 Democratic primary election in this district in which white candidate Clark Jenkins prevailed against two African-American candidates: Florence Armstrong and Frankie Bourdeaux. Dr. Brunell reports that he found racially polarized voting in this contest and that white candidate Jenkins prevailed (p. 23). However, he fails to note Jenkins prevailed because of a split in the African-American vote. Taken together, the two African-American candidates received a majority of 50.3 percent of the votes cast in this election.

32. State House District 60 (Guilford County). This district is 54.4 percent African-American voting age population according to the 2010 Census. For this district, Dr. Brunell analyzes the 2006 general election in which the African-American Democrat Earl Jones competed against the white Republican Bill Wright. Dr. Brunell reports that he found racially polarized voting in this contest (p. 20). However, he fails to note that the African-American candidate overwhelmingly prevailed in this district with 60 percent of the vote. He also fails to note that African-American candidates continued to prevail in the district in the subsequent general elections of 2008, which was uncontested, and 2010, where the African-American Democrat won 70 percent of the vote.

33. State House District 102 (Mecklenburg County). This district is 42.7 percent African-American voting age population according to the 2010 Census. For this district, Dr. Brunell

17

analyzes the 2010 general election in which the African-American candidate competed against the white candidates Becky Carney and Ken Davies. Carney prevailed in this election and Dr. Brunell reports that he found racially polarized voting. However, he fails to note that this was an extremely low turnout election as previously indicated. Moreover, Dr. Brunell's results also show that this was a barely polarized election with very low African-American cohesion. According to Dr. Brunell's ecological regression results, only 53.6 percent of African-American voters voted for the African American candidate (4.1% + 49.5% = 53.6%, p. 21).

34. In addition to omitting considerable information, including the results of additional African-American vs. white elections in those districts, Dr. Brunell also omits from his analyses numerous other State House, State Senate, and Congressional districts in which African-American candidates prevailed with African-American voting age populations of less than 50 percent. These districts are enumerated in Tables 1 to 4 below.

35. **In sum, the results of both the independent analysis presented above and the reanalysis of Dr. Brunell's report demonstrate that the only result of an insistence on creating 50%+ African-American state legislative districts is to waste African-American votes and diminish the ability of African-American voters to influence the political process across the state of North Carolina.** As demonstrated by the comparative analysis of 40%+ to 49%+ African-American districts with 50%+ African-American districts, it is not necessary to create African-American ability districts with African-American voting age populations greater than 50 percent. For both sets of districts, the win rate for electing African Americans and candidates of choice of African-American voters is an overwhelming 90 percent. Examination of the Brunell report shows that despite its many problems, the report's results sustain these

findings. The findings of this report are also consistent with the findings of Dr. Theodore

Arrington who wrote the following in his affidavit:

> These statistics indicate that a primary purpose of precinct splitting was to segregate the races into separate districts. Black voters were placed in packed districts with far higher concentrations than are necessary to give them a reasonable opportunity to elect representatives of their choice or their ability to elect such representatives. I know that these concentrations are excessive based on my extensive study of voting in North Carolina including work on Section 5 preclearance for the Department of Justice and various voting rights cases beginning with my work on the Gingles case.[6]

In addition, the results of analyzing elections in Senate District 5, Senate District 24, House

District 39, and House District 41 also demonstrate that African Americans in North Carolina

have opportunities to elect African-American candidates of their choice in legislative districts

that are considerably below 40 percent in African-American voting age population.

---

6 First Affidavit of Theodore S. Arrington, p. 11-12.

19

**Table 1**
**Electoral Analysis of Previous State House Districts With Black Voting Age Population**
**Greater Than or Equal to 40% & Below 50%,***

| District | % Black VAP 2000 Census | % Black VAP 2010 Census | Result: 2008 Democratic Primary | Result: 2008 General Election | Result: 2010 Democratic Primary | Result: 2010 General Election |
|---|---|---|---|---|---|---|
| HD 5 | 49.0% | 48.9% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 12 | 47.5% | 46.5% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 21 | 48.4% | 46.3% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 29 | 44.7% | 40.0% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 31 | 44.7% | 47.2% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 42 | 45.1% | 47.9% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 48 | 45.5% | 45.6% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 72 | 43.4% | 45.4% | NONE: BLACK | BLACK | BLACK | BLACK |
| HD 99 | 28.3% | 41.3% | BLACK | BLACK | BLACK | BLACK |
| HD 102 | 46.1% | 42.7% | NONE: WHITE | WHITE: CHOICE | WHITE: NOT CHOICE | WHITE: CHOICE |
| HD 107 | 50.5% | 47.1% | BLACK | BLACK | NONE: BLACK | BLACK |

* Analysis of contested elections conducted through ecological regression analysis of VTD-level data.

