NORTH CAROLINA GENERAL ASSEMBLY

NORTH CAROLINA SENATE

---

TRANSCRIPT OF THE PROCEEDINGS

FLOOR SESSION

---

In Raleigh, North Carolina

Thursday, February 18, 2016

Reported by Robbie W. Worley

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

## 2

1        (Reporter's note: Proceedings in this
2 matter began at 9:37 a.m.)
3        LT. GOV. FOREST: This being the time and
4 place set by proclamation by the Honorable Pat
5 McCrory, Governor, for the convening of the 2016
6 Extra Session of the General Assembly of North
7 Carolina, the Senate will come to order.
8        Sergeant-at-Arms will close the doors.
9 Members go to their seats. Members and guests in
10 the gallery, please silence all your electronic
11 devices.
12        Leading the Senate in prayer is the
13 Reverend Peter Milner, Senate Chaplain. All
14 members and guests in the gallery, please stand and
15 remain standing for the Pledge of Allegiance.
16        REV. PETER MILNER: Father in Heaven, we
17 come to you as a Senate family, as state
18 representatives, and even as a nation in need of so
19 much. We need fortification. We need
20 advancements.
21        And, Father, please move us ultimately
22 closer to you. Move us, Lord. Move us as servant
23 leaders. And protect those that are here. Only
24 you can protect us from 10,000 arrows. Provide a
25 hedge around this nation, and establish your

## 3

1 domestic tranquility here.
2        In fact, Lord, we can't do anything
3 without you. But by your spirit, we ask you to
4 lead us and heal us and bring us into your
5 presence. And we thank you for this process, even
6 when it's hard, that reminds us how much we need
7 one another to get anything done. And mostly,
8 Lord, we need you to get anything done.
9        And it's in Jesus' name we pray. Amen.
10        LT. GOV. FOREST: Please join me in the
11 Pledge of Allegiance.
12        (Pledge of Allegiance recited.)
13        LT. GOV. FOREST: Reading clerk will read
14 the Proclamation from the Governor.
15        CLERK: The State of North Carolina, Pat
16 McCrory, Governor, proclamation of an extra
17 session. Whereas, on February 5th, 2016, a three-
18 judge panel for the United States District Court
19 for the Middle District of North Carolina ordered
20 the General Assembly to draw new congressional
21 districts by February 19th, 2016;
22        And whereas, state defendants will
23 exercise all avenues of appeal, but intend to fully
24 comply with the Court's order;
25        And whereas, the three-judge panel,

## 4

1 United States District Court for the Middle
2 District, the Court, recognized, will establish
3 precedence that a state should have the first
4 opportunity to create a constitutional
5 redistricting plan;
6        And whereas, Legislative leadership took
7 steps to prepare for possible extra session by
8 appointing a Joint Select Committee on
9 Congressional Redistricting, the Committee, on
10 Friday, February the 12th, 2016;
11        And whereas, the Committee held a series
12 of public hearings across the state, in Raleigh,
13 Halifax, Charlotte, Fayetteville, Wilmington and
14 Asheville, on Monday, February 15th, 2016;
15        And whereas, the Committee met in Raleigh
16 to discuss public feedback and to review the
17 Court's order on Tuesday, February 16, 2016, and
18 Wednesday, February 17, 2016;
19        And whereas, the Legislative leadership
20 requested an extra session for the purpose of
21 expeditiously approving new congressional districts
22 so as to comply with the Court's order and minimize
23 delay of the primary election currently underway;
24        Now, therefore, I, Pat McCrory, Governor
25 of the State of North Carolina, resort to the

## 5

1 authority invested in me as Governor by Article
2 III, Section 7(7) -- correction -- Section 5(7) of
3 the Constitution of North Carolina, due to
4 extraordinary occasion and by and with the advice
5 of the council of state, do hereby proclaim that
6 the General Assembly shall convene for an extra
7 session on Thursday, February 18, 2016, at 10:00
8 am, and shall continue as provided by law and the
9 rules of each house until both houses shall have
10 adjoined sine die for the purpose of appointing
11 congressional districts as required by the three-
12 judge panel and to consider any other legislation
13 necessary to hold the 2016 Congressional election.
14        In witness whereof, I have hereunto
15 signed my name and affixed the Great Seal of the
16 State of North Carolina at the Capitol in the City
17 of Raleigh this 17th day of February, 2016. Pat
18 McCrory, Governor.
19        LT. GOV. FOREST: Senators, courtesies of
20 the floor is extended to Robbie Worley, who is
21 transcribing today's session.
22        The Clerk will now call the roll of the
23 2015 Senate. When your name is called, please
24 stand and respond clearly into your microphone so
25 we can make sure we record it clearly, as well.

**6**

1    CLERK:  Date of 215 -- 2015 North
2    Carolina General Assembly call of the roll, 2016
3    extra session.
4        Alexander?
5    SEN. ALEXANDER: Here.
6    CLERK:  Apodaca?
7    SEN. APODACA: Here.
8    CLERK:  Barefoot?
9    SEN. BAREFOOT: Here.
10   CLERK:  Barringer?
11   SEN. BARRINGER: Here.
12   CLERK:  Berger?
13   SEN. BERGER: Here.
14   CLERK:  Bingham? Bingham?
15       (No response)
16   CLERK:  Blue?
17   REP. BLUE: Present.
18   CLERK:  Brock?
19   SEN. BROCK: Here.
20   CLERK:  Brown?
21   SEN. BROWN: Here.
22   CLERK:  Bryant?
23   SEN. BRYANT: Present.
24   CLERK:  Clark?
25   SEN. CLARK: Present.

**7**

1    CLERK:  Cook?
2    SEN. COOK: Here.
3    CLERK:  Curtis?
4    SEN. CURTIS: Here.
5    CLERK:  Daniel?
6    SEN. DANIEL: Here.
7    CLERK:  D. Davis?
8    SEN. D. DAVIS: Here.
9    CLERK:  J. Davis?
10   SEN. J. DAVIS: Here.
11   CLERK:  Ford?
12   SEN. FORD: Present.
13   CLERK:  Foushee?
14   SEN. FOUSHEE: Present.
15   CLERK:  Gunn?
16   SEN. GUNN: Here.
17   CLERK:  Harrington?
18   SEN. HARRINGTON: Here.
19   CLERK:  Hartsell?
20   SEN. HARTSELL: Here.
21   CLERK:  Hise?
22   SEN. HISE: Here.
23   CLERK:  B. Jackson?
24   SEN. B. JACKSON: Here.
25   CLERK:  J. Jackson?

**8**

1    SEN. J. JACKSON: Present.
2    CLERK:  Krawiec?
3    SEN. KRAWIEC: Here.
4    CLERK:  Lee? Lee?
5        (No response)
6    CLERK:  Lowe?
7    SEN. LOWE: Here.
8    CLERK:  McInnis? McInnis?
9        (No response)
10   CLERK:  McKissick?
11   SEN. MCKISSICK: Here.
12   CLERK:  Meredith?
13   SEN. MEREDITH: Here.
14   CLERK:  Newton?
15   SEN. NEWTON: Here.
16   CLERK:  Pate?
17   SEN. PATE: Here.
18   CLERK:  Rabin of Harnett?
19   SEN. RABIN: Here.
20   CLERK:  Rabon of Brunswick?
21   SEN. RABON: Here.
22   CLERK:  Randleman?
23   SEN. RANDLEMAN: Here.
24   CLERK:  Robinson?
25   SEN. ROBINSON: Here.

**9**

1    CLERK:  Rucho?
2    SEN. RUCHO: Here.
3    CLERK:  Sanderson?
4    SEN. SANDERSON: Here.
5    CLERK:  Smith?
6    SEN. SMITH: Here.
7    CLERK:  Smith-Ingram? Smith-Ingram?
8        (No response)
9    CLERK:  Soucek?
10   SEN. SOUCEK: Here.
11   CLERK:  Stein? Stein?
12   SEN. STEIN: Here.
13   CLERK:  Tarte?
14   SEN. TARTE: Here.
15   CLERK:  Tillman?
16   SEN. TILLMAN: Here.
17   CLERK:  Tucker?
18   SEN. TUCKER: Here.
19   CLERK:  Van Duyn? Van Duyn?
20       (No response)
21   CLERK:  Waddell?
22   SEN. WADDELL: Present.
23   CLERK:  Wade?
24   SEN. WADE: Here.
25   CLERK:  Wells.

## 10

1   SEN. WELLS: Here.
2   CLERK: Woodard?
3   SEN. WOODARD: Present.
4   LT. GOV. FOREST: With 45 members present
5   and having properly received and subscribed to the
6   oath of office, a quorum is present.
7   The Constitution of North Carolina,
8   General Statutes and the Senate Rules of the 2015
9   Regular Session provide for two-year terms for
10  Senate officers. Without objection, the record
11  will reflect that the officers of the 2015 regular
12  session shall serve as officers of this extra
13  session.
14  Senator Apodaca is recognized.
15  SEN. APODACA: Thank you, Mr. President.
16  I'd like to send forth rules for the 2016 Extra
17  Session of the General Assembly for filing,
18  introduction, and for immediate consideration,
19  please.
20  LT. GOV. FOREST: You can send forward
21  your rules. Introduction of resolution, the Clerk
22  will read.
23  CLERK: Senate resolution. A Senate
24  resolution adopting the permanent rules of the
25  Senate for the 2016 Extra Session of the General

## 11

1   Assembly. Sponsor, Senator Apodaca.
2   LT. GOV. FOREST: Senate Resolution 1,
3   the Clerk will read.
4   CLERK: Senate resolution. A Senate
5   resolution adopting the permanent rules of the
6   Senate for the 2016 Extra Session of the General
7   Assembly.
8   LT. GOV. FOREST: Senators, we're going
9   to stand at ease for just a moment while we get the
10  rules up on your dashboard.
11  (At ease.)
12  LT. GOV. FOREST: All right, everybody.
13  I'm just going to give you a quick housekeeping
14  update as we continue to just stand at ease. But
15  we're going to -- we're having some technical
16  difficulties here with the dashboard, so we're
17  going to pass out paper copies the old fashioned
18  way. And so just bear with us while we're doing
19  that and having the IT folks get the PDF of this,
20  as well, up on the Internet so everybody can see
21  it.
22  (At ease.)
23  LT. GOV. FOREST: All right, Senators.
24  Let's come back to order. Does everybody have a
25  copy of the rules? Does anybody not have a copy of

## 12

1   the rules?
2   All right. Just for the record,
3   Senators, this has been filed appropriately, and a
4   PDF of the rules, for those of you who may be out
5   there listening, will be up on the website
6   momentarily under the news and information section.
7   So let's get back to business. Senator
8   Apodaca is recognized to explain the resolution.
9   SEN. APODACA: Thank you, Mr. President,
10  members.
11  Let me say up front, what we have here
12  are amendments to our existing rules. So our
13  existing rules still are in effect. These will be
14  amendments to said rules. So we'll have plenty of
15  rules for everybody going forward.
16  These rules track closely the rules that
17  were adopted during the 2003 Extra Session for
18  redistricting. There are only a handful of
19  changes.
20  We will operate mainly under the same
21  rules we use in regular session. The main rules
22  here limit the scope of bills that are eligible,
23  and ensure that we can only have bills voted on in
24  one day.
25  Now, what I'd like to do is I'll go

## 13

1   through and hit the high points of what the actual
2   amendments are.
3   31.2 authorizes Standing and Select
4   Committees, Redistricting, and Rules.
5   36.2 requires that amendments to
6   redistricting plan be offered in committee if they
7   are being offered on the floor. Let me say that
8   again. Requires that amendments to redistricting
9   plan be offered in committee if they going to be
10  offered on the floor and that they contain a whole
11  plan with a map.
12  40 allows bills to be introduced and read
13  on the same day of their filing.
14  40.1 limits scopes of bills to
15  redistricting plans for House of Representatives
16  of -- of House of Reps, of Congress, and to the
17  bills provided for the scheduling and
18  implementation of primary.
19  41, this is normally the crossover rule.
20  We are reserving this rule so there is no
21  eligibility for those bills.
22  43 allows for introduction, first
23  reading, and referrals to committee to occur on the
24  same day.
25  43.1 requires all bills that are reported

## 14

1   in -- for committee to be immediately considered
2   for second reading.
3       Rule 50 requires that second reading --
4   requires that after second reading, a bill will be
5   calendared for immediate consideration on third
6   reading.
7       Rule 56.1 allows the Senate to concur and
8   an amendment or a committee substitute of the House
9   on the same day it is received.
10      And rule 59, this rule is reserved so
11  that bills may be sent to the House on the same day
12  the Senate votes on them.
13      I recommend these changes to you.
14      LT. GOV. FOREST:  Do we have any
15  discussion or debate on the resolution?
16      Senator Blue, for what purpose do you
17  arise?
18      SEN. BLUE:  Well, will Senator Apodaca
19  yield for a question?
20      LT. GOV. FOREST:  Senator Apodaca, do you
21  yield?
22      SEN. APODACA:  Yes, sir.
23      SEN. BLUE:  Senator Apodaca, in Rule
24  40.1, the limitation and introduction in
25  consideration of resolutions, as I read this,

## 15

1   the -- you could not offer any amendment to the
2   redistricting bill, any textural or substantive
3   amendment, unless it pertains specifically to the
4   2016 Congressional primary, is that right?
5       SEN. APODACA:  Yes, sir.
6       SEN. BLUE:  Another question?
7       LT. GOV. FOREST:  Senator Apodaca, do you
8   yield?
9       SEN. APODACA:  Yes, I do.
10      SEN. BLUE:  And so anything relating to
11  procedure under this rule would then be ruled out
12  of order?
13      SEN. APODACA:  Yes, sir.
14      SEN. BLUE:  Speak on the bill, Mr.
15  President?
16      LT. GOV. FOREST:  Senator Blue, you have
17  the floor.
18      SEN. BLUE:  Thank you very much, and --
19  Mr. President and ladies and gentlemen of the
20  Senate.
21      For the most part, I think that this
22  simple resolution makes good sense.  All of us want
23  to go ahead and get it over with.  I'm reminded of
24  the Alabama football slogan, "Roll tide."  And --
25  and I know that it's going to roll around here

## 16

1   pretty quickly, so no need in us thinking
2   otherwise.  And it makes sense to do all of this in
3   one day, and I'm in general agreement with that.
4       But the only provision of this -- this
5   resolution that I find somewhat offensive, because
6   it limits us talking about the real issue in this
7   case, and that is the process by which we go
8   through this redistricting stuff.
9       It limits the ability to put forth
10  workable solutions to redistricting so that we're
11  able to get this highly political thing out of
12  highly political minds who think of nature's first
13  rule in doing everything, and that is self-
14  preservation and then preservation of their
15  friends.
16      I think it's an excellent resolution
17  except for that limitation and restriction.  And
18  for that reason, I will vote against the
19  resolution.
20      LT. GOV. FOREST:  Do we have any further
21  discussion or debate? Senator Stein, for what
22  purpose do you rise?
23      SEN. STEIN:  To see if Senator Apodaca
24  will yield to a question.
25      LT. GOV. FOREST:  Senator Apodaca, do you

## 17

1   yield?
2       SEN. APODACA:  Yes, sir.
3       SEN. STEIN:  Just to follow up on the
4   same provision that Senator Blue was just
5   discussing, the Rule 36.2, would you be amenable to
6   having this apply only if the amendment pertained
7   to actually a new redistricting map, as opposed to
8   some policy provision as it deals with
9   redistricting?
10      The reason I ask is, I -- I understand if
11  we were to put forward a new map, y'all would need
12  time to analyze it, and I don't think there's any
13  intention on our side to offer a new map.  But it
14  seems a bit unfair to have a rule that precludes
15  any policy amendments for a committee meeting that
16  already occurred before we knew that we would have
17  to have offered it in that committee and then the
18  rule comes in the next day later.
19      SEN. APODACA:  Senator Stein, our purpose
20  with this is to have as much of this aired out in
21  the committee environment more so that on the
22  floor, where we can deal with it more specifically
23  and, you know, in a little more depth.  So at this
24  point, I would prefer that we leave it as-is.
25  Thank you, though.

