NORTH CAROLINA GENERAL ASSEMBLY

SENATE REDISTRICTING COMMITTEE

_____

TRANSCRIPT OF THE PROCEEDINGS

_____

In Raleigh, North Carolina

Thursday, February 18, 2016

Reported by Rachel L. Hammond, CVR-M

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

## 2

1  (Reporter's note: Proceedings in this matter
2  began at 11:17 a.m. on February 18, 2016.)
3  SEN. RUCHO: We have the Senate Redistricting
4  Committee come to order. Will the members please take
5  their seat. We also have included all members of the
6  Senate be able to be at this meeting, and actually
7  members that are not on the committee can submit
8  amendments following the same rules as been
9  established.
10  First step, let's introduce our
11  Sergeant-at-Arms. I've got Jim Hamilton, Larry
12  Hancock, and Steve McKay. Thank you, folks. And,
13  again, thank you to staff, Ms. Churchill and the staff.
14  I know this has been a monumental task in a very short
15  period of time, and it has been running very
16  efficiently and effectively. And I thank you, and I
17  applaud all of the hard work that you are doing. We're
18  not done yet, so let's get it done.
19  All right. Members of the Committee, I think
20  it probably would behoove us to be sure that we have a
21  roll call of the members of this committee in
22  attendance. Can we do that, Mr. Clerk?
23  CLERK: Senator Rucho.
24  SEN. RUCHO: Aye.
25  CLERK: Senator Apodaca.

## 3

1  SEN. APODACA: Aye.
2  CLERK: Senator Barefoot.
3  SEN. BAREFOOT: Aye.
4  CLERK: Senator Blue.
5  SEN. BLUE: Here.
6  CLERK: Senator Brown.
7  SEN. BROWN: Aye.
8  CLERK: Senator Clark.
9  SEN. CLARK: Present.
10  CLERK: Senator Harrington.
11  SEN. HARRINGTON: Here.
12  CLERK: Senator Hise.
13  SEN. HISE: Aye.
14  CLERK: Senator Jackson.
15  SEN. JACKSON: Aye.
16  CLERK: Senator Lee.
17  SEN. LEE: Here.
18  CLERK: Senator McKissick.
19  SEN. MCKISSICK: Here.
20  CLERK: Senator Randleman.
21  SEN. RANDLEMAN: Here.
22  CLERK: Senator Sanderson.
23  SEN. SANDERSON: Here.
24  CLERK: Senator Smith.
25  SEN. SMITH: Here.

## 4

1  CLERK: Senator Smith-Ingram.
2  Senator Ford.
3  SEN. FORD: Present.
4  CLERK: Senator Wade.
5  SEN. WADE: Here.
6  CLERK: Senator Wells.
7  SEN. WELLS: Here.
8  SEN. RUCHO: Okay. Now, members of the Senate
9  that are not on this committee that are present, would
10  you please identify yourself, starting with Senator
11  Curtis, and then come across. Please put your name on
12  the floor so that we can take note of the other members
13  that are here.
14  SEN. CURTIS: Senator Curtis.
15  SEN. PATE: Pate.
16  SEN. RABON: Rabon, Brunswick.
17  SEN. GUNN: Gunn.
18  SEN. JACKSON: Jackson, Mecklenburg.
19  SEN. ALEXANDER: Alexander, Wake County.
20  SEN. BARRINGER: Barringer.
21  SEN. TARTE: Tarte.
22  SEN. SOUCEK: Soucek.
23  SEN. WADDELL: Waddell, Mecklenburg County.
24  SEN. RUCHO: All right. Do we have any other
25  members here?

## 5

1  SEN. COOK: Cook.
2  SEN. RUCHO: Oh, okay.
3  SEN. KRAWIEC: Senator Krawiec.
4  SEN. FOUSHEE: Foushee.
5  SEN. RABIN: Rabin, Harnett.
6  SEN. DAVIS: Davis, D., Greene.
7  SEN. WOODARD: Woodard.
8  SEN. LOWE: Lowe, Forsyth.
9  SEN. BRYANT: Bryant, Nash.
10  SEN. RUCHO: Did you get Senator Foushee, too?
11  CLERK: Yep.
12  SEN. RUCHO: Okay. Is that all that is in
13  attendance? Okay. Well, everybody's welcome.
14  First thing first, let's get a point of
15  clearance. Senator McKissick, you requested some
16  information yesterday dealing with the demographic
17  information on party affiliation and race in each of
18  the 13 districts. First of all, did you receive it?
19  SEN. MCKISSICK: I did receive this 2011 stat
20  pack with the conforming data that was requested,
21  broken down by category based upon new district
22  distributions and boundaries.
23  SEN. RUCHO: Very good. And since you
24  requested that, would you release the confidentiality
25  requirement? And we'd like to place that on the

6

1  website for all members to be able to have the same
2  information.
3  SEN. MCKISSICK: Absolutely.
4  SEN. RUCHO: Okay. Staff, you've got that?
5  Okay. Then let's do the next thing. There is -- in
6  the packet that members received during the Select
7  Committee -- Joint Select Committee, we gave a copy of
8  the contingent map. We gave a stat pack, a code so
9  that the stat pack can be interpreted, and a criteria.
10  Make sure you have all four of those items and if
11  not -- first of all, the members that were not here
12  yesterday, can you raise your hands so the
13  Sergeant-at-Arms can deliver you that stat pack?
14  Keep your hands up, please, so that we can make
15  sure that everybody has that information.
16  SEN. BLUE: Mr. Chair, when you say members, do
17  you mean members of the committee or all members?
18  SEN. RUCHO: Any member. I hope the rest of
19  you all did a little better than Senator Apodaca who
20  happened not to bring his.
21  All right. We're going to make sure that
22  everybody has this information. Senator Jackson.
23  SEN. JACKSON: Mr. Chairman, I've got
24  everything but the criteria.
25  SEN. RUCHO: Okay. Well, we will give you a

7

1  copy of the criteria. Would you just raise your hand?
2  And is Senator Jackson the only one without the
3  criteria? No, we've got a few folks. All right.
4  We're not in any rush. Make sure that everybody gets
5  the information.
6  And, please, you're getting this information.
7  I hope that everybody will please bring that to the
8  session so that we don't have to -- have to reproduce
9  these items again, Senator Apodaca.
10  Does everybody have the information requested?
11  Okay. Then let's go ahead, and we will begin this
12  meeting and the first agenda item and that is -- first
13  of all, we are here in a special session and in this
14  case, Senate Redistricting Committee to review maps
15  that were -- we call the 2016 Conditional -- excuse me,
16  Contingent Congressional Maps, and they have been
17  proposed and reported into the General Assembly from
18  the select committee after yesterday's meeting and
19  final vote.
20  This map has been -- and the entire process has
21  been required of us so that we can meet the
22  requirements of the three-judge panel from the Middle
23  District who found the enacted maps, and specifically
24  CD 1 and CD 12, unconstitutional. They believed that
25  the use of race was predominant and, therefore, was

8

1  considered unconstitutional. As one might think, when
2  one district or two districts have to be redrawn, it is
3  a rippling effect that will affect the entire state,
4  and that's why you have a map of the entire state. And
5  any amendments that come forward have to include the
6  entire state map.
7  Now, what I'm going to do is recognize
8  Representative David Lewis who explained the map and
9  the criteria yesterday, and I'm going to ask him to do
10  the same thing for every member now. Some of it will
11  be a repeat, and there's nothing wrong with having
12  another chance to listen to a very good presentation.
13  Representative Lewis, welcome to the Senate
14  Redistricting Committee, and I'm going to let you have
15  the microphone to present the 2016 Contingent
16  Congressional Plan. And, again, if you don't mind
17  explaining what "contingent" would mean in this case.
18  REP. LEWIS: Good morning, Mr. Chairman. Good
19  morning, members. Thank you for the opportunity to
20  stand before you this morning and to present this
21  information that comes from the Joint Select Committee
22  on Congressional Redistricting.
23  Pursuant to the instructions from the Chair, I
24  begin my remarks by saying that the proposed map that
25  we're going to review today, that I'm going to do my

