**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**NO. 1:13-CV-00949**

|  |  |
|---|---|
| DAVID HARRIS and CHRISTINE BOWSER, | |
| Plaintiffs, | |
| v. | |
| PATRICK MCCRORY, in his capacity as Governor of North Carolina; NORTH CAROLINA STATE BOARD OF ELECTIONS; and JOSHUA HOWARD, in his capacity as the Chairman of the North Carolina State Board of Elections, | **PLAINTIFFS' REPLY IN SUPPORT OF OBJECTIONS AND MEMORANDUM OF LAW REGARDING REMEDIAL REDISTRICTING PLAN** |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT .................................................................................................... 3

      A.    The Court Has Authority and Responsibility to Review the Entire Plan .............. 3

      B.    The New Plan Fails to Cure the Racial Gerrymander .......................................... 5

            1.    The Actual Criteria Applied for the New Plan Remain a Mystery ........... 5

            2.    Willful Ignorance of Race Does Not Cure the Racial Gerrymander ......... 7

            3.    Defendants Fail to Address the Objections Raised by Plaintiffs ............. 10

      C.    In the Alternative, the New Plan Should Be Rejected As an
            Unconstitutional Partisan Gerrymander ............................................................ 13

      D.    Plaintiffs Are Not Required to Offer an Alternative Plan ................................... 19

III.  CONCLUSION ............................................................................................... 20

- i -

# I.    INTRODUCTION

Defendants offer the Court a decidedly awkward proposition. On the one hand, Defendants suggest that the Court take at face value the assurances of the New Plan's architects that the same mapdrawer who secretly drew the original racial gerrymander did *not* consider race in secretly drawing new district lines. On the other hand, Defendants ask the Court to find that those same architects did not mean what they said when they promised the New Plan "would be a political gerrymander," claiming the new plan "is not a gerrymander of any kind." At the risk of stating the obvious, the propositions do not fit neatly together.

For starters, the Court rejected Defendants' assurances with respect to the original plan. The revised "assurance" is no more trustworthy. Moreover, the architects of the new remedial map explicitly set out to draw a partisan gerrymander as one of its official criteria, and did precisely that. It defies belief that Defendants would now stand before this Court in wide-eyed innocence and attempt to deny what is perfectly obvious. The effort is perhaps more telling than intended.

Contrary to Defendants' assertion that Plaintiffs failed to identify with specificity the basis for their objections, Plaintiffs detailed their objections at great length. Specifically, as to race, Plaintiffs argued that the General Assembly's "remedy" was founded on a fundamental misunderstanding of the violation, ECF No. 154-1 ("Pls.' Objections") at 21-26, dices up African-American voters from CDs 1 and 12 across the remaining districts, *id.* at 27, targets African-American Representative Alma Adams, *id.* at 26-27, and carves up minority populations in the Piedmont region, *id.* at 27-28, so as to

cement the injury inflicted by the original racial gerrymander. Defendants essentially ignore these objections, arguing instead that the General Assembly obeyed this Court's directive by engaging in race-blind redistricting, while simultaneously defending the plan as a boon for minority voters, notwithstanding the General Assembly's refusal to engage in any analysis of racial voting patterns whatsoever.

As to politics, Plaintiffs drew upon the unequivocal and unapologetic statements of the Plan's architects to argue that the New Plan is an unconstitutional partisan gerrymander, with the intent and effect of entrenching and maximizing the Republican advantage achieved as a result of the original racial gerrymander. Pls.' Objections at 30-39. Remarkably, Defendants do not even acknowledge this striking legislative history, arguing instead that the plan exhibits partisan neutrality, notwithstanding the architects' repeated and explicit assertions to the contrary.

Defendants take umbrage at Plaintiffs' "broadside attack" on the General Assembly's New Plan, but fail to acknowledge that Plaintiffs challenge the New Plan in its entirety because the *entire plan* is infected by—and manifests—the General Assembly's impermissible purposes. In short, instead of refuting Plaintiffs' objections, Defendants simply duck and weave in the hope the Court will be too wary of its jurisdiction—and too weary at the thought of adopting its own remedy—to fully scrutinize the New Plan.

This Court should not lend its imprimatur to a remedial plan that refuses to remedy the injury inflicted by the original racial gerrymander and that unabashedly seeks to replace one unconstitutional districting scheme with another.