20

**Table 2**
**Electoral Analysis of Previous State House Districts With 50%+ Black Voting Age Population\***

| District | % Black VAP 2000 Census | % Black VAP 2010 Census | Result: 2008 Democratic Primary | Result: 2008 General Election | Result: 2010 Democratic Primary | Result: 2010 General Election |
|---|---|---|---|---|---|---|
| HD 7 | 56.0% | 60.8% | BLACK | BLACK | NONE: BLACK | BLACK |
| HD 8 | 50.4% | 50.2% | WHITE: NOT CHOICE | WHITE: CHOICE | WHITE: NOT CHOICE | WHITE: CHOICE |
| HD 24 | 54.8% | 56.1% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 27\*\* | 52.9% | 54.0% | NONE: WHITE | NONE: WHITE | NONE: WHITE | NONE: WHITE |
| HD 33 | 50.0% | 51.7% | NONE: BLACK | BLACK | BLACK | BLACK |
| HD 43 | 48.7% | 54.7% | BLACK | BLACK | BLACK | BLACK |
| HD 58 | 53.4% | 53.4% | NONE: BLACK | BLACK | BLACK | BLACK |
| HD 60 | 50.6% | 54.4% | NONE: BLACK | BLACK | BLACK | BLACK |
| HD 71 | 51.6% | 51.1% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |
| HD 101 | 50.6% | 55.7% | NONE: BLACK | BLACK | BLACK | BLACK |

\* Analysis of contested elections conducted through ecological regression analysis of VTD-level data.
\*\* White candidate Michael Wray was elected without primary or general election opposition in HD 27 in 2008 and 2010. In 2006, he was the candidate of choice of black voters in a primary election victory against black opponents.

21

**Table 3**
**Electoral Analysis of Previous State Senate Districts With 40%+ Black Voting Age Population\***

| District | % Black VAP 2000 Census | % Black VAP 2010 Census | Result: 2008 Democratic Primary | Result: 2008 General Election | Result: 2010 Democratic Primary | Result: 2010 General Election |
|---|---|---|---|---|---|---|
| SD 3 | 47.0% | 46.9% | WHITE: NOT CHOICE | WHITE: CHOICE | WHITE: NOT CHOICE | WHITE: CHOICE |
| SD 4 | 49.1% | 49.7% | NONE: BLACK | BLACK | BLACK | BLACK |
| SD 14 | 41.0% | 42.6% | BLACK | BLACK | NONE: BLACK | BLACK |
| SD 20 | 44.6% | 44.6% | BLACK | BLACK | NONE: BLACK | BLACK |
| SD 21 | 41.0% | 44.9% | BLACK | BLACK | BLACK | BLACK |
| SD 28 | 44.2% | 47.2% | BLACK | BLACK | BLACK | BLACK |
| SD 32 | 41.4% | 42.5% | NONE: WHITE | WHITE: CHOICE | WHITE: CHOICE | WHITE: CHOICE |
| SD 38 | 47.7% | 47.0% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |

\* Analysis of contested elections conducted through ecological regression analysis of VTD-level data.

22

**Table 4**
**Electoral Analysis of Previous Congressional Districts With 40%+ Black Voting Age Population***

| District | % Black VAP 2000 Census | % Black VAP 2010 Census | Result: 2008 Democratic Primary | Result: 2008 General Election | Result: 2010 Democratic Primary | Result: 2010 General Election |
|---|---|---|---|---|---|---|
| CD 1: | 48.1% | 48.6% | NONE: BLACK | BLACK | BLACK | BLACK |
| CD 12 | 42.8% | 43.8% | NONE: BLACK | BLACK | NONE: BLACK | BLACK |

* Analysis of contested elections conducted through ecological regression analysis of VTD-level data.