18

1    SEN. STEIN: Follow-up question?
2    LT. GOV. FOREST: Senator, do you yield
3 for follow-up?
4    SEN. APODACA: Yes.
5    SEN. STEIN: Is the committee going to
6 reconvene after we adjourn today, or is the
7 committee done meeting?
8    SEN. APODACA: No, we're reconvening. We
9 were supposed to reconvene at 11:00.
10    SEN. STEIN: Thank you.
11    SEN. APODACA: Yes.
12    LT. GOV. FOREST: Any further discussion
13 or debate?
14    (No response)
15    LT. GOV. FOREST: Hearing none, question
16 for the Senate is the motion to adopt Senate
17 Resolution 1. We'll have one electronic vote.
18    All in favor vote "aye," opposed vote
19 "no." Five seconds will be allowed for the voting.
20 Clerk will record the vote.
21    SEN. BRYANT: Mr. President?
22    LT. GOV. FOREST: Senator Stein, for what
23 purpose do you rise?
24    SEN. STEIN: Senator Stein votes no.
25    LT. GOV. FOREST: Thank you, Senator. I

19

1 was trying to do the count and figure out where we
2 were missing a number.
3    SEN. BRYANT: Mr. President?
4    LT. GOV. FOREST: Senator Bryant, do you
5 want to change your vote from aye to nay? Okay.
6 There we go.
7    33 having voted in the affirmative and 14
8 in the negative, Senate Resolution 1 is adopted.
9    Let the record reflect, as well, that
10 Senator Lee is present.
11    At this time the Chair directs the
12 Principal Clerk to send a message to the House of
13 Representatives, informing that honorable body that
14 the Senate is now ready to proceed with the
15 business for which it has been reconvened.
16    Senators' leaves of absence are requested
17 with your approval and are granted for Senators
18 Bingham, McInnis, and Van Duyn.
19    Senator Apodaca is recognized.
20    Senator Rucho, for what purpose do you
21 rise?
22    SEN. RUCHO: Mr. President, I rise to
23 submit a -- the Joint Select Committee
24 Congressional Redistricting report for the 2016
25 Extra Session.

20

1    LT. GOV. FOREST: You can send that
2 forward, Senator.
3    SEN. RUCHO: I'll bring it up, yes, sir.
4 And also a copy of this report also as delivered
5 to the President Pro Tem in the Speaker's office.
6    LT. GOV. FOREST: All right. Thank you,
7 Senator. Senator Apodaca is recognized.
8    SEN. APODACA: Mr. President, I think
9 Senator Rucho meant to make an announcement also
10 about a committee meeting at 11:00 in 643 for
11 Senate redistricting. And, Senator Stein, at that
12 meeting, we'll be happy to hear amendments anybody
13 has. So we'll have 643 at 11:00 a.m. Is that
14 true, Senator Rucho? Thank you.
15    SEN. RUCHO: Mr. President?
16    LT. GOV. FOREST: Senator Rucho?
17    SEN. RUCHO: Yes. To reiterate, Senator
18 Apodaca, we will have a Senate Redistricting
19 Committee beginning at 11:00 at 643. I -- I
20 request that all members do your best to attend
21 because we're going to be discussing this bill in
22 its entirety, and it'll be a good opportunity for
23 you to have a chance to review it.
24    And I'd also request that everyone that
25 does have the hard copy of the maps and the

21

1 power -- the data packs, please bring them with
2 you. Thank you, Mr. President.
3    LT. GOV. FOREST: Thank you, Senator.
4 Senator --
5    SEN. PATE: Mr. President?
6    LT. GOV. FOREST: Senator Pate is
7 recognized.
8    SEN. PATE: Thank you, Mr. President.
9 I'd like to make an announcement.
10    LT. GOV. FOREST: Senator Pate, you have
11 the floor.
12    SEN. PATE: The President Pro Tem
13 appoints the following Senators to the Senate
14 Redistricting Committee for the 2016 Extra Session.
15    Senator Bob Rucho, chair, Senator Tom
16 Apodaca, vice chair, Senator Ted Barefoot, Senator
17 Dan Blue, Senator Harry Brown, Senator Ben Clark,
18 Senator Joel Ford, Senator Kathy Harrington,
19 Senator Ralph Hise, Senator Brent Jackson, Senator
20 Michael Lee, Senator Floyd McKissick, Senator
21 Shirley Randleman, Senator Norman Sanderson,
22 Senator Jane Smith, Senator Erica Smith-Ingram,
23 Senator Trudy Wade, Senator Andy Wells.
24    LT. GOV. FOREST: Senator Apodaca is
25 recognized.

22

1   SEN. APODACA:  Thank you, Mr. President.
2   Chairman Rucho wanted me to let the body know that
3   anyone, any member of this body may be able to
4   present an amendment in this committee on
5   redistricting.  So you do not have to be a member
6   of the committee.
7   That being said, Mr. President, I move
8   that the Senate stand in recess subject to the
9   standard stipulations set forth in Rule 24.1, the
10  filing of bills, the receipt of committee reports,
11  committee appointments, and messages from the
12  House, to reconvene today at 2:00 pm.
13  LT. GOV. FOREST:  Thank you, Senator.
14  The Senate will stand in recess until 2:00 pm this
15  afternoon.
16  (RECESS)
17  CLERK:  Message from the House.  Mr.
18  President, pursuant to a proclamation issued by
19  Governor Pat McCrory on February 17, 2016, it is
20  ordered that a message be sent to the Senate
21  informing that honorable body that the House of
22  Representatives have organized and is now ready to
23  proceed with the public business of the State of
24  the Extra Session of the 2015 General Assembly.
25  Respectfully, Denise Weeks, Principal Clerk.

23

1   (RECESS)
2   CLERK:  Introduction of bills.  Senate
3   Bill Number 2, enact to realign the congressional
4   districts as recommended by the Joint Select
5   Committee on Congressional Redistricting to comply
6   with the court order in the Harris v. McCrory.
7   Sponsor, Senator Rucho.  Filed February 16, 2016.
8   Passed first reading.  Referred Redistricting.
9   Correction.  Filed February 18.  Referred
10  Redistricting.
11  CLERK:  Message from the House.  Mr.
12  President, it is ordered that a message be sent to
13  the Senate, information that honorable body that
14  pursuant to proclamation issued by Governor Pat
15  McCrory on October 19th, 2015, and November 23rd,
16  2015, Jeffrey -- Gregory F. Murphy and Kyle Hall
17  have been administered the oath of office as
18  members of the House of Representatives for the
19  remainder of the 2015 - 2016 General Assembly.
20  Representative Gregory F. Murphy has been
21  seated to fill the vacancy created by the
22  resignation of Representative Brian Brown from the
23  9th District.  And Kyle Hall has been seated to
24  fill the vacancy created by the resignation of
25  Representative Bryan R. Holloway from the 91st

24

1   District.  Respectfully, Denise Weeks, Principal
2   Clerk.
3   CLERK:  Redistricting Committee report.
4   Senate Bill 2, unfavorable as to bill, but
5   favorable as committee substitute bill.  2016
6   contingency Congressional plan.  Calendar.
7   (RECESS)
8   LT. GOV. FOREST:  Ladies and gentlemen,
9   we are waiting for the maps to be printed and
10  bought in, so as soon as they get here, we'll
11  start.
12  (At ease.)
13  LT. GOV. FOREST:  The Senate will come to
14  order.  Sergeant-at-Arms, close the doors.  Members
15  go to their seats.  Once again, we'll ask all
16  members and guests in the gallery to silence all
17  your electronic devices.
18  SEN. APODACA:  Mr. President?
19  LT. GOV. FOREST:  Senator Apodaca, for
20  what purpose do you arise?
21  SEN. APODACA:  Mr. President, as we move
22  forward this afternoon, I'd like to move the rules
23  be suspended to the end so the staff may be able to
24  join us on the floor.
25  LT. GOV. FOREST:  Without objection, so

25

1   ordered.  With that, Senators, we are going to move
2   right into the calendar for today.
3   Senate Bill 2, the clerk will read.
4   CLERK:  Senate Bill 2, enact to realign
5   the Congressional districts as recommended by the
6   Joint Select Committee on Congressional
7   Redistricting to comply with the Court order in
8   Harris versus McCrory.
9   LT. GOV. FOREST:  Senator Rucho is
10  recognized to explain the bill.
11  SEN. RUCHO:  Thank you, Mr. President and
12  members of the Senate.
13  The Senate Bill 2, second edition, 2016
14  contingent Congressional plan, corrected, is before
15  the body for adoption.
16  We have had an extensive debate in the
17  redistricting.  I believe 40 members of the Senate
18  had a chance to participate, listen, in some manner
19  to understanding exactly what is going on.
20  This contingent Congressional plan is
21  coming before this body because after -- let's just
22  say, after the Justice Department approved the
23  maps, after a three-judge panel approved them as
24  being fair, legal, and constitutional, after the
25  North Carolina Supreme Court, on three occasions

26

1  approved them as being fair, legal, and
2  constitutional, the three-judge panel in Greensboro
3  from the Middle District found that there were
4  problems, at least in their opinion, regarding
5  those maps dealing with constitutionality of CD-1
6  and CD-12.
7      We may not agree with their opinion, but
8  we are complying with what the Court asked us to
9  do.  And each of you received information today,
10  and also what's on your desk, dealing with the
11  criteria that was established by the Joint House
12  and Senate Committee on Redistricting.
13      You have the list of all of the criteria
14  that was used, and that actually represents what we
15  felt was the best way for us to draw a map that
16  would achieve what the Court was concerned about.
17      The map before you has 13 divided
18  counties.  And if you remember correctly during the
19  discussion, that is the lowest in recent history,
20  in going back almost 30 years, as far as dividing
21  counties, because we felt the county was really
22  that core body that needed to be preserved whenever
23  possible except maybe when you have to balance the
24  population as is required by federal law.  And that
25  was achieved, and that, again, is one of the

27

1  criteria that we had in doing so.
2      It also has the least amount of split
3  VTDs going back to the point where VTDs became part
4  of the -- of the determination when maps are drawn.
5  It was -- it was precincts back a number of years
6  ago.  And now the VTDs are the way -- are the way
7  they are -- they're being registered.
8      The -- the map before you is -- I'm just
9  trying to find a couple things here, if I may.  The
10  map before you maintains the 13 districts.  And you
11  can see they are, again, very compact.  The 12th
12  District, which had been criticized for many, many
13  years, was condensed in Mecklenburg County so that
14  the issue of -- and all of the ridicule that we
15  received from -- from that district that we
16  inherited over many, many years has been corrected
17  in this map.
18      The Court decided that the
19  unconstitutionality issue of those two districts is
20  because race -- they considered race being
21  predominately used.  We disagreed with that, and
22  yet we're still complying with the Court because
23  that's the authority that we're -- we're working
24  with.
25      The -- all the other criteria that was

28

1  established have been met in this map, again,
2  trying to be sure that the best map can be put
3  forward.
4      Today before you is what we're here to
5  do, determine whether you believe or we believe or
6  whatever, but this map is something that will move
7  forward in the redistricting plan so that an
8  election can take place on March the 15th, which is
9  something that we all hope can be done.
10      And, Mr. President, under that
11  circumstance, I will stop here and respond to
12  questions that I might be able to answer.  I would
13  see if Mr. Woodcock would be -- would be in the room
14  to join me in case there are some technical
15  questions that I might not be able to address
16  directly.
17      LT. GOV. FOREST:  Thank you, Senator.
18  And just as a reminder, kind of a housekeeping note
19  before we move forward, that related to amendments,
20  I'm not going to read the rule, but 36.2, if
21  everybody will just go back and refer to 36.2 again
22  as to the type of amendments that will be allowed
23  based on the rules that were adopted this morning
24  for this process.  And we will -- we will adhere to
25  that strictly today.  So that's just a -- a

29

1  housekeeping measure.  Thank you, Senator Rucho.
2      Do we have any discussion or debate?
3      Senator Bryant, for what purpose do you
4  rise?
5      SEN. BRYANT: I have a question for
6  Senator Rucho.
7      LT. GOV. FOREST:  Senator Rucho, do you
8  yield for a question?
9      SEN. RUCHO:  Yes, sir.
10      SEN. BRYANT:  Senator Rucho, in some
11  areas, you know, as with any redistricting plan, in
12  some people's minds you have winners and losers
13  because of people who get moved and people who get
14  included and all of that.  So in my area, there is
15  a lot of concern about transparency as it relates
16  to the criteria applied and being -- and -- and
17  trusting that.
18      So with that in mind, I have a question,
19  and that -- that question is, was the -- was the
20  consultant you all used previously, Thomas
21  Hofeller, was he involved in any way with this --
22  these maps, and when and where were they drawn,
23  initially drawn, and were any public funds involved
24  in the process of this -- of the initial drawing of
25  these maps?  So -- so sort of a three-part

Case 1:13-cv-00949-WO-JEP   Document 159-15   Filed 03/07/16   Page 8 of 30

## 30

1  question.
2      SEN. RUCHO:  Which one -- can we do one
3  question at a time, if you --
4      LT. GOV. FOREST:  Senator -- yeah,
5  Senator Bryant, why don't you start with one, and
6  we'll just keep --
7      SEN. BRYANT:  Okay.
8      LT. GOV. FOREST:  -- kind of work our way
9  through them here, so --
10      SEN. BRYANT:  First question -- excuse
11  me.
12      LT. GOV. FOREST:  Senator -- sorry.  Go
13  ahead.  You have the floor.
14      SEN. BRYANT:  First question is was Mr.
15  Thomas Hofeller -- I think I'm pronouncing it
16  correctly -- who was used, I think, previously,
17  involved in any way with these new maps?  That's
18  the first question.
19      SEN. RUCHO:  Mr. President, may I get
20  some -- ask a couple of questions for
21  clarification, if I may?
22      LT. GOV. FOREST:  Senator, go -- Senator
23  Bryant, will you yield for a question for Senator
24  Rucho so he can clarify your question?
25      SEN. RUCHO:  So I can get some clarity