9

1  best to explain today, is being drawn in compliance
2  with the court order issued in the aforementioned case.
3  It is still our belief that the 2011 maps as enacted
4  will ultimately be upheld, and that is the reason that
5  all of this discussion is on the Contingent
6  Congressional Plan or the so-named Contingent
7  Congressional Plan. I will do my best in presenting
8  this to refer to this plan as the Contingent Plan and
9  the map that has been found unconstitutional by the
10  court in Greensboro as the Enacted Plan.
11  May I begin, Mr. Chairman?
12  SEN. RUCHO: Yes, sir. Please begin.
13  REP. LEWIS: Thank you, Mr. Chairman. Members
14  of the Senate, on February 16 the Joint Select
15  Committee on Congressional Redistricting met and
16  adopted seven criteria for the drawing of the 2016
17  Contingent Congressional Redistricting, and a map was
18  produced using those criteria. While I am happy to
19  take corrections -- to take questions from the
20  committee at the direction of the Chair, I would first
21  like to take a moment to walk through the criteria and
22  discuss, generally, how the map addressed each of
23  these.
24  The first criteria is equal population. All of
25  the districts are drawn with either 733,499 total

10

1    persons or 733,498 total persons. This is as equal as
2    practicable and in accordance with federal law.
3         An additional criteria was contiguity. All of
4    the areas in every district are comprised of contiguous
5    territory.
6         Another criteria was political data. The stat
7    reports that have been presented to each of you
8    reflects which election results were used in building
9    these districts. Race was not considered and is not
10   present on the reports presented to the Committee.
11        Partisan advantage was another consideration.
12   We believe this map will produce an opportunity to
13   elect 10 Republican members of Congress. But make no
14   mistake in that regard, this is a weaker map than the
15   enacted plan.
16        Additional criteria was the 12th District.
17   This map does away with the serpentine nature of the
18   12th District which dates back to 1992.
19        Compactness was another criteria. It is very
20   important to point out that only 13 counties and 13
21   voting districts, or VTDs, are split in this map. In
22   accordance with the criteria, more whole counties and
23   more whole precincts are the best indicator of
24   compactness we believe to be available.
25        An additional criteria was incumbencies. Only

11

1    two incumbents are double-bunked, or reside in the same
2    district under this map, one Republican and one
3    Democrat. Those are found in the fourth district of
4    the map, and they are Representative Price and
5    Representative Holding. Eleven incumbents were placed
6    in a district by themselves.
7         Mr. Chairman, this concludes my initial
8    presentation. At your direction, I will yield to
9    questions from the committee.
10        SEN. RUCHO: Yes, and all of the questions will
11   be coming through the Chair, and requests for follow-up
12   need to be addressed. And then also, ladies and
13   gentlemen of the committee and members of the Senate,
14   you can see the historical perspective of the maps
15   going from 1982, I believe, forward. And you can see
16   some of these districts like the 12th District that had
17   a start -- how many years ago? Thirty, thirty-odd
18   years ago, which was a very serpentine district. One
19   of them found unconstitutional, and finally to the
20   point where they found agreement -- where the Supreme
21   Court found that CD 1 and CD 12 were constitutional
22   and, again, that is what the enacted map tended to
23   follow. So this was not something that was contrived
24   by a new map but actually a continuation of what was
25   originally approved by the U.S. Supreme Court.

12

1         That being said, members of the committee, I
2    will start entertaining questions through the Chair.
3    Senator Ford.
4         SEN. FORD: Thank you, Mr. Chairman. The
5    question is for Representative Lewis.
6         SEN. RUCHO: Yes, sir.
7         SEN. FORD: You made a comment as it relates to
8    that. These districts -- the new districts that --
9    congressional districts that were redrawn are more
10   competitive than the ones that were previously drawn.
11   Can you help me with the data to justify that claim and
12   give me an example of such a -- an example of what you
13   articulated by making them more competitive in this
14   regard?
15        REP. LEWIS: Thank you for that question,
16   Senator. In all candor, I can answer that. I do not
17   have the enacted map political data with me. I may
18   need to ask staff to provide that to me and with your
19   permission to come back to that. I would only point
20   out that the political data that was provided to the
21   Committee in the form of a stat pack will show the
22   various races that we used. And unfortunately, I don't
23   know off the top of my head. For instance, if we want
24   to look at the 11th District, I don't know how many
25   votes for Pat McCrory were cast in the 2012 governor's

13

1    race as opposed to the new drawing of the 11th. With
2    the Chair's permission, we can start to compile that,
3    and I am more than willing to answer that. I don't
4    have the information readily available to me. It would
5    be fair to say that that is my recollection of having
6    looked at the data in the past.
7         SEN. RUCHO: One second, Senator Ford, would
8    you mind repeating the question that you had for
9    Representative Lewis so I can be sure that we can help
10   you get your answer?
11        SEN. FORD: Thank you. The question goes
12   directly to a claim that Representative Lewis made
13   that, based upon the redrawing of the new congressional
14   maps, that they are actually more competitive than the
15   old congressional maps. And what I was looking for was
16   data to justify that claim and an example of a district
17   where that claim by Representative Lewis would be true.
18        SEN. RUCHO: Okay. Representative Lewis,
19   the -- I guess, some of the questions that are being --
20   that was specifically addressed could be determined by
21   each member if they paid close attention to the stat
22   pack that is part of this package. And if you'll spend
23   a few minutes explaining the code to them so that each
24   of the members would be able to identify how many votes
25   occurred. Or do you want to do it at a subsequent

14

1  time?
2       SEN. BROWN: Mr. Chairman.
3       SEN. RUCHO: Hold on.
4       SEN. BROWN: Mr. Chairman.
5       SEN. RUCHO: Excuse me, Senator Ford, before we
6  get into complete answer to your question, I'm going to
7  have Representative Lewis go through the stat pack how
8  the code works so that the members that weren't here
9  early on, like yourself, understand how that is
10 there -- how it has been put together. It may help you
11 in understanding that. And then we'll follow-up your
12 question either how that would help answer your
13 question, and if we don't, then we'll find an answer to
14 your question. Thank you.
15      Representative Lewis, would you go through the
16 code so that each member will be able to identify which
17 races to be looking at in dealing with the election?
18      REP. LEWIS: Yes, sir, Mr. Chairman.
19 Mr. Chairman and members of the Senate, if I could
20 direct your attention, all of you should have been
21 given a document that looks like this. It says 2016
22 Redistricting Database Field Key. And, Mr. Chairman, I
23 would like this to be a part of the committee record.
24 If you'll notice this list which elections we looked
25 at. At the Chair's direction, I'll go through briefly,

15

1  hopefully with the aid of Senator Woodard, how this
2  corresponds to this chart.
3       If you will turn, please, to the first area in
4  the stat pack, you will notice in the left corner it
5  reads "Election Results 2008 General AG, AD, CA." It
6  should be the first page in the packet that has a whole
7  lot of numbers on it.
8       Let me start, if I could, by directing your
9  attention to the columns. You will see the first
10 column says District. That obviously is the
11 Congressional District as drawn in the contingent plan.
12      The next column as you see there says -- is
13 labeled EL08G_AG_D. What that means, and is very
14 consistent across the entire plan, this is the gross,
15 the raw votes that were cast for the Attorney General
16 candidate that was the Democratic nominee in 2008. So
17 that would correspond to be Cooper, C-O-O-P-E-R.
18      If you look to the third column, you will
19 see -- the third column of the row that corresponds
20 with District one lists a percentage 79.47. That is
21 showing that the percentage of the raw vote that
22 Attorney General Cooper received was 79.47 in that
23 district.
24      The third column is labeled EL08G_AG_R. This
25 would be the raw votes cast for the Republican nominee