## II.   ARGUMENT

### A.   The Court Has Authority and Responsibility to Review the Entire Plan

Defendants contend that the Court "is limited to CDs 1 and 12 and plaintiffs' racial gerrymandering claims" in reviewing the New Plan. ECF No. 159 ("Response") at 22. But Defendants' attempt to shield the flaws in the New Plan from judicial review is unavailing. Contrary to Defendants' suggestion, the Court's hands are not tied against reviewing—and rejecting—the General Assembly's unconstitutional remedial plan.

Defendants claim that *Upham v. Seamon*, 456 U.S. 37 (1982), forecloses the Court from evaluating the constitutionality of districts other than CDs 1 and 12 or the New Plan as a whole. *Upham* says nothing of the sort, and in no way gives the General Assembly a free pass to enact an unconstitutional plan simply because it did so as a purported remedy to the original violation. Rather, *Upham* held that when *a court* undertakes the task of drawing a remedial plan, it should not "intrude upon state policy any more than necessary" by redrawing districts unaffected by the constitutional violation. *Id.* at 42 (citation omitted).[1] Nothing in *Upham* bars a district court from reviewing a remedial plan *enacted by a legislature* to determine whether it complies with constitutional and statutory requirements. On the contrary, *Upham* confirmed the well-established rule that remedial plans are necessarily limited by the "substantive constitutional and statutory standards to which such state plans are subject." *Id.* Similarly, in *McGhee v. Granville,*

---

[1] In *Personhuballah v. Alcorn*, No. 3:13CV678, 2016 WL 93849 (E.D. Va. Jan. 7, 2016), the three-judge panel properly applied *Upham* in adopting a remedial map after the legislature failed to enact a remedy of its own. *See id.* at *7 ("[W]e conclude that to best balance the need to remedy the *Shaw* violation with the deference otherwise due to the General Assembly's redistricting choices, our chosen remedial plan should not alter any districts outside of the Third District and those abutting it, but may make substantial changes to those districts.").

- 3 -

*N.C.*, 860 F.2d 110 (4th Cir. 1988), the Fourth Circuit rejected a court-drawn remedial plan for its wholesale (and unwarranted) reconfiguration of the county's election system, but reinforced the district court's responsibility to "consider whether the proffered remedial plan is legally unacceptable because it violates *anew* constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *Id.* at 115 (emphasis added). In other words, while a court must not overreach when fashioning a remedy of its own, it must determine whether the legislative remedy enacted at its behest is in fact a lawful substitute for the original unconstitutional plan. *See Wilson v. Jones*, 130 F. Supp. 2d 1315, 1322 (S.D. Ala. 2000), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000) ("When . . . the districting plan is offered as a replacement for one invalidated by the court and will be implemented solely by virtue of the court's power, the court has an independent duty to assess its constitutionality[.]").

Defendants' suggestion that the New Plan is immune from judicial review is not only contrary to the law, it defies common sense. Under Defendants' view, the General Assembly could, for instance, racially gerrymander CD 4, grossly malapportion population in CDs 2 through 11, and openly declare an intent to discriminate against minorities statewide—and the Court would have no choice but to sign off on these blatant constitutional violations. Adopting Defendants' position would invite state legislatures to slap together patently unlawful remedial plans with confidence that any statutory or constitutional flaws are inoculated from judicial review for at least another election cycle.

Plaintiffs have prevailed on the merits of this case, and the Court plainly has jurisdiction to consider whether the map passed by the General Assembly is an effective remedy for the racial gerrymander found by the Court. While the Court must defer to legitimate policy choices of the state in adopting a remedial plan of its own, it must not permit the state to defy the Constitution under the guise of legislative policy. Defendants' suggestion that the Court's review of the New Plan is hamstrung by the original violations of the original unconstitutional plan, giving the General Assembly free rein to draw an unlawful remedy, would render this Court's remedial proceedings a sham.[2]

## B. The New Plan Fails to Cure the Racial Gerrymander

Even if the Court's review of the remedy were limited to the four corners of its Memorandum Opinion, the General Assembly's approach to race in drawing the New Plan flouts that Opinion and the equal protection principles on which it is based.