**Table 5**
**Comparison of State House Districts 30%+ Black Voting Age Population, Previous Districts and Enacted Districts**

| Count | Previous District | % Black VAP 2010 Census | Enacted District | % Black VAP 2010 Census |
|---|---|---|---|---|
| 1 | 7 | 60.77% | 24 | 57.33% |
| 2 | 24 | 56.07% | 99 | 54.65% |
| 3 | 101 | 55.73% | 5 | 54.17% |
| 4 | 43 | 54.69% | 27 | 53.71% |
| 5 | 60 | 54.36% | 102 | 53.53% |
| 6 | 27 | 53.95% | 42 | 52.56% |
| 7 | 58 | 53.43% | 107 | 52.52% |
| 8 | 33 | 51.74% | 21 | 51.90% |
| 9 | 71 | 51.09% | 23 | 51.83% |
| 10 | 8 | 50.23% | 31 | 51.81% |
| 11 | 5 | 48.87% | 43 | 51.45% |
| 12 | 42 | 47.94% | 33 | 51.42% |
| 13 | 31 | 47.23% | 38 | 51.37% |
| 14 | 107 | 47.14% | 60 | 51.36% |
| 15 | 12 | 46.45% | 29 | 51.34% |
| 16 | 21 | 46.25% | 101 | 51.31% |
| 17 | 48 | 45.56% | 48 | 51.27% |
| 18 | 72 | 45.40% | 106 | 51.12% |
| 19 | 102 | 42.74% | 58 | 51.11% |
| 20 | 99 | 41.26% | 57 | 50.69% |
| 21 | 29 | 39.99% | 7 | 50.67% |
| 22 | 100 | 37.39% | 12 | 50.60% |
| 23 | 23 | 36.90% | 32 | 50.45% |
| 24 | 32 | 35.88% | 71 | 45.49% |
| 25 | 39 | 34.91% | 72 | 45.02% |
| 26 | 55 | 32.98% | 100 | 32.01% |
| 27 | 44 | 32.57% | | |
| 28 | 69 | 31.74% | | |
| 29 | 63 | 30.66% | | |
| 30 | 45 | 30.40% | | |
| 31 | 25 | 30.30% | | |
| 32 | 59 | 30.15% | | |

**Table 6**
**Comparison of State Senate Districts 30%+ Black Voting Age Population, Previous**
**Districts and Enacted Districts**

| Count | Previous District | % Black VAP 2010 Census | Enacted District | % Black VAP 2010 Census |
|---|---|---|---|---|
| | | | | |
| 1 | 4 | 49.70% | 28 | 56.49% |
| 2 | 28 | 47.20% | 4 | 52.75% |
| 3 | 38 | 46.97% | 38 | 52.51% |
| 4 | 3 | 46.93% | 3 | 52.43% |
| 5 | 21 | 44.93% | 5 | 51.97% |
| 6 | 20 | 44.64% | 40 | 51.84% |
| 7 | 14 | 42.62% | 21 | 51.53% |
| 8 | 32 | 42.52% | 14 | 51.28% |
| 9 | 7 | 37.36% | 20 | 51.04% |
| 10 | 11 | 37.27% | 32 | 42.53% |
| 11 | 40 | 35.43% | | |
| 12 | 27 | 31.11% | | |
| 13 | 10 | 31.09% | | |
| 14 | 5 | 30.99% | | |
| 15 | 37 | 30.18% | | |

25

**Table 7**
**Ecological Regression Results for Previous Senate District 5, 2008 and 2010 General Elections**

| ELECTION | % OF BLACK VOTERS VOTING FOR BLACK DEMOCRAT | % OF WHITE VOTERS VOTING FOR BLACK DEMOCRAT |
|---|---|---|
| 2008 GENERAL | 97% | 30% |
| 2010 GENERAL | 97% | 21% |

**Table 8**
**Ecological Regression Results for Previous Senate District 24, 2008 and 2010 General Elections**

| ELECTION | % OF BLACK VOTERS VOTING FOR BLACK DEMOCRAT | % OF WHITE VOTERS VOTING FOR BLACK DEMOCRAT |
|---|---|---|
| 2008 GENERAL | 99% | 38% |
| 2010 GENERAL | 97% | 27% |

26