## 31

1  before I answer my question.
2      SEN. BRYANT:  Yes.  Yes, sir.
3      SEN. RUCHO:  Okay.  Just a -- a -- a few
4  questions, if I may.  Representative Bryant --
5  excuse me.  I've been talking with too many House
6  members in the last --
7      SEN. BRYANT:  Once a representative,
8  always a representative.
9      SEN. RUCHO:  Yes.  Yes, ma'am.  I
10  understand that.  Sorry.
11      You know, in -- in drawing -- and you
12  asking questions of me in this -- in drawing maps,
13  may I ask, did you and the minority party have
14  people working on your behalf in drawing any maps?
15      SEN. BRYANT:  No.
16      SEN. RUCHO:  Not at all.
17      SEN. BRYANT:  We had people working on
18  our behalf advising us about what could possibly be
19  done.
20      SEN. RUCHO:  Follow-up?
21      LT. GOV. FOREST:  Follow-up?  Senator
22  Bryant, do you yield for follow-up from Senator
23  Rucho?
24      SEN. BRYANT:  Yes.
25      SEN. RUCHO:  Did the people that you had

## 32

1  advise, are they from Washington or North Carolina,
2  and did they get funded by the unions or George
3  Soros or any of that other kind of activity that
4  may have come from those --
5      SEN. BRYANT:  I do not know the answer to
6  that question.  I'm -- I can't answer that for you.
7      SEN. RUCHO:  All right.  And --
8      LT. GOV. FOREST:  Senator -- Senator
9  Rucho, do you want to ask another question?
10      SEN. RUCHO:  Follow-up -- follow-up --
11      LT. GOV. FOREST:  Senator Bryant, do you
12  yield for a follow-up?
13      SEN. BRYANT:  I will yield for a follow-
14  up as long as I get all mine answered, too.  I'm
15  willing to go along --
16      LT. GOV. FOREST:  We will get there,
17  Senator.
18      SEN. BRYANT:  Okay.  Thank you.
19      SEN. RUCHO:  And again, given the
20  opportunity, as we all were, in a very short time
21  frame given by us and the Court, you know, when
22  they -- you get 14 days, and the first day you get
23  notice is a Friday night at 6:00, and then you
24  don't do Saturday and Sunday, so --
25      SEN. BRYANT:  Yeah.

## 33

1      SEN. RUCHO:  -- within the time frame as
2  we did, did the minority party go out and have any
3  effort in having maps drawn and have them submitted
4  in equal times, especially since there was revenues
5  to be able to pay for that?
6      SEN. BRYANT:  Well, I'm not able to speak
7  for the -- I'm not the leader, so I -- I didn't
8  have -- I'm not privy to all of what was done.  I
9  only know the part that I was involved in, which
10  was just the discussion of what might be possible,
11  the time that it would take, the complications
12  involved for the payoff of -- of getting it done.
13  And it seemed a difficult task, from what I could
14  determine, but the ultimate decision making about
15  all of that, I wasn't privy to the -- you know,
16  final --
17      SEN. RUCHO:  And so Senator Blue or --
18      LT. GOV. FOREST:  Senator Rucho --
19      SEN. RUCHO:  I'm sorry.
20      LT. GOV. FOREST:  Senator Bryant, do you
21  yield for a follow-up?
22      SEN. BRYANT:  Yes.
23      SEN. RUCHO:  Senator Blue or Senator
24  McKissick and/or some of the House members, then,
25  were probably more privileged to know --

**34**

1    SEN. BRYANT: Yes.
2    SEN. RUCHO: -- all of the information as
3  to they -- they went out searching consultants and
4  getting information like that. Would they be
5  better answering the questions as to who funded
6  this --
7    SEN. BRYANT: Senator --
8    SEN. RUCHO: -- Soros or the Unions?
9    SEN. BRYANT: Senator -- yes. Senator
10  Blue would know more about that than I would.
11    SEN. RUCHO: All right. Thank you.
12    SEN. BRYANT: Okay.
13    SEN. RUCHO: I'll answer your question.
14    SEN. BRYANT: Thank you. Do you want me
15  to start over.
16    SEN. RUCHO: Mr. President?
17    LT. GOV. FOREST: Senator Rucho?
18    SEN. RUCHO: At some point I would love
19  to ask those questions to Senator Blue and Senator
20  McKissick. But in answering the question, we, too,
21  went ahead and consulted with Dr. Hofeller --
22    SEN. BRYANT: Uh-huh.
23    SEN. RUCHO: -- to give us the
24  opportunity as to what time frame he would do the
25  work in, and also, you know, in the short period of

**35**

1  time, how were we going to accomplish this task
2  since the Court really gave us 11 days to get this
3  done.
4    SEN. BRYANT: Uh-huh. Uh-huh.
5    SEN. RUCHO: And we also tried to be sure
6  that it was done in a very transparent manner, as
7  you asked. And actually, when you had requested
8  that we get into Halifax County, I think we were
9  able to achieve that, thanks to your good work.
10    SEN. BRYANT: Uh-huh.
11    SEN. RUCHO: And we had a public hearing
12  on Monday, both in Raleigh and six counties or six
13  locations outside. So it was a huge transparent
14  effort. I -- I wish you were there to spend seven
15  hours with us so we could really have enjoyed all
16  that friendship time together.
17    But under the circumstances, yes, Dr.
18  Hofeller was consulted, and at one point, was --
19  there was an agreement to produce a map that we can
20  be able to get the Court -- so we meet our
21  obligation to the Court.
22    SEN. BRYANT: Okay. And so when and
23  where --
24    LT. GOV. FOREST: Senator --
25    SEN. BRYANT: Follow-up?

**36**

1    LT. GOV. FOREST: Senator Rucho, do you
2  yield for another question. Senator Rucho, do you
3  yield?
4    SEN. RUCHO: Yes, I do.
5    LT. GOV. FOREST: Okay. Senator.
6    SEN. BRYANT: So when and where were the
7  maps initially drawn, and were public funds
8  involved in that process?
9    SEN. RUCHO: My understanding of it is
10  that when we consulted with Dr. Hofeller, and of
11  course, consulted with our attorneys to make sure
12  that we have the best answer to be able to comply
13  with the Court, since not like you, an accomplished
14  lawyer, I'm just merely a dentist, and the -- you
15  know, we -- we did talk with the experts, and we
16  were able to find a plan to do it.
17    And in doing so, that's how we actually
18  got the criteria established, which is why and how
19  Dr. Hofeller was able to draw maps that are what we
20  have before us.
21    SEN. BRYANT: One more follow-up.
22    LT. GOV. FOREST: Senator Rucho, do you
23  yield?
24    SEN. RUCHO: Yes, I so.
25    SEN. BRYANT: So at -- at what point, or

**37**

1  when were the maps transferred to our legislative
2  system here?
3    SEN. RUCHO: When the -- when the -- when
4  the -- let me just ask a question. Hold a second.
5    We just asked Dr. Hofeller to follow the
6  criteria in trying to meet the requirements.
7  And -- and I will ask Senator, you know, with all
8  sincerity, Senator Bryant, this map that's before
9  you is what we consider an answer to what the Court
10  asked us to do. And I urge you, members on the
11  back row, members of the majority party, to look at
12  this map and base it on its merits. And the merits
13  that you have before you are why you have a map
14  that looks the best.
15    And if you remember being in the room
16  over there, they had from 1982 forward. All of
17  those maps were addressing all of the different
18  iterations over the years, the 12th District, the
19  1st District, and all the others.
20    So I would just say to you, in -- in
21  concluding my answer, that it's time for you and
22  the other members to just look at the merit of this
23  map. And the time for questioning on these issues,
24  as you well know, as Senator Blue and Senator
25  McKissick, we may have another five years as we

**38**

1  take this into Court or y'all take this into Court,
2  giving the chance so that there'll be plenty of
3  opportunity to do depositions and -- and -- and
4  witnesses in front of Court, and answering all of
5  these questions that you're addressing.
6       So the real issue is, let's go ahead and
7  focus on this map, and decide if this is the map we
8  want to go ahead to meet the obligation of the
9  Court, and I think that probably finishes my
10  answers. Thank you.
11       SEN. BRYANT: Mr. President, I just need
12  a follow-up if I can because I didn't get an answer
13  to my last question.
14       LT. GOV. FOREST: Senator Rucho, do you
15  yield?
16       SEN. RUCHO: I think that's -- no, sir.
17       LT. GOV. FOREST: Senator Rucho does not
18  yield, Senator Bryant. Do --
19       SEN. BRYANT: Could I --
20       LT. GOV. FOREST: Would you like to speak
21  to the bill, Senator Bryant?
22       SEN. BRYANT: Well, I just want to say --
23  I guess I'll -- I'll make this -- these remarks.
24       It's concerning to me, since I can't get
25  an answer to the question about when the data was

**39**

1  imported into our computers and get a sense of that
2  process, then who's accountable for the criteria
3  and what loopholes there might have been with the
4  criteria being honored still is an issue, as he
5  would like us to just accept what's going on and
6  make the best of it.
7       I hear him. But -- but our constituents'
8  rights weigh in the balance. So it's a bigger, a
9  much bigger issue than that. And so I think it's
10  still a question about how -- how much we can trust
11  the honoring of this criteria given we -- that we
12  don't know more information about this process. So
13  thank you.
14       LT. GOV. FOREST: Any further discussion
15  or debate? Senator McKissick, what purpose do you
16  rise?
17       SEN. MCKISSICK: See if Senator Rucho
18  will yield for a question.
19       LT. GOV. FOREST: Senator Rucho, do you
20  yield?
21       SEN. RUCHO: Yes, sir, Senator McKissick.
22       SEN. MCKISSICK: Senator Rucho, do you --
23  I assume your consultant had a database that
24  covered all of the fields that would have been
25  covered back in 2011 for evaluating a new,

**40**

1  potential Congressional District map. Would that
2  not be correct?
3       SEN. RUCHO: Senator McKissick, as I
4  discussed with Senator Bryant, it's very simple.
5  The criteria that Representative Lewis and I gave
6  to our map producer is the ones that they were told
7  to use, and there is nothing in there that included
8  race or -- party affiliation or anything other
9  than what's on the criteria.
10       And you were at the -- at the committee
11  meeting on the Joint Committee. We've discussed
12  it. You hammered it. A lot of questions. You got
13  your answers. You actually requested beyond what
14  we wanted because we felt race should not have been
15  part of this based on the decision by the Court.
16  But you wanted the information on race and the --
17  the racial demographics and the like.
18       And that should -- you know, we actually
19  worked with the staff to make sure you got
20  everything you wanted. Not much else to say about
21  that.
22       SEN. MCKISSICK: Quick follow-up, Mr.
23  President, if I could.
24       LT. GOV. FOREST: Senator Rucho, do you
25  yield?

**41**

1       SEN. RUCHO: Yes.
2       SEN. MCKISSICK: Do you know if before
3  the adoption of the criteria, if your consultant
4  had already begun making maps without knowing that
5  those criteria would be adopted?
6       SEN. RUCHO: Well, to say that -- I think
7  it's simple to say that, you know, there is always
8  criteria when you establish that. You know, I
9  mean, it's like a -- let me just say to you, it's
10  like any bill in the Legislature. When you
11  submitted a bill, you already have it planned out
12  where you have privilege, you know, privacy and the
13  like, and you're thinking about what you want to
14  put to the bill.
15       What we thought -- we think about what we
16  would like to see in there, the same manner as you
17  do. And in doing so, you know, you go ahead and
18  you say, you know, "We want it to be drawn with
19  whole counties," which we actually got only -- 87
20  whole counties, which was the best it's ever been.
21  And we didn't want to cut any -- divide any VTDs,
22  or as few as possible, so that we can at least do
23  it on -- based on trying to maintain the zero
24  deviation. And you know, the basic criteria that
25  would be there and that you would discuss.

42

1      And I'm sure -- and matter of fact, it
2  may be a great time for me to ask you some
3  questions about who your map drawers were and who
4  funded it and the like, too.  So -- but in essence,
5  we did -- we had a discussion with him, and make
6  sure that he fully understand what his limitations
7  were.  And in doing so, you know as well as I do,
8  listing those criteria, that's what he was told to
9  do and that's what I'm sure he did.
10      SEN. MCKISSICK:  So -- follow-up, Mr.
11  President?
12      SEN. RUCHO:  Senator Rucho, do you yield?
13      SEN. RUCHO:  Yes, sir.
14      SEN. MCKISSICK:  Very brief follow-up,
15  Senator Rucho.  So it's possible that before those
16  criteria were adopted, if he had the traditional
17  categories that were available under the 2011 stat
18  pack that might have included race or party
19  affiliations and a number of other parameters that
20  they -- it's a possibility that he began drawing
21  early maps, taking into consideration those factors
22  before the criteria were adopted, isn't it?
23      SEN. APODACA:  Mr. President, Senator
24  Apodaca, what purpose do you rise?
25      SEN. APODACA:  Inquiry of the Chair,

43

1  please.
2      LT. GOV. FOREST:  Senator Apodaca.
3      SEN. APODACA:  Mr. President, are we
4  talking about this map, or are we talking about how
5  we draw maps, or what imaginary maps may have been
6  done, or who may have done what, when, or where, or
7  are we voting on this map today as presented?
8      LT. GOV. FOREST:  Thank you, Senator.
9  I -- I would recommend that we keep our focus on
10  the map that we're talking about today,
11  specifically on that bill.  The question, we can
12  follow-up -- go ahead and finish the question.
13  Senator Rucho, if you'd like to answer it, feel
14  free.
15      SEN. RUCHO:  I'm not sure how to say it
16  any clearer.  The answer was simple.  We -- you
17  know, the -- the -- the criteria that was there was
18  what was given to the -- to the map drawer.  They
19  were told that "This is all you live with and this
20  is all you work with in drawing this map."  What
21  part of that am I not understanding?  Or maybe
22  you're not understanding it.  The criteria was
23  established, and that is the criteria that was
24  followed.
25      SEN. MCKISSICK:  Okay.  I -- I understand