16

1  for AG in 2008. That name was Crumley, C-R-U-M-L-E-Y.
2  And you can see that both of those names, again, appear
3  on the key. You'll notice that the raw votes for
4  Crumley in the first district as drawn were 68,474.
5  The percentage of the vote cast was 20.53 percent.
6       Going on at the direction of the Chair, you'll
7  notice the next column says EL08G_AG Total. That is
8  simply the total votes that were cast in that race.
9       The next column is EL0G_AD_D. That means this
10 is the raw vote total for the votes that were cast for
11 the State Auditor. The Democrat in the first district
12 received 233,665. The name that would be associated
13 with that would be Wood. The corresponding percentage
14 is in the next column. And then the raw vote of 93,433
15 would be the result for the Republican. His name was
16 Merritt, M-E-R-R-I-T-T.
17      With the Chair's permission, I will speed up
18 unless directed to slow down.
19      SEN. RUCHO: Step on the gas. Now that
20 everyone has a beginning idea, they should be able to
21 flow pretty closely with this, correct?
22      REP. LEWIS: Yes, sir. Thank you, Mr. Chairman.
23 Members of the Senate, continuing on, that column also
24 includes the race that has CA. CA stands for
25 Commissioner of Agriculture. You'll notice the

17

1  underscore for a D and the underscore for an R. Those
2  names were Ansley or Ansley, A-N-S-L-E-Y for the
3  Democrat and Troxler for the Republican.
4       If there aren't further questions, we'll go to
5  the next page in the packet. You'll see it starts the
6  heading Election Results 2008 General SPI and USS.
7  This stands for Superintendent of Public Instruction
8  and United States Senate. You'll notice, again, in
9  district one it starts out with SPI_D. That would be
10 the Democratic nominee for the Superintendent of Public
11 Instruction, Atkinson, and then there's a corresponding
12 set of data that have an R, which is Morgan. Then the
13 total votes cast, and then the rest are for the U.S.
14 Senate with the Democrat and the Republican nominee.
15 The only thing that I would point out different about
16 this particular race than all of the other ones we have
17 looked at is there's also an underscore L because there
18 was a Libertarian nominee in this race as well.
19      Going to the next page in the pack. And,
20 again, this corresponds to the 2016 Redistricting
21 Database Key Field. This is the 2010 general election
22 for the United States Senate. Again, you'll notice
23 that the only thing different, there is an underscore L
24 as there was a Libertarian nominee.
25      Turn to the next page. This is the 2012

18

results. You'll notice it has an underscore GV for Governor. There was a Democratic, Republican, and Libertarian nominee as well. Also, on the right one-third of the page it has an underscore LG. That is for Lieutenant Governor. There was a Democrat and a Republican nominee for that office as well.

The next page. Election Results 2012 General AD, CA, and CL [sic]. Again, this would correspond to your guide. For 2012 the AD is the Auditor, the CA is the Commissioner of Agriculture, and the CI is the Commissioner of Insurance.

Turning to the next page. This is the election results for the general election in 2012 for the Commissioner of Labor and the Secretary of State. You'll notice that there were both Democratic and Republican nominees and their corresponding votes recorded.

The next page is entitled Election Results 2012 General SPI and TR. This would be the 2012 results for the Superintendent of Public Instruction and for the Treasurer. There were both Democratic and Republican votes recorded for these races.

The final page reads 2014 General USS United States Senate. Again, there are results. I will point out a slight change in the way this report looks. For

19

whatever reason the Republican is listed first and the Democrat second, and there is also a Libertarian that was in this race.

Mr. Chairman, this concludes my explanation unless directed further.

SEN. RUCHO: Great, thank you very much. Members of the committee and members of the Senate that are in attendance, does that help as far as you understanding the data pack?

Let's go back to Senator Ford. Senator Ford, I assume that this helps in having you better understand what is there?

SEN. FORD: Thank you.

SEN. RUCHO: Okay. I appreciate your indulgence, and thank you, Representative Lewis.

And I've got Senator Brown had a question earlier.

SEN. BROWN: Mr. Chairman, I was going to try to help Senator Ford. I just wanted to point out to him that in '08 for Attorney General, that Attorney General Cooper won every single one of these districts in '08. So that would help as far as competitiveness goes in those districts.

SEN. RUCHO: All right. The stat pack that is before you, ladies and gentlemen, reflects what was

20

believed to be what the Court felt would probably be fair evaluation since both race and party affiliation was not included in this. Representative Lewis, were there any elections that was felt was not appropriate to be used by the Court in regards to determining election results?

REP. LEWIS: Mr. Chairman, we read into the report that while we stated to the Court that we used the 2008 race for President, the Court wrote that they considered that a proxy, basically a proxy for race since the nominee was an African American. So we elected not to use the 2008 or the 2012 race for President.

SEN. RUCHO: Thank you. All right, let's go forward then, and I think I saw Senator Blue raise his hand. Senator Blue, for a question.

SEN. BLUE: Thank you. Representative Lewis, I understand you to say that you didn't use the presidential numbers in 2008 because it is your reading of the opinion that because of the race of the presidential candidate it was a proxy for race if you'd use that?

REP. LEWIS: That is what I said, sir. Yes, sir.

SEN. RUCHO: For follow-up.

21

SEN. BLUE: Further question. You indicated that the offices that you did use were those listed. Did you use the race in the Lieutenant Governor's race in 2012?

REP. LEWIS: Yes, sir. And to speak to the difference in those two as I understand them, the Court specifically listed the race for President, which is why we elected to exclude it.

SEN. BLUE: Follow-up.

SEN. RUCHO: Follow-up.

SEN. BLUE: And the candidate, one of the candidates for Lieutenant Governor was an African American woman, and the statistics show that she won in the three districts that you've created, the Democratic districts, and none of the Republican districts.

REP. LEWIS: I would need to review that, Senator Blue. Certainly the nominee in 2012 was an African American woman, yes, sir.

SEN. RUCHO: I think in that case, Senator Blue, running for President versus running for Lieutenant Governor, there is a little bit higher profile on the Presidential side, so I think that is probably what the Court was looking at. Okay.

SEN. BLUE: In my district the Senator is the highest profile.

**22**

1  SEN. RUCHO: I'm sorry?
2  SEN. BLUE: In my district NC Senate is the
3  highest profile.
4  SEN. RUCHO: Well, then I guess we'd expect you
5  to be there forever, don't we?
6  REP. LEWIS: Mr. Chairman.
7  SEN. RUCHO: All right. Representative Lewis.
8  REP. LEWIS: Mr. Chairman, if I may only to
9  further expound on my answer to Senator Blue. We have
10 noticed over time that the highest participation rate
11 in voting is usually for the President as well. I
12 don't know if this is a correct term to use or not. It
13 is a term that I have used because I can understand it.
14 There is usually -- even if it's slight, there's a down
15 ballot drop-off. So that's a further distinguishing
16 factor between the race for Lieutenant Governor and the
17 race for the Presidency.
18 SEN. RUCHO: Good. Okay. I've got Senator
19 McKissick.
20 SEN. MCKISSICK: Just a couple of questions,
21 Representative Lewis.
22 SEN. RUCHO: Following they're through the
23 Chair.
24 SEN. MCKISSICK: Sure, absolutely, Mr. Chair.
25 Could you identify any consultants or persons that

**23**

1  provided assistance in drawing these districts, either
2  individually or collectively, that you looked to for
3  assistance in preparing this map?
4  SEN. RUCHO: I don't think that's relevant to
5  the -- Senator McKissick.
6  SEN. MCKISSICK: Yes.
7  SEN. RUCHO: We're talking about the maps and
8  how they're drawn and all of the stat packs. I don't
9  think that question is relevant to the decision as to
10 whether you will vote for or against the map. Thank
11 you, that is the decision of the Chair.
12 SEN. MCKISSICK: A follow-up question for the
13 Chair. I see. I just think it is highly relevant to
14 know who the consultants were and where they were
15 located so they could be identified as a part of the
16 record. Particularly since it has been indicated that
17 race was not one of the criteria that was used in
18 developing the maps here at the General Assembly. I
19 don't know if perhaps consultants that might have been
20 used might have used databases outside of the General
21 Assembly where, say, race and other considerations
22 might have been used in helping to draft the map that
23 is before us.
24 SEN. RUCHO: Senator McKissick.
25 SEN. MCKISSICK: Yes.