### 1. The Actual Criteria Applied for the New Plan Remain a Mystery

As an initial matter, Defendants contend that Plaintiffs have "conce[ded]" that "race was not a factor, much less the predominant factor, in drawing any of the districts" in the New Plan. Response at 26. Plaintiffs concede no such thing. In fact, Plaintiffs have offered a host of reasons the Court should be skeptical of Defendants' claim that race was not considered in drawing district lines, just as it was the last time that Defendants offered such assurances to the Court. *See* Opinion at 42-43. The New Plan was drawn by the same mapdrawer who drew the original unconstitutional plan with the same

---

[2] Defendants would elevate form over substance and encourage judicial inefficiency. Of course, Plaintiffs could not challenge the New Plan at the time they filed their lawsuit because it did not exist at the time. It is equally absurd to suggest that the Court is powerless to address constitutional flaws in the remedial plan *it ordered* absent an entirely new lawsuit.

knowledge of North Carolina's racial demographics on the same personal computers shielded from public scrutiny based once again on secretive oral instructions of the same architects who once again assure the Court that race was a not a factor. *See* Pls.' Objections at 18-21. The process hardly inspires trust.

Defendants' Response Brief sheds little additional light. Dr. Hofeller admittedly developed "conceptual maps" on his personal computers prior to the General Assembly hearing public testimony or adopting the criteria that supposedly governed the New Plan, and those "concepts" remain stashed in a black box. Response at 8. Defendants baldly state, without any citation whatsoever, that the General Assembly "incorporated" feedback from the public "to the extent possible," *id.* at 2, leaving both Plaintiffs and the Court to wonder how, if at all, this was accomplished. Indeed, Plaintiffs submit that it would be extraordinary indeed if a map "conceptually" drawn *before* that public testimony was offered, purportedly based on criteria that ignore the bulk of that testimony, somehow is premised on that public testimony.[3]

The General Assembly's development of the New Plan behind closed doors, compounded by Defendants' refusal to disclose any details about the process, reflects yet another attempt to stonewall this Court's remedial review by concealing the actual map-drawing process from scrutiny.

---

[3] Defendants hardly dispute that the General Assembly flatly ignored the public feedback on drawing district lines to favor the political party in power. *See* Pls.' Objections at 6 n.2.

## 2.    Willful Ignorance of Race Does Not Cure the Racial Gerrymander

But even if the General Assembly did turn a blind eye to race in drawing the New Plan, this Court should hardly countenance the legislature's wholesale refusal to consider race in drawing a "remedy" to a racial gerrymander. Defendants echo the General Assembly's fundamental misunderstanding of the Court's Opinion with respect to race in North Carolina. *See* Pls.' Objections at 21-26; Response at 5-6, 16. At no point did this Court find an absence of racially polarized voting in North Carolina; instead it responded to the *State's* arguments on strict scrutiny, where the *State* had the burden of proof to justify the packing of African-American voters in CDs 1 and 12 in service of a mechanical racial threshold. *See* Opinion at 53-57. Indeed, Defendants' suggestion that the only alternative to an unsubstantiated racial quota is the *absence of race* as a consideration altogether, Response at 4-5, distorts, rather than respects, this Court's Opinion. Defendants' contention that the Court *invited* the General Assembly to disregard race underscores the extent to which the New Plan is premised on a warped conception of the original violation.

In lieu of an actual analysis of racial voting patterns, Defendants cobble together a misleading post-hoc evaluation of minority opportunities. Although race purportedly was "not considered in the construction of the 2016 districts," Defendants marvel in retrospect at the supposedly happy circumstances in which minority voters would find themselves under the New Plan. Response at 19. But Defendants' suggestion that the New Plan is a boon for minority voters is plainly absurd, as demonstrated by the paltry evidence they offer in support. Indeed, where the General Assembly expressly declared that ten districts

are engineered to elect the political party widely opposed by African-American voters in North Carolina, Defendants cannot credibly claim that those ten districts provide African-American voters *any*—much less meaningful— opportunity to elect their candidates of choice.

First, Defendants point to a blog post from "a prominent Democratic consultant" to contend that "districts [apparently of any kind anywhere in the State regardless of the extent of crossover or racially polarized voting] with a BVAP of 20% or higher have performed as districts in which Democratic candidates can be competitive." *Id.* The blog post itself includes no citation for this assertion; indeed, it goes on to muse that "[a]t some point, that changed." ECF No. 159-19 at 2. Needless to say, the unsupported assertions of a political commentator do not even hint at, let alone establish, a minority opportunity district. Indeed, if blog commentary were all that were needed as evidence, Plaintiffs could drop at the Court's doorstep a mountain of proof that the New Plan is both a racial and political gerrymander of the highest order.