44

1  your statement, and --
2      LT. GOV. FOREST:  Senator McKissick,
3  would you like to speak to the bill?
4      SEN. MCKISSICK:  Yes.
5      LT. GOV. FOREST:  Senator McKissick, you
6  have the floor.
7      SEN. MCKISSICK:  The -- the thing that
8  gives me some concern, and that is the extent to
9  which there are outside consultants being involved
10  in drawing maps and -- and while I understand that
11  these criteria were indeed put before the Joint
12  Committee of the House and the Senate members
13  dealing with these particular reconsideration and
14  drawing of the Congressional district maps, that
15  perhaps a consultant wasn't completely bound by the
16  criteria that were subsequently established.
17      And -- and that, in my mind, opens up the
18  potential for race, as well as party affiliations
19  and other parameters to have been considered from
20  the maps being drawn, even though by the time they
21  were imported into the database, the State system,
22  to provide us with the map here today, it -- it
23  would have been potentially sanitized, so to speak.
24      Now, why do I ask these questions?  For a
25  couple of reasons.  If you go back to the Harris

45

1  versus McCrory case, the thing that the Court
2  emphasized specifically was that they were
3  extremely concerned about the packing and stacking
4  of District 1 and District 12.  And when I say
5  "packing and stacking," it's the over-concentration
6  of African American voters into those particular
7  districts.
8      And the Court was concerned about it
9  because it was unconstitutional.  It was
10  unconstitutional because these were majority
11  minority districts.  Neither of these districts had
12  been majority minority districts in the past.
13  These districts had been allowed, in the past, to
14  elect candidates of choice without having to be
15  majority minority districts.
16      And that's what the Voting Rights Act
17  requires.  And it still requires that.  It still
18  requires that.  While there is certainly questions
19  about the applicability of Section 5 at this time,
20  Section 2 of that Voting Rights Act still remains
21  standing law.  And you're required to, in looking
22  at the creation of these districts, to think about
23  how you can enable minorities to elect a candidate
24  of choice.  If race is not considered as a
25  factor -- and I'm being told it was not considered

**46**

1 as a factor in drawing of these districts -- then
2 you have the potential to dilute the political
3 strength of that minority.
4     The thing the Court questioned
5 specifically was that being a predominate
6 consideration. A predominate consideration. They
7 never said race could not be considered. That
8 would be a complete misreading of that Court case.
9     And what we've gone is from one occasion
10 using it as a predominate consideration in creating
11 majority minority districts to just the opposite,
12 just the reverse, without understanding the Voting
13 Rights Act and what the Court actually said. They
14 said no packing, no stacking, no overpopulating
15 these districts with minorities.
16     And if you go back to the history of
17 these districts, and you looked at the way they
18 were formed and you looked at the way they were
19 drawn, they didn't have to be majority minority
20 districts.
21     SEN. RUCHO: Mr. President?
22     LT. GOV. FOREST: Senator Rucho, for what
23 purpose to you rise?
24     SEN. RUCHO: Inquiry of the Chair. Are
25 we talking about this map or are we talking about

**47**

1 maps of the past and criteria that was established
2 to count those in? I mean, this map is clearly
3 delineated as to what was followed with the
4 criteria. So I'm not sure I understand why --
5     LT. GOV. FOREST: Thank you, Senator
6 Rucho. Senator McKissick, I think your comments
7 are -- are generally germane. But if you will,
8 keep them to this map specifically. When you're
9 making comments, if you will, direct your comments
10 to the map that's before us today in -- in Senate
11 Bill 2. Thank you.
12     SEN. MCKISSICK: And -- and as you
13 indicated, Mr. President, my comments are germane.
14 They're germane because they relate specifically to
15 the map before us, and whether it is compliant with
16 the Voting Rights Acts today as it now stands: if
17 it is compliant with the Court's decision.
18     The Court never stated in its position
19 and in its decision that you should not consider
20 race. But yet it's been ignored as a factor in
21 drawing up these districts. So we've gone from one
22 extreme to the absolute other in violation of the
23 Voting Rights Act.
24     More importantly, one of the things that
25 gives me one concern is that we now have among the

**48**

1 criteria that was adopted, this idea of partisan
2 advantage.
3     Now, certainly the party in majority has
4 a right to exercise some reasonable degree of
5 discretion in drawing these districts. But I think
6 the articulation in the criteria that were adopted,
7 that says the partisan makeup the Congressional
8 delegation under the plan is ten Republicans and
9 three Democrats, the Committee shall make
10 reasonable efforts to construct districts in the
11 2016 contingent Congressional plan to maintain this
12 makeup is partisan gerrymandering at its worst.
13     What voters in this state want are
14 competitive districts where regardless if one is a
15 Democrat or a Republican or unaffiliated, they have
16 equal chance to compete on the merits, not when
17 political gerrymandering is used to give an unfair
18 balance, an advantage to one party over the other.
19     And particularly if we look at the
20 traditional history of voting right here in North
21 Carolina. If we go back to 2012, total of the
22 votes of Democrats running for Congress versus the
23 votes of Republicans, what we find is that
24 Democrats and those Democratic candidates running
25 for Congress got vastly more votes than

**49**

1 Republicans, but yet they ended up with three seats
2 and Republicans got ten.
3     And what do we know? Back before all
4 this redistricting occurred, we had seven Democrats
5 that were part of our Congressional delegation and
6 six Republicans.
7     LT. GOV. FOREST: All right, Senator --
8 Senator McKissick, now we're not germane any
9 longer. So let's keep your comments, please,
10 focused on the bill that's in front of us. Thank
11 you.
12     SEN. MCKISSICK: Well, I think the bill
13 in front of us and the map in front of us gives me
14 serious reasons for concern because I don't believe
15 it's compliant with the Court's decision by not
16 considering race at all. And I don't believe it's
17 consistent with the Voting Rights Act.
18     More importantly, when I look at the map
19 and I think about the impact upon the 12th
20 Congressional District, one thing that I do know is
21 that we didn't consider as part of our
22 considerations and criteria whether communities of
23 interest would be considered.
24     Communities of interest is a standard
25 that's been adopted by the United States Supreme

50

1    Court.  By failing to consider that and include it
2    as part of our criteria, it perhaps eliminated the
3    capacity to create districts that would have
4    combined cities and communities in a way that they
5    could have been best represented.  That gives me
6    deep concern.  I look at Congresswoman Alma Adams,
7    and --
8         SEN. RUCHO:  Mr. President?
9         SEN. MCKISSICK:  -- and the district that
10   she has --
11        LT. GOV. FOREST:  Senator Rucho, for what
12   purpose do you rise?
13        SEN. RUCHO:  Would Senator McKissick
14   yield to a question?
15        LT. GOV. FOREST:  Senator McKissick, do
16   you yield?
17        SEN. MCKISSICK:  Yes, I will.
18        SEN. RUCHO:  Senator McKissick -- and I
19   know I've read the opinion two or three times.  Of
20   course, I'm not being an attorney like yourself.
21   But where is it in that opinion did it ever say
22   that you must use race as a criteria?
23        SEN. MCKISSICK:  What it says in the --
24        SEN. RUCHO:  No, no.  My question,
25   where -- where is it in the opinion that it says

51

1    you must use race?
2         SEN. MCKISSICK:  I never stated that.  I
3    never stated -- I said that basically what the
4    opinion required was the redrawing of these maps
5    for these Congressional districts because African
6    Americans voters have been packed in the District 1
7    and in the Districts 12.  And that by packing those
8    African American voters into those districts, it
9    was unconstitutional.
10        And that the Voting Rights Act required,
11   one, in drawing maps, to consider how you could
12   draft maps to allow minorities to elect candidates
13   of choice regardless of the race that that
14   candidate may be.
15        SEN. RUCHO:  Follow-up?
16        LT. GOV. FOREST:  Senator McKissick, do
17   you yield for follow-up?
18        SEN. MCKISSICK:  Sure.
19        SEN. RUCHO:  Senator McKissick, in
20   abiding by the Voting Rights Act, which I believe
21   we did in this map -- this is what we're talking
22   about -- the Court was clear in saying that in
23   their opinion, racial polarized voting did not
24   exist.  And in that fact, we complied with the
25   Voting Rights Act, just as we did on this map here,

52

1    did we not?
2         SEN. MCKISSICK:  You never conducted a
3    racially polarized voting study.  There was one
4    conducted, from what I understand, back in 2011.
5    It has not been adequately reevaluated nor
6    considered.
7         One thing that would have been
8    appropriate to have done was to actually conducted
9    racial lines polarized voting studies to have seen
10   what parts of the state where it was a significant
11   factor and what parts of the state where it may not
12   have been.
13        What it basically would have indicated to
14   you, that perhaps in intensely urban areas of this
15   state, there is racial coalition building between
16   blacks, whites, and other groups to come forth with
17   a cohesive political bloc to elect the candidate of
18   choice.
19        Without a racially polarized voting study
20   done, you might not be able to identify those parts
21   of the state within the Congressional districts
22   which have been crafted that would have
23   specifically identified where you needed to take
24   race into consideration.
25        SEN. RUCHO:  Follow-up, please.

53

1         SEN. MCKISSICK:  And you might have been
2    able -- please allow me to complete my explanation
3    before interrupting me -- to have identified the
4    specific areas where, yes, you needed to go in and
5    create sufficient voting blocs of minority voters
6    to allow them to elect candidates of choice.
7         SEN. RUCHO:  Follow-up?
8         LT. GOV. FOREST:  Senator McKissick, do
9    you yield for follow-up?
10        SEN. MCKISSICK:  Yes.
11        SEN. RUCHO:  Senator McKissick, in
12   reading the opinion and, you know, talking about
13   the Gingles case and all that stuff, is it not
14   accurate that the Court said that there was no
15   evidence of -- of racially polarized voting?  Did
16   they not clearly state that in the opinion?
17        SEN. MCKISSICK:  That is not what I saw
18   in that opinion.
19        SEN. RUCHO:  Then you might need to read
20   it again.
21        SEN. MCKISSICK:  And -- and what --
22        LT. GOV. FOREST:  Senator -- Senator
23   McKissick, you have the floor to finish your
24   comment if you'd like.
25        SEN. MCKISSICK:  Sure.  And I guess it's

## 54

1  a good point to direct this all to we all know
2  today, within the State of North Carolina, there's
3  portions of this state where racial relations are
4  excellent. There are multi-racial coalitions that
5  come together to help elect candidates of choice,
6  regardless of race.
7        But unfortunately, there are still
8  portions of our state today where we don't live in
9  a colorblind society. Where race is a predominant
10  factor in people deciding who they select as a
11  candidate and who they vote for.
12        We need to be cognizant of that fact. We
13  need to recognize that fact. And in fact, what the
14  Voting Rights Act did was identify 40 counties in
15  this state where they had historical voting
16  practices that were discriminatory with African
17  American voters. That's why they were subject to
18  Section 5.
19        While Section 5 today has to be revisited
20  by Congress, and Congress is at a stalemate,
21  Section 2 continues to exist in bold strong force
22  teeth and validity.
23        We need to understand that if we want to
24  give voters of this state a choice, first, we need
25  to have voting districts established, Congressional

## 55

1  districts established where we can have competitive
2  races between Republicans and Democrats.
3        And we also need to take race into a
4  factor in drawing these districts. It should
5  not -- it should never be the predominant factor
6  and the predominant thing that should control what
7  we do. But we need to understand that within local
8  counties and communities, and within these
9  districts that are being crafted, that the Voting
10  Rights Act requires us to be cognizant of those
11  factors and to try to give those voters within
12  those districts a potential to elect a candidate of
13  choice.
14        Unfortunately, the maps we have here
15  today may potentially eliminate some of the
16  problems identified by the Court because they are
17  no longer majority minority districts. But they
18  open themselves up to a significant challenge based
19  upon the fact that this articulated criteria for
20  giving oneselves partisan advantage may be
21  completely over the top, and is likely to lead in
22  continued litigation for years to come.
23        I ask that those of you with an open
24  mind, to look at this map and to vote against it.
25        LT. GOV. FOREST: Senator Hise, what

## 56

1  purpose do you rise?
2        SEN. HISE: See if Senator McKissick will
3  yield for a question.
4        LT. GOV. FOREST: Senator McKissick, do
5  you yield?
6        SEN. MCKISSICK: Absolutely.
7        SEN. HISE: Senator McKissick, I'm a
8  little confused on two directions here. I think
9  the Court is clearly -- this Court has ruled that a
10  majority minority district, 50 percent plus one, is
11  a predominant use of race. You're saying that we
12  still have to create districts where minorities can
13  choose a candidate -- can elect a candidate of
14  their choosing.
15        What is the percentage, in your mind,
16  that satisfies both those criteria?
17        SEN. MCKISSICK: There's not a magical
18  number, Senator Hise. That's why the racially
19  polarized voting studies are so important, an
20  integral part of these map drawing processes that
21  should have been utilized significantly back in
22  2011 because what's right in Durham or Chapel Hill
23  may not be the same number in some other community
24  in our state.
25        It's not -- it's not a bright-line test.

## 57

1  It's not an exact number that one can identify. It
2  may be 45 percent one place; it may be 35 percent
3  another. But what one attempts to do is to look at
4  those historical voting trends in patterns and what
5  has been established historically in terms of
6  trying to identify what is right.
7        Is it a challenge? Absolutely. Is it
8  something that's not easy to wrap your arms around?
9  I'd be the first to acknowledge that. But I also
10  say that doesn't mean because it's a challenge,
11  that you should not try to follow the law of the
12  land.
13        SEN. HISE: Follow-up?
14        LT. GOV. FOREST: Senator McKissick, do
15  you yield for follow-up?
16        SEN. MCKISSICK: Sure.
17        SEN. HISE: So -- but given the situation
18  we're in and a Court ruling and a two-week period
19  to conduct these, do you believe there is any
20  manner other than not considering race that we do
21  not place ourselves in a position for a Court to
22  rule that race was the predominant factor in
23  drawing these districts?
24        SEN. MCKISSICK: Well, I think there were
25  other possibilities, yes. One could look at maps

Case 1:13-cv-00949-WO-JEP   Document 159-15   Filed 03/07/16   Page 15 of 30

## 58

1   that had been approved through the Justice
2   Department in the past, before those district were
3   crafted as a majority minority districts, and use
4   it potentially as a benchmark, as a guidepost.
5        I'm not saying that it's a bright-line
6   test. But we know if these majority minority
7   district that went over 50 percent are too much.
8   Perhaps in the past, some of those other maps that
9   might have been drawn that would have been approved
10  by the Justice Department might show a reasonable
11  range of variability for determining what might be
12  valid.
13       LT. GOV. FOREST:  Senator Apodaca.
14       SEN. APODACA:  Mr. President --
15       LT. GOV. FOREST:  Senator Apodaca --
16       SEN. APODACA:  Senator Rucho yield to a
17  question, please?
18       SEN. PRES:  Senator Rucho, do you yield?
19       SEN. RUCHO:  Yes, sir.
20       SEN. APODACA:  Senator Rucho, I know
21  we've been here quite a while, but did not the
22  Justice Department, the Obama Justice Department,
23  approve these maps?
24       SEN. RUCHO:  They move -- they have
25  approved the enacted maps, that is correct.