**24**

1  SEN. RUCHO: I'll be clear, the criteria that
2  Representative Lewis has submitted is the criteria that
3  was used to draw the maps, and probably that's as much
4  as we need to know. Okay. Thank you, have you got an
5  additional question?
6  SEN. MCKISSICK: Yes.
7  SEN. RUCHO: Go ahead.
8  SEN. MCKISSICK: Now, in terms of the partisan
9  advantage that was identified as a criteria, of course
10 that was identified, and it was passed by the
11 committee. I was wondering why there was a 10-3 split
12 when if you look at the registrations of Democrats,
13 Republicans, and unaffiliated voters in North Carolina
14 it would suggest, perhaps, that division ought to be
15 different. And if we look at the fact that back in
16 2012, for example, of the candidates running for
17 Congress, the Democratic candidates received more total
18 votes than Republicans but ended up with only three
19 seats. I mean, what is -- how was the determination
20 made that we should have a 10-3 split in devising this
21 map? When perhaps, based upon voter registration and
22 voting trends, even using patterns from races which
23 have been identified here, it was suggested that
24 perhaps a greater number of seats in districts should
25 have been carved out for Democrats.

**25**

1  SEN. RUCHO: Representative Lewis.
2  REP. LEWIS: Thank you, Mr. Chairman. Thank
3  you for the question. Senator, to try and fully
4  respond to your question, the first part of your
5  question is we believe that voting patterns are better
6  indicators than voter registration. So we did not
7  actually use voter registration in drawing these maps.
8  The second part of your question, why did we
9  attempt to achieve a 10-3 congressional map draw is
10 that was the criteria that was openly debated and
11 adopted by the 2016 Joint Select Interim Committee.
12 SEN. MCKISSICK: Last follow-up, Mr. Chair.
13 SEN. RUCHO: Follow-up.
14 SEN. MCKISSICK: And that's simply this,
15 obviously there's Supreme Court decisions that use the
16 term "communities of interest" as a valid criteria in
17 drafting these types of congressional district maps.
18 Was there a specific reason why it was not one of the
19 identifying criteria that was adopted -- at least
20 proposed and adopted by the committee? Since it is a
21 valid criteria underneath cases decided by the United
22 States Supreme Court, why would we want to disregard
23 that as a criteria for us trying to draw maps since
24 there is certainly advantages in grouping people into
25 districts based upon common collective interests,

26

whether they be urban, whether they be rural, maybe they be of a certain sector of the economy. Perhaps if you could help me with why that criteria might have been omitted.

REP. LEWIS: Thank you for the question, Senator. If I may, perhaps with a two-part answer. The first is, as you recall because you served on the committee, and we appreciate your time that you gave to the effort, the Committee did consider adding communities of interest as a criteria to draw the map. I did not support that attempt to add the criteria because I feel that is too vague a term. It is too nebulous to be understood. I believe the only real definition of community of interest that we have is largely dealing with counties. And, Mr. Chairman, if it would be appropriate only to get it on the record, I believe that during the committee, the Joint Select Committee staff was asked if there was a North Carolina definition in statute of community of interest. If the Chair would allow, perhaps staff could, again, answer if there is a North Carolina statute that defines community of interest.

SEN. RUCHO: Yes, thank you. And Senator McKissick did ask that question. Ms. McCraw, you gave us an answer the other day regarding the definition of

27

community of interest and it is?

MS. MCCRAW: Yes, Kara McCraw, Legislative Analysis Division. At this time, North Carolina has not defined the term communities of interest in statute.

SEN. RUCHO: Okay.

SEN. MCKISSICK: Could I ask one follow-up?

SEN. RUCHO: Follow-up question.

SEN. MCKISSICK: Maybe she could also identify this. Are you familiar with United States Supreme Court cases which identify and use that term community of interest within this particular context?

SEN. RUCHO: Do you have an answer to that question?

MS. MCCRAW: Kara McCraw, Legislative Analysis Division. The Supreme Court has used the term communities of interest and has recognized it as one of the neutral redistricting factors. They have not defined that term. They used the language -- I believe which was offered in Committee the other day, a community of shared interest was the language that was used by the U.S. Supreme Court.

SEN. MCKISSICK: Thank you for that clarification.

SEN. RUCHO: So in reality, as Representative

28

Lewis was alluding to, when the criteria were established we wanted to be clear what each of the goals -- stated goals were, and, therefore, we needed to be sure that whatever they were we understood them to be. And then any time that a future legislator or a future court needed to know that we know specifically what we were trying to achieve. Do you have an additional follow-up?

SEN. MCKISSICK: Last follow-up. Were you all aware that that community of interest term had been used specifically in litigation relating to the 12th District previously and was found to be a valid criteria?

REP. LEWIS: Mr. Chairman.

SEN. RUCHO: Yes, sir, Representative Lewis.

REP. LEWIS: I would just have to state for the record that I was not aware of that. I am not an attorney and -- so, no, sir. I can only speak for myself. I was not personally aware of that.

SEN. RUCHO: I guess, Representative -- excuse me, Senator McKissick, looking at that map along the wall and its transition over the time, it is going to be hard-pressed for anybody to explain what community of interest on that map is and specifically on the CD 12. So, the reality is that is why one of the criteria

29

that Representative Lewis talked about basically eliminated what has been ridiculed as the snake map, or whatever terminology that goes up there.

All right. Anybody have an additional question? Seeing none -- excuse me, Senator Blue.

SEN. BLUE: Are you talking about questions of Representative Lewis? I do have an amendment to send forth.

SEN. RUCHO: Okay. Let's first of all make sure that Senator Lewis -- excuse me, Representative Lewis has finished his presentation, and anybody here may be able to have asked their question of him. Okay.

I hope Representative Lewis will stay around here for a few moments, okay?

Senator Robinson, you have a question?

SEN. ROBINSON: Yes, Mr. Chair, does that include non-members of the committee in terms of asking questions?

SEN. RUCHO: I think it would be appropriate that we have non-members be able to have that chance because that way they are -- if you guys get your question answered now, we won't have to hear about it on the Senate floor. So...

SEN. ROBINSON: I thought that might serve to your advantage.

## 30

SEN. RUCHO: Got my attention with that one.

SEN. ROBINSON: Follow-up question then.

SEN. RUCHO: Yes, please go ahead.

SEN. ROBINSON: Representative Lewis, in terms of incumbency, I know that you said that you tried to allow for that. Did you try to consider that as well in terms of drawing the 12th district? How did you -- did you have any correlation between looking at incumbency and then looking at the 12th district as well?

REP. LEWIS: Thank you for that question, Senator. We considered all of the criteria that I listed at the start of my presentation. It almost became a -- I don't want to say a joke, but we kind of made light of the fact that you've got to consider all of these criteria together. You've got to try and harmonize them. One of the specific criteria was to do away with the serpentine shape of the 12th. So the decision was made to collapse the 12th into the population center of Mecklenburg. So once that was done, obviously the incumbent in the 12th -- in the current 12th, doesn't live in Mecklenburg. And so when we were drawing the map, we were able to create the new 13th district, and she does reside within that. And to that extent, the incumbency was considered.

## 31

SEN. RUCHO: Senator Robinson, are you okay?

SEN. ROBINSON: Absolutely not.

SEN. RUCHO: I thought so. Thank you.

All right. Members of the committee -- Senator Bryant -- see what you started there, Senator Robinson? Senator Bryant.

SEN. BRYANT: Thank you, Mr. Chairman. I have a question about the 13 counties, I think, where there are splits. Which would mean -- and I don't know where the split precincts are, but my question is can we get a precinct spreadsheet for the split counties so that we really know what precincts are in which districts in those counties and then the party and race demographics for those precincts that are split?

SEN. RUCHO: Well, first of all, there is no party, and there is no race demographics that were used in producing this map.

SEN. BRYANT: Okay. Okay. Well, let me ask two questions. Can we get a precinct chart done of which precinct, where there are splits, what the actual precincts are that are split between district whatever it is. Say like in Mecklenburg -- or in Wilson, you have district one and two, correct? So can we get the precincts in one and the precincts in two and whatever stats you're comfortable giving us on the precinct

## 32

splits. And then do I have your permission to ask the staff to give us the race stats.

SEN. RUCHO: Let's answer one question first. Representative Lewis will share with you some information that he has on the 13 splits. And then I will ask staff, and be prepared, I need staff to be able to give a complete analysis of the whole counties in this map as compared to previous maps in complete number of the VTDs that were -- let me rephrase this. The counties that were split in -- the number of counties split in this map, versus the enacted map versus previous maps in the past, and also the number of VTDs that were split, so that that will also help Senator Bryant in understanding the quality of this map.