Nor does Defendants' reliance on Dr. Lichtman's affidavits from the *Dickson* case help their cause. Defendants' ironic embrace of Dr. Lichtman's conclusions stands in stark contrast to the State's strident (and successful) opposition to his testimony in *Dickson*. *See, e.g.*, Defendants-Appellees' Brief at 89, *Dickson v. Rucho*, No. 201PA12-2 (N.C. Dec. 9, 2013) (listing purported deficiencies in Dr. Lichtman's analysis). In any event, Dr. Lichtman's conclusion with respect to North Carolina congressional districts simply echoes the argument advanced by Plaintiffs: it is not necessary to create majority-minority congressional districts in the areas encompassed by enacted CDs 1 and 12 in

order to maintain minority voting strength. *See* ECF No. 159-11 at 3-4. Dr. Lichtman further opines that congressional districts with 40%+ BVAP provide African-American voters an ability to elect their candidates of choice, *id.*, but he draws no conclusions about minority opportunities in a congressional district with a BVAP in the mid-30% range, as in new CD 12.[4]

Defendants further misrepresent Dr. Lichtman's analysis to pretend that African-American voters will enjoy newfound voting opportunities in districts with even lower BVAPs. Defendants' suggestion that a congressional district with a BVAP as low as 21.1% provides African-American voters an opportunity to elect their candidates of choice, *id.* at 20, is drawn from Dr. Lichtman's analysis of a single *state senate* district, ECF No. 159-11 at 11; Defendants can muster no evidence that a congressional district with a BVAP this low would provide any viable opportunity for minority voters. Indeed, where Defendants once argued that African-American voters need to comprise over 50% of a congressional district in order to elect their candidates of choice (an argument they presumably will continue to advance on appeal), *see* ECF No. 110 at 46, 50, their unsupported assertion that a 20% BVAP district is good enough rings more than a little hollow.

Ultimately, Defendants' haphazard reliance upon numbers thrown out by a political blogger and an expert in another case analyzing another plan only highlights

---

[4] Even if new CDs 1 and 12 provide an ability to elect minority candidates of choice, that hardly establishes a cure to the racial gerrymander. Indeed, the original unconstitutional districts provided this same opportunity. The constitutional injury lay in the packing of African-American voters in these districts so as to "reduce those voters' influence in other districts." Opinion at 16.

their blind devotion to mechanical racial percentages to the exclusion of actual, district-specific analyses of racial voting patterns. The General Assembly's continued refusal to engage in a functional analysis of race in either drawing or assessing the impact of the New Plan dooms the New Plan just as it did the enacted plan.

### 3. Defendants Fail to Address the Objections Raised by Plaintiffs

Plaintiffs objected that the New Plan replaces the original "fragmentation" of African-American voters through packing in two districts with a new fragmentation of African-American voters through dispersion across ten districts. Pls.' Objections at 28-29. Instead of addressing this actual objection, Defendants resort to creating, and then attacking, two straw man arguments.

First, Defendants contend that Plaintiffs' citation to Virginia's remedial process advocates in favor of trading "one alleged quota for another quota," excoriating the Virginia three-judge court for "adopt[ing] a racial quota" in remedying the racial gerrymander of that state's third congressional district. Response at 27-28 (claiming "the Virginia mapdrawer adopted a quota of 'somewhat above 40%'"). Defendants' characterization of the Virginia court's opinion is simply wrong, as even a cursory examination of the opinion reveals. The remedial plan in that case was "guided by the neutral goals of compactness, contiguity, and avoiding unnecessary city or county splits, *rather than any racial considerations*." *Personhuballah*, 2016 WL 93849, at *6 (emphasis added). "The BVAP of the *neutrally drawn* Third District was 45.3%." *Id.* (emphasis added). The mapdrawer then conducted a functional analysis to determine that a BVAP "'somewhat above' 40% would preserve African-American voters' ability to

elect the representative of their choice in the Third District," and therefore concluded there was "no need" to increase the BVAP in service of minority voting rights. *Id.* Rather than employing a racial quota, the Virginia court adopted a constitutional remedy by pursuing neutral goals and then engaging in a studied analysis of racial voting patterns. This is a far cry from the General Assembly's remedial process here, in which the mapdrawers purportedly plugged their ears and closed their eyes to race in arriving at a New Plan that *just happens* to perpetuate the effects of the original racial gerrymander.

Second, Defendants contend that Plaintiffs request the Court "to recognize an 'influence' claim on behalf of African Americans in the 2016 Congressional Plan." Response at 30. Plaintiffs do no such thing. Plaintiffs' objections are based not on an entitlement to influence districts, but rather on the profound lengths to which the General Assembly went in order to *avoid* the natural consequences of unpacking CDs 1 and 12, which would be greater minority influence in surrounding districts. *See* Pls.' Objections at 29-30. The original unconstitutional plan used race to suppress minority influence in as many congressional districts as possible; the new unconstitutional plan uses the race-based goals achieved in 2011 to further drown out minority influence in 2016. "In other words, by purposefully locking in place the same result as the racial gerrymander struck down by this Court, the General Assembly sought and managed to *not remedy* the constitutional harm to Plaintiffs and hundreds of thousands of other African-American voters in North Carolina." *Id.* at 30.