## 59

1        SEN. APODACA:  Okay.  Thank you.
2        SEN. STEIN:  Mr. President?
3        SEN. PRESIDENT:  Senator Stein, for what
4   purpose do you rise?
5        SEN. STEIN:  Speak on the bill.
6        LT. GOV. FOREST:  Senator Stein you have
7   the floor to speak to the bill.
8        SEN. STEIN:  Thank you, Mr. President.
9   Members of the Senate, as we all know, last week
10  the three-judge federal panel ruled that the 2011
11  maps were unconstitutional because they diluted the
12  votes of African Americans and it impacted their
13  ability to elect candidates of their choice because
14  they mechanically put a majority of them into two
15  Congressional districts, the 1st and the 12th.
16       I agree with Senator McKissick's
17  analysis, that this effort suffers from the same
18  infirmity as the last, which is there has been no
19  analysis of racially polarized voting, so we don't
20  know, under Section 2, whether there -- these
21  districts are good or not.
22       But by having -- dealing with one
23  constitutional problem and racial gerrymandering
24  that we saw on the last map, what y'all have done
25  is squarely put this map with another

## 60

1   constitutional problem, and that's of political
2   gerrymandering.
3        The Committee Chairs said that they drew
4   these maps to maximize the number of Republicans
5   elected to Congress.  When asked why he supported
6   maps that would yield ten Republican Congressmen
7   and three Democratic Congressmen, Chairman Lewis
8   said it was because he couldn't draw one to produce
9   eleven Republicans.  His goal was to maximize the
10  number of Republicans elected to Congress.
11       Folks, political gerrymandering is
12  unconstitutional and it's subject to Court review.
13  The case, Senator Newton, is Davis versus Bandemer.
14  That is the precedent, and it remains the precedent
15  of political gerrymandering cases.
16       Even Justice Scalia holds that political
17  gerrymandering is unconstitutional.  He just
18  differs -- and that case was the Vieth case -- he
19  differs in that he says those cases, even though
20  unconstitutional, are not appropriate for Court
21  review.
22       But in that case, the Vieth case, he
23  wrote for a plurality of four.  There were five
24  Justices, including Justice Kennedy, who held that
25  Davis versus Bandemer is still good law, and the

## 61

1   political gerrymandering cases are -- can be
2   unconstitutional and it would be appropriate for
3   the Court to determine and set a standard for what
4   is an unconstitutional political gerrymander.
5        Just two months ago, another three-judge
6   federal panel, just like the one here in North
7   Carolina, ruled that a Wisconsin plan would
8   be -- litigation to block a Wisconsin plan could go
9   forward asserting a political gerrymander case in
10  Wisconsin.
11       And of course, one of the most prominent
12  cases upholding a political gerrymandering case
13  happened here in North Carolina.  The Plaintiff was
14  the Republican Party of North Carolina, and they
15  successfully sued to change the way in which
16  Superior Court Judges were elected in our state.
17       This brazen gerrymander undermines our
18  democracy.  The voters have a constitutional right
19  to have their votes mean something.  Yet this map
20  wastes hundreds of thousands of votes of North
21  Carolina citizens simply because of what party they
22  are affiliated with.
23       It is a slap in the face to those voters.
24  It was drawn with the declared purpose of electing
25  ten Republican Congresspeople.  That's 77 percent

**62**

1  of our Congressional delegation.
2      SEN. RUCHO: Mr. President?
3      LT. GOV. FOREST: Senator Rucho, for what
4  purpose do you rise?
5      SEN. RUCHO: Would Senator Stein yield
6  for question?
7      LT. GOV. FOREST: Senator Stein, do you
8  yield?
9      SEN. STEIN: I will be happy to when I'm
10  finished with my remarks.
11      LT. GOV. STEIN: Senator Stein, you have
12  the floor.
13      SEN. STEIN: Thank you very much. Our
14  state is a 50/50 state by almost all measures. An
15  analysis of every United States Senate election in
16  the entire country over the last 25 years concluded
17  that North Carolina is the most politically
18  competitive state in the nation. In 2008, we were
19  the state that most narrowly went for the
20  President. In 2012, we were the state that most
21  narrowly went against the President.
22      In 2012, of all votes cast in that
23  election for Congress, 52 percent -- 51 percent,
24  excuse me, went for a Democratic candidate; 49
25  percent went for a Republican candidate.

**63**

1      We have 13 Congresspeople. You would
2  think it would be seven Democrats, six Republicans,
3  maybe six Republicans -- six Democrats, seven
4  Republicans. That's what happens when you have a
5  50/50 vote. In 2012, the results were nine
6  Republicans and four Democrats.
7      So I want to underline that fact. In
8  2012, more people in North Carolina voted for a
9  Democrat to represent them in Congress, and yet
10  only 31 percent of the representatives were
11  Democrat. A minority of North Carolinians voted
12  for a Republican, and they got 69 percent of the
13  representation in our delegation.
14      This is simply a subversion of democracy.
15  In 2014, Republican candidates did a little
16  better -- 52 percent of all votes went for a
17  Republican; 48 percent went for a Democrat. Yet,
18  the outcome was even more outrageous because 77
19  percent, 10 of the 13 Congressional representatives
20  were Republican.
21      We live in a 50/50 state, and yet our
22  Congressional delegation is three to one Republican
23  to Democrat. And please do not say this is how it
24  has always been done, because that's not true. The
25  last redistricting was 2002. And that election --

**64**

1  that was the first election after the last round of
2  redistricting.
3      In that election, 54 percent of North
4  Carolinians cast a vote for a Republican member of
5  Congress; 46 percent voted -- voted for a Democrat.
6  You know what the split was? 54 percent of our
7  delegation was Republican and 46 percent was
8  Democratic. That is a perfect, nearly perfect
9  congruence of votes and representation. And guess
10  what's supposed to happen in a democracy? The
11  share of votes should yield the same share of
12  representation.
13      This gerrymander boils down to self --
14  self-preservation without representation. The only
15  saving grace of this map is that it represents
16  partisan abuse of such scale that the Supreme Court
17  can use it to create a standard for determining
18  what constitutes an unconstitutional political
19  gerrymander.
20      Friends, we live in North Carolina, not
21  North Korea. Voters should choose their
22  representative, not the other way around. Because
23  this gerrymander does precisely the opposite, I
24  urge you to vote no on this map.
25      LT. GOV. FOREST: Senator Brown, for what

**65**

1  purpose do you rise?
2      SEN. BROWN: Speak briefly.
3      LT. GOV. FOREST: Senator Brown, you have
4  the floor.
5      SEN. BROWN: Thank you, Mr. President.
6  Senator Stein, I appreciate your commentary on
7  this. And I -- I know you have your opinion, like
8  all of us.
9      And -- but part of this map, if you look
10  at it, if you go back to 2008 and look at the
11  Attorney General's race in North Carolina, the
12  Attorney General, who was a Democrat that won that
13  race, won every single district on this map. Every
14  single one of them.
15      I don't think there's a race in North
16  Carolina that all the Republicans could possibly
17  win all these races in -- in North Carolina. It
18  doesn't happen. And for you to say how
19  gerrymandered this -- this map is, when a Democrat
20  could win every single district makes absolutely no
21  sense. If it was that gerrymandered, how could
22  that possibly be so? It makes no sense.
23      And if you look at the maps -- and we had
24  the maps on the wall in -- in the meeting room,
25  and -- and -- and just saw what they looked like

66

1  for many years, at least we finally got a map that
2  I think makes sense when you look at it.
3          If -- you got 13 counties that are
4  divided the least ever. You got 13 precincts,
5  basically, that are divided, I think the least
6  ever.
7          Senator McKissick, you -- you talked
8  about the vagueness of what Senator Hise asked you.
9  If it's not 51 percent, is it 48 percent? Is it 40
10 percent? Nobody can give you that answer. So how
11 do you draw a map on something that vague? I don't
12 think you can, because if you go from that
13 scenario, then you'll never draw a map that's good.
14         It's -- it'll be impossible because it's
15 an interpretation of what an individual thinks.
16 And I'm not sure you'll ever get every individual
17 to think that it's 51 or 49 or 45 or 40 or whatever
18 it may be. You know, we can have that debate
19 forever. You'll never decide it. It's impossible
20 to decide because of its vagueness.
21         I think with what the ruling that came
22 down from the Court that gave us guidance on trying
23 to draw this map, I think the best effort was done
24 to do that in a short period of time. And I think
25 those guidelines were as clear as maybe we could --

67

1  could determine. And I think we tried to -- to
2  abide by those guidelines to draw this map.
3          I just don't know how you can talk about
4  gerrymandered they are when -- when a Democrat
5  running for a key office would have won every
6  single district on this map. That argument makes
7  no sense, absolutely no sense to say that.
8          And you know, I just think that -- I
9  think we're sitting here arguing over something
10 that's just not true. And I -- I think most of the
11 people in this state, because most of these
12 counties are kept whole -- what, 87 whole counties
13 now that know who they're voting for -- I think
14 that's a win for the state. And I -- I think it's
15 the most ever. So that should be something we
16 should be proud of.
17         I know we all have our opinions on this
18 map, but I think this is a pretty dang good job
19 done in a short period of time. And I just think
20 the gerrymandering piece is irrelevant based on
21 facts. And these are competitive districts now.
22 And I think that's what the citizens want in this
23 state, and I think that's what you get with this --
24 with this map.
25         SEN. RUCHO: Mr. President?

68

1          LT. GOV. FOREST: Senator Rucho, for what
2  purpose do you rise?
3          SEN. RUCHO: I did have a question for
4  Senator Stein, if he'll --
5          LT. GOV. FOREST: Senator Stein, do you
6  yield for a question?
7          SEN. STEIN: Yes, sir.
8          SEN. RUCHO: Senator Stein wants you to
9  believe that political gerrymandering is illegal
10 and unconstitutional, but I think a simple
11 question -- answer to that is of the CD-12, which
12 has been in place for a number of years, actually
13 put together by our minority party, the back row.
14         In establishing CD-12, Senator Stein, and
15 going through all the litigation it did go through,
16 the Supreme Court ended up saying that CD-12 was
17 put together and allowed because it was a political
18 gerrymandering and therefore legal.
19         So how do you say that the Supreme Court
20 said that political gerrymandering is illegal and
21 unconstitutional?
22         SEN. STEIN: Because -- I think you have
23 a misunderstanding of what a political gerrymander
24 is.
25         The -- it is absolutely appropriate to

69

1  take race into account when redistricting, so long
2  as you don't make it the predominant factor. Then
3  it becomes a racial gerrymander.
4          Similarly, it is appropriate or
5  acceptable to take into account partisan
6  performance when redistricting unless you take it
7  to its full extent and it becomes a political
8  gerrymander. And at that point, it becomes
9  unconstitutional.
10         What we've heard is that these maps were
11 drawn to maximize the number of Republicans who
12 were elected, which tells us it was the predominant
13 factor in this drawing, and therefore constitutes a
14 political gerrymander. That is the difference.
15         LT. GOV. FOREST: Senator Smith-Ingram,
16 for what purpose do you rise?
17         SEN. SMITH-INGRAM: Thank you, Mr.
18 President. To see if Senator Rucho will yield to a
19 logistics question.
20         LT. GOV. FOREST: Senator Rucho, do you
21 yield for question?
22         SEN. RUCHO: Yes, ma'am.
23         SEN. SMITH-INGRAM: You're aware of the
24 sites that were selected for the public hearings.
25 And with Congressional District 1 being one of the

## 70

1 districts that would have been most impacted, or at
2 least the Courts saw fit to say that there are
3 questionable formation of that Congressional
4 district, why was there only one public hearing
5 site in Congressional District 1, which originally
6 represented some 24 counties, one thousand three
7 hundred and X miles long in distance, if you drive
8 around the district?
9 SEN. RUCHO: Thank you for that question.
10 You weren't here at the time we initially had
11 redistricting where we put together, oh, I would
12 probably say seven or eight public hearings, many
13 of them coming out of District 1 and getting all
14 the information and all of the opinions of the
15 people over there. So it isn't like we neglected
16 them at all. We reached out and achieved that.
17 On this time, we were given 14 days to
18 actually have a public hearing and to have the
19 necessary Joint Commission -- committee to be able
20 to come up with a map to meet the criteria.
21 The Court gave us 14 days. Well, let's
22 really look at it. Three of them were the weekend,
23 so we really never had -- so we had 11 days to do
24 that. And in doing so, we reached out across the
25 state. We reached out when -- when available.

## 71

1 We were able to take care of -- of
2 Senator Bryan's concern, 'cause she was able to do
3 it. I know you had a concern, and you --
4 unfortunately, the technology was not there and
5 available for that to be done. We made every
6 effort to do so. And I applaud our General
7 Assembly staff and our IT people.
8 We had six locations across the state to
9 reach out to the public, plus the fact we opened up
10 the Internet to allow for comments. And I don't
11 remember how many -- how many did we get? -- 80
12 pages of comments, plus the public hearings on all
13 coming from across the state, including CD-1. So
14 under the circumstances, we did the very best we
15 could do with the minimum time we had to achieve
16 public input.
17 We had plenty of opportunity to discuss
18 the criteria at our committee meetings. We
19 arranged the time. We discussed it again today.
20 It -- we made every effort to reach out there. And
21 you may be disappointed with it. I'm sure there
22 are people that are disappointed elsewhere in the
23 state to not have a chance, maybe in -- we tried in
24 Guilford County, which is, again, CD-12 at that
25 point. Unfortunately, they got caught in the

## 72

1 storm. That was the one that we had to cancel
2 because of the weather.
3 Every effort's been made, and I have no
4 apologies for not being able to do it. We reached
5 out as best we could because the Court only gave
6 us, basically, 11 days to accomplish this task, in
7 addition to the fact that we have to get the map
8 done by no later than tomorrow.
9 SEN. SMITH-INGRAM: Follow-up?
10 LT. GOV. FOREST: Senator Rucho, do you
11 yield.
12 SEN. RUCHO: Okay.
13 SEN. SMITH-INGRAM: There were several
14 people who commented during the public hearings,
15 and we never did receive an answer, but did we ever
16 ascertain why race was one of the questions asked
17 during the sign-in of the constituents across the
18 state?
19 SEN. RUCHO: It was the same
20 questionnaire that was done on the very first time.
21 It was done then. No one asked a question then.
22 It was the same -- the staff was -- just basically
23 used the same -- there was nothing other than what
24 was done in the past.
25 SEN. SMITH-INGRAM: May I speak to the

## 73

1 bill, please?
2 LT. GOV. FOREST: Yeah, you have the
3 floor, Senator.
4 SEN. SMITH-INGRAM: The first major
5 concern, I -- I commend my colleague Senator Angela
6 Bryant for working feverishly to get Halifax County
7 included. And that was close to some of the
8 counties, but not the predominant number of
9 counties in Congressional District 1.
10 Senator Don Davis also attempted to
11 secure East Carolina, and I myself in Chowan. But
12 when the announcement came out on a Friday in --
13 late on a Friday, we all scrambled to try to touch
14 base with our community college presidents, so
15 forth and so forth.
16 But I think it was just poor -- poor
17 foresight or poor planning. You only had two
18 weeks, but this has been in litigation, and we knew
19 full well that we would be faced with this. And if
20 we could have gotten those other sites -- I don't
21 see why we didn't get an additional site in
22 Congressional District 1.
23 It takes away the transparency for
24 constituents. And then for those to fight the
25 weather and fight the roads and show up only to be

74

1   insulted as if race was the consideration and what
2   interest and their presence being there. I would
3   like to -- to know why race was a factor, and I
4   hope staff can get that to us.
5          Just because we did something before
6   doesn't give us a reason to do it again. I -- I
7   can't imagine why that was a question on the sign
8   up.
9          But speaking with the bill and the map
10  and the outcome of the map, I do have some concerns
11  on a post-analysis. Serving on the redistricting
12  committee, I heard the criteria. I know the
13  criteria that was voted on. But was there any
14  post-analysis? Or after the maps were constructed,
15  was there any going back and looking at maybe the
16  potential outcome and the effect and impact that it
17  would have on the voters across North Carolina?
18         I had two specific questions to no one in
19  general, but as we deliberate maybe we should think
20  about that in the back of our minds.
21         Once the maps were produced and the
22  redistricting had been done, to what extent would
23  members of the minority group have been elected to
24  public office in these particular jurisdictions
25  that we have remapped, all 13?