SEN. BRYANT: Mr. Chair, I'm not questioning the quality. I'm just sort of looking at details of the splits --

SEN. RUCHO: I understand.

SEN. BRYANT -- and what patterns may be there. I've already --

SEN. RUCHO: Just let Representative Lewis present, please.

REP. LEWIS: Thank you, Mr. Chairman. And Senator Bryant, I will be happy to -- with the Chair's

## 33

permission, to enter this into the record so that you may see it. With your indulgence, there are 13 of them, I will read them real quick. Would that be okay?

SEN. BRYANT: I'm aware, I can look -- I know where they are in terms of which counties. What I don't know is -- and I assuredly don't want you to read me the precincts because I won't -- without looking at stats that will be meaningless to me because they would just have name -- numbers -- probably numbers or something. Normally with redistricting plans where there are splits, you get a precinct spreadsheet that shows which precincts are -- like in Wilson County are in one and two, and in Durham which ones are in one and four, et cetera. So I can tell where you have them. I am not quibbling with that. I'm just trying to understand --

SEN. RUCHO: Representative Lewis, may I be of some assistance? I checked with staff, and that will have to be a specific report that staff will be able to address.

Are you understanding what Senator Bryant needs?

Senator Bryant, we will do our best to get it to you as soon as possible.

SEN. BRYANT: Thank you.

### 34

SEN. RUCHO: Thank you. Members of the committee, additional questions?

We are presently waiting for the bill draft and the entire bill that's there so that we will have a chance to look at that, make sure that everything is in order. We just gave you the overview. Then you'll see the bill which is composed of a lot of numbers as you might expect.

So what I'll do at this point is I will entertain Senator Blue's amendment and let us take a look at that, and then we'll proceed forward.

Senator Blue, you're recognized.

SEN. BLUE: Thank you, Mr. Chairman. Since it is to the bill, I don't know that I can do it until I see where it plugs into the bill because you will discuss the substance of the bill. The question that Senator Bryant raised goes to the substance of the bill because they have to set forth the precincts, the split ones, in the bill itself.

SEN. RUCHO: So you want to wait at that point?

SEN. BLUE: But I'll send it forth whenever you want me to if they --

SEN. RUCHO: Well, if you submit it, and then we'll have a chance to take a look at it. And I'm sure there's a lot of quality there that we would like to

### 35

review. And with that being said, you know, if you put it forward then -- I'm hoping to see the bill in about 10-15 minutes here.

SEN. BLUE: Okay. I'll wait.

SEN. RUCHO: You want to wait?

SEN. BLUE: I'll wait. You're absolutely right. There is a lot of quality in it.

SEN. RUCHO: I have no doubt.

SEN. BLUE: And I think you'll be so so pleased with it if it comes as a surprise.

REP. LEWIS: Mr. Chairman.

SEN. RUCHO: Yes, sir, Representative Lewis.

REP. LEWIS: If I may, sir, and I would have to ask the Senator's indulgence as it is written by hand. I would like to submit for the record and also to give to Senator Ford -- I believe you asked this question, Senator Ford, I apologize if I got that wrong. I did a quick -- staff did a quick breakdown between the enacted plan and the 2016 plan using only the race for Governor, it just takes a while to do. May I submit that to the committee record and also give that to Senator Ford in attempt to answer his question.

SEN. RUCHO: Yes, sir. We'll go ahead, and we will submit that. That is there to answer a question that -- of course, everyone understands that when you

### 36

look at numbers comparing the previous enacted map districts and this district, it is everyone's opinion; and Representative Lewis may have an opinion; and I'll have an opinion; and I'm sure Senator Ford will have an opinion whether it is better, worse or what have you. But that's someone that each of us can speculate on.

That being said, we're going to put -- we're going to stand at ease for about 10-15 minutes to try to get the bill in our hand and under the circumstances -- so stay close so that we can keep on our schedule. We've got still a bit of work ahead. So we'll just stand at ease for about, let's say 15 minutes.

(The Committee stood at ease from 12:07 p.m. until 12:24 p.m.)

SEN. RUCHO: Members, in addition to the bill, you will also have a copy of the report on the split counties and the split districts.

Members, you should have before you a copy of the bill and also a report on split counties and split VTDs. And we will wait just another 2 minutes because I think we said we would come back...11:30, is that right? 12:30?

All right. Members of the committee, let's get back into order, and you have before you Senate Bill 2,

### 37

which is 2016 Contingent Congressional Plan. And this is the actual bill. And, Ms. Churchill, would you like to enlighten us on this bill?

MS. CHURCHILL: Yes, sir.

SEN. RUCHO: Members of the committee, Ms. Churchill is presenting and explaining this bill.

MS. CHURCHILL: Section 1 of the bill overwrites subsection (a) of G.S. 163-201(a) which is the current statutory provisions that set out the 13 U.S. House of Representatives congressional districts. It overwrites that for years -- for elections beginning in 2016 and every two years thereafter.

Beginning on page 1 line 10 through page 10 line 39, you will see the actual assignment of geography. This is done first at the county level. So if a county is whole, you will simply see the county's name. If the county is not whole, you will then see the county's name and then a list of VTDs. If the VTD is whole, you will see just the name of the VTD. For example, on page 1 line 10, you will see Durham County, VTD 01. That means that VTD 01 in Durham County is whole. If the VTD is split, then you will see VTD, the name of the VTD, a colon and a list of census blocks within that VTD that are assigned to that district. An example would be on page 1 line 19 which is VTD 1509:

**38**

Block(s). The census designation for the census blocks is a series of numbers. I am not going to attempt to read those to you.

Section 2 of the bill specifies that this plan adopted under Section 1 of this act is effective for the elections for the years 2016, 2018, and 2020 unless the United States Supreme Court reverses or stays the decision of the United States District Court for the Middle District of North Carolina holding unconstitutional G.S. 163-201(a) as it existed prior to the enactment of this act. And in any such case, the prior version of G.S. 163-201(a) is again effective. The prior version of G.S. 163-201(a) would be the plan that was adopted by the North Carolina General Assembly in November of 2011.

Lastly, Section 3, this act is effective when it becomes law.

SEN. RUCHO: Members of the committee, any questions on that bill? Senator Blue.

SEN. BLUE: Thank you, Mr. Chairman. I notice in some of these -- I notice in some of these districts that there is more than one VTD split; am I correct in making that conclusion?

MS. CHURCHILL: Yes, Senator Blue, you are.

SEN. BLUE: Why would you need to split more

**39**

than one VTD within a county using the criteria that has been adopted since you can't tell the partisan affiliation or the partisan vote within that VTD?

SEN. RUCHO: Representative Lewis, would you respond to Senator Blue's question?

REP. LEWIS: Thank you, Mr. Chairman, and thank you, Senator Blue. If I may, the criteria that were adopted allowed for counties or VTDs to be split, of course, to equalize population, which you rightly pointed out, and also for political considerations. So that would've been considered when it was done. If there is a specific one you want me to look at, I'll be glad to try and do that as well, sir.

SEN. RUCHO: Follow-up question.

SEN. BLUE: Thank you, I don't have a particular one. I just -- when I noticed that there were multiple VTDs split within the same district, since you can't tell the political performance of the voting block and the political consideration was with respect to the incumbent, which would mean you still wouldn't have to split but one VTD within the district once you decided that you were going to split it because your population would be under control. I'm just trying to figure out why would you -- why would you particularly split more than one?

**40**

REP. LEWIS: Well, again, sir, and I appreciate you also mentioning incumbency which was one of the criteria that we considered. Often times a VTD split may have occurred in a county -- and I'll try to refresh my memory just a moment -- may have occurred to make sure that incumbency was considered but also we had to equalize population within the district at-large as well. Again, if there's a specific one -- and I apologize, I was trying to listen to what you asked, but I may have missed part of your question.

SEN. BLUE: Yeah, just in looking at it, I know that we talked about splitting counties and splitting precincts, but once you get to the -- roughly the precinct of the Voting Tabulation District level you don't know what the political performance is other than the overall performance. You can't put it at a block level, and when you split a VTD, you're going down to block level where the political performance can't be measured.