Defendants barely dispute, moreover, that African-American Representative Alma Adams is uniquely affected by the New Plan, arguing only that she is "the only

incumbent Member of Congress residing in" new CD 13. Response at 29. This may be true, but Defendants notably neglect to mention that new CD 13 has been specifically designed to defeat her as part of the General Assembly's predetermined goal to enact a plan that will elect "10 Republicans and 3 Democrats." ECF No. 155 at 145.

Finally, Defendants provide no explanation whatsoever for the General Assembly's decision to split apart Guilford County and then further split Guilford from Forsythe County, fracturing the African-American community therein. *See* Pls.' Objections at 27-28. Defendants are quick to highlight the New Plan's relative improvements in compactness and political subdivision splits. But not only does general adherence to traditional districting principles not inoculate a plan from gerrymandering challenges, *see Miller v. Johnson*, 515 U.S. 900, 915 (1995) (racial gerrymandering plaintiffs "are neither confined in their proof to evidence regarding the district's geometry and makeup nor required to make a threshold showing of bizarreness"), Defendants' self-congratulatory extolling of the decrease in split counties conveniently elides over this glaring split to the detriment of African-American voters.

This Court should not endorse the General Assembly's misguided approach to race in its purported "remedy" to the racial gerrymander. The New Plan unpacks minority voters only to scatter them across the state, ensuring the same result on minority influence as under the original unconstitutional plan. However else one might describe this plan, it is hardly "remedial." Plaintiffs urge the Court to reject it on that basis.

**C.      In the Alternative, the New Plan Should Be Rejected As an Unconstitutional Partisan Gerrymander**

Alternatively, the Court should reject the plan as an impermissible political gerrymander. Remarkably, Defendants argue, with a straight face, that the New Plan "is not a 'political gerrymander.'" Response at 33; *see also id.* ("The new plan is not a gerrymander of any kind: the map speaks for itself."). But maps, of course, cannot speak for themselves, and the Plan's architect spoke quite candidly for it, "acknowledg[ing] freely that *this would be a political gerrymander.*" ECF No. 155 at 103 (emphasis added). Representative Lewis could not have been clearer about his goal in this regard: "[W]e want to make clear that we . . . are going to use political data in drawing this map. It is to gain partisan advantage on the map. I want that criteria to be clearly stated and understood. . . . *I'm making clear that our intent is to use . . . the political data we have to our partisan advantage.*" *Id.* at 106.[5] Defendants airily wave away these repeated and explicit concessions that the New Plan was drawn for political advantage, refusing to so much as acknowledge, let alone try to explain away, the unequivocal statements of the Plan's architect. The undisputed legislative record—and Defendants' efforts to avoid it—speaks volumes. *See Page v. Virginia State Bd. of Elections*, 2015 WL 3604029, at *10 (E.D. Va. June 5, 2015) ("Unlike the dissent, we deem it appropriate to accept the explanation of the legislation's author as to its purpose.").

---

[5] The General Assembly heard this message loud and clear. *See id.* at 210-11 (Sen. Jackson: "[W]e know the map is politically gerrymandered because Representative Lewis told us so. Debating whether the map is politically gerrymandered is like debating the moon landing. It happened.").

Indeed, far from confronting the statements of the Plan's architect, Defendants embark on a strategy of obfuscation, hoping to distract the Court from the admitted goals and consequences of the New Plan. First, Defendants argue that Plaintiffs "mischaracterize[e] the criteria adopted by defendants to comply with the Court's order." Response at 36. In fact, Plaintiffs' opening brief quotes the General Assembly's "Partisan Advantage" criterion *verbatim*. Pls.' Objections at 33-34. The Court would be hard-pressed to find a more brazen example of intent to partisan gerrymander than a written rule, officially adopted by the legislature, mandating that districts be drawn to elect no fewer than ten Republicans, the will of the voters notwithstanding. Defendants emphasize that this criterion merely calls for "reasonable efforts" to gerrymander districts to Republican advantage. Response at 36. In suggesting that "reasonable efforts" means something other than "ensured success," it is *Defendants* who mischaracterize the political advantage criterion. Representative Lewis was specifically asked what was meant by "reasonable efforts": "So it would be your contention, then, that making reasonable efforts would not include violating any of the other criteria that we have passed?" ECF No. 155 at 112. Lewis's response was unequivocal: "Absolutely." *Id.* In other words, a 10-3 Republican advantage would result no matter what.