75

1          And a final question to consider, which
2   is a post-analysis that should have been done by us
3   in making this decision, is the exclusion of
4   members of a minority group from -- from the
5   candidate-slating process. And I say that in
6   particular for the new Congressional District 13 as
7   mapped out. And I do have concerns about the way
8   Congressional District 12 was treated and all of
9   the districts surrounding.
10         I think that this was a hasty process,
11  and I understand we're doing the best that we can.
12  But at the end of the day, I don't think that the
13  best that we could do is the best that we owe the
14  people of North Carolina. We should vote this map
15  down.
16         LT. GOV. FOREST: Senator Tillman, for
17  what purpose do you rise?
18         SEN. TILLMAN: Mr. President, I'd
19  speak -- speak briefly on the bill. You know, it's
20  amazing --
21         LT. GOV. FOREST: Senator Tillman has the
22  floor.
23         SEN. TILLMAN: Thank you, Mr. President.
24  It's amazing to hear Democrats talk about political
25  gerrymandering and that it's unconstitutional.

76

1   It's been said -- it's been done since we had
2   constitutional government, Senator Stein, and you
3   all wrote the book on it. Your predecessors wrote
4   the book on it. It's called "if you win, you draw
5   the maps," and I don't believe that's ever going to
6   change.
7          Now, the only way that you would approve
8   any map we drew -- you can go on with these
9   arguments ad infinitum -- would be for Senator
10  McKissick, Senator Blue, Senator Stein to go down
11  there and draw the maps. You ought to hire
12  yourselves out. You know everything about drawing
13  a map. You drew some real good ones, some of you
14  did, back in the day when we sat on the back row
15  and watched it.
16         I would simply ask you, do you know any
17  legislature of any political party that's ever
18  drawn maps, district maps of any kind, State,
19  Federal, whatever, that's not used political
20  reasons for drawing a map?
21         But we could draw -- '65 Voting Rights
22  Act, yeah, yeah, we got to have minority majority
23  districts, and then we're told you can't use race,
24  then we're told we don't know what number or what,
25  go ahead and draw some more. That's where we're

77

1   caught.
2          You're not going to like any map we draw.
3   No way we can do it. But when you go to railing
4   about the constitutional issue of political
5   mapmaking, folks, there's never been a legislature
6   that's not done that in the history of man. Never.
7          SEN. CLARK: Mr. President?
8          LT. GOV. FOREST: Senator Clark, for what
9   purpose do you rise?
10         SEN. CLARK: I ask Senator Rucho to yield
11  for a question.
12         LT. GOV. FOREST: Senator Rucho, do you
13  yield?
14         SEN. RUCHO: Yes, sir.
15         SEN. CLARK: Senator Rucho, we held some
16  public hearings earlier in the week. Was -- that's
17  correct, I believe?
18         SEN. RUCHO: We had public hearings on
19  Monday. I think there were six locations plus
20  Raleigh.
21         And to further help Senator Smith-Ingram,
22  I just remembered the fact that the question about
23  race was optional, and I know there are people in
24  Wilmington and elsewhere that said, "I choose not
25  to participate to do that," so it was no obligation

78

1    to actually fill that out, for your information.
2         SEN. CLARK: Okay. No problem.
3         SEN. RUCHO: Go ahead.
4         SEN. CLARK: That's not my concern. I'm
5    wondering, though, so you --
6         LT. GOV. FOREST: Senator, you --
7         SEN. CLARK: A follow-up question?
8         LT. GOV. FOREST: Follow-up? Senator
9    Rucho, do you yield?
10        SEN. RUCHO: Yes.
11        SEN. CLARK: If -- the criteria for doing
12   the maps, were they developed prior to the public
13   hearings?
14        SEN. RUCHO: The criteria that -- that
15   were to draw the map that would be necessary to
16   meet the requirements of the Court, the three-judge
17   panel, was -- has been looked at by, of course, our
18   consultants and our attorneys that were helping us
19   make sure that we knew the proper way to answer the
20   concerns of the Court.
21        So, of course, we were looking at the
22   issues that were necessary for us to, since we were
23   only given 11 days, because we really didn't have
24   anything more than that to try to find out what
25   they wanted, because fact of the matter is, the

79

1    Court said it was unconstitutional, but never told
2    you why it was really unconstitutional. He never
3    told you how -- what you needed to do to fix it.
4         And that's one of the reasons why, as
5    Senator Brown alluded to and Senator Hise, talking
6    about the fact that if 50 percent plus one is
7    illegal, is 42 or 31 or any -- there was no light
8    as to be able to say what is the number that you
9    need to achieve to try to help that out.
10        There was no time to do racial polarized
11   studies, as Senator McKissick alluded to, because
12   we had 11 days to get this done. Okay? It took us
13   six months the last time to get this done, and we
14   had 11 days to try to get this done.
15        So in reality, we needed to get advice
16   and we got advice for -- as soon as we found out
17   that there was indeed a problem with the courts and
18   they -- funny thing about it, all the courts in
19   North Carolina said they were fair, legal, and --
20   and constitutional. And the one federal court
21   decided for whatever reason that they didn't agree
22   with what the courts in North Carolina said.
23        SEN. CLARK: Follow-up?
24        LT. GOV. FOREST: Senator Rucho, do you
25   yield?

80

1         SEN. RUCHO: Yes.
2         SEN. CLARK: Let me narrow my question a
3    little bit more. Was the criteria -- criteria to
4    maintain political advantage provided to the
5    mapmakers prior to the public hearing?
6         SEN. RUCHO: Repeat that again. I
7    couldn't hear you.
8         SEN. CLARK: Was the criteria to maintain
9    political advantage for the Republican Party
10   provided to the mapmakers prior to the public
11   hearing?
12        SEN. RUCHO: Well, we looked at the -- at
13   the previous map, which was done following the
14   Voting Rights Act and all the other things that
15   needed to be addressed the way the Supreme Court
16   had told us to do. And that is how we did the
17   other map. This one was found unconstitutional.
18        What we are doing is saying, okay,
19   political gerrymandering is not illegal, despite
20   what Senator Stein says, and -- and CD-12 is a
21   political gerrymandering that was approved by the
22   Supreme Court. So there is nothing wrong with
23   political gerrymandering. I -- I won't accept that
24   as being a criticism.
25        SEN. CLARK: I didn't say anything was

81

1    wrong with it. I'm just asking you to tell me --
2         SEN. RUCHO: Just letting you know.
3         SEN. CLARK: -- whether or not one of the
4    criteria provided to the mapmakers was to maintain
5    political advantage, and was that done prior to the
6    public hearing?
7         SEN. RUCHO: To answer your question --
8         LT. GOV. FOREST: You go ahead, Senator.
9         SEN. RUCHO: To answer your question, we
10   wanted to achieve the same goals that were
11   available or that were achieved on the previous map
12   on this new map so that -- and -- and to clearly
13   achieve -- we had 13 -- excuse me, 10/3, and we
14   said 10/3 would be the appropriate way to go in
15   this one, too.
16        SEN. CLARK: I guess --
17        LT. GOV. FOREST: Senator --
18        SEN. CLARK: -- I should take that for a
19   yes.
20        LT. GOV. CLARK: Senator, do you want to
21   speak to the bill or do you want to ask another
22   question?
23        SEN. CLARK: Will the Senator yield for
24   another question?
25        LT. GOV. FOREST: Senator Rucho, do you

## 82

1  yield?
2     SEN. RUCHO: Yes.
3     SEN. CLARK: Okay. Well, you're proud of
4  the fact that a lot of folks did respond via online
5  to the -- as a part of the hearing, is that
6  correct?
7     SEN. RUCHO: I'm sorry. Say it again,
8  please.
9     SEN. CLARK: Y'all have been somewhat
10  boastful to the fact that we provided opportunity
11  for the citizens to respond to the public hearing
12  on line.
13     SEN. RUCHO: Yes, sir.
14     SEN. CLARK: Did we actually use the
15  comments that they provided to us?
16     SEN. RUCHO: Yes.
17     SEN. CLARK: Are you aware that in those
18  comments, there -- let's see, there about 381
19  comments, and about 150 of them spoke against
20  gerrymandering. So on what basis am I to believe
21  that we actually listened to our citizens when they
22  told us that political advantage for the Republican
23  Party was not one of their concerns?
24     SEN. RUCHO: Well, I think you may have
25  missed it, Senator Clark. I mean, they said that

## 83

1  we want to keep counties whole. We put the map
2  that has never been -- never been better as far as
3  whole counties.
4     They said that they don't want to have
5  VTDs split so it was erratic and have less than
6  what would be respectable. And this is what I
7  would consider respectable mapping. Okay?
8     And you know, it also, you know, achieved
9  the fact that we wanted to -- the 13 -- you know,
10  we did the 13 -- excuse me, the 10/3 because that
11  was what the previous map said. So those are the
12  reasons why.
13     I mean, those are some of the examples
14  that we did -- oh, I know one other thing. They
15  didn't like the shape of the 12th district and we
16  fixed it.
17     And so we listened to the -- to the
18  people out there. And my understanding, having
19  read them and listening for six hours, as you did,
20  that debate -- in that -- that hearing, you know,
21  many of the people spoke on both sides of the
22  issue. Some of them were happy with the old map.
23  Some of them weren't happy.
24     They -- they were critical of the 12th
25  District. We fixed the 12th District. We have

## 84

1  whole counties. We have whole VTDs wherever we
2  could. We have zero population as a federal
3  requirement. We achieved everything that was
4  necessary to meet the requirements of the Court to
5  the best of our ability, and that's what we did.
6     SEN. CLARK: Thank you.
7     LT. GOV. FOREST: Senator Clark --
8     SEN. CLARK: I'd like to speak to the
9  bill.
10     LT. GOV. FOREST: -- you'd like to speak
11  to the bill. You have the floor, Senator.
12     SEN. CLARK: Clearly there are problems
13  here, to me. It appears as though we did not
14  seriously take into consideration our citizens'
15  viewpoints. I mean, I can look at the online
16  submissions right here. I see 381 submissions, 151
17  instances in which people spoke against political
18  gerrymandering. Yet, we do it anyway.
19     We probably established the criteria
20  before we even asked them to speak, which would be
21  bad enough. Maybe even worse if we establish such
22  criteria after they had spoken.
23     A lot of the comments that have just been
24  made were really not the point I was trying to
25  drive home, because even during the public hearing,

## 85

1  I asked the question that I still did not -- that I
2  did not get an answer to then, and I'm not sure
3  anyone can go out and provide the answer to me now.
4     And that is of why should I support these
5  maps that contain a 10/3 partisan advantage, and
6  there were -- this advantage was achieved based
7  upon maps that were deemed to be unconstitutional?
8     It makes no sense to me. It sounds like
9  insanity. I cannot do it and I will not do it.
10     LT. GOV. FOREST: Senator Apodaca, for
11  what purpose you rise?
12     SEN. APODACA: See if Senator Rucho will
13  yield.
14     LT. GOV. FOREST: Senator Rucho, do you
15  yield for a question?
16     SEN. RUCHO: Yes, sir, Senator Apodaca?
17     SEN. APODACA: Senator Rucho, isn't it a
18  fact that this map was actually completed, drawn,
19  and voted on around 2:00 today?
20     SEN. RUCHO: Yes.
21     SEN. APODACA: Okay. Thank you.
22     LT. GOV. FOREST: Senator Davis, for what
23  purpose do you rise?
24     SEN. DAVIS: Mr. President, I would like
25  to see if Senator McKissick would yield for a

86

1  question.
2       LT. GOV. FOREST:  Senator McKissick, do
3  you yield?
4       SEN. MCKISSICK:  Sure.  Absolutely.
5       SEN. DAVIS:  Thanks, Senator.  I -- I was
6  contemplating who to ask the question 'cause I
7  typically listen, you know, but, you know, I've
8  heard a -- a couple of times it being shared that
9  we're quite sure, upon looking at the opinion,
10  that there was any guidance provided by the Court,
11  if I understood that correctly, and I think I've
12  heard it in different settings.
13       All right.  My question to you is what,
14  in your opinion, is drawing lines that is
15  predominantly factored using race?
16       SEN. MCKISSICK:  Well, what that would
17  amount to is using race to create these majority
18  minority districts where the districts were
19  specifically designed to have high concentrated --
20  concentrations of African American voters, if there
21  was an excess of 50 percent, and these districts
22  historically had not had African American voters of
23  that level of concentration.
24       So the Court was deeply concerned about
25  the over-concentration of African American voters

87

1  in those districts, and felt and decided in its
2  opinion that race had been a predominant factor in
3  the drawing of those districts' boundaries.
4       SEN. DAVIS:  Okay.  Follow-up -- may I
5  ask a follow-up question?
6       LT. GOV. FOREST:  Senator McKissick, do
7  you yield?
8       SEN. MCKISSICK:  Sure.
9       SEN. DAVIS:  When you set a ceiling,
10  perhaps, or a quota, you know, I'm listening to
11  some of the inquiries in terms of what is a set
12  number.  Is -- is that something that you think
13  would --
14       SEN. RUCHO:  Mr. President?
15       LT. GOV. FOREST:  Senator Rucho, for what
16  purpose --
17       SEN. RUCHO:  Inquiry of the Chair.
18       LT. GOV. FOREST:  Senator Rucho.
19       SEN. RUCHO:  The line of questioning is
20  dealing with not this map, but something else
21  totally different.  Why is that relevant to -- to
22  what we're talking about:  the merits of this map
23  and -- and getting a map so that the State of North
24  Carolina can go ahead and have an election if the
25  Supreme Court doesn't agree on the motion to stay.