REP. LEWIS: To the best of my knowledge, Senator, VTDs -- and, again, I'll be glad to look up the specific ones. To the best of my knowledge, the only time that a VTD was split in that manner was to equalize population.

SEN. RUCHO: Thank you. Before we go onto the

**41**

next question, what I would like to do is, Ms. McCraw, would you explain your analysis, the staff analysis on the number of split counties and split VTDs so that members would understand what this map, 2016 Contingent Congressional Map, is as compared to previous maps?

MS. MCCRAW: Yes, Senator Rucho. Kara McCraw, Legislative Analysis Division. You do have a table in front of you that says "Comparison of Split Counties and Split VTDS in Congressional Plans." This compiles into a table starting with the '92 Congressional Plan, the three in the '90s, the 2001 Congressional as well as the current plan and the proposed plan. Using the data that is available on the NCGA redistricting archives, if you go to each of those plans, there are reports that are on the General Assembly website that show the counties that are split between districts. And then beginning in the 2000 decade precincts or VTDs that are split, that information is not available for the '90s. So you can see in that the '92 Congressional Plan had 44 counties split; the '97 had 22; the '98, 21; then in 2001, the Congressional Plan had 28; the 2011 had 40; and the proposed plan has 13.

The VTD split, we only have that data back through the last decade. In 2001 that was run as precinct splits and that was 22 at that time; 2011 had

### 42

68; and the current plan has 12.

SEN. RUCHO: Any questions on that particular information, members? You can see that this map is -- has 87 whole counties, and it has only 12 VTD splits. Senator Blue.

SEN. BLUE: The point I was getting to -- and I appreciate the reduction in the numbers, you couldn't split precincts in the '90s anyhow except for very limited purposes. But anyhow, what I was trying to see, once a decision was made to split a precinct is what was the criteria used to assign blocks to one district as opposed to another district? And if, in fact, population was the reason, then you would just simply split the precinct and import however many VTDs you needed to and then just send the blocks appropriately to fill in in the particular districts it would seem to me.

SEN. RUCHO: Representative Lewis.

REP. LEWIS: Again, Senator Blue, to the best of my recollection, the reason a VTD would've been split in that manner would've been for population equalization. And I would go only one step further, you know, sometimes even when you use whole precincts or whole VTDs these things could be 100 years old. Sometimes they look weird. And I remember that there

### 43

may have been times when we had to split a precinct and we might have tried to make the line look as neat as we can, that might be one of the reasons that it was done the way that it was done.

SEN. RUCHO: Okay. Senator Hise.

SEN. HISE: This is a question of Representative Lewis, and I think this may help Senator Blue a little bit as well. When you have to divide a VTD in a district it is -- it can only be divided then into the census tract subdivisions that are out there. I think they are listed by the number here; is that correct?

REP. LEWIS: Thank you for that question, Senator Hise. Let me qualify the answer by saying, to the best of my knowledge, that is correct.

SEN. HISE: Follow-up.

SEN. RUCHO: Follow-up.

SEN. HISE: So, but then to get an equal population to one person, it may be necessary to divide multiple Voter Tabulation Districts because you have to place census blocks in that to come within that one person various, and you can't just pick a number out of that VTD?

REP. LEWIS: Thank you for that question, Senator Hise. To the best of my knowledge, that sounds

### 44

correct.

SEN. RUCHO: Okay. I have got -- well, I had Senator Woodard first.

SEN. WOODARD: Thank you, Mr. Chair. Question, I think for staff, or maybe you can answer it, Mr. Chair, or either of the Chairs. Do the VTD numbers correspond with -- are they supposed to correspond with the precinct number in that county?

REP. LEWIS: Mr. Chairman, I can probably answer that.

SEN. RUCHO: Yes.

REP. LEWIS: But staff would probably do a more concise job. If they don't, I'll be glad to speak to it.

SEN. RUCHO: Did you hear the question? Ms. McCraw.

MS. MCCRAW: Kara McCraw, Legislative Analysis Division. So, in 2007, the General Assembly enacted legislation that required counties to freeze their precincts as Voting Tabulation Districts that would then be used through the census process. That statute requires counties going forward to be able to report election information in the form of that frozen VTD. Counties aren't prohibited from changing precincts going forward, but they do have to be able to still

### 45

report election information in the form of that VTD. So at this point in time, eight, nine years down the road counties, precincts and VTDs may not always be exactly the same, but counties are required to report that information using those VTDs that were used in the 2010 census.

SEN. WOODARD: Follow-up.

SEN. RUCHO: Senator Woodard, follow-up.

SEN. WOODARD: Yes, sir. Thank you, Mr. Chair. Maybe then I need to consult with staff because I think I see a potential error. It may just require a technical correction in one of the Durham VTDs for District 4. So it is just follow-up in verifying.

SEN. RUCHO: How do you want to handle that?

SEN. WOODARD: We can handle it offline.

SEN. RUCHO: All right. If you'll talk with Ms. Churchill on the side and make sure that -- of course, we never want errors, but sometimes it happens when we have numerous numbers here.

Okay. I've got Senator Robinson, I believe.

SEN. ROBINSON: Yes. Thank you, Mr. Chair. Representative Lewis, in Guilford County, District 13, page 9, VTD G67, which is actually a part of my district. You mentioned -- and that has several blocks split out. Can you tell me why those blocks are split

**46**

out like that? Sixty-seven, page 9, District 13. The others are whole precincts in there, but that one is split out considerably.

    REP. LEWIS: I thank you for that question, Senator. My only response would be to repeat what I said earlier, which I believe the primary and probably the overriding reason for a split VTD would be for population equalization. Please understand that I do not have readily available to me maps that show these sub-blocks that are here, and I don't know that I can give you a complete answer.

    SEN. ROBINSON: Follow-up, Mr. Chair.

    SEN. RUCHO: Follow-up.

    SEN. ROBINSON: When I look at precinct 67, you mentioned that race is -- you're not taking race as a factor, but 92 percent of precinct 67 is African American and 88 percent Democrat, so it couldn't have been for another partisan -- to sway your partisan piece. I don't know. I would like to know. Because 67 is 92 percent African American and 88 percent Democrat. So I am really wondering why those blocks are split out like that.

    REP. LEWIS: Well, thank you again for that question, Senator. I would respond by saying that we did not consider race in the drawing of these plans, so

**47**

I would have no way to know that the percentages that you give. I have no way to know that. I would also point out that the reason a VTD would be divided was also addressed, I think, earlier in my remarks when I said that it would be divided primarily for population equalization. And if there is a more detailed answer, I will try to get that to you if it comes to me, but I can't give you something that I don't know.

    SEN. ROBINSON: Mr. Chair, I would like more details, please.

    SEN. RUCHO: We will work to try to help you with that request.

    All right. I've got Senator Bryant -- no? Okay. That is good, we're good.

    All right, members of the committee, you see the bill before you that corresponds to the map that we have. There are no additional questions at this moment?

    Senator Blue, is that a question?

    SEN. BLUE: No question.

    SEN. RUCHO: Okay. All right. So then let's go ahead and take off Senator Blue -- or Senator Blue's -- I guess the Chair probably should've asked this question, is there -- Ms. Churchill, I know this is part of the legalese in explaining this, but in

**48**

reality, is it correct that this map, the Contingent -- 2016 Contingent Congressional Map, will be good for '16, '18, and '20 unless the Supreme Court reverses the decision of the three-judge panel; is that correct?

    MS. CHURCHILL: Reverses or stays the decision of the three-judge panel.

    SEN. RUCHO: Either reverses or stays it. Okay.

    And then at any point, even with a stay, at any point in the process that they find it -- you know, find the map -- the enacted map constitutional, then that is the one that will become the enacted map again in moving forward in the election process?

    MS. CHURCHILL: So given the language in Section 2, if the Supreme Court determines that the Middle District's decision does not stand, either if there is a stay or a reversal of that decision, the current Rucho-Lewis Congress 3, which was the plan enacted by the General Assembly in November 2011, would remain the plan used for the U.S. House of Representative elections in North Carolina for '16, '18, or '20 depending on when that decision came from the Supreme Court.