The other criteria, meanwhile, were specifically designed to give way to this overarching goal. *See id.* at 146 ("Division of counties shall only be made for reasons of equalizing population, consideration of incumbency *and political impact*.") (emphasis added). Indeed, Defendants' contention that any Republican advantage is simply a "natural[]" byproduct of preserving whole counties, Response at 18, 37, fundamentally

- 14 -

ignores that the General Assembly specifically permitted county splits in service of partisan advantage. In fact, the Plan's architect admitted outright that the county split observed in CD 1 was necessitated by "political concerns." ECF No. 155 at 153. And given the General Assembly's utter disregard for preserving the boundaries of major (Democrat- and African-American-heavy) cities such as Charlotte, Greensboro, and Raleigh, it is hardly surprising that the architects refused to adopt a proposed criterion that would have avoided those splits. *Id.* at 133-36. In short, contrary to Defendants' suggestion, the 10-3 Republican advantage—profoundly at odds with North Carolinian voting behavior in congressional races—was neither an accident nor a coincidence. It was the admitted, nonnegotiable goal of the actual mapdrawers.

Defendants next contend that the General Assembly "did not set out to maximize the number of Republicans elected under the congressional plan." Response at 36. This may come as a surprise to Representative Lewis, who engineered the New Plan to achieve a 10-3 Republican advantage "because [he] d[id] not believe it's possible to draw a map with 11 Republicans and two Democrats." ECF No. 155 at 105. Defendants advance in a footnote Senator Berger's (unsupported) belief "that a congressional plan with 11 Republican-leaning districts could be drawn, but [was] not." Response at 15 n.4. But the legislative record does not reflect that Senator Berger either drew or offered a map, directed the mapdrawer, or developed the governing criteria. The man who did stated expressly that maximization of political advantage was his goal.

Even more galling, Defendants purport to rely on "actual statistical facts" to argue that the New Plan is apparently more favorable to Democrats than the mapdrawers

intended. Response at 18-20, 37. One might think upon reading Defendants' brief that the New Plan is nothing short of a *Democratic* gerrymander. But not even the 134-page declaration of the General Assembly's GIS analyst purporting to detail the number of instances in which Democratic candidates might win *statewide* races under the New Plan can obscure the plain and simple fact that the districts were specifically designed to ensure that Democratic *congressional representatives* are limited to three out of thirteen seats, notwithstanding voter demographics in the State. Indeed, the "actual statistical facts" released by the General Assembly alongside the New Plan make plain that the mapdrawers accomplished their avowedly partisan goal. *See* N.C.G.A. 2016 Stat Packs and N.C.G.A. 2016 Report (ten out of 13 districts drawn as majority-Republican, as measured by the percentage of votes cast for Republicans in 27 races in elections conducted between 2004 and 2014, aggregated together).[6]

Defendants' discussion of the number of registered Democrats distributed across Republican-leaning districts, moreover, only proves *Plaintiffs'* point, as it demonstrates the lengths to which the General Assembly had to go in order to draw the 10-3 map, in

---

[6] *Available at* http://www.ncleg.net/GIS/Download/District_Plans/DB_2016/Congress/
CCP16_Corrected/CCP16_Corrected_2011_StatPack.pdf and
http://www.ncleg.net/GIS/Download/District_Plans/ DB_2016/Congress/
CCP16_Corrected/CCP16_Corrected_Reports.pdf (last accessed March 9, 2016).

Case 1:13-cv-00949-WO-JEP    Document 163    Filed 03/15/16    Page 18 of 24

utter defiance of the actual demographics and voting patterns of the State.[7] Similarly, it is hardly surprising that the ten Republican districts are "weaker" for Republicans than they were in the original unconstitutional plan. Response at 12. The General Assembly moved hundreds of thousands of African-American, largely Democratic voters out of CDs 1 and 12, and yet somehow managed to submerge those voters' influence across the state. The General Assembly's preservation of the 10-3 partisan advantage was no easy task, and the efforts it took to entrench this "Partisan Advantage" illustrate precisely how vast this partisan gerrymander is. Indeed, if anything remotely akin to a 10-3 advantage would occur naturally based on traditional redistricting criteria, the General Assembly would not have been forced to adopt a formal written criterion mandating that result.