88

1       LT. GOV. FOREST:  So I'll -- I'll say
2  again that the general direction is germane.  But
3  let's -- let's focus our attention on the bill
4  that's before us and the map that's drawn before
5  us, and let's not be completely theoretical in our
6  conversations here.
7       So if we can direct it specifically --
8  speak -- speak in specifics towards the map that's
9  in front of us, then I will consider that germane.
10  So you may continue, sir.
11       SEN. DAVIS:  Okay.  Thank you, Mr.
12  President.  I'll -- I'll back up and go a different
13  direction, 'cause I've heard a lot of discussion
14  to -- about when Democrats were in office and so
15  forth, you know, that there was political
16  gerrymandering.
17       My only question to you, and I -- and I
18  selected you to answer these questions today, not
19  just because you're my seatmate, but I think you're
20  the longest-serving, at least Democrat around here.
21  But my question is, to your knowledge, did the
22  Democrats ever adopt a criteria that was defined as
23  partisan as --
24       LT. GOV. FOREST:  Senator -- Senator,
25  this exactly what I'm getting at.  This is not

89

1  germane at this point.  If you'll focus
2  specifically on the map that's in front of us, then
3  your -- then your questions can be germane to that
4  map.  But now we're talking --
5       SEN. DAVIS:  Mr. President, may I --
6       LT. GOV. FOREST:  Yeah.
7       SEN. DAVIS:  May I ask a question of
8  the --
9       LT. GOV. FOREST:  Yes.
10       SEN. DAVIS:  -- Chair?
11       LT. GOV. FOREST:  Please, Senator.
12       SEN. DAVIS:  If this map contains
13  potentially or a criteria that was set to be used
14  to establish the map, would that not be germane?
15       LT. GOV. FOREST:  If you speak
16  specifically to the map, that would be germane,
17  yes.  So focus on this bill and this map that's in
18  front of us, even in -- even in your questioning.
19       So I think you have a question for
20  Senator McKissick.  If you want to speak to the
21  bill, then you can do that, as well.  And then
22  we'll talk about the germaneness of that.
23       But right now you're asking a question.
24  So if you'll please continue with your question to
25  Sen. McKissick and allow him to answer.

90

1        SEN. MCKISSICK:  Okay.  When it comes to
2    partisan advantage, I have never seen articulated
3    in a set of criteria, language that specifically
4    stated partisan advantage.  I've not ever see that
5    ever stated as written criteria at any point in
6    time, nor as criteria which was used that was not
7    articulated.
8        I think that if we look at this new issue
9    that's before us now, a distinct identification in
10   written criteria voted on by a committee of
11   partisan advantage and it -- and a specific map
12   being driven by that partisan advantage, I think it
13   opens up a floodgate of litigation that's likely to
14   come.  And this is going to be before the courts
15   for a long, long time.
16       It's unfortunate because I -- I think
17   there was an opportunity to draw a new map as
18   opposed to one that's before us that did not embed
19   partisan advantage and an unfair advantage to -- to
20   one political party when this state is essentially
21   about 50/50.
22       SEN. DAVIS:  Thank you.
23       LT. GOV. FOREST:  Senator Jackson, for
24   what purpose do you rise?
25       SEN. JACKSON:  Speak to the bill.

91

1        LT. GOV. FOREST:  Senator Jackson, you
2    have the floor.
3        SEN. JACKSON:  Until a few years ago,
4    transportation funding in our state was a game of
5    inside politics.  Road money was often funneled to
6    certain districts for reasons that had nothing to
7    do with actual transportation needs.
8        Then Senator Harrington, Senator Rabin,
9    Representative Torbett, Representative Brawley came
10   together and did the State a great service.  They
11   put in place a new system that elevated simple
12   fairness over partisan politics.  The Strategic
13   Transportation Investments Bill was a generational
14   piece of Legislation that brought both sides
15   together to take the politics out of transportation
16   funding.  Our state is better for it.
17       Even thought the majority party finally
18   had the power to be the ones playing politics with
19   that pot of money, you decided to leave a legacy
20   instead.  I bet none of you regret that choice.  I
21   bet that's one of the pieces of legislation you are
22   most proud of.
23       Partisan redistricting needs to end.  No
24   one can honestly defend drawing maps for the
25   express purpose of favoring one political party.

92

1    And we know the map is politically gerrymandered
2    because Representative Lewis told us so.
3        Debating whether this map is politically
4    gerrymandered is like debating the moon landing.
5    It happened.  As my good friend Senator Tillman
6    once said, "It's called 'if you win, you draw the
7    map.'" although I'll accept his challenge to name a
8    state anywhere that has solved this problem.
9    Arizona.  California.  Hawaii.  Idaho.  Montana.
10   New Jersey.  Washington.  Alaska.  Arkansas.
11   Colorado.  Missouri.  Ohio.  Pennsylvania.  It can
12   be done.
13       Look, I'm not ignoring the fact that my
14   party abused its power over you.  None of us are
15   surprised by your vengeance.
16       SEN. RUCHO:  Mr. President?
17       LT. GOV. FOREST:  Senator Rucho, for what
18   purpose to you arise?
19       SEN. RUCHO:  Inquiry of the Chair.
20       LT. GOV. FOREST:  Senator Rucho.
21       SEN. RUCHO:  We talked about roads.  We
22   talked about other things.  What does that has to
23   do with this map?
24       LT. GOV. FOREST:  Senator -- Senator,
25   I'll allow you to finish, Senator Jackson.  Again,

93

1    focus on the bill.  I think you're -- so far,
2    you've been pretty germane here, so keep going
3    and -- but please keep it focused on the map and
4    the bill.
5        SEN. JACKSON:  Just like with
6    transportation funding, this is an opportunity to
7    leave a legacy of simple fairness and common
8    decency that will outlast all of us.  If you bring
9    an end to partisan redistricting, it will be an act
10   of political courage unlike any this state has seen
11   in a long time.
12       Independent redistricting is the type of
13   legislation that gets politicians into heaven.
14   That may alter the course for some of us.  It's a
15   demonstration of truly selfless service.  It's
16   proof that we're all here for the right reasons.
17   We could do it today.  We could shock the state.
18   We could restore confidence in our elections and
19   set an example for the nation in how both sides --
20       LT. GOV. FOREST:  Senator --
21       SENATOR JACKSON:  -- can come together --
22       LT. GOV. FOREST:  Senator Jackson --
23   Senator Jackson, now you're straying a bit.  So
24   let's focus -- let's focus on the bill at hand.  If
25   you have comments related to the bill and comments

Case 1:13-cv-00949-WO-JEP   Document 159-15   Filed 03/07/16   Page 24 of 30

94

1  related to the map, please direct them there.
2  We -- we've had a lot of comments, a lot of
3  discussion here, but we're -- we're drifting.  So
4  that's -- what you're speaking about is not this
5  bill, currently.  So please keep it focused on this
6  bill.
7         SEN. JACKSON:  This bill was produced by
8  a flawed process.  This bill should be denied by
9  this chamber because it was allowed to be produced
10 through a thoroughly partisan process.  No system
11 of redistricting is perfect, but ours wins the
12 prize for absolute worst.
13        We are living with an open acknowledgment
14 that we draw the map to favor one party.  This map.
15 In a few years that's going to seem about as
16 strange and sad as Jim Crow laws seem to us now.
17 The process that produced this map is not going to
18 age well.  By the -- by the time it is finally put
19 to rest, public opinion on the matter will be harsh
20 and unanimous.  Be the ones who finished partisan
21 redistricting.
22        In a moment I'm going to offer an
23 amendment that would allow us to do that.  I feel
24 confident in predicting that this amendment has
25 less than a 50 percent chance of becoming law

95

1  today.  I think that's a safe statement.
2         I'm not doing this to be a burden or hold
3  things up.  I'm doing this to remind people that
4  there is a solution to this problem.  Our democracy
5  is very sick, and there's good medicine on the
6  shelf.
7         If not this amendment, if not today, then
8  know that I stand ready to work with any member of
9  this Chamber on stepping out of this dark corner of
10 our democracy.
11        With that, I'd like to submit an
12 amendment, and then I yield the floor to Senator
13 Apodaca.
14        LT. GOV. FOREST:  Send forth your
15 amendment.
16        Senator, I don't think you need to yield
17 to Senator Apodaca because according to our own
18 rules today, Rule 36.2, this amendment would be
19 ineligible.  So it's an ineligible amendment and
20 it -- we won't be bringing that forward.
21        Any other discussion or debate?
22        SEN. SMITH:  Mr. President --
23        LT. GOV. FOREST:  Senator Smith, for what
24 purpose do you rise?
25        SEN. SMITH:  To speak on the bill.

96

1         LT. GOV. SMITH:  Senator Smith, you have
2  the floor to speak to the bill.
3         SEN. SMITH:  I just would like to point
4  out to this body that in the course of six years,
5  my home county of Robeson will have been in three
6  different Congressional districts.
7         For years we had been in District 7.  In
8  the 2011 -- 2011 redistricting, most of Robeson
9  County was moved out of the 7th District in an
10 effort of political gerrymandering to remove
11 Congressman McIntyre's home and base of support
12 from the 7th District, and we were placed in the
13 8th District.  Now, with this map, we will be moved
14 to the 9th District.
15        I've heard from a number of residents of
16 Robeson County that are not happy about this, find
17 it confusing, and do not understand why we have to
18 change districts so often.
19        So I just wanted to let this body know
20 that that has -- is the case with this map.  We
21 will have been in three districts in six years.
22        LT. GOV. FOREST:  Senator Tarte, for what
23 purpose do you rise?
24        SEN. TARTE:  To ask Senator Rucho a
25 question.

97

1         LT. GOV. FOREST:  Senator Rucho, do you
2  yield?
3         SEN. RUCHO:  Yes, sir.
4         SEN. TARTE:  Senator Rucho, was the
5  Court's ruling that District 1 and District 12 were
6  unconstitutional?
7         SEN RUCHO:  Senator Tarte, the Court did
8  say that District 1 and District 12 were
9  unconstitutional, yes, sir.
10        SEN. TARTE:  Follow-on question?
11        LT. GOV. FOREST:  Senator Rucho, do you
12 yield?
13        SEN. RUCHO:  Yes, sir.
14        SEN. TARTE:  Did the courts give us any
15 direction to change the composition of the North
16 Carolina Congressional delegation?
17        SEN. RUCHO:  The delegation -- the
18 district --
19        SEN. TARTE:  The delegation, the
20 composition, how many Democrats, how many
21 Republicans they required it to be?
22        SEN. RUCHO:  No, sir.
23        SEN. TARTE:  May I speak on the bill?
24        LT. GOV. FOREST:  Senator Tarte, you have
25 the floor to speak to the bill.

## 98

1    SEN. TARTE:  This is just a simple
2 reminder for everybody in the Chamber, we're going
3 way off scope.  If -- and this comes back to
4 Senator Clark's comments.
5    The Court said we have two districts that
6 are basically gerrymandered.  They didn't say we
7 need to change the composition of the delegation.
8    In due respect, we have a very limited
9 scope and a very limited time frame.  And that's to
10 fix District 1 and District 12.
11    I just Googled the -- "gerrymandering,"
12 the term.  Those two districts appear right at the
13 beginning.  Look at the current maps.  They're
14 crazy.  What did this -- the current maps do, in
15 the work of the select committee, both parties, it
16 has fixed clearly District 1 and District 12 are
17 compact, they address what we do, and it keeps the
18 delegation, whether we like it or not, in the same
19 composition, the ten to three.
20    We can debate and go on about what
21 redistricting should be, how it should be comprised
22 going forward, how we're going to draw maps in the
23 future.  That's not the task at hand.  The task is
24 to fix two districts, get on with, submit it back
25 to the Court, and complete our work.  I suggest

## 99

1 that's what these maps do right now.  They're not
2 perfect, but they address the Court's directive.
3 Thank you.
4    SEN. SMITH-INGRAM:  Mr. President?
5    LT. GOV. FOREST:  Senator Smith-Ingram,
6 for what purpose do you rise?
7    SEN. SMITH-INGRAM:  To see if Senator
8 Stein will yield for a question.
9    LT. GOV. FOREST:  Senator Stein, do you
10 yield?
11    SEN. STEIN:  I do.
12    SEN. SMITH-INGRAM:  Senator Stein,
13 listening to the debate, I got a little bit
14 confused because like Senator Rucho, I am not an
15 attorney.  And you explained it well, so -- so much
16 earlier.
17    But I've read the case and I read the
18 opinion, and it appears that the maps were rejected
19 because they could not meet the high standard of
20 strict scrutiny.  If these maps right here were
21 submitted, can you explain to me, do you think as
22 presented and as redrawn, would they be able to
23 meet that strict scrutiny if race was not a
24 predominant factor.
25    SEN. STEIN:  I have -- Mr. President?