    SEN. RUCHO: Thank you. All right. Now, I guess we're ready.

**49**

    SEN. BRYANT: Mr. Chair. I'm sorry.

    SEN. RUCHO: Senator Bryant.

    SEN. BRYANT: I have a follow-up to that question that I think would be helpful. And that is, can we get a -- from Ms. Churchill just a brief synopsis of what will happen between -- after we -- after this plan is enacted by the Legislature with whatever changes or implementation occur. What will be the next steps relative to the court case about that? Can she just close those gaps?

    SEN. RUCHO: Senator Bryant, I think there are so many opportunities and options on that issue that have to be determined by attorneys on both sides and then ultimately the Court. I'm not sure we can answer that question. Okay.

    All right. That being said, I think Senator Blue has an amendment, and, Senator Blue -- let's see, I think that is the one that says S2-ARN-2[v.5]; is that correct?

    SEN. BLUE: That is correct, Mr. Chairman.

    SEN. RUCHO: Okay. Would you explain it?

    SEN. BLUE: Thank you very much, Mr. Chairman. As you indicated before we broke, it is a wonderful amendment, great idea. We watched the agony of going through this process, joy for some, but nevertheless,

50

1  it is time that we match our actions to our beliefs in
2  democracy. And this is a small effort to do just that.
3  There've been several ways recommended for us to handle
4  this dicey subject. This does nothing to handle it for
5  2016, but in future redistricting efforts, what it
6  would do would be to take away, at least directly from
7  the General Assembly, the power to do this and put it
8  in a staff position with the advice of an advisory
9  commission. But staff would actually follow, most
10 importantly, the provisions on page 5 of the bill which
11 sets forth -- pages 4 and 5, really which sets forth
12 the standards that would be used, but more importantly
13 I think on line 15 page 5 of the bill, it says that,
14 "No district shall be drawn for the purpose of favoring
15 a political party, incumbent legislator, or member of
16 Congress, or other person or group, or for the purpose
17 of augmenting or diluting the voting strength of a
18 language or racial minority group." And it sets forth
19 criteria that I think goes to the heart of this
20 democracy that we all profess to love and believe in.
21 If, in fact, the people that we chose to represent us
22 are going to be representative, we don't need to put
23 artificial barriers as to what that representation
24 consists of. So this would enable people without a
25 direct stake in it to draw districts based on specific

51

1  criteria and submit those to the Legislative Services
2  Offices and he or she to the General Assembly, and we
3  would vote bills up or down. That is in essence -- I
4  hadn't seen this in five years, but when I realized
5  what the process was after the session this morning, I
6  knew that I needed to get the idea out there. I would
7  ask the Chair to recognize Kara just for a minute to
8  answer any specific details that I have failed to
9  include and as to the workings of this group or the
10 advisory committee.
11      SEN. RUCHO: Before we go to answer questions
12 on it, Senator Apodaca, as Rules Chair, would you
13 explain your thoughts about this?
14      SEN. APODACA: Yes, Mr. Chairman. I think this
15 is out of order. It does not meet our guidelines that
16 we set forth. So I'm going to rule this out of order.
17 We shouldn't proceed any further with it.
18      SEN. BLUE: Mr. Chairman.
19      SEN. RUCHO: Yes?
20      SEN. BLUE: At least he is improving. The last
21 time he tabled it when I did it in 2011.
22      SEN. RUCHO: Well, I mean, it is out of the
23 scope of what the Governor sent us here for, and that
24 is handling Congressional District, specifically this
25 map. All right.

52

1  I will rule that amendment out of order. And
2  we have the bill before us and -- do you have anything
3  else other than -- all right.
4       This -- I'm going to -- as a member of the
5  committee and also I'm the Chair, I'm going to submit
6  an amendment to the 2016 Contingent Congressional Plan,
7  and I'm going to ask Representative Lewis to explain
8  it.
9       Representative Lewis, just give a moment for
10 everyone to receive a copy of this, and then you can
11 explain it. So, Sergeant-at-Arms, please, distribute
12 the amendment. And as you all know, the amendment that
13 is out there has to be an amendment that covers the
14 entire state because you can't just adjust one
15 district.
16      And in addition to the draft bill, which is
17 S2-AST-2[v.2], you have the amendment to Bill Number 2,
18 2016 Contingent Congressional Plan - Corrected. And
19 Representative Lewis will explain what that correction
20 is.
21      Has everybody received the bill and the pack, plus
22 the map? Is there anyone that has not received that?
23      Okay. Members, I assume everybody has that.
24 Let's ask Representative Lewis to explain the amendment
25 on Senate Bill 2 as corrected.

53

1       Representative Lewis, you have the floor.
2       REP. LEWIS: Thank you, Mr. Chairman. Members
3  of the committee, the amendment that you have before
4  you is simply to clarify the Chair's intent all along.
5  Earlier when I testified before the Committee that only
6  in the 4th district were members double-bunked, it was
7  brought to our attention that inadvertently, that may
8  have been the case in the 13th district as well. This
9  amendment will clearly define that it changes a total
10 of three precincts to make sure that Representative
11 Walker, the home in which he resides, is clearly in the
12 6th, and the home in which Representative Adams resides
13 is clearly in the 13th. This was always the Chair's
14 intent. We were advised of staff that we might have
15 gotten that wrong, so we've switched two whole and one
16 partial precinct to make sure that we didn't mess that
17 up.
18      SEN. RUCHO: Members of the committee, any
19 questions?
20      Senator Blue.
21      SEN. BLUE: And, again, because of the process,
22 I want to make sure since I've got this old map before
23 me. You're saying, Representative Lewis, that you just
24 switched precincts between District 13 and District 6?
25      REP. LEWIS: Yes, sir. That is correct.

## 54

1  SEN. BLUE: Okay.
2  SEN. RUCHO: Senator Woodard.
3  SEN. WOODARD: Mr. Chair, a question of
4  Representative Lewis. Are you saying that, in fact, in
5  the first draft, Congressman Walker was in the 13th so
6  that the maps we saw yesterday were -- did not meet
7  your intent, they were not correct?
8  REP. LEWIS: Based on being advised of that by
9  staff, yes, sir, that is correct. Our intent was not
10 accurately reflected in the map or in the earlier bill
11 draft that this committee saw.
12 SEN. RUCHO: In essence, the address that was
13 registered for one person was inaccurate, and we found
14 out that it was; and that is how it was corrected.
15 Okay. Any additional questions?
16 Senator Bryant.
17 SEN. BRYANT: Mr. Chair, just in an abundance
18 of caution, can we be told on what page and what lines
19 these changes are? Is that too complicated?
20 REP. LEWIS: Mr. Chairman, if you could
21 recognize staff for that purpose.
22 SEN. BRYANT: Yes, Thank you.
23 SEN. RUCHO: Say that again, Representative
24 Lewis.
25 Ms. Churchill will explain that. That may be a

## 55

1  challenge.
2  SEN. BRYANT: Okay, well, she can send it to us
3  then if it is to complicated to be given verbally.
4  MS. CHURCHILL: Mr. Chair, if I might.
5  SEN. RUCHO: Yes.
6  MS. CHURCHILL: The way the districting
7  software works for purposes of producing a map and for
8  producing a bill, when the two talk to each other,
9  we're inserting complete statewide plans so that we do
10 not have any ability to erase a precinct or erase a
11 county so that there's less chance for error. So in
12 terms of what has been produced, we inserted an entire
13 statewide plan. We can do a Word document compare and
14 show you where the differences are. It will take us a
15 little bit of time to prepare that for you.
16 SEN. RUCHO: All right. She said she's
17 satisfied with that answer.
18 Senator Blue.
19 SEN. BLUE: Just one last question to make sure
20 since we're comparing this. Look at the 2008 election
21 results, the -- and I'll take page 1 to begin with.
22 Based on the explanation you gave us, Representative
23 Lewis, and thank you so much for the little handwritten
24 chart. Even though it was tough to read because of the
25 penmanship, it helped. But let's look at the printout,