In short, Defendants' "data-driven" discussion is nothing but smoke and mirrors. There is no credible dispute that the General Assembly accomplished what it set out to do through its "skillful mapmaking." Opinion at 66 (Cogburn, J., concurring) ("Today, modern computer mapping allows for gerrymandering on steroids as political mapmakers can easily identify individual registrations on a house-by-house basis, mapping their way to victory."). The General Assembly purposefully and effectively manipulated district lines to determine electoral outcomes before a single voter casts a ballot. The General Assembly has already announced its unapologetic goal to achieve a 10-3 partisan

---

[7] Defendants' extensive reliance upon voter registration figures to suggest the existence of Democratic opportunities in manifestly Republican districts, Response at 18, is belied by their vigorous opposition to the use of voter registration figures as a predictor of electoral outcomes. *See* ECF No. 108 at 2 (arguing that Plaintiffs' expert's methodology is "unreliable" because it relies on "registration statistics . . . instead of actual election results"; "[E]vidence that 'focuses upon party registration, not upon voting behavior . . . [is] inadequate because registration figures do not accurately predict preference at the polls.'") (quoting *Easley v. Cromartie*, 532 U.S. 234, 244-45 (2001)).

gerrymander, adopted criteria to that effect, and voted along party lines on a plan that achieved the same partisan composition as the original gerrymander. Defendants cannot smooth over the undisputed record by suggesting the General Assembly—historically expert at gerrymandering—somehow fumbled its goal of ensuring maximum "Partisan Advantage."

In their last gasp, Defendants suggest that Plaintiffs advocate "for a political quota based on the statewide share of votes received by Democratic and Republican candidates." Response at 38. Any search for this contention in Plaintiffs' Objections would be in vain. Instead, Plaintiffs argued that, whatever else a partisan gerrymander might be, it most assuredly must include a plan that is "freely" acknowledged to be a partisan gerrymander and was drawn to ensure the maximum "Partisan Advantage" thought possible in contravention of traditional districting principles, voter demographics, and the will of the electorate.[8]

Ultimately, it is telling that despite their original defense of the enacted plan as a partisan gerrymander, the General Assembly's express goal of "Partisan Advantage," and the mapdrawers' proud pronouncement that they purposefully and effectively engineered

---

[8] Defendants point to *Pope v. Blue*, 809 F. Supp. 392 (W.D. N.C. 1992), arguing that if the 1992 plan was not a partisan gerrymander, nothing, not even the 2016 plan, is. Response at 35. Notably, the record in *Pope* is nowhere near as stark as it is here. While the 1992 plan was motivated by incumbency protection, *see* Response at 34; *Bush v. Vera*, 517 U.S. 952, 964 (1996) (recognizing "incumbency protection" as a legitimate state interest in redistricting), the 2016 Plan was expressly motivated by "Partisan Advantage," ECF No. 155 at 145. Moreover, at the time of the alleged Democratic gerrymander in *Pope*, "[r]egistered Democrats outnumber[ed] registered Republicans by a two-to-one ratio," and the alleged gerrymander produced a significant number of safe Republican seats. 809 F. Supp. at 394, 397. In any event, the *Pope* decision was premised on a partisan gerrymandering standard that has since been rejected by the Supreme Court, *Veith v. Jubelirer*, 541 U.S. 267 (2004).

a partisan gerrymander, Defendants now go to great lengths to disavow the notion that partisan goals were the driving force behind the New Plan. If, as Representative Lewis believed, this partisan gerrymander "is not against the law," ECF No. 155 at 103, one would think Defendants would have the courage of their convictions to make that argument before the Court and not just before the General Assembly. Defendants' refusal to champion the cause advanced by the Plan's architects reflects Defendants' understandable discomfort with the unprecedented partisan manipulations of the General Assembly. Where the Plan's architects believed they had unfettered discretion to draw a partisan gerrymander without legal consequence, Defendants' backpedaling tacitly acknowledges that this Plan goes well beyond politics as usual and has crossed into dangerous—and unconstitutional—territory. At bottom, Defendants scramble to paint a picture of partisan neutrality because even they know this Plan, as devised by the actual mapdrawers, impinges on the fundamental right to cast a meaningful ballot and contradicts equal protection principles.