## 100

1    LT. GOV. FOREST:  Senator, you have the
2 floor.
3    SEN. STEIN:  I can't speak to that.  I --
4 I can't get in the mind of the judges.
5    LT. GOV. FOREST:  Senator Robinson, for
6 what purpose do you rise?
7    SEN. ROBINSON:  To speak to the bill.
8    LT. GOV. FOREST:  Senator Robinson, you
9 have the floor.
10    SEN. ROBINSON:  Thank you, Mr. President.
11 And ladies and gentlemen, I certainly won't waste
12 time asking questions again, but I would not be
13 representative of Guilford County and Greensboro if
14 I were not able to talk for the citizens of my area
15 who, unfortunately, because of the snow and ice,
16 could not get there to make their comments.  And I
17 know some that sent those in, so I won't blame you
18 for the weather 'cause you don't have that much
19 power.
20    However, when we look at this map, we
21 know that this map is clearly an act of racial and
22 partisan packing.  And we talked about that before.
23 We know that in the 13th District, where you talk
24 about not disenfranchising people, where
25 Congresswoman Alma Adams is placed in the new map,

## 101

1 there's only 21 percent African Americans in that
2 district.  And she was overwhelming elected by
3 African Americans and Democrats in the 12th
4 District.
5    The other issue here is that in the new
6 District 13, any African American or Democrat can't
7 be elected.  So that is partisan packing and that
8 is disenfranchising a group of people because of
9 how the African Americans -- and I've looked at
10 that 13th, and it's most of my district, and how
11 it's lumped in with mostly Republican areas all
12 around it, which makes it virtually impossible to
13 elect another African American -- another Democrat
14 and African American, Angela.
15    This, to me, while you're talking about
16 maintaining -- and certainly, you can maintain the
17 3 and the 10, however.  But when you're taking one
18 incumbent and you're targeting that one incumbent,
19 and that incumbent is only the second African
20 American woman elected from this state since it
21 began to elect African Americans during -- after
22 Reconstruction, and then make it almost virtually
23 impossible to elect another, either Democrat or
24 African American, in that area, then this smacks
25 of -- in the face of equal protection under the

## 102

1 law.
2 I'm not surprised, of course, by these
3 actions. There's a cultural -- a culture of racial
4 inequality has been deepened on this side of the
5 aisle. It saddens me, however, to think that this
6 is how we operate in Raleigh, and it is controlled
7 still by male gerrymandering. This is a sad day to
8 me for women across the state in terms of equal
9 protection and fairness, and even sadder in terms
10 of a growing majority of minorities in the state of
11 North Carolina who should be able to expect that
12 they could elect their representatives.
13 LT. GOV. FOREST: Senator Brown, for what
14 purpose do you rise?
15 SEN. BROWN: Just quickly respond to
16 Senator Robinson's comments.
17 LT. GOV. FOREST: Senator Brown, you have
18 the floor to speak a second time.
19 SEN. BROWN: Senator Robinson, I was
20 looking at District 13, I guess it was. Let's see.
21 That's right. You were talking about Senate
22 District 13.
23 In the 2012 election, both our Treasurer,
24 Janet Cowell, who is a Democrat, won that district.
25 And also our Superintendent of Public Instruction,

## 103

1 June Atkinson, won that district. So I'm not sure
2 that you've looked at the numbers to be able to
3 make that argument because in that case, two women,
4 both Democrats, won that particular district.
5 So I think it's a very competitive
6 district, and I -- I think a district a Democrat
7 can win and a woman, obviously, can win. So I just
8 felt like you -- you need to look at those numbers
9 because it is a very competitive district.
10 LT. GOV. FOREST: Senator Robinson, for
11 what purpose do you rise?
12 SEN. ROBINSON: I'm not sure whether
13 Senator Brown was asking a question or just making
14 a comment.
15 LT. GOV. FOREST: I think he was just --
16 just speaking a second time. Senator Robinson --
17 SEN. ROBINSON: Just a friendly comment?
18 Okay. Well --
19 LT. GOV. FOREST: -- would you like to
20 speak a second time?
21 SEN. ROBINSON: Yes. Would I -- could --
22 LT. GOV. FOREST: You have the floor,
23 Senator.
24 SEN. ROBINSON: Thank you, Senator Brown,
25 for that, but I do acknowledge that the numbers

## 104

1 that are on the page that I read said 21 percent.
2 And we know that that is a difficult place.
3 Now, on the other side, if I were to
4 run -- excuse me, Mr. President -- I'd expect your
5 support.
6 LT. GOV. FOREST: Any further discussion
7 or debate?
8 (No response)
9 LT. GOV. FOREST: Hearing none -- Senator
10 Berger, for what purpose do rise?
11 SEN. BERGER: Mr. President, to speak on
12 the bill.
13 LT. GOV. FOREST: Senator Berger, you
14 have the floor.
15 SEN. BERGER: Thank you, Mr. President.
16 I hesitated because I didn't know if the Minority
17 Leader was going to speak, so I -- this has been
18 interesting, to say the least.
19 And I think one of the challenges that
20 the folks on the back row have is that they got a
21 decision that they really like the result, but
22 they're not really too crazy about the rationale
23 that got them that result, because you see, the --
24 the three-judge panel was pretty clear that race
25 should not be used as a factor.

## 105

1 In fact, at the beginning of the -- of
2 the decision, the Court made clear that by quoting
3 some -- some other cases, that by assigning voters
4 to certain districts based on the color of their
5 skin, states risk entangling the offensive and
6 demeaning assumption that voters of a particular
7 race, because of their race, think alike, share the
8 same political interests, and will prefer the same
9 candidates at the poles.
10 And so the Court was telling us at that
11 point we should avoid -- avoid that. And so moving
12 further along that line, the Court had one problem
13 in getting to the result that it wanted. And that
14 problem was the Strickland case. And so the maps
15 that were drawn in 2011 were drawn because of the
16 criteria that was required based on case law from
17 the Strickland case in particular.
18 But the Court found, which is really an
19 interesting thing, because most of the discussion
20 has been about whether race was a factor, and then
21 we got into the discussion of whether politics was
22 a factor. But the Court specifically found that --
23 well, the Court concludes that Section 2 did not
24 require the defendants to create a majority
25 minority district in Senate District -- I'm sorry,

## 106

1  Congressional District 1.
2      The Court also found -- the Court finds
3  that the defendants failed to show the third
4  Gingles factor that the Legislature had a strong
5  basis in evidence of racially polarized voting in
6  Congressional District 1, significant enough that
7  the white majority routinely votes as a block to
8  defeat the minority candidate of choice. So in
9  other words, what the Court found was there was no
10  racially polarized voting in Congressional District
11  1.
12      Now, it's been said that the reason they
13  didn't find it is because there was no study done.
14  Well, my experience has been that if a Court feels
15  it needs evidence about something and feels that
16  something is -- is necessary, they send the case
17  back or they defer a ruling for that evidence to be
18  presented to them. So the Court felt like that it
19  had sufficient evidence to make a decision and to
20  make a decision that there was no racially
21  polarized voting.
22      Now, at that point, the question becomes,
23  well, what -- what do you do? How do you draw the
24  maps? And so what was done in this case is that
25  criteria were drawn up. Now, some folks have

## 107

1  wanted to concentrate on one of the criteria, but
2  the -- the reality is that these maps were drawn to
3  harmonize the criteria. And so the criteria -- and
4  I -- I -- I'll just read -- read from the list.
5  You've all seen them.
6      Equal population. So the maps have to --
7  have to have equal population in the districts.
8  Contiguity. I apologize for my inability to
9  pronounce certain words. Political data. Partisan
10  advantage.
11      The 12th District, the Court specifically
12  found that the makeup or -- or the -- the visual of
13  the 12th District was something that troubled the
14  Court and wanted something done about that. A lot
15  of folks have complained about the 12th District.
16      Compactness and incumbency. Those are
17  all legitimate criteria for this Legislature to
18  take into account in drawing districts.
19      Because of the Court's finding of no
20  racially polarized voting, it was determined that
21  that -- that race should not be a factor in drawing
22  the districts. And that's why the districts were
23  drawn as -- as they were drawn. And they were
24  drawn to harmonize all of these factors.
25      I have no question that if the goal had

## 108

1  been to maximize political advantage, that you
2  could have drawn -- with the technology that's
3  available today, you could have drawn an 11/2, or
4  maybe even a 12/1 map. But it would have been god-
5  awful looking. And it would not have been this.
6      I can -- I can almost assure you that if
7  you want to Google -- if you want to Google
8  "gerrymander," this is not a map that will come up
9  because it's compact, it doesn't split very many
10  counties, it doesn't split very many districts, it
11  doesn't have a bunch of squiggly lines, it follows
12  natural boundaries.
13      It is a map that in the -- in the
14  definition that most North Carolinians use for
15  gerrymandering, which is a map that has a bunch of
16  squiggly lines and looks like a salamander --
17  remember "gerrymander" comes from the term that
18  came out of Massachusetts where someone drew for
19  themselves -- his name was Gerry-something -- and
20  they -- somebody said it looks like a salamander,
21  and they said, "No, it's a gerrymander." So it was
22  the visual aspect that was the problem, and it's
23  the visual aspect that I think most people, most
24  North Carolinians, most people have a difficulty
25  with.

## 109

1      Members, this Court has put this
2  Legislature in a difficult position with reference
3  to timing. Has put us in a difficult position with
4  reference to the instructions it's given us. And
5  the reason we're in this position is because the
6  Court has come up with a result that's a political
7  result. And that's why the folks on the back row
8  are happy with it, because it's a political result
9  that they wanted. But the rationale does not
10  necessarily mean that the maps come out politically
11  the way the Democratic Party would like for them to
12  come out.
13      There are legal precedents that need to
14  be followed. We have taken the appropriate
15  criteria that the Courts have -- have allowed in
16  the past, and we've harmonized those criteria, and
17  that criteria has resulted in this map, which I
18  think complies with the Court's decision, complies
19  with the decisions of previous Courts, and is a map
20  that -- that you should feel very comfortable
21  voting for, and I urge you to do so.
22      LT. GOV. FOREST: Any further discussion
23  or debate?
24      (No response)
25      LT. GOV. FOREST: Hearing none, the

### 110

1     question before the Senate is the passage of Senate
2     Bill 2 on the second reading.
3         All in favor, vote "aye," opposed vote
4     "no." Five seconds will be allowed for the voting.
5     The clerk will record the vote.
6         32 having voted in the affirmative and 15
7     in the negative, Senate Bill 2 passes at second
8     reading, and will be read a third time. Be read a
9     third time.
10         CLERK: North Carolina General Assembly.
11         LT. GOV. FOREST: Any further discussion
12     or debate?
13         (No response)
14         LT. GOV. FOREST: Hearing none, all in
15     favor of the passage of Senate Bill 2 on its third
16     reading will vote "aye," opposed will vote "no."
17     Five seconds will be allowed for the voting. The
18     clerk will record the vote.
19         Hise, aye. 32 having voted in the
20     affirmative and 15 in the negative, Senate Bill 2
21     passes its third reading, and it will be sent to
22     the House.
23         That wraps up our calendar today. Do we
24     have any notices or announcements.
25         SEN. APODACA: Mr. President?

### 111

1         LT. GOV. FOREST: Senator Apodaca, for
2     what purpose do you rise?
3         SEN. APODACA: We need it sent special
4     messenger, please.
5         LT. GOV. FOREST: So ordered. Senator
6     Tillman, for what purpose do you rise?
7         SEN. TILLMAN: Thank you, Mr. President.
8     Moment of personal privilege.
9         LT. GOV. FOREST: Senator Tillman, you
10     have the floor.
11         SEN. TILLMAN: I want to thank my good
12     friend Robert Rucho for his hard work and his
13     committee and our staff people that have done a
14     tremendous job on this in a short time.
15         But I've been thinking, we need -- we do
16     need a term where -- with "mandering" in it. And
17     my good friend Senator Brock just -- I'm stealing
18     this from him. He didn't want to say it. We do
19     need to use a new term. "Rucho-mandering." These
20     district are short, fat, and compact.
21         LT. GOV. FOREST: Senator Smith, for what
22     purpose do you rise? Senator Smith, you have the
23     floor for a moment, personal privilege.
24         SEN. SMITH: Okay. Thank you, Mr.
25     President. I have the privilege of being a

### 112

1     seatmate of Senator Mike Woodard. Senator Woodard
2     has been a tremendous help to me this year as a
3     newbie in this body, answering questions, giving
4     advice, basically being a great mentor. And I
5     appreciate it very much, and would like to thank
6     him for that.
7         This Saturday is Senator Woodard's
8     birthday. And I would ask -- hope that all of you
9     will join me in wishing him, in advance, a very
10     happy birthday Saturday.
11         LT. GOV. FOREST: Happy birthday,
12     Senator.
13         Senator Gunn, for what purpose do you
14     rise?
15         SEN. GUNN: A moment of personal
16     privilege.
17         LT. GOV. FOREST: Senator Gunn, you have
18     the floor.
19         SEN. GUNN: I just want to let this body
20     know -- I know we have a lot of discussion time.
21     Sometimes we don't agree on everything. But one
22     thing we -- we've always been great about is
23     supporting each other and especially when
24     somebody's a little -- little down on their luck.
25     And I just want to give you an update on Senator

### 113

1     Thom McInnis.
2         I have talked to him before surgery and
3     after. His break is a real break. He fell getting
4     out of the shower and literally broke the ball off
5     of the shoulder in half, and then the bone
6     splintered. And he has had a -- a pretty difficult
7     surgery on Tuesday. And it went well. He's got a
8     steel plate and 12 screws in his shoulder. So he's
9     going to be -- he's going to be on the mend for
10     quite some time.
11         I will tell you one good news is it's
12     obvious all the shoulder surgery and -- and some of
13     the drugs, anesthesia and everything he's on, has
14     not in any way stopped his conversation. He was --
15     he was rather jovial today, as he always is.
16         But if you think about it, you might just
17     want to drop him a note or -- or give him a little
18     call. He's -- he's got a little ways to go before
19     he recovers, and I just wanted to give everybody an
20     update.
21         LT. GOV. FOREST: Senator Brock, for what
22     purpose do you rise?
23         SEN. BROCK: To make an announcement.
24         LT. GOV. FOREST: Senator Brock, you have
25     the floor.

114

1   SEN. BROCK: First of all, Jerry, I would
2   never, ever say that publicly about Bob.
3   The -- but I'd like to announce that on
4   February 2nd, Andrea and I welcomed our third
5   child, a boy, Turner Ward Brock, 7 pounds, 5
6   ounces. And -- and he's one of the pride and joys
7   and our life. But my wife texted me while we were
8   in session. And since we've been here today, he's
9   learned to walk, talk, and drive a car. So it's
10  time to go home.
11  LT. GOV. FOREST: Is there any further
12  business to come before the Senate? If not, the
13  Chair recognizes Senator Berger for a motion.
14  SEN. BERGER: Thank you, Mr. Chairman. I
15  move that the Senate do now adjourn subject to the
16  standard stipulations set forth in Senate Rule
17  24.1, filing of bills, the receipt of committee
18  reports, appointments to committees, ratification
19  of bills, and the receipt of House messages to
20  reconvene tomorrow, Friday, at 9:30 am.
21  LT. GOV. FOREST: The motion is the
22  Senate do now adjourn subject to the stipulations
23  stated by Senator Berger to reconvene Friday,
24  February 19th at 9:30 am. Seconded by Senator
25  Apodaca. All in favor say "aye."

115

1   (Verbal vote.)
2   LT. GOV. FOREST: Opposed "no." They
3   ayes have it. Senate stands adjourned.
4   (THE PROCEEDINGS IN THIS MATTER ADJOURNED AT 2:26 P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

116

STATE OF NORTH CAROLINA
COUNTY OF GRANVILLE
CERTIFICATE
I, Robbie W. Worley, a duly commissioned Notary
Public in and for the State of North Carolina, do hereby
certify that on February 18, 2016, this proceeding was held
before me at the time and place aforesaid, that all parties
were present as represented, and that the record as set
forth in the preceding pages represents a true and accurate
transcription of the proceedings to the best of my ability
and understanding.
IN WITNESS WHEREOF, I have hereto set my hand, this
the 28th day of February, 2016.