## 56

1  the stat sheet for the 2008 results under both plans,
2  and we switched out between districts 13 and district
3  6. Under the plan that we had enacted, district 13 in
4  2008 had a 48.41 percent Democratic performance for the
5  Governor; is that correct? Comparing the two sheets,
6  13.
7  REP. LEWIS: Yes, sir, Senator Blue. I
8  apologize. I'm just trying to get to the right place.
9  My eyes had fallen on the 2012 results. I apologize.
10 I'm trying to reorient myself.
11 SEN. BLUE: So on district 6, 2008 was
12 48.15 percent Democratic performance. I'm trying to
13 see what the difference is in the performance based on
14 the criteria. I'm trying to see what difference moving
15 these two precincts makes since we adopted specific
16 criteria for doing it. And if you'll bear with me one
17 second, based on your numbers in 2008 under the old
18 map, it was 48.01 percent performance -- now that's the
19 corrected one, I'm sorry. 48.01 percent performance
20 under the corrected one, and under the old one, it was
21 48.15. So, in effect, it makes the 6th district more
22 Republican performance.
23 REP. LEWIS: Thank you for that question, and
24 thank you for you're patience in walking me through the
25 two charts, Senator. I do believe you are reading that

## 57

1  correctly. When we discovered it -- or, frankly, when
2  staff discovered it, we wanted to make clear that it
3  was not our intent to double-bunk Representative Adams
4  with Representative Walker. We tried to make the
5  smallest possible change to keep with the equalizing
6  population criteria. It was certainly anticipated that
7  there could have been marginal political change, but
8  that was not the motivating factor in making this swap
9  or in asking now Chairman Rucho to offer the amendment.
10 SEN. RUCHO: Okay. That explains that
11 question. All right.
12 Senator McKissick.
13 SEN. MCKISSICK: Representative Lewis, other
14 than this change that we've discussed, this is the only
15 change between the two maps that is before us right
16 now? I mean, other than that minute change that is
17 over there dealing with Congressman Walker's district
18 and Alma Adams'. That's the only change we're looking
19 at? There's nothing else embedded in these documents
20 that would do anything different?
21 REP. LEWIS: No, sir. There's nothing else
22 embedded. And yes, sir, that is the only change.
23 SEN. MCKISSICK: Thank you, sir.
24 SEN. RUCHO: All right. No, additional
25 questions?

**58**

1   On the amendment that has been put forward by
2   Senator Rucho and explained by Representative Lewis --
3   Honorary Senator Lewis, he'll want to be.
4       Members of the committee, you have before you
5   an amendment on Senate Bill 2, has been explained,
6   discussed.  And all in favor of adopting the amendment
7   on Senate Bill 2, we are going to do it on a roll call
8   vote.
9       Clerk, would you please go ahead through the
10  roster.
11      CLERK:  Senator Rucho.
12      SEN. RUCHO:  Aye.
13      CLERK:  Rucho, aye.
14      Apodaca.
15      SEN. APODACA:  Aye.
16      CLERK:  Apodaca, aye.
17      Barefoot.
18      SEN. BAREFOOT:  Aye.
19      CLERK:  Barefoot, aye.
20      Blue.
21      SEN. BLUE:  No.
22      CLERK:  Blue, no.
23      Brown.
24      SEN. BROWN:  Aye.
25      CLERK:  Brown, aye.

**59**

1       Clark.
2       SEN. CLARK:  No.
3       CLERK:  Clark, no.
4       Harrington.
5       SEN. HARRINGTON:  Aye.
6       CLERK:  Harrington, aye.
7       Hise.
8       SEN. HISE:  Aye.
9       CLERK:  Hise, aye.
10      Jackson.
11      SEN. JACKSON:  Aye.
12      CLERK:  Jackson, aye.
13      Lee.
14      SEN. LEE:  Aye.
15      CLERK:  Lee, aye.
16      McKissick.
17      SEN. MCKISSICK:  No.
18      CLERK:  McKissick, no.
19      Randleman.
20      SEN. RANDLEMAN:  Aye.
21      CLERK:  Randleman, aye.
22      Sanderson.
23      SEN. SANDERSON:  Aye.
24      CLERK:  Sanderson, aye.
25      Smith.

**60**

1       SEN. SMITH:  No.
2       CLERK:  Smith, no.
3       Smith-Ingram.
4       Ford.
5       SEN. FORD:  No.
6       CLERK:  Ford, no.
7       Wade.
8       SEN. WADE:  Aye.
9       CLERK:  Wade, aye.
10      Wells.
11      SEN. WELLS:  Aye.
12      CLERK:  Wells, aye.
13      SEN. RUCHO:  The motion to adopt the amendment
14  passed 12 to 5.
15      Now -- all right, any other additional
16  questions or comments regarding the bill that we have
17  before us as amended?  Seeing none, Senator Apodaca.
18      SEN. APODACA:  Mr. Chairman, I move that we
19  give Senate Bill 2 a favorable report as amended
20  enrolled into a PCS.
21      SEN. RUCHO:  Members of the committee, you have
22  Senate Bill 2 as amended to be given a favorable report
23  enrolled into a new committee substitute and
24  unfavorable to the original bill.  That is the motion
25  you have before you.  Any questions?

**61**

1       Seeing none, would you take the roll, please?
2       CLERK:  Rucho.
3       SEN. RUCHO:  Aye.
4       CLERK:  Rucho, aye.
5       Apodaca.
6       SEN. APODACA:  Aye.
7       CLERK:  Apodaca, aye.
8       Barefoot.
9       SEN. BAREFOOT:  Aye.
10      CLERK:  Barefoot, aye.
11      Blue.
12      SEN. BLUE:  No.
13      CLERK:  Blue, no.
14      Brown.
15      SEN. BROWN:  Aye.
16      CLERK:  Brown, aye.
17      Clark.
18      SEN. CLARK:  No.
19      CLERK:  Clark, no.
20      Harrington.
21      SEN. HARRINGTON:  Aye.
22      CLERK:  Harrington, aye.
23      Hise.
24      SEN. HISE:  Aye.
25      CLERK:  Hise, aye.

62

1  Jackson.
2  SEN. JACKSON: Aye.
3  CLERK: Jackson, aye.
4  Lee.
5  SEN. LEE: Aye.
6  CLERK: Lee, aye.
7  McKissick.
8  SEN. MCKISSICK: No.
9  CLERK: McKissick, no.
10 Randleman.
11 SEN. RANDLEMAN: Aye.
12 CLERK: Randleman, aye.
13 Sanderson.
14 SEN. SANDERSON: Aye.
15 CLERK: Sanderson, aye.
16 Smith.
17 SEN. SMITH: No.
18 CLERK: Smith, no.
19 Smith-Ingram.
20 Waddell -- sorry, Ford.
21 SEN. FORD: No.
22 CLERK: Ford, no.
23 Wade.
24 SEN. WADE: Aye.
25 CLERK: Wade, aye.

63

1  Wells.
2  SEN. WELLS: Aye.
3  CLERK: Wells, aye.
4  SEN. RUCHO: Members of the committee, the
5  motion from Senator Apodaca to adopt Senate Bill 2 as
6  amended enrolled into a new PCS and unfavorable to the
7  original bill passed 12 to 5.
8      Members of the committee, that concludes our
9  business, and we will be -- I'm sure it will be going
10 to the floor. So I assume we have through -- I think
11 2:00 was the starting time for the session, just for
12 you're information. And that concludes this meeting,
13 and thank you for you're attention.
14 (THE PROCEEDINGS IN THIS MATTER CONCLUDED AT 1:05 P.M.)
15
16
17
18
19
20
21
22
23
24
25

64

STATE OF NORTH CAROLINA
COUNTY OF WAKE
CERTIFICATE

I, Rachel L. Hammond, a Notary Public in and for the State of North Carolina duly commissioned and authorized to administer oaths and to take and certify hearings, do hereby certify that on February 18, 2016, this hearing was held before me at the time and place aforesaid, that all parties were present as represented, and that the record as set forth in the preceding 63 pages represents a true and accurate transcript of the proceedings to the best of my ability and understanding.

IN WITNESS WHEREOF, I have hereto set my hand, this the 25th day of February, 2016.

_____
Notary Public

Rachel L. Hammond
Notary Number
201126500152