### D.  Plaintiffs Are Not Required to Offer an Alternative Plan

Finally, Defendants argue that Plaintiffs cannot challenge the General Assembly's handiwork unless they offer an alternative plan, Response at 21-22, an argument already rejected by this Court, *see* Opinion at 47. Needless to say, no alternative map is needed to

demonstrate the constitutional deficiencies made apparent by the legislative record and the resulting New Plan.[9]

Indeed, Plaintiffs purposefully do *not* seek to use this Court's remedial proceedings to urge the Court to choose among competing plans. Rather, Plaintiffs instead urge the Court to recognize the multiple grounds on which the New Plan fails to remedy the original constitutional violation and violates anew constitutional principles. Where "the legislative body . . . responds with a legally unacceptable remedy, the responsibility falls on the District Court," not on Plaintiffs, to fashion a constitutional plan. *McGhee*, 860 F.2d at 115. Plaintiffs respectfully urge the Court to embrace that responsibility and move deliberately to fashion and implement an appropriate remedy.

### III.    CONCLUSION

For all of the reasons set forth above and in Plaintiffs' Objections and Memorandum of Law Regarding the Remedial Redistricting Plan, Plaintiffs respectfully request that the Court reject the New Plan and proceed to adopt a lawful congressional plan that fully remedies the constitutional injury inflicted by the original gerrymander.

---

[9] Defendants similarly fault Plaintiffs' supposed "allies" in the General Assembly for refusing to waste taxpayer funds on developing an alternative plan "for the legislature's consideration." Response at 22. There is little doubt this would have been a fool's errand. The General Assembly adopted redistricting criteria on a party line vote one day before the New Plan was released. All proposed amendments to those criteria were rejected out of hand. Democratic legislators had nothing to gain from proposing a plan that would have been rejected because it presumably would not have enshrined the 10-3 Republican advantage, as required by the governing criteria.

Respectfully submitted, this the 15th day of March, 2016.


By: */s/ Kevin J. Hamilton*

   Kevin J. Hamilton
     Washington Bar No. 15648
   William B. Stafford
     Washington Bar No. 39849
   Khamilton@perkinscoie.com
   WStafford@perkinscoie.com
   PERKINS COIE LLP
   1201 Third Avenue, Suite 4800
   Seattle, WA 98101-3099
   Telephone: (206) 359-8741
   Facsimile: (206) 359-9741


   John M. Devaney
     D.C. Bar No. 375465
   Marc E. Elias
     D.C. Bar No. 442007
   Bruce V. Spiva
     D.C. Bar No. 443754
   JDevaney@perkinscoie.com
   MElias@perkinscoie.com
   BSpiva@perkinscoie.com
   PERKINS COIE LLP
   700 Thirteenth Street, N.W., Suite 600
   Washington, D.C. 20005-3960
   Telephone: (202) 654-6200
   Facsimile: (202) 654-6211


   *Attorneys for Plaintiffs*

By: */s/ Edwin M. Speas, Jr.*

   Edwin M. Speas, Jr.
     N.C. State Bar No. 4112
   John W. O'Hale
     N.C. State Bar No. 35895
   Caroline P. Mackie
     N.C. State Bar No. 41512
   espeas@poynerspruill.com
   johale@poynerspruill.com
   cmackie@poynerspruill.com
   POYNER SPRUILL LLP
   P.O. Box 1801 (27602-1801)
   301 Fayetteville St., Suite 1900
   Raleigh, NC 27601
   Telephone: (919) 783-6400
   Facsimile: (919) 783-1075

   *Local Rule 83.1 Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

On March 15th, 2016, I will electronically file the foregoing with the Clerk of

Court using the CM/ECF system, which will then send a notification of such filing (NEF)

to the following:

| | |
|---|---|
| Alexander McC. Peters | Thomas A. Farr |
| Senior Deputy Attorney General | Phillip J. Strach |
| apeters@ncdoj.gov | Michael D. McKnight |
| N.C. Department of Justice | thomas.farr@ogletreedeakins.com |
| P.O. Box 629 | phil.strach@ogletreedeakins.com |
| Raleigh, NC 27602 | michael.mcknight@ogletreedeakins.com |
| Telephone: (919)716-6900 | OGLETREE, DEAKINS, NASH, SMOAK & |
| Facsimile: (919)716-6763 | STEWART. P.C. |
| | 4208 Six Forks Road, Suite 1100 |
| *Counsel for Defendants* | Raleigh, North Carolina 27609 |
| | Telephone: (919)787-9700 |
| | Facsimile: (919)783-9412 |
| | |
| | *Co-counsel for Defendants North* |
| | *Carolina State Board of Elections and* |
| | *Joshua Howard, in his capacity as* |
| | *Chairman of the North Carolina State* |
| | *Board of Elections* |

*/s/ Edwin M. Speas, Jr.*